**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Criminal Case No. 18-CR-00359-REB

UNITED STATES OF AMERICA,

        Plaintiff,

v.

LAWRENCE MARTIN BIRK,

        Defendant.

---

**UNITED STATES' SENTENCING STATEMENT**

---

The United States of America submits the following sentencing statement.

**I.  PROCEDURAL HISTORY**

On July 26, 2018, the grand jury for the District of Colorado returned a one-count indictment charging Defendant with tax evasion [#1]. Defendant was not arrested, but was summonsed to appear in court on August 9 [#3]. He did not show up and the Court issued an arrest warrant [#5]. On September 6, a Park County Sherriff's Deputy, responding to a domestic violence call at Defendant's home, arrested Defendant on the federal warrant. After completing a financial affidavit [#13], he was appointed counsel at his initial appearance [#9].

The parties negotiated a pretrial resolution and scheduled a change of plea hearing [#35, #37] before Defendant changed his mind, and the case proceeded to trial on July 22, 2019 [#39, #82]. After a brief period of deliberation, the jury found Defendant guilty on July 25 [#89-91]. The Court released Defendant pending his

October 30 sentencing, but ordered him to surrender his firearms to the Court within a week.  The Court also, on August 8, ordered Defendant to "show cause why he should continue to be afforded free legal counsel" [#94].

## II. STATEMENT OF FACTS

Defendant has not voluntarily paid federal income tax in over two decades.  *See* Trial Exhibit 17.  He was indicted for tax evasion, insisted on a trial, and took the stand to explain why: "within the boundaries that I believe are set by the Constitution as amended and the applicable Supreme Court decisions early on, it's an indirect tax and must take the form and proper subjects of an indirect tax."  Tr. Trans. 7/24/19 ("Transcript")[1] at 51:7-10.  Responding to his lawyer's final question, Defendant ended his direct examination by testifying that he believed he was not guilty of tax evasion because 1) his legal research gave him "an understanding of the true nature of the income tax," 2) he sincerely believes the tax laws are "misapplied," and 3) he "disagree[s]" with federal courts' interpretation of the 16th Amendment.  *Id.* at 82:4-16.

Defendant was not always a tax defier.  After a few years in the military, he "spent 22 years traveling around the country, working for many brand-name defense contractors," *id.* at 3:17-18, and according to IRS records, he filed returns and paid taxes every year from at least 1988 through 1997.  *See* Trial Exhibit 16.  But when it came time to file his 1998 return, Defendant had a change of heart, the timing of which is curiously aligned with his decision to leave his defense contracting career, where

---

[1] This is the only transcript cited in this statement.  It is attached as Exhibit A.

taxes were automatically withheld from his paycheck, and go into business for himself, where he could control what income information was provided to the IRS. Defendant did not file another tax return until 2005, when he requested over $70,000 in refunds for 1998 and 1999.[2] *See* Trial Exhibit 32. Finally, after years of the IRS telling him to file and pay (and telling him his arguments were frivolous), the IRS sent him a Final Notice of Intent to Levy on July 12, 2006. *See* Trial Exhibit 33.

The threat of levy was the push Defendant needed to call a reputable tax firm to address his tax troubles. *See* Trial Exhibit 70. On August 3, 2006, he walked into the Denver offices of Advanced Tax Solutions ("Advanced Tax"), told them the IRS said he owed over $3 million, and asked for help "in returning to the system." Trial Exhibit 71. Defendant paid Advanced Tax over $10,000 to prepare back tax returns for 1998-2005. *See* Trial Exhibit 75. Defendant claimed he filed these returns "<u>under duress</u>, as the court case [i.e. the lawsuit described in Trial Exhibit 122] is still in progress," in November 2006 and January 2007, noting that his lawsuit might impact his tax liability.[3] These tax returns reported that Defendant owed just over $90,000 plus interest and penalties. *See* Trial Exhibit 92. However, Defendant knew these returns were false because he intentionally failed to tell Advanced Tax about the sizeable retirement

---

[2] These returns, filed July 26, 2005, came just weeks after Defendant's July 7 fax to Appeals Officer Bruce Stork, where he wrote that he would file "all of my back returns," pay all taxes owed "including interest and penalty," and "probably owe[d] some good people at the IRS an apology for [his] past actions in this matter." *See* Trial Exhibit 28.

