IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 18-cr-00359-REB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

LAWRENCE MARTIN BIRK,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
TRIAL TO JURY – DAY 3
TESTIMONY OF LAWRENCE MARTIN BIRK ONLY

_____

        Proceedings before the HONORABLE ROBERT E. BLACKBURN,

Senior Judge, United States District Court for the District of

Colorado, continuing at 8:36 a.m., on the 24th day of July,

2019, in Courtroom A1001, United States Courthouse, Denver,

Colorado.

**A P P E A R A N C E S**

        CHRISTOPHER MICHAEL MAGNANI and ELIZABETH CARYL
HADDEN, Trial Attorneys, U.S. Department of Justice, Tax
Division, 601 D Street, N.W., Washington, DC, 20004 , appearing
for the Government.

        EDWARD HARRIS and Jennifer Lynn Beck, Assistant
Federal Public Defenders, 633 17th Street, 10th Floor, Denver,
Colorado, 80202, appearing for the Defendant.

THERESE LINDBLOM, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1          **P R O C E E D I N G S**

2               (The following excerpt contains the testimony of

3      Lawrence Martin Birk only.)

4                         *    *    *    *    *    *

5               *MR. HARRIS:*  Thank you, Your Honor.

6               The defense would call Mr. Birk.

7               *THE COURT:*  Very well.

8               Mr. Birk, good afternoon.

9               *THE DEFENDANT:*  Good afternoon, sir.

10              *THE COURT:*  If you'll approach my bench, please.

11      That's fine.

12              And if you'll raise your right hand to be sworn.

13      Thank you.

14              May I have your attention in the courtroom.

15          (**LAWRENCE MARTIN BIRK, DEFENDANT'S WITNESS, SWORN**)

16              *THE COURT:*  Thank you.  Please be seated in that

17      witness stand.

18              Mr. Harris, you may inquire.

19              *MR. HARRIS:*  Thank you, Your Honor.

20              *THE COURT:*  You're welcome.

21                          **DIRECT EXAMINATION**

22      *BY MR. HARRIS:*

23      *Q.*  Please state your name and spell your last name.

24      *A.*  Lawrence Martin Birk, B-I-R-K.

25      *Q.*  Mr. Birk, tell the jury a little bit about yourself, just a

Lawrence Martin Birk - Direct

 1   little bit about your background, by way of introduction.

 2   *A.*   Very well.   I'm 65 years old.   I'm married.   My wife's name

 3   is Jean.   We've been married for 27 years.   I have two adult

 4   children, Jason and Erica, from a previous marriage.   They live

 5   in Charlottesville, Virginia.   My daughter works for the

 6   University of Virginia campus police, so this has been an

 7   interesting experience for her.   My son is a chef.

 8          My educational background, I have an undergraduate

 9   degree from Oregon Tech in industrial management.   I have two

10   graduate degrees, both from Colorado Tech, one in management

11   science and one in business administration.

12          I served in the military.   I spent three years in the

13   Army in the early '70s, including a short tour in Vietnam, at

14   the tail end of that.   I then joined the Marine Corps Reserve

15   with intent to become a pilot.   Unfortunately, that did not

16   work out; so I left the military and began a career in the

17   defense industry.   I spent 22 years traveling around the

18   country, working for many brand-name defense contractors.   A

19   lot of interesting programs.

20          I am an ordained minister and an elder in the

21   Evangelical Protestant Church.   And I like to hike the

22   mountains and camp and fish.   And that's pretty much it.

23   *Q.*   Okay.   You mentioned your educational background.   What

24   about currently, are you employed or self-employed?   What's

25   your work status?

Lawrence Martin Birk – Direct

1   A.   Currently, I am retired.   I retired last December and

2   closed my log home business.

3   Q.   And was that Tarryall?

4   A.   Tarryall River Log Homes; correct.

5   Q.   When did you start Tarryall?

6   A.   I initially began in summer of '98.   I became an

7   independent dealer for Honest Abe Log Homes, and I –– when I

8   retired from the defense business in 2000, I became a general

9   contractor and a custom log home builder.

10   Q.   And what was, like, the average sales price of a log home

11   that you would be selling?

12   A.   Well, the kit price that I would purchase from Honest Abe

13   Log Homes usually ran around $40,000 delivered; and then the

14   finished product on the owner's land would typically be a

15   $200,000 project.

16   Q.   And so what was your net?

17   A.   I usually ran about 8 to 10 percent, typically, between the

18   sale of the package and the construction project.

19   Q.   And you mentioned you're retired.   Does that mean that you

20   are no longer running Tarryall?

21   A.   I am no longer running Tarryall.

22   Q.   Why?

23   A.   Well, I have a full dance card right now.   My wife and I

24   like to travel.   We –– my mother lives in Virginia, and she's

25   quite elderly and got some medical issues, so I try to spend as

Lawrence Martin Birk – Direct

1    much time as I can back there.  I have a sister in Texas.  I

2    already mentioned that my kids were in Charlottesville,

3    Virginia.

4    Q.  Okay.

5    A.  That's pretty much what we're doing with our time now.

6    Q.  Now, in your list of educational accomplishments, I don't

7    think you mentioned a law degree.  Are you a lawyer?

8    A.  No, sir.  I am not.

9    Q.  Are you an accountant?

10   A.  I am not.

11   Q.  Do you have any formal training in tax law?

12   A.  No, sir.  I do not.

13   Q.  Have you ever paid income taxes to the federal government?

14   A.  I have.

15   Q.  When?

16   A.  That would have started with my military service in 1973

17   through the first quarter of 2000.

18   Q.  In that long period of time, why were you paying taxes?

19   A.  Well, I, like a lot of Americans, believed that we were

20   required to do so.  I had never even looked at the tax code.

21   Q.  And at some point did you stop paying taxes?

22   A.  Yes, I did.

23   Q.  Why?

24   A.  The journey began when I was in graduate school in 1998 --

25   '97, actually, is when I started my MBA program.  And I was in

Lawrence Martin Birk – Direct

1    a business law class, and there was a discussion one night

2    between the professor and one of the students about the tax

3    code, which got my interest.  And there was some follow-on

4    discussions before that class ended, and I started doing my own

5    research.

6    Q.  And we'll talk a little bit more about that in a moment.

7    But just to sort of close the loop on that chronology, you paid

8    taxes, you stopped paying taxes.  Do you intend at any point to

9    pay any taxes again?

10   A.  I believe that may become necessary.

11   Q.  And are you against paying the federal income taxes under

12   any and all circumstances?

13   A.  No, I am not.

14   Q.  Do you believe that taxes serve any valid purpose?

15   A.  Oh, yes.  Absolutely.

16   Q.  Elaborate.

17   A.  Well, the government is very large.  And it has large

18   revenue requirements, our military, our social programs, the

19   day-to-day operation of the government, this courthouse, for

20   example, and everybody who is in it.

21   Q.  And anything else as to that?

22   A.  We obviously have a lot of expenses.  We have foreign

23   programs that we support; we have a lot of issues on our border

24   right now that require attention.  There is a lot of revenue

25   requirements, and I fully appreciate that.

Lawrence Martin Birk - Direct

1        MR. HARRIS:  Ms. Roberson, could you activate us if we

2   aren't?

3        COURTROOM DEPUTY:  You are.  I just have the jury

4   blanked.

5        MR. HARRIS:  Great.

6        Mr. Cohen, could you pull up Government Exhibit 20.

7   BY MR. HARRIS:

8   Q.  Mr. Birk, taking a look at what's already admitted,

9   Government Exhibit 20, just reacquaint us with what that

10  appears to be.

11       And, by the way, if it's easier for you to look on the

12  screen or in the notebook, either one is fine.

13  A.  I can see the screen just fine.

14       That's much better.  I don't need my glasses for that.

15  Okay.  Okay.

16  Q.  So walk us through, what is that?

17  A.  It's a letter in response to correspondence that I sent to

18  the IRS telling me that the federal tax laws are passed by

19  Congress, signed by the President, the role of the Internal

20  Revenue Service for administering those tax laws.

21  Q.  Okay.  I'm going to ask you some specific questions about

22  it.

23       Mr. Cohen, if you could zoom in on the second full

24  paragraph -- I'm sorry.  The other -- that.  Yeah.

25       So federal tax laws are passed by Congress and signed

Lawrence Martin Birk - Direct

1  by the President.  Do you agree?

2  *A.*  I agree.

3           *MR. HARRIS:*  And -- we can take that -- zoom it down.

4           There is a sentence there, "while tax collection is

5  not a popular function," if you could find and zoom in on that.

6  It's the second paragraph, the last sentence.  Right around

7  there.

8  *BY MR. HARRIS:*

9  *Q.*  So they tell you that tax collection is not a popular

10  function.  Let's just stop there.  Fair statement?

11  *A.*  Fair statement.

12  *Q.*  It isn't -- it is clearly a necessary one.  Do you agree?

13  *A.*  I agree.

14  *Q.*  Okay.  The government had --

15           You can take that down.

16           The government alleges that you did not pay taxes from

17  roughly 1998 to 2018, or 2000 to 2018; is that, generally

18  speaking, true?

19  *A.*  That is correct.

20  *Q.*  Now, what exactly is your understanding of the law with

21  respect to your duty to pay the taxes that the government says

22  you have not paid?

23  *A.*  My research and my beliefs involve what I call

24  constitutional boundaries that exist that describe the two

25  basic categories of tax, direct taxes and indirect taxes.  And

Lawrence Martin Birk - Direct

1    the Supreme Court ruled often and consistently that any tax

2    levied by the Congress must fall into one of those two

3    categories.  There is not a third.

4    Q.  And to be clear, when you say something like "the Supreme

5    Court ruled" or when you state these things that you believe to

6    be propositions of law, you're stating what you understand the

7    law to be; correct?

8    A.  Absolutely.

9    Q.  Continue, if I interrupted.

10   A.  Okay.  If you look at some of those early Supreme Court

11   decisions, like the *Brushaber* decision, you will see that the

12   Court said that the income tax must be an indirect tax,

13   otherwise it would be an apportioned and direct tax to the

14   states based on their census or population.  And I believe that

15   the current tax that is imposed upon our incomes is, in fact,

16   an unapportioned direct tax.

17          MR. MAGNANI:  Excuse me.  I would just rise, not to

18   object, but to ask the Court for a 105 instruction as to

19   specific cases and propositions of law as explained by the

20   defendant.

21          THE COURT:  At this time?

22          MR. MAGNANI:  Whenever the Court thinks it's

23   appropriate.  I'll defer.

24          THE COURT:  Well, counsel, I look to you to guide the

25   Court either by individual or joint request.

Lawrence Martin Birk – Direct

1          *MR. MAGNANI:*  It would be the --

2          *THE COURT:*  I will grant that request eventually.

3          *MR. MAGNANI:*  All right.

4          *MR. HARRIS:*  With respect to that very brief -- I will

5    not be making that request, but I will not oppose it when made.

6    *BY MR. HARRIS:*

7    *Q.*  Continuing, then.  So what's the -- what's the upshot of

8    all of this?  What's the impact in terms of your payment of

9    taxes?

10   *A.*  I was obviously engaged by the IRS shortly after I ceased

11   filing.  And I was still -- through the first quarter of 2000,

12   still had some corporate income with a W-2 that was being

13   filed.  So what I did was I quit filing, and I quit paying, and

14   the IRS engaged me, and I engaged them back.  We began to

15   correspond.

16   *Q.*  Did you view it as -- give me one moment.

17          Did you view it, as Ms. Trabold characterized it, as a

18   collaborative process?

19   *A.*  I believe it has to be.  Yes.

20   *Q.*  And do you believe there are any categories of income that

21   are subject to federal taxation?

22   *A.*  Absolutely.  I believe that if you have income from the

23   exercise of a federal privilege of any kind -- and a good

24   example of that would be social security income.  It's not

25   disability.  Certainly federal salaries, including our

Lawrence Martin Birk – Direct

1   military, would fall into that category.  It's a privilege to

2   have a government job.  If they pay it, they can tax it.

3   Q.  So to summarize some of what you're saying -- I just want

4   to know -- correct me if I'm wrong -- are you saying that this

5   is a constitutional problem -- it's of a constitutional

6   dimension?  Or are you saying that some taxes apply to some

7   kinds of income and some don't?

8   A.  I don't believe it's a constitutional problem.  I think

9   it's a misapplication of our tax laws problem within the

10  boundaries that I discussed earlier, that the Constitution as

11  amended and a handful of early-on Supreme Court decisions set

12  those boundaries.  I think that most -- as a result of those

13  boundaries, including this unapportioned direct tax issue, most

14  public sector -- or private sector receipts are not taxable

15  income.

16  Q.  Do you believe -- or put somewhat differently, is it your

17  understanding of the law that you have a duty to pay taxes on

18  income from Tarryall Log?

19  A.  No.  Those would be private sector receipts.

20  Q.  Do you believe, or is it your understanding of the law,

21  that there was an obligation to pay tax on moneys flowing

22  through Tarryall Asset Management, Inc.?

23  A.  No.  Those were private funds that were being transferred

24  from one entity to another and eventually used for business

25  purposes.

Lawrence Martin Birk – Direct

1  *Q.*  And we'll talk a little more about that later.  But while

2  we're on it.  You heard Ms. Trabold characterize TAMI -- as she

3  puts it -- as a sham.  Did you view it as a sham?

4  *A.*  No, sir.  I view it as a conduit.

5  *Q.*  What's that distinction you draw between conduit and sham?

6  *A.*  Well, a sham certainly feels like something inappropriate,

7  something bad.

8  *Q.*  Okay.  So let's return, then, to the beginning.  How did it

9  come to pass that you stopped paying taxes?  In other words,

10  what first draw your attention?

11  *A.*  Well, I talked about the business law class.  That got me

12  started in doing some research on my own.  And by that time,

13  the internet was still somewhat in its early phases, but it was

14  up and running.  I had access through the college.  And the

15  other thing that was going on during at the time were the IRS

16  abuse Congressional hearings at the tail end of the Clinton

17  administration.  And I believe that was discussed earlier by

18  the government witness, including the restructure and reform

19  act.

20       So I went from there -- I became aware that there was

21  a tax honesty movement, I'll call it, that existed across this

22  country in different forms, some good and some bad.  And I

23  eventually found my way to the We the People Foundation for

24  Constitutional Education.

25  *Q.*  And with respect to what your professor told you, did you

1   simply rely on what he said, or did you look further --

2   *A.*  Oh, I absolutely looked further.

3   *Q.*  And you have no attorney-client relation with that

4   individual; correct?

5   *A.*  No.  No.  He was just a professor at the school.

6   *Q.*  You've mentioned We the People.  Were your views influenced

7   to any degree by the teaching of any particular folk?

8   *A.*  Oh, absolutely.

9   *Q.*  For example?

10  *A.*  Just a brief background on that organization.  It was

11  originally set up before I was associated with it as a

12  nonprofit corporation.  Mr. Bob Schulz was the chairman, a

13  rather accomplished *pro se* litigant in his own right.  But the

14  centerpiece of that organization were ex-IRS agents.  Joe

15  Banister, who was a former Special Agent, CID, forensic CPA;

16  John Turner, a former revenue officer; Sherry Jackson, a former

17  revenue agent.  Those folks traveled far and wide addressing

18  groups in seminars and also at meetings in Washington, D.C.

19  *Q.*  And you, at least -- well, how did you come into contact

20  either with them or their work?

21  *A.*  Well, they had a website up; and I began to follow some of

22  their information.  And in 1998, they had a meeting in

23  Washington, D.C. at the National Press Club that I attended.

24  *Q.*  And based on all of that, did you form any impressions

25  about whether they seemed to know what they were talking about,

Lawrence Martin Birk - Direct

1   at least to you?

2   *A.*  Well, I believed that the testimony that was being given by

3   Joe Banister, in particular, at that meeting was compelling and

4   credible.  But I did look into some of the things he said.  He

5   did publish an investigative report that he -- before he went

6   public with it, he ran it up the chain of command at the IRS,

7   which resulted in his resignation -- they were not going to

8   respond to it -- that is now available.  That was probably --

9   if I was going to form a belief, that was probably a pretty

10  good start right there.

11  *Q.*  And, again, as to Mr. Banister specifically, did you simply

12  take his word as gospel --

13  *A.*  Oh, no.

14  *Q.*  -- so to speak?

15  *A.*  No, I don't do that.  I've got two graduate degrees.  I

16  learned how to do research and to form a hypothesis and to

17  collect my data and score it.

18  *Q.*  How much time would you estimate, looking back, that you

19  spent researching these things?

20  *A.*  I think early on, it was maybe an hour, five days a week or

21  so, I would spend -- take time to get on the internet and see

22  what was going on and do a little research.

23  *Q.*  And later?

24  *A.*  As I got more involved with the We the People Foundation,

25  probably going to maybe a couple of hours a day, seven days a

Lawrence Martin Birk – Direct

1  week.

2  *Q.*  Speaking of We the People, do you -- are you still

3  affiliated in any way with them?

4  *A.*  I am not currently.  I would categorize that organization

5  as currently dormant.  They still have a website up, but it has

6  not been touched since I think 2012 or something.  But it's an

7  archive.  It's a good research tool.

8  *Q.*  At various times over the course of your interaction with

9  or relationship with We the People, did you find yourself

10  always in agreement with everything they espoused?

11  *A.*  Oh, no.  Definitely not.  There were things like zero

12  returns and things that I knew were wrong.  I --

13  *Q.*  And how much money would you say you've spent over time in

14  all of these endeavors?

15  *A.*  Well, initially, I became a $50-a-month contributor to the

16  organization.  But surrounding the preparation for given

17  meetings, the need to publish materials and travel and set

18  things up, that started to add up.  Maybe 4 or $500 a month on

19  the average.

20  *Q.*  And in the course of the research that you did, how common

21  was it for you to come across views contrary to your own?

22  *A.*  Oh, using the internet as a search tool, you can find lots

23  of contrary opinions on almost anything, including tax matters.

24  *Q.*  Typically, if you saw a link debunking or claiming that an

25  argument that you believed to be accurate was wrong or

Lawrence Martin Birk - Direct

1   frivolous, what would be your reaction?

2   A.   There -- as I gained experience in the tax honesty

3   movement, we'll call it, I began to generate a short list of

4   people and sites that I felt were not credible.  They were

5   usually trying to sell you something, some kind of silver

6   bullet to try to quit paying taxes.  And that's kind of a

7   glaring example of things that I would avoid.

8          Other sites, particularly academic or law sites, very

9   intriguing reading.  Especially case law.  I hate to admit it,

10  but I enjoy reading case law.

11  Q.   So if you come across a -- well, in the course of your

12  research, did you come across links to government sites or

13  publications such as those that were sent to you claiming that

14  different anti-tax arguments were frivolous?

15  A.   Oh, absolutely.  I spent quite a bit of time on the IRS

16  website.  I still do.

17  Q.   And is it fair to say that some of the interpretations of

18  law on that website differ significantly from your own?

19  A.   Absolutely.

20  Q.   So when that happens, what, if anything, do you do?

21  A.   Well, it's back to trying to form a hypothesis of what the

22  issue is.  And then you go research it, and you try to find

23  out, what are they -- what are the courts saying about it, what

24  is academia saying about it?  There is a plethora of published

25  researchers out there -- once again, some are better than

1    others, but it's worthwhile reading.

