1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3
     Criminal Action No. 18-cr-00359-REB
4

5     UNITED STATES OF AMERICA,

6              Plaintiff,

7              vs.

8     LAWRENCE MARTIN BIRK,

9              Defendant.

10   -----------------------------------------------------------

11                     REPORTER'S TRANSCRIPT
                       SENTENCING HEARING
12   -----------------------------------------------------------

13
              Proceedings before the HONORABLE ROBERT E. BLACKBURN,
14   Judge, United States District Court for the District of
     Colorado, commencing at 1:09 p.m. on the 30th day of
15   October, 2019, in Courtroom A1001, Alfred A. Arraj United
     States Courthouse, Denver, Colorado.
16

17                        APPEARANCES

18   For the Plaintiff:
     CHRISTOPHER MAGNANI, Trial Attorney, and ELIZABETH C. HADDEN,
19   Assistant Chief, U.S. DEPARTMENT OF JUSTICE, TAX DIVISION,
     150 M Street, NE, Washington, DC 20002
20
     For the Defendant:
21   EDWARD R. HARRIS, Assistant Federal Public Defender, FEDERAL
     PUBLIC DEFENDER'S OFFICE, 633 Seventeenth Street, Suite 1000,
22   Denver, CO 80202

23

24
          JULIE H. THOMAS, RMR, CRR, 901 19th Street, Room A256,
25         Denver, CO 80294, (303)296-3056  (CA CSR No. 9162)

              Proceedings reported by mechanical stenography;
                   transcription produced via computer.

```
 1        (Proceedings commenced 1:09 p.m.,

 2        October 30, 2019.)

 3             THE COURT:  Good afternoon, and thank you.  Please be

 4   seated.

 5             Thank you.  Please open the record now in 18-cr-359,

 6   identified as United States of America versus Lawrence Martin

 7   Birk, defendant.  The matter comes on for sentencing hearing.

 8             Commencing with the Government and transitioning to

 9   the defense, ladies, gentlemen, may I have your appearances,

10   please.

11             MR. MAGNANI:  Christopher Magnani for the United

12   States.  Good afternoon, Your Honor.

13             MS. HADDEN:  Elizabeth Hadden for the United States.

14   Good afternoon.

15             THE COURT:  And joining you is -- drum roll.

16             SA WARNOCK:  Special Agent George Warnock for the

17   IRS.

18             THE COURT:  Lady, gentlemen, good afternoon.

19             Mr. Harris.

20             MR. HARRIS:  Good afternoon, Your Honor.  Ed Harris

21   appearing on behalf of Mr. Birk.  Mr. Birk is present.

22             THE COURT:  And gentlemen, good afternoon.

23             Also present from the Probation Department is the

24   architect of our presentence investigation and author of our

25   presentence report, Probation Officer Ryan Kinsella.
```

1          PROBATION OFFICER:  Good afternoon, Your Honor.

2          THE COURT:  As required both by federal statute and

3     Rule of Criminal Procedure, the Probation Department, through

4     Mr. Kinsella, has conducted a presentence investigation and

5     filed a presentence investigation report, the final and

6     operative version of which is document 104, filed October 18,

7     2019.

8          For our purposes, the presentencing report shall be

9     defined to include:  that Presentence Investigation Report;

10    the Revised Sentencing Recommendation, document 104-1; the

11    Addendum to the Presentence Report, document 105; and the

12    Second Addendum to the Presentence Report, document 106.

13         As now comprised and defined, I have received, read,

14    and reviewed carefully and thoroughly our presentence report.

15    Thus, I inquire of the parties:

16         Has the Government received, read, and reviewed the

17    presentence report as I now define it?

18         MR. MAGNANI:  Yes, Your Honor.

19         THE COURT:  Are there any additions or corrections of

20    a material or substantive nature not now of record?

21         MR. MAGNANI:  No, Your Honor.

22         THE COURT:  Mr. Harris, have you received and read

23    the presentence report as I define it?

24         MR. HARRIS:  Yes, Your Honor.

25         THE COURT:  To your knowledge, has Mr. Birk done

1    likewise?

2              MR. HARRIS:  Yes, Your Honor.

3              THE COURT:  And have you reviewed and discussed with

4    him carefully and thoroughly the presentence report as I

5    define it?

6              MR. HARRIS:  Yes.

7              THE COURT:  Are there any additions or corrections of

8    a material or substantive nature not now of record?

9              MR. HARRIS:  No, Your Honor.

10             THE COURT:  Thank you.

11             Also pending before the Court relevant to sentencing

12   are the following papers and documents:

13             The United States' Sentencing Statement, document 95,

14   filed August 23, 2019; the Defendant's Reply to United States'

15   Sentencing Statement, document 99, filed August 29, 2019; the

16   Defendant's Objections to Presentence Report Guideline

17   Calculations, document 102, filed October 3, 2019; the

18   Defendant's Sentencing Statement and Motion for Nonguideline

19   Sentence of Probation, document 103, filed October 3, 2019;

20   and, lastly, the United States' Sentencing Recommendation and

21   Response to Defendant's Objections to the Presentence Report

22   Guidelines Calculations and Motion for Nonguideline Sentence,

23   document 107, filed October 23, 2019.  These documents also

24   include any attached exhibits or addendum.

25             I have received, read, and reviewed carefully and

1    thoroughly each of those aforementioned sentencing related

2    documents.

3            Counsel, before I receive your anticipated sentencing

4    presentations, please understand that I have received, read,

5    and reviewed carefully and thoroughly all facts asserted,

6    reasons stated, arguments advanced, and authorities cited by

7    you and the probation officer in the various papers relevant

8    to sentencing.  Therefore, during this hearing, please do not

9    simply present a soporific, festooned reiteration of those

10   written arguments and authorities.  Thank you.

11           With that introduction, Mr. Harris, I turn to you to

12   inquire:  Do you wish to make a statement or presentation on

13   behalf of Mr. Birk, offer additional information in mitigation

14   of sentencing and punishment, comment further on the various

15   determinations of the probation officer, and, of course, be

16   heard on matters relating to the appropriate sentence?

17           MR. HARRIS:  Yes, Your Honor.

18           THE COURT:  And you may.

19           MR. HARRIS:  So, Your Honor, as a starting point and

20   a guidepost to what I'm going to say, I don't intend to

21   address in any manner the objections that we have lodged.  I

22   think both sides have laid out their arguments, staked out

23   their ground, and the Court will decide what the Court

24   decides.

25           With respect to sentencing and specifically variance

1    or departure, it is my -- not my intention to reiterate what I

2    have written except to the degree that it involves responding

3    to what the Government has written in ECF 107.  So I will

4    attempt to focus my remarks on that.  And I'll begin by

5    discussing family ties, responsibilities, and the question of

6    departure or variance to accommodate.

7            The law is clear, and both sides I think agree, that

8    the central issue concerning such a departure, if styled as a

9    departure at least, is whether a guideline sentence would

10   cause a substantial direct and specific loss of essential

11   caretaking to the defendant's family.  From there the parties

12   diverge factually and speculatively as to whether it would.

