IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 18-cr-00359-REB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

LAWRENCE MARTIN BIRK,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
TRIAL TO JURY
DAY ONE
_____

    Proceedings before the HONORABLE ROBERT E. BLACKBURN, Senior Judge, United States District Court for the District of Colorado, commencing at 3:42 p.m., on the 22nd day of July, 2019, in Courtroom A1001, United States Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

    CHRISTOPHER MICHAEL MAGNANI and ELIZABETH CARYL HADDEN, Trial Attorneys, U.S. Department of Justice, Tax Division, 601 D Street, N.W., Washington, DC, 20004 , appearing for the Government.

    EDWARD HARRIS and JENNIFER LYNN BECK, Assistant Federal Public Defenders, 633 17th Street, 10th Floor, Denver, Colorado, 80202, appearing for the Defendant.

THERESE LINDBLOM, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1               **P R O C E E D I N G S**

2               (Jury Selection contained in separate volume.)

3               (In open court at 3:42 p.m.)

4               *THE COURT:*  Thank you.  Then either as you choose, you

5    may be seated or remain standing for the jury.

6               Madam Clerk, thank you.

7               (Jury in at 3:42 p.m.)

8               *THE COURT:*  Thank you.  Please be seated.

9               Thank you, Madam Clerk.

10              As you receive your notetaking materials, please place

11   your name on them, of course, to distinguish them from those of

12   your colleagues and fellow jurors.

13              Does anyone not have notetaking materials?  You will

14   shortly.

15              Well, as you might imagine, ladies and gentlemen,

16   because you have notepads and writing instruments, you may take

17   notes during the trial.  However, you are not required to do

18   so.  The notepads may only be used by you in the courtroom

19   during the trial and then in the jury room during your

20   deliberations.  You may take your notes between the jury room

21   and the courtroom and no other place.

22              If you take notes, don't let your notetaking detract

23   from your close attention to the testimony given or the other

24   evidence presented during the trial.  I encourage you to take

25   notes sparingly.  Don't view yourselves as a second court

1    reporter.  Notes can be particularly helpful in recording and

2    recalling such things as dates, times, places, measurements,

3    numbers, identities, and relationships.  And whether or not you

4    take any notes, try to rely on your memory insofar as possible

5    and not on your notes or those of other jurors.  The notes you

6    take are to refresh your individual memory.

7            At this time I'm going to read the Indictment to you,

8    but quickly instruct you that neither the Indictment nor the

9    allegations in it constitute evidence in this trial, and they

10   may not be used or viewed by you as such.

11           The Indictment provides as follows:  Introductory

12   allegations.  At all times relevant to this Indictment, one,

13   defendant, Lawrence Martin Birk, defendant, lived in the

14   District of Colorado, where he owned and operated as a sole

15   proprietorship Tarryall River Log Homes LLC -- Tarryall -- a

16   company that builds and sells log homes.

17           Two.  Defendant opened a personal bank account at Park

18   State Bank & Trust -- PSBT -- on or about February 28, 2000.

19   Defendant opened a business account for Tarryall at PSBT on or

20   about April 6, 2000.

21           Three.  An official check -- which is also known as a

22   cashier's check, bank check, or certified check -- is issued by

23   a bank and directly draws on the bank's funds.

24           Four.  The Internal Revenue Service -- IRS -- was an

25   agency within the United States Department of the Treasury and

1   was responsible for enforcing and administering federal tax

2   laws.

3          Five.  Defendant failed to timely file U.S. individual

4   income tax returns -- Forms 1040 -- for 1998 through 2005.

5          Six.  In or around January 2004, the IRS assessed

6   defendant taxes for 1998 and 1999.  In or around April 2006,

7   the IRS assessed defendant taxes for 2000 through 2003.  The

8   IRS notified defendant about these assessments in numerous

9   ways, including a visit to his home in July 2006.

10          Seven.  Between approximately November 2006 and

11   January 2007, defendant submitted individual income tax returns

12   for 1998 through 2005 to the IRS.  The returns were submitted

13   on or about the dates listed below, reporting the following

14   amounts of taxes due, none of which was voluntarily paid at the

15   time of filing.

16          And then I'm looking at a table.  And it has three

17   columns, "form," "date submitted to IRS," "tax due listed on

18   return."  I begin with 1998, Form 1040X, amended return,

19   January 3, 2007, $1,177.

20          1999 Form 1040, November 22, 2006, $10,006.07.

21          2000 Form 1040, January 3, 2007, a negative $1,090.

22          2001 Form 1040, January 3, 2007, $40,497.

23          2002 Form 1040, January 3, 2007, $18,622.

24          2003 Form 1040, January 3, 2007, $16,030.

25          2004 Form 1040, January 3, 2007, $6,195.

1          2005 Form 1040, January 3, 2007, $993.

2          Total according to returns submitted by defendant,

3    $93,031.

4          Eight.  Defendant did not make any voluntary income

5    tax payments to the IRS from at least January 2001 through

6    June 2018.

7          Count 1 and 9.  Paragraphs 1 through 8 are

8    incorporated here.

9          Ten.  From at least in or about December 2010 through

10   in or about September 2013, in the District of Colorado and

11   elsewhere, defendant, Lawrence Martin Birk, willfully attempted

12   to evade and defeat the payment of at least $93,031 of income

13   tax due and owing by him to the United States of America for

14   years 1998 through 2005 by committing the following affirmative

15   acts of evasion, among others:

16          A.  Defendant used the Tarryall business bank account,

17   PSBT account ending in 694, to conduct personal financial

18   affairs.

19          B.  Defendant maintained a low balance in the Tarryall

20   business bank account by purchasing official checks often

21   immediately after depositing funds to either, one, pay for

22   business expenses, or, two, keep for himself.

23          Again, that is the Indictment and the charges

24   contained within it, none of which is evidence in the trial of

25   this case.

1        Now, let me take this opportunity to describe to you

2   step by step the process and procedure that we shall follow

3   during the course and balance of this trial.

4        First, counsel for the Government and counsel for the

5   defendant may make an opening statement.  I instruct you that

6   opening statements are not evidence.  Their purpose is to help

7   you understand what the evidence will be from the unique gaze

8   of the Government and the defense.  Therefore, what the

9   attorneys say to you or show to you during their opening

10  statements is not evidence and may not be used or considered by

11  you as such.

12       Following opening statements, the evidence in the

13  trial will be presented.  Evidence consists of the sworn

14  testimony of the witnesses, regardless of who calls them; the

15  exhibits received in evidence, regardless of who offers them;

16  and any fact that is admitted, stipulated, or judicially

17  noticed.

18       The mere number of witnesses appearing for or against

19  a certain fact, issue, or proposition does not in and of itself

20  prove or disprove that fact, issue, or proposition.

21       There are two types of evidence from which you may

22  properly find the truth as to the facts of this case.  One is

23  direct evidence presented by a percipient witness, such as an

24  eyewitness or ear witness.  All else is indirect or

25  circumstantial evidence, that is, the proof of facts from which

1    other facts may reasonably be inferred.  The law makes no

2    distinction between direct and circumstantial evidence.