[3] Defendant's lawsuit had already been dismissed at this point. When he filed these returns, an appeal was pending before the D.C. Circuit. *See* Trial Exhibit 122.

distributions he received in 2000 and 2001—distributions he thought he successfully slipped under the IRS's radar.

## The TAMI Fraud

In May of 2000, Defendant devised an enterprising scheme to evade the payment of federal income taxes on over $400,000 of retirement distributions.  After he started taking money out of his and his wife's retirement accounts, Defendant learned that the custodians of those accounts (financial firms like Merrill Lynch and SalomonSmithBarney) would report the withdrawals to the IRS as taxable distributions and withhold income taxes.  *See, e.g.*, Trial Exhibit 84, Transcript at 100:1-6.  To evade the withholding of income taxes, Defendant created a sham entity that masqueraded as a retirement custodian.  This was a multi-step process.  First, Defendant incorporated Tarryall Asset Management, Inc. ("TAMI") with the Colorado Secretary of State.  *See* Trial Exhibit 121.  Second, he used his newly incorporated entity to apply to the IRS for a federal Employer Identification number ("EIN").  *See* Trial Exhibit 14.  Third, he used that EIN to open a bank account for TAMI at Vectra Bank.  *See* Trial Exhibit 120.  Finally, with the infrastructure in place, Defendant put the scheme to work, running over $400,000 in retirement assets through the TAMI account between May 10, 2000 and August 14, 2001.  *See* Trial Exhibit 131.

On direct examination, Defendant testified that he viewed TAMI as a "conduit" and not a "sham," because "a sham certainly feels like something inappropriate, something bad."  Transcript at 12:4-7.  He went on to say it was not his intention to use TAMI "to hide income from the IRS," but that he "was intending to use it as a conduit to move [his] funds . . . from the custodians into that conduit so that those funds could be

used in Tarryall River Log Homes." *Id.* at 75:17-24.  He then denied using TAMI to defraud the IRS, *id.* at 80:2-5, and denied hiding the taxable distributions from his return preparer, Dale Erikson.  *Id.* at 80:12-14.  Erikson testified that Defendant did not tell him that he withdrew over $400,000 in retirement funds in 2000 and 2001.  Erikson's testimony is corroborated by his contemporaneous notes about TAMI, which say nothing about retirement funds.  *See* Trial Exhibit 93.  Defendant himself admitted that he did not tell Erikson about the distributions because he "honestly believed that was not taxable income."  Transcript at 101:4-12.  Whatever Defendant claims he "honestly believed," he well knew that the IRS would treat such distributions as taxable income and the retirement custodians would withhold income taxes from the distributions.

Defendant dissembled on cross, first claiming that he "*needed* to have a conduit to do those transfers," *id.* at 99:8-10 (emphasis added), but ultimately conceding that he "used TAMI as a way to avoid paying withholding on a tax [he] didn't believe in."  *Id.* at 102:4-7.  Of course, Defendant could have transferred his retirement funds directly into his personal bank accounts or bank accounts for his log home business, but he knew that would be reported to the IRS and taxed.  To evade the payment of income taxes that would have been withheld by his retirement account custodians and paid to the IRS, Defendant incorporated TAMI, a company with a name that sounded like it might plausibly be a custodian of retirement accounts.  He then used TAMI to trick his real retirement custodians into thinking that they were doing a direct rollover to a new retirement custodian, rather than distributing the money to Defendant.

It was a clever scheme, but was ultimately detected by Revenue Agent Paulette Applegate, who testified that she treated it as a distribution, counted it as taxable

income, and applied a 10% early withdrawal penalty because Defendant and his wife were both under 59.5 years old.  Because Defendant did not tell his return preparers about this, his 2000-2001 returns were rejected by the IRS in September 2007.  *See* Trial Exhibit 39.  This rejection came just two months after the District of Columbia Circuit affirmed the dismissal of his lawsuit.  *See* Trial Exhibit 122.