2    *Q.*  Let me ask you this -- and I don't mean it in any way to be

3    insulting, but there is not a lot of ways to ask this.  You do

4    realize, don't you, that probably the vast majority of people

5    don't subscribe to your understanding of the law.  Right?

6    *A.*  Yes, sir.  That's correct.  Including my own family.

7    *Q.*  I mean, you do realize that -- I mean, this is a little

8    like Don Quixote tilting at a windmill; right?

9    *A.*  Yes, sir.

10   *Q.*  And yet you persist; right?

11   *A.*  Yes, sir.

12   *Q.*  Why?

13   *A.*  There is a part of me that once I think I've found the

14   truth in a matter, I cannot ignore it any longer.  I persist in

15   researching it, and it just becomes a basis for my belief

16   system.  I can't discard it.  I can't turn a blind eye to it.

17   *Q.*  Is it simply a question of you being a stubborn guy?

18   *A.*  No, not at all.  I don't think anybody that knows me would

19   say I'm a stubborn guy.

20   *Q.*  Do you simply turn a blind eye to any contrary argument?

21   *A.*  No.  That's not my nature.

22   *Q.*  Are you an ostrich?

23   *A.*  I am not.

24   *Q.*  At some point, as we know, the IRS contacted you about

25   nonpayment issues.  Do you remember roughly when that first

Lawrence Martin Birk - Direct

1    occurred?

2    A.   I'm thinking about spring of 2000, maybe, I got my first

3    CP515 letter, which is basically a letter from the IRS that

4    says, I did not get your return.

5    Q.   And at some point, did you try to let the IRS know what you

6    thought the law was concerning tax liabilities?

7    A.   Yes, I did.

8    Q.   How did you do that?

9    A.   Via correspondence, initially.

10   Q.   And, generally speaking, what do you feel the IRS response

11   was to that correspondence?

12   A.   Almost always it was that I was taking a frivolous position

13   and they were not going to address it.

14   Q.   Do you believe that the IRS answered your questions?

15   A.   No.

16   Q.   Let me back up a bit.  So the correspondence -- and we'll

17   talk and look at some of it -- but the correspondence was --

18   that you sent to them, was it in the form of, you know, a

19   manifesto or a series of questions or a little bit of each?

20   A.   Well, certainly, I had questions that I would ask.  A

21   manifesto, I don't think so.  I don't think I would call my

22   beliefs a manifesto.

23   Q.   Okay.  Did they, as far as you could tell, try to rebut

24   your position in any meaningful way?

25   A.   I don't believe so.  Usually what I heard was, my position

Lawrence Martin Birk - Direct

1   was frivolous, that the courts had consistently ruled against

2   these positions, and they weren't answering my specific

3   questions.

4   Q. Did they ever provide you evidence that your view of the

5   law was unfounded?

6   A. Well, they certainly provided me with some information.

7   They would point me to pamphlets or provide them as

8   attachments, and I did read those.

9   Q. And we'll talk about those in some detail.

10         So when they present with you information -- and by

11  "they," I mean the IRS specifically -- when they present that

12  information to you that was contrary to your position, what did

13  you do with that?

14  A. Well, once again, if it was in the form of case law -- I

15  like to read case law -- I would go to look at those decisions.

16  One of the things that I always kind of used as a screening

17  device, it wasn't a Supreme Court case and it was very case

18  specific.  And I would kind of set those aside in a separate

19  category.  Meaningful information.

20  Q. Were you, in fact, willing to discuss your tax liability

21  with the IRS?

22  A. Absolutely.

23  Q. With respect to answers to questions, are you familiar with

24  something called a petition for redress?

25  A. Yes, I am.

Lawrence Martin Birk - Direct

1   *Q.* As it applies here, what are we talking about?

2   *A.* The -- once again, through my association with the We the

3   People Foundation, we decided after a couple of years as

4   individuals and as an association attempting to get the IRS and

5   the Department of Justice to attend a meeting with us to

6   discuss these issues, that they were not going to do that.  So

7   we resorted to our First Amendment right -- the last ten words

8   of the First Amendment -- to petition the government for a

9   redress of grievances.  These petitions were drafted -- the

10  first one was regarding correct application of our federal tax

11  laws, and it was served upon the government.

12  *Q.* Fast forwarding.  That didn't end well; correct?

13  *A.* It did not.

14  *Q.* What happened?

15  *A.* Well, after years of serving petitions for redress -- and

16  it got to be a much bigger matter constitutionally than just

17  federal tax issues, but that's not for this discussion -- but

18  we decided as an association -- and a group of individuals,

19  something over 1400 plaintiffs joined the lawsuit, the right to

20  petition lawsuit, we called it, against the United States

21  government.

22  *Q.* And what happened to that lawsuit eventually?

23  *A.* It was filed in the District Court for the District of

24  Columbia.  And I believe it was Judge Emmet Sullivan had the

25  case.  After about a year, he dismissed the case, stating in

Lawrence Martin Birk – Direct

1    his comments that, sure, we have a right to petition, but the

2    government has no obligation to listen or provide redress.

3    *Q.*  Did it end there?

4    *A.*  It did not.  We appealed that case to the Circuit Court of

5    Appeals for the District of Columbia.

6    *Q.*  And what happened?

7    *A.*  After about nine months, they issued a decision, affirming

8    the lower court decision to dismiss.  The opinion for the Court

9    was written by Judge Kavanaugh, who is now on the Supreme

10   Court, and Judith Rogers.

11   *Q.*  And then what?

12   *A.*  We petitioned the Supreme Court to pick up the case.

13   *Q.*  Did they?

14   *A.*  They did not.

15   *Q.*  So is that the end of it?

16   *A.*  Well, it was the end of that lawsuit, for sure.  I don't

17   believe it's the end of it.  I think the American people need

18   to pick it up through their elected representatives, is the

19   next step.

20   *Q.*  So this petition for redress -- and we'll look at some of

21   that -- but does it contain a bunch of claims about the

22   applicability of tax?

23   *A.*  Not really claims.  It's formatted as a remonstrance, as

24   a --

25   *Q.*  Questions, then?

Lawrence Martin Birk - Direct

1   *A.*   Questions.  I believe there are 60 plus, 62, maybe, in that

2   particular petition on the federal income tax.

3   *Q.*   Do the claims in the petition go beyond the specific

4   understandings of law that you have as to the applicability of

5   income to your business income?

6   *A.*   Oh --

7   *Q.*   In other words, is the petition broader?

8   *A.*   Yeah, it's broader.  There are a number of different issues

9   addressed in there.

10  *Q.*   Do you subscribe to each issue, every single one of them in

11  there?

12  *A.*   No, I don't.

13  *Q.*   Summarize for us what issues in the petition you did

14  subscribe to.

15  *A.*   The first one had to do with the constitutional matter of

16  two types of taxes.

17  *Q.*   Okay.

18  *A.*   That you find in Article I, which is our legislative branch

19  of government.  We have direct taxes -- that's covered in

20  Section 2 and Section 9 of Article I -- and we have indirect

21  taxes in Section 8.

22  *Q.*   Who drafted those portions?

23  *A.*   I helped quite a bit on that particular question.  There

24  were a few other related ones to that same issue that invoked

25  some Supreme Court cases that addressed the issue.

Lawrence Martin Birk - Direct

1    Q.   Okay.  Back to you and the IRS.  How many letters would you

2    guess -- let me put it differently, because I don't want you to

3    guess.

4         Do you have a rough idea of how many letters you sent

5    the IRS over time explaining your position or seeking answers

6    to questions?

7    A.   I would say well over two dozen.

8    Q.   Now, the government's introduced some of them.  Fair to say

9    that's not all two dozen?

10   A.   No.

11   Q.   Let's take another look at Exhibit 20 -- Government Exhibit

12   20.

13        Fourth paragraph, first sentence, if you could zoom

14   that, Mr. Cohen.  The one that begins "there are."

15        "There are people who encourage others to deliberately

16   violate our nation's tax laws."  The IRS is telling you this,

17   huh?

18   A.   Right.

19   Q.   Did that come as news to you?

20   A.   No, sir.

21   Q.   Are you one of those people?

22   A.   I am not.

23   Q.   Do you believe you were deliberately violating tax laws?

24   A.   No, I don't.

25   Q.   Do you consider yourself a tax protester?

1    A.   I do not.

2    Q.   In fact, you even told the IRS as much, that you weren't a

3    tax protester; right?

4    A.   I did.

5         MR. HARRIS:   No. 38, please.

6    BY MR. HARRIS:

7    Q.   This is, of course, already introduced.   But let's

8    familiarize ourselves with it.   What is this?

9    A.   That's a letter from Agent Michael Jeka that was on the

10   witness stand I believe yesterday.   It's a letter of

11   determination.   I think it's below that certified mail receipt.

12   Q.   Okay.

13   A.   That he had received -- "we have reviewed the collection

14   actions," and so on.

15        MR. HARRIS:   Okay.   And let's scroll forward in

16   that -- to the next page, if you would, and the next.   Let's

17   keep going down a little.   Okay.

18   BY MR. HARRIS:

19   Q.   There is a sentence in here -- and I won't bog us down

20   finding it unless Mr. Cohen finds it before I'm done -- that

21   says, "I asked him if he's against the tax system."   Do you

22   remember seeing that at some point?

23   A.   I do.

24   Q.   And then it continues, "Basically, he said that he believes

25   that taxes are needed and that he is willing to pay what is

Lawrence Martin Birk – Direct

1    fair."  And we see that on the screen now.

2         Thank you, Mr. Cohen.

3         Is that true?

4    A.  I --

5    Q.  Well, let me ask that better.  It's a terrible question.

6         Number one, is it true that he asked you if you're

7    against the tax system, to the best of your recall?

8    A.  Yes.

9    Q.  And did you, in fact, say something to the effect of, no, I

10   believe taxes are necessary.  I'm willing to pay what is fair?

11   A.  Yes.  I remember that conversation.

12        MR. HARRIS:  Okay.  You can take that down.

13   BY MR. HARRIS:

14   Q.  The IRS has also said at some point -- well, do you recall

15   at some point getting a letter from the IRS associating with

16   you a group called American Rights Litigator?

17   A.  I do.

18   Q.  Were you ever associated with that group?

19   A.  I had hired them -- they had an attorney on staff and a

20   CPA.  I had hired them to do some consulting and to write some

21   letters for me.

22   Q.  And that's it?

23   A.  That's it.

24   Q.  Let's look again at some correspondence.  And let's again

25   go back to No. 20, which we've looked at already.  But I want

Lawrence Martin Birk - Direct

1    to focus in on the line talking about -- the very first, right

2    after the salutation.  "Dear Mr. Birk," the very next sentence.

3           "This is in reply to your recent correspondence."  So

4    looking at that letter --

5           We can take that down, just zoomed in --

6           Do you believe that letter to be in any meaningful

7    respect responsive to anything you ever sent the IRS?

8    *A.*  No, sir.  I do not.

9    *Q.*  Do you believe -- well, let's look at another thing.

10          Last paragraph before the "sincerely."

11          They're telling you that federal courts have

12   consistently ruled against the arguments you have made.  Do you

13   agree with that?

14   *A.*  I do not.

15   *Q.*  When you read that, what kind of understanding did you come

16   away with of what the IRS meant by that, if any?

17   *A.*  Well, it doesn't use the word "frivolous"; but they end it

18   by saying they're not going to respond to any of my future

19   correspondence.

20   *Q.*  Did you view that as responsive?

21   *A.*  I did not.

22       *MR. HARRIS:*  Okay.  We can take that down.

23   *BY MR. HARRIS:*

24   *Q.*  On February 3 or potentially, February 2 of 2004, did you

25   write to the IRS?

Lawrence Martin Birk – Direct

1    *A.*   I --

2    *Q.*   If you recall?

3    *A.*   I don't recall that specific date.  It's very possible.

4    *Q.*   Okay.  If you could -- and we would like not to publish

5    this one yet -- take a look at Defense Exhibit 1, that

6    Mr. Cohen will put on the screen.

7            Do you see that?

8    *A.*   I do.

9    *Q.*   And does that refresh your recollection as to whether you

10   wrote to them --

11   *A.*   Yes --

12   *Q.*    -- on --

13   *A.*   Yes, it does.

14           *MR. HARRIS:*  Let's go ahead and show that to everyone.

15   *BY MR. HARRIS:*

16   *Q.*   What is that?

17           *MR. HARRIS:*  I believe it's a stipulated exhibit.  If

18   not --

19           *COURTROOM DEPUTY:*  Yes, it is.

20           *THE COURT:*  It's in by stipulation.

21           *MR. HARRIS:*  Yes.

22   *BY MR. HARRIS:*

23   *Q.*   So let's go back to that.  What is that?

24   *A.*   That's a letter from me to Agent Burgman.

25   *Q.*   By the way, did we hear from Agent Burgmann this week?

Lawrence Martin Birk - Direct

1    *A.*   No, we did not.

2    *Q.*   So does that letter contain some of your questions to the

3    IRS?

4    *A.*   Let me take a moment, here.

5          Well, using tax avoidance transactions -- let's see,

6    things that I've been accused of.  I stand by my statement

7    there, I've done nothing with American Rights Litigators that

8    I'm aware of that is abusive or unlawful.  And to set the

9    record straight, it talks about, there is no such thing as an

10   abusive tax avoidance scheme, as tax avoidance is perfectly

11   legal.  And I give a cite there.

12         Once again, that's refers to the nature of the income

13   tax, which I believe the Supreme Court says very clearly is an

14   indirect tax.  An indirect tax can be avoided.

15   *Q.*   Let me direct your attention to a couple of passages.  Last

16   full paragraph on that page.

17         So in there you say that -- with respect to the 2003

18   return, you say, "I am a firm believer in the rule of law" and

19   that you haven't found a requirement for you or your wife to

20   file; right?

21   *A.*   Right.

22   *Q.*   Then you ask them to be so kind as to send the statute and

23   implementing reg requiring the filing of a specific return;

24   correct?

25   *A.*   Correct.

Lawrence Martin Birk - Direct

1   Q.  So what did you mean by that?  What was your intention in

2   asking them to do that?

3   A.  Well, I believe -- back to my primary belief I have.  I

4   believe that the income tax is an indirect tax.  It's a form

5   and -- with proper subjects of an indirect tax -- what the

6   Supreme Court called it -- and as such, I should be able to

7   find in the tax code, as we do with many other kinds of

8   indirect taxes, the specific taxable source activity I'm

9   involved in, what the tax applies to, and how much it is.

10  Q.  Did they ever send you what you asked them to send you?

11  A.  They did not.

12      MR. HARRIS:  If we could zoom out and go to the next

13  page.  Zoom in on the 1 through 4 bullet points.

14  BY MR. HARRIS:

15  Q.  What are those?

16  A.  These are specific questions that I asked the IRS.

17  Q.  Did you ever get answers?

18  A.  I did not.

19  Q.  The first question, what -- to the extent that it may

20  require any explanation, what does it mean?  What did you mean?

21  A.  When you search the tax code for a specific definition of

22  taxable source activities that you may be involved in, thereby

23  incurring a tax liability, that's the section that comes up.

24  Q.  And so why did you ask them about that?

25  A.  I wanted them to verify for me that that's what I'm

1   supposed to use to determine my taxable domestic income.

2   Q.  Why did you think they -- well, let me back up.  Did you

3   think they'd answer?

4   A.  I -- I believed they would.

5   Q.  Did you hope they would answer?

6   A.  It was my expectation.  Yes.

7   Q.  Why did you think they'd answer you?

8   A.  Well, you asked earlier about a collaborative effort.  I

9   believe that our government should answer our questions in good

10  faith and public and in a timely manner and allow us to work

11  together on these things, not accuse me of being frivolous.

12  Q.  Looking at No. 2 on that list, what did you mean?

13  A.  Once again, this talks about domestic income.  If a U.S.

14  citizen lives and works exclusively in the 50 states and

15  receives all of their income -- I don't have any foreign

16  income -- does that section show that income to be taxable?

17  And there is a list there.

18  Q.  Question 3, what did you mean?

19  A.  That specific one -- and I put it in parenthesis -- items

20  of income they receive.  I give examples, compensation,

21  interest, rents, et cetera, are they excluded for federal

22  income tax purposes?  If they're not on that list, are they

23  then excluded, was the point of the question.

24  Q.  Let me ask you this because, you know, some people might

25  think -- they have different take-aways.  To ask them all of

1   this stuff -- but you know there are laws; right?

2   A.   Yes.

3   Q.   I mean, are you just kind of jerking them around?

4   A.   No, I don't think so.  I think they're legitimate

5   questions.  They're very detailed questions.

6   Q.   And questions as to which you had hoped and expected

7   legitimate responses?

8   A.   Absolutely.

9   Q.   Quality responses?

10   A.   Yes.

11   Q.   Question No. 4, what did you mean by that?

12   A.   The purpose of the list of non-exempt income found at that

13   particular cite and why is the domestic income of most

14   Americans not on that list?  I think that's a valid question,

15   such as the income I have with my log home business.  That's

16   not on that list.

17   Q.   Okay.  Let's take a look at government 23.

18        What is that?

19   A.   Okay.  There we go.  Much better, thank you.

20        All right.  It's a reply to correspondence of

21   February 3.  "We have determined the arguments you have raised

22   are frivolous and have no basis in law.  Federal courts have

23   consistently ruled" -- we've seen that before.  And I can

24   obtain IRS publications, "Why Do I Have to Pay Taxes," and so

25   on.

Lawrence Martin Birk – Direct

1   Q.   Okay.  So that's what we've now come to lovingly know as a

2   3175 letter; right?

3   A.   Correct.

4   Q.   All right.  Now, they say that in reply to your

5   correspondence of February 3; right?

6   A.   Correct.

7   Q.   As best you can recall, did you ever send them a February 3

8   correspondence?

9   A.   Once again, I can't off the top of my head verify that.

10  Q.   Is it possible?  To the extent that that is a reply to a

11  February 3 correspondence, if you sent one, would you have

12  written anything to them that you would consider this to be

13  responsive to?

14  A.   No.  Once again, it starts out saying that I've raised

15  frivolous arguments, I can obtain publications, the paragraph

16  we've seen before about people who encourage others to violate

17  tax laws.  It's the same.

18  Q.   Okay.  And this is not, certainly, responsive, in your

19  view, to your February 2 correspondence, which we just

20  discussed; correct?

21  A.   Absolutely not.

22  Q.   You know, kind of to put it in the vernacular, it's like a

23  big F-U; right?

24  A.   Correct.

25  Q.   What would you have done if they had actually provided

Lawrence Martin Birk – Direct

1   answers to your questions?

2   *A.*  Well, I think if they had given specific answers, either in

3   correspondence or agreed to meet and provide those answers, I

4   would have taken the effort to research those.  And if they

5   answered my questions, I guess I would have accepted that.

6   *Q.*  Let's take a look at Government Exhibit 43.  What's this?

7   *A.*  Okay.  It's from Agent Bentley -- who I believe we heard

8   from yesterday -- dated 5th of May.  "Received your request for

9   a collection due process hearing," is what it is.

10  *Q.*  Okay.  Now in there, there is an advisement that says

11  they're required to advise you -- let's find that.  That might

12  be on the next page.  Yeah.  Four lines down.