13           It's our position that this is precisely the

14   circumstance envisioned by the guideline.  The Government

15   certainly cannot help but concede that Mrs. Birk does need

16   caretaking of some sort, but claims that someone else can and

17   should do it.  They speculate in 107 -- and by "107" I mean

18   ECF 107 -- that someone else can do that, whether it's a

19   family member other than Mr. Birk or a skilled living

20   facility.  They haven't, however, despite commendable

21   investigation, investigated the question really of whether her

22   family can do that.  They have investigated, to a degree,

23   other options, provided some fact sheets showing, um,

24   purported costs, but the fact is that the family cannot do it,

25   that it would be impracticable, and that it is absurd to

1    assume otherwise.  And I'll talk about that in a bit.  But as

2    for other options, we submit, by way of overview, that those

3    also are not terribly realistic here and certainly are

4    suboptimal.

5            At this point Mr. Birk certainly does not have the

6    kind of money to pay for assisted living or skilled care such

7    as that which the Government has investigated.  His finances

8    are well known to all in this courtroom, and he owes a huge

9    amount of money to the IRS which no doubt they will seek to

10   enforce.

11           And the Government provides nothing but the opinion

12   of Mr. Birk's ex-wife, who no doubt, given the history there,

13   has no fond wishes for the -- for Jean Birk, his current wife,

14   to support the assertion that Mr. Birk will need help in

15   caring for Mrs. Birk.  Concededly, at some point he will

16   probably need that assistance.  At this point my understanding

17   from Mr. Birk is that he does not.

18           And it is all too easy for the Government to cast

19   Mrs. Birk off to some assisted living arrangement.  However,

20   the question remains as to whether the loss -- this is

21   guideline language -- of caretaking or financial support

22   substantially exceeds the harm ordinarily incident to

23   incarceration for a similarly situated defendant.  The

24   Government, for its part, compares this situation to losing a

25   parent to incarceration.  I submit this is different in any

1    number of ways from losing a parent and that, simply put, if

2    Mr. Birk's care is irreplaceable, that this Court does have

3    discretion, whether by variance or by departure, to impose a

4    lower-than-usual sentence.

5            Now, the Government argues that this caregiving by

6    Mr. Birk is not irreplaceable.  I submit that those arguments

7    are beyond weak.  First, the Government, uh -- and frankly,

8    surprisingly, it's a grasping-at-straws desperate argument --

9    analyzes his liquor expenditures over the course of an average

10   year, suggesting that maybe he's got issues himself with

11   substances such that he's not best suited to caretaking.  This

12   despite zero evidence of any substance issues.  The

13   Government's account analysis reveals the shocking -- and I

14   put this in quotes and say it ironically, sarcastically, dare

15   I say -- $1500 a year at liquor stores.  In other words, and

16   my math skills are weak, but that's about 28 or $30 a week, a

17   bottle or two of a moderately priced wine for one or two

18   people.  Hardly a raging alcoholic.  Hardly worth mentioning,

19   and I will, therefore, move on.

20           Argument number two that the Government proffers is

21   the Park County arrest that led to his brief incarceration in

22   this case at the front end of the case, a nonevent which the

23   Government implies or I think wants the Court to infer was

24   some sort of deviant incident despite the fact, which the

25   Government cannot help but admit, that there was no probable

1   cause determination made by the police that there was any such

2   incident.

3         Now, the Government I think also asserts or puts

4   forward these circumstances to show that, well, maybe it

5   wasn't that, but clearly Mr. Birk just can't handle Mrs. Birk

6   if she's running outside, screaming whatever it is she's

7   screaming.  But that really doesn't prove the point.  It just

8   proves that there was a difficult situation one day with

9   Mrs. Birk.  It doesn't really say much more than that.

10        The third point the Government makes with respect to

11  this argument is a wholly unsupported position that

12  Mrs. Birk's family is somehow in a position to step in.  They

13  note that her sister and her sister's husband live, quote,

14  nearby, close quote, in Colorado Springs.  Frankly, I guess it

15  depends on how one defines "nearby," but it would not be my

16  definition or I think consummate with any common sense

17  definition that Colorado Springs is sufficiently nearby that

18  they would be in a position to provide ongoing care for

19  Mrs. Birk given where Mr. Birk lives and where she lives.

20  Additionally, she has a brother that lives in Kansas.  There

21  is nothing in the record to support that either the brother in

22  Kansas or her sister or sister's husband are able or willing

23  to provide the kind of care and support for their sister or

24  sister-in-law, respectively, that the Government hopefully

25  asserts they can provide.

1          The Government -- and, by the way, the Government was

2     busy sending agents out to speak to other family members, his

3     children, for instance, and his ex-wife, who provides the not

4     wholly unbiased and not at all expert opinion as to what might

5     be needed for the care of the woman that she asserts Mr. Birk,

6     her first husband, had an affair with.  But notwithstanding

7     that limited investigation, the Government does not actually

8     contact the sister, her husband, or the brother.  So they shed

9     no real light but just a fair amount of heat on this subject.

10         Now, the Government is correct that they wrote

11    letters to the Court, but it should be obvious, I think, it

12    should be plain that if they were actually able to care for

13    their sibling, they would have so asserted in those letters.

14    Pointedly, they did not.  They cannot and apparently will not

15    uproot their lives to do that.  It's just a fact.  It's not a

16    judgment.  It's just a fact.

17         Finally, as I said, the Government turns for expert

18    advice to Jean Birk's nemesis, Mrs. -- Mr. Birk's ex-wife, to

19    which I can only say, Really?  Because she's neither expert

20    nor unbiased.  Nor is this even remotely analogous to when

21    Mr. Birk was in custody for three days in court -- for three

22    days or in court in Denver for his one-week trial.  Because

23    the Government suggests, well, you know, he handled it then,

24    you know, so surely if he can handle it for three days or five

25    days, you know, someone can take care of her for six months or

 1    five years.  Not so.

 2          Turning then to the nature and circumstances of the

 3    offense and what the Government says about that in ECF 107, I

 4    submit that really what gets lost in here to a great degree is

 5    kind of the corrosive effect of the tax protestor culture on

 6    an individual, the almost cultlike hold of these taxpayer

 7    protest organizations.  Now, admittedly, Mr. Birk walked into

 8    that situation, and, you know, I guess was, to a degree, at

 9    some level predisposed to adopt this mindset, but, you know,

10    at the end of the day for whatever reasons, um, you know,

11    these things do kind of take on, to a degree, a life of their

12    own.  And, you know, one becomes enmeshed in these and sort of

13    the, for lack of a better term, culture of the whole thing and

14    the arguments of it and -- and all of it.  The belief system

15    is maybe the word I was searching for.