3         The Government presents its evidence first.  The

4    defendant may cross-examine all witnesses and evidence

5    presented against him by the Government.  After the Government

6    has presented its evidence in its case in chief, the defendant

7    may present evidence in his own behalf; but I remind you, he is

8    not required to do so.  I remind you, instruct you, that

9    Mr. Birk, as the defendant, is presumed to be innocent.  The

10   Government must prove his guilt if it can beyond a reasonable

11   doubt.

12        The defendant does not have to prove his innocence or

13   call or examine any witnesses or introduce any evidence,

14   although he certainly may do so.  The Government may

15   cross-examine any witness called by the defendant.  If the

16   defendant presents evidence, under certain limited

17   circumstances the Government may present rebuttal evidence.  At

18   the conclusion of the evidence, I will instruct you on the

19   rules of law which you are to use in reaching your verdict.  I

20   will read those rules of law to you from jury instructions, and

21   you will have your own set of copies.

22        After you have heard the evidence and after I have

23   instructed you on the law, the parties will make closing

24   arguments, starting with the Government, followed by the

25   defense, and concluding with the Government by way of rebuttal.

1   You will then retire to the jury room to deliberate.

2         Your purpose as jurors is to decide what the facts

3   are, and your decision must be based solely on the evidence and

4   the reasonable inferences and deductions that in common sense

5   lead you to draw from that evidence.  Importantly, neither

6   sympathy, prejudice, bias, nor public opinion should influence

7   your participation in this trial at any time or in any way.

8   Undoubtedly, you'll have to decide what testimony to believe.

9   You should carefully consider all of the testimony given and

10  the circumstances under which each witness testifies.  Consider

11  each witness's knowledge, motive, state of mind, demeanor, and

12  manner while on that witness stand.  Consider each witness's

13  means of knowledge, ability to observe, and strength of memory.

14  Consider also any relationship each witness may have to either

15  side in this case; the manner in which each witness might be

16  affected by your verdict; and the extent to which, if at all,

17  each witness is either supported or contradicted by other

18  evidence, including other testimony presented during the trial.

19        In summary, you should consider carefully all facts

20  and circumstances shown by the evidence which affects the

21  credibility of each witness's testimony and then you and you

22  alone may believe all of the testimony of a specific witness,

23  or only part of that testimony, or absolutely none of that

24  testimony.

25        It's my job to decide what rules of law apply during

1   the trial; and you must follow those rules of law as I instruct

2   you, as I explain them to you.  You're not at liberty to follow

3   some and ignore others.  Even if you disagree or don't

4   understand the rationale for those rules of law, nevertheless,

5   you must follow them.  You will then apply those rules of law

6   to the facts that you find from the evidence; and in that way,

7   you will determine ultimately whether the Government has proven

8   the guilt of Mr. Birk by proof beyond a reasonable doubt.

9          Concerning reasonable doubt, it's not required that

10  the Government prove guilt beyond all possible doubt.  The test

11  is one of reasonable doubt.  Proof beyond a reasonable doubt is

12  proof that leaves you firmly convinced of the guilt of the

13  defendant.  There are few things in this world that we know

14  with absolute certainty; and in criminal cases, the law does

15  not require proof that overcomes every possible doubt.  It is

16  only required that the Government's proof exclude any

17  reasonable doubt concerning the guilt of the defendant.

18          A reasonable doubt is a doubt based upon reason and

19  common sense after careful and impartial consideration of all

20  the evidence or the lack of evidence in the case.  It is not a

21  vague, speculative, or imaginary doubt, but the kind of doubt

22  that would cause a reasonable person to hesitate to act in a

23  matter of importance to himself or herself.  If based on your

24  consideration of the evidence you are firmly convinced that the

25  defendant is guilty of the crime charged, then you must find

1    him guilty.  If, on the other hand, you think there is a real

2    possibility that he is not guilty, you must give him the

3    benefit of the doubt and find him not guilty.

4           Now, testimony and exhibits, as you're about to see,

5    may be admitted into evidence during a trial if they satisfy

6    certain legal standards and requirements.  Please understand,

7    it's the right -- it's actually the duty of an attorney to

8    object when testimony or other evidence is offered which the

9    attorney believes is inadmissible.  In fact, only by offering

10   an objection may an attorney request and receive a ruling from

11   me on the admissibility of specific evidence.  For your part,

12   you must not be prejudiced against any attorney or party

13   because an attorney makes an objection.  And do not attempt to

14   interpret my rulings on objections as somehow indicating how I

15   think you should decide this case.  I'm only ruling on

16   questions and matters of law.

17          Now, at times I may sustain objections or direct that

18   you disregard certain questions, testimony, exhibits, or other

19   information.  On those occasions, you may not guess or

20   speculate about what the answer or evidence might have been.

21   You must not consider any evidence to which an objection has

22   been sustained or which I have instructed you to disregard.  At

23   other times, I may overrule objections to questions or answers.

24   On those occasions, you must not give any such evidence any

25   more weight simply because I overrule the objection.  At times

1   I may limit the introduction of evidence to a specific purpose.

2   You may not consider such evidence for any other purpose.

3         Legal arguments are occasionally required to be

4   considered outside your hearing and on some occasions, outside

5   your presence altogether.  This may cause delay, and please

6   understand that while you are waiting patiently, we are working

7   diligently to resolve those important legal issues.  Again, for

8   your part, do not be prejudiced for or against any attorney or

9   party if I grant or deny a request for a conference at my bench

10  or outside your presence altogether.

11        Periodically, it may be necessary for me to admonish

12  counsel; and you should not be prejudiced for or against an

13  attorney or his or her -- or his client because of any such

14  admonishment.  All rulings that I make will be based solely on

15  the law that applies during the trial, and you must not infer

16  from any ruling or from anything I do or say during a trial

17  that I hold any views for or against the Government or Mr. Birk

18  in the trial of this case.

19        Now, I do not permit jurors to ask questions of the

20  witnesses or the attorneys.  Therefore, please do not interrupt

21  the lawyers during their examination of witnesses or otherwise.

22  However, if you did not hear or understand a question asked or

23  an answer given, please speak up.  I'll rectify that for you.

24        Now, during recesses and adjournments of court, as you

25  already experienced over the noon hour, you will not be

1    sequestered.  Instead, you'll be free to separate, leave the

2    federal courthouse, go your separate ways for that particular

3    recess, subject always, of course, to the continuing important

4    rules that I have provided to you in writing.

5         Now, you've already interacted with my courtroom

6    deputy clerk, Ms. Leigh Roberson.  She will also serve as your

7    bailiff.  She's here to take care of your needs during the

8    trial.  However, she is not your attorney, and she is not the

9    attorney for the jury.  Do not discuss this case with her.  Do

10   not seek legal advice from her about the case or otherwise.  If

11   you have personal problems or needs, please take them up with

12   Ms. Roberson, who in turn will discuss those matters with me.

13        Now, listen carefully.  Among you are twelve regular

14   and two alternate jurors, who shall remain anonymous until the

15   commencement of deliberations of the twelve regular jurors or

16   until further order of the Court.  Therefore, all of you must

17   pay close attention to all that transpires during the trial.

18   You may not assume from your seating position that you are

19   either a regular or an alternate juror.