## **Acts of Evasion**

Defendant successfully evaded the payment of taxes for over a decade by placing his money beyond the IRS's reach.  He did this in two ways: using his business bank account to conduct personal financial affairs and keeping that bank account balance low by regularly purchasing official checks.  Shortly after receiving IRS notices of intent to levy, Defendant stopped using his personal bank account and started using his business account instead, even to pay personal expenses.  *See* Transcript at 97:19-25, Trial Exhibit 118.  He did this because he knew the IRS could not, in the ordinary course, seize a business's money to satisfy an individual's tax debt.  To reduce the risk of the IRS levying his business account, Defendant began regularly buying official checks to keep his balance low.  Between 2006 and 2018, he bought over $1.6 million in official checks for the purpose of preventing the "IRS and Colorado Department of Revenue from sweeping [his] account."  Transcript at 98:21-99:1, Trial Exhibit 117.

## **Acts of Defiance**

The United States called 14 witnesses at trial, half of which were IRS employees who interacted with Defendant: Revenue Agent Applegate audited Defendant; Revenue Officers Fred Bass (pseudonym), Roseanne Miller, and Jennifer Morgan attempted to collect unpaid taxes from Defendant; and Appeals Officers Bruce Stork, Michael Jeka,

and Thomas Bentley handled Defendant's administrative appeals.  Defendant did not cooperate with any of them and, after his tax returns were rejected and his lawsuit failed, Defendant's defiance ratcheted higher.  In his May 2008 letter to Bentley, Defendant complained of a "blatant judicial conspiracy" and "judicial tyranny," before noting his intention to defy the federal courts' dismissal of his lawsuit: "The results of the lawsuit are disappointing . . . but the <u>refusal of the high court to affirm a fundamental right</u> . . . does not change our position one bit."  Trial Exhibit 51.  After acknowledging the Supreme Court's denial of *certiorari*, he defiantly told Bentley that "even if the IRS had a legitimate claim . . . our Constitutional Right to Petition prevails legally" before declaring his withdrawal of "financial support from this government."  *Id.*

By April 13 2009, Defendant's correspondence turned threatening.  After lamenting "outright collusion" of the courts and his "little chance" of prevailing "in a court of law," Defendant demanded a response from his congressman:  "If we don't hear from you in this matter, the die will be cast, and we will prepare to defend ourselves, and our property, in accordance with our solemn Oath.  It is our Right as a sovereign people. No Answers, No Taxes."  *Id.*  The next day, he wrote to Revenue Officer Miller, who testified at trial, demanding she "cease and desist any and all collection actions" and "release all 'notices of federal tax liens'."  *Id.*  In addition to references to defending himself and his property "by whatever means are necessary," Defendant also wrote that getting his way is "[t]he only non-violent option remaining."  *Id.*

In an attempt to minimize the impact of these letters on the jury, Defendant testified that his reference to "[t]he only nonviolent option remaining" was an homage to the Second Amendment.  Although he claimed he was not "personally threatening

violence," his testimony left little assurance of that. *Id.* at 65:1-20. During cross examination, Defendant essentially acknowledged that his letters were threatening, saying "The frustration was probably showing in any correspondence by then." *Id.* at 90:10-13. His testimony that he would forgive Revenue Officer Morgan for not showing up at his house alone after he sent that letter is undercut by what Defendant actually did at the time—complained to the Park County Sheriff about the armed escort that accompanied Ms. Morgan when she went to serve Defendant with papers regarding the seizure of his land.

### Defendant's False Testimony at Trial

Unable to offer a non-constitutional good faith defense, or an innocent explanation for the TAMI fraud, Defendant gave materially false testimony on these points.

Willfulness was the only element in dispute at trial, making his goal in testifying clear: demonstrating that he misunderstood the law. Defendant knew what he had to do because he studied jury instructions in prior cases, and understood that it was his subjective understanding that mattered. *See id.* at 124:19-20. He also understood that believing the law was unconstitutional was not a defense. *See id.* at 124:24-125:8. While his mission was clear, Defendant was faced with an insurmountable dilemma, because the trial evidence was replete with his claims that the tax system was unconstitutional. But having insisted on a trial, he was not going to take the stand just to admit that his objections were constitutional in nature, because he knew the Court would tell the jury that was not a defense. So he stuck to his constitutional opinions about the law, while falsely insisting that he believed the law was constitutional.