13  *A.*  Okay.  I got it.

14  *Q.*  Here it is a little bigger.

15          So such issues -- refer to such issues.  Let's back up

16  and go up one line.  Let's highlight the first line of that.

17          Did you ever assert to the IRS any argument about tax

18  liability based solely on moral, religious, constitutional,

19  conscientious, or similar grounds?

20  *A.*  Perhaps in the constitutional arena, but not solely.

21  *Q.*  Okay.  And in the constitutional arena, only insofar as it

22  relates to the applicability questions that you've already

23  discussed?

24  *A.*  Right.  Based on the Supreme Court decisions.

25  *Q.*  Okay.  So they're advising you that such issues and any

Lawrence Martin Birk - Direct

1    other frivolous arguments raised -- let's stop there.

2           Frivolous arguments raised, did they ever tell you in

3    any letter which argument you're raising was frivolous or why?

4    A.  No.  I think that's been used consistently as a blanket

5    statement.

6    Q.  In any event, does that admonition in any way describe or

7    address your claims?

8    A.  I believe it does not.

9    Q.  They also write -- let's look at the next paragraph.  "All

10   of the correspondence you have sent to the IRS has been

11   identified as espousing frivolous tax arguments."  Again, your

12   response to that?

13   A.  I believe my questions were absolutely relevant.  And I did

14   try to address some at a due process hearing, and I was told

15   face to face that they weren't going to do that.

16   Q.  Okay.  Let's turn to that question of the due process

17   hearing.

18          Government Exhibit 27, please.  First paragraph after

19   the "Dear Mr. Birk."

20          More of the same?

21   A.  More of the same.

22   Q.  Disagree?

23   A.  I disagree 100 percent.

24   Q.  This time they add some descriptive adjectival language

25   referring to your argument not only as frivolous but

Lawrence Martin Birk – Direct

1   groundless.  Disagree with that?

2   *A.*  I disagree.

3   *Q.*  Does that statement or the letter as a whole appear to

4   address any specific question you raised ever?

5   *A.*  Not that I can see.

6           *MR. HARRIS:*  Okay.  We can take it down.

7           Actually, let's put -- let's put 43 up again.  I just

8   want to make sure we covered it.  Go to the second page.

9           We did.  Let's take it down.

10  *BY MR. HARRIS:*

11  *Q.*  Okay.  Let's take a look at Defendant's Exhibit 2.  What's

12  that?

13  *A.*  This is a letter from me dated February 14, 2005, with a

14  request that this letter and its attachments to be added to the

15  individual master file maintained by the Internal Revenue

16  Service.

17          *MR. HARRIS:*  Okay.  Let's take that down and look at

18  Defense Exhibit 3.

19          And before we -- I just want to make sure with the

20  government, you're fine with this subject to a 105?

21          *MR. MAGNANI:*  3, you say?

22          *MR. HARRIS:*  Yeah.

23          *MR. MAGNANI:*  Yes.

24          *MR. HARRIS:*  Okay.  So that is published.

25

Lawrence Martin Birk – Direct

1  *BY MR. HARRIS:*

2  *Q.*  What is this?

3  *A.*  It's a request from me for a collection due process

4  hearing.

5      *MR. HARRIS:*  Just to be sure that I check off a small

6  or not so small legal box.  I'm moving if it's not already

7  admitted to admit Defendant's Exhibit 2 and 3.

8      *THE COURT:*  They're in by stipulation.  You only get

9  it in once.

10      *MR. HARRIS:*  Okay.  That's fine.

11  *BY MR. HARRIS:*

12  *Q.*  Does this appear to be the letter referred to in

13  Exhibit 27?

14      If we can scroll through, see if we can get a better

15  sense.  Or better yet, let's do this --

16      Can you put up Government Exhibit 27 side by side?

17      And let's -- on Exhibit 3, go to the next page.  Next

18  page after that.  Actually, let's put up Exhibit 2 in place of

19  Exhibit 3.

20      Okay.  So does it appear that Exhibit 2 is the letter

21  referred to in Exhibit 27.  In other words, Exhibit 27 being

22  their acknowledgment of request for a collection due process

23  hearing, and your letter in February being the request.

24  *A.*  I think that's possible.  Although, February to June seems

25  like a long time.  The IRS is usually pretty responsive as far

Lawrence Martin Birk – Direct

1    as replying to requests for CDP hearings.

2    Q.  Okay.  At least as far as timeliness?

3    A.  Timeliness.  Sure.

4    Q.  Okay.  In any event --

5            Let's take down Government Exhibit 26.

6            Does Exhibit 2 lay out your concerns that you were

7    holding at that point about tax payments?

8    A.  The first page does.

9    Q.  And then the second page?

10   A.  Petitions for redress -- let's see where I'm -- to my

11   understanding, there is a larger list of folks --

12   Q.  Yeah.  In fact, maybe it will be easier -- let me break

13   that down a little.

14   A.  Okay.

15           MR. HARRIS:  Let's see.  Go back to the first page,

16   please.  The first paragraph, four lines down, "I have put

17   forth," up to "schemes" or -- maybe a little further is fine.

18   BY MR. HARRIS:

19   Q.  Okay.  You say, "I have put forth many questions regarding

20   the correct application of tax laws."  True?

21   A.  True.

22   Q.  Determination of your taxable income, in other words,

23   questions about it; true?

24   A.  True.

25   Q.  Questions about due process of law; true?

Lawrence Martin Birk – Direct

1    *A.*   True.

2    *Q.*   "IRS has steadfastly refused to answer those questions."

3    True?

4    *A.*   True.

5    *Q.*   IRS has accused you of participating in abusive tax

6    avoidance schemes; true?

7    *A.*   Also true.

8         *MR. HARRIS:*   Okay.   That's take that down and zoom in

9    on this, at some point -- "also of record are four petitions."

10   *BY MR. HARRIS:*

11   *Q.*   When you say "also of record," what did you mean?

12   *A.*   That means they were formally served upon the government,

13   to the Legislative and Executive branches of government in

14   Washington, D.C., and --

15   *Q.*   And the --

16   *A.*   And it went on to talk about the lawsuit that I had joined.

17   *Q.*   And it says there, "In the interest of seeking answers from

18   my servant government," what does that mean?

19   *A.*   Well, I think that's a -- some language that I used -- the

20   government of this country serves by the consent of the people.

21   It says so right in the Constitution, in the Preamble, and

22   that's just a reference to that.   Obviously, I don't consider

23   them servants *per se*, other than I expect the government as a

24   whole to be a servant to the people.

25   *Q.*   Okay.   Let's look at another passage.

Lawrence Martin Birk – Direct

1        Last sentence on that page, "in 1998."

2        "In 1998 I became aware of a substantial incredible

3   body of legal evidence in support of the proposition that the

4   income tax system was fraudulent in its origin."  Let's stop

5   there.

6        Well, fraudulent in its origin.  What's that?

7   A.  Well, a little bit of history here.  In 1894, the Congress

8   passed an income tax act.  It was promptly struck down by the

9   *Pollock* decision in 1895 as being an unapportioned direct tax

10  on property -- on income.  The Supreme Court, I think -- that's

11  a lengthy case.  It covers a lot of different aspects, but

12  that's probably the gist of it right there.  The unapportioned

13  direct tax aspect of the income tax --

14  Q.  Let me ask you, then, if it's fraudulent in its origin,

15  does that mean you felt you could never owe taxes again under

16  any circumstances?

17  A.  Oh, absolutely not.  I was going to carry that thought

18  forward just a little bit.

19  Q.  Okay.  Go right ahead.

20  A.  It's a history lesson.  The 16th Amendment, which started

21  its ratification process in 1910 and ended in February of 1913,

22  when it was declared to be ratified by Philander Knox, then

23  Secretary of State.  There is a body of evidence published

24  by -- entitled "The Law that Never Was" by a man named Bill

25  Benson.  And what he did in the late '70s, early '80s, was

1    visit the state capitals of all 48 states that were in the

2    union at the time and got certified copies of what had actually

3    occurred during the ratification process.  And if you look at

4    that body of evidence, you find out that the process left a lot

5    to be desired.  It did not even come close.  That was -- when I

6    used the term "fraudulent in its origin," that's exactly what

7    I'm referring to.

8    Q.  You say it was limited in its application to most

9    Americans, what does that mean?

10   A.  Yes.  That, again, refers to the two types of taxes that

11   the Constitution authorizes.  The Supreme Court has said it

12   must be an indirect tax; therefore, it must have the form and

13   proper subjects of an indirect tax.  It does not apply to the

14   private sector funds that most Americans earn.  If they work

15   for themselves or a U.S. company, they have no foreign income,

16   no income from a commerce act of Congress of any kind, or a

17   federal privilege is another way to look at that --

18   Q.  Let me interrupt you, if I might.  Where do you believe the

19   legal authority for that statement derives?

20   A.  I think it derives from the Constitution itself, as

21   amended, and that handful of Supreme Court cases that define

22   what the income tax is and what it is not.

23   Q.  Okay.  Well, take a look at the next page of this exhibit.

24        And turning -- actually, further down in that exhibit,

25   another page in.  Highlighting the numbered section.

Lawrence Martin Birk – Direct

1          What is this?

2   A.   That is a group of statements that I'm making regarding my

3   understanding at the time of many different issues surrounding

4   the federal income tax.

5          MR. HARRIS:   Let's zoom back out on that.  And go to

6   the paragraph that begins at "beyond."

7   BY MR. HARRIS:

8   Q.   You respectfully request that someone be prepared to

9   discuss something at the due process hearing.  What were they

10  supposed to be prepared to discuss?  Those statements?

11  A.   That list of statements.

12  Q.   And who was supposed to be prepared to discuss it?

13  A.   Whoever the government was going to provide -- holding that

14  meeting, representing the IRS.

15  Q.   So these are basically, in one form or another, eleven

16  questions that you have for them; correct?

17  A.   Yeah.

18  Q.   And did they ever address those eleven issues with you?

19  A.   No, they -- they will not do that.

20  Q.   When you got to the hearing, did you try to raise those

21  issues?

22  A.   I tried to.  But I was informed right away that those were

23  considered frivolous, and they were not going to discuss it.

24  Q.   By Mr. -- as you knew him, Mr. Bass?  Now we know his real

25  name.

Lawrence Martin Birk – Direct

1   *A.*   Correct.

2   *Q.*   And Mr. Jeka?

3   *A.*   Correct.

4   *Q.*   What happened any time you tried to raise those issues at a

5   hearing?

6   *A.*   Basically brought the meeting to a close.

7          MR. HARRIS:   Okay.   We can take that down.

8   *BY MR. HARRIS:*

9   *Q.*   At some point did the IRS send you a publication, "The

10  Truth About Frivolous Tax Arguments"?

11  *A.*   Yes.

12         MR. HARRIS:   Let's go to Government Exhibit 43 at page

13  92.   Actually -- Government 43.

14  *BY MR. HARRIS:*

15  *Q.*   Is that the document we're talking about?

16  *A.*   That is it.

17         MR. HARRIS:   Okay.   Just flip through to the next

18  page, and the page after, then the page after that.   Okay.   And

19  one more page.

20         So you can take that down.

21  *BY MR. HARRIS:*

22  *Q.*   You actually read that?

23  *A.*   I did.   Still have a copy of it.

24  *Q.*   Okay.   Considered it?

25  *A.*   I did.

Lawrence Martin Birk – Direct

1   *Q.*  Reflected on the possibility that to the extent that it

2   might at some level address some issues, that you might be

3   wrong about stuff?

4   *A.*  I was certainly hopeful of that.  Yes.

5   *Q.*  Why were you hopeful of that?

6   *A.*  Well, at this stage --

7         I forgot the date of the letter we were looking at.

8   2008; is that right?

9   *Q.*  We can pull it up again.

10  *A.*  Yes.  May 5.

11  *Q.*  Okay.

12  *A.*  By this time it had become sort of an arduous journey for

13  me and my wife.  And I was hopeful that we were going to either

14  at a collection due process hearing or perhaps a document like

15  this start to make some progress on this collaborative effort

16  we've been talking about.  And it just didn't answer the mail.

17        *MR. HARRIS:*  Let's go back to that document in

18  Government Exhibit 43, publication.  Let's actually go one page

19  in.  Keep going.  Yeah.  This.  How many -- let's go one more

20  page and one more after that.

21  *BY MR. HARRIS:*

22  *Q.*  So how many pages was that, if you can tell, more or less?

23  *A.*  Fifty-nine, this says.

24  *Q.*  So at least 59?

25  *A.*  Right.

1    *Q.*  Right.  And looking at this, letters A through J; right?

2    *A.*  Right.

3    *Q.*  Each of those letter designations referring to some

4    argument that the Government or the IRS puts forth as

5    frivolous; correct?

6    *A.*  Well, looking at this short list right here, I don't see

7    any position there -- issue that I ever took a position on.

8    *Q.*  Okay.

9    *A.*  Challenging authority of the IRS authorities, no, that's

10   not me.  Unauthorized representatives, no.  And no authority to

11   bring an action, I don't --

12   *Q.*  Okay.

13   *A.*  I've never espoused those beliefs.

14   *Q.*  So there is, like, a dozen subheadings under there?

15   *A.*  Yes.

16   *Q.*  Dozens of potential tax arguments that some people are

17   making, that they're swatting down; right?

18   *A.*  That's what I believe the purpose of this is.

19   *Q.*  Have you ever taken any courses in law?

20   *A.*  No.

21   *Q.*  Are you familiar with the concept called a straw man

22   argument.

23   *A.*  Yes.

24   *Q.*  What is that?

25   *A.*  A straw man, a canned response, a boilerplate, where you

Lawrence Martin Birk – Direct

1    come up with a response to a particular situation -- typically

2    a general response -- and you build that straw man as you go.

3    And then that becomes your response in general to these

4    frivolous arguments.

5    *Q.* Even if what you're responding to isn't what was put forth

6    to you?

7    *A.* Correct.

8    *Q.* And that paradigm, how does this fit in, if at all?

9    *A.* That was sent to me, not as an answer or a specific

10   response to my questions, but, once again, a straw man

11   approach.  Take a look at these frivolous arguments and see if

12   you find something in there that matches what you're -- the

13   position that you've taken, I think is what they're trying to

14   do here.

15   *Q.* Well, let's do that.  Let's match some stuff up.

16            Defense Demonstrative Exhibit No. 10.

17            Now, looking at this, on the left side, what do we

18   see?

19   *A.* Those look like the lists -- from my letter, my February 3

20   letter of '04, some of the items off that list.

21   *Q.* And the bottom --

22         *THE COURT:*  Counsel, excuse me.  We appear to be

23   discussing an exhibit that you have characterized as a

24   demonstrative exhibit without response by the government or

25   approbation by the Court.

Lawrence Martin Birk – Direct

1        MR. MAGNANI:  The Government has no objection.

2        THE COURT:  Very well, then.  Neither do I.  And,

3   thus, Defendant's Exhibit 10 may be used, published, and

4   discussed in the presence of the jury as a demonstrative

5   exhibit only.

6        MR. HARRIS:  And I'll be more careful with respect to

7   the next couple.

8        THE COURT:  I'll help you.

9        MR. HARRIS:  Thanks.

10  BY MR. HARRIS:

11  Q.  So on the left side on the bottom, where it says No. 6.,

12  what's that?

13  A.  It says "The Internal Revenue Code as written does not

14  impose a tax on the income of most Americans who have no

15  foreign income or derive income from federal possessions."

16  Q.  Okay.

17  A.  That's a statement that I made in my letter.

18  Q.  Okay.  And so all of these items on the left side from your

19  letters, generally speaking, fall under the category of a

20  question of what is taxable domestic income; correct?

21  A.  Correct.

22  Q.  What's on the right side?

23  A.  That's from the table of contents, I believe, from the

24  document we just had up.

25  Q.  And do you believe that the right side and the content that

Lawrence Martin Birk – Direct

1    you've reviewed that goes with that table of contents addresses

2    the questions on the left side?

3    A.   Well, I don't believe that.  I don't think I've made a

4    contention that only foreign source income is taxable.

5    Q.   What about wages, tips, other compensation for personal

6    services?

7    A.   Which one is that?  I'm looking for it.

8    Q.   It's the -- it's on the right side.  Contention 1.

9    A.   Okay.  It's not highlighted.  All right.

10   Q.   Yeah.

11   A.   I believe that, once again, you have to look at the source

12   of wages, compensation for services.  And if it's not as a

13   result of the exercise of some federal privilege -- I think I

14   made a statement earlier that I believe that -- if the

15   government pays it, they can tax it, whether it's Social

16   Security or whether you get a salary from the government or the

17   military.  So I don't know that I would embrace that entirely.

18   I think there could be some exceptions to that statement.

19   Q.   Okay.  Back to the highlighted one, foreign source income.

20   So on the left side, when you talk about 861 and domestic

21   income, and income from the 50 states, domestic income again,

22   No. 6, Americans without foreign source income, why -- what's

23   the disconnect between that and what they're replying to?

24   A.   Well --

25   Q.   Purporting to reply to.

Lawrence Martin Birk – Direct

1    A.  Well, I think my statements are asking a specific question.

2         We'll take No. 6, for example.  The Internal Revenue

3    Code as written does not impose a tax on the income of most

4    Americans who have no foreign income or derive income from

5    federal possessions.  It's a partial statement.  I think you

6    can go on to say -- I think I mentioned earlier, income from a

7    commerce act of Congress, for example.  If you mine or drill

8    for oil, if you take commercial pictures in the national forest

9    and derive income from that, that's taxable income, regardless

10   of -- you know, where it is.  If it's a federal privilege,

11   you're going to pay a tax on it.

12        So I think the purpose of No. 6, when I made that

13   statement, I was saying that the way it's written -- once

14   again, I think that the Constitution sets the boundaries for

15   interpreting that -- it's an indirect tax.  And I think if it's

16   not from the exercise of a federal privilege, then it's not

17   taxable income.

18   Q.  Okay.  Now, you reviewed the entirety of Government Exhibit

19   43; correct?

20   A.  I have.  And I still have a copy of it.

21   Q.  And are you prepared if, for example -- I'm not going to do

22   it -- but if the government came up and pointed you to some

23   section of it, to discuss with them why -- or how or whether

24   that answers questions?

25   A.  I would do my best.

Lawrence Martin Birk – Direct

1          MR. HARRIS:  Okay.

2          Your Honor, at this time I would ask to show the jury

3    defense demonstrative Exhibit No. 11.

4          THE COURT:  Response.

5          MR. MAGNANI:  The Government doesn't object to the use

6    of any of defense counsel's demonstrative exhibits, provided

7    they're the ones that the defense has shown us previously.

8          MR. HARRIS:  I promise I've not sneaked in new ones.

9          THE COURT:  Well, as we focus on Defendant's

10   Exhibit 11 for identification, it may be used, published, and

11   discussed in the presence of the jury as a demonstrative

12   exhibit only.

13   BY MR. HARRIS:

14   Q.  So looking at what's now on the screen -- actually, let's

15   go -- let's go back to the other exhibit for a moment.

16          And before we take a look at I think it was 11, I

17   would also seek the Court's leave with respect to Demonstrative

18   9, to show it to the jury.