16          As to the history and characteristics of Mr. Birk,

17    the Court knows that he has over a long period of time served

18    his country honorably both in the military and in the

19    contracting industry.  He's fallen certainly, you know, in

20    paying his taxes or not paying his taxes, rather.  Whatever

21    the reasons, it is not good, not commendable.  It's a bad

22    thing.  But I do take strong exception to the Government

23    portraying this as a case of privilege versus poverty.  I

24    don't appreciate the Government lecturing me, of all people,

25    who's turned aside the opportunity to make considerably more

1    money than I would otherwise make, um, to work representing

2    people who don't have money to afford the services of a person

3    such as myself, to be lectured on privilege versus poverty.

4    It is particularly ironic that the Department of Justice

5    positions itself as the champion of the economically

6    downtrodden given what I see everyday.

7              But putting that aside, Mr. Birk simply is not so

8    privileged, as the Government might suggest.  He's an

9    individual whose dad served the country in the military.  He's

10   an individual who has worked hard for what he has earned up to

11   the point at which he did, one could say, unjustly enrich

12   himself further by not paying taxes, but he did work hard for

13   what he's earned.  He did work hard as an employee.  He did

14   work hard building a business, albeit advantaged by not paying

15   taxes.  He is not seeking special treatment due to his good

16   fortune to be born into a white middle-class family in an

17   admittedly classist society, but rather he is simply letting

18   the Court know that he spent the bulk of his life obeying the

19   law, serving his country, and contributing positively to his

20   community, and contributing positively to his community even

21   at a time when he was evading taxes.

22             The Government goes to some length to decry the

23   letters of support saying that, well, it's not uncommon in

24   white collar cases to see such letters.  And that is true,

25   granted.  So what?  That does not in any way diminish the

1    nature or quality of the support that is evidenced by those

2    letters.  They still indicate positive aspects of his

3    character, and that is still a statutorily required factor for

4    this Court to consider in sentencing.

5            Then, unable to contradict the writers who know

6    Mr. Birk well, the Government turns to what, frankly, can only

7    fairly be described as mudslinging, claiming, quote,

8    defendant's submission includes some glaring omissions, close

9    quote.  The Government frames the debate in almost Biblical

10   terms, accusing him of a long ago adultery and complaining

11   about his religious views on homosexuality.  You know, and

12   whether he has those views, had those views, has changed those

13   views, whether those views are right or wrong -- and, frankly,

14   if he still holds those views, those are views that I would

15   hold personally repugnant -- that's not the question here.  It

16   accuses him of lying to Probation by saying that he and his

17   wife, his first wife, split because they stopped liking each

18   other.  No, I think that's a fair characterization of a

19   situation where a man stops liking his wife or, vice versa,

20   where the relationship breaks down, where he has, uh,

21   relations with another woman outside of marriage.  You know, I

22   mean, one doesn't negate the other.  It is not simply true

23   that if he had an affair with Jean Birk years ago and later

24   wound up marrying her, that it was untrue that he and his

25   first wife stopped liking each other.  Rather, to the

1    contrary.  It proves the point, if anything.

2         Turning then to policy arguments, the Government

3    complains that no cases are cited in support of the argument

4    that the guidelines are flawed and deserve little weight.

5    True.  However, that misses the point.  The point that I

6    perhaps inarticulately was making is that there is simply no

7    empirical support to the increased tax guideline --

8    guidelines.

9         Finally, turning to two specific areas, seriousness

10   of the offense, respect for the law, and just punishment, and

11   then deterrence.  As to the first, seriousness of this

12   offense, concededly it's a serious offense, but also with

13   respect to just punishment or respect for the law, considering

14   all of the circumstances here, including both Mrs. Birk's

15   circumstances and Mr. Birk's, and including his age, five

16   years is certainly a lot of time for a man of his age and a

17   man in his current position vis-à-vis Mrs. Birk.  It is a lot

18   of time for a nonviolent crime, and it is a lot of time for a

19   crime where he did not actually set out to take and did not

20   take, for instance, someone's life savings.  I know it's easy

21   to get up and postulate all the things someone didn't do, like

22   he didn't rob a bank, he didn't kill someone or whatever, and,

23   yeah, it's serious, and there's, you know, however many

24   million taxpayers in the U.S. who are paying their taxes, like

25   me and you and everyone else, you know, from whose pocket he

Julie H. Thomas, RMR, CRR                              (303)296-3056

1   picked.  I get that.  But putting it in a perspective and

2   looked at from his position, five years is a lot of time and a

3   fair amount of time for what he did and what he faces and, um,

4   and in totality.

5           Finally, there's the question of deterrence.  First,

6   and I don't spend much time on it, as to specific deterrence,

7   well, he has a felony.  He has a huge tax debt.  He now needs

8   to simply take care of his wife.  Notwithstanding what he

9   either believes or doesn't believe at this point about taxes

10  or the Constitution or any of that stuff, I think it's

11  probably safe to say that you're not going to see him in a

12  courtroom again accused of tax evasion or probably anything

13  else.

14          General deterrence is admittedly a somewhat tougher

15  nut to crack.  I mean, my usual response that the Court is

16  well familiar with and the general refrain I suppose of

17  defense counsel across the country is, yeah, general

18  deterrence, prove it.  I mean, where is it ever really clear

19  from any study that anyone's ever deterred from anything?  And

20  I hold to that, but I recognize that tax cases and tax defier

21  cases, and it's an excellent point the Government makes, are

22  somewhat different qualitatively, um, and factually, but I

23  would say this.  Even if tax defiers were watching this case,

24  even if another Marty Birk out there, the doppelganger Marty

25  Birk, is watching this case, he or they would see if a lower

1    than guideline sentence were imposed that it -- because they

2    watch it carefully, as the Government has documented, they

3    would see that a lower sentence was imposed, were it imposed,

4    due to very specific circumstances, circumstances that don't

5    necessarily apply in every case, circumstances supported by a

6    record, and unless they're just identically situated or

7    situated in such a manner that they can manipulate facts in

8    such a negative way as to create a doppelganger Jean Birk,

9    they're not necessarily going to draw the conclusion the

10   Government believes they would draw in this case from a

11   specific below-guideline sentence here.

12           So for all of the reasons I previously asserted in

13   writing and any that I have implicitly asserted today, we hold

14   to our recommendation of probation or, at the very least, a

15   significantly below-guideline sentence for Mr. Birk.

16           THE COURT:  Counsel, thank you.

17           Mr. Birk, again, good afternoon.

18           THE DEFENDANT:  Good afternoon, sir.

19           THE COURT:  Before I impose sentence on you, you

20   first have the legal right and opportunity now, right now if

21   you choose, to make your own statement to this Court and to

22   offer the Court any additional information in mitigation,

23   lessening, of your sentence that you may have.  Do you wish to

24   make such a statement or offer such information?

25           THE DEFENDANT:  Yes, Your Honor.

1    THE COURT:  And you may.  Would you and your attorney

2    report to the podium, please.  And, gentlemen, I thank you

3    both.

4        Mr. Birk, before I receive your anticipated

5    sentencing statement that we know as allocution, please first

6    raise your right hand to be sworn by the Court.  Thank you.

7        (The defendant was sworn.)