20        Now, pursuant to Federal Rules of Evidence, Rule 615,

21   except for Mr. Birk, any advisory witness, and any other

22   witness granted exemption from sequestration, all other

23   witnesses who may testify during trial must leave and remain

24   outside the courtroom and shall not discuss their testimony

25   with anyone other than legal counsel, provided further that

1  each party shall advise all prospective witnesses endorsed by

2  them of the Court's order of sequestration, which I believe to

3  be in full force and effect.

4          We'll now have the benefit of the opening statements

5  of counsel.  Again I instruct you that what counsel say to you

6  or show to you during their respective opening statements, that

7  is not evidence and may not be used by you as such.

8          Very well.  If the Government is prepared to make its

9  opening statement, counsel, you may.

10         MS. HADDEN:  Yes, Your Honor.  Thank you.

11         THE COURT:  You're welcome.

12                      **OPENING STATEMENT**

13         MS. HADDEN:  Ladies and gentlemen of the jury, many

14 times tax cases can be very complicated, very long, very drawn

15 out, lots of numbers.  This case is not a complicated tax case.

16 This is a case about a man who didn't want to pay his taxes,

17 and that man is the defendant.  And for over 20 years, he did

18 not pay one dollar in taxes.  You are going to hear that he

19 also took the added affirmative acts to conceal his income from

20 the IRS so that they could not collect the taxes that he owed.

21         As the judge informed you, the defendant is charged

22 with evasion of payment for the 1998 through 2005 tax years.

23         This story begins as far back as at least 2001, when

24 the IRS began simply trying to get the defendant to file his

25 '98 and '99 tax returns.  For over ten years, the IRS -- you'll

1    hear from many witnesses from the IRS, at least seven -- tried

2    to get the defendant to file tax returns and pay his taxes.

3    You're going to hear from these seven witnesses that they sent

4    him notices, they sent him letters, they called him, they made

5    visits, they sent summons, they had hearings.  They did a

6    tremendous amount of work over more than ten years to get him

7    to pay and file his tax returns.

8         You are going to hear that he did -- the defendant did

9    eventually file some tax returns.  You're going to hear from

10    two CPAs the defendant went to to file his '98 through 2005 tax

11    returns, that he provided those CPAs with his company's books

12    and records, Tarryall River Log Homes.  And they prepared his

13    1998 through 2005 tax returns, and he eventually filed them

14    with the IRS.  And those returns reported that he owed over

15    $90,000 in taxes.  Now, you'll hear that the defendant did, in

16    fact, file those returns but never paid the $90,000 that he

17    himself said he owed.

18         Now, you're going to hear about the two affirmative

19    acts -- two ways that he committed affirmative acts to evade

20    his taxes.  The first is he had a personal and a business bank

21    account.  The -- in both the personal and business bank

22    accounts, he would deposit funds, and then almost immediately,

23    often the same day, would withdraw that money through an

24    official bank check.  Some of those checks were used for bills,

25    but some of those checks were made out to he and his wife for

1   thousands of dollars.  What this accomplished was, he was able

2   to keep the bank accounts -- balances in both accounts very

3   low, primarily the in personal account.  In his personal

4   account, he was able to keep his balance below $201 from 2007

5   through 2018.  Over this time period, from 2006 through 2018,

6   the defendant purchased over $1.6 million in official checks

7   from the bank.

8           The second way that he concealed his income from the

9   IRS is that you'll hear in his business account, he paid for

10   personal expenses out of that account.  You'll hear from 2013

11   to 2017, he paid for over $151,000 in personal expenses out of

12   his business account.  And you'll hear from the IRS witnesses

13   that it is more difficult for them to levy a business account

14   than it is to levy a personal account.

15           Now, you're also going to hear from Special Agent

16   Hopping.  He is a special agent with IRS Criminal

17   Investigations.  And in 2014 he interviewed the defendant about

18   his conduct regarding his taxes and the use of his bank

19   account.  And Special Agent Hopping is going to explain to you

20   that the defendant admitted that he did not want to keep a lot

21   of money in his bank account because the IRS or the State of

22   Colorado would sweep it out.

23           Finally, you're going to hear from revenue agent Mary

24   Trabold.  Ms. Trabold is going to go through all of the

25   defendant's finances, all of the money going in and out of his

1    bank accounts, and she's going to explain to you how much taxes

2    he owed and his financial situation throughout these time

3    periods.

4           After of you hear all of this evidence, there is only

5    going to be one verdict in this case, and that is guilty.

6           THE COURT:  Counsel.  Thank you.

7           Very well.  Opening statement for Mr. Birk.

8    Mr. Harris.

9           MR. HARRIS:  Thank you, Your Honor.

10          THE COURT:  You're welcome.

11                        **OPENING STATEMENT**

12          MR. HARRIS:  Two of the worst times to be losing your

13   voice are probably before you get married and before you open

14   in a criminal trial, so bear with me while -- we'll do what we

15   can.  If you don't hear me, let me know.

16          So Marty Birk, sitting over there, is a regular guy.

17   He's no different than any of us in this courtroom.  Until

18   recently, he was living the American dream.  He raised a

19   family; he served his country in Vietnam; started a business;

20   and for years, he paid his taxes.

21          Give me one second --

22          For years, he paid his taxes.  Unquestioningly, as we

23   all do.  And Marty Birk's American dream has been interrupted

24   by this prosecution for tax evasion, a charge which he, as you

25   will hear, vehemently denies.

1          Over the course of the next couple of minutes, I'm

2     going to discuss with you the evidence that you're going to

3     hear during the course of this trial and also what you won't

4     hear.

5          First, make no mistake about it, you're going to hear

6     that Marty Birk made money, that he started a little business.

7     And I expect there will be a parade of federal agents brought

8     in to tell you that, yeah, he had income; and we're not going

9     to deny this.  Mr. Birk did in fact have income, money coming

10    in, because he did own a business, and that business did have

11    money that came in.  It was a local company, Tarryall.  It sold

12    log homes.

13         You'll hear also that Mr. Birk spent the vast majority

14    of his adult life working hard and, as I said, paying his

15    taxes.  It was only fairly recently, in the scheme of his life,

16    that he stopped paying.  Not because, you'll hear, that he

17    thought taxes were unnecessary.  Not because he thought that it

18    was a bad idea to have a tax system.  Because he will tell you,

19    as he told the IRS, he agrees, taxes are necessary.  Not

20    because he opposed the idea of taxation, because he doesn't.

21    Not because he thought he was someone special, better than you,

22    better than me, somehow exempt, holding an immunity idol.  Not

23    because he hated the country he had served.  But because he had

24    come to an understanding of the law in good faith and

25    believed -- right or wrong -- and I'll tell you right now,

1    everyone here is going to say, except for Mr. Birk, that he's

2    wrong on that belief -- but he had come to a belief in good

3    faith that he had no legal duty to pay income taxes on certain

4    types of income.

5           Now, importantly, he didn't just wake up one day and

6    say, today I'm done with taxes.  I've paid in, and we're

7    through.  Mike drop.  His decision not to pay came after a long

8    and careful study of tax law, their history, the voluminous

9    IRC, the Internal Revenue Code, the statutes, the cases, the

10   Constitution.  His decision came after a law professor in a

11   business law class said something that piqued his curiosity, a

12   lawyer, a professional.  And he began to read up, and he read,

13   and he studied, and he kept his eyes open for similar,

14   like-minded people.  He saw there were other people who had the

15   same sorts of questions that he had, and he met with them.