Defendant's testimony at trial, like his previous correspondence with the IRS, made it clear that his issue with the tax system was constitutional. In fact, when his lawyer first asked him to explain his understanding of the law, Defendant began by talking about "constitutional boundaries," "direct taxes and indirect taxes," and saying "I believe that the current tax that is imposed upon our income is, in fact, an unapportioned direct tax." *Id.* at 7:23-8:16.[4]  Notwithstanding, he was sufficiently prepared to give the "correct" answer that would preserve his legal defense: "I don't believe it's a constitutional problem." *See id.* at 11:3-15. He went on to say "I believe the tax code is absolutely constitutional." *Id.* at 56:7. This testimony was false. It was also crucial to his defense—practically the *only* material issue in dispute at trial—and Defendant understood that. He willfully gave false testimony.

Defendant also lied about the TAMI fraud. On direct, he testified that he never hid anything from his return preparer, Dale Erikson, and that he did not create TAMI as a "device to hide income from the IRS." *Id.* at 75:5-6, 75:17-20. Instead, he claimed that he created TAMI and did not tell Erikson about the distributions because he did not

---

[4] Defendant's strong views about the Constitution permeated his testimony and extend beyond the constitutionality of the income tax and proper ratification of the 16th Amendment. He testified about numerous amendments and voiced particularized constitutional objections, including to the filing of tax returns (on Fifth Amendment grounds, *id.* at 53:3-24), IRS collection enforcement and third-party summonses (Fourth Amendment, 57:17-23), and government pressure on USA Today regarding a tax defier advertisement sponsored by the We The People Foundation (First Amendment, 69:20-70:6). There is also, of course, Defendant's view that the positioning of the first two amendments suggests that if the government does not respond to petitions for redress of grievance (end of First Amendment), and the Courts do not require them to do so, the Second Amendment provides the remedy. *Id.* at 65:6-20.

Case No. 1:18-cr-00359-REB   Document 95   filed 08/23/19   USDC Colorado   pg 10 of 17

P a g e | **10**

consider them to be "taxable income." *Id.* at 77:15-18, 80:2-14. But according to his other testimony, he did not believe *any* of his income was taxable. Yet he told Erikson about that other income because, as he testified, he understood from his first meeting with the owner of Advanced Tax that they would not entertain his frivolous tax positions and "would prepare those returns to the best of their ability in accordance with the rules as they understood them." *Id.* at 10-17.

The real reason Defendant did not tell Erikson about the TAMI fraud was because he thought he could get away with it—he knew there was no paper trail. Since he created TAMI to make his distributions appear as direct rollovers, the former custodians did not report the payments to the IRS on Forms 1099, as they would with a distribution. On cross, Defendant admitted that he gave Erikson such 1099s and understood that those factored into the tax preparation. *Id.* at 100:20-24. He further testified that in failing to tell Erikson about the over $400,000 in distributions: "I was not intending to mislead him. I honestly believed that was not taxable income." *Id.* at 101:4-12. Defendant said that he understood that the CPAs at Advanced Tax "were going to apply the rules as they understood them," *id.* at 109:6-8, which is why he told them about the distributions he knew they would know about—the ones that resulted in the issuance of Forms 1099. Ultimately, during cross-examination, Defendant admitted to the fraud itself, testifying that he "used TAMI as a way to avoid paying withholding on a tax [he] didn't believe in." I*d.* at 102:5-7. Accordingly, Defendant lied when he told the jury and the Court that he did not mislead Erikson or intend to defraud the IRS.

### III. SENTENCING CONSIDERATIONS

Defendant was convicted of tax evasion, in violation of 26 U.S.C. § 7201. The maximum statutory penalties for tax evasion are five years in prison, a $250,000 fine, or both, three years of supervised release, and a $100 special assessment.

**A. Guidelines Calculation**

The applicable guideline in a tax evasion case is USSG § 2T1.1.