19          THE COURT:  Same response by the government?

20          MR. MAGNANI:  Yes, Your Honor.

21          THE COURT:  Focusing now on Defendant's Exhibit 9 for

22   identification, it, too, may be used, published, and discussed

23   in the presence of the jury as a demonstrative exhibit only.

24          MR. HARRIS:  Okay.  Let's look at No. 9.

25

Lawrence Martin Birk – Direct

1    *BY MR. HARRIS:*

2    *Q.* Okay.  On the left side, what do we have?

3    *A.* That's from my February 3 letter of 2004.  And it's a

4    statement I made, "As I've been unable to find a requirement in

5    law for me and my wife to file, if you would be so kind as to

6    send me the statute and implementing regulation that requires

7    said filing of a specific tax return, I will promptly send it

8    in."

9    *Q.* And below that?

10   *A.* It says, "In fact, I have looked for such a statute and

11   regulation for the past six years.  What I did find was really

12   interesting."

13   *Q.* And then the next entry, the one with the 11.

14   *A.* "The IRS steadfastly refuses to cite its legal authority to

15   require filing of returns and payment of taxes."

16   *Q.* Okay.  And on the right side, an excerpt from Government

17   43, concerning the voluntary nature of the federal income tax

18   system and whether or not filing is voluntary.  Isn't that

19   synonymous with saying that, you know, you don't have a legal

20   requirement to file if you're saying something is -- you're not

21   required to file it, aren't you, in effect, saying it's

22   voluntary?

23   *A.* I think the -- under the frivolous tax arguments, there are

24   in fact some people out there that would try to get you to

25   believe it is a voluntary act, and they try to reference things

Lawrence Martin Birk – Direct

1  in instructions for tax forms that says, voluntary compliance,

2  et cetera, et cetera.  I do not adhere to that belief.  I

3  believe that the income tax is absolutely mandatory for all of

4  those to whom it applies.

5  Q.  Why do you say you can't find a requirement that you need

6  to file?

7  A.  Once again, within the boundaries that I believe are set by

8  the Constitution as amended and the applicable Supreme Court

9  decisions early on, it's an indirect tax and must take the form

10 and proper subjects of an indirect tax.  And that would mean I

11 need to go look for specific taxable source activity that I am

12 involved in, that I have received income from, then I would be

13 told what kind of forms I've got to file and what kind of tax

14 I've got to pay.

15 Q.  Okay.  We've looked at Demonstrative Exhibit 10.  Let's now

16 look at 11, which we've previously been granted leave to

17 publish.

18          Okay.  On the left-hand side, that shows a question

19 you've asked concerning, where do you look to find out if

20 income is taxable; correct?

21 A.  Correct.

22 Q.  On the right-hand side, there is the contention that

23 certain types of income are not income that are taxable;

24 correct?

25 A.  Yeah.  The wages, tips, and other compensation received for

Lawrence Martin Birk – Direct

1   personal services are not income.

2   *Q.*  All right.

3   *A.*  And I think we addressed that.  I said, certainly some who

4   receive those types of income are involved in a taxable source

5   activity, the exercise of a federal privilege, and they do have

6   to pay a tax --

7   *Q.*  Okay.

8   *A.*  -- and file.

9   *Q.*  And that's not responsive; correct?

10  *A.*  The -- well, the -- without reading what they said there,

11  that's out of the table of contents --

12  *Q.*  Right.

13  *A.*  -- but --

14  *Q.*  As you recall from what you have read of it, you didn't see

15  anything responsive?

16  *A.*  No.  The IRS would refer you to the Internal Revenue Code,

17  where it said -- where it defines gross income and taxable

18  income, it has these lists of classes, types of income, and --

19  but -- nor does it tell you what is the taxable source

20  activity.  If it's an indirect tax, it must take the form and

21  proper subject of an indirect tax.  It needs to tell me, what

22  activity is that?

23         *MR. HARRIS:*  Okay.  I would request leave to publish

24  Demonstrative Exhibits -- Defense Exhibits 12, 13, 14 --

25         *THE COURT:*  Any objection?

Lawrence Martin Birk - Direct

1      MR. MAGNANI:  No objection to any of the

2  demonstratives, Your Honor.

3      THE COURT:  Again focusing on Defendant's Exhibit 12

4  for identification, it, too, may be used, published, and

5  discussed in the presence of the jury as a demonstrative

6  exhibit only.

7  BY MR. HARRIS:

8  Q.  And let's look at that.

9      Okay.  You posit that if you file, you've waived your

10 Fifth Amendment rights.  They reply that taxpayers -- they

11 reply that it's frivolous to say taxpayers don't have to file

12 returns because of Fifth Amendment protections; right?

13 A.  That's what they're saying.

14 Q.  Do you believe that that's responsive -- I mean, is that a

15 match in terms of arguments, at least?

16 A.  Well, the issue of what generated my statement was a case

17 right here in the Tenth District, gentleman by the name of Bill

18 Conklin -- it's an unpublished case, but it's still

19 available -- where the court finally came through and says,

20 well, yeah, that could happen.  Now, I have never taken that

21 position that -- that I believe you're waiving your Fifth

22 Amendment rights.  Pay attention to what it says on the

23 signature block, though, under penalty of perjury.  So if you

24 do file, you better tell the truth.

25 Q.  Okay.  No. 13, if we could look at that.  What's that?

Lawrence Martin Birk - Direct

1    A.  My statement goes back to my commentary on Mr. Benson's

2    evidence, "The Law that Never Was."  I was seeking the

3    government to respond to that.  And what they said -- I don't

4    exactly remember what was said in Paragraph 5 there, but --

5    Q.  Let's take a look --

6    A.  Let's take a look at that.

7    Q.  -- 43, I believe it is.

8         Why don't we do this -- it might be easier to pull

9    that up.  Let's put 13 back up, and then side by side to the

10   other, and we can flip to it quicker.

11        Okay.  So page 31 in the document, on the -- on the --

12   we can take down 13.  If we can go backwards to 31 as it's

13   numbered at the top.

14        Okay.  So we're looking at that.  Let's zoom that in a

15   little.

16        So this is what is on the right side.  This is the

17   content that goes with that table of contents.  Do you view

18   this as responsive to your statement, or do you not?  And why

19   or why not?

20   A.  This particular one provides a lot of good information.  It

21   says that -- references the *Brushaber* case.  I've got to see

22   what is below that.  If we could scroll down a little bit,

23   because I see a name I recognize.  That's the chairman of the

24   We the People Foundation.  Yeah, I remember that tax

25   termination package.  I did not support that.

Lawrence Martin Birk - Direct

1   Q.   Then scrolling down to the case law.

2   A.   Let's keep going.

3   Q.   Okay.

4   A.   A lot of circuit court cases, which is good information.

5   Once again, I would rest upon the evidence as published.  It

6   was provided to every member of Congress from 1983 and the

7   President.  I believe that was Ronald Reagan at the time.

8   Q.   By the way, did you read every one of these cases?

9   A.   No, I didn't read all of them.  I like to read case law,

10  but I just read the highlights on most of these.  Certainly,

11  this one -- if a case refers to another case, like the

12  *Brushaber* case, certainly I would go -- that would get my

13  interest going.  I would look at that one for sure.

14  Q.   Let me ask you about that one, while we're up there.

15          The first case, if we could highlight on that

16  paragraph, number one.

17          So this is a Seventh Circuit case, where they say --

18  they talk about specifically rejecting the argument advanced in

19  "The Law that Never Was"?

20  A.   I do not personally espouse the belief that the 16th

21  Amendment was not ratified, or maybe it was.  I don't think it

22  matters.  The Supreme Court spoke often and consistently in the

23  1916 through about 1929 time frame about what the income tax

24  was and what it was not.  So does it really matter?  It's one

25  of those things.  We've had it for 106 years.  Does it really

1    matter if it wasn't properly ratified at this stage of the

2    game?  If you look at the Supreme Court decisions and what they

3    said the income tax was and what it wasn't, I think it settles

4    the matter.  It creates very clear boundaries on how the tax

5    code should be interpreted.

6    Q.  Okay.

7    A.  And I believe the tax code is absolutely constitutional.

8    Q.  All right.  Let's take that down.

9         And two more, briefly.  Exhibit 14, demonstrative.

10   This is your unapportioned direct tax --

11   A.  Correct.

12   Q.  -- area.  And on the right -- well, let me back up.

13        You said, based on constitutional limits, that most

14   Americans' income can't be taxed in the form of an

15   unapportioned direct tax, those limits being circumscribed by

16   which amendment?

17   A.  It's actually in the body of the Constitution and

18   Article I.  I think I spoke to that earlier.  Talks about the

19   two types of taxes that Congress can levy, direct taxes --

20   which is found in Section 2 and 9 -- which requires the

21   apportionment of a direct tax.  And, basically, that means to

22   the states based on census or population.  And in Section 8 of

23   Article I, the indirect tax.

24   Q.  So your argument isn't premised on the 16th Amendment?

25   A.  No.  I don't -- I'll say it again.  I don't think the 16th

Lawrence Martin Birk – Direct

1    Amendment in and of itself addresses the issue.  The Supreme

2    Court has almost set it aside by saying it did not authorize in

3    Congress any new power to tax.  It did not create a third type

4    of tax.

5    Q.  Okay.  One last area on this, and that would be Exhibit 15.

6    This one a little different, a due process argument.

7           You say a tax system that violates due process is

8    unconstitutional.  Not terribly controversial; right?

9    A.  I don't think so.

10   Q.  And --

11   A.  Anybody would agree with that statement.

12   Q.  Okay.  And they address due process in their exhibit, and

13   they talk about it in the context of collection due process

14   cases.  Right?

15   A.  Yes.

16   Q.  Is that what you mean?

17   A.  I think the reference to collection due process cases is

18   very specific to collection actions by the IRS.  I think that

19   there is potentially other issues -- fourth Amendment issues,

20   primarily -- that sometimes come into play.  Now, there are due

21   process solutions.  For example, if the IRS issues a

22   third-party summons, like they did to my bank, I can go to the

23   court and petition them to quash that summons.  I know other

24   people who have done that.  If you give the court a good reason

25   for it, normally they'll grant that.  I did not see any reason

Lawrence Martin Birk - Direct

1    to do that.  I didn't have anything to hide.  There had been a

2    very thorough discussion of my banking in this court.

3    Q.  Okay.  And we're going to get to that, as well.

4         We can take this down.  Let's take one more look at

5    Exhibit 2.

6         In Exhibit 2 you say, "The federal government cannot

7    tax income within the 50 states."  Let's just find that.  And

8    it might be on the next page, or the page after.  Sorry.

9         It's No. 5.  Did Exhibit 43 address that argument?

10   A.  Oh, boy.  I don't remember off the top of my head.

11   Q.  Well, let me ask you -- go ahead.

12   A.  I do believe what I was talking about here is what we call

13   jurisdictional limitations.  If you look at the Constitution

14   and where the federal government has legal jurisdiction, it --

15   it's varied and far reaching.  Certainly, the District of

16   Columbia and the federal territories, any kind of property

17   where the federal government holds a deed, Army posts, some

18   post offices -- not always.  Sometimes it's a lease.  You've

19   got to be careful.

20        But the relationship I think constitutionally between

21   the federal government and the state speaks for itself, that in

22   many cases, where the government, due to the Ninth and Tenth

23   Amendment limitations -- where it is not specifically granted

24   an enumerated power, it doesn't have.

25   Q.  Okay.

Lawrence Martin Birk – Direct

1   A.   The states or the people retain that.

2   Q.   Okay.  That's what you meant?

3   A.   That's where I was going with this one.

4   Q.   Okay.  All right.

5        Let's look at another exhibit.  Let's take another

6   look at Government 38.  And, specifically, where -- this is

7   just to review and expedite -- a letter from Jeka to you;

8   correct?

9   A.   Correct.

10  Q.   And what -- it says in there on the next page -- sorry, on

11  this page, first page -- something about the 16th Amendment --

12  maybe not.

13  A.   Huh.

14       MR. HARRIS:  Apparently not.  Let's pull that -- let

15  me look at one thing.

16       I just want to confirm, is this 38?

17       Let's take that down.  I'll ask that a different way.

18  BY MR. HARRIS:

19  Q.   At some point you received a notice of determination from

20  the IRS; correct?

21  A.   Correct.

22  Q.   That notice of determination had some discussion in it

23  summarizing your views of the tax system.  Remember, we looked

24  at that a little earlier; right?

25  A.   Correct.

Lawrence Martin Birk – Direct

1  *Q.* And somewhere in there, it was stated by the IRS that you

2  believe the 16th Amendment is fraudulent in origin and that IRS

3  collection actions are actually outside the law.  Do you

4  remember words to that effect?

5  *A.* I believe I do.

6  *Q.* Is that an accurate statement of your understanding of the

7  law?  And you can just answer yes or no.

8  *A.* I would say, yes.

9  *Q.* Okay.  And does that mean that you're unwilling ever to

10  pay?

11  *A.* No.

12  *Q.* Okay.  Let's look at Government 51 now.

13         And this is made up of several pieces.  But this first

14  piece, what is that?

15  *A.* You say the first piece?

16  *Q.* Yeah, just this first page, because it's actually --

17  *A.* Oh.  The whole first page?

18  *Q.* Yeah.

19  *A.* All right.  Copies of correspondence -- and I've got them

20  listed there in my reference list -- to my Congressman.  Let's

21  see here, Agent Bentley, who we saw on the stand --

22  *Q.* Let me direct your attention to the top of the document --

23  *A.* Okay.

24  *Q.* -- subject line.  So this is a letter.  Basically, what's

25  the letter deal with?

Lawrence Martin Birk - Direct

1   A.  I'm requesting -- I've made a demand for release of notice

2   of federal tax liens.

3   Q.  Who is the letter addressed to?

4   A.  It was addressed to Agent Miller.

5        MR. HARRIS:  Let's go to the bottom of the page, and

6   carrying over to the next page -- go up a little.  Okay.

7   "Also, we hereby demand" -- that paragraph, if we could zoom

8   that.

9   BY MR. HARRIS:

10  Q.  So this is you writing.  And you're saying you're demanding

11  the IRS release all notices of tax liens; right?

12  A.  Correct.

13  Q.  Why?

14  A.  Well, it's primarily -- if you look at a federal -- a

15  notice of federal tax lien -- and there may be some folks in

16  here who have seen some -- Paragraph A on the back of that

17  notice is missing.  And I believe that was the paragraph that

18  gives the authority to do what they're doing and who it applies

19  to.  And I address that -- that very topic in my right -- in my

20  petition that I had filed with the government.

21        If you read that missing paragraph, it basically tells

22  you that it only applies to officers and employees of the

23  federal government.  And I said, well, number one, why would

24  they take that out?  And then number two, that's not me.  So

25  I --

Lawrence Martin Birk - Direct

1   *Q.*   Okay.

2   *A.*   That was basically the gist of why I wanted that out.   It

3   also had to do with -- if you look above, I had tried to get a

4   signed verified assessment from the IRS; and I never received

5   one.

6          *MR. HARRIS:*   Okay.   Let's zoom back out.   And moving

7   to what is marked at the bottom as page 731.   It's this letter.

8   Zooming to the top quarter or so of it.

9   *BY MR. HARRIS:*

10  *Q.*   What's that letter, and who is it to?

11  *A.*   That's one I wrote to my Congressman, Doug Lamborn.   I

12  referenced some letters I had written to the IRS.   And I was

13  filling him -- I was trying to keep him up to speed on the

14  status on this, because I had solicited his aid in trying to

15  work with the IRS.   And that's basically the gist of the

16  letter.

17  *Q.*   Okay.

18  *A.*   Refused to answer questions regarding the correct

19  application of our tax laws.

20  *Q.*   Let's zoom back out on that.

21         Language in there, withdrew our request.

22  *A.*   Where are we at on this letter?   Which paragraph?

23  *Q.*   Mr. Cohen will find it.

24  *A.*   Let's see --

25  *Q.*   Maybe the next page -- oh, no, it's up here in the first

Lawrence Martin Birk – Direct

1  paragraph.  That entire paragraph.

2  *A.*  Okay.

3  *Q.*  Okay.

4  *A.*  Yeah.  "At the time we withdrew our request for a hearing

5  on the basis that the federal government refused to answer

6  questions regarding the correct application of the tax laws,

7  determination of taxable income, and due process of law."

8  *Q.*  Okay.  Let's stop there.  Let's go back out, highlighting

9  the date of the letter.

10  *A.*  April of 2009.

11  *Q.*  So back in April of 2009, more than ten years ago, you were

12  already concerned about the IRS's refusal to answer your

13  questions; correct?

14  *A.*  Oh, very much so.

15      MR. HARRIS:  Okay.  Let's go back into the letter.

16  Second full paragraph, fourth line to the end, from "lives,"

17  down to the end.

18  *BY MR. HARRIS:*

19  *Q.*  You say, "What the IRS has done is create a fiction, at

20  best."  What do you mean?

21  *A.*  Could we include one more line at the top?

22  *Q.*  Yeah, sure.

23  *A.*  I want to reference that number.

24  *Q.*  Mr. Cohen --

25  *A.*  Because we've seen a lot of data during this trial.  At the

1  time of -- referencing those notices of federal tax liens, that

2  number there, $2.1 million and some change, I was making the

3  statement -- and I'll stand by it -- an amount that exceeds our

4  total income from all sources for our entire lives -- that's me

5  and my wife -- including the value of our real property.

6          So the next question, obviously, would be, this

7  fiction that was created, at best, and at worst, fraud, by

8  recording it into the public record, those notices of tax liens

9  come through the Secretary of State and into your county Clerk

10  and Recorder's office.  They not only encumber your property,

11  but affect your credit and your good name, for that matter.  So

12  I was challenging that.

13          We have seen some data since then in this trial that's

14  a number that is slightly more than 10 percent of that.  So my

15  question is, I could understand it being maybe double because

16  of the issue of me not providing or volunteering the

17  information at this time that I did give to, say, Advanced Tax

18  Solutions, and what drove those returns; but I was challenging

19  this number.  And by recording it into the public record, I'm

20  concerned about that.  I was very concerned about that at this

21  time.

22          MR. HARRIS:  Okay.  Zooming back out.  Next page.

23          Actually, back to the other page.  Last paragraph.

24  BY MR. HARRIS:

25  Q.  You say, "The only nonviolent option remaining is for the

65

Lawrence Martin Birk - Direct

1    government to answer."  Let me stop right there, because that

2    will strike someone reading that as jarring.  Are you

3    threatening?

4    A.  You mean violence?

5    Q.  Yeah.

6    A.  That's a direct reference constitutionally to the Second

7    Amendment.  What follows the First Amendment, and why is it

8    where it is?  The last ten words, we have a series of

9    fundamental rights and law.  And the last ten words of the

10   First Amendment says, "and to petition the government for

11   redress of grievances."  If we cannot get good faith answers

12   through correspondence or meetings about the significant legal

13   issues surrounding the federal income tax, what is going to be

14   left to a free people?

15        Now, am I personally threatening violence?  No, I'm

16   not.  I'm talking about, what did our founding fathers and the

17   framers of our Constitution and those first ten amendments give

18   us as far as the tools to hold our own government accountable

19   to the law?  That was why I put that in there.  The Second

20   Amendment speaks for itself.

21        MR. HARRIS:  Okay.  Next, if we can zoom back out and

22   go to the next page.  Last part of that paragraph.  Yeah,

23   there.