8        THE COURT:  Thank you.  Now under oath, please, what

9    is it that you would tell the Court?

10       THE DEFENDANT:  I've had quite a bit of time since my

11   Indictment and arrest and the proceedings of this trial to

12   reflect on how I got here today.  And to say that I made some

13   errors in judgment, some serious mistakes, is probably an

14   understatement.  In fact, I would apologize to the Court

15   today, to the IRS employees that I knocked heads with for the

16   better part of 20 years, that it was wrong.  It was wrong.  I

17   was wrong.  I listened to what Mr. Harris had to say about the

18   Tax Honesty Movement.  It is very much a cult.  I believe that

19   in my heart today.  It doesn't really matter what the person's

20   individual intent is in getting involved in this cult, whether

21   it's to enrich themselves, whether it's an attempt to correct

22   a system that they think has gone astray.  The bottom line is

23   we all live by the rule of law, plain and simple.  And so I

24   stand here today repentant that I got involved in this.  I

25   would apologize to Special Agent Warnock.  I chased him quite

1    a bit, and he chased me.  Also, the IRS employees that are

2    seated behind me.  I remember the letters and the phone calls.

3            One of the things I would have changed, and I believe

4    that would have led to a totally different result, is I would

5    not have terminated my project with Advanced Tax Solutions.  I

6    would have followed through with that.  It would have

7    certainly led to a different point.

8            As far as my caregiving tasks, I am concerned today

9    about my wife, not myself.  She has been on this journey, this

10   dementia, probably Alzheimer's.  Her mother had it, two of her

11   aunts had it and are deceased from that disease.  I have been

12   pretty much a full-time caregiver for her for the last two

13   years, and I have witnessed her decline.  If I was going to

14   try to say I don't know if she's still going to be here in two

15   years, that would probably not be an understatement.  It's

16   that kind of a disease.  It's really beginning to tax me.

17   It's a day-and-night job.  And I recognize at some point in

18   this I am going to have to seek additional help.

19           In addition to that, my mother, who is 90 years old

20   or will be here next February, is suffering from breast

21   cancer.  I talked to her this morning.  She has a recent

22   pathology result that is going to lead to a additional

23   surgery, a mastectomy.  She lives back in Virginia by herself

24   and does not get a lot of support from the family there.

25           And one more item.  I have a nephew, my sister's

1   oldest boy, Christopher Onorato, who is diagnosed as a

2   paranoid schizophrenic.  He's on medication, and he's still

3   out here trying to live amongst us.  And I would like to have

4   the opportunity to be able to help him.  I seem to be the only

5   one in the family that can communicate with him.  He is

6   estranged from his own family, his mother, his father, his two

7   brothers.  He's living on a ranch in Wyoming right now, but I

8   don't know how much longer that's going to last.

9           So I would throw myself on the mercy of this Court to

10  give me a sentence that will allow me to do some important

11  work that I know I have coming at me.  Thank you, Your Honor.

12          THE COURT:  Thank you, Mr. Birk.  And, gentlemen,

13  again, you may be seated.

14          Counsel for the Government, does the Government wish

15  to be heard on matters relating to the appropriate sentence?

16          MR. MAGNANI:  Yes, Your Honor.

17          THE COURT:  And you may, of course.

18          MR. MAGNANI:  Thank you.

19          Thank you, Your Honor, for the opportunity --

20          THE COURT:  You're welcome.

21          MR. MAGNANI:  -- to address the Court.  After 20

22  years of tax defiance, this day is a long time coming.  As

23  counsel for the defendant and Mr. Birk himself acknowledged,

24  this is a serious crime.  It's serious not only because of the

25  duration.  20 years is a long time to be defying the tax laws.

1   Um, it -- the Government would differ from Mr. Birk's

2   characterization as an error in judgment.  This was sort of a

3   way of life.  This wasn't -- there are many crimes, there are

4   many people who do things that they make a mistake in

5   judgment.  They muled those drugs, or they made a very

6   consequential mistake that puts them at the mercy of the

7   Court.  This is not about one mistake.  This is about 20 years

8   of defying the tax laws of the United States for your own

9   gain.  That's what this case is about.

10          And the harm, it really is substantial.  Mr. Harris

11  says, well, it's not like people's life savings were wiped

12  out.  But could we find anyone in this courtroom who in their

13  entire life of making what to them and to their families seem

14  like very substantial contributions, could anyone in one

15  lifetime pay back all of this?  It's a remarkable amount.  It

16  really is -- you know, $4 million is not just nothing simply

17  because it wasn't stolen from a person's retirement account.

18          And it's not just the dollars.  It's the government

19  resources.  It's the servant government, to use Mr. Birk's

20  words at the time.  You have seen from this -- 12 witnesses at

21  trial, countless others, hours and hours of government time

22  for Mr. Birk, and that's putting aside this trial, this

23  criminal investigation.  That's just for 20 years of civil

24  enforcement and the attempts to gain him into compliance.

25          It's also a serious crime, as Probation noted,

1    because of the threatening behavior.  This wasn't just not

2    filing.  This was making threats.  When Revenue Officer Morgan

3    went to his house, she didn't just want to bring, you know,

4    five armed guards.  She did, and she, as she told the sheriff

5    out there, she has to do a lot of paperwork to do that.  And

6    the reason she did that is because of the statements the

7    defendant made which were threatening.

8            It's also serious because, as the Government has --

9    and I'm not going to go into again, this sort of abuse of the

10   willfulness defense, this concept that when the Supreme Court

11   decided that any view, no matter how ridiculous, can be a

12   defense in tax cases.  And Justice Blackman said, well, this

13   is going to open the floodgates; people will come in here,

14   they will take to the stand, and they will hope that they can

15   convince just one person that maybe they really believed it.

16   And the abuse of that defense.  The defense is for people who

17   have a good faith misunderstanding, but that is what fuels

18   this sort of tax defier movement, and that's one of the things

19   that makes it so dangerous and it makes this crime serious.

20           Um, you know, the Court's sentence, it's about -- the

21   3553(a) factors talk about the sentence imposed, you know,

22   being -- meeting the requirements of the statutes, the

23   sentence, not the collateral consequences.  The sentence that

24   the Court imposes is what must create deterrence.  This idea

25   that, oh, if the Court gives him no time, people out on the

1    street will understand, you know, it's because of his unique

2    circumstance.  The United States respectfully disagrees.  If

3    the Court gave the defendant the sentence that he's asking

4    for, the public would think it's just a joke, it's just an

5    example of white collar defendants being treated differently

6    and getting off.  It would be getting off with it.  The idea

7    that, oh, he has a felony conviction and, you know, he can't

8    possess guns anymore, the idea that that is a sentence is just

9    not right.  It's just -- it's legally not right, and it's not

10   the way that other people will view the Court's sentence.