16   But, you know, he didn't just accept everything he was told.

17   He questioned and researched and eventually reached certain

18   legal conclusions about the tax law.

19          But, understand, you'll learn that Mr. Birk isn't a

20   lawyer, he isn't an accountant, he doesn't have formal

21   training.  He just did his best, however misguided, to

22   understand a complex area of law.  And he came to believe that

23   the tax law didn't apply to his income from that business,

24   Tarryall, the log home company.  And so what did he do?  He

25   acted on that sincere belief, his good faith understanding of

1     the law.

2          Now, no doubt, you're going to hear that the

3     conclusions he reached, that understanding, was wrong.  But

4     listen carefully, because I submit that you will not hear any

5     credible evidence that that mistaken understanding of the law

6     was in bad faith.  And that's the critical issue -- the only

7     issue, really, in this case.

8          You're not going to hear that what Mr. Birk was saying

9     is not something that he did not truly believe.  You're not

10    going to hear that.  Or that Mr. Birk didn't truly believe what

11    he would tell the IRS.  And, in fact, he told this to the IRS

12    again and again and again, repeatedly, over the years.

13         Now, of course, the IRS had and has a very different

14    idea, understandably, about the law, about its applicability to

15    Mr. Birk.  So when he stopped suddenly paying taxes, that

16    wasn't cool.  The IRS did not let that pass.  They tried -- as

17    Ms. Hadden has said, tried to get him to pay what they say he

18    owed; they calculated his taxes for him; they put together

19    something called SFRs -- substitutes for returns -- and

20    repeatedly, in a variety of ways, they demanded payment.

21         And what was Mr. Birk's response to this?  He asked

22    them questions, he demanded to know why they were assessing

23    taxes against him, he tried to engage them in a civil

24    discussion of the issues, but it fell on deaf ears.  You're

25    going to hear, over the course of the many years and the many

1    letters that he tried to get them to answer basic questions,

2    individualized answers to basic questions.

3          And you'll see that he sent them letters, and they

4    sent him letters back.  But you know what?  By the end of the

5    case, it will be clear that instead of directly answering his

6    questions, they simply diminished his arguments and called them

7    frivolous.  They sent them documents, lumping all the anti-tax

8    arguments of people he knew or people he didn't know, just lump

9    them all together.  Boilerplate responses.  We'll call them

10   canned responses.  And they sent him citations to cases, which

11   he read, and which he considered.  And eventually, he hired a

12   firm, Advanced Tax Solutions, to try to resolve things.  And

13   we'll get to that.

14         But they sent him letters lumping all of these

15   arguments together.  And they sent him citations to cases,

16   which he read, considered, but ultimately rejected as being

17   incorrect.

18         Now, eventually they succeeded in beating him down.

19   As I said, he hired a company, his spirit broken, tired for a

20   moment of fighting for what he believed, and agreed to, as he

21   put it, come back into the system.  But he never really changed

22   his sincerely held beliefs about his legal duty to pay the

23   taxes.  And he hired them, and relied on them to calculate his

24   taxes correctly.  He provided them the documents they asked

25   for; he cooperated with them fully, and he was prepared to pay,

1   despite even at that time not really believing for a second

2   that he still had a legal duty to pay.

3           You'll hear that despite the best of intentions, Marty

4   Birk couldn't eventually compromise this good faith

5   understanding of the law, this belief based on his

6   understanding of the law that he had no duty to pay.

7           You'll hear that he and the IRS were -- had some

8   differences in some respects on what tax amounts would actually

9   be due.  And, yeah, to this day, he has not paid.  Again, you

10  will not hear us dispute that he made money or failed to pay

11  taxes; and you will not hear us argue that he tried to avoid

12  the IRS seizing money that he thought he did not owe.

13          Now, we've talked a lot -- or you've talked a lot, and

14  I've been listening -- about whether Mr. Birk has to testify

15  and whether he will testify.  And I'll tell you right now, I'd

16  be shocked if he didn't testify.  He is dying to get up there

17  and tell you his side of the story.  He welcomes it; he

18  embraces it, even though he doesn't have for a second any

19  burden of proving a single thing to you; but he's going to.

20  And what he's going to tell you is this:

21          He spent time, he spent effort, he spent money trying

22  to understand the law, which he researched.  And from that

23  research, he did come to the belief that we've been discussing,

24  and he communicated that to the IRS.  He sent them letters, he

25  sent them questions, he sincerely wanted their input, but he

1    never got back more than boilerplate responses.

2            The evidence will show that the IRS was dismissive,

3    derisive of his arguments, that they did not directly answer

4    his questions, that they did not for a moment take him

5    seriously.  They sent him canned responses; they called him a

6    tax protestor; they lumped him together with people who

7    wouldn't pay taxes for a whole host of reasons that had nothing

8    to do with him.

9            By contrast, you'll hear that Mr. Birk reviewed

10   carefully the materials that the IRS sent to him; that he

11   didn't ignore them; that he researched what they told him; that

12   he kept an open mind; but eventually, he still persisted in

13   believing that he did not legally owe taxes.

14           Now, as you listen to the evidence in this case, I

15   would ask you this:  Keep an open mind.  It's going to be a

16   long couple of days or week before you actually hear Marty

17   Birk.  Please remember it's your job to decide whether the case

18   is proven beyond a reasonable doubt based on credible evidence.

19   And please listen carefully to all of the evidence from all of

20   the sources as it's presented, because in the end, the

21   Government and we agree on one thing -- this is a simple case.

22   As Ms. Hadden said at the very beginning, the first words from

23   her mouth, this is not complicated.  No.  She's right.  It's

24   not.

25           In the end, because the evidence will show that

1    Mr. Birk never willfully evaded taxes, as that's defined for

2    you by the Court, we're going to ask you to return a not guilty

3    verdict at the conclusion of this case.

4         Thank you.

5         THE COURT:  Counsel, thank you.

6         Counsel and ladies and gentlemen of the jury, all

7    exhibits that are marked in the exhibit list as stipulated or

8    no objection are now admitted in evidence with leave to publish

9    or broadcast to the jury.

10        Ladies and gentlemen, to the evidence to be presented

11   first by the Government in its case in chief.

12        If the Government is prepared, it may call its first

13   witness.

14        MR. MAGNANI:  United States calls Kristy Morgan.

15        THE COURT:  Very well.

16        Do you need our assistance in retrieving her?

17        MS. HADDEN:  No, Your Honor.

18        THE COURT:  Thank you.  We'll be at ease.

19        MR. MAGNANI:  Your Honor, do you mind if I move the

20   podium?

21        THE COURT:  We'll get Ms. Roberson to do it.

22        Ms. Morgan, if you'll come and stand in front of my

23   bench.  If you will raise your right hand to be sworn.  Thank

24   you.

25        May I have your attention in the courtroom.

Kristy Morgan – Direct

1

2                    (**KRISTY MORGAN, GOVERNMENT'S WITNESS, SWORN**)

3              *THE COURT:*  Thank you.  Please be seated in that

4    witness stand.