*1. Tax loss*

The first step in determining the defendant's sentence is to "correctly calculate the applicable sentencing range. As a matter of administration and to secure nationwide consistency, the United States Sentencing Guidelines should be the starting point and the initial benchmark." *United States v. Roy*, 704 F.3d 1307, 1315 (10th Cir. 2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). Indeed, a correct calculation is "the natural starting point from which the sentencing court exercises its discretion under section 3553(a)." *United States v. Kieffer*, 681 F.3d 1143, 1164-65 (10th Cir. 2012).

Revenue Agent Mary Trabold, who testified as an expert at trial, has preliminarily estimated the tax loss at $3,882,416. The figures for 1998, 1999, 2004 and 2005 are based on the Forms 1040, which were prepared by Advanced Tax and filed by Defendant in November 2006 and January 2007 ($135,771). The figures for 2000-2003 are based on the audit of Revenue Agent Paulette Applegate, who also testified at trial ($2,610,600). The figures for 2006-2011 are based on the audit of a Revenue Agent who did not testify at trial, Cindy Russell ($994,757). The figures for 2012-2018, which

were not previously audited, are based on Revenue Agent Trabold's analysis of Defendant's bank records ($142,288).

Defendant attempted to defeat the payment of over $3.5 million in taxes, interest, and penalties, leading to a Base Offense level of 24.  *See* USSG §§ 2T1.1(a)(1), 2T4.1(J).  The tax loss is "the total amount of loss that was the object of the offense (*i.e.*, the loss that would have resulted had the offense been successfully completed)."  Section 2T1.1(c)(1).  It includes both charged conduct (tax loss from 1998-2005) and relevant conduct (tax loss from 2006-2018).  *See* USSG §§ 1B1.3, 2T1.1 comment. (n.2) ("All conduct violating the tax laws should be considered . . . unless the evidence demonstrates that the conduct is clearly unrelated.").  Here, Defendant has been consistently evading payment of tax since he dropped out of the system in 1998.  He has not paid a single dollar since then.  Therefore, relevant conduct includes tax loss from 1998 until the present.

Tax loss includes interest and penalties for the crime of which Defendant was convicted, "willful evasion of payment cases under 26 U.S.C. § 7201."  USSG § 2T1.1 comment. (n.1).  The rationale for including interest and penalties in evasion of payment and willful failure to pay cases is that the avoidance of paying interest and penalties is part of the object of the offense.  *See United States v. Black*, 815 F.3d 1048, 1052 (7th Cir. 2016) ("[I]f the object of the offense is to avoid the tax, penalties, and interest, then penalties and interest should be included in the tax loss.").

Over many years, through his interaction with and correspondence from numerous IRS employees, Defendant was repeatedly informed of his unpaid liabilities, which included taxes, interest, and penalties.  In his 2009 letter to Congressman

Lamborn, Defendant acknowledged that the IRS was seeking to collect over $2.1 million.  *See* Trial Exhibit 51.  As of January 2012, Revenue Officer Morgan sent Defendant a letter noting that he owed nearly $2.4 million, just for 1998-2005.  *See* Trial Exhibit 54.  It should not be any surprise to Defendant that the inclusion of 2006-2018, as well as years of additional compounding, has resulted in a tax loss of over $3.5 million.  Unsurprisingly, given Defendant's multi-decade evasion, the interest and penalties constitute a majority of the tax loss in this case.

### 2. Sophisticated Means

Section 2T1.1(b)(2) provides that "if the offense involved sophisticated means" the offense level should be increased by two-levels.  Sophisticated means is "especially intricate offense conduct pertaining to the execution or concealment of an offense.  Conduct such as *hiding assets or transactions, or both, through the use of fictitious entities, corporate shells*, or offshore financial accounts ordinarily indicates sophisticated means."  USSG § 2T1.1 comment. (n.5) (emphasis added), *see also United States v. Vernon*, 814 F.3d 1091, 1107 (10th Cir. 2016) (enhancement affirmed for use of "sham" company).  Whether it is a "sham" or a "conduit," TAMI had no genuine business purpose, making it what the Guidelines refer to as a "fictitious entity" or "corporate shell."  The TAMI fraud was a sophisticated, multi-step process that Defendant put into place for the purpose of evading the payment of taxes that would otherwise have been withheld by his retirement account custodians and paid to the IRS.