24   BY MR. HARRIS:

25   Q.  "No answers, no taxes," what does that mean?

Lawrence Martin Birk - Direct

1   *A.*   That referred directly to our petitions for redress.

2   *Q.*   Okay.  One more letter, and then we'll turn to other

3   topics, most likely after the mid-afternoon break.  But let's

4   see how far we can get.

5          Government Exhibit -- well, same exhibit.  Let's go

6   forward in it a page.  Highlighting the top part.

7          And just to expedite, at the risk of leading, letter,

8   May 29, 2008, from you to Bentley; correct?

9   *A.*   Correct.

10  *Q.*   Bentley was the other bearded gentleman that testified;

11  correct?

12  *A.*   Correct.

13  *Q.*   Okay.  So did you write this letter?

14  *A.*   I did.

15  *Q.*   Why?

16  *A.*   I was -- what I was trying to do was talk about the due

17  process hearing that was originally scheduled.  We had been

18  informed repeatedly by the IRS that they were not going to

19  address in good faith my questions regarding the correct

20  application of our tax laws.  What's the point of going to

21  another meeting, or even a telecon meeting if I'm going to be

22  told the same thing.

23          *MR. HARRIS:*  Zooming in on four lines down from "it

24  has been our intent."  Down a couple of lines.

25

Lawrence Martin Birk – Direct

1    *BY MR. HARRIS:*

2    *Q.* "It has been our intent these past nine years to

3    communicate with the IRS in good faith." You wrote that;

4    right?

5    *A.* I did.

6    *Q.* You meant that; right?

7    *A.* Uh-huh.

8    *Q.* "To administratively resolve the many issues between us as

9    afforded by the law." Is this the collaborative aspect that

10   you were talking about and hoped Ms. Trabold was sincere about?

11   *A.* It is. And we've heard about that often in this trial.

12   And I certainly appreciate that we have that right to due

13   process in this country; but when they end it abruptly by

14   accusing you of having frivolous positions and they won't even

15   talk to you, that's what it is.

16        MR. HARRIS: Okay. Let's zoom back out.

17        "We've put forth many questions." It's -- in that

18   paragraph, letter -- it's -- let's just highlight the bottom

19   third of that paragraph.

20   *BY MR. HARRIS:*

21   *Q.* We'll get back to the other. But here you refer to his

22   letter of May 5 and that he says, "All of the correspondence

23   you have sent was identified as espousing frivolous tax

24   arguments. We strongly disagree." Right?

25   *A.* I do.

Lawrence Martin Birk – Direct

 1   Q.   Okay.  And then you say, at this point you see no benefit

 2   for anyone in further meetings or correspondence for any

 3   purpose.  That's what you were just testifying about?

 4   A.   That's correct.

 5   Q.   Okay.  We can pull that down.

 6        Last half or so of the first paragraph from the R.

 7   Creamer down.  There.

 8   A.   Yeah.  Okay.

 9   Q.   You say, "Also of record are several petitions for redress

10   of grievances."  And you say, "Those petitions remain

11   unanswered as of this date."

12   A.   Correct.  They still are.

13   Q.   That was my next question.

14        Let's pull that down.

15        Bottom paragraph.  "We have watched with dismay as

16   basically everyone refused to respond to questions."  True?

17   A.   True.

18   Q.   Why was it dismaying?

19   A.   Well, I think by this time -- this is 2008 -- my

20   frustration is beginning to show somewhat in my letters.  I am

21   continually told that I'm espousing frivolous arguments; but

22   I'm not getting any answers, any specific responses that would

23   lead me to believe that I am incorrect.  I'm not getting any

24   answers.

25        MR. HARRIS:  Same paragraph.  If you could highlight,

Lawrence Martin Birk - Direct

1   Mr. Cohen, the sentence that says "We have also watched."

2   *BY MR. HARRIS:*

3   *Q.*   "We have also watched with dismay the blatant judicial

4   conspiracy evidenced by recent legal actions" -- well, judicial

5   conspiracy --

6   *A.*   Yeah.   When --

7   *Q.*   You want to elaborate?

8   *A.*   There is a legislative act called the Anti-Injunction Act

9   that basically forbids a taxpayer, an American citizen, to

10  bring a tax matter into the court for resolution to -- as the

11  Act calls, to avoid paying a tax.   You are required, I guess,

12  by due process to try to administratively resolve that somehow.

13  And if you don't, then they begin collection and seizure and

14  apportionment actions against you.   That was part of what I was

15  talking about there, judicial conspiracy.

16         But there were all kinds of things that were happening

17  against what I called leaders of the tax honesty movement.

18  Outside of the We the People Foundation, there were other

19  things going on.   I did not necessarily support some of the

20  positions these people were taking.   The government was trying

21  to shut down websites.   I think that's a First Amendment issue.

22  We had -- We the People -- I'll give you an example about an

23  attack on the right of free speech, which is the next one.

24         We had a contract with *USA Today* for twelve full-page

25  ads, that were not inexpensive.   We succeeded in running six of

Lawrence Martin Birk - Direct

1  them before we received a letter from *USA Today* and a refund on

2  our balance saying, hey, you know, we've been contacted by the

3  Department of Justice, and our attorneys say we better stop

4  doing this.  Oh, really?

5        We had a similar experience with C-Span regarding our

6  meetings at the National Press Club --

7  *Q.*  Okay.  Let me just bring it back for a moment to the

8  letter.  I'm not going to go through every line of the letter;

9  I don't think that would be fair to the jury or the Court.  But

10  fair to say that the bulk of this letter is expressing your

11  concerns historically with what you perceived as the lack of

12  responsiveness and answers to what you viewed as legitimate

13  questions; correct?

14  *A.*  That's the bulk of it.

15  *Q.*  Okay.

16        *THE COURT:*  Counsel, a propitious time, as I am wont

17  to say, to declare and take our medication afternoon recess for

18  this afternoon of trial.  During this recess, Mr. Birk, you may

19  stand down and return to your seat.

20        *THE WITNESS:*  Thank you, Your Honor.

21        *THE COURT:*  You're welcome.

22        And, counsel, you may be seated at your convenience.

23        Ladies and gentlemen of the jury, in preparation for

24  this mid-afternoon recess, two things:  First, once again,

25  leave your notetaking materials face down on your seats or your

Lawrence Martin Birk - Direct

1    chairs.  And on all such occasions, be mindful of those

2    important rules that continue to govern you as jurors in this

3    trial.

4              We are in recess for 15 minutes.

5              (Recess at 3:03 p.m.)

6              (In open court at 3:25 p.m.)

7              THE COURT:  Thank you.  And either be seated or remain

8    standing, as you choose, while waiting for the jury.

9              Madam Clerk, one more time, please.

10             Thank you.

11             (Jury in at 3:27 p.m.)

12             THE COURT:  Ladies and gentlemen, again, please be

13   seated, with the exception of you, Mr. Harris.  You may resume

14   your direct examination of Mr. Birk.

15             MR. HARRIS:  Thank you, Your Honor.

16             THE COURT:  You're welcome.

17   BY MR. HARRIS:

18   Q.  Let's move to a different topic area.  At some point,

19   despite your understanding of the law concerning your duty to

20   file returns, you did decide to file returns under duress or

21   under protest; correct?

22   A.  Yes, sir.

23   Q.  When approximately did that decision happen?

24   A.  To the best of my recollection, let's see -- that was

25   probably about August of 2006, July -- maybe a little bit

1    before that.  Because I think that's when I approached Advanced

2    Tax Solutions.  Let's say sometime in the spring of '05.

3    Q.  And the spring of '05.  Okay.

4            And did you decide -- why did you decide to do that?

5    A.  I would say it's a twofold answer.  The first one is my

6    loving wife, she was beginning to get nervous about collection

7    and enforcement actions; so she got me thinking about that.

8    The other aspect that I'd been thinking about for some time was

9    the magnitude of the assessments against me and wanting to take

10   some kind of action that would pave the way for coming back

11   into the system, perhaps, and disarming those assessments.

12   Q.  Had you at that point changed any of your understandings of

13   or beliefs with respect to your duty to pay taxes on that

14   income?

15   A.  No.

16   Q.  So when you say or write that these returns were filed

17   under duress, what do you mean?

18   A.  At that time I was a plaintiff in a lawsuit -- we spoke

19   briefly about that -- the right to petition lawsuit with We the

20   People Foundation, and approximately just under 1,500

21   plaintiffs total.

22   Q.  And so what's -- what's the relation between the lawsuit

23   and the under the duress?

24   A.  The -- at the time I had expectations that our right to

25   petition lawsuit would bear fruit and that the government would

Lawrence Martin Birk - Direct

1   be required to provide answers in good faith in public to those

2   petitions.

3   Q.   And so when you write "under duress," what does it mean to

4   you?

5   A.   It meant to me that I was willing to file those returns and

6   sign them under penalty of perjury at the time.  Even though my

7   philosophies may have been different, the data was as accurate

8   as I could make it at the time.

9   Q.   Okay.  Now, you sometimes refer to this as getting back

10  into the system; correct?

11  A.   Correct.

12  Q.   What does that mean?

13  A.   It basically means, filing returns and working with the IRS

14  to pay the taxes.

15  Q.   So -- okay.  You're going to get back into the system.

16  What steps did you take to get back in?

17  A.   Well, the first one was approaching Advanced Tax Solutions

18  to prepare returns from '98 through 2005.  And then --

19  certainly, behind the scenes, I do keep good records; and I had

20  to get busy generating data for Mr. Erikson.

21  Q.   And about how much did it cost in total to get back in?

22  A.   As far as what I paid Advanced Tax Solutions, I believe

23  that the total number ended up being around $12,000.

24  Q.   Now, when you met with Advanced Tax Solutions -- let's

25  actually step back a minute.  You did meet with them; correct?

Lawrence Martin Birk – Direct

1    *A.* I did.

2    *Q.* And was that with Mr. Whalen initially?

3    *A.* Initially, Mr. Whalen; correct.

4    *Q.* Did you have any second meeting with Mr. Whalen?

5    *A.* I don't believe I did.

6    *Q.* Did you have any meeting with Mr. Erikson?

7    *A.* I did.

8    *Q.* More than one or just one?

9    *A.* I remember two meetings with Mr. Erikson.

10   *Q.* In any of those three in total meetings, variously, with

11   Erikson or Whalen, did you have any conversation with them

12   concerning your understanding of tax law applicability to you?

13   *A.* I believe in the initial meeting with Mr. Whalen, we had a

14   short discussion.  And he made his position very clear to me,

15   that that was not going to be something they could do.  That

16   they would prepare those returns to the best of their ability

17   in accordance with the rules as they understood them.

18   *Q.* Who decided what materials they would have to prepare your

19   returns?

20   *A.* Mr. Erikson requested specific information from me, and we

21   kind of built on that as we went through the process of

22   preparing those returns.  There was quite a bit of email

23   traffic and some phone calls with Mr. Erikson to provide that

24   information to him.

25   *Q.* Did you provide everything that you had been requested to

Lawrence Martin Birk – Direct

1   provide?

2   *A.*   I did.

3   *Q.*   Were you ever dishonest with them?

4   *A.*   I was not.

5   *Q.*   Did you ever hide anything from them?

6   *A.*   I did not.

7   *Q.*   Did you either discuss or provide to them information about

8   Tarryall Asset Management?

9   *A.*   I did.   There were some handwritten notes, I think, that

10   have been part of the record for this trial.   There was a

11   specific phone call I had with Mr. Erikson about that, where he

12   requested some information from me.   And I did my best to come

13   up with that.

14          I think the information was originally flagged by the

15   IRS to Mr. Erikson through Mr. Bass, and I went and retrieved

16   those records, and we corrected that return.

17   *Q.*   With respect to Tarryall Asset Management, was it your

18   intention that Tarryall Asset Management be used as some sort

19   of device to hide income from the IRS?

20   *A.*   That was not my intent.   I think I said earlier, I was

21   intending to use it as a conduit to move my funds in the form

22   of -- primarily my wife's retirement funds, and she agreed with

23   that -- from the custodians into that conduit so that those

24   funds could be used in Tarryall River Log Homes.

25   *Q.*   Did Mr. Erikson ever tell you, write you, or otherwise

Lawrence Martin Birk – Direct

1  advise you that you were doing anything wrong in -- with

2  respect to Tarryall Asset Management?

3  *A.*  No, he did not.

4  *Q.*  Had he told you that you were doing something wrong, what

5  would you have done?

6  *A.*  Well, I think at that point, when we were preparing

7  returns, it was probably overcome by events.  The -- the

8  actions that were taken far preceded my involvement with

9  Advanced Tax Solutions, so it was a -- a past data point that

10  really needed to be corrected.  And I think the handwritten

11  notes that Mr. Erikson had as part of this court record show

12  that.

13  *Q.*  Did you rely on Advanced Tax Solutions to complete returns

14  correctly?

15  *A.*  Yes.

16  *Q.*  At some point your relationship with Advanced Tax Solutions

17  ended; right?

18  *A.*  That's correct.

19  *Q.*  How did it end and why?

20  *A.*  Well, I think we reached a point after we had produced all

21  the returns through 2005, to file those returns under duress,

22  as we have just spoken about, and I felt at that time their

23  work for me was completed.  I had not ruled out a future

24  relationship with them, and I don't think they had either, but

25  we were done.

Lawrence Martin Birk – Direct

1    *Q.*  Amicably?

2    *A.*  Yes.

3    *Q.*  Now, there was a power of attorney, POA, in effect at

4    times; right?

5    *A.*  That's correct.

6    *Q.*  And that granted them the right to advocate for you with

7    the IRS; right?

8    *A.*  That's correct.

9    *Q.*  We've heard some testimony about that.  Who terminated it?

10   *A.*  I did.

11   *Q.*  For the reasons you've just discussed?

12   *A.*  That's correct.

13   *Q.*  Now, you've heard the testimony from Ms. Trabold and other

14   witnesses, and it -- to summarize, it would appear the IRS is

15   claiming, variously, number one, that you deliberately

16   underreported income at times.  Did you?

17   *A.*  I did not consider that in the overall scheme, that it was

18   taxable income.  It was earned income that my wife had made or

19   myself -- mostly my wife's, again.  Those were my funds.  I

20   made no intent to violate anything.  I was merely using my

21   funds.

22   *Q.*  Did you at any time deliberately overreport business

23   expenses or list as expenses things that were not expenses?

24   *A.*  No.  I would not do that.

25   *Q.*  Did you at times use the Tarryall business bank account,

Lawrence Martin Birk - Direct

1   the PSBT bank account ending in 694, to conduct personal

2   business affairs?

3   *A.*  Yes, I did.

4   *Q.*  Did you at times use your business account to pay personal

5   expenses?

6   *A.*  I did.

7   *Q.*  Why?

8   *A.*  Once again, it was -- those were considered my funds.  One

9   of the convenience items -- I had a debit card for that

10  account, which I did not have on my personal account, which

11  made it easy on the fly to purchase fuel occasionally.  Most of

12  the fuel was, in fact, business use.  It's a long way to

13  anywhere in Park County.  I think most of the special agents

14  who have been out there, they probably know.  Groceries

15  occasionally, using that debit card, that's how it was

16  purchased are.  It was a matter of convenience for me.

17  *Q.*  Did anyone ever -- let me ask a different question.  Did

18  you hold any funds in that business account in a fiduciary

19  capacity for anyone?

20  *A.*  If we're talking about something like deposit money --

21  *Q.*  Uh-huh --

22  *A.*  -- yes.  Occasionally I would get large deposits on a log

23  home package, *per se*, that I would deposit to my business

24  account.

25  *Q.*  Now, this business of official checks, is what you've told

Lawrence Martin Birk – Direct

1   Agent Hopping true, that you maintained -- that you

2   deliberately maintained a low balance in the Tarryall business

3   account by purchasing official checks?

4   *A.*   I did.

5   *Q.*   And why?

6   *A.*   To protect my funds, which were also my customers' funds at

7   times, or my subcontractor or suppliers' funds, from being

8   seized.

9   *Q.*   And the reason for that is you didn't believe that the IRS

10  was legally entitled to those funds; correct?

11  *A.*   That's correct.

12  *Q.*   Now, with respect to the IRA rollover issue and the -- you

13  remember the discussion of that; correct?

14  *A.*   I do.

15  *Q.*   And the demonstrative exhibit with all of those circles;

16  right?

17  *A.*   Correct.

18  *Q.*   Tell us about that.  What -- what -- why did you not simply

19  transfer that distribution from one trust to another?

20  *A.*   I --

21  *Q.*   One --

22  *A.*   My wife decided and I decided we wanted to use those funds

23  to invest in our log business.  We actually used a lot of that

24  money to build what we called a spec house, which we used as a

25  model and a place to store things like doors and windows for

Lawrence Martin Birk – Direct

1   other projects.

2   *Q.*  Was it your intention in handling the funds the way you did

3   with TAMI as the intermediary for them, to defraud the IRS?

4   *A.*  No.  Of course, not.  I considered those to be our funds.

5   That was a conduit that I used for that purpose.

6   *Q.*  Did you consider those distributions, those funds, to be

7   taxable income?

8   *A.*  I did not.

9   *Q.*  And is that for the same or similar reasons to the reasons

10  you've expressed as to other income?

11  *A.*  That's correct.  It's private sector funds.

12  *Q.*  Did you hide either the existence of TAMI or the

13  distributions themselves from Advanced Tax Solutions?

14  *A.*  I did not.  I called them personal funds.  They were on the

15  handwritten notes, and that's what I considered them.

16  *Q.*  Now, there was discussion in Ms. Trabold's testimony of a

17  company you had worked for, PRC.

18  *A.*  Correct.  That was the last company I worked for in my

19  defense industry career.

20  *Q.*  And she explained a discrepancy between the 1998 return you

21  filed and Advanced Tax Solutions' return as it related to some

22  of that income.  Do you recall that testimony?

23  *A.*  I certainly do.

24  *Q.*  What comment, if any, do you have with respect to the PRC

25  question?

Lawrence Martin Birk – Direct

1   *A.*   Those funds that were discussed, the lion's share of that

2   was really from my wife's employment at MCI.  She was laid

3   off -- when WorldCom purchased MCI, she was laid off at the end

4   of 1998.  She had a rather substantial benefit, based on her

5   years of service, that was paid at the end of 1998.  Obviously,

6   taxes and withholding was done on that.  When I say "taxes,"

7   I'm talking about payroll taxes, Social Security, and Medicare.

8   And we decided that since we did not believe that was taxable

9   income, that we would correct those W-2s and make a request for

10  a refund.

11  *Q.*   Just a couple of more questions.  I won't say one last

12  question, because I've never been correct when I said it.

13          But do you expect to be issued SFRs or otherwise be

14  assessed taxes and forced to pay them on at least some of these

15  tax years at some point regardless of the outcome of this case?

16  *A.*   I would hope to avoid going down that path again and having

17  the IRS prepare returns.  I believe it's fair to say that my

18  wife and I are poised regardless of the outcome of this case to

19  file those returns, to work with the IRS, to get squared away

20  on that.  We're retired now.  We don't need these kind of --

21  these kinds of things in our lives.  So I would intend to avoid

22  going through that whole process again and to approach the IRS

23  and sit down, get the paperwork done, get into an offer in

24  compromise, and call it good.