11           And the way that other people view the Court's

12   sentence is important.  And it's particularly important -- and

13   I -- you know, we put some articles in our filings about --

14   and this was when, um, just to sort of give the recent

15   context, when it was a big news story that Michael Avenatti

16   did not file tax returns in years, and people thought how

17   could that be.  And the New York Times published that

18   editorial saying actually, you know, audits of nonfilers are

19   down from 2.4 million in 2011 to 362,000 in 2017.  And the

20   reason is clear, and you heard -- and the Court knows because

21   the Court heard from the witnesses.  Nonfilers are very hard

22   and resource intensive to audit.  In a typical audit, an

23   auditor will look at a few questionable items on a tax return,

24   identify which seem specific, they will meet with the

25   taxpayer, the taxpayer will talk to them, they will go over

1    documents.  If there's no return and the taxpayer will not

2    talk to you, it is incredibly resource intensive to try to

3    accurately determine the amount of tax that this person owes.

4    And that's one of the reasons why these sort of nonfiler tax

5    defendants have to be sentenced seriously because so few of

6    them are caught.  So few of these crimes are detected.  So few

7    of them are even audited civilly, let alone referred for

8    prosecution.

9            So the sentence, yes, it should reflect and be suited

10   and proportionate to the crime, but and more, because and more

11   to get into the mindset of a person who's committing these

12   crimes, who thinks, well, there's one -- a very low percent

13   chance that I even get caught.  So if the punishment fits the

14   crime, well, 99 -- you know, on the chance that I get away

15   with it, I don't have to worry about it, and if I do get

16   caught, it will just be equal.

17           So, you know -- and Mr. Harris concedes it now.  I

18   don't know if this is after the memo saying deterrence or

19   general deterrence is not an issue in this case, but, you

20   know, concedes it is important, but especially again in this

21   tax defier community.  This is a man who was suing the United

22   States along with a thousand other tax defiers.  It's a

23   movement.  It's a community.  It's a dangerous community, or

24   it's dangerous to the United States if this sort of thing gets

25   traction.  And, you know, and I can -- you know, only from my

1   experience and looking at other cases, it seems like these

2   people pay attention to these cases.  It's not just Mr. Birk

3   or the other trial that I had recently where defendants

4   testified.  They pay attention to these cases.  They pay

5   attention to the acquittals.  They can tell you about Joe

6   Banister and how he got off.  These people pay attention, Your

7   Honor, and a sentence that is seen as a joke or, you know,

8   that will be something that they will pay attention to, too.

9           You know, as for -- Mr. Harris's presentation was

10  mostly focused on the departure.  And not to get back into it,

11  but the only thing the Government would note is, one, there

12  were several, half a dozen or more, cases in the defendant's

13  brief, and in those cases we are talking three-level

14  departures, three-level departures for family circumstances

15  that are far more unusually severe than this case.  After

16  someone who doesn't pay taxes for 20 years, it is not

17  surprising that they, at the point that they are standing

18  before the Court in this situation, they will be older, they

19  will have family with health conditions.  This is not so

20  unusual.

21          Also, the defendant has the burden of establishing

22  these facts.  It's his burden to prove to the Court that a

23  departure is warranted and that there are sufficient facts to

24  warrant a departure.  And his failure to sort of make a plan,

25  that can't be held against the Government.  That's not him

1   making his burden.  And so, you know, when Mr. Harris stands

2   up and says, well, Jean -- excuse me -- Mrs. Birk's brother

3   and sister wrote letters, and if they could have taken care of

4   their sister, they would have said so, that's not meeting

5   their burden.  That's not meeting their burden.  And, you

6   know, that's why the Government tried to conduct an

7   investigation, but it's not the Government's responsibility.

8   And the idea that -- you know, Mr. Harris said it was, quote,

9   absurd to assume -- for the Government to assume that a

10  brother and a sister -- or a sister.  These are people with

11  means.  These aren't people who are struggling like Mr. Birk's

12  nephew.  Mrs. Birk's family, these are people who have means.

13  And in hard times I don't think it's absurd to assume that a

14  family will look out for each other.

15          And so just to -- in support of the Government's

16  proposed sentence of 60 months, it would just note that it's

17  far below the guidelines, and if the Court is to entertain the

18  sentence proposed by Probation or the defendant that that

19  would just be seen as the defendant getting away with it.  It

20  would be seen as no consequence.  It would be seen as just

21  another example of white collar defendants being treated

22  differently.

23          And the fact that so much of the briefing and the

24  Court's time were talking about, you know, how imprisonment

25  affects a family, imprisonment always affects a family.  And

1    the fact that we are focusing so much time on it in this case,

2    the Government believes that it does go to the fact that white

3    collar defendants are treated differently.

4              So the United States just asks the Court to craft a

5    sentence that will send a message to people who think that

6    maybe I can risk not getting caught, maybe it's worth the risk

7    to cheat, to send the message that it's not worth the risk

8    because, if you are caught, these crimes are taken seriously.

9    The Court's sentence should also send a message to tax

10   defiers, people who think that if they get caught, they are

11   just going to snow the jury, they are just going to come in

12   here and say all this stuff and get away with it.  And also it

13   should just send a message, Your Honor, to hard working people

14   who pay their taxes every year, who make substantial

15   contributions, who spend money that their family could use to

16   better their lives, they pay every year, and the sentence in

17   this case should tell people that they're not suckers, Your

18   Honor.  Thank you.

19             THE COURT:  You're welcome.

20             Very well.  In considering, fashioning, and imposing

21   a condign and constitutional sentence, I have considered

22   carefully all relevant matters of fact and law, through the

23   unique lens which is the federal sentencing statute, including

24   the following, and the list is intentionally long:  the

25   evidence presented at trial; the nature and circumstances of

1   the offense of conviction, focusing on its real conduct; the

2   history and characteristics of Mr. Birk, the offender; the

3   sentences authorized under 18 U.S.C. Section 3551; the

4   presentence report, its sentencing recommendation and two

5   addenda; the basic purposes of criminal punishment,

6   deterrence, incapacitation, just punishment, and

7   rehabilitation as declared by Congress in the Sentencing

8   Reform Act of 1984; the purposes and needs of sentencing as

9   prescribed by Congress at 18 U.S.C. Section 3553(a)(2); the

10  factors to be considered in imposing sentence under 18 U.S.C.

11  Sections 3582(a) and 3553(a)(1) through (7); the

12  constitutional and relevant provisions of the advisory United

13  States Sentencing Guidelines; the kinds of sentences and the

14  sentencing range established under those guidelines for the

15  applicable category of offense committed by the applicable

16  category of defendant, a clear reference to section

17  3553(a)(4); the important, the critical need to avoid

18  unwarranted sentencing disparities by ensuring, and I quote

19  the *Booker* court, ensuring similar sentences for those who

20  have committed similar crimes in similar ways; the important

21  need to restitute victims; all pertinent policy statements of

22  the United States Sentencing Commission; the need to impose

23  sentences consistent with the needs codified in Section

24  3553(a)(2); the advancement of the congressional goals of

25  honesty, uniformity, and proportionality in sentencing; the

 1  principle and requirement codified at section 3553(a) to

 2  impose a sentence that is sufficient, but not greater than

 3  necessary, to preserve, protect, and vindicate the

 4  congressional goals and purposes of sentencing; the position

 5  of the Government, the defense, and the Probation Department;

 6  the relevant papers of the Government and the defense to which

 7  I cited earlier; the evidence presented, reasons stated,

 8  arguments advanced, and authorities cited by the parties in

 9  their papers and during this oral argument and presentation;

10  all relevant information concerning the background, character,

11  and conduct of Mr. Birk, as I may under 18 U.S.C. Section 3661

12  and Guidelines Section 1B1.4 and *United States v Williams*,

13  337 U.S. 241, 246 and 247, 1949.