5                    Counsel, when prepared, you may inquire.

6              *MR. MAGNANI:*  Thank you, Your Honor.

7              *THE COURT:*  You're welcome.

8                            **DIRECT EXAMINATION**

9    *BY MR. MAGNANI:*

10   *Q.*  Good afternoon, Ms. Morgan.

11   *A.*  Good afternoon.

12   *Q.*  Can you just tell the ladies and gentlemen of the jury

13   where you're joining us from today.

14   *A.*  I live in Ogden, Utah.

15   *Q.*  And what is it that you do in Utah?

16   *A.*  I work for the Internal Revenue Service in Ogden, Utah.

17   *Q.*  How long have you worked for the Internal Revenue Service?

18   *A.*  In October it will be 35 years.

19   *Q.*  What is going on in Ogden, Utah, for the Internal Revenue

20   Service?

21   *A.*  That's where the tax returns -- mostly business tax returns

22   are being filed, and there is a lot of different areas of the

23   Internal Revenue Service, processing and working with tax

24   returns.

25   *Q.*  What is your current position with the IRS?

Kristy Morgan – Direct

1   A.   I'm the court witness coordinator for the Ogden center.

2   Q.   How long have you held that position?

3   A.   I was selected in 2009.

4   Q.   Can you just tell the jury some of your duties as –– in

5   that role.

6   A.   My main responsibility is to assist the special agents and

7   attorneys in preparation for trial.  I'll secure documents and

8   tax returns that are maintained in the normal course of

9   business.  I'll review those documents and certify those

10  documents and then testify on behalf of a commissioner as a

11  custodian of record regarding those specific documents.

12  Q.   And in your capacity as court witness coordinator for the

13  Ogden Service Center, about how many cases would you say that

14  you've worked on?

15  A.   Cases, I've worked on well over 400.  I have testified in

16  over 190 trials.

17  Q.   Is that both civil and criminal?

18  A.   Correct.

19  Q.   Now, through your work at the IRS, have you become familiar

20  with IRS record-keeping practices?

21  A.   Yes.

22  Q.   And is –– do you draw on that familiarity to pull records

23  and to achieve the function that you described?

24  A.   Yes.  Based on our training, we use the different areas;

25  and we're taught how the records are kept, when they are

Kristy Morgan – Direct

1   deposed of, where we can find those records.  So I use all of

2   that information.

3   Q.  Does the IRS keep folks' tax returns as records?

4   A.  We keep tax returns as records.  Yes.

5   Q.  For about how long, in the ordinary course, does the IRS

6   keep those records?

7   A.  We'll keep the actual tax return -- for instance, the paper

8   tax return is kept six years and nine months; and then it's

9   destroyed.

10  Q.  Are there any circumstances where a tax return might be

11  kept longer than six years and nine months?

12  A.  There is certain circumstances where it may be kept for

13  collection purposes, criminal investigations, or examination.

14  Q.  With regard to those tax returns that are maintained by the

15  IRS, is one of your duties coordinating the certifications of

16  them for trial?

17  A.  Yes.

18  Q.  Now, Ms. Morgan, Exhibits 1 through 10 have been admitted

19  in evidence in this case.  I was hoping you could grab one of

20  the two binders near you.

21          THE COURT:  Thank you, Madam Clerk.

22          MR. MAGNANI:  Thank you.

23  BY MR. MAGNANI:

24  Q.  Now, in this case were there certified tax returns for 1998

25  through 2005?

Kristy Morgan – Direct

1   A.   There was not certified tax returns.   No.

2   Q.   So the tax returns in Exhibits -- well, I guess, what is

3   Exhibits 1 through 10?   If you could just sort of take your

4   time, flip through the binder, and just tell the jury what is

5   there.

6   A.   They are tax returns from 1998 for approximately ten years.

7   There is three for 1998, and then additional years are actual

8   copies of tax returns.

9   Q.   Okay.   And did you -- were you able to find tax returns

10  from before -- actual tax returns from before 1998 in this

11  case?

12  A.   Before 1998, not the original records.   Just information

13  regarding the filing.

14  Q.   So once a tax return is destroyed, once it's out of

15  retention, what are the types of information that the IRS may

16  still have about those old tax returns?

17  A.   We maintain what is called a transcript, which is a history

18  of the filing.   Takes information right from the tax return and

19  is recorded in the system.   We also have some command codes

20  that we can use with the computer to pull specific information

21  regarding filed tax returns.

22  Q.   Are you -- were you able in this case to find some of that

23  old tax return data that exists for tax returns that themselves

24  no longer exist?

25  A.   Yes.

Kristy Morgan - Direct

1   Q.  And did you certify that data?

2   A.  Yes.  I reviewed and that -- that is certified.  Yes.

3   Q.  So how does the data -- when a tax return comes into the

4   IRS, can you explain how that tax return is -- how the data on

5   that tax return ends up in an IRS database.

6   A.  When the tax return is accepted, information is actually

7   input into the system by our data transcribers.  They'll put in

8   line items like, for instance, your wages, taxable income, tax

9   that is due.  All of that is recorded in our main computer,

10  which is maintained in Martinsburg, West Virginia.  Then as the

11  history of the account goes on, if there is payments made, a

12  refund that is issued, all of that data is input by clerical

13  support.  So we have a record of all of the returns that were

14  filed, any action on that account, any refunds, any tax

15  payments that are made.  It's a transcript, chronologically

16  kept as history.

17  Q.  So I'd like to now point your attention to some of those

18  types of data that are maintained by the IRS.  Could you please

19  turn to Exhibit 12, which I believe is also in evidence.

20  A.  Yes.

21          MR. MAGNANI:  And if there is no objection, can the

22  exhibit be published to the jury?

23          THE COURT:  It may.

24          MS. BECK:  No objection.

25          THE COURT:  As I advised counsel during the trial

Kristy Morgan – Direct

1   preparation conference, once an exhibit has been admitted, it

2   may be published or broadcast to you ladies and gentlemen of

3   the jury without seeking my independent leave.  Instead,

4   counsel must coordinate the form of electronic publication with

5   Ms. Roberson.

6   *BY MR. MAGNANI:*

7   *Q.*  Ms. Morgan, can you please tell the jurors what they're

8   looking at on the screen here?  Do you see it on your screen,

9   ma'am?

10  *A.*  I do.

11  *Q.*  Can you tell the jurors what that is.

12  *A.*  This is the official certification of the tax document.

13  All returns will have this type of form.

14  *Q.*  And now, can you please turn -- well, actually, what is --

15  if you could please turn to the second page, Ms. Burgess.  What

16  type of tax document is this?

17  *A.*  We refer to it as a transcript.  This transcript is called

18  an IMFOLR.  So it's from the individual tax return of -- I

19  received the actual social security number.  I pulled the

20  information based on the social security number and the year.

21  And this is a printout of the fact of filing, whether or not

22  there was a tax return received, and some of the information

23  that was on that tax return.

24  *Q.*  So is it fair to say that what you refer to as an IMFOLR,

25  it contains some information on tax returns, even if those

Kristy Morgan – Direct

1   returns themselves are still out of retention?

2   *A.*   Correct.

3   *Q.*   Okay.  But it doesn't contain all of the information that's

4   on a tax return; correct?