### 3. Obstruction of Justice

The Supreme Court has held that when a defendant perjures himself or herself on the stand, enhancing the defendant's offense level for obstruction of justice is

warranted.  *See United States v. Dunnigan*, 507 U.S. 87, 96 (1993).  Noting that "not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury," the Supreme Court has held that the sentencing court must be satisfied that the inaccurate testimony was not due to confusion, mistake, or faulty memory.  *Id.* at 95. Therefore, in applying the obstruction enhancement for a defendant's perjury, the trial court must make findings on the record that encompass all of the factual predicates for a finding of perjury.  *Id.*  Under *Dunnigan*, the following is required to sustain a finding of perjury in support of a § 3C1.1 enhancement: (1) the giving of false testimony (2) concerning a material matter (3) with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory. *See also United States v. Mounkes*, 204 F.3d 1024, 1028-30 (10th Cir. 2000) (noting that the district court should identify the testimony found to be perjured so the review court does not have to speculate).

An obstruction enhancement is also appropriate for providing materially false information to judge or magistrate judge, or to a probation officer in respect to an investigation for the court.  USSG § 3C1.1 comment. (n.4(F)) and (n.4(H)).  Information is "material" when, if believed, it would "tend to influence or affect the issue under determination."  *Id.* comment. (n.5).  The government does not know what Defendant wrote in his CJA 23 financial affidavit, but notes that those statements were made under

penalty of perjury. To the extent they were materially false, they may serve as a basis for an enhancement at sentencing.[5]

Even putting aside any materially false statements on his CJA 23 financial affidavit, Defendant's trial testimony, as described *supra*, was sufficiently false to warrant a two-level enhancement for obstruction of justice.

With a Base Offense Level of 24, a two-level enhancement for sophisticated means and a two-level enhancement for obstruction of justice, Defendant's Total Offense Level is 28. Assuming Defendant has no criminal history, the advisory sentencing guidelines range would be 78-97 months, which is far over the statutory maximum of 60 months, and a fine of between $25,000 and $250,000.

**B. Restitution**

Restitution is not mandatory in tax cases, but it may be ordered as a condition of supervised release. *See* 18 U.S.C. §§ 3563(b), 3583(d). USSG § 5E1.1(a)(2) provides that, in the case of an identifiable victim, the court "shall . . . impose a term of probation or supervised release with a condition requiring restitution for the full amount of the victim's loss" so long as the offense meets the criteria for an order of restitution under 18 U.S.C. § 3663(a)(1). Unlike the tax loss for purposes of calculating the base offense level, restitution is limited to the offense of conviction. Additionally, although restitution

---

[5] Defendant testified he had "probably $50,000 . . . in liquid assets" and estimated his home, "which is paid for [is] probably worth 3 or 400K." Defendant defined "liquid assets" as "cash, other liquid kinds of assets that you could sell. I've got some machinery that I kept from the business that has some value, motor vehicles, just liquid assets. If I needed money, I could go sell something." Transcript at 85:18-86:10.

may include interest in an evasion of payment case, it should not include penalties. The restitution figure, which will be based on the tax loss for 1998-2005, has not been calculated yet, but it will exceed $2 million.

Respectfully submitted this 23rd day of August, 2019.

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

By: /s/ *Christopher Magnani*

ELIZABETH C. HADDEN
Assistant Chief
CHRISTOPHER MAGNANI
Trial Attorney
U.S. Department of Justice, Tax Division
150 M Street, NE
Washington, DC 20002
Tel: (202) 514-5189
Fax: (202) 514-9623
elizabeth.c.hadden@usdoj.gov
christopher.magnani@usdoj.gov

Attorneys for the United States

## **CERTIFICATE OF SERVICE**

        I hereby certify that on August 23, 2019 I electronically filed the foregoing with the clerk of court by using the CM/ECF system which will send a notice of electronic filing to the attorneys of record.

                                      */s/ Christopher Magnani*
                                      Christopher Magnani
                                      Trial Attorney
                                      U.S. Department of Justice, Tax Division
                                      150 M Street NE
                                      Washington, DC 20002
                                      Tel: (202) 307-6408
                                      Fax: (202) 514-9623
                                      Email: christopher.magnani@usdoj.gov