25  *Q.*   Trepidatiously, I'll say this, one last question --

Lawrence Martin Birk – Direct

1          *THE COURT:*  Perhaps with subparts.

2          *MR. HARRIS:*  Perhaps.

3     *BY MR. HARRIS:*

4     *Q.*  Why are you pleading not guilty?

5     *A.*  I believe that the research I've done on the federal tax

6     system, the original intent of those who wrote the tax laws,

7     the 16th Amendment, even back to the Constitution itself, the

8     original intent of those taxing clauses, gave me an

9     understanding of the true nature of the income tax.  And it was

10    my sincere belief that the tax laws were being misapplied.  I

11    think that it's fair to say that the government and, for the

12    most part, the lower courts, believe that the 16th Amendment

13    did authorize some kind of unapportioned direct tax or perhaps

14    a -- some unknown third kind of tax, and I disagree with that.

15    I believe that that is not what the law says and the Supreme

16    Court cases that surround it, and that is my belief.

17          *MR. HARRIS:*  No further questions.

18          *THE COURT:*  Very well.  Cross-examination for the

19    government.  Mr. Magnani.

20          *MR. MAGNANI:*  Your Honor, at this time can we have

21    that 105 instruction, please?

22          *THE COURT:*  You may.

23          Ladies and gentlemen of the jury, you are instructed

24    as follows:  At various times during the testimony of the

25    defendant, he expressed his beliefs and understanding or

Lawrence Martin Birk - Cross

1    referred to exhibits in which he expressed his beliefs and

2    understanding about his legal duty to pay federal income taxes.

3    This testimony and those exhibits may only be considered by you

4    for the limited purpose of determining what the defendant

5    believed or understood about his legal duty to pay federal

6    income taxes.  This testimony and those exhibits may not be

7    considered or accepted by you as correct statements of the

8    applicable law governing the legal duty to file federal tax

9    returns or to pay federal income taxes.

10          It is the duty of the Court, not a party or an

11   attorney, to explain to you the law that applies in this trial.

12   You may not rely on any statements of law expressed by the

13   defendant in his testimony or in the exhibits to which he

14   referred.  Instead, you may rely only on the law as the Court

15   gives it to you in the final jury instructions at the end of

16   this case.  It is your sworn duty to follow all of the rules of

17   law as the Court explains them to you, and you are so

18   instructed.

19          Now, I reiterate my earlier question,

20   cross-examination for the government?

21          MR. MAGNANI:  Thank you, Your Honor.

22          THE COURT:  You're welcome.

23                        **CROSS-EXAMINATION**

24   BY MR. MAGNANI:

25   Q.  Good afternoon, Mr. Birk.

Lawrence Martin Birk - Cross

1    *A.*  Good afternoon, sir.

2    *Q.*  Did you understand the instruction that the judge just gave

3    to everyone in this room?

4    *A.*  I believe I did.

5    *Q.*  And so do you understand that, basically, it's the Court's

6    duty to interpret the law?

7    *A.*  I understand that.

8    *Q.*  And that it's the Court's job to say what the law is --

9         *MR. HARRIS:*  Objection.  401, 402, 403.  Relevance.

10        *THE COURT:*  Response.

11        *MR. MAGNANI:*  The defendant's understanding of what

12   the law is, is at the heart of this case, Your Honor.  It's

13   imminently relevant.

14        *THE COURT:*  It's relevant under Rule 401, thus

15   ostensibly admissible under Rule 402.  Its probativity is not

16   substantially outweighed by any one or more of the six dangers

17   made the focus of Rule 403.  So those bases of objection are

18   respectfully overruled, and the examination may continue.

19   *BY MR. MAGNANI:*

20   *Q.*  Do you need me to repeat the question --

21   *A.*  No, I understand.

22   *Q.*  And so do you understand, although you may have opinions

23   about the law, it's ultimately the courts that get to say what

24   the law is?

25   *A.*  I understand that.

85

Lawrence Martin Birk - Cross

1   *Q.*  You mentioned a lot of cases.  Are you familiar with

2   *Marbury v. Madison*?

3   *A.*  I am.

4   *Q.*  Ever since 1803, that's what the law has been in this

5   country?

6   *A.*  I understand that.

7   *Q.*  Now, you don't think that means that because the courts

8   have that power, that's not a judicial conspiracy, is it?

9   *A.*  No, it's not.

10  *Q.*  Well, let me switch gears.  You mentioned that you're

11  recently retired?

12  *A.*  That's correct.

13  *Q.*  Okay.  And -- I'm sorry, can you remind us again, when did

14  you say you retired?

15  *A.*  Last December.

16  *Q.*  You say you're 65?

17  *A.*  I'm 65.

18  *Q.*  And how much money do you have saved for retirement?

19  *A.*  I never really thought about -- probably $50,000, I guess,

20  in liquid assets, and my home, which is paid for and probably

21  worth 3 or 400K.  Depends on the market.

22  *Q.*  Sure.  And just to sort of get through the jargon, when you

23  say liquid assets, do you mean cash?

24  *A.*  I would say cash, other liquid kinds of assets that you

25  could sell.  I've got some machinery that I kept from the

Lawrence Martin Birk - Cross

1  business that has some value, motor vehicles, just liquid

2  assets.  If I needed money, I could go sell something.

3  *Q.*  And apart from the liquid assets that you're referring to,

4  do you have any other bank accounts?

5  *A.*  No, I do not.

6  *Q.*  Stock accounts?

7  *A.*  I do not.

8  *Q.*  I should clarify, when I'm asking the questions, did the

9  answers that you gave, does that apply to your wife, as well?

10  *A.*  That's correct.

11  *Q.*  So you're an MBA --

12  *A.*  (Nodded head.)

13  *Q.*  I'm sorry.  You have to answer yes.

14  *A.*  Yes, I am.

15  *Q.*  Okay.  You run a business?

16  *A.*  I did.

17  *Q.*  You created profit and loss statements?

18  *A.*  I did.

19  *Q.*  So do you think that you can live the rest of your life on

20  $50,000?

21  *A.*  That is not my plan.  The short answer is, I am truly

22  blessed to have some very deep pockets in the family, on both

23  my wife's side and mine.  There will be some inheritance kinds

24  of transactions at some day in the future, should I live long

25  enough to enjoy that.

Lawrence Martin Birk - Cross

1   *Q.* And is -- you heard Ms. Trabold testify earlier?

2   *A.* I did.

3   *Q.* Okay.  And so is it fair to say that your folks or Jean's

4   folks are giving you some guys some money now?

5   *A.* We've been getting a gift once a year from my mother and

6   from her father.  It's not a big number.  Whatever the gift

7   threshold is.  I think it's $14,000 now.

8   *Q.* Okay.

9   *A.* That certainly factors into, you know, the cash we have to

10  live.  It's not cash in my pocket until I get the check, but

11  those -- those deposits would certainly be reflected in my bank

12  records.

13  *Q.* And are gifts taxable, as you understand it?

14  *A.* No, they're not.  Up to that threshold.

15  *Q.* What about inheritance, is that taxable?

16  *A.* I think it is, both at the federal and state level.  I

17  think there will be some tax liability when that happens.

18  *Q.* You -- and please correct me if I misquote you.  But I

19  think you said on direct that if the government pays it, they

20  can tax it, or something to that effect?

21  *A.* It's a general rule.  I think unless it's, like, disability

22  payments and things that are, you know, of law.  Generally

23  speaking, yes.  Like a Social Security check, you bet.

24  *Q.* So if the government pays wages to me, for example, that

25  can be taxed?

Lawrence Martin Birk - Cross

1   *A.*   Yes.

2   *Q.*   Okay.  Now, also, just drawing on your experience as an

3   MBA, do you think that the government could fund itself only

4   from taxing government employees?

5   *A.*   No, no.  There is indirect taxes, duties, tariffs, excises.

6   And then there is, of course, the Federal Reserve system, and

7   we all know what is going on there.

8   *Q.*   Now, do you remember when Mr. Harris gave his opening

9   statement, and he said that it wasn't because you thought you

10  were someone special.  That's not why you stopped paying;

11  right?

12  *A.*   That's correct.

13  *Q.*   And you agree with that?

14  *A.*   I do.

15  *Q.*   Would you agree you've gotten an extra special amount of

16  attention from the federal government over the years?

17  *A.*   I have.  And believe me, I know a lot of other folks that

18  have been in the tax honesty movement that have also received a

19  lot of attention.

20  *Q.*   And is some of that attention what your lawsuit was about,

21  the retaliation that you mentioned in the lawsuit?

22  *A.*   Not the lawsuit*, per se*.  The lawsuit was specifically to

23  the right to petition.

24  *Q.*   But in the lawsuit, there were two claims; right?

25  *A.*   The first claim -- we're talking about the right to

Lawrence Martin Birk - Cross

1   petition lawsuit?

2   *Q.*   I'm sorry.  I'll just be clear.  In the lawsuit that We the

3   People filed with 1,000 something plaintiffs --

4   *A.*   Yes.

5   *Q.*   -- there were two claims in that lawsuit; correct?

6   *A.*   I believe there was.

7   *Q.*   And one of the claims was basically, we are

8   constitutionally entitled to a response from the government?

9   *A.*   That is correct.

10  *Q.*   The other one is that the government should be enjoined,

11  prevented from retaliating against us for holding these views?

12  *A.*   That's correct.

13  *Q.*   So the retaliation was about the government attention that

14  was focused on those folks in the movement?

15  *A.*   That was my intent of that statement; correct.

16  *Q.*   Just speaking -- Mr. Harris asked you a little bit about

17  the intent of your statements.  Would you agree as you sit here

18  today and you read some of those statements, would you forgive

19  someone for someone perceiving them as threatening?

20  *A.*   I would forgive them.  I got asked that point-blank by a

21  special agent on my property one day.  He put that letter in my

22  face -- it wasn't George; I don't believe, it was.  It was an

23  older gentleman, very large.  He put that letter in my face and

24  said, What do you mean by that?

25  *Q.*   Was that the gentleman who came with Ms. Morgan, who

Lawrence Martin Birk - Cross

1    testified earlier?

2    A.  Correct.

3    Q.  Okay.  So you sent the letter to Ms. Morgan first; and then

4    she came to your property with an older gentleman, as you

5    described it?

6    A.  With six agents.  Yes.

7    Q.  Okay.  Those agents were armed?

8    A.  They had body armor on, so I don't know for sure.  There

9    were also still some sitting in vehicles.

10   Q.  My question is, would you forgive Ms. Morgan for after

11   receiving your letter, talking about the only nonviolent means,

12   for not coming alone to your house?

13   A.  Absolutely.  I fully appreciate.  The frustration was

14   probably showing in any correspondence by then.

15   Q.  Okay.  So I just want to run through a few things that I

16   hope are not too controversial.  So you understand that in this

17   case, you know, this the government has a burden to prove

18   certain elements?

19   A.  I do.

20   Q.  Okay.  And my understanding is that you don't contest any

21   of those elements except for one; is that right?

22   A.  If you could --

23   Q.  Sure --

24   A.  -- remind me of the elements.  Be specific.

25   Q.  Okay.  Sure.

Lawrence Martin Birk - Cross

1          MR. HARRIS:  He's here to testify about facts, not to

2     interpose his views of the law.  It's burden shifting.

3          THE COURT:  Response.

4          MR. MAGNANI:  There is only one fact in dispute in his

5     question, Your Honor, and it's about what is in the defendant's

6     brain.  And so these questions are probative of that.  And it's

7     only circumstantial evidence that the government can rely on in

8     this case.

9          THE COURT:  Well, you know, you can ask specific

10    questions without framing them in the essential elements on the

11    law, which I will instruct the jury concerning.  And you simply

12    can proceed on that basis.

13         MR. MAGNANI:  Very well.

14    BY MR. MAGNANI:

15    Q.  So just -- we'll keep it simple.  You agree that between

16    1998 and 2005, you worked every year?

17    A.  I did.

18    Q.  You made money?

19    A.  I did.

20    Q.  And you lived on that money?

21    A.  I did.

22    Q.  Okay.  And would you agree that the amounts of income that

23    were reported on the returns that you worked with Advanced Tax

24    on, those accurately reflected the amount of income you earned?

25    A.  In accordance with the rules that Advanced Tax Solutions

Lawrence Martin Birk - Cross

1    supplied, yes.

2    Q.  Now, before you -- you testified that in those early years,

3    you were still at PRC?

4    A.  Correct.

5    Q.  Can you just tell us, what exactly is it?  You said defense

6    contracting, but what did you do?

7    A.  PRC at that time was a subsidiary of Litton Industries, a

8    defense contractor.  We did a variety of design and support

9    activities for U.S. Space Command, Cheyenne Mountain, other

10   kinds of sensor systems, we'll call them.  I can't say any more

11   than that, because I'm still bound by my agreement.

12   Q.  Okay.  What was your job there?

13   A.  I started out as what they call a logistics support

14   analyst.  What that entails is defining operation and support

15   requirements, spare parts, operation and maintenance manuals,

16   training, teaching the government end user how to operate and

17   maintain the system.  That basically encompasses that.

18   Q.  And so when you're talking about this -- was your client

19   the Department of Defense?

20   A.  Yes, it was -- Department of Defense, Air Force, Space

21   Command, other entities.

22   Q.  Okay.  Now, for your 1998 return --

23   A.  Uh-huh.

24   Q.  -- the one you filed before Advanced Tax Solutions.

25   A.  Okay.

Lawrence Martin Birk - Cross

1   *Q.*  Do you recall that?

2   *A.*  Yes, I do.  The corrected W-2 one.

3   *Q.*  Exactly.  So you -- PRC Inc., your company, gave you a W-2

4   at the end of the year?

5   *A.*  Correct.

6   *Q.*  That W-2 said that they paid you a lot of wages?

7   *A.*  Correct.

8   *Q.*  You asked them if they would issue you a W-2 that said they

9   paid you no wages?

10  *A.*  I'm not sure if that's correct.  What I did was I asked

11  them to correct the W-2 -- there is a line -- there is a

12  number -- as you well know, there is different blocks on that

13  W-2 that define what kinds of income you've received.  And what

14  I was asking them to do is correct the taxable income line and

15  zero that out, because I did not believe it was taxable income.

16  They, obviously, refused to do that.

17  *Q.*  Well, there is not a taxable income on a W-2.  Isn't the

18  first line on a W-2 wages?

19  *A.*  Wages, okay.  I agree with that.

20  *Q.*  On your tax return you put zero for wages?

21  *A.*  Correct.

22  *Q.*  And you had asked them if they would put zero for wages on

23  the W-2?

24  *A.*  I did.

25  *Q.*  Okay.  So they disagreed with your reading of the law, and

Lawrence Martin Birk - Cross

1   they refused to do it?

2   A.  I expected that.  Yes.

3   Q.  Now, you said if the government pays, it can tax it.  Does

4   that not apply if they pay a contractor?

5   A.  It would apply to the contractor, certainly, as a

6   corporation, but not their private sector employees.  It's a

7   different thing than, say, working for a civilian Department of

8   Defense.

9   Q.  Now, switching over from being a W-2 wage earner -- is that

10  term something you're comfortable with?

11  A.  Yes.

12  Q.  Okay.  Switching over to being your own businessman, did

13  that mean that you were no longer required to have taxes

14  withheld from your income?

15  A.  I believe that.  Yes.

16  Q.  And you switched over in about 2000?

17  A.  The first quarter of 2000; that is correct.

18  Q.  And you agree that even though taxes are no longer

19  withheld, it is the IRS's position that you still owed tax?

20  A.  I understand that.  Yes.

21  Q.  And just so we're clear, is it also true that between 2006

22  and up until your retirement, you continued to build log homes

23  for your company?

24  A.  That's correct.

25  Q.  You continued to make profit?

Lawrence Martin Birk - Cross

1   A.  I continued to earn income, yes.

2   Q.  Okay.  Is -- well, let me ask you this:  Was the income you

3   earned greater than the money that you spent to earn that

4   income?

5           I'll ask a different question, were you in the black

6   or in the red?

7   A.  Sometimes I was in the red.

8   Q.  Okay.

9   A.  But depended on the project.  I obviously endeavored not to

10  do that.  But we had to operate on a pretty slim margin up

11  there in central Colorado, so --

12  Q.  Now, after not -- when you first dropped out of the system,

13  the IRS audited you; right?

14  A.  I never went to a face-to-face audit; so from that

15  perspective, no.  They were conducting audits for the purpose

16  of creating SFRs.

17  Q.  So did the IRS audit you?

18  A.  I did not participate in that.  No.

19  Q.  Sorry.  My question is, did they audit you?

20  A.  I -- yes.  They audited me without my presence or my

21  participation.

22  Q.  You didn't -- did they invite you to participate?

23  A.  I don't recall getting invited to an audit.  I got some

24  letters requesting some documentation.  But I didn't -- I've

25  been to an audit.  I went to one in my life.  I spent 27 years

1    as a W-2, including my military service; and I did my own taxes

2    for 27 years.  I got audited one time, and I paid the amount at

3    the audit, $1.26.

4    Q.  I'm sorry.  My only question was, did you participate in

5    the audit?

6    A.  No.

7    Q.  You saw Ms. Applegate testify?

8    A.  I did.

9    Q.  Okay.  And would you agree that she sent you a letter and

10   that you called in response and left her a voicemail?

11   A.  Yes, I remember that.

12   Q.  And would you agree that you would not give her any bank

13   records?

14   A.  I -- I wouldn't give her any records.

15   Q.  And when your bank, Park State Bank & Trust, got a summons,

16   you reached out to them and told them not to give up any

17   records?

18   A.  No, I did not --

19   Q.  You --

20   A.  I did not instruct them to do that.  The only notification

21   that I got was a letter from the president of the bank, wanting

22   to close my accounts.

23   Q.  And when --

24   A.  And then I found out when I went in to talk to him that it

25   had to do with the summons.  So we worked out an agreement.  I

Lawrence Martin Birk - Cross

 1  said, I'll take care of my issues.  Don't worry about me suing

 2  the bank.  He said, fine.  You can have your accounts.

 3  Q.  So is it your testimony that you never threatened to sue

 4  the bank at first?

 5  A.  I never threatened to sue the bank.

 6  Q.  But the resolution was, I'll promise not to sue you, and

 7  you can --

 8  A.  They were good with that.  Absolutely.

 9  Q.  Okay.

10  A.  I never tried to quash the summons.  I didn't have anything

11  to hide.

12  Q.  Now -- and do you agree with the witnesses and exhibits

13  that show that you have not voluntarily paid a dollar in tax

14  since 1998?

15  A.  I agree with that.

16  Q.  And is that also true for the state of Colorado?

17  Voluntarily, I'm talking about.

18  A.  Aside from withholding, that's correct.

19  Q.  And does -- now, shortly after you got those notices of

20  intent to levy, is that about the time frame when you stopped

21  using your personal account?

22  A.  I'd say that's correct.

23  Q.  And that's when you started using your business account for

24  personal expenses?

25  A.  Certainly started using it a lot more.  That's correct.

Lawrence Martin Birk - Cross

1    *Q.*  It's your only bank account at that point?

2    *A.*  My only bank account with a debit card.  I still had

3    another account, but we didn't use it much.