14          Having engaged in the comprehensive sentencing

15  calculus and analysis I just described, I now make the

16  following sentencing statement under 18 U.S.C. Section 3553(c)

17  and now enter essentially the following findings of fact,

18  conclusions of law, judgment of conviction, sentence, and

19  orders, commencing with my findings and conclusions.

20          Trial by jury was conducted from July 22, 2019,

21  through July 25, 2019.  On July 25, 2019, the jury found

22  Mr. Birk guilty of the crime of attempt to evade or defeat tax

23  in violation of federal law at 26 U.S.C. Section 7201 as

24  charged in Count 1 of the Indictment.

25          The defendant filed formal objections to the

1    presence report.  His objections are stated and argued in

2    document 192, Defendant's -- that's 102, excuse me,

3    Defendant's Objections to Presentence Report Guidelines

4    Calculations.

5          Defendant objects, first, to the presentence report

6    at paragraph 61 where the probation officer, relying in part

7    on the Government's sentencing statements, documents 95 and

8    107, increases the offense level by two levels under

9    Guidelines Section 2T1.1(b)(2) for an offense involving

10   sophisticated means.

11         The Government has the burden of proof by a

12   preponderance of the evidence to sustain the enhancement.

13         Guidelines Section 2T1.1(b)(2) provides that if the

14   offense involved sophisticated means, the offense level should

15   be increased by two levels.  Sophisticated means is especially

16   intricate offense conduct pertaining to the execution or

17   concealment of an offense.  Conduct such as hiding assets or

18   transactions, or both, through the use of fictitious entities,

19   corporate shells, or offshore financial accounts ordinarily

20   indicates sophisticated means.  That comes from Application

21   Note 5 to the commentary to Guidelines Section 2T1.1.  Also

22   see *United States v Vernon*, 814 F.3d 1091, Tenth Circuit 2016,

23   enhancement affirmed for use of sham company.  I find by a

24   preponderance of the evidence that TAMI was a sham, serving no

25   legitimate business purpose, making it what the guidelines

Julie H. Thomas, RMR, CRR                          (303)296-3056

1   refer to as a fictitious entity or corporate shell.  The TAMI

2   fraud was a sophisticated multistep process that Mr. Birk

3   devised and implemented for the sole unlawful purpose of

4   disguising taxable income to evade the payment of taxes that

5   would otherwise have been withheld by his bona fide retirement

6   account custodians and paid to the IRS, duping both his

7   retirement account custodians and the IRS in the process.

8          On this record, the Government has sustained its

9   burden of proof by a preponderance of the evidence.  Thus, the

10  defendant's objection for offense level enhancement for use of

11  sophisticated means is overruled.

12         Defendant objects next, and last, to the presentence

13  report at paragraph 64 where the probation officer, again

14  relying in part on the Government's sentencing statements,

15  documents 95 and 107, increases the offense level by two

16  levels under Guidelines Section 3C1.1 for obstruction of

17  justice by the defendant.

18         As before, the Government has the burden of proof by

19  a preponderance of the evidence to sustain this enhancement.

20         On this record, I find that (1) Mr. Birk testified

21  falsely at trial when he (a) testified that "I believe the tax

22  code is absolutely constitutional"; (b) that he did not create

23  and use TAMI to conceal taxable income from the IRS; (c) that

24  he never hid anything from his tax preparers; and (d) that he

25  believed his duty to pay taxes was suspended until and unless

 1   the IRS answered his questions; (2) this foregoing false

 2   testimony at trial concerned matters that were indeed

 3   material; and (3) Mr. Birk testified falsely with a willful

 4   intent, that is, he intended to provide false testimony

 5   concerning these material matters.  I rely on, in part, *United*

 6   *States v Quarrell* -- Madam Reporter, Q-u-a-r-r-e-l-l --

 7   310 F.3d 664, at pages 681 and 82, Tenth Circuit 2002.

 8           On this record, the Government has sustained its

 9   burden of proof by a preponderance of the evidence.  Thus, the

10   defendant's objection for offense level enhancement for

11   obstruction of justice is overruled.

12           In further support of my rulings on the objections of

13   the defendant to the presentence report, I approve, adopt, and

14   incorporate the facts presented, reasons stated, arguments

15   advanced, and authorities cited by the Government in its

16   sentencing statement, document 95, and its sentencing

17   recommendation and response, document 107.

18           Having addressed and overruled the objections of the

19   defendant to the presentence report, I accept the presentence

20   report, including its guideline applications and calculations,

21   as an integral part of my findings of fact.

22           For advisory purposes only, the November 2018 edition

23   of the United States Sentencing Commission Guidelines Manual

24   applies.

25           Thus, I have used those advisory sentencing

1    guidelines as the starting point and the initial benchmark for

2    my own sentencing analysis.  And although once again I have

3    given respectful consideration to those advisory guidelines,

4    once again, I have not presumed the resulting guideline ranges

5    to be reasonable per se.

6         For advisory purposes only, identification,

7    consideration, and application of all relevant provisions of

8    those advisory guidelines in this context produces the

9    calculations stated in paragraphs 59 through 74 of the

10   presentence report, that is, a total adjusted advisory offense

11   level of 28 and an advisory Criminal History Category of I,

12   based on zero criminal history points.

13        In turn, the resulting advisory guideline ranges are

14   as follows:  imprisonment, 60 months, representing the

15   statutory maximum; supervised release, one to three years;

16   fines, if imposed, ranging from $12,500 to $125,000.  I note

17   that the guideline range is actually 78 to 97 months but, to

18   rehearse, capped by statute at 60 months.

19        The defendant requests in document 103 at pages 15

20   through 18 that I depart downward from the advisory sentencing

21   guideline range under Guidelines Section 5H1.6, family ties

22   and responsibilities.  Although I recognize and acknowledge

23   that I have jurisdiction and authority to depart downward as

24   requested, I decline to exercise my discretion to depart

25   downward after careful consideration of Application Note 1(A)

1   and (B) to the commentary to Guidelines Section 5H1.6.  This

2   is a sentencing hearing in federal court, not a protective

3   proceeding focusing on the circumstances of Mrs. Birk in the

4   probate division of a state district court.