5   *A.*   That's correct.

6          *MR. MAGNANI:*  Ms. Burgess, if you could pull up

7   Exhibit 14.

8   *BY MR. MAGNANI:*

9   *Q.*   And, Ms. Morgan, whenever you get to the page in your

10  binder, or if you prefer to look at it on the screen, could you

11  please tell the ladies and gentlemen of the jury, what is

12  Exhibit 14?

13  *A.*   This is a printout of what is called BMFOLE.

14  *Q.*   Okay.  So another weird name?

15  *A.*   That's correct.

16  *Q.*   Are there a lot of IRS documents with long acronyms and

17  things like that?

18  *A.*   That's correct.  That is our language, is long acronyms.

19  *Q.*   What would be the plain English that you would describe to

20  the jury what a BMFOLE is?

21  *A.*   It's called a business master file entity.  So when an

22  account is established on a business, this is the entity

23  information for employees to look at when they're working the

24  case.

25          *MR. MAGNANI:*  And now, Ms. Burgess, if you could

Kristy Morgan – Direct

1   please turn backwards to Exhibit 11.

2   *BY MR. MAGNANI:*

3   *Q.*  And, Ms. Morgan, when you have the chance to look at that,

4   just let me know.

5   *A.*  Exhibit 11.  Yes.

6   *Q.*  What is Exhibit 11?

7   *A.*  This is actually what is a transcript of an account --

8   plain language transcripts.  We can pull transcripts that don't

9   have all the codes and the different command codes.  Gives you

10  more of an idea that you can read and understand the account.

11  And that's what is certified in this group of tax returns, is

12  the transcripts of the accounts.

13  *Q.*  So when you say "plain language," would you say that

14  Exhibit 11 is a little more -- well, like you said -- plain

15  English, as compared to the other IRS data that you have before

16  you?

17  *A.*  Correct.

18  *Q.*  What -- could you talk about the transcript delivery system

19  and explain to the jury just how the information gets into

20  these account transcripts.

21  *A.*  All of the information is, again, entered into our master

22  file computer, Martinsburg, West Virginia.  It's information

23  kept by social security number or employee identification

24  number.  So in the transcript, we can request information, for

25  instance, using a social security number and specific year.

Kristy Morgan - Direct

1  Say we want 1990 through 1995, the transcript delivery system

2  will pull us plain language transcripts for the social security

3  number that we request.  We get a printout.

4  Q.  And in this case, were you able to get all the data from

5  1988 on forward?

6  A.  Yes.

7  Q.  Is it possible that there may be other IRS data from before

8  1988?

9  A.  There is possibility.  Yes.

10  Q.  But you didn't look at microfiche or anything like that to

11  try to find it?

12  A.  No.

13  Q.  Okay.  Now, we've talked a lot about the records that the

14  IRS maintains.  I'd like to ask you, are you familiar with a

15  certification of lack of record?

16  A.  Yes.

17       MR. MAGNANI:  If I could please -- Ms. Burgess, if you

18  wouldn't mind pulling up Exhibit 13.

19  BY MR. MAGNANI:

20  Q.  Ms. Morgan, my question is, what is a certification of lack

21  of record?

22  A.  When a request is received for specific information -- for

23  instance in this record we're looking at, it's for Lawrence M.

24  Birk, supplied me with the social security number, and asked

25  that I look for certain things on the account.  I would ask the

1   computer, for instance, in this, if there was any payments or

2   estimated tax payments made on behalf of Mr. Lawrence M. Birk.

3   This would tell me, again, what the results of that were.  At

4   the bottom of the certification of lack of record is telling me

5   a diligent search was done, and the record has shown that there

6   was no payments made from December -- for the tax period

7   December 31, 2006, through 2018.  So no record of any payments

8   for those specific years.

9   Q.  Now, who did the diligence search for the records --

10  A.  I did -- I'm sorry.  I do the search.

11  Q.  And so does this certification basically just mean that you

12  searched for certain records and you couldn't find them?

13  A.  Correct.

14  Q.  Now, unlike the records that we've been talking about

15  these, whether the IMFOLR or the BMFOLE or the account

16  transcripts, are these records made in the ordinary course of

17  business, or are they only made in preparation for something

18  like this?

19  A.  The lack of record is made in preparation at a request like

20  this.

21  Q.  Okay.  Now, looking at this one -- and the section that is

22  highlighted, can you just sort of explain to the jury how they

23  would read these forms.

24  A.  The very bottom that is highlighted in yellow?

25  Q.  Well, when it says, periods, December 31, 2006, to

Kristy Morgan – Direct

1    December 31, 2018, is that referring to the dates of payment,

2    or is it referring to certain tax years, or can you just sort

3    of explain what those dates refer to?

4    A.   When we're doing research, we're looking at an account for

5    the entire year, from January 1 through December 31.   And

6    that's the period ending for that time frame.   December 31,

7    2006 covers that entire year, all the way through the end of

8    December 31, 2018.

9    Q.   So is it fair to say that this certification means that

10   Mr. Birk didn't make any voluntary payments, not in those

11   years, but for the tax -- for income earned in the tax years

12   2006 through 2018?

13   A.   Correct.

14        MR. MAGNANI:   And could you go to the next page,

15   please, Ms. Burgess.   If you could zoom in on the same section.

16   BY MR. MAGNANI:

17   Q.   So, Ms. Morgan, what is the difference with this page?

18   A.   This search was -- I specifically asked to look for

19   individual income tax returns, the Form 1040, that was filed,

20   executed, signed by the taxpayer, and sent into the Internal

21   Revenue Service for the same period.

22   Q.   So it's the same period, but the first one is for payments,

23   and now this one is for tax returns filed?

24   A.   Correct.

25   Q.   Okay.   Now, if we could go to the next page, please.

35

Kristy Morgan – Direct

1    And the next -- well, actually, let me ask you this:

2  Do you know from the search of records that you did if Mr. Birk

3  either filed tax returns or paid tax voluntarily through either

4  his wife or his companies or anything like that?

5  A.  In doing the search, I would look at each account.  So I

6  looked at his personal account, his spouse account, the

7  business account, so I would search every single account

8  looking for returns, payments.

9  Q.  And so is it fair to say that the pages that follow in this

10  exhibit are similar certifications that there are no records of

11  any payments or returns filed for Mr. Birk, his wife, or his

12  companies?

13  A.  Correct.

14  Q.  Now, in order to, you know, spare the jury from having to

15  sort of try to make sense of all of these different IRS forms,

16  did you happen to also certify a summary of different

17  information that the IRS keeps in its records?

18  A.  Yes.

19    MR. MAGNANI:  If we could please pull up Exhibit 16.

20  BY MR. MAGNANI:

21  Q.  What is Exhibit 16, Ms. Morgan?

22  A.  This is basically a summary of the transcripts, the tax

23  returns, and the years.  So we've entered all of this

24  information from the exhibits into a summary sheet.

25  Q.  Okay.  And I notice there is a lot of different acronyms

36

Kristy Morgan - Direct

1    and things like that on the sheet.  Do you know, what is, for

2    example -- do you know what SA stands for in the columns here?