4    *Q.*  You agree that about a million six of official checks

5    coming out of that account?

6    *A.*  That's the record.  I don't have that number handy, but I

7    assume that Park State Bank & Trust keeps good records and that

8    the IRS does too.

9    *Q.*  Well, I don't want you to assume.  Sir, I mean, if the

10   question is you don't know, that's fine.  You can say you don't

11   know.

12   *A.*  I don't know.

13   *Q.*  Okay.  You don't have any reason to dispute that figure?

14   *A.*  No.

15   *Q.*  And also you don't dispute that you did all of this to

16   protect against the IRS or the Department --

17   *A.*  No, that --

18   *Q.*  I'm sorry.  If I could --

19   *A.*  That is not correct.

20   *Q.*  Oh, I want to make sure so it's clear for the court

21   reporter and the record.  My question is, did you engage in the

22   official check buying to prevent the IRS and Colorado

23   Department of Revenue from sweeping your account?

24   *A.*  Not entirely.  No.

25   *Q.*  In part?

Lawrence Martin Birk - Cross

1    *A.*  In part, I did.  Yes.

2    *Q.*  Okay.  Now I'd like to ask you about -- he that's what you

3    told Agent Hopping?

4    *A.*  Absolutely.  Had nothing to hide.

5    *Q.*  Now, I want you to focus on TAMI.  And since you said you

6    have nothing to hide, why did you incorporate TAMI and open a

7    bank account as a conduit?

8    *A.*  I needed to have a conduit to do those transfers from the

9    custodians who -- various custodians to an account that I had

10   access to so that I could use those funds.

11   *Q.*  So you had an IRA at Park State Trust, didn't you?

12   *A.*  I had an MSA.

13   *Q.*  Talking about an IRA?

14   *A.*  I don't know that I had an IRA at Park State.  I don't

15   remember having one.

16   *Q.*  So some of the money came from Janus, for example?

17   *A.*  That was my wife's funds.

18   *Q.*  So there was nothing preventing you from saying, hey,

19   Janus, that's my money.  Just send it to my personal account.

20   *A.*  That's correct.

21   *Q.*  If you did that, they would have withheld tax?

22   *A.*  That's correct.  A tax that I did not believe I owed.

23   *Q.*  And so -- you had had tax withheld from earlier

24   distributions that you had taken from retirement accounts.

25   If -- I'll ask a clearer question.

Lawrence Martin Birk - Cross

1        Before you created TAMI, you had taken other

2   retirement distributions, and tax was withheld?

3   *A.*   I'm thinking about that.   There might have been one that I

4   did, and I'm trying to remember when that would have been.   I'm

5   thinking it was, I don't know, $30,000 or something.   But there

6   was one.   Yes.

7   *Q.*   And not to get into specifics, but -- and you got a

8   record -- a tax record about that distribution at the end of

9   the year called a 1099; right?

10  *A.*   I did.

11  *Q.*   And when you got that 1099, you brought it to Advanced Tax

12  Solutions and gave it to Mr. Erikson.

13  *A.*   Are we talking -- we're talking about the --

14  *Q.*   So --

15  *A.*   -- '98 and subsequent distributions, not prior to that.

16  Because mine would have been prior to that.

17  *Q.*   And when I'm asking about yours, I'll just say yours or

18  your wife's, if that's easier.

19  *A.*   That's fine.

20  *Q.*   So you brought Mr. Erikson 1099s showing that you had

21  retirement distributions; right?

22  *A.*   I did.

23  *Q.*   And that factored into his tax preparation; right?

24  *A.*   That's correct.

25  *Q.*   And you agree, though, that you didn't tell him about TAMI

Lawrence Martin Birk - Cross

1   as this conduit?

2   A.  Only from the standpoint that I was using that to -- as a

3   conduit for personal funds.

4   Q.  So I guess my question is, you did not tell Mr. Erikson

5   that you took over $400,000 in retirement assets, put it into

6   TAMI, and then into your business?

7   A.  Not specifically, I didn't.  No.

8   Q.  Did you tell him that in any way?

9   A.  I don't recall doing that.  I think when the information

10  from the IRS came back, he had some questions, and I explained

11  what that was.  I was not intending to mislead him.  I honestly

12  believed that was not taxable income.  It was personal funds.

13  Q.  So why did you give him the 1099s for other distributions

14  for him to use in his tax analysis?

15  A.  What were the other 1099s --

16  Q.  The 1099 --

17  A.  Other than the rollover ones, there was other 1099s?  I

18  don't recall hearing about those.

19  Q.  I'll move on.

20  A.  Or what they would be.

21  Q.  So -- now, you said that you terminated Advanced Tax after

22  you filed the tax returns?

23  A.  Correct.

24  Q.  Just briefly, why did you terminate them?

25  A.  I -- I believed that we were done with that phase, which

1    was to get those returns produced and filed.

2    Q.  And so -- I'm sorry.  One more question on TAMI.  I want to

3    make sure I just understand this.

4         When you talk about the conduit, is it your testimony

5    that you used TAMI as a way to avoid paying withholding on a

6    tax you didn't believe in?

7    A.  Yes.

8    Q.  Okay.  So you started your testimony -- and forgive me if

9    I'm misquoting you -- but you basically said you might file tax

10   returns going forward or you might not, or it may become

11   necessary?  What was it that you said?

12   A.  I think sitting here today, that there is a -- some

13   certainty that's going to happen, that I will be going back and

14   filing those returns, working with the IRS to resolve this

15   matter.  I'm retired now.  I don't -- I don't need any more of

16   this, and I know my wife doesn't.

17   Q.  Just today, as you sit here, do you believe that you are

18   required to file a tax return?

19   A.  I do not.

20   Q.  So what about on your wife's social security income that

21   she's drawing?

22   A.  Yes.

23   Q.  And --

24   A.  There will be a 2019 return filed.  I can assure you of

25   that.

Lawrence Martin Birk - Cross

1   Q.   And what about you, are you going to take social security?

2   A.   Maybe some day.  I'm not in a hurry to do that until age

3   70.

4   Q.   Now, you mentioned that you don't -- that you haven't paid

5   federal tax in about 20 years; right?

6   A.   About 20 years.  That's correct.

7   Q.   Or Colorado state tax?

8   A.   Or Colorado state tax.

9   Q.   What about real estate tax?

10  A.   That's a direct tax that's levied on property by the

11  state -- by the county, actually, is who collects it.  I'm good

12  with that.

13  Q.   So, sorry, is the answer yes?

14  A.   Yes.

15  Q.   Yes, that you do pay real estate tax?

16  A.   I do.

17  Q.   Do you pay vehicle tax?

18  A.   I do.

19  Q.   And how many vehicles would you say you've owned since

20  1998?

21  A.   Oh, my gosh.  Including trailers and special mobile

22  equipment and machinery, maybe a dozen.

23  Q.   And you've always paid your taxes on those things?

24  A.   I did.

25  Q.   Okay.  Now, why don't you pay the state tax?

Lawrence Martin Birk - Cross

1   *A.*  Thirty-four states in the union have what we call a

2   piggyback tax.  That means if you look at the implementing

3   statute and regulation at the state level, you always start out

4   with your federal tax liability.  Typically, you take your

5   federal adjusted gross income and add your state deduction to

6   it, and that's where you start.  It's Article 39, I think

7   Section 24 -- 22, Paragraph 104.

8   *Q.*  Of --

9   *A.*  Colorado Revised Statute.

10  *Q.*  Just so -- I just want to make sure I clearly understand

11  your position.  So are you saying that because the state tax

12  relies on the federal tax computations, therefore, it's not

13  lawful?

14  *A.*  Well, it's -- if I -- I would say that if I don't have a

15  federal tax -- if I don't believe I have a federal tax

16  liability, I don't have a state tax liability.  The state wrote

17  the law.

18  *Q.*  Okay.  And now the -- is it also true if you don't pay your

19  real estate tax, the state will take your house?

20  *A.*  I believe that will happen.

21  *Q.*  But, I mean, the IRS, you heard from agents, that they

22  can't really take a house that you live in with much ease.

23  *A.*  Oh, no.  I --

24  *Q.*  So if you don't pay your vehicle tax, can they suspend your

25  registration on your cars?

Lawrence Martin Birk - Cross

1   *A.*  Well, it will expire; and then you get to talk to the

2   sheriff's deputy or the trooper or whoever notices that.  And

3   there is a penalty applied.

4   *Q.*  So -- now -- and just -- if I'm not phrasing this

5   accurately, please correct me.  But is, basically, your basic

6   position that you would file taxes if you got a sort of

7   tailored explanation to your particular issues from the IRS?

8   *A.*  Well, from the government, the IRS, somebody in Congress.

9   I want the issue of the unapportioned direct tax on our incomes

10  to be addressed.

11  *Q.*  And you tried to raise this with several appeals officers,

12  for example?

13  *A.*  I did.

14  *Q.*  Three of whom testified in this trial?

15  *A.*  Correct.

16  *Q.*  And, basically, they said, I'll listen to your argument but

17  not really engage, but just sort of be polite and ignore it?

18  *A.*  I don't think we got that far.

19  *Q.*  Okay.  So do you think that an appeals officer at the IRS

20  has the power to interpret statutes and the Constitution?

21  *A.*  No, I don't.  But they have a chain of command also.  And

22  all I was really asking was for them to accept many materials I

23  had provided and to take -- take that up the chain of command,

24  and maybe I would get a response.

25  *Q.*  So the answer is no, you don't --

Lawrence Martin Birk - Cross

1   *A.*   No.

2   *Q.*   -- don't think they have it?

3   *A.*   No.  They don't have.

4   *Q.*   And so you know that at the top of that chain of command,

5   their position is, you have to pay tax on income you earn in

6   this country?

7   *A.*   Well, so far that's been true.  Yes.

8   *Q.*   That's always been true, the last 100 years?

9   *A.*   Well, I guess you could make that statement.  Sure.

10  *Q.*   Now -- and you're aware that no court in this country has

11  ever said anything other than that folks have to pay tax on the

12  income earned in this country?

13  *A.*   I'll accept that for face value.

14  *Q.*   Well, I'm just asking if you're aware of it.  I don't want

15  you to accept what I'm saying.

16  *A.*   Well, I don't know that that's true.  No.

17  *Q.*   Now, you mentioned that you were skeptical of folks who

18  sold silver bullet "here's the way to get out of taxes"

19  packages?

20  *A.*   True.

21  *Q.*   Okay.  So you never fell for any of those silver bullet

22  schemes?

23  *A.*   No.  I don't ever remember signing up or buying something

24  like that.  No.

25  *Q.*   But you just did your own research?

Lawrence Martin Birk - Cross

1    A.   I did.

2    Q.   And you mentioned spending -- was it 50 bucks a month, was

3    it?

4    A.   Well, yeah, that was kind of almost like association dues.

5    I was just supporting the home team.

6    Q.   And so -- and the home team, this is We the People?

7    A.   We the Peopled Foundation; correct.

8    Q.   And We the People -- you mentioned John Turner.  You

9    described him I think as a *pro se* litigant?

10   A.   That was the chairman, Mr. Schultz.

11   Q.   Bob Schulz?

12   A.   Right.  Mr. Turner was a former revenue officer out of

13   Washington state, I think.

14   Q.   Mr. Schulz -- so when you say a *pro se* litigant, that means

15   he wasn't a lawyer; right?

16   A.   No, he was not a lawyer.

17   Q.   And you mentioned that meeting you went to in D.C.  Were

18   there a lot of the big members of the movement there?

19   A.   Yes.

20   Q.   Larry Becraft, was he there?

21   A.   Yes.

22   Q.   You know who he is?

23   A.   Yes.

24   Q.   An attorney from Alabama?

25   A.   Yes.

Lawrence Martin Birk – Cross

1    Q.   Okay.

2    A.   I know him.

3    Q.   You're aware he's been sanctioned by the courts for making

4    frivolous tax arguments?

5    A.   Amount least once.

6    Q.   For arguing that the 16th Amendment was not properly

7    ratified?

8    A.   I am aware of that.

9    Q.   Okay.  And that case is cited in that big packet that the

10   IRS sent you; isn't it?

11   A.   It is.

12   Q.   And you also mentioned Mr. Banister.  I think you said he

13   was the IRS agent and CPA?

14   A.   He was a -- yeah.  He called himself a forensic CPA.  He

15   was a special agent, CID agent.

16   Q.   He's not a special agent anymore, is he?

17   A.   No, he's not.

18   Q.   He's not a CPA anymore; right?

19   A.   Not that I know of.

20   Q.   He was disbarred from being a CPA?

21   A.   Yes.

22   Q.   He was indicted criminally?

23   A.   He was.

24   Q.   Okay.  Now, the folks that testified here, the CPAs,

25   Mr. Erikson and Mr. Whalen, haven't been indicted; right?

Lawrence Martin Birk - Cross

1    *A.*   Not that I'm aware of.

2    *Q.*   Still have their CPA licenses?

3    *A.*   Yes.

4    *Q.*   Okay.  But you didn't agree with them and their

5    understanding of how the system works?

6    *A.*   I'm -- I really didn't discuss that aspect of it.  I knew

7    they were going to apply the rules as they understood them, and

8    I was okay with that.

9    *Q.*   And so you -- you mentioned the American Rights Litigators

10   earlier.

11   *A.*   Yes.

12   *Q.*   And I think you said -- and correct me if I'm wrong -- you

13   hired them to do some consulting and write letters?

14   *A.*   Correct.

15   *Q.*   And when you say "write letters," do you mean send

16   correspondence to the IRS on your behalf?

17   *A.*   Yes.

18   *Q.*   So it's true that one of those folks was your power of

19   attorney --

20   *A.*   That's correct.

21   *Q.*   -- before the IRS?

22   *A.*   You bet.

23   *Q.*   And that person's name was Brian Malatesta?

24   *A.*   That sounds right.

25   *Q.*   And he was a CPA?

Lawrence Martin Birk - Cross

1   *A.*   That sounds right.

2   *Q.*   Not anymore?

3   *A.*   That's my understanding.

4   *Q.*   And he was enjoined by a federal court -- prevented from

5   representing folks before the IRS?

6   *A.*   I don't know about that, but -- could be.

7   *Q.*   He wasn't your CPA for long.

8   *A.*   No, he wasn't.  I ceased activity with that group.

9   *Q.*   Now -- so why -- well, let me just ask you:  You never

10  hired a lawyer to serve as your counsel and give you advice on

11  taxes?

12  *A.*   I did not.

13  *Q.*   You never pressed your case in a court?

14  *A.*   I did not.

15  *Q.*   Not tax court?

16  *A.*   Not a tax court.

17  *Q.*   Not in Article III court?

18  *A.*   No.

19  *Q.*   Okay.  And is -- but you understand that legal

20  controversies are decided in courts; right?

21  *A.*   Unless there is -- like the anti-injunction act that I

22  referred to previously, where you're not allowed to go to the

23  court --

24  *Q.*   And that --

25  *A.*   -- with a tax matter.

111

Lawrence Martin Birk - Cross

1    *Q.* But that holding was decided in a court; right?  Judge

2    Kavanaugh, he's the one that said that; right?

3    *A.* I believe so.

4    *Q.* Okay.  Do you understand in this country, courts are where

5    we settle legal disputes?

6    *A.* I agree with that.

7    *Q.* Okay.  Not in appeals conferences or places like that?

8    *A.* True.

9    *Q.* Not on the phone with your auditor?

10   *A.* True.

11   *Q.* And isn't it true that in one of your letters you wrote --

12   that you basically said, you had no chance winning in the

13   courts.

14   *A.* I don't recall what letter that was, but -- it's possible

15   that I would have said something like that out of frustration.

16   *Q.* So does that mean that you didn't really mean it?

17   *A.* I'm sure when I wrote it, I did.

18   *Q.* So you knew when you wrote that letter that you had no

19   chance of prevailing in court?

20   *A.* I don't believe I had any intent to use the court at that

21   time.  I was going to use the right to petition and the

22   Congress, who makes the laws, to try to resolve the matter.  I

23   thought our chances were far better with the Congress.

24   *Q.* So you didn't -- you did not intend to use the courts?

25   *A.* I did not intend to use the court.

Lawrence Martin Birk - Cross

1   *Q.* And when you say "petition," do you mean like that letter

2   you sent to Congressman Lamborn?

3   *A.* No.  The petition for redress itself.

4   *Q.* So --

5   *A.* All I was doing is informing him that we had done so and

6   that he had not responded.

7   *Q.* So why would you have said that you had no chance in court

8   and that you were going to rely on the petition process even

9   after the Supreme Court denied the We the People lawsuit?

10  *A.* We, first of all, I guess I was not surprised that that

11  happened.  I had high hopes that we would get into the Supreme

12  Court with that issue.  In fact, the appeals court, Judge

13  Rogers, wrote in her opinion that it would be interesting to

14  see how the Supreme Court would handle it, since it was a first

15  impression constitutional issue.  It never had been

16  adjudicated.  So that did not happen.

17  *Q.* Now, you just mentioned the Constitution.  And correct me

18  if I'm wrong, but you testified on direct -- you said, I

19  believe the tax system is 100 percent constitutional.  Was that

20  your testimony?

21  *A.* I believe it is, if it's properly applied.  Absolutely.

22  *Q.* Okay.  But in your testimony, you referenced Article I of

23  the Constitution?

24  *A.* Correct.

25  *Q.* First Amendment?

1    *A.*  Correct.

2    *Q.*  Second Amendment?

3    *A.*  I did.

4    *Q.*  Fifth, Ninth, and Tenth?

5    *A.*  Sure.

6    *Q.*  16th?

7    *A.*  You bet.

8    *Q.*  So -- and in your letters you references several amendments

9    to the IRS?

10   *A.*  Yes.

11   *Q.*  Now, when you say that you believe the tax system is

12   100 percent constitutional -- well, let me withdraw that

13   question.

14       You know that no court has ever held the tax system

15   unconstitutional; right?

16   *A.*  Correct.

17   *Q.*  Would you agree that in your correspondence, however, you

18   claimed that the tax system was not constitutional?

19   *A.*  If I said that, it was probably related to the 16th

20   Amendment issue.

21   *Q.*  Okay.  And so -- but is the answer yes --

22   *A.*  Yes.

23   *Q.*  -- that you said that.

24       Okay.  Are you saying that your view has changed from

25   when you wrote those letters to today?

Lawrence Martin Birk - Cross

1    A.   No.  I think it's a matter of interpretation.  I believe if

2    the tax laws are applied properly in accordance with the way

3    the tax code is written, within the boundaries of the

4    Constitution, that it is absolutely constitutional.  The

5    problem is the misapplication, not the least of which is a

6    direct unapportioned tax on our income.

7    Q.   When you use the words "direct" and "unapportioned," those

8    are constitutional terms, are they not?

9    A.   They are.

10   Q.   But you're saying your argument is not constitutional.

11   A.   My argument is not constitutional?  I'm not making an issue

12   out of the ratification of the 16th Amendment.  I talked to

13   that earlier.  I don't think it matters.  I think that Supreme

14   Court cases early on address those issues and certainly I

15   believe clearly stated that it did not create some kind of a

16   new tax and that it was an indirect tax --

17   Q.   Okay --

18   A.   -- with proper form and subjects.

19   Q.   You have said that the government violates the taxing

20   clauses of the Constitution; correct?