5          Thus, having considered all of the matters I

6   enumerated earlier, having overruled the defendant's

7   objections to the presentence report, having declined to

8   exercise my acknowledged authority to depart downward under

9   Section 5H1.6, and having considered and applied all relevant

10  advisory sentencing guidelines to the offense, offender, and

11  all relevant conduct, I now consider the discreet sentencing

12  factors and needs at 18 U.S.C. Section 3553(a)(1) through (7)

13  and the defendant's motion for a variance as requested and

14  argued in document number 103 in which he requests a

15  noncustodial sentence to probation, and in the process I make

16  an individualized assessment based on the facts presented.

17         Concerning the nature and circumstances of the

18  offense of conviction, I find and conclude as follows:

19         The crime is serious generally, but the manner in

20  which this crime was committed makes it especially serious,

21  approaching egregious.  At all relevant times, Mr. Birk acted

22  on his understanding, actually misunderstanding, based on his

23  self-reported extensive, and ofttimes cherry-picked, legal

24  research that the imposition and collection of taxes on his

25  particular income in his particular circumstances was

1   unconstitutional.  His ends-justifies-the-means philosophy

2   resulted in, among other things, the creation of a sham

3   business entity, his dissembling relationship with his tax

4   preparers, his use of only a business bank account, and his

5   extensive use of bank checks, all designed and intended to

6   hide taxable income from the IRS and to shield that tax from

7   lawful collection.

8          But there is more.  The relevant conduct here began

9   in at least 1998 and continued essentially through trial, 20

10  years, two decades.

11         But there is more.  Since his interaction and

12  communication with the IRS began, Mr. Birk engaged in a

13  froward and perverse pattern and practice to delay, harass,

14  frustrate, impede, and obstruct the IRS in the performance of

15  its lawful duties and responsibilities.  It became, if you

16  will, his raison d'être.

17         Eventually, the defendant employed the services of a

18  professional tax preparer in an attempt to lend the appearance

19  of integrity and credibility to his ongoing tax evasion.

20         For the years at issue, 1998 through 2005, never mind

21  2006 through 2018, the pattern and practice of Mr. Birk

22  resulted in the substantial underpayment of federal income

23  taxes in the amount of $818,654 and concomitant interest of

24  $1,040,171.96, not to mention accumulated penalties in the

25  thousands of dollars.

1          Concerning the history and characteristics of

2    Mr. Birk, I have treated and viewed him at all times as the

3    unique being he is and find and conclude as follows:

4          Age 65; raised in an intact two-parent family; no

5    dysfunctional, chaotic, or abusive childhood; highly educated;

6    married twice, with two children from his first marriage who

7    are essentially estranged from him; decorated Vietnam era

8    veteran, serving both in the Army and Marines; history of

9    successful employment and self-employment; dedicated caretaker

10   of his wife, who is suffering from progressive and inexorable

11   dementia; supported by numerous friends, as indicated in the

12   numerous letters submitted on his behalf; no criminal record;

13   no serious documented health or mental health problems; but

14   his character is flawed and blemished by the nature and

15   circumstances of this ongoing crime and the calculating way in

16   which he committed it and then lied about it, including at

17   trial.  His involvement in these crimes was voluntary, not

18   forced or coerced in any way by anyone.  He is no victim.  He

19   is no especially vulnerable or susceptible proselyte of an

20   evil tax protestor movement or cult.  He has never truthfully

21   accepted responsibility.  At trial, in my view, he committed

22   perjury.

23          The offense, offender, and relevant conduct here

24   implicate considerations of respect for the law and the rule

25   of law; just punishment reflecting, however, the seriousness

```
 1    of the crime focusing on its real conduct; deterrence,

 2    especially of others similarly situated or inclined -- and

 3    make no mistake, they exist, and they are watching --

 4    protection of the public; sentencing parity, and restitution.

 5             This protracted and presumptuous violation of settled

 6    federal law must end.  And today, 20 years, two decades, of

 7    prodigal lawlessness comes to an end.  This never had to be,

 8    but for the defendant's adamantine, morbid preoccupation with

 9    a feckless legal position that has been rejected by virtually

10    every court to consider it.

11             The position and beliefs of the defendant were not

12    the product of the sagacious profundity of a learned and

13    exceptional constitutional scholar blessed with extraordinary

14    legal perspicacity.  Instead, defendant's ratiocination was

15    nothing more than disaffected rationalization born of common

16    cupidity, greed.

17             The law, for good reason, does not deal kindly with

18    someone who arrogantly believes he is above the law, immune to

19    its application, and better and smarter than millions of

20    taxpaying people.

21             I have considered carefully, but reject probation as

22    a viable sentencing option for five principal reasons:

23             (1) probation fails to adequately address and satisfy

24    the needs and requirements emphasized in Section 3553(a)(2);

25    (2) it unreasonably depreciates the seriousness of this
```

1    offense; (3) it undermines, not promotes, respect for the law;

2    (4) it likely would fail to achieve deterrence, especially of

3    others similarly situated or inclined; and (5) it likely would

4    constitute an unwarranted sentencing disparity.

5          Here, considerations of respect for the law, just

6    punishment reflecting the seriousness of this offense in the

7    manner and time it was committed, deterrence, protection of

8    the public, and sentencing parity are paramount and can best

9    and only be achieved through incarceration.

10         The present and prospective privations and hardships

11   to the defendant and his wife were created and perpetuated by

12   Mr. Birk, who is solely and exclusively responsible.  Mr. Birk

13   literally had thousands of days to make things right, but now

14   it is too late.

15         Having considered all of the matters I enumerated

16   earlier, having considered and applied all relevant advisory

17   sentencing guidelines to the offense, offender, and all

18   relevant conduct, and having considered the discreet

19   sentencing factors at Section 3553(a)(1) through (7), I

20   conclude ultimately that a sentence variance is not warranted

21   and that Mr. Birk should be sentenced to a term of 60 months,

22   the statutory maximum, which is the sentence barely sufficient

23   and certainly not greater than necessary to protect and

24   vindicate the purposes and needs of the federal sentencing

25   statute, especially at Section 3553(a) and (a)(2).

1           The defendant's assault on the relevance and

2    propriety of the application of the sentencing guidelines for

3    this offense and offender turns out to be largely misplaced

4    because, ultimately, the sentence is the product of the

5    reticulated consideration and application of Section 3553(a).

6           After considering the provisions of and factors at

7    18 U.S.C. Sections 3013 and 3572(a) and Guidelines Section

8    5E1.2, I find and conclude that Mr. Birk is financially unable

9    to pay a fine or interest on restitution.

10          Restitution is implicated here.  The victim is the

11   IRS.  As a proximate result of Mr. Birk's criminal conduct,

12   the IRS has suffered pecuniary losses consisting of unpaid

13   taxes and interest for tax years 1998 through 2005, totaling

14   $1,858,826.26, as shown and calculated in the presentence

15   report at pages 12 and 13 in paragraph 51.

16          The Mandatory Victim Restitution Act of 1996 does not

17   apply; however, under 18 U.S.C. Sections 3556 and 3583(d) and

18   Guidelines Section 5E1.1, I may, should, and will order

19   restitution as a special condition of supervised release for

20   the benefit of the IRS, payable in care of the Clerk of the

21   Court in full in the amount of $1,858,826.26, to be paid by

22   Mr. Birk immediately, failing which in monthly installments of

23   10 percent of his monthly gross income as computed

24   periodically by his probation officer, commencing with his

25   incarceration and continuing through his term of supervised

1   release.