3    A.  Self-assessment.

4    Q.  Okay.  And what is AGI?

5    A.  The adjusted gross income from the tax return.

6    Q.  Now, the years from 1988 through 1997, those are the years

7    you said you didn't have any physical tax returns; so where

8    does this information on self-assessed income come from?

9    A.  This can come from the copies that were produced of the tax

10   returns or the transcripts.

11   Q.  And when you say "the transcripts," are you talking about

12   the IMFOLRs, which are at -- that we previously looked at?

13   A.  Correct.

14   Q.  Okay.  Now, can you also explain, what is -- and I'm trying

15   to indicate on the top.  What does the initialism SFR stand

16   for?

17   A.  That stands for substitute for return.

18   Q.  Okay.  Now --

19            If you could zoom out, Ms. Burgess.

20            I notice there is some different colors on this

21   summary.  Is it -- with respect to the ten yellow and blue

22   lines, is the information on those lines from the tax returns

23   that are certified and at Exhibits 1 through 10?

24   A.  Correct.

25   Q.  Okay.  And there are three entries for 1998.  Can you

Kristy Morgan – Direct

1  please explain why there are three different lines for 1998.

2  A.  Yes.  First of all, there was a tax return that was

3  received that at the time was not accepted; then there was a

4  second return filed with the substitute for return, the audit

5  done; then there was an amended tax return also received, which

6  is the 1998X.

7  Q.  Do you know what X refers to?

8  A.  That's the amended form, the 1040X.

9  Q.  And so -- I should have asked you this before, but is the

10  third column the date on -- that those tax returns were filed?

11  A.  Correct.

12      MR. MAGNANI:  If you could please zoom out, again,

13  Ms. Burgess.

14  BY MR. MAGNANI:

15  Q.  Now, the information on voluntary payment, where did that

16  information come from?

17  A.  That is actually from my review, from the account

18  transcripts.

19  Q.  And the transcripts, is that that plain English document

20  that you were talking about?

21  A.  Correct.

22  Q.  Now, when it says the amounts that were paid, are those

23  amounts -- does that indicate the time it was paid or the tax

24  year that it was paid for?

25  A.  The time when -- guide me to which column we're looking at.

38

Kristy Morgan – Direct

1  Q.  Sorry.  Actually, I'll withdraw that question.  We can get

2  to that later.

3         And then I notice this is a --

4         Can you go to the second page, please, Ms. Burgess.

5         Now, this page -- is this basically the same

6  information, the information you pulled from transcripts and

7  things like that?

8  A.  Yes.

9  Q.  Okay.  Now, I'd like to direct your attention to Exhibit 1,

10  which is one of the tax returns in this case.

11         Please pull that up, Ms. Burgess.  It's in evidence.

12         And, actually, Ms. Burgess, if you could go to the

13  second page, please.

14         And, Ms. Morgan, if you could sort of explain to the

15  jury -- there is a lot of different stamps on this return.  Can

16  you sort of explain what those different stamps are?  I don't

17  know if you can see in the binder or if it would be easier --

18  A.  Yeah.

19  Q.  Take your time to flip to the page so you can look at the

20  actual document.

21  A.  There is several different stamps on the tax return.  The

22  first one is going to be the date that it was actually received

23  at the Ogden Service Center.

24  Q.  And then what about all of those other stamps and received

25  dates?

Kristy Morgan – Direct

1   A.   The stamp that the arrow is pointing to is where it went

2   into the Frivolous Return Program.  So it tracks the return as

3   it's in the IRS, as it moves from different functions.

4        MR. MAGNANI:  And can you scroll down, Ms. Burgess.

5   Is there a way you can scroll down to the bottom?

6   BY MR. MAGNANI:

7   Q.   Now, what about those other stamps?  I know you mentioned

8   the Ogden Service Center, you mentioned the Frivolous Return

9   Program.  What are these other stamps?

10  A.   The received audit recon, that is where someone is

11  reconsidering the audit that was done.  So when it is in that

12  area, it also receives a date stamp.  Also receives a stamp

13  saying that it was considered and the examination.

14  Q.   So is it fair to say that as these tax returns make their

15  way through the IRS, they get stamped when they're received in

16  different divisions of the IRS?

17  A.   Correct.

18  Q.   And now I'd like to draw your attention to Exhibit 18.

19  Now, what is Exhibit 18?

20  A.   This is actually a summary of the notices that were

21  received, based on the transcripts, again, that I reviewed.

22  Q.   And the transcripts -- they don't list every single letter

23  ever sent to a taxpayer; right?

24  A.   That's correct.  These are what we call the statutory

25  notices, that they're required by law for the IRS to send to

Kristy Morgan – Direct

1   the taxpayer.

2   *Q.*   From your review of the transcripts in this case, is this a

3   fair and accurate depiction of at least some of the legally

4   required notices that were sent to Mr. Birk between 2005 and

5   2012?

6   *A.*   That is correct.

7   *Q.*   Okay.  Now, do you know if other letters were sent to

8   Mr. Birk during the period that you reviewed for this case?

9   *A.*   Yes, there was.

10  *Q.*   Okay.  And were you -- actually, if we could just draw your

11  attention to -- well, actually, let me ask you this:  In

12  addition to sending out the letters that are noted on the

13  transcript, does the IRS routinely send out letters to

14  taxpayers who have a balance due?

15  *A.*   Yes.  There is a balance due routine that happens on every

16  assessment.  Then at the end of the year, if that balance is

17  not zero, they get a reminder every year about the balance

18  owed.

19  *Q.*   So would it be fair to say that if you owe the IRS money,

20  they bug you at least once a year with a letter?

21  *A.*   At least once a year.

22  *Q.*   Okay.  I'd like to talk about some of these letters.

23          If we could please pull up Exhibit 20.  And, actually,

24  if you could put 20 and 53 side by side.

25          Ms. Morgan, once the other exhibit comes up, if you

Kristy Morgan - Direct

1    could just -- well, what do you refer to these letters as?

2    A.  These are -- we refer to them by the letter number.  At the

3    bottom of the page, it shows letter 3175 on both of them.

4    Q.  And how would you describe what -- well, let me ask you

5    this:  First of all, is it fair to say that basically every --

6    everything in the IRS has a number for a name?

7    A.  Yes, it does.

8    Q.  Okay.  So how would you define in sort of plain English

9    what a letter 3175 is to the jury?

10   A.  This is a letter sent out regarding correspondence that was

11   received from Mr. Birk to the Internal Revenue Service,

12   received in Frivolous Return Program, an exam.

13   Q.  What is the Frivolous Return Program?

14   A.  That is a specialty group that is trained to look at types

15   of returns that could be subject to a frivolous return penalty.

16   And they have responsibilities to the taxpayer to inform them

17   of the possibility of a penalty; and they work with them,

18   trying to bring them into compliance.

19   Q.  When you say "bring them into compliance," what exactly do

20   you mean?

21   A.  That means they file correct tax returns and pay.

22   Q.  So, basically, if you file something that the IRS deems as

23   frivolous, they'll try to get you to correct it before

24   assessing a penalty?

25   A.  Correct.

Kristy Morgan - Direct

1  *Q.*  Are you familiar with frivolous return penalties?

2  *A.*  Yes, I am.

3  *Q.*  How are you familiar with that?