21   A.   I believe that is what we're facing today.  Yes.

22   Q.   So today as you sit here, you believe the government's

23   interpretation of the tax laws is violating the taxing clause

24   of the Constitution?

25   A.   Yes, I do.

Lawrence Martin Birk - Cross

1    *Q.*  Now, this -- the views that you have, do you espouse them

2    to other folks?

3    *A.*  Well, when I was associated with We the People, I certainly

4    did.  I went to meetings.  I even held meetings.  I was the

5    Park County coordinator for We the People Congress.

6    *Q.*  But today, do you try to get other people to not pay their

7    taxes?

8    *A.*  No.  I don't discuss it with anybody anymore.

9    *Q.*  Your kids, do they pay their taxes?

10   *A.*  They do.

11   *Q.*  Okay.  What about your clients, do you ever discuss it with

12   them?

13   *A.*  No.  I wouldn't say my clients.  I may have had some

14   discussions with subcontractors, but certainly not initiated by

15   me.

16   *Q.*  Let me ask you, you would agree that your view is an

17   outlier view?

18   *A.*  Yes.  I would say that it's not mainstream.

19   *Q.*  It's a view on the far fringes; would you agree with me?

20   *A.*  Perhaps you could categorize it as that.

21   *Q.*  Let me ask you this:  Besides you and your wife, do you

22   know anyone else that doesn't pay taxes?

23   *A.*  Yes.  I know quite a few people who don't.

24   *Q.*  Even though they earn income?

25   *A.*  Yes.

Lawrence Martin Birk - Cross

1    *Q.*  Who?

2    *A.*  Well, I can't divulge that.  I won't do that.  Why would I

3    do that?  Let's just say that up where I was running my

4    business, we had a lot of subcontractors, carpenters and

5    drywall guys and roofers, they don't even have bank accounts.

6    *Q.*  So --

7    *A.*  They want to be paid in cash.

8    *Q.*  So I'm asking you if you could tell us who the people that

9    you know are that don't pay taxes, even though they earn

10   income?

11            *MR. HARRIS:*  Objection.  Relevance as to the names of

12   individual people.

13            *THE COURT:*  Response.

14            *MR. MAGNANI:*  Your Honor, it goes to this witness's

15   credibility.  He's just testified he knows many people who

16   don't pay taxes.  And if he actually does, he should name them.

17   He has no privilege.

18            *THE COURT:*  Credibility is always relevant.  We start

19   in the Federal Rules of Evidence at 104(e), go quickly to Rules

20   401, 402, 403, and wind up at 611(b), just showing off.  The

21   objection is overruled.

22            Sir, you shall answer the question, as long as you

23   recall it and can answer it.

24            *THE WITNESS:*  Very well, Your Honor.

25            I know several -- I'll call them concrete flatwork

Lawrence Martin Birk - Cross

1   contractors that are outside the system.

2   *BY MR. MAGNANI:*

3   *Q.*   I'm sorry.  The question is, would you tell me the names of

4   the people you know who make income and don't pay taxes?

5         *MR. HARRIS:*  I think he's trying to answer the

6   question.  Maybe if Mr. Magnani gave him a chance.

7         *THE WITNESS:*  Greg -- you want full names?

8   *BY MR. MAGNANI:*

9   *Q.*   First and last names.

10  *A.*   Greg Langendorfer is one.  Oh, boy, I'm trying to remember

11  the other guy's last name.

12  *Q.*   How do you spell the last name?

13  *A.*   I think it's Langendorfer.   L --

14  *Q.*   Try your best.

15  *A.*   L-A-N-G-E-N-D-O-R-F-E-R.   I'm trying to remember the guys

16  that work on that crew.

17  *Q.*   What's the name of the crew?

18  *A.*   Oh, they're just a group of subcontractors that work for

19  many people.  Bona Fide Concrete Companies.  And when they need

20  help, they bring these guys in.

21  *Q.*   So the question is, what's the name of the crew?

22  *A.*   Of the crew?

23  *Q.*   So, Mr. Birk, if I wanted to find these people and bring

24  them into court to ask them the same questions, how would I

25  find them?

Lawrence Martin Birk - Cross

1    A.  Well, quite honestly, I have a hard time finding them

2    sometimes, up in Park County.  But I'm trying to remember some

3    more names for you.  I'm trying to multiplex here.

4    Q.  Sir, you were on a lawsuit with over 1,000 plaintiffs

5    claiming that the tax laws were unconstitutional.  Are you

6    saying that the only person that you can tell me --

7    A.  That was a long time ago.  And I didn't know a lot of these

8    people personally.

9    Q.  So is the answer -- so here is my question:  Are you

10   telling us the only person you can name is one guy who works on

11   a crew?

12   A.  No.  There is lots of contractors up there.  In many cases,

13   I don't even know their last names.

14   Q.  Okay.  So it's your testimony that you can't give the name

15   of a single person, except for this one person that you've

16   named and you don't know where he works?

17   A.  I don't -- well, he works at various places.  I don't know

18   where he lives.

19   Q.  Sir, you testified that you paid membership dues in an

20   organization; correct?

21   A.  I did.

22   Q.  That organization protested the tax system; correct?

23   A.  I don't know if I would the use the word "protest."  We

24   don't consider ourselves tax protesters.

25   Q.  Sure.  That organization filed a lawsuit in federal court

Lawrence Martin Birk - Cross

1   saying they don't have to pay federal taxes because of their

2   First Amendment rights to a response to their petition of

3   grievances?

4   A.   That is correct.

5   Q.   You worked with these people.  And in working with them,

6   you placed ads in newspapers; correct?

7   A.   Correct.

8   Q.   You said you spent hundreds of dollars on travel; correct?

9   A.   I did.

10  Q.   Okay.  And what you're saying now is that you don't know if

11  any of these people by their names, whether or not they pay

12  taxes on income earned in this country?

13  A.   That particular group of people, no, I don't.

14  Q.   So you're still sticking with, you know one person, a guy

15  on a crew?

16  A.   No, I --

17       MR. HARRIS:  Mischaracterizes his testimony.  That is

18  absolutely not what he's saying.

19       THE COURT:  Guess what?  We're in luck.  The jury gets

20  to determine who said what to whom and when, and we'll leave it

21  up to the jury to determine that.  Whether or not counsel

22  believes it or not is irrelevant.  The objection is overruled.

23       Let's move on, counsel.

24       MR. MAGNANI:  I just -- to answer the question -- may

25  the witness answer the question?

Lawrence Martin Birk - Cross

1          *THE COURT:*  Well, let's do it this way:  To the extent

2     that you persist in your question, please reiterate it.

3               *MR. MAGNANI:*  Sure.

4     *BY MR. MAGNANI:*

5     *Q.*  Is it your testimony that you only know the first and last

6     name of one person who makes income in this country and doesn't

7     file tax returns?

8     *A.*  No.  That's not correct.

9     *Q.*  So please tell us the name of the other folks.

10    *A.*  And I don't know what their current status is, but I know

11    they've had issues with the IRS.  John Dillon.

12    *Q.*  Sort of a celebrity?

13    *A.*  Well, he had a company named Gunsmoke Excavating.

14    *Q.*  Are you saying that you were personal friends with him?

15    *A.*  I wouldn't say friends.  Business associates.

16    *Q.*  Okay.

17    *A.*  You know -- I guess I didn't come prepared to give you a

18    list of names today.  But if I sat down, I could probably come

19    up with some.  But -- never really thought about that.  But

20    there is -- you know, the rural areas are a lot different.

21    There are a lot of people that live up there on purpose, and

22    they don't even have bank accounts.

23    *Q.*  So you're saying, you just know some unbanked people who

24    get paid in cash, those are the only ones --

25    *A.*  No.  I like I said, I don't initiate the conversations, but

Lawrence Martin Birk - Cross

1   sometimes these people do?

2   *Q.*  So in your travels in the We the People movement, haven't

3   you met a lot of like-minded people?

4   *A.*  Years ago I did, yes.

5   *Q.*  None of those people, you can't think of any of them?

6   *A.*  Not off the top of my head.

7   *Q.*  So --

8   *A.*  The senior people.  We talked about Joe Banister and John

9   Turner and Sherry Jackson.

10  *Q.*  So you're talking about the senior people, some of whom we

11  talked about before?

12  *A.*  Yes.

13  *Q.*  And --

14  *A.*  But I don't know what their status -- I don't know if they

15  were paying taxes or filing them.  We never really discussed

16  that.

17  *Q.*  Now, you've done a lot of legal research over the course of

18  your study in taxes; right?

19  *A.*  I think that's a fair statement.

20  *Q.*  I think -- you say that you do research, you get data, test

21  hypothesis --

22  *A.*  Sure.

23  *Q.*  Sort of pretty scientific?

24  *A.*  Yeah.

25  *Q.*  Okay.  But you would agree that you have a bit of a

Lawrence Martin Birk - Cross

1    conflict of interest.  This isn't an impartial academic study;

2    right?

3    A.  I think that would probably be fair.  I think most people

4    would be that way if they've come to a position where they

5    think they have an understanding of something.  That doesn't

6    mean they won't consider alternatives, they won't look at that

7    information.  I think I've already testified to that.

8    Q.  Sure.  And you have.  But my question is, you would agree

9    with me that you have a bit of a conflict in this regard.

10   A.  A conflict?  I'm not --

11   Q.  Right --

12   A.  I might have a bias of some sort because of the information

13   I've seen year after year after year.

14   Q.  You're not like an unbiased, impartial law professor

15   studying this as an academic issue?

16   A.  Probably not.  No.

17   Q.  You're not aware of any law professors that have agreed

18   with your conclusions?

19   A.  I don't know that I've talked to any about my conclusion.

20   Quite frankly, I was a student sitting in a class listening to

21   other people talk.

22   Q.  So my question was, you're not aware of any law professors

23   that agreed with your position?

24   A.  No, I'm not.

25   Q.  You're not aware of any federal judges who agree with your

Lawrence Martin Birk - Cross

1    position?

2    *A.*   The only one that comes to mind -- and I don't know if

3    Judge Fox is still in the Eastern District of North Carolina.

4    But in 2003, he had a case where during a hearing, he made a

5    comment on the record about the ratification of the 16th

6    Amendment that I thought was interesting.  That if you looked

7    at the evidence, you would find that not the prerequisite

8    number of states ratified that amendment.  Okay?  I just

9    thought it was curious that a senior judge in a District Court

10   would make a comment like that on the record.  But --

11   *Q.*   I'll ask a different question.  When I say "agree with your

12   views," I'm not talking about the 16th Amendment --

13   *A.*   Okay.

14   *Q.*   -- I'm talking about your views --

15   *A.*   No.  I do not know anybody.

16   *Q.*   Just so we're clear, I need to make sure the court reporter

17   gets this --

18   *A.*   Okay.

19   *Q.*   Your view that folks like you in business in America don't

20   have to pay income tax, that specific view is not shared by

21   anyone on the federal bench in this country?

22   *A.*   Not that I know of.

23   *Q.*   Now, you also know that a lot of the folks who have been

24   affiliated with this movement have ended up in pretty bad

25   shape; right?

Lawrence Martin Birk - Cross

1    A.  I'm aware of some of that, yes.

2    Q.  Some folks have been indicted?

3    A.  Yes.

4    Q.  Some folks been convicted?

5    A.  Yes.

6    Q.  Some folks gone to prison?

7    A.  Yes.

8    Q.  In your study, did you ever study those cases of those

9    people?

10   A.  The ones that I spent the most time on were the acquittals.

11   Q.  So let me ask you this:  Looking at those acquittals, did

12   you ever look at the jury instructions in those cases?

13   A.  I did.

14   Q.  So did you look at the way the judge instructed the juries

15   on the law in those cases?

16   A.  I did.

17   Q.  Did any judge in any of those cases ever tell the jury that

18   your view of the law was a correct one?

19   A.  No.  It -- in the instructions, it had more to do with what

20   I believed the law is.

21   Q.  And so the -- so you do understand that the instruction is

22   about what you believe the law is?

23   A.  Correct.

24   Q.  Okay.  And you also read instructions in those cases that a

25   belief that the law is unconstitutional is not a good faith

Lawrence Martin Birk - Redirect

1  defense?

2  A.  I'm not sure I'm making that claim, that it's

3  unconstitutional.

4  Q.  I'm sorry.  I'll repeat the question.  Did you read

5  instructions in criminal cases -- judges instructing juries --

6  that a belief that the law is unconstitutional does not

7  constitute a good faith defense?

8  A.  I believe that's correct.

9  Q.  And that's why you are 100 percent not making a

10  constitutional argument; isn't that right?

11  A.  No, not from that perspective.  I think that it's my

12  understanding of the law of the Constitution and the Supreme

13  Court cases, that's why I'm making that statement.

14        MR. MAGNANI:  Very well, Mr. Birk.  Thank you.

15        THE WITNESS:  You bet.

16        THE COURT:  Mr. Harris, redirect examination?

17        MR. HARRIS:  Yes.  If I could have a moment?

18        THE COURT:  And you may, of course.  Thank you.

19        Stand and stretch if you're quick, ladies and

20  gentlemen of the jury.

21                    **REDIRECT EXAMINATION**

22  BY MR. HARRIS:

23  Q.  Couple of questions, following up on what Mr. Magnani was

24  asking you in different areas.

25        So I want to make sure that you're clear on what he

Lawrence Martin Birk - Redirect

1  was asking you, because I wasn't at times, with respect to

2  people who don't pay taxes that you may know.  So let me, with

3  that introduction, introduce this topic.

4        It's fair to say, isn't it, that over periods of time,

5  you knew plenty of people who didn't pay taxes; right?

6  A.  Over periods of time; correct.

7  Q.  People in the tax honesty movement; correct?

8  A.  Correct.

9  Q.  People at We the People; right?

10  A.  Correct.

11  Q.  Other people here and there that you would come into

12  contact with through your study and associations; correct?

13  A.  Correct.

14  Q.  He asked you, however, two distinct questions that at times

15  I believe were conflated.  I want to know, do you think that

16  those questions sometimes merged together?  Do you think that

17  sometimes he was asking --

18        MR. MAGNANI:  Objection, Your Honor.

19        MR. HARRIS:  I'll ask it differently.

20        MR. MAGNANI:  Counsel is testifying.

21        THE COURT:  Well, we've got a part of the question;

22  we've got an objection; we've got an offer to rephrase.  I'm

23  going to make it easy on myself and allow counsel to rephrase.

24  That moots the objection; obviates the necessity for my ruling;

25  I'm off the hook.

Lawrence Martin Birk - Redirect

1        You may ask your next question, counsel.

2        MR. HARRIS:  Thank you, Your Honor.

3   BY MR. HARRIS:

4   Q.  Did you fully understand his question as referring to one

5   or another of the two groups, people you've known generally and

6   people you know now in Park County?

7   A.  I -- I think he was just testing me to know if I could list

8   a group -- bunch of people by name, which made me very

9   uncomfortable, quite frankly.

10  Q.  Why?

11  A.  Well, I don't think that it's proper to name other people

12  by name that -- you know, I'm not sure what their current

13  situation is.  Maybe they're already engaged with the IRS too.

14  I don't know.  Maybe they've left the area.  Maybe they've

15  died, for that matter, because this goes back 20 years.

16  Q.  Okay.  Have you spent a whole lot of time other than in the

17  last few minutes wracking your brain to figure out who you know

18  who pays taxes and who you know who doesn't?

19  A.  Not really, no.

20  Q.  That hasn't been a big focus of your attention; right?

21  A.  Not at all, really.

22  Q.  You've got your own tax problems?

23  A.  That's correct.

24  Q.  Law professors, judges, other people, you're aware of

25  plenty of people besides law professors and judges that don't

Lawrence Martin Birk - Redirect

1  endorse your view of the law; right?

2  *A.*  Yes.  My own family.

3  *Q.*  Does it mean you're wrong?

4  *A.*  I don't think so.

5  *Q.*  Has it given you pause to think, though, over time as to

6  whether you might be wrong?

7  *A.*  No, not really.

8  *Q.*  Why?

9  *A.*  Well, I think people have a variety of opinions about

10  things; and how they form those opinions is also varied.  I

11  don't think it's my role to try to correct them.  I learned a

12  lesson in graduate school about, you know, phases of truth.

13  You know, you start out with disbelief.  Somebody will look at

14  you and say, that can't be true because -- I would know about

15  it.  And then they would ridicule you, you don't believe that,

16  really.  Then they get angry about it, say, if you don't stop

17  that, you're going to get in trouble.  And the last one is

18  acceptance, because now the truth has manifested itself.  You

19  know, are there lessons there in dealing with people?  Yes.

20  *Q.*  Are you familiar with a guy named Galileo?

21  *A.*  I am.

22  *Q.*  Did he hold an unconventional belief?

23  *A.*  Very much so.

24  *Q.*  Mr. Magnani talked about some statement, no chance in

25  court.  Do you know what document he was referring to that he's

129

Lawrence Martin Birk – Redirect

1    quoting from?

2    *A.*  Not off the top of my head.

3    *Q.*  Do you believe that whether or not you had a chance in

4    court, that -- well, let me put it differently.

5          Would your view concerning whether or not you had a

6    chance in court affect your understanding of the law?

7    *A.*  No.  I don't think so.

8    *Q.*  Just a few loose ends.

9          Vehicle taxes, you were okay paying those; right?

10   *A.*  Yes.  I think those are valid constitutional taxes at the

11   federal and the state levels, depending on what kind of tax

12   you're paying.  I've never been involved in things like

13   commercial trucking or things that have DOT requirements, but I

14   do know a lot of people that do.

15   *Q.*  If we had a national sales tax, would you be okay paying

16   that?

17   *A.*  Well, I think from the standpoint of a valid indirect tax

18   and a proper form and subject, yes, I would.

19   *Q.*  Colorado taxes.  I just want to make sure we all understand

20   your position.  Colorado state income taxes, what's your

21   concern with respect to those.

22   *A.*  I don't have a concern.  I have an understanding of what

23   the revised statute says --

24   *Q.*  That's --

25   *A.*  -- and how it works.

Lawrence Martin Birk - Redirect

1    Q.  That's a better way to put it.  What's that understanding?

2    A.  It's basically a piggyback tax.  It starts right in the

3    statute in the first line, it talks about your federal adjusted

4    gross income.  So you start with the federal tax liability.

5    Q.  So if you start -- so garbage in, garbage out?

6    A.  Basically.

7             MR. HARRIS:  If I could have a moment.

8             THE COURT:  You may, counsel.  Thank you.

9             MR. HARRIS:  I have no further questions.

10            THE COURT:  Very well.

11            Mr. Birk, once again, you may stand down and return to

12   your seat.

13            THE WITNESS:  Thank you, Your Honor.

14            THE COURT:  You're welcome.

15                     *   *   *   *   *

16                        **I N D E X**

17   **Witness**                                              **Page**

18      LAWRENCE MARTIN BIRK
              Direct Examination By Mr. Harris            3
19            Cross-examination By Mr. Magnani            84
              Redirect Examination By Mr. Harris          126
20

21                   REPORTER'S CERTIFICATE

22            I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
23

              Dated at Denver, Colorado, this 9th day of August,
24   2019.

25                                  _____
                                    Therese Lindblom,CSR,RMR,CRR