2         In formulating a payment schedule, I considered and

3   applied the factors prescribed and enumerated at 18 U.S.C.

4   Section 3664(f)(2)(A) through (C).

5         Under 26 U.S.C. Section 7201 and Guidelines Section

6   5E1.5, I must order Mr. Birk to pay costs of prosecution.  The

7   Government has requested and circumstantiated costs of

8   prosecution in document 107 at pages 30 and 31 in the amount

9   of $9,356.22.

10        Although no one, and especially the defendant, has

11  objected to the proposed special conditions of supervised

12  release as identified in the revised sentencing

13  recommendation, I do so sua sponte.  My analysis occurs in the

14  context of 18 U.S.C. Section 3583(c) and (d) as codified and

15  construed and Guidelines Section 5D1.3.

16        As required by Section 3583(c), I have considered

17  carefully, to the extent relevant and apposite, the factors

18  enumerated in the federal sentencing statute, specifically

19  18 U.S.C. Section 3553(a)(1), (a)(2)(B) through (D), and

20  (a)(4) through (7).

21        Those special conditions are set forth in the revised

22  sentencing recommendation, document 104-1 on pages R-2 and R-3

23  in paragraphs 1 through 9.  I find and conclude that each

24  proposed special condition is reasonably related to the nature

25  and circumstances of the offense and the history and

1    characteristics of Mr. Birk, the need for the condition to

2    afford adequate deterrence, protect the public, and provide

3    the defendant during supervised release with needed

4    correctional treatment in the most effective manner.  None

5    involves any greater deprivation of liberty than is reasonably

6    necessary for the underlying statutory purposes, and each is

7    consistent with the pertinent policy statements of the

8    Sentencing Commission.

9           Mr. Birk is not likely to flee and does not pose a

10   risk of harm to any person or to the community.  Thus, he

11   should be permitted to surrender voluntarily to the

12   institution to be designated by the Bureau of Prisons.

13          Therefore, it is ordered as follows:

14          That the Defendant's Motion for Nonguideline Sentence

15   of Probation, which includes a motion for a downward

16   departure, document 103, is respectfully denied;

17          That judgment of conviction shall now enter on

18   Count 1 of the Indictment;

19          That it is the judgment and sentence of this Court

20   that the defendant, Lawrence Martin Birk, is committed to the

21   custody of the Bureau of Prisons to be imprisoned for a term

22   of 60 months on Count 1 of the Indictment;

23          That on release from imprisonment, Mr. Birk shall be

24   placed on supervised release for a term of three years;

25          That within 72 hours of his release from imprisonment

1   and the custody of the Bureau of Prisons, Mr. Birk shall

2   report in person to the United States Probation Department

3   within the federal district to which he is released;

4           That while on supervised release Mr. Birk shall

5   comply with the mandatory, standard, and special conditions of

6   supervision proposed and recommended in the revised sentencing

7   recommendation, document 104-1, at pages R-2 and R-3, provided

8   specifically, that as a special condition of supervised

9   release Mr. Birk shall pay restitution for the benefit of the

10  IRS payable in care of the Clerk of the Court in full in the

11  amount of $1,858,826.26 to be paid immediately; failing which,

12  then in monthly installments of not less than 10 percent of

13  the defendant's monthly gross income, as determined

14  periodically by his probation officer, with all disputes

15  resolved by the Court, commencing with his incarceration and

16  continuing during his term of supervised release; provided,

17  however, that interest on restitution is waived;

18          That no fine is imposed;

19          That Mr. Birk shall pay forthwith a special victim's

20  fund assessment of $100;

21          That Mr. Birk shall pay forthwith costs of

22  prosecution in the amount of $9,356.22;

23          That presentence confinement credit shall be

24  determined by the Bureau of Prisons under 18 U.S.C. Section

25  3585;

1          That Mr. Birk shall voluntarily surrender and report

2    to the official detention facility designated by the Bureau of

3    Prisons within 15 days of the designation.

4          Mr. Harris, I interrupt the dictation of my

5    sentencing orders to inquire:  Does the defendant seek the

6    recommendation of this Court to the Bureau of Prisons for any

7    specific designation?

8          MR. HARRIS:  I don't think so.  I'm going to just

9    quickly consult.

10          THE COURT:  And you may.  We'll be at ease.

11      (The defendant and counsel consult.)

12          MR. HARRIS:  I stand, and I stand corrected.  He

13    would like a Colorado recommendation.

14          THE COURT:  Very well.  Any objection by the

15    Government?

16          MR. MAGNANI:  No, Your Honor.

17          THE COURT:  That this Court recommends that the

18    Bureau of Prisons designate Mr. Birk to an official detention

19    facility -- the language of the statute, not mine -- within

20    the state and district of Colorado.

21          Mr. Birk, please be advised that you have the right

22    to appeal your conviction and sentence to a higher court.  If

23    you want to appeal either your conviction and/or your

24    sentence, a notice of appeal must be filed with the Clerk of

25    this court, not the Court of Appeals, within 14 days of the

1    entry of formal judgment or your right of appeal will be lost

2    or, in the language of the Tenth Circuit, forfeited.

3          If you are unable to pay the costs of an appeal, you

4    have the right to request permission to appeal as a poor

5    person or, as we say, in forma pauperis.

6          You have the right to be represented during any such

7    appeal by an attorney.  If you want one, but cannot afford

8    one, the Court will appoint appellate legal counsel for you,

9    appropriately, at the expense of the government.

10         And, finally, at your request, the Clerk of the Court

11   shall prepare and file immediately on the entry of final

12   judgment a notice of appeal on your behalf.

13         Do you understand these additional appellate legal

14   rights that you now have in these circumstances?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  Very well.

17         Objections to the sentence.  By the Government?

18         MR. MAGNANI:  No, Your Honor.

19         THE COURT:  By the defense?

20         MR. HARRIS:  No, Your Honor.

21         THE COURT:  Very well.  Please close the record.

22         This Court is in recess in anticipation of commencing

23   its 2:00 p.m. docket after a short recess for the benefit of

24   my staff.  Madam Clerk.

25         (Proceedings concluded 2:29 p.m.,

1        October 30, 2019.)

2

3                    REPORTER'S CERTIFICATE

4            I, JULIE H. THOMAS, Official Court Reporter for the
United States District Court for the District of Colorado, a
Registered Merit Reporter and Certified Realtime Reporter,
5    CA CSR No. 9162, do hereby certify that I reported by machine
shorthand the proceedings contained herein at the time and
6    place aforementioned and that the foregoing pages constitute a
full, true and correct transcript.
7            Dated this 31st day of October, 2019.

8

                        /s/ Julie H. Thomas
9                      Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Julie H. Thomas, RMR, CRR                          (303)296-3056