4  *A.*  I worked in the Frivolous Return Program for ten years.

5  *Q.*  Is that before your current job?

6  *A.*  Correct.

7  *Q.*  And what did you do as the penalty coordinator with the

8  IRS?

9  *A.*  I actually developed the letter that is being sent out

10  still today regarding the filing of a frivolous return or a

11  frivolous type of correspondence; I answered telephone calls

12  and spoke with the individuals filing these returns; I assessed

13  the penalties if they did not comply.

14  *Q.*  And can you just -- what are the dates on these two

15  particular 3175s, if you can tell on the small screen?

16  *A.*  The first one is December 12, 2001; and the second letter

17  is sent in August 30, 2011.

18  *Q.*  Now, if you could look at the bottom of these letters --

19      Sorry, Ms. Burgess.  I know I have you jumping around.

20      -- what is -- it says there are some enclosures.

21  *A.*  Yes.

22  *Q.*  What is publication 2105?

23  *A.*  That is a publication entitled "Why Do I Have to Pay

24  Taxes?"  It's sent with every single 3175, 3176.  It explains

25  the Internal Revenue Service's position on the type of returns;

Kristy Morgan - Direct

 1    it gives them resources to research; it gives different facts

 2    regarding frivolous arguments; phone numbers, where to call;

 3    different websites to look at, to actually research what they

 4    filed; and the IRS's position on why that's subject to a

 5    penalty.

 6    Q.  And so what -- how would you describe the publication,

 7    21 -- like, is it a lengthy document?  Is it a short document?

 8    A.  It's a two-page document.  More or less a trifold type of

 9    document, if it's inserted.  Nowadays, it goes out actually

10    electronically.  You can pull it up on the website.

11    Q.  And also just -- can you tell by looking at these two

12    different 3175s, can you tell who sent out the first one?

13    A.  As in the --

14    Q.  Exhibit 20 --

15    A.  -- individual --

16    Q.  I'm sorry.  Can you tell from looking at Exhibit 20 who

17    sent out that letter?

18    A.  It was the -- the employee-wise?  It was -- the actual

19    signature on that is the chief of the examination branch.

20    Q.  But is it fair to say that the chief didn't actually mail

21    that letter?

22    A.  Correct.  It is the tax examiner, which is identified at

23    the top, who is working the case.

24    Q.  And then looking at Exhibit 53, was this one sent by

25    someone different?

Kristy Morgan – Direct

1   A.   Yes.   This is actually from the revenue officer, Jennifer

2   Morgan.

3   Q.   Okay.   Now, do both of these letters basically say that

4   courts have repeatedly struck down the arguments being made by

5   the taxpayer?

6   A.   Yes, they do.

7   Q.   Also, can I just ask, why does the IRS use the term

8   "taxpayer"?

9   A.   Why do they use the term "taxpayer"?

10  Q.   Yeah.

11  A.   Generally, that is just a term that we use to talk about

12  anyone filing information with the IRS.

13  Q.   And do both of these letters also explain to the taxpayers

14  that folks who continue to pursue these types of arguments may

15  be subject to criminal prosecution?

16  A.   It does state that.   Yes.

17  Q.   Do the letters both also say that the IRS will no longer

18  respond to the frivolous arguments being made by the taxpayer?

19  A.   That's correct.

20  Q.   Do you know from your experience as the penalty coordinator

21  why the IRS does not engage with taxpayers who espouse

22  frivolous arguments?

23  A.   Basically, it is their responsibility to comply and file a

24  correct return.   The IRS's job is to receive and process tax

25  returns.   The frivolous arguments people that work with the IRS

Kristy Morgan – Direct

1   are not necessarily to address that type of situation.  The law

2   is passed by Congress; we enforce that law by processing the

3   returns and collecting tax.

4   Q.  So are you saying the IRS does not believe it has the

5   responsibility to explain the tax laws to every person and

6   answer all of their questions?

7   A.  That's correct.

8           MS. BECK:  Objection.  Leading.

9           THE COURT:  The objection is leading.  The objection

10  is sustained.

11          MR. MAGNANI:  I'll move on.

12          If we could please look at Exhibit 23.

13  BY MR. MAGNANI:

14  Q.  Ms. Morgan, when you've had the chance to look at it, can

15  you tell the folks on the jury what special IRS name this

16  letter has?

17  A.  This again is the 3175 letter, notification regarding

18  correspondence mailed to the IRS.

19  Q.  And what -- what is the difference between a 3175C and a

20  3175?

21  A.  The 3175C is actually from a different database.  Different

22  individuals can pull up and use these letters that were

23  developed for the Frivolous Return Program.

24          MR. MAGNANI:  Ms. Burgess, if you can go to the next

25  page.

1

2      *BY MR. MAGNANI:*

3      *Q.*  Can you -- what enclosures are included in this letter?

4      *A.*  It shows publication 1 was sent, and, again, the 2105, "Why

5      Do I Have to Pay Taxes?"

6              *THE COURT:*  Counsel, I apologize for the interruption.

7      But looking at our courtroom clock, this is probably a

8      propitious time to declare our first day of trial at an end.

9              Ma'am, I'm going to respectfully request and require

10     that you return to continue and complete your testimony

11     tomorrow at 8:30 a.m., as measured by the courtroom clock.  Can

12     you and will you do that?

13             *THE WITNESS:*  I will.

14             *THE COURT:*  Thank you.  You're excused until then and

15     may stand down.

16             Counsel, of course, you may be seated at your

17     convenience.

18             Ladies and gentlemen of the jury, I respectfully

19     request that you return for further duty and service in this

20     trial tomorrow morning at 8:30 a.m.

21             But I quickly inquire, will that be unreasonable or

22     terribly inconvenient for any one or more of you?  Presumably

23     not.  We'll proceed on that basis.

24             Here is the trick:  To tee up an 8:30 a.m. start, you

25     need to be here by about 8:15 a.m.  Now, I don't know your

1  customary traveling arrangements, but you're driving in

2  downtown Denver, and you're having to park in downtown Denver

3  during rush hour, so please factor that in as you make the

4  necessary arrangements to return tomorrow morning.

5          Now, in preparation of this overnight recess, once

6  again, you will not be sequestered.  Once again and

7  momentarily, you'll be allowed to separate, leave the federal

8  courthouse, go your separate ways overnight subject to two

9  things:  Number one, leave on your seats face down your

10  notetaking material so that they may not be viewed.  And number

11  two, before you leave, take the reasonable time necessary to

12  read and heed those critically important rules that govern your

13  conduct as jurors in this trial.

14          Very well.  We are in recess until tomorrow at

15  8:30 a.m.

16          Good afternoon.

17          (Recess at 4:57 p.m.)

18                          **I N D E X**

19  **Witness**                                              **Page**

20  Opening Statement By Ms. Hadden                          14
    Opening Statement By Mr. Harris                          17

21

22      KRISTY MORGAN
            Direct Examination By Mr. Magnani               25

23

24

25

1                           REPORTER'S CERTIFICATE

2              I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.

3

4              Dated at Denver, Colorado, this 16th day of December,
   2019.

5

6                                    _Therese Lindblom_

7                                    _____
                                     Therese Lindblom,CSR,RMR,CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25