1    IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
2

3    Criminal Action No. 18-cr-00359-REB

4    UNITED STATES OF AMERICA,

5        Plaintiff,

6    vs.

7    LAWRENCE MARTIN BIRK,

8        Defendant.

---

9                **REPORTER'S TRANSCRIPT**
10                    TRIAL TO JURY
                         DAY TWO
11

---

12        Proceedings before the HONORABLE ROBERT E. BLACKBURN,

13    Senior Judge, United States District Court for the District of

14    Colorado, continuing at 8:36 a.m., on the 23rd day of July,

15    2019, in Courtroom A1001, United States Courthouse, Denver,

16    Colorado.

17                **A P P E A R A N C E S**

18        CHRISTOPHER MICHAEL MAGNANI and ELIZABETH CARYL
      HADDEN, Trial Attorneys, U.S. Department of Justice, Tax
19    Division, 601 D Street, N.W., Washington, DC, 20004 , appearing
      for the Government.
20

21        EDWARD HARRIS and JENNIFER LYNN BECK, Assistant
      Federal Public Defenders, 633 17th Street, 10th Floor, Denver,
22    Colorado, 80202, appearing for the Defendant.

23

24                THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25            Proceedings Reported by Mechanical Stenography
                  Transcription Produced via Computer

1        **P R O C E E D I N G S**

2              (In open court at 8:36 a.m.)

3              *THE COURT:*  Good morning and thank you.  And as you

4     choose, either remain standing or be seated.

5              Madam Clerk, please retrieve our jury once again.  And

6     thank you.

7              (Jury in at 8:36 a.m.)

8              *MR. HARRIS:*  Your Honor, before the jury actually gets

9     here, I don't know if it was communicated to you that we were

10    hoping for a couple of minutes' delay because we're in the

11    process -- we're at the very last batch of printing and

12    collating some impeachment exhibits.

13             *THE COURT:*  Well, again, it's a matter that should

14    have been brought to my attention last night so that I could

15    schedule the return of the jury appropriately and more

16    conveniently.  So your problem now does not become the Court's

17    emergency.  We'll proceed.  If you need additional time, we'll

18    take it up when it actually is ripe.

19             *MR. HARRIS:*  Okay.

20             (Jury in at 8:37 a.m.)

21             *THE COURT:*  Thank you, Madam Clerk.

22             Ladies and gentlemen, please be seated.

23             Ladies and gentlemen of the jury, good morning.

24             *JURY:*  Good morning.

25             *THE COURT:*  I've already bid everyone else a good

Kristy Morgan – Direct

 1   morning.  Presumably you've had a good night's rest, you're

 2   prepared to proceed.  Let us do precisely that.

 3          Mr. Magnani, you may continue your cross-examination.

 4          *MR. MAGNANI:*  Thank you, Your Honor.

 5        (**KRISTY MORGAN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**)

 6                       **DIRECT EXAMINATION**

 7   *BY MR. MAGNANI:*

 8   *Q.*  Ms. Morgan, yesterday we ended the day with talking about

 9   the letters, 3175.  Do you remember the ones we're talking

10   about?

11   *A.*  Yes.

12   *Q.*  And so I think where we left off yesterday is with

13   Exhibit 23.  You can either look at that in the binder or on

14   the monitor.  This is the letter 3175C; is that correct?

15   *A.*  Yes.

16   *Q.*  Now, just directing your attention to the second paragraph

17   of this letter.  Now, you testified yesterday about publication

18   2105.  Can you just tell the jury about the other document

19   that's mentioned here, "The Truth About Frivolous Tax

20   Arguments."  What is that document?

21   *A.*  That's a document that is on IRS.gov.  It's referenced in

22   the letters, and it speaks to different types of arguments and

23   legal information regarding those arguments as to why they are

24   not correct.

25   *Q.*  So what -- can you just describe, what's the difference

1  between the "Why Do I Have to Pay Taxes?" I think you described

2  as a trifold, and "The Truth About Frivolous Tax Arguments"

3  documents?  Could you explain the differences?

4  A.   The 2105 is a publication, more simple general answers.

5  "The Truth About Frivolous Arguments" is about a 20-page

6  document, has a lot more information.

7  Q.   Okay.  And I'd also like to direct your attention to

8  Exhibit No. 32, which is also in jury and can be shown to the

9  jury.

10            What is the name of this letter?

11  A.   The letter is the 3176C.

12  Q.   And just talking collectively about the letters, 3175 or C

13  or 3176, do these letters collectively inform taxpayers that

14  their arguments were rejected by federal courts?

15  A.   Correct.  They all do.

16  Q.   Do they point taxpayers to IRS publications that explain

17  the law?

18  A.   They do.

19  Q.   Do they tell taxpayers they can be penalized criminally?

20  A.   Yes.

21            THE COURT:  If you're going to continue to lead the

22  witness, I'm going to have to give you a baton or administer

23  the solemn oath under 603.  I suspect that on direct

24  examination, this jury is much more interested in the testimony

25  of the witness than counsel.  So let's ask non-leading

Kristy Morgan – Direct

1    questions, please.

2             MR. MAGNANI:  Sure.

3    BY MR. MAGNANI:

4    Q.  So looking at Exhibit 32 --

5             Can you go to the second page please Ms. Burgess and

6    zoom in on the bottom.

7             I would just, then, ask the witness to read the second

8    to last paragraph.

9             THE COURT:  Unnecessary.  You're in luck, you've got a

10   literate jury and a literate judge, and that would be

11   absolutely unnecessary.  If you have a specific non-leading

12   question about the excerpt being broadcast, I exhort you to ask

13   it.

14   BY MR. MAGNANI:

15   Q.  Ms. Morgan, why do all of these letters suggest that

16   taxpayers seek the advice of attorneys or reputable tax

17   practitioners to have their questions answered?

18   A.  That is because the documents, the correspondence, the

19   returns they're filing is frivolous.  It's subject to now a

20   $5,000 penalty.  The Internal Revenue Service wants to inform

21   people, give them the opportunity to seek answers and also

22   competent counsel to make sure that they file the correct type

23   of tax returns and avoid that penalty.

24            MR. MAGNANI:  If we could turn back to the first page

25   of Exhibit 32, please, and zoom in on the top.

Kristy Morgan – Direct

*BY MR. MAGNANI:*

Q.   Are you able to tell the jury from looking at the top of
this letter what this letter was sent in response to?

A.   Yes.  It's for a tax return -- two different tax returns.
The tax periods are for 1998 and 1999.

Q.   And what did those tax returns -- what about those tax
returns led to the sending of this letter?

A.   They attached frivolous arguments, also were what we call a
zero type of tax return, asking for a large refund.

Q.   How much was the refunds requested by the tax returns that
this letter was sent in response to?

A.   One of the tax refunds requested was $52,644.38.  The other
refund that was requested was $18,365.95.

        MR. MAGNANI:  And I also -- if we could now turn to
Exhibit 17, which I don't believe we covered yesterday.

*BY MR. MAGNANI:*

Q.   Ms. Morgan, what is Exhibit 17?

A.   This is an actual summary from transcripts or exhibits that
show the actual voluntary payments that were made, lists the
date, the tax year, the withholding amount, how much was
voluntarily paid.

Q.   What's the difference between the date column and the tax
year column?

A.   The date column can show when the withholding was there and
when an actual payment was there.  The year is for what tax

1  period we actually posted that payment.

2  Q.  Why is there specific dates for some -- for the voluntary

3  payments but only years for the withheld amounts?

4  A.  The withholding amount with the Internal Revenue Service is

5  always recorded as being on the account, the due date of the

6  tax return, which is April 15th of that tax period.

7       MR. MAGNANI:  Okay.  And, Ms. Burgess, would you

8  please put Exhibit 16 up side by side with this one.

9  BY MR. MAGNANI:

10 Q.  And, Ms. Morgan for all of these summary exhibits, did you

11 personally check over every single piece of information in the

12 exhibits and compare them to the data in the IDRS?

13 A.  Yes, I did.

14 Q.  Looking at 16, which is on the right --

15      Ms. Burgess, if you could zoom in to the 1998 line,

16 all the way across.  Thank you.

17      And can you tell from looking at Exhibit 16 when this

18 $12,000 seizure for 1998 happened?

19 A.  The $12,000 seizure was actually made January 3, 2007.

20 Q.  Well, the -- I guess what I'm wondering is, in terms of

21 explaining the difference between 16 and 17, does Exhibit 16

22 mention only --

23      If we could zoom out, actually, on Exhibit 16.

24      -- does it mention only the year to which the seizure

25 was credited, as opposed to the date of the actual seizure?

Kristy Morgan – Direct

| | |
|---|---|
| 1 | *A.* That's correct. |
| 2 | *Q.* And so can you please go to page 2 of Exhibit 17.  And so, |
| 3 | by contrast, does Exhibit 17 explain the dates of all the |
| 4 | actual actions? |
| 5 | *A.* Correct. |
| 6 | *Q.* From Exhibit 17, are you able to tell when the last time |
| 7 | Mr. Birk made a voluntary tax payment was? |
| 8 | *A.* A voluntary tax payment? |
| 9 | *Q.* A voluntary tax payment. |
| 10 | *A.* Yes.  That would be shown on the first page of Exhibit 17. |
| 11 | *Q.* And do you have the paper copy in front of you or -- |
| 12 | Ms. Burgess, if you could -- yeah. |
| 13 | What date was that last voluntary tax payment made? |
| 14 | *A.* That was April 16, 1998, which was a withholding. |
| 15 | *Q.* Now, what tax year was the last voluntary tax payment for? |
| 16 | *A.* For the 1997 tax period. |
| 17 | *Q.* And just so after -- if you can tell from Exhibit 17, after |
| 18 | April 16, 1998, how many dollars did Mr. Birk voluntarily pay |
| 19 | in tax? |
| 20 | *A.* No payments were made after that date voluntarily. |
| 21 | *MR. MAGNANI:* No further questions. |
| 22 | *THE COURT:* Very well. |
| 23 | Cross-examination for Mr. Birk? |
| 24 | *MS. BECK:* Yes, Your Honor.  May we approach, please? |
| 25 | *THE COURT:* You may. |

Kristy Morgan – Direct

1            MS. BECK:  Thank you.

2            THE COURT:  Ladies and gentlemen, please excuse us.

3    Hopefully, we'll not be too long.

4            (Hearing commenced at the bench.)

5            MR. HARRIS:  Let me begin with an apology.  I should

6    have anticipated this.  Having said that, we have five

7    impeachment exhibits which are printed, they're being collated,

8    and I suspect there is a person from the office either on their

9    way -- on their way.  It's an eight-minute walk from the office

10   to here.  We have a ton of copies.  Of course, it's the paper

11   copies we're waiting on, for the matter of witness convenience.

12           I would ask the Court's indulgence to, number one,

13   make a phone call to the office to see what the ETA is.  And I

14   expect the ETA is either two minutes or ten minutes.  I mean,

15   it's very short.  And, alternately, for about a ten-minute

16   recess to get those in front of us.  Again, it's our fault --

17   more my fault than anyone else's -- but I should have

18   anticipated to notify the Court earlier.

19           THE COURT:  Well, you're running out the clock now,

20   Mr. Harris, skillfully.

21           Let me inquire, why is it that the electronic version

22   would be deemed insufficient for your purposes?

23           MR. HARRIS:  I don't know that it would be.  I mean,

24   we'd be fine with that.

25           THE COURT:  Let's begin with that.

Kristy Morgan - Direct

1          MR. HARRIS:  Okay.

2          THE COURT:  If it presents a problem, then we'll

3   revisit the issue.

4          MR. HARRIS:  Thank you.  Apologize also for the bench

5   conference.

6          THE COURT:  If you need to make a call, go grab the

7   phone, step up here, and make the call.  Do it here at the

8   bench.  We won't listen.

9          MR. MAGNANI:  And I don't need to see it.  I think my

10  concern is, my understanding this is the Internal Revenue

11  manual, which is a large document.  And for the witness to be

12  able to look through it and actually -- as opposed to be given

13  snippets on the screen, I think it might be hard for the

14  witness to say, here is a snippet on the screen, as opposed to,

15  here is the whole section that we're asking you about.

16         MS. BECK:  The electronic copy does have the entire

17  document.  It's not just a snippet.  And I will refer her to

18  the specific section.  I think the electronic copy would be

19  sufficient.

20         MR. MAGNANI:  We can make do if we have to.  I just

21  don't know how the witness will navigate the document on her

22  own.  We'll try.

23         MR. HARRIS:  They are on their way, they just left, so

24  shouldn't be very long.

25         THE COURT:  Well, is there no other cross-examination

Kristy Morgan - Direct

1    to be conducted by this witness save for the exhibits in the

2    nature of impeachment?

3              MS. BECK:  Your Honor, there is not much

4    cross-examination of this witness.  You know, so there would be

5    maybe three minutes of cross-examination that doesn't involve

6    potential need to refer to the impeachment.

7              THE COURT:  We're doing precisely what I have worked

8    so diligently throughout my judicial career to avoid, the

9    protocol that allows you to, as you should anticipate

10   difficulties and delays.  This jury is simply being delayed for

11   our problems.  And I'm very reluctant, and I'm frustrated when

12   that occurs.  If you can't tell, I'll make it more obvious.

13   We're just chewing up time.

14             I'm going to ask you to begin your cross-examination.

15   To the extent that impeachment will be used by electronic

16   version, we'll begin with that.  If that's insufficient, then

17   in the interest of justice, I'll revisit the issue.  But this

18   bench conference is through.

19             MS. BECK:  Thank you.

20             (Hearing continued in open court.)

21             THE COURT:  Thank you, ladies and gentlemen of the

22   jury.

23             Madam Clerk, could we use pink noise next time?

24             COURTROOM DEPUTY:  I'll work on it, Your Honor.

25             THE COURT:  Now, where were we?  Cross-examination for

Kristy Morgan - Cross

1    Mr. Birk.

2            Ms. Beck.

3            *MS. BECK:*  Thank you, Your Honor.

4            *THE COURT:*  You're welcome.

5                      **CROSS-EXAMINATION**

6    *BY MS. BECK:*

7    *Q.*  Ms. Morgan, you've been with the IRS for almost 35 years?

8    *A.*  Correct.

9    *Q.*  It will be 35 years in October; is that right?

10   *A.*  That's right.

11   *Q.*  Okay.  And you've been a court witness coordinator since

12   2009?

13   *A.*  Correct.

14   *Q.*  Before you were the court witness coordinator, what was

15   your duty?  What was your title?

16   *A.*  Before?  I was an investigative aide in the criminal

17   investigations.

18   *Q.*  How long did you hold that position?

19   *A.*  From 2002 until 2009, when I was selected.

20   *Q.*  Okay.  And at some point you worked as a penalty

21   coordinator in the Frivolous Returns Program; is that right?

22   *A.*  Yes.

23   *Q.*  When did you hold that position?

24   *A.*  I worked in the penalty -- in examination, I worked in the

25   penalty area from 1992 to 2002, I believe.

Kristy Morgan - Cross

1  Q.  Okay.  So just to summarize, from 1992 to 2002, you worked

2  in the penalty and examination division?

3  A.  Correct.

4  Q.  And then in 2002, you worked in criminal investigation up

5  until 2009?

6  A.  Yes -- well, the court witness is still in criminal

7  investigations.

8  Q.  Okay.

9  A.  Just a different position.

10  Q.  Okay.  So you continued to work in the criminal

11  investigation division from 2002 through the present?

12  A.  Yes.

13  Q.  But you've held this current position as court witness

14  coordinator since 2009?

15  A.  Yes.

16  Q.  Okay.  I just wanted to make sure I understood some of your

17  recent experience.  Thank you.

18         You didn't become involved in Mr. Birk's case until

19  you were tasked with compiling records in the case; is that

20  right?

21  A.  I was actually involved in -- about a week ago, the initial

22  witness that was coming here had training that she had to

23  attend and didn't find out until a later date, so I have just

24  been assigned the case.

25  Q.  For the last week or so?

Kristy Morgan - Cross

1   *A.*   Correct.

2   *Q.*   Okay.  So up until that point, you had never worked on this

3   case?

4   *A.*   Correct.

5   *Q.*   Okay.  You didn't personally correspond with Mr. Birk at

6   any point?

7   *A.*   No.

8   *Q.*   You didn't talk with him on the phone at any point?

9   *A.*   No.

10   *Q.*   You never went to his home?

11   *A.*   No.

12   *Q.*   You never summoned his records?

13   *A.*   No.

14   *Q.*   Okay.  Now, you discussed the retention policy for returns

15   that the IRS has.  And you said that the retention policy for

16   paper returns is six years and nine months; is that right?

17   *A.*   Well, that's destroying the documents.

18   *Q.*   Correct.  And then you keep detailed records in the data

19   for those returns for much longer?

20   *A.*   Yes.

21          *MS. BECK:*  Okay.  If we could pull up Government

22   Exhibit 18, please.

23   *BY MS. BECK:*

24   *Q.*   This is the summary of notices listed on account

25   transcripts document that was prepared by you; is that right?

Kristy Morgan - Cross

1    A.   Yes.

2    Q.   And this document lists all of the legal notices that were

3    sent to Mr. Birk; right?

4    A.   This is the legal notices from the exhibits that I

5    reviewed.

6    Q.   Okay.  What is the retention policy for correspondence

7    between the IRS and taxpayers?

8    A.   The correspondence part would be part of the file.  It

9    would be destroyed when the return is destroyed.

10   Q.   The paper returns?

11   A.   If it's attached to that.

12   Q.   So --

13   A.   If not, it's different time periods, depending on the tax

14   examiner or whoever is reviewing the correspondence.

15   Q.   Okay.  So let me make sure I understand the retention

16   policy with regards to correspondence.  If correspondence is

17   attached to a return, then that correspondence would be

18   destroyed, just as paper returns would be destroyed, within six

19   years and nine months; right?

20   A.   Correct.

21   Q.   Any, then, any other correspondence that is sent from the

22   taxpayer to the IRS or sent from the IRS to the taxpayer would

23   be destroyed depending on the individual tax examiner or person

24   who was dealing with that taxpayer; right?

25   A.   That's not totally correct.  No.

Kristy Morgan - Cross

1   *Q.*  Okay?

2   *A.*  As far as correspondence being sent into the IRS by the

3   taxpayer, that file is maintained by the tax examiner or

4   whoever is working the case.   Correspondence to the taxpayer is

5   recorded in the account, and that becomes part of that account,

6   and we can review that.

7   *Q.*  Okay.  You would agree that Exhibit 18 that's up there on

8   the screen is the entire -- is not the entire list of letters

9   that was sent by the IRS to Mr. Birk; right?

10  *A.*  That's correct.

11  *Q.*  And it's -- it actually doesn't list any letters that

12  Mr. Birk sent to the IRS?

13  *A.*  No.  It is notices regarding the tax owed.

14       *MS. BECK:*  Okay.  You can take that down, Mr. Cohen.

15  Thank you.

16  *BY MS. BECK:*

17  *Q.*  Some taxpayers are flagged and routed to the Frivolous

18  Returns Program; right?

19  *A.*  Yes.  They're there for review.  Yes.

20  *Q.*  And the IRS has a manual to guide IRS employees in carrying

21  out their duties; right?

22  *A.*  Yes.

23  *Q.*  And it's called the Internal Revenue manual?

24  *A.*  Well, there is Internal Revenue manuals for all different

25  aspects of the IRS.  Yes.

Kristy Morgan - Cross

1   Q.   Okay.  And you're familiar with that?

2   A.   Yes.

3   Q.   Okay.  And the manual itself has a specific chapter on

4   frivolous returns; right?

5   A.   Yes, it does.

6   Q.   It's Chapter 25 that actually defines what "frivolous

7   position" is; right?

8   A.   That I don't know.  Without looking at it, I wouldn't know.

9   Q.   So you would need to see that in order to verify that

10   chapter deals with frivolous returns?

11   A.   Yes.

12        MS. BECK:  And so at this time, Ms. Roberson, I'd like

13   the screens in front of the jury not to be published.

14        Ms. Morgan, if you could take a look at your screen,

15   please.

16        Mr. Cohen, if you could please pull up Defense Exhibit

17   29.

18   BY MS. BECK:

19   Q.   I'm referring you to your screen, Ms. Morgan.  Do you

20   recognize that?

21   A.   It looks like a printout from the IRS.  Yes.

22   Q.   Okay.  And it's Part 25 -- Chapter 25, Revenue Protection,

23   Section 10, Frivolous Return Program; right?

24   A.   Yes, that's what it's entitled.  Yes.

25   Q.   Okay.  So it's Chapter 25 that refers to the Frivolous

Kristy Morgan – Cross

1   Return Program?

2   A.   Yes.

3   Q.   And that chapter defines "frivolous positions" as whatever

4   the IRS says they are; right?

5   A.   Without reading that, I wouldn't know.

6   Q.   Okay.  I'm going to refer you to page 8 of this same

7   exhibit.

8           If you could pull that up, Mr. Cohen.

9           And specifically 6 at the bottom there, note 6.  "A

10  frivolous position is one that the IRS has identified as being

11  frivolous" --

12          THE COURT:  Excuse me.  We're discussing an exhibit

13  that has deliberately been shielded from the jury, but yet its

14  substance is being discussed in the presence of the jury

15  without its admission.

16          Your response.

17          MS. BECK:  I'll rephrase, Your Honor.

18          THE COURT:  Thank you.

19  BY MS. BECK:

20  Q.   So, Ms. Morgan, we're talking about how the IRS defines

21  "frivolous positions"; right?

22  A.   Yes.

23  Q.   And my question to you is, it's the IRS that defines

24  "frivolous positions"; right?

25  A.   Not correct.  No.

Kristy Morgan - Cross

1  Q.   Okay.  So you're saying that the IRS does not define what a

2  frivolous position is.

3  A.   There is a policy for the Internal Revenue Service to

4  follow to identify a tax return as being frivolous.

5  Q.   And that policy is detailed in the Internal Revenue manual;

6  right?

7  A.   No, it is not.

8  Q.   So you're saying today that the IRS manual -- the Internal

9  Revenue manual does not detail the definition of a frivolous

10  policy?

11  A.   It has a definition of "frivolous," but how that becomes

12  frivolous is decided by the attorneys for the Internal Revenue

13  Service.  It would be in their manual.

14  Q.   So let's talk about what the frivolous position is, though,

15  according to the IRS.  You would agree that a frivolous

16  position is one that reflects a desire to delay or impede the

17  administration of federal tax laws; right?

18  A.   That is what the return purports to be, as far as we're

19  looking at it.  Yes.

20  Q.   What return are you talking about?

21  A.   When they file a frivolous return, it is impeding the

22  system as far as processing that tax return.

23  Q.   And the IRS has said that a frivolous position is one that

24  the IRS deems frivolous; right?

25  A.   Through attorneys making reviews.  Yes.

Kristy Morgan - Cross

1    *Q.*   Okay.  So the attorneys at the IRS decide what is

2    frivolous?

3    *A.*   Yes.

4    *Q.*   Okay.  The IRS operates under a mission statement; right?

5    *A.*   Yes, we do.

6    *Q.*   And that submission statement in part includes helping

7    taxpayers understand their tax liabilities?

8    *A.*   Correct.

9    *Q.*   Okay.  And, specifically, the IRS is supposed to provide

10   quality responses to taxpayer inquiries; right?

11   *A.*   They do.  Yes.

12   *Q.*   And one way that they're -- that's one way that they're

13   supposed to actually help taxpayers understand their taxpayer

14   liability, is by providing quality responses; right?

15   *A.*   Yes.  They provide notices and letters.

16        *THE COURT:*  Counsel, excuse the interruption, and to

17   the witness, as well.  I think members of your staff may be

18   present and seeking leave to enter the well of the court or to

19   confer with counsel.

20        *MS. BECK:*  May I have a moment, Your Honor?

21        *THE COURT:*  You may.  And leave is granted for those

22   purposes.  Thank you.

23        Ladies and gentlemen of the jury, an opportunity to

24   stand and stretch.  I know it's early, but you may.

25        *MS. BECK:*  Your Honor, may I approach the witness --

Kristy Morgan - Cross

1    may I provide this to your clerk so that she may --

2              THE COURT:  Ms. Roberson may.  Yes.

3         MS. BECK:  Thank you.

4              THE COURT:  All right.  Where were we?

5    BY MS. BECK:

6    Q.  Ms. Morgan, if we could go back to what we're talking about

7    regarding the mission statement of the IRS.  So the mission

8    statement includes a provision that ensures that the IRS helps

9    people understand their tax liability; right?

10   A.  Yes.

11   Q.  And one of the ways that the IRS ensures that people

12   understand their tax liability is by providing quality

13   responses to taxpayer inquiries; right?

14   A.  Correct.

15   Q.  And the Service must issue quality responses to all

16   taxpayer inquiries; right?

17   A.  Depends on what the notice says that we're -- they priorly

18   did.  3175 specifically says, we'll not respond to further

19   letters regarding this type of information.

20   Q.  So if you could take a look at Defense Exhibit 31, page 11.

21         Just let me know when you got there.

22   A.  To page 11?

23   Q.  Yes.

24   A.  I'm there.

25   Q.  Okay.  If you'll direct your attention to the second

70

Kristy Morgan - Cross

1    numeral 1.  Your testimony today is that the IRS does not need

2    to respond to all taxpayer inquiries; right?

3    A.  That's what the notices are telling them regarding specific

4    issues regarding frivolous types of returns.

5    Q.  Okay.

6    A.  It states that.

7    Q.  But you --

8    A.  Doesn't state that you won't.  It says that we won't

9    respond, but it doesn't say that the tax examiner cannot make

10   that decision.

11   Q.  Okay.  So your testimony today, if I understand it

12   correctly, is that the IRS does not necessarily need to respond

13   to all taxpayer inquiries?

14   A.  To all taxpayer inquiries regarding frivolous types of tax

15   returns.

16   Q.  Okay.  So you're familiar with the IRS manual; right?

17   A.  Yes.

18   Q.  And it says that the service must issue quality responses

19   to all taxpayer inquiries; right?

20   A.  Stated in the Frivolous Return Program.  Yes.

21   Q.  Okay.  And a quality response also has to be written in

22   plain language; right?

23   A.  That, I don't know.

24   Q.  Okay.  Would it refresh your recollection to look at the

25   Internal Revenue manual with regard to what the policy is on

Kristy Morgan - Cross

 1   that?

 2   A.   I'm here as a fact witness, not necessarily the policy.

 3   Q.   If you don't know the answer to the question, you can say

 4   you don't know.  I'm asking you another one.

 5        Would it refresh your recollection to review the

 6   manual?

 7   A.   No, I don't need to review the manual.

 8   Q.   Okay.  So you --

 9   A.   I don't know.

10   Q.   Okay.  You don't know the answer to the question; right?

11   A.   Correct.

12   Q.   And it won't refresh your recollection to look at the

13   manual?

14   A.   In preparation for coming here, I didn't review this kind

15   of information.

16        THE COURT:  Counsel, I don't mean to interrupt; but

17   the confusion here is, you're attempting to refresh a

18   recollection without any foundation that the witness ever knew.

19   Only that which was known at some time may be refreshed.

20   That's the disconnect here.  It will go on as long as you

21   phrase this as an effort to refresh recollection.

22   BY MS. BECK:

23   Q.   So, Ms. Morgan, you've been working at the IRS for 35

24   years; correct?

25   A.   Correct.

Kristy Morgan - Cross

1    Q.   And you've held a number of titles within the IRS; right?

2    A.   Correct.

3    Q.   And your specific involvement at this point is court

4    witness coordinator; right?

5    A.   Yes.

6    Q.   But you've worked in the penalty examination?

7    A.   I've worked in examination function and criminal

8    investigations.

9    Q.   Okay.  And in your capacity in those roles, you have

10   reviewed the Internal Revenue manual; right?

11   A.   For those positions.

12   Q.   Okay.

13   A.   For examination position, criminal investigation position.

14       MS. BECK:  Okay.  Can you go to the first page of this

15   document, please.

16   BY MS. BECK:

17   Q.   Is your testimony to the Court that you are not familiar

18   with the section of the manual that covers incoming and

19   outgoing correspondence and letters?

20   A.   That's correct.  I never worked in that area.

21   Q.   Okay.  Your testimony today to this jury was that the IRS

22   doesn't always have to respond to a taxpayer's correspondence

23   if that correspondence has been marked as frivolous?

24   A.   That's what the notice is informing them.  Yes.

25   Q.   Okay.  Are you familiar with the Internal Revenue manual's

Kristy Morgan - Cross

1    chapter regarding the Frivolous Returns Program?

2    A.  I was in there in 1992; I was familiar then; I'm not

3    necessarily familiar now without reading it.

4    Q.  Okay.  So you're not familiar with the manual as it

5    pertains to the Frivolous Returns Program?

6    A.  No, no.

7    Q.  Okay.  If a taxpayer is flagged and routed to that program,

8    though, you testified yesterday that they received forms from

9    the service center?

10   A.  I'm not understanding "forms."

11   Q.  Form letters.

12   A.  Yes.  They receive responses to their filings.  Yes.

13   Q.  Okay.  And those responses to their filings are not

14   individualized to them; they're forms.  Right?

15   A.  They're letters and notices regarding what they filed.

16        MS. BECK:  Okay.  Well, let's pull up if we could for

17   the jury Government Exhibit 20.

18   BY MS. BECK:

19   Q.  You were speaking with Mr. Magnani about this exhibit

20   yesterday and today, as well?

21   A.  Yes.

22   Q.  This is, if you'll look at the bottom of this form, letter

23   3175; right?

24   A.  Correct.  Yes.

25   Q.  Okay.  And this letter is, aside from being addressed to

Kristy Morgan - Cross

1  Mr. Birk with a specific date, otherwise a form letter; right?

2  A.  Basically, yes.

3  Q.  Okay.  You testified yesterday that even though there was a

4  signature line for the chief of the examination branch, the

5  chief didn't actually sign this letter?

6  A.  That's correct.

7  Q.  And that it referred Mr. Birk to a tax technician to

8  contact; right?

9  A.  Right.  It gives a phone number for him to call.

10  Q.  But there is no name associated with that tax technician,

11  is there?

12  A.  There is not.  No.

13  Q.  Okay.  So this letter was sent to Mr. Birk; and presumably

14  he's supposed to call a phone number to contact somebody?

15  A.  And ask questions regarding the notice.  Yes.

16  Q.  You developed this letter; right?

17  A.  That's correct.

18  Q.  When did you do that?

19  A.  1996.

20  Q.  And you told the jury yesterday that it's the same letter

21  that is being sent today by the Frivolous Returns Program?

22  A.  Basically the same.

23  Q.  Okay.  And this letter is sent out when a taxpayer

24  indicates an unwillingness to file a return or pay taxes based

25  on what the IRS has determined to be a frivolous argument;

Kristy Morgan - Cross

1    right?

2    A.   The 3175 is specifically for correspondence, where there is

3    no tax return filed.

4    Q.   Okay.  When the IRS has determined that there was a

5    frivolous argument made?

6    A.   Correct.

7           MS. BECK:   Okay.  If we could take a look at -- well,

8    actually, if we could pull up Government 23, please.

9    BY MS. BECK:

10   Q.   Government 23 is another letter that was sent to Mr. Birk;

11   right?

12   A.   Correct.  Yes.

13   Q.   And it includes a link to what we've been talking about as

14   form 2105, "Why Do I Have to Pay Taxes?"

15   A.   Yes.

16   Q.   Okay.  And you testified that that is a pamphlet, a trifold

17   pamphlet?

18   A.   It is.  Yes.

19   Q.   And it can be sent out to a taxpayer as a link, like it is

20   in this letter?

21   A.   Correct.

22   Q.   Okay.  And that is sent out to people that have been

23   flagged by the Frivolous Returns Program?

24   A.   Anyone that receives the 2105 -- these two letters --

25   actually that one -- the 3175 or the 3176 always gets that

Kristy Morgan - Cross

1   publication.

2   Q.  Okay.  And then there is the 3175C letter?

3   A.  Yes.

4   Q.  Which is actually the one we're looking at; right?

5   A.  Yes.

6   Q.  If you could go to page 2, please.  At the very bottom of

7   that letter, there is an indication that there are enclosures

8   to the letter, Publication 1 and Publication 2105; right?

9   A.  Correct.

10  Q.  And, again, those are documents that are always sent out to

11  the taxpayer with this letter?

12  A.  Correct.

13  Q.  Okay.  So if someone was flagged and routed into the

14  Frivolous Returns Program, they receive the 3175?

15  A.  If they file correspondence, yes.

16  Q.  The 3175C?

17  A.  Which is just a computer-generated notice, not printed from

18  the desktop of the tax examiner.  Same notice.

19  Q.  And so a computer-generated notice gets sent out to that

20  taxpayer --

21  A.  Correct.

22  Q.  -- because they're in the Frivolous Returns Program?

23  A.  Yes.

24  Q.  And then the 2105, "Why Do I Have to Pay Taxes?"

25  A.  Correct.

Kristy Morgan - Cross

1   Q.   Publication 1?

2   A.   Yes.

3   Q.   Which is the Taxpayer Bill of Rights?

4   A.   Correct.

5   Q.   They also receive The Truth About Taxes form?

6   A.   That's in the -- a link in the letter.   Yes.

7   Q.   And the 3176C?

8   A.   The 3176C?

9   Q.   I'm sorry.   The 3176.

10  A.   Not with the 3175 --

11  Q.   Right.   That's a separate letter that they receive; right?

12  A.   They can, yes, for a return.

13  Q.   Okay.

14          MS. BECK:   May I have a moment?

15          THE COURT:   Counsel, you may.

16          MS. BECK:   Thank you.

17          THE COURT:   You're welcome.

18  BY MS. BECK:

19  Q.   If we could talk about Publication 1 for a moment.

20  Publication 1, again, was referred to in letter 3175; right?

21  A.   Yes.   In the letter we've seen, it's sent out.   Yes.

22  Q.   Right.

23          And I believe that's Exhibit 20.   Yes -- I'm sorry,

24  23, page 2, please, at the bottom.

25          So if we could talk about Publication 1 for a moment.

Kristy Morgan – Redirect

1    That's the Taxpayer Bill of Rights?

2    A.   It is.

3    Q.   Are you familiar with that document?

4    A.   I've not looked at it in a long time because that's

5    something I don't send out through criminal investigations.

6    Q.   Okay.

7            No further questions for this witness.  Thank you.

8            THE COURT:  Very well.

9            Redirect examination for the Government.

10           MR. MAGNANI:  Briefly, Your Honor.

11                    **REDIRECT EXAMINATION**

12   BY MR. MAGNANI:

13   Q.   Ms. Morgan, you testified on cross-examination that there

14   are lawyers at the IRS; is that right?

15   A.   There is.  Yes.

16   Q.   When you helped to draft the form 31 -- sorry -- the letter

17   3175, did you work with any lawyers in helping to draft that

18   letter?

19   A.   Yes.

20   Q.   And so is it fair to say that for all the letters you've

21   been talking about, IRS lawyers helped to draft them?

22   A.   Yes.  The lawyers review all of the letters.

23   Q.   And why -- only if you know, why is it that if the IRS has

24   lawyers, those lawyers don't draft customizable legal

25   memorandum to every single taxpayer that sends in a frivolous

Kristy Morgan – Redirect

1   argument?

2   A.   That's correct, they don't.   They are there for our advice,

3   because we are not to give out tax advice.   We don't interpret

4   the law.   We ask them to interpret the law; and then the

5   procedures are then established for us to work the Frivolous

6   Returns Program, for instance.

7         MR. MAGNANI:   No further questions.

8         THE COURT:   Thus, may Ms. Morgan be excused and

9   released from subpoena?

10        Any objection by the Government?

11        MR. MAGNANI:   None from the Government, Your Honor.

12        THE COURT:   Or by Mr. Birk?

13        MS. BECK:   No, thank you, Your Honor.

14        THE COURT:   Ms. Morgan, you are both excused and

15  released from subpoena with our thanks.

16        THE WITNESS:   Thank you.

17        THE COURT:   You're welcome.

18        Very well.   When the Government is prepared, it may

19  call its next witness.

20        MR. MAGNANI:   Thank you, Your Honor.   The United

21  States calls Paulette Applegate.

22        THE COURT:   Thank you.

23        Ms. Applegate, good morning.   If you'll make your way

24  forward to come stand in this open area in front of my bench,

25  please, to be sworn by the Court.   There is fine.

Paulette Applegate – Direct

1              Please face me and raise your right hand to be sworn,

2    and thank you.

3              May I have your attention in the courtroom.

4              (**PAULETTE APPLEGATE, GOVERNMENT'S WITNESS, SWORN**)

5              Please be seated in that witness chair.

6              Counsel, you may inquire.

7              *MR. MAGNANI:*  Thank you, Your Honor.

8              *THE COURT:*  You're welcome.

9                              **DIRECT EXAMINATION**

10   *BY MR. MAGNANI:*

11   *Q.*  Good morning, Ms. Applegate.

12   *A.*  Good morning.

13   *Q.*  Could you please just tell the jury where you're from.

14   *A.*  I'm from -- I grew up in Arvada, Colorado; graduated from

15   Arvada High School; and basically lived here most of my life.

16   *Q.*  Where do you work?

17   *A.*  I work for the Internal Revenue Service.

18   *Q.*  Can you describe to the jury how you found your way to the

19   Internal Revenue Service?

20   *A.*  After I graduated high school, I got married, and I had

21   four sons --

22              *MS. BECK:*  Objection.  Relevance.

23              *THE COURT:*  Response.

24              *MR. MAGNANI:*  Just introducing the witness, Your

25   Honor.

Paulette Applegate – Direct

1          THE COURT:  I'll allow a brief introduction.

2          The objection is duly noted but overruled.

3          THE WITNESS:  And so I took accounting classes at

4    night while raising four sons and one day applied for the

5    Internal Revenue Service.  Came to work here as an audit

6    accounting aide, and then progressed through my career as a tax

7    auditor, and then became a revenue agent in 2003.

8    BY MR. MAGNANI:

9    Q.  Do you know just about what year you started working at the

10   IRS?

11   A.  I started working with the IRS in 1991.

12   Q.  And what year did you become a revenue agent?

13   A.  In 2003.

14   Q.  Can you describe to the jury what it means to be a revenue

15   agent -- I'm sorry.  Let me ask a better question.  What are

16   the duties of a revenue agent?

17   A.  The duties of a revenue agent is to examine income tax

18   returns of individuals, corporations, and partnerships.  So

19   what I would do is be assigned a case file, review it, and

20   contact the business or individual to conduct the examination.

21   Q.  What -- what group were you in when you first became a

22   revenue agent?

23   A.  I was in a general program group that was located south of

24   the metro area in Englewood.

25   Q.  And can you just tell the jury, what is the general

Paulette Applegate - Direct

1    program?

2    *A.*  General program, we usually receive returns that come out

3    through classification.  We may need to examine income,

4    expenses, depreciation, those type of items.

5    *Q.*  And did you receive training in these areas?

6    *A.*  Yes.  We did receive income tax training, along with

7    S corporation, partnership, and C corporation training.

8    *Q.*  Now, you testified you became a revenue agent in 2003.  Did

9    you have any experience auditing taxpayers before 2003?

10   *A.*  Yes.  From 1993 through 2003, I was a tax auditor.  So I

11   would be assigned a case file for audit, I would send you a

12   letter, you would come in, and we would meet in an office

13   setting.  And we were usually examining Schedule C, Schedule E,

14   income information that might not be on the tax return, or

15   expenses that were on the tax return that we would question,

16   were they related to your business.

17   *Q.*  So if you could just help the jury understand how the audit

18   process goes.  Could you explain, when you were a revenue agent

19   in the general program, what was the first thing you would do

20   when you would get assigned a case to audit?

21   *A.*  When I was assigned a case to audit, I would review the

22   information to try to familiar myself with what type of

23   business it was.  I would access IRS computer systems to update

24   any information to see if there were changes, if maybe items

25   were filed during the time period that it was put together and

Paulette Applegate – Direct

1    it was assigned to me, I would update the case file at that

2    time, and I would attempt to locate the taxpayer by mail, and I

3    would send them a letter.

4    Q.   And what's the purpose of reaching out to the taxpayer at

5    the beginning of your audit?

6    A.   Mainly to meet with them to discuss what their business is,

7    how they earn their income, what expenses they were entitled

8    to, get an overall overview of your business to determine if

9    everything was included on your tax return, everything that you

10   were allowed to be deducted were -- was deducted on your tax

11   return, and to see if it was correct.

12   Q.   And can you just explain to the jury, what are the types of

13   information that the IRS has in its own records; and what are

14   the types of information that you need to get from a taxpayer

15   in order to do an audit?

16   A.   Right.  The IRS has income information.  So if you are a

17   W-2 employee, you receive a 1099, any type of interest income,

18   that's all information that I can access with the IRS secure --

19   computer system.  When I meet with a taxpayer, if they are a

20   Schedule C or a partnership, they may receive income that is

21   not reported to us.  And so I would request a profit-and-loss

22   statement, I would request bank statements to review, and

23   reconcile to the return that was filed.

24   Q.   When you -- when you were in the general program working as

25   a revenue agent, would taxpayers typically meet with you?

Paulette Applegate - Direct

1   *A.*   Yes.   Most taxpayers would meet face to face with me.   I

2   would -- sometimes it would be in my office; but the majority

3   of the time, I went to your business location to review your

4   books and records.

5   *Q.*   Why --

6   *A.*   There -- I'm sorry.

7   *Q.*   Please finish.

8   *A.*   Sometimes you didn't have to meet directly face to face

9   with me; you could appoint somebody, a power of attorney, who

10  would meet with me.

11  *Q.*   And can you just describe to the jury, what is the closing

12  process portion of the audit?

13  *A.*   Right.   When the audit is completed, a lot of times the

14  business owner deals with me directly or through a power of

15  attorney.   At the end we meet and discuss what changes are made

16  to a tax return, and basically you can -- and discuss how to

17  resolve issues if there is a problem.   Say there is a tax due

18  and owing, you could actually give me additional information to

19  prove that my determination is wrong.   You can meet with my

20  manager if you disagree with me.   You also have a -- you can

21  petition appeals, go to tax court.   So there are lots of ways

22  to resolve the issue if you disagree with me.

23  *Q.*   Well, what are the three possible outcomes that you -- at

24  the end of an audit, what are the three possible outcomes from

25  the result of an audit?

Paulette Applegate - Direct

1   A.   There could be a tax due and owing; there could be a

2   no-change, I might not have found anything wrong with your tax

3   return; or there could have been something that there was a

4   error, and you're entitled to a refund.  So those are three

5   different results that could happen after an examination.

6   Q.   And so when you were explaining those different options

7   that a taxpayer has, are those the options that they have with

8   respect to contesting an additional increase in tax?

9   A.   No.  If the tax -- you disagree with any increase in tax

10  that I am giving you with our report, then you can meet with my

11  manager, you can request an appeals conference, or you can

12  petition tax court.

13  Q.   And as a revenue agent, are you required to explain all of

14  these taxpayer rights to the taxpayer at the closing --

15  A.   Yes.  Well, they get explained at various different times.

16  At the very beginning there is a publication that goes out, a

17  3498, that explains exactly what your rights are.  At any time

18  during the process, you can stop and ask to talk to my manager.

19  Or if -- at the very end, you have those other three options.

20  Q.   What is a 30-day letter?

21  A.   A 30-day letter is a letter that we send out with our

22  report, or we give to you at a closing conference.  It gives

23  you 30 days to give me additional information, request appeals,

24  talk to my manager.  And if we don't meet face to face, I mail

25  it to you with the report.

Paulette Applegate - Direct

1    Q.  What happens if the taxpayer doesn't respond to the letter

2    within 30 days?

3    A.  Well, we usually do 40 because of mailing.  And so it gets

4    closed out to technical services.  Technical services reviews

5    the case to make sure that my determination is correct, matches

6    it with my findings, and so they will mail out a 90-day letter

7    to an individual.

8    Q.  And so who are the folks at technical services that review

9    your work product before mailing the 90-day letter?

10   A.  They're actually other revenue agents that are experienced

11   in tax law.

12   Q.  And what is a 90-day letter?

13   A.  A 90-day letter is basically a letter that again offers you

14   an appeals conference, an opportunity to meet with another

15   revenue agent to review my findings, and also to petition the

16   tax court.

17   Q.  So is it fair to say that's similar to the 30-day letter,

18   it explains the taxpayer's rights?

19   A.  Yes.  Only you get 90 days instead of 30.

20   Q.  What happens if the taxpayer does not exercise any of those

21   rights within 90 days?

22   A.  Then it's closed from 90 days, and the tax is assessed to

23   the account for that year that I make the determination.

24   Q.  When you say "the tax is assessed," is that final?  Can

25   that be appealed?

Paulette Applegate - Direct

1   *A.*  No, that can be appealed.  The taxpayer actually after it's

2   been assessed can file for an offer in compromise they can file

3   an amended return to have that tax reduced, so there is other

4   opportunities after it's on the tax year to get it reduced.

5   *Q.*  Now, just focusing the next inquiry just on Mr. Birk, do

6   you remember working on Mr. Birk's case?

7   *A.*  Yes.

8   *Q.*  When you were assigned the case, what were you –– what was

9   your job, essentially?

10  *A.*  I was a revenue agent.  I had finished the beginning

11  training but hadn't gone to corporate training yet, and so my

12  manager assigned the case file to me.

13  *Q.*  Do you have a specific memory of this case?

14  *A.*  Yes, I do.

15  *Q.*  Why?

16  *A.*  Mainly because one of the vendors was called Honest Abe.

17  And this person had not filed tax returns, and so it was one of

18  the first nonfiled returns that I had been assigned to me.

19  *Q.*  And when you say it was one of the first nonfiled returns,

20  just can you explain what that means to the jury.

21  *A.*  In a nonfiled return, nobody has filed a tax –– the

22  taxpayer has not filed for that tax year.  The majority of the

23  cases that I would examine are returns that have been filed and

24  assigned to me.  So this was a person who it appears is

25  receiving income but chooses not to file a tax return.

Paulette Applegate - Direct

1   Q.  And can you also just explain to the jury how your job is

2   affected when you're auditing a nonfiler, versus auditing a

3   filed tax return?

4   A.  One of the things when I send out an appointment letter to

5   you, you know, we want to get you to cooperate with us, because

6   then the process goes so much faster, and we can meet a

7   resolution, and, basically, I can move on to another case, and

8   you can move on, you know, with your business and life.  And

9   when somebody doesn't file and doesn't answer to come in and

10  meet with you, or you meet with them, then my job is to

11  determine, is there income that should have been reported on a

12  tax return?

13  Q.  So in the case of a nonfiler, how are you able to get

14  information -- let me withdraw that question.

15          In the absence of a filed return, how can you get any

16  baseline information about the taxpayer and their business?

17  A.  I would check the IRS computer systems to see if there was

18  a 1099, W-2s, interest income.  After discussing areas or

19  specific places where maybe the taxpayer's banking or people

20  they're working for, I would meet with my manager to determine

21  how to proceed with the examination.  And one of the options

22  that we have is to issue a summons to banks or vendors or

23  people that the person worked for to determine if there is

24  income that should have been reported on the tax return.

25  Q.  What is a summons?

Paulette Applegate – Direct

1   *A.*   A summons is a specific legal document.  And if I –– for

2   example, if I issue one to a bank, I'm going to list the

3   periods; if there is bank account information; does this person

4   have an account at your bank; what are the names of the

5   accounts; who has signing authority on the account?  And if

6   they do, then I request bank statements, deposited items,

7   canceled checks, that type of information.

8   *Q.*   So why would you summons the bank for that information

9   instead of just asking the taxpayer for it?

10  *A.*   Because the taxpayer does not want to cooperate with the

11  examination and has refused to meet with me to give me that

12  information, so that would be the option that I would do.

13  *Q.*   Are you allowed to send summonses in a case where the

14  taxpayer is cooperating in giving information?

15  *A.*   No.  If you're cooperating with an examination, I have no

16  reason to issue a summons.

17          MR. MAGNANI:  If we could please pull up Exhibit 21.

18  *BY MR. MAGNANI:*

19  *Q.*   Ms. Applegate, I'd like to ask you, before you were

20  assigned to work on this case –– let me take that back.  Let me

21  ask you a different question.

22          Were you assigned to work on specific tax years?

23  *A.*   Yes, I was.

24  *Q.*   And before –– were there any audits done of prior tax years

25  of ones that you were assigned to?

Paulette Applegate - Direct

1   A.  Not that I was aware of.

2   Q.  Which tax years, if you remember -- well, let me ask you

3   this, do you know who Ms. Stuart is?

4   A.  I have heard of Ms. Stuart, yes; but I never met with her

5   face to face.

6   Q.  Do you -- well, what is this letter, basically?

7   A.  So this letter basically tells the taxpayer that they have

8   no record that they've received a federal tax return for

9   specific years.  And in this case, it's December 31 -- the year

10  end December 31, 1998.  So it would be a 1998 tax return, and

11  the IRS has no record that it was received.  And so they're

12  reaching out to a taxpayer to find out basically why.

13  Q.  And so was this work that was done prior to your

14  involvement in the case?

15  A.  Yes, it was.

16       MR. MAGNANI:  If you could put that down, please.

17  BY MR. MAGNANI:

18  Q.  When you -- when you started working on Mr. Birk's case --

19  well, let me ask you this question generally:  When you start

20  working on audit, before reaching out to the taxpayer directly,

21  is there something that you have to do before you reach out to

22  them directly?

23       Let me ask a different question.  What is a power of

24  attorney?

25  A.  A power of attorney, once again, if you go to -- when I

Paulette Applegate - Direct

1   update a case file, I'm looking on the computer system to see

2   if a power of attorney has been filed.  And this would be

3   somebody who you've asked to represent you, you've signed a

4   form 2848, and you actually list the specific years that they

5   can represent you.  And so this form is usually sent to the

6   service center, and it's put on the computer system.

7   Q.  If a taxpayer has a power of attorney, do you work with the

8   taxpayer, or do you work with the power of attorney?

9   A.  We will send notices to both.  But usually the power of

10  attorney will contact us and not the taxpayer.

11  Q.  Did you check if Mr. Birk had a power of attorney?

12  A.  Yes, I did.

13  Q.  Did he?

14  A.  There was a power of attorney that was filed, but it was

15  also noted on the computer system that this power of attorney

16  was disbarred.  So at that point, I can't contact them, because

17  they have no power to represent the taxpayer.

18  Q.  And is that when you reach out to Mr. Birk then?

19  A.  Yes.

20       MR. MAGNANI:  If you could please pull up Exhibit 24.

21  BY MR. MAGNANI:

22  Q.  Do you recognize this document?

23  A.  Yes, I do.

24  Q.  So -- and also if it's more convenient, there is also --

25  there are also binders, if you prefer to look at the paper.

Paulette Applegate - Direct

1          Thank you, Ms. Roberson.

2          *COURTROOM DEPUTY:*  Which --

3          *MR. MAGNANI:*  This is 24.

4    BY MR. MAGNANI:

5    *Q.*  While we're getting this in front of you, how many times

6    did you reach out to Mr. Birk?

7    *A.*  I reached out to Mr. Birk twice.

8    *Q.*  And can you describe when in that process you sent this

9    letter?  And if you need to wait for the letter to look at

10   it --

11   *A.*  No, I'm familiar with the letter.  It's actually a letter

12   that we mail to every taxpayer.  And this would have been the

13   second letter.  The first letter I send out asks Mr. Birk if

14   there were copies of his tax return.  Maybe he thought he filed

15   them, and they weren't on the computer system.  This gives you

16   an opportunity to give me the tax return.

17          I didn't receive a response for that letter; and so I

18   mailed this letter, which asks you to contact me so we can set

19   up an interview.

20   *Q.*  And how does it -- how does this letter ask -- how does

21   this letter say that the taxpayer should contact you?

22   *A.*  They should give me a call, and my phone number is on here.

23   Or if they are hiring a power of attorney, send me a copy of

24   the 2848 so I can directly contact that person.

25   *Q.*  Did Mr. Birk call you after getting this letter?

Paulette Applegate - Direct

1    A.   Yes.  He did call me after getting this letter and left me

2    a message that he was not going to cooperate and that he would

3    send me information by certified mail.

4    Q.   Do you remember what information he sent you by certified

5    mail?

6    A.   He sent me a letter and a disc.

7    Q.   When you say "a disc," what do you mean?

8    A.   A CD disc.

9    Q.   What was on the CD?

10   A.   I don't know.  I would not have opened it and put it in my

11   computer.  There is always virus concerns, and there was really

12   no need for me to do that.

13   Q.   So after Mr. Birk said that he wasn't going to cooperate

14   with the audit, what did you do?  Did you stop the audit?

15   A.   No.  I actually met with my manager to determine whether we

16   should continue working the case or if we should not work the

17   case, if it wasn't worth our time.  And -- because there is

18   always another case out there to be audited.  And so we

19   determined that this one, we should go forward with; and that's

20   when I reviewed the information that I had and issued summons

21   to the banks.

22   Q.   Did you get responses from the banks pursuant to your

23   summonses?

24   A.   Yes, I did.  I received from -- well, the banks that I

25   summonsed were Vectra and Park Bank out of Colorado Springs;

Paulette Applegate - Direct

1  and I received signature cards, bank statements, deposited

2  items from those banks.

3  Q.  What did you do when you got those bank statements,

4  signature cards, deposit items -- well, when you got the bank

5  records, what did you do?

6  A.  When I received the bank records, I review them to see,

7  does it look like there are deposits?  Does it look like there

8  could be a filing requirement?  And in this case I created

9  spreadsheets, where each spreadsheet was created for each year,

10  for each account.  And I would have a column for the date of

11  the deposit; how much the deposit was; was it into a business

12  account -- or the payee, was it a business; was it an

13  individual; could I determine that it was a non-taxable

14  deposit?  And so I would do that by each year, each deposited

15  item, and who it was from.

16  Q.  So are you familiar with the term "spreading bank records"?

17  A.  Yes.

18  Q.  What does it mean to spread bank records?

19  A.  Basically, to determine by each deposit exactly what the

20  totals are for each year.

21  Q.  And what -- what do you do -- after you sort of convert all

22  of those bank records into Excel spreadsheets, what do you do

23  with those spreadsheets?

24  A.  I actually would total up the amount and determine, is

25  there a filing requirement?  Should Mr. Birk actually have

Paulette Applegate - Direct

1    income that should be reported on a tax return?

2    Q.  About how long did it take you to spread these accounts?

3    A.  It takes about 80 hours to spread an account, because you

4    go through a lot of bank statements and documents.  In this

5    case, it was a four-year examination.

6    Q.  So did you have four years of bank records to spread?

7    A.  Yes.

8    Q.  You mentioned having to identify income items as income

9    deposits.

10   A.  Uh-huh.

11   Q.  Are you also required in the case of a business to also

12   identify potential business expenses?

13   A.  No.  I'm not required to identify individual income

14   expenses.

15   Q.  Why not?  I'm sorry, did you say income expenses?

16   A.  Expenses.  I'm sorry.  Not income.

17   Q.  Okay.  Do you know why you are not required to find all of

18   the expenses that a taxpayer might have?

19   A.  Because it's usually up to a taxpayer to verify exactly

20   what your expense is in relation to your income.

21   Q.  In this case, did you identify expenses?

22   A.  Yes, I did.  Because this was a specific business, and he

23   was building log homes -- he was actually an authorized dealer

24   for Honest Abe -- and so I did a third-party contact to that

25   vendor and requested invoices so that I could determine exactly

Paulette Applegate - Direct

1    what homes were built and that he would be directly allowed an

2    expense for that building.

3    Q.   When you say a third-party contact does that mean a

4    summons?  What does that mean?

5    A.   Actually, when you do a third-party contact, you can pick

6    up the phone and call them, you can send them a letter.  You

7    don't have to summons them.  And in this case they gave me the

8    information.

9    Q.   And so why -- if you remember, why did you sort of go out

10   of your way to determine expenses from a person who wasn't

11   cooperating with you if you weren't required to do that?

12   A.   Because it's only fair.  We had a specific vendor that he

13   used and no other vendors, so it just stands to reason that I

14   would give him cost of goods sold for those log home kits.

15   Q.   Now, after you got all those records and spread all of

16   those accounts, did you come to a conclusion about how much tax

17   Mr. Birk owed?

18   A.   Yes, I did.  Basically, our reports, we would classify

19   gross receipts, we would classify expenses, and in this case,

20   cost of goods sold for the log home kits.  Also, there are --

21   any W-2s that are reported to us would be included, any

22   withholding would be included, as well.  Interest income and

23   pension income is also included.

24   Q.   In this case, after you came up with your conclusions about

25   how much was owed -- or your best estimate at figuring how much

Paulette Applegate – Direct

1   income and expenses --

2   *A.*   Uh-huh.

3   *Q.*   -- was your work reviewed by anyone else at the IRS?

4   *A.*   It -- after my case was closed out of our group, because

5   the tax was over $250,000, it is automatically reviewed by

6   district counsel.

7   *Q.*   What is district counsel?

8   *A.*   District counsel are IRS attorneys that review how I apply

9   the tax law to an audit and if it was correct and if my

10  findings were substantiated with everything that I had done in

11  the file.

12  *Q.*   Did IRS counsel concur with your analysis?

13  *A.*   Yes, they did.

14  *Q.*   Now, we've been talking about Tarryall River Log Homes.

15  Was there another company that factored into your analysis?

16  *A.*   When I summonsed the bank accounts, the information I

17  received was personal accounts, Tarryall LLC, and there was a

18  Tarryall Asset Management account.  So all three of those

19  accounts were used by Mr. Birk in the years that I examined.

20  *Q.*   Was Mr. Birk, as far as you could tell from your audit, was

21  he involved in the Asset Management business?

22  *A.*   Well, the Asset Management business, no, because he was

23  specific to log homes.  And so I don't know why an account was

24  opened under that name, but it -- I'd look at the substance of

25  what was deposited into that account to determine the relevancy

Paulette Applegate - Direct

1   to Mr. Birk.

2   Q.   When you got the bank records for Tarryall Asset

3   Management's bank accounts, what did you discover?

4   A.   I discovered that there were actually pension amounts being

5   deposited into that account.

6   Q.   And so can you just explain to the jury in general terms, a

7   401K or IRA, is it taxable in the year that the income is

8   earned or in the year that it's distributed?

9   A.   It's taxable in the year that it's distributed.  Usually we

10  might participate in a 401K if you're a wage employee.  You can

11  also contribute amounts to an individual retirement account.

12  So those amounts aren't taxed when you put them into those

13  accounts, those pension, IRA accounts for retirement.

14  Q.   What essentially -- can you sort of describe the flow of

15  money in Mr. Birk's retirement accounts and sort of where it

16  went from there?

17  A.   One of the things that is reported on the IRS accounts are

18  form 5498s, and those are your pension accounts at the end of

19  the year.  So consistently, you can see year after year, if

20  you're contributing money -- it even lists on there if you

21  contribute to a Roth, to an individual retirement account.

22  Pension accounts usually are held by the trustee for -- from

23  your employer.

24       If you take a distribution, you receive a 1099R.  If

25  you transfer from one trustee to another trustee, a 1099 is not

Paulette Applegate - Direct

1    required to be issued.  If you roll over an amount from a

2    trustee to another trustee -- so you're basically receiving a

3    check, and you give it to the next trustee -- that comes out as

4    a 1099R with a distribution code G, which means it's a

5    rollover.  If you have a 1099R that has a distribution code of

6    1, it means it's an early distribution and subject to

7    penalties, unless there is a reason.

8    Q.  So without getting into all of the codes and the 1099s and

9    the subcodes --

10   A.  Yeah.

11   Q.  -- was there a 1099 for Mr. Birk taking that retirement

12   money as a distribution?

13   A.  The distribution codes on the 1099s that were issued in

14   those years were distribution code G, which indicates it was a

15   direct rollover from one trustee to another trustee.

16   Q.  And from your analysis, did you conclude that it was, in

17   fact, a rollover from one trustee to another trustee?

18   A.  No.  Those were deposited into the Tarryall Asset

19   Management account.

20   Q.  And where did the money go after Mr. Birk transferred it

21   from the retirement accounts to the Tarryall Asset Management

22   account?  Where did the money go next?

23   A.  It went directly into his business account, Tarryall

24   partnership account.

25   Q.  Was that the log home account?

Paulette Applegate – Cross

1    A.   Yes.  I'm sorry.  Tarryall Log Home.

2    Q.   How did you treat that transfer for tax purposes?

3    A.   I treated it as a distribution, because it didn't go to

4    another trustee.  It went directly into an account that was

5    used by Mr. Birk.

6    Q.   Did that affect your tax computations?

7    A.   Yes, it did.  It increased the tax computation.  It also

8    added an early withdrawal penalty of 10 percent.

9    Q.   Why was there that penalty?

10   A.   Because in order to take a withdrawal from your pension or

11   IRA account, you need to be at a certain age.  And I calculated

12   that Mr. Birk was not 55, these were not periodic payments, nor

13   was he over 59 1/2.  And even if he was 59 1/2 and he wasn't

14   subject to an early withdrawal penalty, you still needed to

15   include it in income.

16        MR. MAGNANI:  Thank you.  I have no further questions.

17        THE COURT:  Cross-examination for Mr. Birk.

18        Ms. Beck.

19        MS. BECK:  Thank you.

20        THE COURT:  You're welcome.

21                        **CROSS-EXAMINATION**

22   BY MS. BECK:

23   Q.   Good morning, Ms. Applegate.

24   A.   Good morning.

25   Q.   So your role in this case was as a revenue agent; right?

Paulette Applegate - Cross

1  A.  Yes, it was.

2  Q.  And that meant that you were examining Mr. Birk's tax

3  returns or lack thereof; right?

4  A.  Yes.

5  Q.  And this case was one of the first nonfile returns that was

6  assigned to you?

7  A.  Yes, it was.

8  Q.  Before 1998, to your knowledge, Mr. Birk regularly filed

9  his taxes?

10  A.  I'm -- I can't say for sure if he did, because I don't

11  remember if that was part of the information that I pulled up

12  and was in his file.

13  Q.  Okay.  So you don't recall whether or not he filed taxes

14  prior to 1998?

15  A.  Yes.

16  Q.  Okay.  Your job was to assess what you thought he owed

17  based on the information that you could get from all of your

18  computer systems and any bank account records you received;

19  right?

20  A.  Yes.  To determine exactly what tax.

21  Q.  And then you needed to notify him about his civil liability

22  to pay that amount?

23  A.  Yes.

24  Q.  You don't conduct a criminal investigation as part of your

25  role?

Paulette Applegate - Cross

1   A.   No, I do not.

2   Q.   Okay.  And you began corresponding with Mr. Birk in 2004;

3   right?

4   A.   Yes.

5   Q.   You testified that you sent him two letters?

6   A.   Yes.

7   Q.   Okay.  And the second letter that you sent him, you asked

8   him to give you a call?

9   A.   Yes.

10   Q.   And he called you back?

11   A.   Yes, he did.

12   Q.   And he said that he was not going to communicate with you

13   on the phone any further, that he was going to send you

14   certified mail?

15   A.   Yes.

16   Q.   And he did send you certified mail?

17   A.   Yes, he did.

18   Q.   He sent you letters?

19   A.   Yes.

20   Q.   And he also sent you a disc of information?

21   A.   He did send me a disc.

22   Q.   And you didn't open that disc?

23   A.   No, I did not.

24   Q.   Because you didn't feel there was a need for you to open

25   that disc?

Paulette Applegate - Cross

1    A.   That's correct.

2    Q.   One of the letters you sent him included a form

3    publication; right?

4    A.   Yes.  A Publication 3498.

5    Q.   And that's a form that gets sent to everybody that you

6    communicate with regarding their tax liability?

7    A.   Yes.

8    Q.   Are you familiar with the Internal Revenue manual?

9    A.   Yes, I am.

10   Q.   Are you familiar with the section of that manual that

11   requires certain IRS agents to have -- to follow certain

12   protocols when they're responding with taxpayers?

13   A.   Yes.  There is a guide that we do follow.

14   Q.   Okay.  And when is the last time you reviewed that manual?

15   A.   Presently?

16   Q.   Yes.

17   A.   Probably six months ago.

18   Q.   Okay.  So you're up to date on it, then?

19   A.   Yes.

20   Q.   Okay.  And so you understand that --

21           I'm looking for something.

22           You understand that the IRS as part of its mission

23   statement includes helping taxpayers understand what their tax

24   liability is; right?

25   A.   Yes.

Paulette Applegate - Cross

1    *Q.*  And that one of the ways that the IRS ensures that people

2    understand their tax liability is providing quality responses

3    to their correspondence; right?

4    *A.*  Yes.

5    *Q.*  Okay.  And the IRS has to issue quality responses to all

6    taxpayer inquiries; right?

7    *A.*  Yes.

8    *Q.*  And responses to taxpayer requests have to be responsive to

9    taxpayer needs; right?

10   *A.*  Yes.

11   *Q.*  A quality response is timely?

12   *A.*  Yes.

13   *Q.*  Accurate?

14   *A.*  Yes.

15   *Q.*  Right?  And responsive to taxpayer needs?

16   *A.*  Yes.

17   *Q.*  And even if a taxpayer's correspondence has been flagged as

18   frivolous, the IRS still has an obligation to respond to that

19   taxpayer's correspondence; right?

20   *A.*  Yes.

21   *Q.*  And they have to respond to taxpayer questions

22   specifically?

23   *A.*  Yes.

24   *Q.*  If a taxpayer is flagged as frivolous, then the -- the IRS

25   still has to abide by its mission; right?

Paulette Applegate - Cross

1   A.   Yes.

2              MS. BECK:   May I have a moment?

3              THE COURT:   You may, counsel.

4              MS. BECK:   Nothing further for this witness.   Thank

5   you.

6              THE COURT:   Very well.

7              MR. MAGNANI:   Nothing else from the Government.   This

8   witness can be excused.

9              THE COURT:   Very well.   Any objection -- she can be

10  released from subpoena, if any?

11             MR. MAGNANI:   As far as the Government is concerned,

12  yes.

13             THE COURT:   Any objection by Mr. Birk?

14             MS. BECK:   No objection, Your Honor.

15             THE COURT:   Ms. Applegate, you are both excused and

16  released from your subpoena with our thanks.

17             THE WITNESS:   Thank you.

18             THE COURT:   You're welcome.

19             Combining my observations of the courtroom clock and

20  the jury's co-efficient of fidget, a propitious time for us to

21  declare and take our mid-morning recess.

22             Ladies and gentlemen of the jury, in preparation for

23  this mid-morning recess, two things:   First, leave your

24  notetaking materials face down on your chairs.   And, second, be

25  ever mindful of those critically important rules that continue

Paulette Applegate – Cross

1    to govern you as jurors in this important trial.

2            We are in recess for 15 minutes.

3            Madam Clerk.

4            (Recess at 9:56 a.m.)

5            (In open court at 10:21 a.m.)

6            THE COURT:  Thank you.  And, again as you choose,

7    either be seated or you may remain standing for the jury.

8            Madam Clerk, thank you.

9            (Jury in at 10:22 a.m.)

10           THE COURT:  Thank you.  Madam Clerk and ladies and

11   gentlemen, please be seated.

12           Using highly sophisticated and technical judicial

13   jargon, away we go.  The Government may call their next

14   witness.

15           MS. HADDEN:  Thank you, Your Honor.

16           The United States calls Mr. Bruce Stork.

17           THE COURT:  Thank you.

18           Mr. Bruce Stork, good morning.  Please make your way

19   to come stand in this open area in front of my bench, please.

20           Right there is fine, sir.  Good morning.

21           THE WITNESS:  Good morning, Your Honor.

22             (**BRUCE STORK, GOVERNMENT'S WITNESS, SWORN**)

23           THE COURT:  Thank you.  Please be seated in that

24   witness stand.

25

Bruce Stork – Direct

1        **DIRECT EXAMINATION**

2    *BY MS. HADDEN:*

3    *Q.*  Good morning, Mr. Stork.

4    *A.*  Good morning.

5    *Q.*  Could you please state the city and state where you live.

6    *A.*  Fresno, California.

7    *Q.*  What is your educational background?

8    *A.*  Bachelor of arts in business administration, finance.

9    *Q.*  And where did you get that degree?

10   *A.*  California State University Fresno.

11   *Q.*  What is your employment background?

12   *A.*  Primarily, I worked for the IRS for 30 years.  While I was

13   in college, part-time jobs.

14   *Q.*  And what year did you start working for the IRS?

15   *A.*  My actual first day with IRS would have been in December of

16   '86, but early '87.

17   *Q.*  Do you still work with the IRS?

18   *A.*  No.  I'm recently retired.

19   *Q.*  When did you retire?

20   *A.*  September of last year.

21   *Q.*  What positions did you hold in the IRS?

22   *A.*  Initially -- the IRS has a large service center in Fresno;

23   so initially I was a seasonal tax examiner, various jobs.  But

24   within four years of starting to work for the IRS, I was --

25   switched to appeals, to a permanent position, so I worked in

Bruce Stork – Direct

1   appeals.

2   Q.   Were you ever a revenue officer?

3   A.   No.

4   Q.   So when did you start working for appeals?

5   A.   1992.

6   Q.   And how long did you work at appeals?

7   A.   Twenty-six years.

8   Q.   Until you retired?

9   A.   Correct.

10  Q.   What are your duties as an appeals officer?

11  A.   I was an appeals officer for collection issues, so

12  primarily where I worked was what we call collection due

13  process cases.

14  Q.   What does that mean?

15  A.   If a taxpayer is issued a notice of intent to levy or has

16  had a federal tax lien filed, they have a right to appeal that,

17  those notices.  And so I gave hearings for people that appealed

18  those notices.

19  Q.   What exactly is a levy -- a notice of levy or a notice of

20  lien?

21  A.   Notice of intent to levy is basically one of the last levy

22  notices that goes out, and they're saying that we're now ready

23  to levy.  Levy action is going to take place.

24  Q.   What is a levy, specifically?

25  A.   In my words, a levy is where the IRS grabs money.  Whether

Bruce Stork – Direct

1    it's garnishing wages, taking money out of their checking or

2    savings account, IRS is now going to start taking money.

3    *Q.*  And what is a lien?

4    *A.*  A lien is a notice filed with the county that you live in

5    that lets the public know that you owe the IRS money.

6    *Q.*  And is it attached to something specific, a piece of

7    property or something else?

8    *A.*  A notice of federal tax lien -- actually, a lien is

9    attached to everything.

10          *THE COURT:*  Sir, you can help us all if you'll go

11   closer to the microphone in front of you.

12          Thank you.

13   *BY MS. HADDEN:*

14   *Q.*  And so what is the process of getting this hearing that you

15   conduct with the taxpayer?

16   *A.*  The notice of -- that does make a difference.

17          The notice of intent to levy describes your appeal

18   rights and tells you to file a form 12153 and request a

19   hearing.  The lien, you get that same option after the lien has

20   been filed.

21   *Q.*  Okay.  So once you -- the hearing is requested, then what

22   happens?

23   *A.*  The idea of the hearing is that you don't agree with the

24   levy action or you think the lien was improperly filed, so

25   you're contesting that.  What actually happens in most

Bruce Stork - Direct

1   collection due process hearings is the appeals officer provides

2   you an opportunity to avoid the levy action by setting up a

3   collection alternative.  By that I mean, alternative to a levy

4   action.  The most common being an installment agreement, an

5   offer in compromise, or establishing that you should be placed

6   in current and non-collectible status.

7   Q.  So are all of those available to the taxpayer if they

8   request this hearing?

9   A.  Yes.

10  Q.  Is there any information that you request from the taxpayer

11  prior to the hearing or at the hearing?

12  A.  Yes.  We request a collection information statement.

13  Q.  And what exactly is that?

14  A.  It's a form -- the most important way to describe the form

15  is on the fourth page there is a table.  On one side of the

16  table, you list your income; the other side, you list your

17  expenses.  The difference between the two columns is considered

18  your ability to pay monthly.

19  Q.  Were you involved in a hearing with Mr. Birk?

20  A.  Yes.  I was assigned his appeal request.  His request for a

21  hearing was assigned to me.

22  Q.  What year was that?

23  A.  2005.

24  Q.  How long did you work on this case?

25  A.  My review of my records show I spent seven and a half hours

Bruce Stork - Direct

1   on the case.

2   Q.  Seven and a half hours.  Was that all at once?

3   A.  No.  Over a course of maybe three or four months.

4   Q.  Okay.  And what is your role in the hearing, as a

5   settlement officer?

6   A.  Hmmm.  Okay.  All of my hearings were done by telephone.  I

7   call the taxpayer or request the taxpayer to call me on a

8   specific date and time; I explain his rights; and then I ask

9   him questions -- usually I ask the taxpayer questions to

10  determine what their ability to pay is.  Most of the times they

11  have already provided the collection information statement that

12  I requested.

13  Q.  Do you remember if you got a collection information

14  statement from Mr. Birk?

15  A.  I did not get one.

16  Q.  Was a hearing scheduled?

17  A.  Yes.

18  Q.  Do you remember when it was scheduled for?

19  A.  I don't remember the exact date, but I think it was around

20  July 6.

21  Q.  Of what year?

22  A.  2005.

23  Q.  And did you end up speaking to the defendant?

24  A.  Yes.  At that time they had a procedure in place where a

25  clerk set up the hearing, so I did not get to prepare the

Bruce Stork – Direct

1    letter requesting him to either call me or me call him.  So my

2    understanding is that the letter wasn't real clear on that.  So

3    the requested phone call did not take place.

4    Q.  So what ended up happening with the hearing?

5    A.  The next day -- I think it was the next day -- I called him

6    and told him that, your hearing was missed, and one was

7    scheduled for yesterday.  I'm willing to admit it wasn't clear

8    who was supposed to call who.  If you would still like a

9    hearing, I'll schedule you one.

10   Q.  And did that in fact happen?

11   A.  At that time he told me that, no, him and his wife had

12   decided to come back into compliance and that he was going to

13   file a return that showed a zero balance.  And I said something

14   to the effect of, that appears to me that that will resolve

15   your issue with the levy notice.  So if you want to, you can

16   withdraw your request for hearing.

17   Q.  So just to understand, if he wants to then file a return,

18   does that mean the appeals hearing is done and something else

19   happens?  And what is that something else?

20   A.  In this situation, I explained to him that the tax periods

21   before me -- which were tax periods '98 and '99 -- if he files

22   a return and pays the amount shown on that return, or if the

23   return shows zero, then the levy action won't take place.

24   Filing of that return will resolve that issue.  So in my

25   opinion, while you're entitled to a hearing, I don't really

Bruce Stork - Direct

1   think you need one, and there will be no harm in withdrawing.

2   Q.  So what's the process for withdrawing?

3   A.  In this situation, I faxed him a withdrawal form -- he

4   provided me his fax number -- he signs it, I get it back, and

5   that's it.  The case is over.  I send a closing letter.

6         MS. HADDEN:  Ms. Burgess, can you please bring up

7   Government Exhibit No. 28.

8         Technology, it can be great, and it can be slow.

9   BY MS. HADDEN:

10  Q.  Mr. Stork, what is Government Exhibit No. 28?

11  A.  That is the fax cover sheet that I received from Mr. Birk;

12  and attached behind it, I expected to find the signed

13  withdrawal.

14  Q.  And what did you get instead?

15  A.  Instead, I got a letter, as you see here on the screen.

16  And he correctly stated that I didn't fully explain what

17  withdrawing from the hearing entailed.

18  Q.  And so what did it appear that he was requesting from this

19  letter?

20  A.  That he now realizes he didn't want to withdraw after

21  speaking to his lawyer and that he would like to go forward in

22  having a hearing.

23  Q.  Okay.

24  A.  Because the initial phone call that we had had wasn't an

25  official hearing.  It was just, we were sharing information.

Bruce Stork – Direct

1    *Q.* What happened after you received this letter?

2    *A.* He indicated to me in the letter that he would file a

3    return by the 22nd -- I think July -- and that he would like

4    his hearing scheduled after that. And so I agreed to that, and

5    I scheduled him a hearing I think it was on July 28, or close

6    to that date.

7        *MS. HADDEN:* Ms. Burgess, if you could please go to

8    Exhibit No. 29.

9    *BY MS. HADDEN:*

10   *Q.* And what is this letter, Mr. Stork?

11   *A.* This is the letter I sent to him in response to his letter

12   where he said he wasn't going to sign the withdrawal. And so

13   per his request in this letter, I went ahead and scheduled him

14   a telephone conference on July 28.

15   *Q.* And did that conference happen on July 28?

16   *A.* Yes, it did.

17   *Q.* And what occurred during that conference?

18   *A.* He again said he was going to file the returns -- maybe he

19   said he had just filed them, and they weren't in the system

20   yet. Either way, I didn't have possession of them, and they

21   weren't in the system; but he told me that they were filed or

22   about to be filed.

23   *Q.* So how did you handle that hearing from that point?

24   *A.* Well, again I told him -- well, he told me the returns were

25   going to show a zero balance. So I said, well, okay, so that's

Bruce Stork – Direct

1    going to resolve your levy issue.  The levy issue will not

2    occur if you actually file those returns, once the returns are

3    posted.  I said, so in this situation, I won't ask you for a

4    withdrawal.  If you're willing to sign a waiver saying that you

5    won't go to tax court, I can stipulate in the waiver that the

6    service center is to suspend collection until -- I forget -- so

7    many days or months out to allow time for your returns to hit

8    the system and for your balance to get to zero, or whatever is

9    shown on the return.

10          MS. HADDEN:  Okay.  Ms. Burgess, if you can go to

11   Government Exhibit 31.

12   BY MS. HADDEN:

13   Q.   And Mr. Stork, what is this?

14   A.   After receipt of the signed waiver -- he did sign the

15   waiver.  This is a standard cover letter telling the taxpayer

16   that we've accepted your waiver and your appeal is closed.  I

17   generated this letter, but my manager signed it.

18          MS. HADDEN:  And if you could please go to the second

19   of Exhibit 31.

20   BY MS. HADDEN:

21   Q.   And what is this?

22   A.   This is the actual waiver of itself, the first page.

23   Q.   Second page -- actual third page of Exhibit 31.

24   A.   This is the page that shows the signature -- his signature

25   and my manager's signature.  The important part of this page is

Bruce Stork - Direct

1   the last paragraph, which is the one that I generated.

2        Do you want me to read that paragraph?

3   Q.  If you could generally tell us what the importance of this

4   paragraph is.

5   A.  This is where I explain that I'm instructing collections to

6   suspend your account for a period of time to allow time for the

7   returns to post.  I considered the cover letter to this that

8   you just had on the screen a closing letter.  At that point,

9   I'm done with it.

10        MS. HADDEN:  If we could go back to page 1 of

11  Exhibit 31.

12  BY MS. HADDEN:

13  Q.  What is the date of this letter?

14  A.  August 2, 2005.

15  Q.  And one more time, what tax years is this for?

16  A.  '98 and '99.

17  Q.  All right.  Thank you very much, Mr. Stork.

18  A.  Uh-huh.

19        MS. HADDEN:  No further questions.

20        THE COURT:  Very well.

21        Cross-examination for Mr. Birk.

22        MS. BECK:  Thank you, Your Honor.

23        THE COURT:  You're welcome.

24

25

Bruce Stork – Cross

1          **CROSS-EXAMINATION**

2     *BY MS. BECK:*

3     *Q.*  Good morning, Mr. Stork.

4     *A.*  Good morning.

5     *Q.*  You weren't on this case too long, were you?

6     *A.*  No.

7     *Q.*  Three or four months?

8     *A.*  Yeah -- yes.

9     *Q.*  You spent about seven and a half hours --

10    *A.*  Yes.

11    *Q.*   -- working on this case?

12    *A.*  Correct.

13    *Q.*  You don't have an independent recollection of this case, do

14    you?

15    *A.*  No, I do not.

16    *Q.*  You had to go back and look at your correspondence with

17    Mr. Birk and your records to figure out what happened?

18    *A.*  Right.

19    *Q.*  Okay.  And your role in this case was as an appeals

20    settlement officer?

21    *A.*  Yes.

22    *Q.*  So you get involved after a revenue agent assesses tax

23    liability for Mr. Birk; right?

24    *A.*  Yes.

25    *Q.*  And he is notified of that tax liability?

Bruce Stork - Cross

1   A.   Right.

2   Q.   And your job is, then, to resolve any tax dispute between

    the taxpayer and the IRS through an administrative civil

4   process?

5   A.   I wouldn't say any issue.  Any issue related to those

6   collection notes.

7   Q.   Okay.  So your job, then, is to specifically look at the

8   collection notices and resolve those disputes?

9   A.   Correct.  Make sure the notices were correctly issued and

10  then resolve any dispute that he had regarding those notices.

11  Q.   Okay.  And this is a civil process that we're talking

12  about; right?  Not criminal.

13  A.   Well, the word I would use is administrative.  So, yeah, I

14  guess that's civil.

15  Q.   Okay.  You weren't conducting a criminal investigation?

16  A.   No.  Not at all.

17  Q.   Okay.  And the IRS had determined that Mr. Birk had not

18  filed tax returns for the tax years that we're talking about;

19  right?

20  A.   Correct.

21  Q.   They assessed tax liability against him; right?

22  A.   Correct.

23  Q.   Using substitutes for returns?

24  A.   Correct.

25  Q.   Okay.  And let's talk to you about what substitutes for

Bruce Stork – Cross

1    returns means just for the jury's edification.  When I say

2    "substitute for return," I'm talking about the IRS coming up

3    with what they think would be a tax return because they don't

4    have one; right?

5    A.  Right.  They come up with a return based on information

6    returns that were provided to the IRS.

7    Q.  Okay.  And based on those substitutes for returns, they say

8    Mr. Birk owes this amount of tax?

9    A.  Correct.

10   Q.  And then the IRS notified Mr. Birk, specifically on

11   January 27 of 2005, that if he didn't pay the taxes that he --

12   that they said that he owed, that they would levy his property.

13   Does that sound about right?

14   A.  It's a little bit simplified, but along that order.

15   Q.  Okay.  And when we're talking about levying property, we're

16   talking about bank accounts; right?

17   A.  Uh-huh.

18   Q.  Wages?

19   A.  Uh-huh.  Yes.

20   Q.  Real estate commissions?

21   A.  To the extent that that's income, yes.

22   Q.  Business assets?

23   A.  Probably.

24   Q.  Okay.  And the taxpayer, when they're notified about this

25   levy, they get a letter that says basically, call us

1    immediately; right?

2    A.   Yeah.   Encourages them to.   But there is different letters,

3    so I'm not sure exactly which one you're referring to.

4              MS. BECK:   Okay.

5              Can you pull up Government Exhibit 28 for me -- 25.

6    Excuse me.

7    BY MS. BECK:

8    Q.   If you'll take a look at your screen, that's a version of

9    this letter, right, that says, "final notice of intent to levy

10   and notice of your right to a hearing"?

11   A.   Right.

12   Q.   Okay.

13   A.   This is the letter that gives them the right to request a

14   hearing.

15   Q.   Okay.   Shortly after Mr. Birk receives this letter, he

16   requests the collection due process hearing; right?

17   A.   Correct.

18             MS. BECK:   Okay.   You can take that down.   Thank you.

19             THE WITNESS:   That's considered timely.   If the

20   taxpayer requests a hearing timely, then collection action is

21   suspended while he's in appeals.

22   BY MS. BECK:

23   Q.   And he timely requested a hearing?

24   A.   Correct.

25   Q.   Okay.   And then you notified him that his hearing was going

Bruce Stork - Cross

1    to take place -- or the IRS generally notified him that the

2    hearing was going to take place on July 5 of 2005?

3    A.  Right.  I notified him of that.

4    Q.  You did.  Okay.  But there was some issue regarding who was

5    to make that phone call, and that call was missed on July 5.

6    Right?

7    A.  Okay.  You mentioned July 25th and the 5th.

8    Q.  Okay.  Let me clarify.

9    A.  Because there were two different hearings scheduled.

10   Q.  Let me clarify.

11   A.  Okay.

12   Q.  So you notified Mr. Birk after he requested the collection

13   due process hearing that he was going to have one, and that

14   that phone call hearing was going to take place on July 5.

15   A.  Right.

16   Q.  Okay.  And for some reason, it was not clear who was

17   supposed to call who; right?

18   A.  Right.  The letter was generated by a clerk prior to the

19   case being assigned to me.  Unfortunately, she didn't word it

20   exactly right; so I conceded that the letter wasn't clear on

21   who was supposed to call who.

22   Q.  Okay.  So you spoke the next day, on July 6?

23   A.  Right.

24   Q.  Okay.  Now at that point, the system hadn't identified

25   Mr. Birk as a frivolous tax filer; right?

Bruce Stork - Cross

1   A.  I'm not sure that the system did, but there is wording in

2   my case history notes to indicate that the clerk that built the

3   case had reason to believe he was.  So --

4   Q.  Okay.

5   A.  Because the word "frivolous" shows up in there.

6           MS. BECK:  May I have a moment, Your Honor?

7           THE COURT:  You may.  Thank you.

8           THE WITNESS:  I mean in my case file.

9   BY MS. BECK:

10  Q.  Do you recall speaking with Special Agent Warnock in

11  preparation for trial?

12  A.  No.  And I really don't recall speaking to special agents

13  at all.

14  Q.  Okay.  Did you meet with Ms. Hadden of Government counsel

15  to prepare for trial in this case?

16  A.  For the hearing?  It's just an administrative hearing.  No,

17  I did not.

18  Q.  Okay.  What I'm talking about is preparing for this trial.

19  A.  Oh, this trial.  I'm sorry.  Did I speak to her?  Yeah.

20  Q.  Okay.

21  A.  Scheduled a phone call.

22  Q.  You spoke with her over the phone?

23  A.  Right.

24  Q.  That was on July 9; right?

25  A.  Yes.  I'm sorry.

 1   *Q.*  And Ms. Hadden was on the phone with you, but Special Agent

 2   Warnock was also on the line.  Right?

 3   *A.*  Right.

 4   *Q.*  And when you spoke with Ms. Hadden, you told them that the

 5   system at that point hadn't identified Mr. Birk as a frivolous

 6   tax filer.

 7   *A.*  I may have.  And by system, I take that to mean the main

 8   IDRS computer system.

 9   *Q.*  Okay.  And you -- if he had been identified as a frivolous

10   tax filer at that point, he would have gotten a different

11   letter and would not have been granted a hearing; right?

12   *A.*  Right.

13   *Q.*  Okay.  But he was granted a hearing?

14   *A.*  He was.  And I can tell you from personal experience that

15   sometimes the clerk that scheduled the first hearing

16   inadvertently scheduled hearings for frivolous filers.  So I

17   don't know for sure if he should have been scheduled one or

18   not.

19   *Q.*  But he was?

20   *A.*  But he was.

21   *Q.*  Okay.  After the phone call that you had with Mr. Birk on

22   July 6, he wrote you a letter; and he said he was going to be

23   filing returns to challenge the substitute for returns that

24   were prepared by the IRS.  Right?

25   *A.*  Right.

Bruce Stork - Cross

1    *Q.* And he said that the IRS was relying on sources of

2    information that led to inaccuracies in his tax liability;

3    right?

4    *A.* Yes.

5    *Q.* For instance, he said that a specific example was the

6    misrepresentation of 1099G forms; right?

7    *A.* I don't recall what specific income he felt was

8    misrepresented.

9          *MS. BECK:* Okay. If we could pull up Government

10   Exhibit 28, please. And if we could turn to page 3 of that

11   exhibit. And if you could blow up the middle paragraph,

12   please.

13   *BY MS. BECK:*

14   *Q.* He said, "The real issue before us is the reliability and

15   accuracy of the form W-2s and 1099s provided by third parties

16   directly to the IRS." Do you see that?

17   *A.* Yes.

18   *Q.* And he went on to say, "Sources of information contain

19   multiple errors or have been misrepresented by those preparing

20   information returns." Right?

21   *A.* Uh-huh.

22   *Q.* And he said, "A specific example is the misrepresentation

23   of 1099G forms that are clearly annotated as IRA rollovers that

24   have been included as taxable income." Right?

25   *A.* Right.

Bruce Stork - Cross

1          *MS. BECK:*  Okay.  You can take that down.  Thank you.

2  *BY MS. BECK:*

3  *Q.*  Mr. Stork, you would agree with me that if people fail to

4  pay their taxes, the IRS doesn't start by charging a person

5  with a crime; right?

6  *A.*  Yes.

7  *Q.*  That it starts with the IRS telling the taxpayer, Hey, you

8  didn't pay your taxes.

9  *A.*  Correct.

10  *Q.*  And it can take years to go through a civil process; right?

11  *A.*  To get the return corrected?

12  *Q.*  To come to an agreement between the IRS and the taxpayer.

13  It can take years?

14  *A.*  It can.

15  *Q.*  And that civil process can require the taxpayer to pay

16  penalties; right?

17  *A.*  Penalties can accrue during that time.

18  *Q.*  And if those penalties are determined to be correct, then

19  the taxpayer has to pay those penalties; right?

20  *A.*  Right.

21  *Q.*  And there is also interest that adds up on late taxes;

22  right?

23  *A.*  Right.

24  *Q.*  And the IRS can also levy bank accounts, as we've been

25  discussing?

Bruce Stork - Cross

1    A.   At some point.

2    Q.   Right.  And the IRS can put liens on property; right?

3    A.   Right.

4    Q.   They can seize property; right?

5    A.   Uh-huh.  Eventually.

6    Q.   And sell property of yours?

7    A.   Right.

8    Q.   Right?  And they actually did that with Mr. Birk's

9    property; right?

10   A.   I wouldn't know.

11   Q.   Okay.

12   A.   If that occurred, it occurred after I had the case.

13   Q.   Okay.  To your knowledge, if the civil process doesn't

14   resolve, then the IRS might conduct a criminal investigation;

15   right?

16   A.   Right.

17   Q.   And a criminal investigation means that the taxpayer can be

18   charged with a crime; right?

19   A.   Yeah.

20   Q.   Okay.  And there are a number of ways that people can

21   resolve the civil side of their tax liability; right?

22   A.   Right.

23   Q.   You were discussing a number of them, like an installment

24   statement plan, for instance?

25   A.   Even prior to that, you can try to resolve the amount of

1    assessed liability.

2    *Q.*   Okay.  So you could also enter into a short-term payment

3    plan?

4    *A.*   Right.

5    *Q.*   Or an offer in compromise?

6    *A.*   If appropriate, yes.

7    *Q.*   Or bankruptcy?

8    *A.*   Yes.

9    *Q.*   So even if the jury finds that Mr. Birk is not guilty in

10   this case, the IRS is still going to attempt to collect taxes;

11   right?

12   *A.*   Yeah.  My understanding is if the tax is properly assessed.

13   *Q.*   So the IRS will continue to go after that tax amount?

14   *A.*   So long as it's properly assessed and the collection

15   statute is still open.

16   *Q.*   So this doesn't end with this trial; right?

17   *A.*   No, I wouldn't think so.

18          *MS. BECK:*   Thank you.  No further questions.

19          *THE COURT:*   Redirect examination for the Government?

20          *MS. HADDEN:*   Yes, Your Honor.

21          *THE COURT:*   Certainly.

22          *MS. HADDEN:*   Ms. Burgess, can you please pull up

23   Government Exhibit 27.

24

25

Bruce Stork – Redirect

1          **REDIRECT EXAMINATION**

2     *BY MS. HADDEN:*

3     *Q.*  So, Mr. Stork, you were talking about this letter that a

4     clerk sent out; and I think it was talked about on cross, as

5     well.  Is this that letter that you were talking about, where

6     the hearing was set?

7     *A.*  If there is a paragraph in there that schedules a hearing,

8     then, yes.

9     *Q.*  Page 2.  If you can please go to page 2.

10    *A.*  Yeah.  There it shows July 5, 3 p.m. -- 3:30 p.m. Mountain

11    Standard Time.  It says, "Please contact Mr. Stork."

12          *MS. HADDEN:*  Okay.  If you could go back to page 1,

13    please.  And first area with the 1 and 2.

14    *BY MS. HADDEN:*

15    *Q.*  And so we were talking about what can be discussed and

16    brought up in this hearing.  Can you explain just kind of what

17    it is telling Mr. Birk here what cannot be discussed in the

18    hearing?

19    *A.*  The courts have determined that, you know, certain

20    frivolous information or arguments cannot be raised during the

21    hearing.  The purpose of the hearing is not to resolve your

22    frivolous arguments.

23    *Q.*  And why is that?

24    *A.*  It's beyond the scope of the collection due process

25    hearing.  You have a properly assessed liability; we're here to

1    talk collections.  You can raise liability.  But by liability,

2    I mean the amount of tax assessed, not the fact why it was

3    assessed.

4           MS. HADDEN:  Thank you.  I have no further questions.

5           THE COURT:  And may Mr. Stork be excused and released

6    from subpoena?

7           Any objection by the Government?

8           MS. HADDEN:  No, Your Honor.

9           THE COURT:  Or Mr. Birk.

10          MS. BECK:  No, Your Honor.  Thank you.

11          THE COURT:  Mr. Stork, you are both excused and

12   released from subpoena with our thanks.

13          THE WITNESS:  Thank you.

14          THE COURT:  Back to retirement you go.

15          Very well.  The Government may call its next witness.

16          Ms. Hadden.

17          MS. HADDEN:  Yes, Your Honor.  The United States calls

18   Mr. Fred Skaluba.

19          THE COURT:  Thank you.

20          Mr. Fred Skaluba, good morning.

21          THE WITNESS:  Good morning.

22          THE COURT:  If you will make your way forward to come

23   stand in this open area in front of my bench, please.  I'm

24   going to administer the oath to you.

25          THE WITNESS:  Yes, sir.

Fred Skaluba – Direct

1          THE COURT:  There is fine.  Please raise your right

2    hand to be sworn, and thank you.

3          May I have your attention in the courtroom.

4               (**FRED SKALUBA, GOVERNMENT'S WITNESS, SWORN**)

5          THE COURT:  Thank you.  Please be seated in that

6    witness stand.

7          Ms. Hadden, you may inquire.

8                       **DIRECT EXAMINATION**

9    BY MS. HADDEN:

10   Q.  Mr. Skaluba, can you please state the city and state you

11   live in.

12   A.  The state I live in?  Pennsylvania.

13   Q.  What is your educational background?

14   A.  I have an undergraduate degree in forest science.

15   Q.  Where did you get that degree?

16   A.  Colorado State.

17   Q.  What is your employment background?

18   A.  I worked with my family in a new car dealership for

19   approximately eight years.  And then I decided to go back to

20   college in Colorado, earned my degree; and I decided to get a

21   job with the Internal Revenue Service, applied, and was

22   accepted.

23   Q.  When did you start working with the IRS?

24   A.  1983.

25   Q.  How long did you work there for?

Fred Skaluba – Direct

1    *A.*   Twenty-four years.

2    *Q.*   Do you still work for the IRS?

3    *A.*   I retired in 2007.

4    *Q.*   And what were your various positions in the IRS?

5    *A.*   I was hired as a revenue agent, which is a position that

6    serves usually to collect and assess taxes; and then I also was

7    an analyst in D.C. for about a year; and then I also did acting

8    group manager jobs in numerous offices.

9    *Q.*   What are the duties of an acting group manager?

10   *A.*   You normally have a group of ten to fifteen revenue

11   officers to supervise, over an area that usually encompasses

12   either a state or half a state, depending on the size and the

13   number of employees that you have in the area you have to

14   cover.

15   *Q.*   What are the primary duties of a revenue officer?

16   *A.*   To collect taxes, as revenue officer would indicate by that

17   name.  And you also look to secure tax returns from businesses,

18   from individuals, and from all different types of entities.

19   Nonprofit organizations, as well.

20   *Q.*   And what are the various tools at your disposal to collect

21   on taxes?

22   *A.*   Tools you normally have that we used the most would be

23   filing a federal tax lien, initiating a levy action on income,

24   on bank accounts, on retirement income, and all other sources

25   that would readily be available to the Service.  And we also

Fred Skaluba - Direct

1    have the tools to file a federal tax lien, which would

2    determine our priority against other lienholders in the amount

3    that you owe.

4    Q.   And what is the difference between a levy and a lien?

5    A.   Well, a federal tax lien is a document that is used to

6    establish our priority, much similar to a mortgage.  So you

7    establish our priority against a certain amount of money from a

8    creditor that -- like the United States, that would have that

9    lien.  So that the difference between a levy would be, if

10   you're attaching income, you would use a levy to attach that

11   income.  It could be, again, your bank accounts, your -- bank

12   accounts, your individual self-employment income, could be

13   against your wages, salaries, all types of income we could

14   normally attach.

15   Q.   Did you work on a case involving Mr. Lawrence Birk?

16   A.   Yes.

17   Q.   When did you work on that case?

18   A.   2006.

19   Q.   And what was your role in that case?

20   A.   I was the -- I believe the first collection officer

21   assigned that case when it came to the field.  The procedure

22   normally is, the notice gets sent out on the assessments or on

23   returns that are required, and those are referred by the

24   service center.  And then if that's not successful, the case is

25   sent to the field, assigned to an officer such as myself.

1  *Q.* And what do you first do when you get a file?

2  *A.* I do extensive research when I get a case. I normally find

3  out where the taxpayer lived, physically, because you can take

4  a reasonable trip to get the taxpayer and try to contact them

5  personally, face to face. The other thing that I would

6  normally do would be to prepare a federal tax lien, if you've

7  already initiated final notice for the taxpayer. You can also

8  determine all sources of income from our sources, Pennsylvania

9  sources, whatever sources -- what state you're working in. You

10  can use all those sources to attach the income directly by

11  preparing a document and sending it to that source.

12  *Q.* Do you send the taxpayer any notices throughout your

13  process?

14  *A.* Yes. I normally -- I would send a notice, the final

15  notice, what we call our final notice of demand, which is a

16  notice we send prior to taking any collection action such as a

17  levy or filing a lien.

18       *MS. HADDEN:* Ms. Burgess, if you could please put up

19  Government Exhibit 33.

20  *BY MS. HADDEN:*

21  *Q.* Mr. Skaluba, what is this document?

22  *A.* It's a letter -- it's a 1058.

23  *Q.* Excuse me. I'm sorry. What is a 1058? What is its

24  purpose?

25  *A.* The purpose of that is to advise the taxpayer that this is

Fred Skaluba – Direct

1   a final notice, we intend to collect.  And if you do not comply

2   by either calling us to schedule an appointment or by sending

3   us full payment, partial payment, or work out an agreement of

4   some type, our next action would be to file a federal tax lien

5   and to levy whatever sources that we have found.

6   Q.  And if you could look at the top as to who the person to

7   contact is.  What name is there?

8   A.  The name there is Lawrence M. Birk.

9   Q.  I mean, the person to contact at the IRS, on the right-hand

10  side.

11  A.  Oh, Fred -- F. Bass.

12  Q.  Who is that?

13  A.  That's me.

14  Q.  So why is the name F. Bass instead of F. Skaluba?

15  A.  Because in this type of position, normally we're subject to

16  a lot of harassment, the possibility the taxpayer will call you

17  and give you a hard time.  Some taxpayers, we'll go ahead

18  and --

19          MS. BECK:  Objection.  403.

20          THE COURT:  Response.

21          MS. HADDEN:  Your Honor, I'm not saying that Mr. Birk

22  did this.  I'm just explaining why it's a different name on

23  here than Mr. Skaluba's name.  Although this is his letter that

24  he sent out.

25          THE COURT:  I agree on that purpose it is relevant.

Fred Skaluba - Direct

1    Its probativity for that purpose is not substantially

2    outweighed by any one or more of the six dangers that are made

3    the focus of Rule 403, which we'll probably talk about later.

4    Thus, the objection is overruled; and the examination may

5    continue.

6    *BY MS. HADDEN:*

7    *Q.*   So just briefly, why is your name Bass on this letter?  You

8    were in the middle of explaining it.

9    *A.*   That reason that name is F. Bass is because through the

10   position that I'm in, we're more subject to having problems

11   with taxpayers.  Therefore, we would normally be allowed to

12   take a name -- a name that we made up or a name that we could

13   use and send that and get it approved throughout the Service.

14   Once that approval is made, then we use that name officially as

15   the -- in our capacity with the Service.

16   *Q.*   And if you could please go to page 2 of Exhibit 33.  What

17   tax years is this for?

18   *A.*   Tax years were 12/31/2000, 2001, 2002, and 2003.

19   *Q.*   So was your job to collect for all of these years?

20   *A.*   Yes.

21   *Q.*   So we talked about the different tools that are at your

22   disposal for collection process.  What if any of those tools

23   did you use in this case?

24   *A.*   In this case, we used the summons primarily and the federal

25   tax lien.

Fred Skaluba - Direct

1    *Q.*  And what did you summons?

2    *A.*  We summonsed the bank -- we located bank accounts for the

3    taxpayer.  So we summonsed the bank for the records over a

4    period of time that we deemed necessary to find sources of

5    income that we could attach.

6    *Q.*  Did you get any information as a result of those summons?

7    *A.*  We did.  Yes.

8    *Q.*  What did you do with that information?

9    *A.*  Normally, we take that information and use it to issue

10   levies.

11   *Q.*  And did you actually issue any levies?

12   *A.*  No.

13   *Q.*  Did you speak to the defendant at all during your --

14   *A.*  Pardon?

15   *Q.*  Did you speak to the defendant at all during your work on

16   this case?

17   *A.*  Yes, I did.

18   *Q.*  And what kind of conversations did you have with him?

19   *A.*  The conversation that I had was not very lengthy.  But the

20   taxpayer -- bottom line is he refused to provide any

21   information -- financial information or to discuss the tax

22   liability at all.

23   *Q.*  And did you make any field visits?

24   *A.*  Yes, I did.  I made a couple of field visits.  The first

25   one primarily was an initial contact.  And that one was the

Fred Skaluba - Direct

1    lengthiest, because you had to actually find an address out in

2    the middle of the country, so to speak.  I did locate the

3    taxpayer, and I was able to get to the taxpayer's home.

4    Q.  Did you ever meet with the taxpayer when you made these

5    field visits?

6    A.  I -- I found the taxpayer in the office.

7    Q.  And what was discussed while you were in the office?

8    A.  Pretty much the same.  I advised the taxpayer that they

9    must either come up with a payment plan and file the returns

10   that they have not filed and that examination prepared

11   assessments for.  The taxpayer said he would contact -- if I'm

12   correct, he would contact his attorney, his accountant, and try

13   to see what they said, as far as preparing the return.

14   Q.  So he indicated he was going to file some returns?

15   A.  Yes.

16   Q.  Did he ever ask for a collection due process hearing?

17   A.  Yes, he did.

18   Q.  And so what happens if he requests a collection due process

19   hearing?

20   A.  What happens is the collection is suspended until the

21   appeals determination is made.

22   Q.  And when did you stop working on this case?

23   A.  October of 2006.

24          MS. HADDEN:  Thank you, Mr. Skaluba.

25          No further questions, Your Honor.

Fred Skaluba – Cross

1          THE COURT:  Cross-examination for Mr. Birk?

2          Ms. Beck.

3          MS. BECK:  Thank you.  May I have a moment?

4          THE COURT:  You may.  Thank you.

5          MS. BECK:  Thank you.

6                        **CROSS–EXAMINATION**

7    BY MS. BECK:

8    Q.  Good morning, Mr. Skaluba.  How are you?

9    A.  Fine.  How are you?

10   Q.  Good.  Thank you.

11         So your role in this case was as a revenue officer; is

12   that right?

13   A.  Yes.

14   Q.  Okay.  And your work was primarily to determine what tools

15   you could use to collect Mr. Birk's undue -- sorry -- overdue

16   taxes; right?

17   A.  Somewhat.

18   Q.  And then to do some fieldwork to try to contact him to

19   resolve any dispute; right?

20   A.  Yes.

21   Q.  All right.  I want to talk with you about your efforts in

22   that case.  And just to verify, the first correspondence that

23   you had with Mr. Birk was July 12 of 2006, when you notified

24   him of the final notice of intent to levy; is that right?

25   A.  Yes.

Fred Skaluba - Cross

1          MS. BECK:  Okay.  And if we could pull up Government

2     33.

3     BY MS. BECK:

4     Q.  This is -- the letter that we're looking at is that first

5     correspondence that you had with Mr. Birk; right?

6     A.  Yes.

7          MS. BECK:  Okay.  You can take that down, please.

8     BY MS. BECK:

9     Q.  In addition to writing him that letter, you also spoke with

10    him over the phone; right?

11    A.  Yes.

12    Q.  And when you spoke with him over the phone, you testified

13    that he refused to provide you with any information or discuss

14    his liability; is that right?

15    A.  That's correct.

16    Q.  But he told you that he was part of a group, We the People;

17    right?

18    A.  Yes, he did.

19    Q.  And you looked up their website; right?

20    A.  Yes.

21    Q.  And after looking at their website, you didn't speak with

22    Mr. Birk about We the People, did you?

23    A.  No.

24    Q.  Okay.  At some point you conducted field visits, where you

25    tried to contact him at his home; right?

Fred Skaluba - Cross

1    A.   Yes.

2    Q.   And he met with you at his office?

3    A.   Yes, he did.

4    Q.   I'm sorry.  At your office?

5    A.   Yes.

6    Q.   And you worked on this case from about July through October

7    of 2006; does that sound right?

8    A.   That's correct.

9    Q.   Okay.  While you were working on Mr. Birk's case, he hired

10   an accounting firm; right?

11   A.   Yes.

12   Q.   Called Advanced Tax Solutions.

13   A.   I believe that's correct.  I don't have the document in

14   front of me.

15   Q.   Okay.  Do you recall corresponding with Advanced Tax

16   Solutions, in addition to corresponding with Mr. Birk?

17   A.   I do not.

18        MS. BECK:  If I may have just a moment.

19        THE COURT:  You may.

20   BY MS. BECK:

21   Q.   In addition to the correspondence that you sent him in July

22   of 2006, the IRS would also send out responses from the Ogden

23   Service Center to taxpayers; right?

24   A.   Correct.

25        MS. BECK:  Let's look at Government Exhibit 32,

Fred Skaluba - Cross

1   please.

2   *BY MS. BECK:*

3   Q.  This is a letter dated March 16 of 2006; right?

4   A.  That's what it says.

5   Q.  And if you'll take a look at this document, it's a standard

6   response from the service center for frivolous return

7   information; right?

8   A.  Yes.

9   Q.  Okay.  You had a number of --

10          You can take that down.  Thank you.

11          You had a number of tools available to you to collect

12  taxes; right?

13  A.  I do.

14  Q.  You can levy bank accounts; right?

15  A.  Correct.

16  Q.  You can put liens on people's property?

17  A.  Correct.

18  Q.  The IRS can seize property?

19  A.  Yes.

20  Q.  And if that civil process of collecting the taxes doesn't

21  resolve, then the IRS can conduct a criminal investigation, and

22  a taxpayer can be charged with a crime; right?

23  A.  Yes.

24  Q.  Now, if the jury finds Mr. Birk not guilty in this case,

25  the IRS is still going to continue to try to collect taxes;

Fred Skaluba - Cross

1   right?

2   *A.*  Yes.

3   *Q.*  They're going to continue that civil process; right?

4   *A.*  Yes.

5   *Q.*  And so this doesn't end if this case is over; right?

6          *MS. HADDEN:*  Objection, Your Honor.  Mr. Skaluba

7   doesn't know the whole criminal process and how it affects

8   civil collections.

9          *THE COURT:*  There's got to be a traditional label in

10  there somewhere.

11         *MS. HADDEN:*  Relevance.

12         *THE COURT:*  Relevance under Rule 401 and 402?

13         *MS. HADDEN:*  Yes, Your Honor.

14         *THE COURT:*  Response.

15         *MS. BECK:*  Your Honor, I believe the objection that

16  the Government was making, he doesn't know.  He didn't indicate

17  whether or not he knew.

18         *THE COURT:*  The objection is really lack of personal

19  knowledge under Rule 602.  I was expecting 403, but we'll start

20  with 602.  That objection for now is sustained, but easily

21  remedied.

22  *BY MS. BECK:*

23  *Q.*  Mr. Skaluba, do you know whether or not the IRS is going to

24  continue to collect taxes against Mr. Birk if this case is --

25  *A.*  I do not.

Fred Skaluba - Cross

1     Q.    -- resolved.

2           Okay.  May I have a moment?

3           THE COURT:  You may.  Thank you.

4           MS. BECK:  Nothing further.  Thank you.

5           THE COURT:  Ms. Hadden, redirect examination for the

6    Government?

7           MS. HADDEN:  No, Your Honor.

8           THE COURT:  Very well.  May Mr. Skaluba be excused and

9    released from subpoena?

10          Any objection by the Government?

11          MS. HADDEN:  No, Your Honor.

12          THE COURT:  Or Mr. Birk.

13          MS. BECK:  No, thank you.

14          THE COURT:  Mr. Skaluba, you are both excused and

15   released from subpoena with our thanks.

16          THE WITNESS:  Thank you.

17          THE COURT:  Very well.  The Government may call its

18   next witness.

19          Mr. Magnani.

20          MR. MAGNANI:  Thank you, Your Honor.  The United

21   States calls Todd Whalen.

22          THE COURT:  Mr. Todd Whalen.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Good morning.  If you would make your way

25   to stand over here in this open area in front of my bench,

Todd Whalen – Direct

1    please.

2           May I have your attention, please.

3               (**TODD WHALEN, GOVERNMENT'S WITNESS, SWORN**)

4           *THE COURT:*  Thank you.  Please be seated in that

5    witness stand.

6           Counsel, you may inquire.

7           *MR. MAGNANI:*  Thank you.

8                        **DIRECT EXAMINATION**

9    *BY MR. MAGNANI:*

10   *Q.*  Good morning, Mr. Whalen.

11   *A.*  Good morning.

12   *Q.*  Can you just introduce yourself to the jury and let them

13   know where you're from and where you live now?

14   *A.*  My name is Todd Whalen.  I'm currently living in Denver,

15   Colorado, which is where I've been the last 30 plus years.

16   *Q.*  What do you do for a living, sir?

17   *A.*  I'm a CPA; and I help people with their taxes and tax

18   issues, collections.

19   *Q.*  How long have you been helping people with tax issues as a

20   CPA?

21   *A.*  So I've been a CPA, filing tax returns, doing accounting

22   for 30 years, and IRS resolution or controversy for the last 20

23   years.

24   *Q.*  And can you just tell the jury where you went to school.

25   *A.*  I have an associate's degree from Colorado Northwestern

Todd Whalen - Direct

1   Community College, and I have a bachelor's degree from Western

2   State College of Colorado, and I have a master's degree from

3   the University of Denver.

4   Q.   And what did you study in those -- all those degrees?

5   A.   The community college was just general ed, then I had an

6   accounting major with a second major in business management,

7   and then the master's degree is taxation.

8   Q.   Do you have any professional licenses in addition to your

9   educational background?

10  A.   Yes.  I'm a certified public accountant in Colorado, and

11  I'm an enrolled agent with federally -- and -- federally

12  licensed enrolled agent.  And then I'm -- as a non-attorney,

13  I'm licensed to practice before the tax court as a -- you know,

14  in -- well, I'm just licensed to practice before the tax court.

15  Q.   You're authorized to represent clients in tax court?

16  A.   I am.

17  Q.   Okay.  And what is -- just to go over those other terms

18  that you mentioned, what is an enrolled agent?

19  A.   An enrolled agent is an IRS designation that allows you to

20  represent clients before the -- before the IRS.  So, basically,

21  once you get a power of attorney, you can kind of step into

22  your client's shoes.  You're able to talk with IRS without

23  violating privacy issues.  You know, the IRS can't talk with

24  you without a power of attorney; and an enrolled agent

25  designation allows you to talk to the IRS on their behalf.

1   *Q.*  In brief, if you can just explain to the jury generally,

2   what is a CPA?

3   *A.*  A CPA is a state witness, and it allows you to do a few

4   things.  You know, we can prepare audits for public companies.

5   I do not do any of that kind of work.  But also as a CPA, it's

6   a license that allows you to practice before the IRS.  The IRS

7   recognizes three people to practice on behalf of clients.  One

8   would be an enrolled agent, one would be an attorney, and one

9   would be a certified public accountant.

10  *Q.*  How do you become a certified public accountant?

11  *A.*  You have to have a certain amount of education; a certain

12  amount of classes in accounting; and you have to pass a test to

13  prove competency in, you know, tax, audit, accounting,

14  financial ethics.

15  *Q.*  After you become a certified public accountant, is there

16  anything you need to do to maintain your license with the

17  state?

18  *A.*  Yeah.  You have to have 80 hours of continuing education in

19  a two-year period.  It can be either -- you know, it can be 40

20  hours and 40 hours; it can be no hours and 80 hours; but in a

21  two-year period, I've got to have 80 hours of professional

22  education, including four hours of ethics for the state of

23  Colorado.

24  *Q.*  And so taking all of your education and licenses and all of

25  that, what did you choose to do professionally?

Todd Whalen - Direct

1   A.  I like tax, so I help -- I know that's sick, but -- I enjoy

2   tax.  I help people who have not -- well, some who haven't

3   filed in a while, some who owe the IRS a lot of money.  I help

4   people, basically, who have civil issues with the IRS.

5   Q.  And who do you work for?

6   A.  I work for the client.

7   Q.  Well, do you have a boss?  Well, your client is always the

8   boss.  Do you work for a company?

9   A.  I'm the owner of the company, but I -- so I work -- it's a

10  corporation, so I work for my company.  And it's Advanced Tax

11  Solutions.  So this is the majority of what we do, we only file

12  tax returns, and we only do IRS controversy.

13  Q.  How long have you owned your own company?

14  A.  Thirty years.

15  Q.  How many employees do you have that work for you?

16  A.  Right now, ten others.  Usually eleven others.

17  Q.  And about, if you remember, how many employees did you have

18  working for you in 2006?

19  A.  Eight or ten, probably.

20  Q.  Now, if you could just sort of, just to give the jury a

21  sense of -- I know you mentioned you had two different types of

22  works.  How much is tax, and how much is IRS representation?

23  Do you specialize in one or the other?

24  A.  Well, our firm, that's all we do.  But some of us do tax

25  returns, and some of us do the IRS controversy.  And I myself

Todd Whalen - Direct

1    don't do many tax returns at all.  I -- at this point and for

2    the last, you know, ten or more years, I haven't done hardly

3    any tax returns.  But our firm does -- it's probably one-third,

4    30 percent tax work, and the rest is IRS controversy.

5    Q.  You mostly focus on the controversy work in the last ten

6    years?

7    A.  Yes.

8    Q.  And does your company advertise?

9    A.  Yes.

10   Q.  Did you advertise back in 2006?

11   A.  Yes.

12   Q.  Where -- how do you advertise or -- let me actually ask a

13   different question.

14        In 2006, to the best of your memory, can you just give

15   the jury a sense of the different type of ways you advertise

16   your services.

17   A.  That's highly confidential.

18   Q.  Without revealing any trade secrets.

19   A.  Okay.  We advertise then and now on the radio.  We send

20   letters to people who -- people -- when the IRS files a lien

21   for collection, that lien is public record.  We get ahold of

22   that record, and we send them a letter saying, this is the kind

23   of work we do.  Would you like help?

24        Because we do so much of this, we get a lot of

25   referrals from attorneys and from other CPAs and enrolled

149
Todd Whalen - Direct

1   agents, because not -- not everybody really understands this

2   kind of work or want to do this kind of work.

3          MR. MAGNANI:  I'd like to pull up Exhibit 70.  And

4   this -- I don't know if the monitors are back -- this is in

5   evidence.

6          I think we have to switch to the Government's

7   computer.  Thank you.

8   BY MR. MAGNANI:

9   Q.  And, Mr. Whalen, we're going to be pulling up exhibits on

10  the screen.  There is also binders, if it's easier for you to

11  see them, if you would like a binder, as well, or is the screen

12  okay?  Do you want both?

13  A.  You know, I have to apologize.  I brought my reading

14  glasses, but I left them in the room, so I'm not able to read

15  this right now.  Can I go get them?

16         They're in my backpack in the side pocket.

17         Sorry about that.

18         THE COURT:  We'll be at ease, ladies and gentlemen.

19  An opportunity for you, perhaps, to stand and stretch briefly,

20  if you're quick.

21         THE WITNESS:  Okay.  Thanks.

22  BY MR. MAGNANI:

23  Q.  Good to go?

24  A.  Good to go.

25  Q.  Okay.  Just so you know, sir, the exhibits that I'll be

Todd Whalen - Direct

1    asking about are mostly in the back of that binder, in case

2    that's easier for you.

3    A.   Okay.

4    Q.   So starting with Exhibit 79 -- can you see that now on the

5    screen, sir?

6    A.   I can.  I can see the top.

7    Q.   What is this -- I'm sorry.  70.  Excuse me.

8    A.   Okay.

9    Q.   What is this form?

10   A.   This is -- when somebody calls our office, the admin person

11   answers the phone, and this is their script.  And they fill it

12   out, and the goal is to kind of find out what their issues are

13   so we know who to have them meet with.

14   Q.   And just -- can you tell from looking at this form when the

15   call was made?

16   A.   It -- it's July 31, but this part doesn't tell me the year.

17   Q.   Okay.

18   A.   I think at the bottom --

19   Q.   Does it say when the appointment was made after this call?

20   A.   Yeah.  It was made on August 3.

21   Q.   And let's turn to -- and do you know who the caller was,

22   who called in on July 31?

23   A.   It was Mr. Birk.

24   Q.   Okay.  And when he called in, if you can tell from the

25   form, how much did he say he owed the IRS?

151
Todd Whalen – Direct

1    A.  It says approximately $2 million.

2    Q.  Are you familiar with the reference here to We the People?

3    Is that something you're familiar with?

4    A.  I am.

5    Q.  What is We the People, as far as you understand it?

6    A.  It's a group that basically helps people in the belief that

7    the tax system is either voluntary or -- or they don't have to

8    file taxes for some reason, or their income isn't income as

9    defined by, you know, the Constitution -- whatever.  They have

10   reasons to help people with tax protesting -- protesting the

11   system.

12   Q.  Now --

13   A.  The government.

14   Q.  I'm sorry.  Are you finished?

15   A.  Protesting the system -- the IRS system of filing.

16   Q.  Now, if I can direct your attention to Exhibit 71.  Back in

17   2006, when clients would first come into your office, is there

18   a form that they would be asked to fill out?

19   A.  Yeah.  That's what this form is.

20   Q.  Okay.

21   A.  That's -- they would fill this out in the lobby, and then

22   this would be given to me right before the meeting.

23        MR. MAGNANI:  And can you please -- Ms. Burgess, can

24   you actually zoom out and then just go to the bottom?

25

Todd Whalen - Direct

1   *BY MR. MAGNANI:*

2   *Q.*  Why is it on -- why -- what's the purpose of this form?

3   Why do you give folks this form when they come in?

4   *A.*  Well, it gives me an idea of what the problem is before I

5   walk in, so I'm -- it kind of saves time.  Helps me understand

6   the situation so that I can give them good advice.

7   *Q.*  If you could just help sort of explain -- what's your

8   understanding of the term "outside the system" or "returning to

9   the system"?  What does that mean, "the system"?  If you know,

10  as you understand it?

11  *A.*  My understanding now -- and it would have been my

12  understanding when I read this initially -- that he had a lot

13  of unfiled tax returns.  He was outside -- hasn't filed and

14  paid taxes, is what that would indicate to me.

15  *Q.*  Could you also sort of translate -- what is the initialism,

16  RO mean?  RO at IRS?

17  *A.*  Revenue officer -- RO would be a revenue officer.  It's a

18  collection agent -- a very powerful collection agent for the

19  Internal Revenue Service.

20  *Q.*  And so -- I'll move on.

21         Can we please -- can we please turn to Exhibit 72.

22         What is Exhibit 72?

23  *A.*  That's an engagement letter.

24  *Q.*  What --

25  *A.*  It's our agreement with the client.  Kind of defines what

1    we're going to do and what their responsibilities are and the

2    fees -- and fees associated with all of that.

3    Q.  And just looking at that sort of first paragraph, does that

4    sort of explain the purpose of the engagement letter?

5    A.  Yes.

6    Q.  And asks the client to sign the letter if they agree?

7    A.  Correct.

8    Q.  Does the letter explain the client's responsibilities?

9    A.  Yes.

10        MR. MAGNANI:  Your Honor, if there is no objection, I

11   would just ask, because this is a long letter, if the witness

12   could read some portions of it.

13        THE COURT:  Leave is granted as requested.

14        MR. MAGNANI:  Thank you, Your Honor.

15   BY MR. MAGNANI:

16   Q.  What is the first responsibility that the letter explains

17   to the client?

18   A.  To provide timely and truthful information.

19   Q.  And so why is that important?

20   A.  Well, the truthful is kind of self-explanatory.  I need

21   good information, or I can't do a good job.  So -- and then

22   timely, the IRS puts deadlines on us, and we have to meet those

23   deadlines.  We can actually -- like, if you're continually

24   promising deadlines and you don't meet them, you can get in

25   trouble, and they can do what is called a bypass.  They can --

Todd Whalen - Direct

1   I mentioned the power of attorney.  So they can bypass the

2   power of attorney and contact the client directly; but they can

3   also file a complaint against us.  And we could literally have

4   our tax license in jeopardy.  So it's pretty important.  Plus

5   we need stuff quickly to get the job done quickly.  And in this

6   case, you know, there were threats of levies and liens, and so

7   timely -- everything has got to move fast when you're dealing

8   with a tax problem.

9        MR. MAGNANI:  Could we please go to the bottom of this

10  page, Ms. Burgess.

11  BY MR. MAGNANI:

12  Q.  And if you could just read the top paragraph that is zoomed

13  in here, please.

14  A.  Sure.  "We will provide questionnaires and worksheets to

15  guide you in organizing the information we need to prepare your

16  tax returns.  You represent that the information you are

17  supplying to us is accurate and complete to the best of your

18  knowledge.  We will not verify the information you give us;

19  however, we may ask for additional clarification on some

20  information.  You have the final responsibility for the income

21  tax returns; and, therefore, you should review them carefully

22  before signing and filing them."

23  Q.  And is it fair to say that this, dut to provide timely and

24  truthful information persists throughout the letter?

25  A.  Yes.

Todd Whalen - Direct

1   Q.   Okay.  I'd like to ask you about the --

2            If you could zoom out, Ms. Burgess.

3            -- about that 7, the last duty that is listed.  What

4   is that last duty?

5   A.   Filing returns timely and paying current estimated taxes.

6   Q.   Why is it important for your clients to timely file and

7   start paying?

8   A.   If we're trying to get any kind of a solution, such as a

9   payment plan, an offer in compromise, any kind of, like,

10  assistance for time, the IRS won't work with you at all -- they

11  won't give you a payment plan, they won't do any solution for

12  you if you're not doing it right now.  So you have to kind

13  of -- you might have problems behind you, but they're not going

14  to let you do it proactively.  So you have to file your tax

15  returns, and you have to pay your taxes going forward or they

16  just won't give you a solution on the back stuff.  They'll just

17  take your stuff.

18  Q.   And the solutions that you're talking about, do those

19  solutions have potential to save clients lots of money?

20  A.   Yeah.

21  Q.   Can you just give an example of -- start with of an offer

22  in compromise.

23  A.   Okay.  An offer in compromise is an IRS term.  And it's --

24  basically, you're proving to the IRS through financial

25  information -- it's their own forms and whatnot -- that this

156

Todd Whalen – Direct

1    person could not pay the entire balance over the course of a

2    reasonable amount of time.  And so it's in everybody's best

3    interests to -- for the IRS or the government to accept less

4    money to satisfy the debt, and then to let the person get back

5    into the system and do it right going forward.

6         MR. MAGNANI:  Ms. Burgess, if you could please go to

7    the second page and sort of zoom on the bottom portion -- a

8    little bit higher than that.  I'm sorry.

9    BY MR. MAGNANI:

10   Q.  And Mr. Whalen, if you could read the paragraph stating

11   "you agree to maintain."

12   A.  Yes.  "You agree to maintain current compliance for all

13   current and ongoing taxes.  This includes filing and paying all

14   payroll tax and income tax returns on time.  Most solutions

15   that are available with the IRS are contingent on filing and

16   paying your taxes properly from this day forward.  In other

17   words, the IRS will not work with you or us on your old

18   problems if new problems are accumulating.  If you have any

19   questions on filing a return properly or need help paying

20   estimated taxes, please bring this to our attention

21   immediately."

22   Q.  Mr. Whalen, do you know if the defendant signed this

23   engagement letter?

24   A.  Can I look?

25   Q.  Of course.

Todd Whalen - Direct

1   *A.*   Yes.  He signed it August 3, 2006.

2   *Q.*   And putting aside all the responsibilities for the client,

3   I want to ask you a question.  For you as the business owner,

4   what is the most important thing in this engagement letter?

5   *A.*   The retainer.

6   *Q.*   What is a retainer?

7   *A.*   That's what we get paid for doing the work.

8   *Q.*   And so what was the retainer in this case?

9   *A.*   Actually, back up a little bit.  Our reputation is

10  critical; but in the engagement letter, it talks about a

11  retainer of $10,000.

12  *Q.*   Now, how do you determine how much of a retainer to request

13  of a client?

14  *A.*   Well, in -- in this case it's -- well, the difficulty of

15  the returns and the number of returns.  And so in this case,

16  there were both federal and state tax returns outstanding.  And

17  in addition to that, he had a business that was incorporated as

18  an S corporation, so we had to do another series of tax

19  returns.  And it's multiple years.  I mean, this is not for one

20  year; it's multiple years.  And so we had to do federal and

21  state corporate tax returns, as well.

22  *Q.*   Now, when folks come into your -- well, let me ask you:

23  Have you had experience with other clients who are coming from

24  outside the system, to use the term?

25  *A.*   A lot of it.  Yes.

158

Todd Whalen - Direct

1    *Q.*  And is it common that those folks have a lot of years,

2    federal and state, this kind of complexity?

3    *A.*  Yeah -- yes.

4    *Q.*  Okay.

5    *A.*  I mean, basically, most people who come in either haven't

6    filed in a long time or they owe a large balance.  And a lot of

7    times when people haven't filed, they also owe a large balance;

8    so that's the majority of our work.

9    *Q.*  Now, after Mr. Birk signed the engagement letter on

10    August 3 -- well, actually, let me ask you this question:

11          Can we please bring up Exhibit 73 -- I'm sorry,

12    Ms. Burgess -- 73.  Thanks.

13          What -- what is this?

14    *A.*  That is a power of attorney.

15    *Q.*  And this is the thing you discussed before, about giving

16    you authorization to represent the client before the IRS?

17    *A.*  Yes.  This is -- to be on a power of attorney, that's where

18    I mentioned you have to be a CPA, an enrolled agent, or an

19    attorney.  And this is -- this is what the client signs to let

20    both us and the IRS know that it's okay if we do business on

21    their behalf.

22    *Q.*  And turning to the second page, can you please tell us who

23    signed this document on behalf of your firm?

24    *A.*  My firm?

25    *Q.*  Yep.  Maybe it's easier to read the text rather than the

Todd Whalen - Direct

1   scribbles.

2   A.  It's myself, Dale Erikson, and Francis Wren (ph).

3   Q.  Are those people that worked for you back then?

4   A.  Yes.

5   Q.  Now, what date did you sign this?

6   A.  August 8, 2006.

7   Q.  Did you also meet with the defendant that day, if you

8   remember?

9   A.  I would have met the client pretty close to this, but I

10  don't know -- it's possible I met him the day before.  I mean,

11  within -- I probably met with him within 48 hours of this.

12  Q.  Well, let me direct your attention -- and we can pull this

13  up to the jury too -- to Exhibit 74.

14         Could you please tell us what this is.

15  A.  Okay.  This is my notes of the meeting of when I met with

16  him I believe the second time, when he engaged us.  That is

17  dated August 8, 2006.

18  Q.  And then -- and we don't have to pull this up for the jury

19  right now.  But also, can you tell -- and I would direct your

20  attention to Exhibit 75, which is also in evidence.  Can you

21  tell when the defendant made payment of that $10,000?

22  A.  August 9, 2006.

23  Q.  So it was one day after this meeting?

24  A.  Yes.

25  Q.  Now, when you meet with a client who you know going into

Todd Whalen - Direct

1   the meeting has been affiliated with We the People or a similar

2   group, what are the important things for you to pay attention

3   to?

4   A.   Well, one, that they're not still trying to do that.   If

5   they really believe that the tax system is illegal or income is

6   not income for some reason, I can't help them.   So that's one

7   of my first criteria, is, you know, do they -- do they want to

8   get back into the system?   If they do, I can help them.   But if

9   they still think that, you know, they want to do the tax

10  protestor type arguments, I can't help them.   Can't help them.

11  Q.   You said about two-thirds of what your firm does is

12  representation of clients before the IRS; right?

13  A.   Uh-huh.   Correct.

14  Q.   If you're representing a client, why can't you just

15  represent them the way they want to be represented before the

16  IRS?

17  A.   I could get in trouble.   I mean, it's -- you can't -- there

18  is penalties for taking those positions; and if you get

19  penalties, your license could be in jeopardy.   So we simply

20  don't help people who are continuing -- but if they change

21  their mind and they want to get back in the system, we can help

22  them.   But if they're still, you know, believing that the tax

23  system is voluntary, the tax system is not legal, the tax

24  system -- for some reason they don't have to file, then we just

25  simply can't help them.

161

Todd Whalen - Direct

1          MR. MAGNANI:  So if we could have Exhibit 74 again,

2     please, Ms. Burgess.  If you could zoom in sort of on the top

3     third.

4     BY MR. MAGNANI:

5     Q.  Now, can you please read that second paragraph, starting

6     with "they."

7     A.  "They see the futility of arguing the legality of taxes and

8     now want to get back into the system."

9     Q.  And so that's important to you, as one who is taking on a

10    client?

11    A.  Yeah.  Yes.

12          MR. MAGNANI:  Now, if we could please go to the bottom

13    of this letter -- or this note.

14    BY MR. MAGNANI:

15    Q.  What does it mean when you say "taxes first, then

16    solution"?

17    A.  Well, the IRS will not give you a solution if there is

18    outstanding tax returns.  They want to get all the tax returns

19    filed so they know exactly how much is out there before they

20    offer any kind of a solution to you.  So without taxes being

21    filed, basically, for the last six years, is the current rule,

22    if you -- if you don't file the last six years, they won't do a

23    payment plan, they won't do an offer, they won't do any kind of

24    solution.

25    Q.  So do you explain that to clients?

Todd Whalen – Direct

1    A.   Yeah.

2    Q.   Now, also, just above that, there is a reference to

3    QuickBooks.  Can you just tell the jury what QuickBooks are.

4    A.   QuickBooks is a bookkeeping program that -- accounting

5    program -- like, we use that in our office.  That's how we

6    track receivables, payables.  It looks kind of like a check

7    register.  You enter it in, and it will spit out financial

8    statements so you can -- you know, it's information that makes

9    it easier for a business to give financial information that's

10   required to prepare tax returns.

11   Q.   And what are organizers?

12   A.   Organizers are -- those are our worksheets that we give to

13   a client.  And it has questions on it like, you know, what kind

14   of income information do you have?  What kind of transactions?

15   Have you moved?  Do you owe any other entity money?  It's

16   basically -- and it's -- so it helps us know if there is other

17   issues outside of the financial information they gave us, so we

18   know to inquire, oh, you have dependents?  I didn't see that.

19   So it just helps gather -- it helps us gather information so we

20   can do a good job preparing the taxes.

21   Q.   The information that you're trying to gather, I assume is

22   this all just because -- because it has tax implications or

23   potentially has tax implications?

24   A.   Yes.  For instance, if somebody has moved -- there is a

25   question of, Have you moved this year?  And they may not --

Todd Whalen - Direct

1    there is not a document, really, that would let us know.  Yet

2    there could be tax consequences to moving that are favorable,

3    so we want to know about that kind of thing.  There are lots of

4    questions like that.

5    Q.  Is the organizer kind of like an interview but through

6    paper in some ways?

7    A.  In some ways, yeah.  In other ways it's like, how much is

8    your income?  What are your business expenses?  Some things are

9    questions, and some things are fill in the blank so that we

10   know what kind of expenses are out there, what kind of income

11   is out there.

12   Q.  Now, after -- in going forward with this plan, the taxes

13   first plan, who did you set up Mr. Birk to meet with in order

14   to do the taxes first part of the plan?

15   A.  Dale Erikson.

16   Q.  Who is Dale Erikson?

17   A.  Dale Erikson is the other gentleman listed on the power of

18   attorney, and he's a very skilled tax preparer.  He's better at

19   taxes than I, am.  So he was the one that worked on the tax

20   returns.

21   Q.  Now, after you sort of passed this off to Dale, did you --

22   and I --

23          Let's pull up Exhibit 75.

24          After you sent this to Dale to do the taxes, did you

25   continue to have some involvement with the case?

Todd Whalen - Direct

1   A.   I did.

2   Q.   And could you -- you don't have to read specific lines.

3   I'm only bringing this up in case it helps you.  But,

4   basically, if you could just tell the jury, what is the gist of

5   your role after you set Mr. Birk up with Dale?

6   A.   I called the revenue officer, the collection agent, that

7   was assigned to the case by the government and asked him, you

8   know, where are we at on this?  What is going on?  Can we have

9   time?  And then after that, I have a list of the things that he

10  had requested.  And then after that -- shortly after that --

11  because there was a deadline on there -- we filed an appeal,

12  called a collection due process appeal.  And then after that --

13  you know, really -- then we just worked with Mr. Bass, which

14  was mostly me.

15  Q.   I'm sorry.  When you say Mr. Bass, is that the collections

16  officer?

17  A.   That was the revenue officer.  Yes.

18  Q.   And is Exhibit 57 a copy of correspondence that Mr. Bass

19  sent to you?

20  A.   Yes.

21  Q.   Okay.  In addition --

22  A.   Now --

23  Q.   Please.

24  A.   So the first page is a cover page directed to me, and it's

25  a copy of what he had requested.  And the next page, it's a

1    summary of what he had requested from Mr. Birk.

2    Q.   Is this basically Revenue Officer Bass just trying to get

3    you up to speed, sending you the things that he requested of

4    Mr. Birk?

5    A.   Well, he expects that I would provide these items.

6    Q.   Is that your responsibility now that you're power of

7    attorney?

8    A.   Right.  Yeah.  At that point he really can't contact

9    Mr. Birk.  He has to talk with us.  So this is now no longer

10   what he requested -- is requesting from him, it's now what he's

11   requesting from us, and it's our job to get it from him.

12   Q.   Okay.  Now, in addition, just -- and I don't know if it

13   helps, sir -- would it be fair to say that in addition, you

14   also sort of maintain client relationships periodically?

15   A.   That's true.  Yes.

16   Q.   And on Exhibit -- you know, call Mr. Birk and speak to him

17   periodically, about every month or so?

18   A.   Yeah.  Yes.  That's in addition to Dale.  Dale is probably

19   talking to him a lot more about getting information for his

20   taxes.  And then I'm kind of updating him, well, the IRS said

21   this, the IRS wants this.

22   Q.   Now, let me ask you this:  If during those conversations --

23   and I'm not just necessarily talking about Mr. Birk, but if you

24   had any client who during periodic conversation with you asked

25   you to basically take a different tack with the IRS and to

Todd Whalen - Direct

 1   explain that they don't have to file taxes, something like

 2   that, what would you have done?

 3              MS. BECK:  Objection.  401.  402.

 4              THE COURT:  Relevance?

 5              MS. BECK:  Correct.

 6              THE COURT:  Response.

 7              MR. MAGNANI:  In the absence of this witness having a

 8   specific memory of calls with Mr. Birk, I think that his

 9   general practice of how he would handle what he describes as

10   the types of clients he often had would be probative of what he

11   did with Mr. Birk.

12              THE COURT:  Well, then, frame it so it's clearly

13   admissible under Rule 406.

14              MR. MAGNANI:  Sure.

15   BY MR. MAGNANI:

16   Q.  Do you have a specific memory of these calls, these

17   periodic calls with Mr. Birk?

18   A.  No.

19   Q.  But have you -- in the course of your experience and

20   practice working with folks who have peculiar beliefs, have you

21   developed a general practice with how you deal with those

22   folks?

23   A.  Yes.

24   Q.  And can you just describe what that practice is.

25   A.  It's okay to ask a question.  If somebody asks me, oh, can

Todd Whalen - Direct

1    we do this?  Of course.  But if they're saying, can we change

2    directions and start claiming that the tax system is not legal,

3    that we don't have to file, tax protester arguments, I would

4    answer that I can't do that.  And if they wanted to continue

5    doing that, I couldn't help them.  We would -- if that was

6    their desire, we would have to withdraw from the case.

7    Q.  Have you ever found yourself in a situation where you have

8    to talk someone off the ledge, so to speak?

9    A.  Yes.

10   Q.  If you can't do that, what do you do?

11   A.  Withdraw.  If somebody wants us -- I mean, we just can't do

12   it.  I mean, there -- you know, like I said, there are specific

13   penalties for filing what they would now call frivolous

14   arguments, or back then it was tax protester arguments.  Like

15   if you filed an appeal, you can get fined and then even

16   disbarred if you're making tax protester or frivolous arguments

17   before the IRS.

18   Q.  Now, would clients often bring in correspondence that the

19   IRS would send them for you to review or just to be added to

20   their file?

21   A.  Sure.  Yes.

22   Q.  And pointing your attention to Exhibit 76, can you just

23   sort of describe for the jury what this is.

24   A.  Yes.  This is -- it's the IRS rejecting a tax return that

25   he had -- that was filed by Mr. Birk -- not us -- saying

Todd Whalen – Cross

1   that -- you know, they filed the tax return that has no legal

2   basis.  Therefore, it says they won't honor the claim for

3   refund.  He filed a tax return asking for a refund; and this is

4   saying, no, we're not going to give it to you, because there is

5   no legal basis for the position you took.

6   Q.  How much was the refund requested in these tax returns?

7   A.  You know, I -- I'll need a minute.  I don't see it in here.

8   Q.  And I'll just direct your attention to the top of the first

9   page.

10  A.  Oh, yes.  I'm sorry.  Amount of claim -- let's see -- there

11  is two claims, one for $52,644.38 and one for $18,365.95.

12  Q.  And after you took Mr. Birk as a client, did your firm

13  fight on his behalf -- advocate on his behalf to have these

14  $70,000 refunds honored by the IRS?

15  A.  No.  We filed proper returns.

16           MR. MAGNANI:  No further questions.

17           THE COURT:  Cross-examination for Mr. Birk.

18           Ms. Beck.

19           MS. BECK:  Thank you.

20           THE COURT:  You're welcome.

21                        **CROSS-EXAMINATION**

22  BY MS. BECK:

23  Q.  Good morning, Mr. Whalen.  How are you?

24  A.  Pretty good.  A little nervous.  Doing pretty good.

25  Q.  So you don't accept clients who want to go forward with

Todd Whalen - Cross

1   their tax protester beliefs?

2   *A.*   Correct.

3   *Q.*   And you could get in trouble if you supported

4   unconstitutional tax arguments; right?

5   *A.*   Correct.

6   *Q.*   When Mr. Birk first contacted your firm, he spoke with an

7   administrative staff person named Sue; correct?

8   *A.*   Yes.

9   *Q.*   And she went over a script with him about why he was

10   contacting your office?

11   *A.*   Correct.

12   *Q.*   And she wrote up notes based on her conversation with him?

13   *A.*   Correct.

14   *Q.*   And those notes included that he was involved with the We

15   the People movement?

16   *A.*   Correct.

17   *Q.*   And Tax Honesty movement?

18   *A.*   Correct.

19   *Q.*   And the purpose of having Mr. Birk fill out some

20   preliminary paperwork with your office is so that you have a

21   sense when you go in and meet with a client about what their

22   needs are; right?

23   *A.*   Yes.

24   *Q.*   All right.

25   *A.*   Can I refresh my memory on one thing?  Can I look at the

Todd Whalen - Cross

1    tax -- you talked about Sue's form.  Can I look at that for a

2    second?

3    Q.  Sure.

4           If you don't mind bringing up Government's 70.

5    A.  Okay.  Thank you.

6           *MS. BECK:*  Mr. Cohen, could we bring up Government's

7    70.

8    *BY MS. BECK:*

9    Q.  I just want to give the jury an opportunity to look at what

10   you're looking at.

11   A.  Sure.  Okay.

12   Q.  So Mr. Birk contacts your office on July 31; right?

13   A.  Correct.

14   Q.  And Sue takes some notes that include that Mr. Birk is

15   involved with Tax Honesty movement, We the People; right?

16   A.  Correct.

17   Q.  Thank you.

18          So, Mr. Whalen, when you met with Mr. Birk, you knew

19   about that?

20   A.  Yes.

21   Q.  Okay.  And he ultimately hired your firm to prepare his tax

22   returns; right?

23   A.  Yes.

24   Q.  And you required a minimum retainer of $10,000 for that

25   work?

Todd Whalen - Cross

1    *A.*   Correct.

2    *Q.*   And he paid that retainer?

3    *A.*   He did.

4    *Q.*   And then you assigned Dale Erikson to complete the returns?

5    *A.*   Correct.

6    *Q.*   Okay.  And you testified that he's a skilled tax preparer.

7    You think that he's more skilled than you are at doing that, at

8    this point?

9    *A.*   Yeah.

10   *Q.*   Okay.  The returns that he prepared for Mr. Birk had a

11   stamp on them that said "SRF protest."  Are you familiar with

12   that stamp?

13   *A.*   SFR protest?

14   *Q.*   Yes.

15   *A.*   SFR protest.  Yes, I am.

16   *Q.*   That's a stamp that your firm created?

17   *A.*   Uh-huh.

18   *Q.*   Right?  Is that a yes, for the court reporter?

19   *A.*   Yes.

20   *Q.*   Okay.  And that stamp was something that your firm placed

21   on returns; right?

22   *A.*   Correct.

23   *Q.*   Okay.  It was the practice of your firm to stamp all

24   returns submitted after substitute for returns were created as

25   SFR protests; right?

172
Todd Whalen - Cross

1    *A.*  Correct.

2    *Q.*  Okay.  And we've talked a little bit about SFRs during the

3    course of this trial, but I just want to make sure we're on the

4    same page about what that means.  So when I say "substitute for

5    return," I'm talking about the returns that the IRS prepares

6    because they don't have returns paid by the taxpayer; right?

7    *A.*  Correct.

8    *Q.*  Okay.  So when you're preparing returns that are in

9    response to those substitutes for returns, you put an SFR

10   protest stamp on those returns; right?

11   *A.*  Right.

12   *Q.*  Okay.  And that stamp was meant to designate that the IRS's

13   substitute for return is being contested; right?

14   *A.*  Right.  The reason we place that on there is so that it

15   doesn't get posted as a duplicate return, so that they know,

16   you know, this is basically the client's originally filed

17   return.

18   *Q.*  Okay.  It doesn't have anything to do with whether or not

19   somebody's a tax protester?

20   *A.*  Right.

21   *Q.*  Okay.  Because, again, you wouldn't work with tax

22   protesters?

23   *A.*  Correct.

24   *Q.*  After the tax returns are completed by Mr. Erikson,

25   Mr. Birk revoked the power of attorney that he signed; right?

Todd Whalen - Cross

1   A.   I do not know if he revoked it or we revoked it; but, yes,

2   the power of attorney was revoked.

3   Q.   So you no longer had the right to work on Mr. Birk's case;

4   right?

5   A.   We no longer had the right to contact the revenue officer

6   or the IRS.  We can still contact -- sometimes we'll revoke a

7   power of attorney, for instance, if things aren't timely -- I'm

8   not saying in this case; I'm just saying in general -- if

9   things weren't moving fast enough and I felt like we were in

10  danger of missing the IRS deadlines, we might revoke the power

11  of attorney but continue working with the client to give the

12  IRS the information.  But then it's on the client's shoulders

13  to meet the deadlines now, because we couldn't do it.  I mean,

14  that's a possibility.  I'm not saying that happened on this

15  case.  I don't know.

16  Q.   Sure.

17       THE COURT:  Counsel, excuse the interruption; but we

18  have arrived at the noon recess for this day of trial.

19       Mr. Whalen, I respectfully request and require that

20  you return to continue and complete your testimony in this

21  trial at 1:15 p.m., as measured by the courtroom clock.  Can

22  you and will you do that?

23       THE WITNESS:  Sure.

24       THE COURT:  You're excused until, then, and may stand

25  down.

Todd Whalen – Cross

1          Counsel, you may be seated at your convenience.

2          *MS. BECK:*  Thank you.

3          *THE COURT:*  Ladies and gentlemen of the jury, it's

4    lunchtime, over which you shall not be sequestered.  But two

5    things:  First, store your notetaking materials face down in

6    your seats; and be ever mindful of those critically important

7    rules that govern you as jurors in this trial.

8          We are in recess until 1:15 p.m.

9          (Recess at 11:57 a.m.)

10          (In open court at 1:18 p.m.)

11          *THE COURT:*  Good afternoon, and thank you.  Again, as

12    you choose, remain standing or be seated for our jury.

13          (Jury in at 1:19 p.m.)

14          *THE COURT:*  Thank you.  Madam Clerk.

15          Ladies and gentlemen, please be seated.

16          Ladies and gentlemen of the jury, good afternoon.

17          *JURY:*  Good afternoon.

18          *THE COURT:*  Again in my best judicialese, away we go.

19          Ms. Beck, you may resume your cross-examination.

20          *MS. BECK:*  Thank you, Your Honor.

21          *THE COURT:*  You're welcome.

22    *BY MS. BECK:*

23    *Q.*  Mr. Whalen, we left off talking about what happened after

24    the tax returns were prepared by your firm.

25    *A.*  Okay.

175

Todd Whalen - Redirect

1   *Q.*  So Mr. Erikson prepared Mr. Birk's tax returns; right?

2   *A.*  Yes.

3   *Q.*  And then Mr. Birk filed those returns?

4   *A.*  I believe so.

5   *Q.*  Okay.  Your firm did not file those returns?

6   *A.*  I believe that's correct.

7   *Q.*  And you did not represent -- your firm did not represent

8   Mr. Birk at a collection due process hearing?

9   *A.*  That's correct.

10  *Q.*  Or have any involvement with Mr. Birk after the returns

11  were prepared?

12  *A.*  I believe that's correct.

13          *MS. BECK:*  Your Honor, I have no further questions for

14  this witness.  Thank you.

15          *THE COURT:*  Very well.  Thank you.

16          Redirection examination for the Government?

17          *MR. MAGNANI:*  Could I just have one moment, Your

18  Honor?

19          *THE COURT:*  You may.  Thank you.

20                    **REDIRECT EXAMINATION**

21  *BY MR. MAGNANI:*

22  *Q.*  Mr. Whalen -- could we please pull up Exhibit 75.

23          Mr. Whalen, if I could direct your attention to the

24  second page of this exhibit.  And my only question is, can you

25  tell from looking at this exhibit how much of a balance

Todd Whalen - Redirect

1  remained of that $10,000 on January 3, 2007?

2  A.  January 3?

3  Q.  Yes, sir.

4  A.  $467.

5  Q.  So does that mean --

6  A.  Oh, wait.  I'm sorry.  We worked beyond the retainer, and

7  he owed us $467 on January 3.  Of 2007?

8  Q.  Yes, sir.

9  A.  Okay.  Yeah.  That's a balance due to us, and then he paid

10  that.

11  Q.  And so does that sort of mean that the $10,000 paid at

12  first was kind of eaten up by January 3?

13  A.  Correct.

14  Q.  And did the defendant ever make any more payments after

15  that?

16  A.  From what I can see, he paid on January 30th, $428; and

17  then we gave a little discount.

18          MR. MAGNANI:  Okay.  Thank you.  No further questions.

19          THE COURT:  Very well.  May Mr. Whalen be excused and

20  released from subpoena?

21          Any objection by the Government?

22          MR. MAGNANI:  None from the Government, Your Honor.

23          THE COURT:  Or by Mr. Birk?

24          MS. BECK:  No, thank you, Your Honor.

25          THE COURT:  Mr. Whalen, you are both excused and

Dale Erikson – Direct

1    released from subpoena with our thanks.

2         *THE WITNESS:*  Thank you.

3         *THE COURT:*  You're welcome.

4         And when prepared, the Government may call its next

5    witness.

6         *MR. MAGNANI:*  Thank you, Your Honor.  At this time the

7    United States calls Dale Erikson.

8         *THE COURT:*  And you're welcome.

9         Mr. Erikson, good afternoon.  If you would please make

10   your way forward to come stand in this open area in front of my

11   bench.

12        And there is fine, sir.

13        If you'll please face me and raise your right hand to

14   be sworn.  Thank you.

15        May I have your attention in the courtroom.

16            (**DALE ERIKSON, GOVERNMENT'S WITNESS, SWORN**)

17        *THE COURT:*  Thank you.  Please be seated in that

18   witness stand.

19                         **DIRECT EXAMINATION**

20   *BY MR. MAGNANI:*

21   *Q.*  Good afternoon, Mr. Erikson.

22   *A.*  Hello.

23   *Q.*  Could you please just introduce yourself to the jury by

24   describing your educational background.

25   *A.*  My name is Dale Erikson.  My undergraduate is from the

178

Dale Erikson - Direct

1    University of North Dakota.  I have a bachelor's degree in

2    accounting.  And then I left North Dakota and went to

3    University of Denver to get a master's in accounting.  And

4    then -- it's hard to remember all the years -- ten years later

5    I went back and got a master's of finance from University of

6    Colorado Denver.  And then I was doing taxes, I wanted to learn

7    more about the law, obviously; so I went and got a master's of

8    taxation at the University of Denver, as well.

9    *Q.*  Can you also just give the jury a little bit of your

10   professional background and what you did with all of those

11   master's degrees.

12   *A.*  Well, after I graduated from the University of Denver with

13   a master's of accounting in 1990, I worked for seven years with

14   the firm called Ernst & Young.  And I audited major

15   corporations, like the Coleman Company was one of my clients.

16   And then I spent maybe two to three years working in controller

17   type roles for one company in Longmont that was publicly held,

18   and then one -- a start-up down in Colorado Springs.  And then

19   I started Advanced Tax Solutions in probably January or

20   February of 2002, and I worked there through June of 2017 --

21   June, July, 2017.  Then I worked for a firm called Taylor

22   Roth -- and I did taxes at Advanced Tax Solutions and tax

23   resolution.  I worked for Taylor Roth, which we work with

24   nonprofit organizations, for two years.

25   *Q.*  And just in case some of the jurors are not familiar, can

Dale Erikson - Direct

1   you describe what Ernst & Young is?

2   *A.*  Well, there is -- I guess there is four left of major

3   accounting firms that have I guess you'd call worldwide

4   operations, so they can work with major corporations in case

5   they need to take an inventory in China or Japan, wherever.

6   They're just very large accounting firms that have, you know,

7   specialties in a lot of different areas, auditing, tax,

8   everything.

9   *Q.*  How long have you -- sorry.  Do you have any professional

10  licenses in addition to all of your degrees?

11  *A.*  Well, I have -- I am a CPA; I've been a CPA since 1989.

12  I -- I did -- I was a CMA at one point in time -- that's

13  certified management accountant -- and I think I've let that

14  lapse since.  I don't even know if that organization -- that

15  designation is around anymore.  And I've had some other ones

16  that I've just -- I like education, so -- associate in risk

17  management is more in the insurance side.  Just -- I haven't

18  been asked that question.  I think that's it.

19  *Q.*  And this jury may already be familiar with CPAs, but what's

20  a CMA?  You mentioned that.

21  *A.*  You know, certified public accountant, they work with the

22  public, audit corporations, things of that nature, do taxes.

23  Certified management accountant is more -- think of a -- an

24  accountant in the corporation that handles, you know, the

25  inventory, accounts receivable, the day-to-day operations of a

180

Dale Erikson - Direct

1    corporation or a smaller business; and that's more of a

2    certified management accountant.

3    Q.  And how does one become a certified management accountant?

4    A.  You know, there is probably some education background that

5    you need to take the exam; and then there is an exam that you

6    take.  When I took it, it was a day-long course -- you know,

7    it's so hard to remember.  I took it back in 1991.  It could

8    have been two and a half days.  The CPA was two and a half days

9    or three days when I took it.  But it was at least one day,

10   maybe a couple of days.  And then it's graded, you know -- it's

11   not graded right there.  You hear back in a couple of months.

12   Q.  How did you do on the CMA exam?

13   A.  I did -- I won an award on that for -- a bronze medal, so

14   I --

15   Q.  Does that mean you had one of the best scores in the state?

16   A.  It was -- it was national, and I -- I did okay.  I did

17   well, so --

18   Q.  Now I'd like to ask you, did you ever have a client by the

19   name of Lawrence Martin Birk?

20   A.  I did.  When I worked at Advanced Tax Solutions, Mr. Birk

21   came in I believe in July or August of 2006, I believe.

22   Q.  And so understanding that was a long time ago, would you

23   recognize him if you saw him again?

24   A.  I believe it's the gentleman right there, in -- honestly,

25   if we passed on the street, I wouldn't.  It's been so long.

1    That has been in the back of my mind.

2    Q.  But you recognize him in court today?

3    A.  Yes.  Yes.

4    Q.  Now, do you remember what tax year -- can you just

5    describe, what did you understand your job to be when you got

6    Mr. Birk as a client?

7    A.  Well, in 2006, I guess -- I think there was three CPAs

8    there, maybe four; but I was more on the tax return preparation

9    side.  You know, apart from helping folks with IRS and State of

10   Colorado tax matters, we did a lot of tax returns there too for

11   continuing clients.  So I did mostly tax returns, and I did a

12   little bit of resolution work.  It wasn't -- like I've said,

13   it's not my cup of tea; so I did primarily tax return

14   preparation.

15   Q.  Do you have a memory of working on these particular

16   returns?

17   A.  I do.  I mean, I've had four months to think about it; so I

18   do remember working on them.  And I do.

19   Q.  And when you say you have had four months to think about

20   it, what are you referring to, just so it's clear to everybody?

21   A.  Well, when I -- when I understood that I was to testify at

22   the grand jury --

23   Q.  Well --

24        MS. BECK:  Objection.  401.  402.  403.

25        THE COURT:  Well, I think we're moving away from that.

1          MR. MAGNANI:  I withdraw that --

2     BY MR. MAGNANI:

3     Q.  Did we meet four months ago?

4     A.  No.  No.  I was contacted by a gentleman from the IRS four

5     months ago.

6     Q.  Okay.  Actually, I'll just withdraw this line of

7     questioning, actually.

8          Can I ask you, sir -- and I might need Ms. Roberson's

9     help -- there is a binder next to you.  If I could show the

10    witness the first series, because I want to show the witness

11    Exhibits 2 through 10.  So the lower numbers, please.

12         Mr. Erikson, please take your time; but I would like

13    you to look at Exhibits 2 through 10.  And when you're done

14    looking through all of them -- well, let me ask you the

15    question now so you know what to look for.

16         Did you prepare Exhibits 2 through 10?  But please,

17    you know, take a look through them.

18    A.  Sure.  Just the tax return itself?

19    Q.  Yeah.  Well, let me ask you:  Can you tell just from

20    looking at the first one, what is Exhibit 2?

21    A.  Well, it says -- it's a blue page.  It says "United States

22    of America, certificate of official record" and --

23    Q.  You didn't -- yeah, the next page?

24    A.  Sorry.

25    Q.  That's okay.

Dale Erikson - Direct

1   *A.*   It says "1998 1040 SFR protest."  It's a tax return.

2   *Q.*   Okay.

3   *A.*   And then my name is on the bottom of page 2.

4   *Q.*   So did you prepare that tax return?

5   *A.*   Yes.

6   *Q.*   And can you just similarly inspect the first couple of

7   pages of Exhibits 3 through 10.  And when you're done, if you

8   could tell the jury whether or not you prepared those tax

9   returns.

10  *A.*   Each one at a time, or all of them --

11  *Q.*   Up to you, sir.

12  *A.*   Okay.  No. 3 is a 1040X for 2000 -- 1998.  That's an

13  amended return; and that is signed by me, December 20 of 2016.

14  And No. 4 is -- that is a 1999 original return.  It's a 1040;

15  and that is signed by me, as well, in November of 2006.  And

16  then No. 5 is 2000.  That's -- it's a 1040 return, and that is

17  signed by me in December of 2006.  And then 2001 is -- No. 6 is

18  2001, and that's signed by me in December of 2006.  And --

19          How far do I go, til 9?

20  *Q.*   Through 10, please.

21  *A.*   10.  Okay.  No. 7 is 2002, original -- 1040 return, and

22  that's signed by me in December of 2006.  And then No. 8 is

23  2003; and that is signed by me, as well, December of 2006.  And

24  then No. 9 is a 2004 return; and that is signed by me in

25  December of 2006, as well.

184

Dale Erikson - Direct

1    Q.   And No. 10?

2    A.   10?  Sorry.

3    Q.   That's okay.

4    A.   That's a 2005 return; and that was signed by me in

5    December, as well, 2006.

6    Q.   Okay.  So having reviewed all of those exhibits, are you

7    confident that you prepared the tax returns found in Exhibits 2

8    through 10?

9    A.   Yes.  That's my signature.

10   Q.   Now, I know that you said you mostly did tax return

11   preparation.

12   A.   Uh-huh.

13   Q.   Did you do a little bit of work sort of with the IRS, as

14   well?

15   A.   I did.  I did a little bit of resolution work.  I don't

16   know if I said earlier, it's not my cup of tea; but it was

17   really helpful.  But you know, I was truly -- it was gratifying

18   being able to help people that came in.  A lot of people get

19   notices in the mail that they made a mistake on the tax return,

20   especially back during these years.  You know, folks sold some

21   stock, and they didn't know how to put it on their tax return,

22   the IRS system was very good about sending notices out.  And

23   you could really make somebody's day by fixing things.  You

24   know, and tax problems just kind of ran the gamut of fixing

25   things, helping people get into payment plans, you know, so

185

Dale Erikson - Direct

1    they don't have the burden.  But I didn't -- I was more in the

2    background doing work.  I didn't enjoy all the negotiation, if

3    you will, with the IRS and that piece of it.

4    Q.  So do you just mean you preferred to focus on the tax

5    returns?

6    A.  Yeah, that was my --

7            MS. BECK:  Objection, leading.

8            THE WITNESS:    -- Most of my work.  And I did a little

9    bit of resolution work.  Smaller dollar amounts, smaller cases,

10   you know, in terms of years.  That if folks haven't filed for a

11   few years, I can't remember where we split up the different

12   folks that we met that came in the office.  But I think I did

13   more -- you know, we had some guidelines of two years unfiled

14   and then $25,000 or less.  I can't remember the exact figures,

15   but they were smaller cases.

16   BY MR. MAGNANI:

17   Q.  Where did this case fall on the scale of big case, small

18   case, in your experience at Advanced Tax at that time?

19   A.  Well, I think, you know -- Todd met with Mr. Birk when he

20   came in.  And, you know, there is a sheet -- I don't know if

21   it's in here -- that folks fill out when they come in.  And I

22   think when he called into the office, the lady that answered

23   the phone, she kind of screened folks on who they would need.

24   So it was on the higher end, so I wouldn't -- I didn't meet

25   with him initially.

1          *MR. MAGNANI:*  If we could pull up Exhibit 78, please.

2          *THE WITNESS:*  78?

3     BY MR. MAGNANI:

4     *Q.*  Mr. Erikson, this will also be shown on your screen, so

5     whatever is more convenient for you.

6     *A.*  Oh, okay.

7     *Q.*  But I would flip in the binder, since we'll be in that

8     range from now on.

9     *A.*  Sure.  Okay.

10    *Q.*  So just -- what is Exhibit 78?

11    *A.*  That is signed by me.  That is a letter I would have

12    written, dated October 2, 2006.

13    *Q.*  And --

14    *A.*  I --

15    *Q.*  I'm sorry.  Did you finish your answer or --

16    *A.*  Yeah.  I mean, I don't have what's behind it, the

17    attachments.  But I'm kind of left with the impression that

18    Oklahoma City Appeals Office was handling this matter.  And,

19    you know, we like to work direct -- face to face with appeals.

20    They're kind of -- within the IRS, kind of a buffer between the

21    taxpayer and the collection department.  You can bring your

22    case to appeals and have kind of an independent person do it.

23    So we always like to have it brought locally because -- so we

24    can meet people face to face across the table.  Found that more

25    efficient and effective than calling somebody on the phone.

Dale Erikson - Direct

1  *Q.*  And just to ask a simple question, what were you trying to

2  do in sending this letter?

3  *A.*  Well, I guess it was in the appeals department in Oklahoma

4  City; so we were asking for it to be transferred to Denver.

5  *Q.*  Do you know if it was transferred to Denver?

6  *A.*  Yes.  Yes, I do.  I think it was Mike Jeka.

7  *Q.*  Now, in your work on this case, did you have an opportunity

8  to communicate with Mr. Birk?

9  *A.*  Yeah.  Now -- I remember meeting Mr. Birk one time, and --

10  but there may have been a second, but it's just so hard to

11  remember.  I remember once, though, for sure.

12  *Q.*  Okay.

13  *A.*  But there -- I may have met him when he initially came in

14  and met with Todd.  There may have been an introduction at the

15  end of their meeting about, you know, Dale will be working on

16  your taxes; but it's just so hard to remember.

17  *Q.*  But just to understand it --

18  *A.*  Uh-huh --

19  *Q.*  -- are you sure you met him at least once or you're not

20  sure.

21  *A.*  I'm sure on that.  Yeah.

22  *Q.*  Besides meeting face to face, how else did you communicate

23  with Mr. Birk?

24  *A.*  By phone and email.  You know, this is back 13 years ago;

25  we may have faxed things back and forth.  I don't remember.

Dale Erikson - Direct

1        MR. MAGNANI:  Okay.  Can you please pull up

2   Exhibit 79, please.

3        THE WITNESS:  79.  Okay.

4   BY MR. MAGNANI:

5   Q.  Now, would you also send him letters sometimes?

6   A.  Yes.  Yeah.  Yeah.  You know, when we sent things for folks

7   to file -- you know, bear in mind, he was in Lake George.  I

8   think that's down near Colorado Springs.  I'm not sure where it

9   is, but it's not like you're driving in from Golden.  It's a

10  ways away.

11  Q.  And what were you essentially trying to communicate in this

12  letter?

13  A.  As I understood it, there was an IRS representative out of

14  Fort Collins named Fred Bass; and we were sending some returns

15  to him.  And a substitute for return -- I think maybe I alluded

16  to when we were going through the tax returns, there was an SFR

17  stamp on it.  That meant substitute for return.  We were

18  asking -- sometimes if the person doesn't file a return, the

19  IRS will file one for you on your behalf, based on the

20  information they have, W-2s, stock sales, and things of that

21  nature.  And what you can do is file an originally prepared

22  return, you know, claiming proper deductions, things of that

23  nature, and ask the IRS to substitute that in return for the

24  return that they prepared.

25  Q.  So did you prepare some of those returns that followed

1    SFRs, or substitute for returns?

2    A.   Yeah.  This letter says 1998 and 1999 are SFR protests.  So

3    those returns I would have prepared.  Sure.

4    Q.   And then can you just -- just pointing your attention to

5    the second to last paragraph of this letter, why were you -- if

6    you remember, why were you concerned about the timeliness with

7    regard to the other returns?

8    A.   Well, you know, I don't know exactly when he came in, if it

9    was July or August.  But, you know, that was three months of

10   getting those done.  And, you know, I -- sometimes when folks

11   haven't filed in a while, you kind of have to, you know,

12   encourage them along to get -- we've got to keep this case

13   moving, because, you know, the IRS doesn't wait forever.  If we

14   moved it from Oklahoma to Denver, they're going to set

15   deadlines of getting information and returns filed; so I was

16   trying to meet deadlines, I'm sure.

17          MR. MAGNANI:  If we could please pull up Exhibit 76,

18   and just zoom in to the top.

19   BY MR. MAGNANI:

20   Q.   And --

21   A.   Okay.  All right.

22   Q.   Before Mr. Birk had asked you to file those what have been

23   described as SFR protests, were you aware -- did you know

24   whether or not he had filed 1998 and 1999 returns before?

25   A.   You know, maybe.  I just don't know.  I just can't remember

Dale Erikson - Direct

1   exactly.

2           *MR. MAGNANI:*  Can I -- this might be easier to do on

3   the screen.  Can we please pull up Exhibit 1 and go to page 3.

4           *THE WITNESS:*  Of my --

5           *MR. MAGNANI:*  Well, you don't -- it's on the screen.

6   It will be easier to look at.

7           *THE WITNESS:*  Okay.

8           *MR. MAGNANI:*  Can you zoom in on the bottom, please,

9   Ms. Burgess.

10  *BY MR. MAGNANI:*

11  *Q.*  Now, I've asked you about Exhibits 2 through 10.

12  *A.*  Yeah.

13  *Q.*  And now I'd like to ask you this about this, Mr. Erikson.

14  Did you prepare this tax return?

15  *A.*  No.  We did all of our returns by computer, so it wouldn't

16  have been handwritten.

17  *Q.*  Did -- do you have any memory of preparing a tax return in

18  this case requesting a $50,000 refund?

19  *A.*  No.  No.

20  *Q.*  So how -- have you -- have you looked at this tax return

21  before testifying today?

22  *A.*  Yeah.  I -- I mean, cursory.  I think I saw page 1 and 2 of

23  it.

24  *Q.*  Well -- and you didn't prepare this, you said; right?

25  *A.*  No.  No.

1   *Q.*  So how is Exhibit 1 different from the tax returns that you

2   prepared in Exhibits 2 through 10?

3   *A.*  Well, without looking at them, it's a little hard to

4   answer.  But, I mean, I think this return was prepared by -- I

5   don't know if Mr. or Mrs. Birk prepared it, but somebody

6   prepared it handwritten.  We didn't -- I didn't prepare this

7   return for Advanced Tax.

8   *Q.*  Okay.  And with regard to the tax returns that you did

9   prepare --

10  *A.*  Uh-huh.

11  *Q.*  -- how did you get the information that you needed to

12  prepare those returns?

13  *A.*  Well, you know, we're -- the firm had been doing this for

14  quite some time, so -- you know, working with tax returns,

15  returns in controversy.  And you can get information from the

16  IRS -- you yourself can ask them for the information that is

17  filed to the IRS.  Think of your W-2s; those are all sent to

18  the IRS.  Stock transactions, pull money out of retirement

19  accounts, interest, you know, all of that stuff is sent to the

20  IRS.  So we almost on -- not on every case, but almost every

21  case, especially when folks hadn't filed in a few years, we'd

22  ask for that information from the IRS to make sure.  Because,

23  you know, nobody's memory is perfect.  You forget things over

24  time that -- you forgot you had a job, if you have many jobs.

25  And we just wanted to make sure we got all of the information.

Dale Erikson - Direct

1    And we'd also get it from the taxpayer, as well, because

2    sometimes not everything gets reported to the IRS, believe it

3    or not.  Not often, but sometimes.

4    Q.  And so did you endeavor to collect information from the IRS

5    and from Mr. Birk, as you described?

6    A.  I know we got it from Mr. Birk, and I haven't seen anything

7    that -- we used to call it income return master file -- I think

8    that was an IRS term.  I'm assuming we did ask for it from the

9    IRS.  I can't remember exactly but --

10   Q.  But that was your practice?

11   A.  Yes.  That was our practice, absolutely.

12        MR. MAGNANI:  If we could please pull up Exhibit 81.

13   BY MR. MAGNANI:

14   Q.  Okay.  What is Exhibit 81, just generally?

15   A.  That is an email I would have sent in December of 2006 to

16   Mr. Birk.

17   Q.  And what -- what was the purpose of you sending this

18   email?

19   A.  Well, I guess it starts, you know, "I'm working back

20   through the returns and have the following questions by year."

21   So that tells me I worked through them once.  And I used to

22   organize by year, you know, various questions.  And I'm just

23   asking -- you know, to do a good and thorough return, I'm just

24   trying to get all of my open questions answered.

25   Q.  And in this email, does -- are Mr. Birk's answers also in

193
                          Dale Erikson - Direct

1    this email?

2    A.  I believe so, or else -- you know, that's my check mark

3    right there by the 351, so that means I, you know, put it on

4    the return somewhere.  But I think the different shading is his

5    response.  Yes.

6    Q.  Like, for example, just looking at No. 2 -- and because

7    it's a little bit hard to read, can you tell which part of this

8    you wrote and which part Mr. Birk wrote?

9    A.  I wrote the first sentence, "Any purchase of long-lived

10   tools.  If so, please let me know the asset description, cost,

11   date of purchase for each one."

12   Q.  And did -- what about that following section, did you write

13   that?

14   A.  I think that's Mr. Birk's response, where he says, "I'm not

15   sure what long-lived tool is."  I think that's his response.

16   It would have to be.

17   Q.  Just zooming out --

18   A.  Uh-huh.

19   Q.   -- who is this email from?

20   A.  Well, that's from me to their email address.

21   Q.  Just focusing on the top part of the email --

22   A.  Uh-huh.

23   Q.  -- can you tell --

24   A.  It says, "Dale answers to below."  So he must have sent it

25   back to me saying, you know, please reference my answers below.

Dale Erikson - Direct

1   Q.  Okay.  The shading notwithstanding, you're not the one

2   answering your own questions, would that be fair --

3   A.  No.  No.

4   Q.  Okay.  Now --

5           Just one moment, please.

6           Just go to the third page, please, Ms. Burgess.

7           Mr. Erikson, however you prefer to follow along,

8   either on the screen or --

9   A.  Okay.

10  Q.  And --

11  A.  It's item 3 or 83?  What item number?

12  Q.  I'm sorry.  I'm just directing your attention to the bottom

13  of this, just if that makes it clearer to you who was providing

14  the answer to the questions.

15  A.  Okay.  I'm sorry.

16  Q.  I don't --

17  A.  I'm sorry.  I thought it was item 3.  Let's see.  It says,

18  "No sweat, Dale.  Thanks for the extra effort and late hours.

19  I do appreciate your work and attention to detail.  M.B."  So I

20  think that's Mr. Birk.

21  Q.  Okay.  If we could please turn to Exhibit 82.

22  A.  82.  Okay.

23  Q.  If you can tell the jury, what is this?

24  A.  I don't know if that was a fax or an email; it's hard to

25  say.  But answers to your meetings from our last -- your

Dale Erikson - Direct

1    questions from our last meeting, so that -- that tells me we

2    had at least one meeting.

3    Q.   Well, let me ask you this question:

4    A.   Okay.

5    Q.   Who sent this?

6    A.   That would have been from Mr. Birk.

7    Q.   Okay.  And whose handwriting marks are on this?

8    A.   Those -- I'm assuming they're mine.  It looks like

9    something I would do.

10   Q.   Now, why is Mr. Birk giving you information about truck

11   mileage or car mileage?

12   A.   Well, you know, we like to do a thorough job.  And for

13   vehicle expenses, you're allowed to either take actual expenses

14   or to take standard mileage deduction.  And that's what we're

15   getting here for -- I guess Item No. 3, would be the business

16   and personal miles.

17   Q.   And then just going to page 2 of this exhibit.  What is --

18   what is an MSA, just directing your attention to No. 3?

19   A.   Honestly, I think this is -- this is the only job I've ever

20   seen that on.  Medical savings account.  I didn't see it very

21   much.

22   Q.   Well --

23   A.   Huh?

24   Q.   Sorry to interrupt.

25   A.   Sure.

Dale Erikson - Direct

1    Q.  Are you asking him these questions because they might have

2    an implication on the tax returns?

3    A.  Yes.  Yes.

4    Q.  Also, there is -- in No. 4, why are you talking about

5    family loans?

6    A.  I guess there was -- you know, I -- when I did returns, you

7    know, just always want to make sure they make sense.  And I

8    think when I was going through these --

9           Can I refer back to something earlier?

10   Q.  You may.  But --

11   A.  Okay.

12   Q.  I guess, just in general, if you could just explain, what

13   is the significance?  Why is it that when you're preparing a

14   tax return, you're asking a question about loans?

15   A.  Well, loans aren't taxable.  When you receive a loan, it's

16   not taxable income, because the intent is to pay it back.  Now,

17   if they're forgiven, it's taxable.  But that -- then also, you

18   know, if a business is losing money -- when you start up a

19   business, oftentimes it will lose money.  So I always like to

20   understand if, you know -- if I have everything.  Just, how are

21   you funding those losses?  Savings, et cetera.

22   Q.  If you could please pull up Exhibit 83.

23   A.  Sure.

24   Q.  What is Exhibit 83?

25   A.  You know, what?  Either -- it's one of two things.  It's

Dale Erikson - Direct

1  either my notes from a meeting.  Open items, I used to make a

2  copy of it and give it to the person I was preparing the

3  returns for.  Or it could have been from my file of going

4  through and saying, these are the open items yet.  It's one of

5  the two.  I don't know.

6  Q.  But they are your notes?

7  A.  They are -- yeah.  Yeah, that's my notes.

8  Q.  Again, just from a simple point of view, why are you asking

9  for a breakout between personal and business expenses?

10  A.  Well, it's not uncommon that smaller businesses would have

11  a credit card, and they put personal things on the credit

12  cards.  And you just want to draw that line of -- when you put

13  it on a credit card, going out to McDonald's, you don't want to

14  take that as a tax deduction, so we want to split up the two.

15  Q.  So it might impact the tax returns?

16  A.  Absolutely.  Yeah.

17  Q.  Now, apart from these sort of notes and email

18  correspondence, did Mr. Birk also send you records?

19  A.  Yeah.  You know, W-2s, whatever he had, 1099s, et cetera.

20  Q.  Did you review records that were only in Mr. Birk's name or

21  also in his wife's name?

22  A.  No.  I think they were joint returns, so it would have been

23  Ms. Birk's W-2s, what have you, as well.

24  Q.  Now, speaking of Mrs. Birk, did you ever meet with

25  Mrs. Birk?

Dale Erikson - Direct

1  *A.*  I know I met with Mr. Birk.  I don't know if she was there

2  or if I met her that first day they came in.  I just -- it's

3  hard, and I can't remember exactly.

4  *Q.*  Do you have any memory of any phone calls with Mrs. Birk?

5  *A.*  I -- I don't believe she called me, but I think she may

6  have answered the phone when I called there.  I --

7  *Q.*  Well, let me ask you this question:  Do you have any memory

8  of having any substantive --

9  *A.*  No --

10 *Q.*   -- communication?

11 *A.*  No.

12 *Q.*  And I just want to make sure -- only because there is a

13 court reporter, I want to make sure the question is clear.  Do

14 you remember having any substantive tax-related conversation

15 with Mrs. Birk?

16 *A.*  I don't have a memory of that.  No.

17      *MR. MAGNANI:*  If we can please pull up Exhibit 84.

18 *BY MR. MAGNANI:*

19 *Q.*  So -- and I know there may be a lot to say about all of

20 these different tax forms, but we could just -- I guess I'm

21 briefly asking, what is the first page of Exhibit 84?

22 *A.*  That is a -- it should say 1099 on there.  It says 1099B on

23 the left-hand side.  And that's for when you sell stock, the

24 brokerage house or whomever would send you that, and they'd

25 also send a copy to the IRS, saying, here is the gross proceeds

Dale Erikson - Direct

1    of what you sold that for.  So on this one, MCI stock sold for

2    $50,138.

3    Q.   This is a record of a stock sale?

4    A.   Yes.

5    Q.   Okay.  If we could go to the next page, please.

6    A.   Sure.

7    Q.   And same question, what is -- what's this?

8    A.   That is from Salomon Smith Barney; and that is a sale of

9    MCI stock, as well, showing just the gross proceeds.

10   Q.   And if we could please go to the third page.

11   A.   Okay.

12   Q.   What is that?

13   A.   This -- this looks like, I guess, a quarterly statement.

14   It says January 1, 1999 through September 1999.  And I guess

15   Ms. Birk probably had a -- I guess an IRA that was invested in

16   different mutual funds with Oppenheimer.

17   Q.   And the next page, please.

18   A.   Okay.

19   Q.   What does this page show?

20   A.   This shows a disbursement from a 401K plan.  I don't know

21   what year.  I guess 1999.

22   Q.   How much was the disbursement?

23   A.   I guess I would have to say 246,000, amount eligible for

24   rollover, 246,000.

25   Q.   Just one moment, please.

Dale Erikson - Direct

1   *A.*   Well --

2   *Q.*   Now -- are you finished with your answer?  I don't want to

3   cut you off if you're not.

4   *A.*   Yeah.  I think the total amount was 246,000, of which 200

5   was rolled over to a qualified plan, and then 46,000 was

6   probably taxable.

7   *Q.*   Okay.  And just if you can go to the fifth page now.

8   *A.*   Okay.

9   *Q.*   What's this one?

10  *A.*   This is a sale of MCI stock again in 1999 for, I guess

11  40,000 of proceeds.

12  *Q.*   Now, are these -- are these -- do you know if these five

13  documents -- is this a complete list of every financial

14  document that Mr. Birk gave you, or is this just a sample of

15  some of them?

16  *A.*   I -- I don't know.  I mean, I don't have the file; so I

17  can't tell exactly what he gave me.

18  *Q.*   That's fine.

19  *A.*   But that -- they're examples of what he sent.  Sure.

20  That's my handwriting.

21       *MR. MAGNANI:*   Then if we could please go to the

22  Exhibit 4.  And it's the second page, please.

23  *BY MR. MAGNANI:*

24  *Q.*   Might be easier for you to look on the screen -- oh, you

25  have the binders.

Dale Erikson – Direct

1   *A.*   Second page?

2   *Q.*   Well, the first --

3   *A.*   I gotcha.

4   *Q.*   Okay.  So you were just talking about that large dollar

5   rollover.  Does that appear on the tax return that you filed?

6   *A.*   Yeah.  I mean, if they're for the same year -- line 16(a)

7   talks about total pension annuities, that 271,000 probably came

8   from there and maybe some other ones that were added up into

9   that.

10  *Q.*   Can you --

11  *A.*   I --

12  *Q.*   Sorry.  If you can just sort of briefly explain to the

13  jury, you know, what is a rollover?  And is it taxable?

14  *A.*   Yeah.  Well, when folks work for, say, a company, they put

15  away money into a 401K.  And when you leave, oftentimes people

16  will -- more often than not will roll it over into another

17  taxable plan, if you will.  Maybe it's with another employer;

18  but more often than not, to an individual retirement account.

19  That's like a retirement plan, and they're both tax sheltered.

20  So you just roll it over directly, or some people take the

21  money and then put it into that, but you've got to do it within

22  60 days.  Always recommend just to do it directly.

23          *MR. MAGNANI:*  Okay.  We can take that exhibit down,

24  please.

25          Can we please pull up Exhibit 85.

Dale Erikson – Direct

1   *BY MR. MAGNANI:*

2   *Q.*   And, Mr. Erikson, what -- when you were doing tax returns

3   for someone who opens a business --

4   *A.*   Uh-huh.

5   *Q.*   -- what types of documents do you typically require them

6   to provide you so that you can do an accurate tax return?

7   *A.*   I guess there was two -- two -- two different kinds of

8   clients.  One had very small, small organizations; and they

9   kind of kept their books by hand.  And we gave them tax

10  organizers that they filled out with -- kind of looked like a

11  tax return in some respects, where they would add up their

12  receipts and drop in numbers for, you know, supplies they

13  purchased, their income, things of that nature.  And then other

14  folks that might be more computer literate did their books via

15  Excel or QuickBooks.

16  *Q.*   And how did Mr. Birk do his books?

17  *A.*   Well, this here does not look like QuickBooks to me; but it

18  looks like some kind of accounting software.  Maybe Quicken or

19  something.  I'm not sure.  I don't think it's QuickBooks, but

20  it's some kind of software -- or maybe a spreadsheet.  I'm not

21  sure.

22  *Q.*   What is a business ledger?

23  *A.*   A business ledger?  I guess that's, you know, like your

24  checkbook, maybe a little bit more advanced, of tracking

25  where -- all of your income coming in, expenses, maybe

1    classifying them by supplies, labor, things of that nature.

2    Q.  Why is it important for someone doing your job preparing

3    returns to have a business ledger?

4    A.  Well, I mean, it helps do the tax returns.  But also, you

5    know, if you have questions, you can look in the detail and

6    pull out -- you know, if they're buying equipment, they go on a

7    different place on the tax return, so it's easier to pull that

8    out of there to put it on the tax return.

9    Q.  How many pages is this business ledger?

10   A.  Well, I don't know.

11   Q.  I mean, roughly.

12   A.  It looks like 23 less -- I don't know 59 -- 69, probably.

13   Q.  Did Mr. Birk provide you with business ledgers for multiple

14   years, or just the one?

15   A.  No.  There was this but then also there was QuickBooks for

16   a different year.

17   Q.  Well, so let me just ask you --

18   A.  Sure.

19   Q.   -- this business ledger at Exhibit 85, do you know what

20   year this is for?

21   A.  Well, this would be for tax year 2000, because it says

22   date -- you know, these transactions are in 2000, so --

23   Q.  Okay.  Did you have ledgers like this for every year for

24   which Mr. Birk was in business that you prepared his returns?

25   A.  I -- I can't say that exactly.  I -- I think so, but I'm

Dale Erikson – Direct

1   not 100 percent sure.

2   Q.  Would you have been able to prepare the returns without

3   records like this?

4   A.  Well, I mean, I had a fair number of clients that just

5   filled out tax organizers, that had bigger businesses.  But

6   sometimes it was a little difficult, because I had detailed

7   questions.  But I think he provided me these -- this type of

8   information for every year, but I can't say 100 percent.

9         MR. MAGNANI:  Then if we could just look at page 14 of

10   Exhibit 85.

11        THE WITNESS:  Page -- what's the number on the bottom?

12   BY MR. MAGNANI:

13   Q.  So --

14   A.  Oh -- I guess there is -- looks like there is 32 -- I don't

15   know what the pages are.  Page 2?

16   Q.  Page 14, please.

17   A.  Okay.  I'll look at the screen.

18   Q.  And just directing your attention to the loans portion --

19   A.  Yeah.

20   Q.  -- why would loans be in a business ledger if they're not

21   taxable?

22   A.  Well, very often folks would get money from friends and

23   family to finance a business start-up.  And in that -- that

24   money -- you know, a ledger, you track it by bank accounts, to

25   make sure you get everything.  If money comes into your bank --

1   your business bank account, you've got -- to make everything

2   work, you've got to show that in that bank account.  And that's

3   what this is demonstrating, that this is from dad,

4   father-in-law, mother-in-law.  That goes back to a loan you

5   don't want to treat as income, because the intent is to pay it

6   back.

7   Q.  So the loans from family would not be considered on the tax

8   return?

9   A.  You know, not -- not unless they were forgiven, I guess.

10  Q.  And if I could then direct your attention to Exhibit 86.

11  A.  Sure.  Okay.

12  Q.  What is a profit and loss report?

13  A.  Well, this, I would bet -- this looks very much like out of

14  QuickBooks.

15  Q.  And who prepared this?

16  A.  That would be Mr. Birk.

17  Q.  Why would this be in your file?

18  A.  Well, this -- I mean, it shows in detail, you know, the

19  income and expenses.  And it's broken up by -- by, you know,

20  different categories, so it just helps to do the tax return.

21  Q.  Now, when Mr. Birk sent you, whether it's a business ledger

22  or a P&L, would you do any independent corroboration of the

23  figures in those records?

24  A.  No.  No.  If there was something that we need to clarify --

25  like if people put down like a vehicle registration, maybe only

Dale Erikson - Direct

1    part of that is deductible.  But, no, I didn't audit clients.

2    No.

3    Q.   So is this the type of information you'd rely on?

4    A.   Yeah.

5    Q.   Now -- oh, I guess, similar question.  If you know, with

6    regard to the P&L, is this something that you also had for

7    every year or just one year?

8    A.   You mean the QuickBooks format or --

9    Q.   Well, the profit and loss statement that --

10   A.   Yeah.  We had it for 2000 in a different format, and we had

11   it for 2001 -- the other years, you know, I don't know if --

12   when he started the business, if he started in 1999, if he

13   didn't keep his books in this format.  I just -- I can't -- I

14   can't remember.

15   Q.   Sure.  If we could please move to Exhibit 87.

16   A.   Sure.

17   Q.   And just take a minute.  And whenever you're ready, just

18   let the jury know what we're looking at here.

19   A.   Okay.  Okay.

20   Q.   Well, let me ask you this -- don't let me rush you,

21   Mr. Erikson.  But does this -- does this -- when in the course

22   of your professional relationship with Mr. Birk did you send

23   this letter?

24   A.   Well, it was on or around December 20.

25   Q.   And just for the jury's benefit, was that at the beginning

Dale Erikson - Direct

1   of your relationship or the end of your relationship?

2   A.   That was at the end.

3   Q.   And so does this letter summarize the different things that

4   you prepared?

5   A.   Yeah.

6   Q.   And take --

7   A.   I thought we did 2005 as well, but it's not referenced

8   there.   Maybe I just missed the year.

9   Q.   Let me ask you:  From the best of your recollection --

10  A.   Yes.

11  Q.   -- from the best of your recollection, what's the total

12  work product that you prepared for Mr. Birk?  Not tying you to

13  any exhibit, but just the best that you can remember, what are

14  the different things that you did for Mr. Birk as part of your

15  job at Advanced Tax.

16  A.   Well, we did the tax return -- we did the tax returns, and

17  then I know he had -- him and his wife had some losses in some

18  of the earlier years when he formed the business.  And when you

19  have a loss, you're oftentimes able to carry that back and

20  offset it against taxable income from an earlier year.  That's

21  what we're making reference to in the third bullet point there,

22  where it says "Amended federal returns for 1998 reflecting a

23  carryback of 2000."  That's what we're saying there.

24        And then oftentimes we'd prepare a summary for

25  clients, because, you know -- if you have some years that

Dale Erikson – Direct

1    aren't filed, the interest and penalty add up; and we'd like

2    to, you know, show that to clients so that they just have a

3    frame of reference.  And that's what the fourth bullet point

4    is.  And, then, the original files, we like to make sure

5    everybody gets back everything they gave us.

6         MR. MAGNANI:  Can we please pull up Exhibit 92.

7    BY MR. MAGNANI:

8    Q.  And is this the summary that you're talking about?

9    A.  It is.  It is.  The far right column, which we shaded --

10   it's shaded on this, at least --

11   Q.  I'm sorry to interrupt you, Mr. Erikson --

12   A.  No worries.

13   Q.  -- but I just want to alert you that this is a two-page

14   exhibit.

15   A.  Okay.

16   Q.  But I haven't asked a question yet.

17   A.  Sure.

18   Q.  My question is going to be, what is the difference

19   between --

20        Ms. Burgess, is it possible to put the first page and

21   the second page of this exhibit both on the -- side by side?

22        Mr. Erikson, what is the difference between the two

23   summaries that you provided Mr. Birk at the end of your

24   representation?

25   A.  Well, I don't have them side by side on here --

Dale Erikson - Direct

1   Q.  If you can flip --

2   A.  Yeah.  I guess the first one that's up on the screen is --

3   it's a little bit less than the second one.  And that relates

4   to carrying back that loss from 2000.  I think the start-up of

5   the business threw off a loss, and you're able to carry that

6   back to 1998.  You'll see that 1998 has a couple of bullet

7   points there.  Three, that says, "assumes the acceptance of

8   2000 NOL carried back" -- NOL being net operating loss --

9   "carried back to 1998 by the IRS," because we didn't know --

10  100 percent sure whether they would accept it.

11  Q.  So are these just the two possible scenarios at the end of

12  your representation, one being --

13  A.  Yes.

14  Q.  And is the only difference between the two whether or not

15  the IRS accepts the net operating loss, without going into

16  detail on what a net operating loss is?

17  A.  Yeah.

18  Q.  Okay.

19  A.  Um --

20  Q.  So my question is, in the best of circumstances, assuming

21  the acceptance of the loss, how much federal tax would Mr. Birk

22  have owed based on the returns that you prepared for him?

23  A.  Okay.  Well, the left-hand column includes interest and

24  penalties, which is -- and then they add up to 168,000.  And

25  then the right-hand column that's just hard to read is the

Dale Erikson - Direct

1    balances without interest and penalty.  I think that's near

2    94,000.

3    Q.  Do you have any memory of why the Colorado number is that

4    exact round --

5    A.  I think that was just a -- these were -- these were from

6    the returns.  I think it just worked out that way.  It is odd

7    that it works out to 10,000 exactly, but I think that's just

8    the way it worked out.

9    Q.  Did you also prepare Colorado returns?

10   A.  We did.  And there is two bullet points there.  And there

11   is no software that you can calculate interest and penalty for

12   Colorado; that's why we just put the tax on there.  We just

13   wanted to make our clients aware that there is software to

14   calculate the federal but not the Colorado.

15   Q.  Mr. Erikson, do you -- in your long professional

16   experience, do you -- have you had occasion to be confronted by

17   clients who espouse what you would consider to be frivolous tax

18   arguments?

19   A.  Can you say that again?

20   Q.  Sure.  In the history of your career, can you think of a

21   time when a client espoused what you would consider a frivolous

22   tax argument?

23   A.  You know, on rare occasions we would have folks come in

24   that did that.  I mean, that's not the firm I worked for.  I

25   wouldn't work for a firm that proponed that -- those arguments.

211

Dale Erikson - Direct

1  I do remember one gentleman that made those arguments, and he

2  had a wage garnishment, and I just -- I told him I couldn't

3  help him.  I mean, it's -- I couldn't make -- support those

4  arguments.  I couldn't help him.

5  *Q.*  Do you have any memory of Mr. Birk ever espousing such

6  arguments to you?

7  *A.*  You know, my involvement with the tax returns is more on

8  the tax preparation side.  I know when -- when he came in, that

9  they filled out a tax -- kind of an informational sheet.  And

10  there is a reference to some kind of group or something on

11  there, and I just can't remember without it right in front of

12  me.

13  *Q.*  Well, in your various correspondence --

14  *A.*  Uh-huh.

15  *Q.*  I'm asking about your emails, faxes, phone calls, et

16  cetera, face-to-face meetings, do you have any memory or have

17  you reviewed any document that would suggest that Mr. Birk made

18  such arguments to you?

19  *A.*  Well, I think there was an email making reference to some

20  kind of litigation or something.  I -- I can't remember, but I

21  think that was about it.  I'm -- my involvement was just

22  really, you know, in getting the tax returns done.

23  *Q.*  And then in the few cases in your career where you do have

24  a memory of that --

25  *A.*  Uh-huh.

212

Dale Erikson - Direct

1   Q.   -- how did you handle it?

2   A.   Well --

3   Q.   And only if you remember.  I'm not asking you to guess.

4   But if you do remember, how do you handle it?

5   A.   Well, you know, you've got to be courteous to clients

6   but -- to folks that come in.  But you try to just let them

7   know that that's just not -- you know, those arguments don't --

8   in our -- just don't carry weight.  You know, we help people --

9   we like to say we help people get into the system, get on -- I

10  can't remember the term we used to say.  I haven't worked there

11  for two years, so it's hard to remember -- back on track.  You

12  know, get your tax returns filed, let's get you into a

13  solution, whether it be a payment plan, offer in comp, what

14  have you, and then file the taxes going forward.  Get back into

15  the system, so to speak.

16  Q.   I just have a few more questions.

17          And so in terms of the tax returns that you did

18  prepare --

19  A.   Uh-huh.

20  Q.   -- for Mr. Birk, what was the source?  And, you know,

21  putting aside what you mentioned about the IRS.  But what was

22  the source of all of the information that went in there?

23  A.   Well, that would have been -- I mean, the IRS information

24  plus what he provided to us.

25  Q.   So you're not guessing or making anything up?

213

Dale Erikson - Direct

1    *A.*  No.  No.  No.  No.  We always like to have support behind

2    any number we had.  Sure.

3    *Q.*  And the figures that you showed in that summary, that was

4    based on the information that you just described?

5    *A.*  That would have been based on the tax returns we did here;

6    and then, you know, calculating interest and penalties for the

7    federal returns.

8           *MR. MAGNANI:*  Just one second please.

9           *THE WITNESS:*  Uh-huh.

10   *BY MR. MAGNANI:*

11   *Q.*  Directing your attention to Exhibit 10.  I guess we'll go

12   to the third page, please.

13          Based on the information that was provided to you by

14   Mr. Birk and the IRS, were you able to determine if he

15   qualified for any tax credits that year?

16   *A.*  I guess on this one there would be an earned income credit.

17   *Q.*  What's the earned income credit?

18   *A.*  Well, that's a credit that has been around since maybe the

19   '80s, since Reagan was president.  And I think it's a credit

20   that folks get on their tax return that if you have lower

21   income -- I guess the intent was to -- as an encouragement for

22   lower income folks to work.  I think that was the genesis

23   behind it, or whatever.

24   *Q.*  So is that just -- so based on -- so based on the

25   information that you received from the IRS and Mr. Birk --

Dale Erikson – Direct

1    A.   Uh-huh.

2    Q.   -- he qualified as a low-income individual who deserved a

3    credit?

4    A.   Yeah.  You know what, honestly, sometimes on the first

5    page, there is a low business income from the Schedule C.  So

6    it doesn't, you know, look at your assets.  It just looks at

7    your income on your tax return; that's how that earned income

8    credit is calculated.

9         MR. MAGNANI:  If we could please have Exhibit 93.

10   BY MR. MAGNANI:

11   Q.   Mr. Erikson, while we're pulling that up, do you remember

12   the name -- do you remember what business Mr. Birk was in?

13   A.   It was log homes, I think, building.

14   Q.   And do you happen to remember the name of his company?

15   A.   Tarryall was in it.  I'm not sure.

16   Q.   Okay.  That's okay.  Now, do you remember the corporate

17   form, for lack of a better term, of the log home building

18   company?

19   A.   Well, I believe it was an LLC, and probably just him, a

20   single member, because we put it on his individual tax return.

21   Q.   Now, looking at Exhibit 93, I mean, what is this?

22   A.   Well, that's my meeting notes from August 9, 2006.  That's

23   my handwriting.  And that's -- the first bullet point there,

24   number one, is probably just clarifying -- you know,

25   2000 through 2005, I was probably saying to myself -- or

 1   writing, those were original returns.  And 1998 through 1999

 2   were probably where we had to go back and redo a return that

 3   the IRS did.

 4   Q.  And so are these your notes -- just to simplify, are these

 5   your notes from one of your meetings with Mr. Birk?

 6   A.  Yeah.  Like I said, I can't remember if I met him more than

 7   once.  But this looks -- yeah, this meeting on taxes -- this is

 8   August 9, I would have met with him.  Now, I don't know if

 9   Ms. Birk was there, because it said Marty and Jean up in the

10   right-hand column.  But I just can't remember.

11   Q.  Did the information on this page come from Mr. Birk?

12   A.  Well, it came from our conversation.  Sure.

13   Q.  So there is a reference -- just if I can point your

14   attention to kind of the bottom right portion.  I know it's

15   hard to see it.  It says Tarry L, Asset Management, Inc.  Do

16   you know what that is?

17   A.  I -- I don't remember all that well, no.  I think there was

18   another organization, corporation.  And, you know, my

19   handwritten notes, Personal Service Corp. has an FEIN number.

20   I think I would have probably -- you know, it's hard.  Thirteen

21   years.  Maybe I was -- maybe that corporation was formed to do

22   consulting on log building homes, and there was the intent of

23   keeping them separate for lawsuit purposes.  I don't know.

24   Q.  That's okay.  I'm not asking you to guess.  If the answer

25   is you don't know, that's totally fine.

Dale Erikson - Direct

1    *A.*   No.

2    *Q.*   Pointing your attention to what you wrote, numbers one and

3    two below that --

4    *A.*   Yeah.

5    *Q.*   -- where would the information that it was funded with

6    personal funds have come from?

7    *A.*   That would have come from the conversation, that meeting.

8    *Q.*   Okay.

9    *A.*   Sure.

10   *Q.*   Now, what about "paid money to LLC for spec home," where

11   would that information have come from?

12   *A.*   The meeting, the conversation.  Sure.

13   *Q.*   Now, at the time of this conversation, if you can remember,

14   do you know -- did you know the source of those personal funds?

15   *A.*   Funded from personal -- no.  No.

16   *Q.*   Would it --

17   *A.*   No.  I mean, could have been savings in the past.  I don't

18   know.

19   *Q.*   Would it have had an impact on your tax analysis if

20   Mr. Birk told you that those personal funds came from a

21   retirement fund?

22   *A.*   Yeah.  I mean, we would have had to understand, you know,

23   how that money got in there and if there is any personal -- tax

24   consequences on the personal returns.  Sure.

25   *Q.*   And so -- and if you need a chance to review your

Dale Erikson - Direct

1   returns -- again, I would just ask on the 2000 -- this is

2   Exhibits 5 and 6.  On the 2000 and 2001 tax returns that you

3   prepared, how much of a rollover was reported in those years?

4   A.  In 2000, the tax return shows -- it's not on the screen --

5   line 16(a) shows 45,805 as a rollover.

6   Q.  How much was it?  I'm sorry.

7   A.  45,805.

8   Q.  How much of that was taxable?

9   A.  Zero.

10  Q.  And what about for the next year, Exhibit 6, 2001?

11  A.  And that's showing zero and zero.

12  Q.  So why didn't you report any retirement distributions in

13  2001?

14  A.  Well, we didn't know of any.  I mean, there wasn't anything

15  in the records or the IRS information.

16  Q.  So the -- did Mr. Birk ever tell you that in those two

17  years he took out over $400,000 from retirement plans?

18  A.  No.  No.  No.

19  Q.  If he told you that, would you have put that in the tax

20  returns?

21  A.  Yeah.  We would have had to get our arms around it.  Sure.

22          MR. MAGNANI:  No further questions.

23          THE COURT:  Very well.

24          Cross-examination for Mr. Birk.

25          MS. BECK:  Thank you.

Dale Erikson – Cross

1          **CROSS-EXAMINATION**

2     *BY MS. BECK:*

3     *Q.*  Good afternoon, Mr. Erikson.  How are you?

4     *A.*  Good.

5     *Q.*  Good.  So this was a long time ago.  This was over 13 years

6     ago that you were dealing with Mr. Birk; right?

7     *A.*  Yes.  Quarter of my life.  Yes.

8     *Q.*  So you were alerted to what was going on with Mr. Birk most

9     recently about four months ago; right?

10    *A.*  I don't know -- do I have to go through everything?  I

11    mean --

12    *Q.*  No.  I'm going to ask you some questions --

13    *A.*  Yeah.

14    *Q.*   -- to bring you --

15    *A.*  The latest contact was -- I don't recall -- early March,

16    maybe.  I don't know, on or about early March.

17    *Q.*  Okay.  And initially, when you were contacted in early

18    March, you didn't recall your involvement in this case; right?

19    *A.*  Well, I do -- I mean, you know, I've got an interesting

20    memory.  I can't remember folks' birth dates or things, but I

21    do remember clients.  I remember clients that I worked on.  I

22    do.  I remember notable clients, I guess.

23    *Q.*  Okay.  So is it fair to say, though, that you had to look

24    through your work product in order to get caught up to speed?

25    *A.*  Well, I -- I'm trying to answer these things.  When we -- I

Dale Erikson - Cross

1   left Advanced Tax Solutions in June or July of 2007.  But

2   previous to that, we had received a subpoena or summons -- I

3   don't know what the right legal term is -- to provide their

4   information to them for this case.  And during that process, I

5   didn't go through every page for -- but I -- I probably looked

6   at it at that time.  So that's, you know, five years ago or

7   four years ago, when we originally got that summons or

8   subpoena.  You know, I -- you know, when you get that, it's

9   pulling together a bunch of information and sending it.  So

10  that was a refresher, I guess, if you will.

11  Q.  Okay.  So your work on this case began when you were at

12  Advanced Tax Solutions?

13  A.  Oh, absolutely.

14  Q.  Okay.  And Mr. Birk first contacted your firm, Advanced Tax

15  Solutions, on July 31 of 2006; is that right?

16  A.  You know, without having the record in front of me, it's

17  hard to say.

18  Q.  Okay.

19  A.  We had a call sheet, and that's --

20  Q.  Let me refer you to that.

21      Ms. Roberson, is the system hooked up?  Great.  Thank

22  you.

23      If you could pull up Government's Exhibit 70.

24      Is this the call sheet you're referring to?

25  A.  Yes.  Yes.

220

Dale Erikson – Cross

1    *Q.*  Okay.  And I'll direct your attention to the date in the

2    top right corner, that says July 31?

3    *A.*  July 31.  Yes.

4    *Q.*  That would have been when Mr. Birk first contacted your

5    firm; right?

6    *A.*  Yes.

7        MS. BECK:  Okay.  You can take that down.  Thank you.

8    *BY MS. BECK:*

9    *Q.*  And initially, Mr. Whalen met with Mr. Birk; right?

10   *A.*  Yes.

11   *Q.*  Okay.  And Mr. Birk hired your firm to complete the tax

12   returns for the years we've been discussing?

13   *A.*  Yeah.  I -- without the engagement letter in front of me --

14   I know we had to do the returns, because we did them.

15   Sometimes we helped people -- oftentimes we helped people with

16   tax resolution matters, as well.

17       MS. BECK:  Okay.  If you could pull up Government's

18   Exhibit 72, please.

19   *BY MS. BECK:*

20   *Q.*  This is the engagement letter you're referring to?

21   *A.*  Yes, ma'am.

22   *Q.*  In the first page in the middle where there is that

23   ellipsis, it says, "We will prepare income tax returns as

24   needed."

25   *A.*  Sort of --

221

Dale Erikson – Cross

 1          *MS. BECK:*  Can you highlight that for me, Mr. Cohen?

 2          *THE WITNESS:*  Yeah.

 3  *BY MS. BECK:*

 4  *Q.*  Okay.  Thank you.

 5          So because of Mr. Birk's hiring your firm, you

 6  prepared his tax returns; right?

 7  *A.*  Yeah.  I mean, we did the individual; and that included the

 8  log home business.  Yes.

 9  *Q.*  Okay.  And on the tax returns that you prepared, Exhibits 2

10  through 10 that you were discussing with Mr. Magnani --

11  *A.*  Uh-huh.

12  *Q.*   -- there is a stamp on there; right?

13  *A.*  Yeah.

14  *Q.*  And that stamp says "SFR protest"; right?

15  *A.*  Yeah.  I don't know if all of them have it on there.  But,

16  yeah, the SFR -- a fair number of the years have SFR on it.

17  Sure.

18          *MS. BECK:*  Okay.  Mr. Cohen, can you pull up

19  Exhibit 2, please.  Page 2, please.

20  *BY MS. BECK:*

21  *Q.*  Let me direct your attention to the screen at the top right

22  corner of this document.  The SFR protest stamp that I'm

23  referring to has been highlighted.  Do you see that?

24  *A.*  Sure.

25  *Q.*  Okay.  I just want to make sure we're on the same page when

Dale Erikson - Cross

1   we're talking about that stamp.

2   *A.*   Uh-huh.

3   *Q.*   So the returns that you prepared had that stamp on them;

4   right?

5   *A.*   Where they were appropriate, yes.   Yes.

6   *Q.*   And where they were appropriate was where they were

7   responding to substitute for returns that were prepared by the

8   IRS; right?

9   *A.*   Exactly.   Yes.

10  *Q.*   Right.   And that was -- that stamp was something that your

11  firm placed on the returns?

12  *A.*   That is correct.   Yes.

13  *Q.*   And it was the practice of your firm to stamp all returns

14  that were being submitted after SFRs were created with that

15  stamp; right?

16  *A.*   Yeah.   Yeah.   We -- later on we got a stamp.   I think in

17  the early days we used to handwrite it on top.

18  *Q.*   And what it was meant to designate was that it was a

19  response or a contested return to an SFR; right?

20  *A.*   Yeah.   In essence, we were asking for the IRS to accept

21  that in lieu of the return they did.

22  *Q.*   There is nothing about that stamp that says, this is a tax

23  protester's return; right?

24  *A.*   No.

25  *Q.*   Okay.

Dale Erikson - Cross

1    A.   No.

2           MS. BECK:   Thank you.

3    BY MS. BECK:

4    Q.   Now, you were telling the jury that in order to prepare

5    Mr. Birk's returns, you relied on a lot of information, right?

6    A lot of different sources of information.

7    A.   Yes.

8    Q.   Information that you received from the IRS; right?

9    A.   Uh-huh.   Yeah.

10   Q.   Yeah.   Information that you received from Mr. Birk?

11   A.   Yes.

12   Q.   Okay.   And the information that you received from Mr. Birk

13   was provided by him in response to your requests; right?

14   A.   I mean, we don't tell clients everything they need to

15   provide us, because we don't know.   But usually most people

16   will come in with their shoebox of all of their W-2s and all of

17   their -- most people know when they receive a letter in the

18   mail that that's tax, that's important, so they'll put it in a

19   certain cubbyhole.

20   Q.   Okay.   And so he would provide you with spreadsheets;

21   right?

22   A.   There were spreadsheets for the business.   Yes.

23   Q.   Business ledgers; right?

24   A.   Yeah.

25   Q.   Profit and loss statements?

Dale Erikson – Cross

1    A.   Uh-huh.

2    Q.   Is that a yes, for the court reporter?

3    A.   Yes.

4    Q.   Other tax forms like 1099s.

5    A.   Yeah.  Yeah.

6    Q.   Okay.  And if you had follow-up questions or you needed

7    additional information, you reached out to him; right?

8    A.   Yeah.  Yeah.  It would via email or -- most of the time we

9    would try to do it via email, or I might have called.  We do

10   reach out.  Sure.

11   Q.   Sure.

12   A.   You've got to clarify.

13   Q.   And we saw an example of that in the Government's Exhibit

14   81, where there is this email exchange back and forth between

15   you and Mr. Birk about various questions you had?

16   A.   Yeah.  I think it was by tax year.  Yeah.

17   Q.   Right.  So when you reached out to him, he responded to

18   you; right?

19   A.   Yes.

20   Q.   He took your calls?

21   A.   Yeah.  Yeah.

22   Q.   He met with you?

23   A.   Uh-huh -- at least once that I remember.  Yeah.

24   Q.   And he responded at least to the emails that we've seen;

25   right?

Dale Erikson - Cross

1   *A.*   Yeah.   Yeah.

2   *Q.*   Okay.   Now, you wouldn't work for a firm that espoused tax

3   protester beliefs; right?

4   *A.*   No, I wouldn't.

5   *Q.*   And you would not file a frivolous return.

6   *A.*   No.   No.

7   *Q.*   And if you were dealing with somebody who wanted to file a

8   frivolous return, you would just say to them that you're not

9   going to do it, because it's not proper; right?

10  *A.*   You know, I think my professional responsibility is to

11  just -- you know, to describe to them that it's -- like I said,

12  they don't carry weights, and I can't do that type of return,

13  and wish them good day.   I don't know what else we can do.

14  *Q.*   Okay.   And you have a specific memory, you were saying to

15  Mr. Magnani, about a specific tax protester guy, and he was

16  wanting to submit returns, and you told him you couldn't help

17  him.   Right?

18  *A.*   Yes.   I mean, the CliffsNotes of the story:   There was an

19  older gentleman that came in, and he was making arguments about

20  the tax return.   And he had a garnishment -- a wage

21  garnishment.   He was working, he must have been 70, and he had

22  a wage garnishment.   And he wanted us to help him.   I didn't

23  know what to tell him.   I -- I didn't know what to tell him,

24  because he wanted us to, you know, protest the IRS -- you know,

25  the tax code.

1   *Q.*  Sure.  Ultimately, Mr. Birk paid your firm at least a

2   $10,000 retainer.

3   *A.*  I believe that was the retainer.  Yes.

4   *Q.*  Okay.  And after the tax returns were completed by you, you

5   didn't represent him at a collection due process hearing;

6   right?

7   *A.*  I don't believe so.  My involvement was doing the taxes, so

8   I -- I can't really speak to -- I just don't want to say

9   something I don't know for sure.  But --

10  *Q.*  And I don't want you to either.

11  *A.*  Yeah.

12  *Q.*  Okay.

13  *A.*  I worked on the taxes.

14  *Q.*  Okay.  And aside from working on the taxes, you don't

15  recall having any other involvement with Mr. Birk's case; is

16  that right?

17  *A.*  Well, I think they pointed out in some of these that I did

18  some -- you know, a letter to Oklahoma and what have you; but

19  my focus was on the taxes.  I didn't work -- there was a term,

20  collection -- I can't remember the term, 433A and 433B, that's

21  where we gather information when we're trying to look at a

22  solution.  I wasn't involved in that.

23  *Q.*  Okay.  So outside of some miscellaneous correspondence you

24  might have sent to the IRS on Mr. Birk's behalf, you were

25  mostly just involved with filing his -- preparing his taxes?

Dale Erikson - Cross

1   A.   Preparing.   Yes.

2   Q.   Thank you.   No further questions.

3           THE COURT:   Redirect examination for the Government?

4           MR. MAGNANI:   No, thank you, Your Honor.   And no

5   objection from the Government to excuse this witness.

6           THE COURT:   Any objection by Mr. Birk to excusing

7   Mr. Erikson?

8           MS. BECK:   No.   Thank you, Your Honor.

9           THE COURT:   Sir, you are both excused and released

10  from subpoena with our thanks.

11          Very well, the Government may call its next witness.

12          Ms. Hadden.

13          MS. HADDEN:   Thank you, Your Honor.

14          THE COURT:   You're welcome.

15          MS. HADDEN:   The United States calls Mr. Michael Jeka.

16          THE COURT:   Very well.

17          Mr. Jeka --

18          THE WITNESS:   Yes, sir.

19          THE COURT:   -- if you'll please come forward and stand

20  in this open area in front of my bench, please.   There is fine.

21          If you'll face me and raise your right hand to be

22  sworn.   Thank you.

23          May I have your attention in the courtroom.

24          (**MICHAEL JEKA, GOVERNMENT'S WITNESS, SWORN**)

25          THE COURT:   Thank you.   Please be seated in that

Michael Jeka – Direct

1   witness stand.

2          Ms. Hadden, you may inquire.

3          *MS. HADDEN:*  Thank you, Your Honor.

4          *THE COURT:*  You're welcome.

5                    **DIRECT EXAMINATION**

6   *BY MS. HADDEN:*

7   *Q.*  Good afternoon, Mr. Jeka.

8   *A.*  Hello.

9   *Q.*  Could you please tell us the city and state you live in.

10  *A.*  Kennewick, Washington.

11  *Q.*  What is your educational background?

12  *A.*  I have a master's in political science and a bachelor's in

13  political science and history.

14  *Q.*  What university did you go to?

15  *A.*  University of Wisconsin Milwaukee.

16  *Q.*  What is your employment background?

17  *A.*  I worked for the IRS as a revenue officer and an appeals

18  settlement officer.  I was with the IRS for 28 years.

19  *Q.*  Do you still work for the IRS?

20  *A.*  No.  I retired January 31 of 2017.

21  *Q.*  When did you start working with the IRS?

22  *A.*  It would have been October of 1984.

23  *Q.*  What different positions did you hold while you were at the

24  IRS?

25  *A.*  I started as a revenue officer and did that for

Michael Jeka - Direct

1    approximately 18 years, and then in 2002, became an appeals

2    settlement officer.

3    *Q.*  And what is an appeals settlement officer?

4    *A.*  An appeals settlement officer is a person that is somewhat

5    similar to a revenue officer, in terms of the area of work that

6    they do.  A settlement officer will receive a case from a

7    revenue officer involving the taxpayer requesting certain

8    appeal rights in either the collection of taxes and/or

9    delinquent tax returns.

10   *Q.*  So how does a case get to you?

11   *A.*  The revenue officer will -- through their contact with the

12   taxpayer, they will go through a series of contacts in order to

13   try and contact the taxpayer, resolve a tax matter, if there is

14   a tax balance.  Or if the taxpayer has not filed any tax

15   returns, get the taxpayer to file the returns.  If the taxpayer

16   is not cooperating in those procedures and methods, then the

17   revenue officer will take steps and issue different notices.

18   And one of those is a collection due process hearing letter,

19   that the taxpayer basically has a right to appeal the proposed

20   actions that the revenue officer is taking.  A specific one

21   would be if the revenue officer is proposing to take a levy or

22   garnishment action against the taxpayer.

23   *Q.*  And what happens when the case comes to you?  What is the

24   first thing you do?

25   *A.*  The first thing we do is, once we get the case -- at the

Michael Jeka - Direct

1   time that I was working, we were tremendously backlogged with a

2   number of cases; and we would just send out an introductory

3   letter, advising the taxpayer that their case had been assigned

4   to me and that I would be contacting them at the earliest

5   convenience.  Once was able to get caught up, would review the

6   case and determine what the facts were, what the revenue

7   officer was trying to do, what the possible options were in

8   order to resolve the matter.  And then I would send out a

9   hearing letter, and that hearing letter would specify that the

10  taxpayer had the option of either doing a hearing in person or

11  by phone.  And we would set up a date, and then we would

12  proceed from there.

13          MS. HADDEN:  Ms. Burgess, can you please bring up

14  Government Exhibit 34.

15  BY MS. HADDEN:

16  Q.  So Mr. Jeka, what is this document, Exhibit 34?

17  A.  This is basically the letter that would have been sent out,

18  stating that we had received the case and set up a hearing for

19  the taxpayer on the specified date here, January 3.

20  Q.  And for what tax periods was this for?

21  A.  Specified up there, tax periods 2000, 2001, 2002, and 2003.

22  Q.  What was the date of this letter?

23  A.  The date is November 17, 2006.

24          MS. HADDEN:  If you can zoom out, please, Ms. Burgess.

25

Michael Jeka - Direct

1    *BY MS. HADDEN:*

2    *Q.*  If you can look bullet No. 2 there -- No. 2, what is the

3    purpose of that section of the letter?

4    *A.*  The purpose is to basically advise the taxpayer of what we

5    are -- what I, as the settlement officer, was trying to work

6    with them to resolve the tax matter.  So we're specifying that

7    if there are any proposed collection actions by the revenue

8    officer in terms of trying to resolve the matter, what options

9    were available to the taxpayer in order to avoid any type of

10   collection action.

11        *MS. HADDEN:*  Ms. Burgess, if you would please go to

12   page 2.

13   *BY MS. HADDEN:*

14   *Q.*  And, Mr. Jeka, if you could look at No. 6 there, what is

15   the purpose of No. 6?

16   *A.*  Basically, over the period of years, the IRS had changed

17   its procedures in terms of what the best methods were to

18   resolve tax disputes.  And we are trying to advise the taxpayer

19   that we're going to take whatever action is necessary, but it's

20   not going to be any more intrusive than previous actions that

21   were taken.

22        *MS. HADDEN:*  And if you could just go to the second

23   full paragraph, beginning with "IRS," in the middle there,

24   Ms. Burgess.

25

Michael Jeka – Direct

1    *BY MS. HADDEN:*

2    Q.   And what is the paragraph that starts with "IRS computer

3    records," what is the purpose of that paragraph?

4    A.   The purpose is to advise the taxpayer that they had not

5    filed their tax returns and that -- one of the processes that

6    the IRS used is that they had all the income data from the

7    taxpayer.  And after repeated attempts to get the taxpayer to

8    file the returns, that was unsuccessful, the IRS would actually

9    prepare a tax return for each of those years.  And the -- it

10   was called a substitute for return.  The actual substitute for

11   return, in many cases, the tax that would be due, the tax

12   balance, was usually higher than what -- if the taxpayer had

13   filed the returns by themselves.  And that is because the IRS

14   did not have any of the deductions, mortgage interest and all

15   the related things that you would normally take for deductions

16   to reduce your tax.  So that substitute for return was what the

17   IRS used in order to try to get the taxpayer into compliance.

18           *MS. HADDEN:*  If you can zoom out, please, Ms. Burgess.

19   *BY MS. HADDEN:*

20   Q.   Now, in the hearing -- I'm sorry -- assuming there are

21   different things that you can do to help the taxpayer through

22   this hearing.  If you can look through 1 through 5 at the

23   bottom of this letter, what are those different options that

24   are available to the taxpayer?

25   A.   The first one, the installment agreement.  Before we could

Michael Jeka - Direct

1     look at -- discuss any of these options, we had to have a full

2     financial statement.  So we need all of the taxpayer's income

3     information, all of their expense information.  And they would

4     prepare that information on a form, 433A, which is the personal

5     income tax statement.  If they had a business, self-employment

6     or LLC or something, then we would also require that they

7     submit a financial statement for the business, which is a form

8     433B.  Once I had all of that information, was able to review

9     it, analyze it, then I could better explain to the taxpayer

10    what the options were.

11          So an installment agreement would basically indicate

12    what their income and expenses are, that they may qualify to

13    pay a certain dollar amount per month on an installment

14    agreement like you would pay on a car loan or any type of loan.

15          Short-term payment plan would be that they had the

16    financial resources to pay the tax balance in full, but they

17    would need some time in order to liquidate that.  So let's --

18    they had some assets that they could liquidate, and we were

19    giving them time to pay it within 120 days.  So that was

20    usually an indication that they had the ability to full pay;

21    we're just giving them time.

22          The third thing is an offer in compromise.  Again, we

23    would use all of the financial data that we had and go through

24    that.  And the taxpayer basically would say, for example, I owe

25    $100,000; I cannot pay that $100,000; I'm going to offer you

Michael Jeka - Direct

1    $10,000; and in lieu of the full payment, we would accept the

2    $10,000.  But that process was very detailed and required a

3    great deal of analysis of the data in order to make sure that

4    what they were offering would be acceptable to the government.

5           If the government accepted the offer, then the

6    guidelines provided that the taxpayer had to file and pay their

7    income tax returns for five straight years.  If they did not

8    pay that, if they did not file, then the offer would default,

9    and whatever they had paid in as a part of the offer in

10   compromise, it would be applied to their balance, and whatever

11   was left, they would still owe.

12          Currently not collectible.  Again, we're reviewing all

13   of the financial data and making a decision that they basically

14   do not have any ability to pay.  Just financially in the red;

15   their expenses greatly exceed their income.  So we would

16   recommend to our manager that the case be closed as

17   non-collectible, with the stipulation that the IRS would review

18   their income data over a period of years.  And if it was

19   determined that their income situation had changed, that they

20   could now make payments or look at an offer in compromise, then

21   that case would be brought out.  So it would be determined how

22   long the case would be put in a non-collectible status.

23          Bankruptcy, the last solution, was -- none of the

24   other four options were available, and the best option for the

25   taxpayer was to file a bankruptcy.

235

Michael Jeka - Direct

1   Q.  Now, just to be clear, who provides the information on the

2   433As and Bs?

3   A.  The taxpayer.  If it's a joint, then both husband and wife

4   would provide that information.

5   Q.  Did you ever receive a 433A or B from Mr. Birk?

6   A.  Not that I remember.  No.

7        MS. HADDEN:  Ms. Burgess, if you could please put up

8   Exhibit 35.

9   BY MS. HADDEN:

10  Q.  Mr. Jeka, do you recognize this document?

11  A.  Since it was provided to me to review, yes, I do.  I don't

12  remember it at the time; but in reviewing it, I understand what

13  it is.  Yes.

14  Q.  Let me ask you this:  Did you ever receive any filed

15  returns from Mr. Birk?

16  A.  In reviewing the documents that were provided to me, yes, I

17  did receive those returns.

18  Q.  And so let's look at Exhibit 35 first.  What is the date of

19  that letter?

20  A.  November 22, 2006.

21  Q.  And for what tax years is -- was -- were enclosed in this

22  letter?

23  A.  This is for 1998 and 1999.

24       MS. HADDEN:  And if we could go to Government Exhibit

25  No. 6, please.

Michael Jeka – Direct

1    *BY MS. HADDEN:*

2    *Q.*  What is the date of this letter?

3    *A.*  January 3, 2007.

4    *Q.*  And what tax years were attached to this letter?

5    *A.*  1998, 2000, 2001, '2, '3, '4, and '5.

6    *Q.*  So did you, in fact, have a collection due process hearing

7    with Mr. Birk?

8    *A.*  We did.  Yes.

9    *Q.*  What was the result of that hearing?

10   *A.*  The -- to the best of my recollection from reviewing the

11   documents, we determined that the returns that he filed -- that

12   we had to make a determination if the returns were going to be

13   processed in one of two different ways.  Because there were

14   some substitute for returns, we had to either submit them

15   through the exam division to review the returns that they

16   submitted and make any adjustments to the substitute for

17   returns that the IRS prepared, or those returns would go to the

18   appeals officer, who would basically do the same type of work.

19        *MS. HADDEN:*  Ms. Burgess, if you could please bring up

20   Government Exhibit 36.

21   *BY MS. HADDEN:*

22   *Q.*  Mr. Jeka, what is this document?

23   *A.*  This is the letter that I sent to the taxpayer apologizing

24   for the delay, again explaining that we had a backlog of cases,

25   and advising him that the returns that he submitted, that they

Michael Jeka - Direct

1    were -- they were originally prepared by the IRS under the

2    substitute for return procedure and that we were in the process

3    of establishing new procedures as to how the returns that he

4    submitted were going to be reviewed and adjusted.

5    *Q.*   What was the date of this letter?

6    *A.*   March 5, 2007.

7    *Q.*   And if can just look at the third paragraph --

8          If you could zoom out, please, Ms. Burgess.

9          The third paragraph, how much did Mr. Birk say that he

10   owed on these filed returns?

11   *A.*   On the returns that he filed, he was showing, not including

12   penalty and interest, tax of $93,031.

13   *Q.*   And you mentioned penalties and interest.  What penalties

14   or interest would be applied to a taxpayer?

15   *A.*   A late filing penalty, a failure to file penalty, whatever

16   the interest -- current interest rate was at that time.

17   *Q.*   And how is the interest calculated?

18   *A.*   It's an annual rate.

19   *Q.*   And if you look at page 2 of Exhibit 37, at the bottom,

20   does it give Mr. Birk a deadline?

21   *A.*   Yes.  At the bottom I asked him to please respond by

22   March 15 of 2007.

23   *Q.*   Did you ever receive a response from Mr. Birk regarding

24   this letter?

25   *A.*   I did not.

Michael Jeka – Direct

1   *Q.*  So what was your next step in this case?

2   *A.*  The next step would have been to send him a final notice

3   letter, advising that if we're not going to -- he's not going

4   to respond, then we're going to issue a notice of

5   determination.  And that, basically, is a decision that -- a

6   recommendation for a decision as to of how we were going to

7   proceed.

8         *MS. HADDEN:*  Ms. Burgess, if we could please bring up

9   Exhibit 38.

10  *BY MS. HADDEN:*

11  *Q.*  Mr. Jeka, what is Exhibit 38?

12  *A.*  That's what is called a notice of determination.  That

13  basically is my decision, approved by my manager, that because

14  the taxpayer did not cooperate, did not provide the

15  information, did not come to the hearing so that we could

16  discuss further actions to resolve the matter, that we were

17  advising him through this notice of determination that we were

18  going to sustain the proposed collection action against him.

19  *Q.*  And what was the date of this letter?

20  *A.*  That's March 27, 2007.

21  *Q.*  And if you could just look at the second paragraph of this

22  letter.  What option does it give the defendant if he does not

23  agree?

24  *A.*  The basic option is that he can file a petition with tax

25  court in order to continue his appeal.

239

Michael Jeka - Direct

1   *Q.*  And how long does he have to do that?

2   *A.*  Within 30 days of the notice of the letter.

3        *MS. HADDEN:*  If you could, Ms. Burgess, please go to

4   page -- page 3 -- I'm sorry, page 4.

5   *BY MS. HADDEN:*

6   *Q.*  So what is this portion of the letter?

7   *A.*  The discussion and analysis, basically, is an explanation

8   to the taxpayer, explaining what it is that he had submitted --

9   in this case, he had submitted the returns -- what the balances

10  were due, and again explaining to him of the collection due

11  process, what his options were, and advising him of --

12  continuing to advise him of his appeal rights.

13       *MS. HADDEN:*  If we could go to the next page, please,

14  Ms. Burgess.

15  *BY MS. HADDEN:*

16  *Q.*  And this particular section, the multiple paragraphs, what

17  is that a summary of?

18  *A.*  It's basically a summary of our communications.

19  *Q.*  At the hearing?  Is it a summary --

20  *A.*  At the hearing and whatever correspondence I sent him.

21  *Q.*  What, if anything, did you inform Mr. Birk at the hearing

22  about his appeal rights?

23  *A.*  I'm not specific -- I'm not understanding specifically the

24  question.

25  *Q.*  Look at the first paragraph on this page.  You discussed

Michael Jeka – Direct

1   some rights that you explained to Mr. Birk and his response.

2   A.  Well, I was trying to get him to understand that we were in

3   this appeals process and this collection due process hearing,

4   and that we were affording him the opportunity to resolve his

5   tax matter through various options.  And he indicated that he

6   basically did not wish to proceed any further, because he had

7   filed this court case, because he was contending that there --

8   he was espousing what were determined to be frivolous tax

9   arguments.  And he did not want to proceed any further through

10  the process that I was offering him until this other legal

11  matter that he had began -- until that was resolved.

12  Q.  So how do you handle a taxpayer when, as in your words,

13  they're espousing frivolous tax arguments?

14  A.  We generally try to explain to them that these are

15  frivolous arguments, that there have been many court cases

16  indicating that the 16th Amendment, the tax system, it is a

17  legal and operational process to collect taxes, and that his

18  continued insistence that this was a fraudulent process or it

19  was unconstitutional was not something that we were going to

20  discuss in the CDP hearing.  It was outside the realm of that.

21  And if he continued to believe that that was what he wanted to

22  do, then his option was to go through the tax court procedure.

23  Q.  So after you send out this letter, this notice of

24  determination, what is the next step in the process?

25  A.  Basically, after it goes out, then the information is sent

Michael Jeka - Direct

 1  via certified mail.  And if there is no response, then the case

 2  is closed, and it's forwarded on -- and notified of the -- to

 3  the revenue officer, to the collection division, that we have

 4  made a determination, the taxpayer has not responded, and they

 5  can proceed with the collection action.  A lot depends on -- if

 6  we're going to get a response that the taxpayer wishes to

 7  proceed with the matter in tax court, then everything is just

 8  put on a -- in a suspended status until that matter is

 9  resolved.

10  Q.  So once you send this letter, do you continue on the case

11  any longer; or is your job done?

12  A.  My job is done.

13          MS. HADDEN:  Thank you, Your Honor.  No further

14  questions.

15          THE COURT:  Before we entertain anticipated

16  cross-examination, a propitious time to declare and take our

17  mid-afternoon recess for this afternoon of trial.  During which

18  recess, sir, you may stand down.  After which you must return

19  to continue and complete your testimony.

20          Will you do that?

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  Very well.  You're excused and may stand

23  down.

24          Ladies and gentlemen of the jury, in preparation for

25  this afternoon recess, two things:  You're right, the same two

1   things, important things.  During the recess, leave your

2   notetaking materials face down on your seats or your chairs;

3   and, of course, be mindful of those powerful rules that

4   continue to govern you as jurors in the trial of this case.

5          We are now in recess for 15 minutes.

6          (Recess at 3:02 p.m.)

7          (In open court at 3:27 p.m.)

8          THE COURT:  Thank you.  Again, as you choose, either

9   remain standing or be seated waiting for the jury.

10          Madam Clerk, thank you.

11          (Jury in at 3:28 p.m.)

12          THE COURT:  Thank you, Madam Clerk.  Ladies and

13   gentlemen, please be seated.

14          Cross-examination for Mr. Birk.

15          MS. BECK:  Thank you, Your Honor.

16          THE COURT:  You're welcome, Ms. Beck.

17                         **CROSS-EXAMINATION**

18   BY MS. BECK:

19   Q.  Good afternoon, Mr. Jeka.  How are you?

20   A.  Fine.  Thank you.

21   Q.  Good.  So just to reorient the jury after the break, your

22   involvement in this case was as the settlement officer --

23   appeals settlement officer; right?

24   A.  Yes.

25   Q.  So you get involved after a revenue officer has assessed a

Michael Jeka – Cross

1    tax liability against a taxpayer; right?

2    *A.*  Yes.

3    *Q.*  Okay.  And in this case, we're talking about Mr. Birk.  He

4    was informed of a tax liability; right?

5    *A.*  Yes.

6    *Q.*  And your job is, then, to resolve the tax dispute between

7    the IRS and Mr. Birk through a civil process; right?

8    *A.*  Yes.

9    *Q.*  And that civil process that we're talking about is the

10   collection due process hearing?

11   *A.*  Yes.

12   *Q.*  Okay.  You worked on this case in 2006 and 2007; does that

13   sound right?

14   *A.*  Yes.

15   *Q.*  So over ten years ago?

16   *A.*  Yes.

17   *Q.*  You don't have an independent recollection of this case, do

18   you?

19   *A.*  I do not.

20   *Q.*  Okay.  So the IRS determined that Mr. Birk didn't file

21   taxes from 1998 to 2005?

22   *A.*  Correct.

23   *Q.*  And they assessed a liability against Mr. Birk using the

24   substitute for return process; right?

25   *A.*  Yes.

244

Michael Jeka - Cross

1    *Q.* And they notified Mr. Birk of the liability based on the

2    SFRs?

3    *A.* Yes.

4    *Q.* And then Revenue Officer Bass informed Mr. Birk that if he

5    didn't pay the liability amount, that the IRS could then levy

6    his accounts; right?

7    *A.* That would be the procedure for the revenue officer, yes;

8    but I would not have been directly involved in that.

9         *MS. BECK:* Okay. If you could pull up Government's

10   Exhibits 33 for me, please.

11   *BY MS. BECK:*

12   *Q.* I just want to refer you to the letter that was sent by

13   Mr. Bass to Mr. Birk back on July 12, 2006. And this letter is

14   the final notice, the notice of intent to levy; right?

15   *A.* Yes.

16   *Q.* And this informs Mr. Birk of his right to a collection due

17   process hearing; right?

18   *A.* Yes.

19        *MS. BECK:* Okay. Thank you.

20   *BY MS. BECK:*

21   *Q.* Shortly after that letter was sent to Mr. Birk, he

22   requested a collection due process hearing; right?

23   *A.* Yes.

24   *Q.* And he was doing so to appeal the IRS's finding of tax

25   liability.

Michael Jeka – Cross

1   *A.* Yes.

2   *Q.* And you notified him on November 17 that that hearing was

3   going to take place in January; right?

4   *A.* Yes.

5   *Q.* Now, in preparation for that collection due process

6   hearing, he submitted returns for the years 1998 through 2005;

7   right?

8   *A.* Yes.

9   *Q.* And he submitted those returns in two sets; right?

10  *A.* To the best of my recollection, yes.

11       *MS. BECK:* Okay. Can you pull up Government

12  Exhibit 35 for me, Mr. Cohen.

13  *BY MS. BECK:*

14  *Q.* The first set of returns that he submitted was for the

15  years 1998 and 1999; is that right?

16  *A.* Yes.

17  *Q.* And the letter we're looking at is a letter from Mr. Birk

18  to the IRS, enclosing those returns; right?

19  *A.* I don't know if it was directly to the IRS or it was part

20  of the package he sent me.

21  *Q.* Fair enough. That letter says that "The enclosed returns

22  have been signed under duress." Right?

23  *A.* That's what it says.

24       *MS. BECK:* Okay. Thank you.

25       Can you put up Government 36, please.

Michael Jeka – Cross

1   *BY MS. BECK:*

2   *Q.*   The next document we're looking at is enclosing returns --

3   purports to enclose returns from 1998 amended and 2000 through

4   2005; right?

5   *A.*   Yes.

6   *Q.*   And, again, Mr. Birk wrote, "The enclosed returns have been

7   signed under duress."  Right?

8   *A.*   Yes.

9        *MS. BECK:*   Thank you.

10  *BY MS. BECK:*

11  *Q.*   Now, those returns were prepared by Dale Erikson of

12  Advanced Tax Solutions; right?

13  *A.*   That, I don't know.

14       *MS. BECK:*   Okay.  If you could pull up Government's 2

15  for me.

16  *BY MS. BECK:*

17  *Q.*   Directing your attention to page 2 of this exhibit, this is

18  the 1040 for Mr. Birk; correct?

19  *A.*   Yes.  The 1040 substitute for return.

20  *Q.*   And this is --

21  *A.*   Rough -- I'm sorry.  What it is saying -- I was just

22  reading over --

23  *Q.*   That stamp there?

24  *A.*   Yes.

25  *Q.*   That SFR protest stamp?

Michael Jeka – Cross

1    A.   Right.

2    Q.   Now, do you recall corresponding with accountants from

3    Advanced Tax Solutions on behalf of Mr. Birk as part of your

4    involvement in this case?

5    A.   I do not have any specific recollection of that.

6         MS. BECK:   Okay.   If I may have a moment?

7         THE COURT:   You may, thank you.

8    BY MS. BECK:

9    Q.   If you'll direct your attention to the bottom of page 3 of

10   this amended return.   It has been signed by Lawrence Martin

11   Birk; right?

12   A.   Yes.

13   Q.   And Jean Ann Birk; right?

14   A.   Yes.

15   Q.   And then there is a section there that says "paid

16   preparer's use only."   Right?

17   A.   Yes.

18   Q.   And the firm name there is Advanced Tax Solutions; correct?

19   A.   Yes.

20   Q.   Okay.   Thank you.

21        If I told you that when Mr. Birk submitted the returns

22   from 1998 through 2005 he used a firm called Advanced Tax

23   Solutions, does that sound right now?

24   A.   Again, I can't say with any specific recollection that that

25   is accurate.   I don't remember.

Michael Jeka – Cross

1          *MS. BECK:*  Okay.  Could you pull up Government Exhibit

2     3 for me, please.  Page 2.

3     *BY MS. BECK:*

4     *Q.*  Referring you to page 2 of Government Exhibit 3, which is

5     your screen.  On the bottom of that form, it indicates that

6     that document was prepared by Advanced Tax Solutions.

7     *A.*  Yes.

8     *Q.*  Does that look right?

9     *A.*  Right.

10    *Q.*  Okay.  And referring you to Government Exhibit 4, page 3.

11    Again, on the bottom of that document, it says that the paid

12    preparer was Advanced Tax Solutions?

13    *A.*  Yes.

14    *Q.*  And that's for 1999?

15    *A.*  Just looking at the bottom there, I don't know if it was

16    for 1999.

17    *Q.*  If you could look at the top of the form, to the left.

18    *A.*  Yes.  It is 1999.  Yes.

19          *MS. BECK:*  Thank you.  If you could pull up Government

20    5 for me, please.

21    *BY MS. BECK:*

22    *Q.*  Directing your attention to page 3 of Government 5, the

23    bottom of that form indicates that this 1040 from 2000 was

24    prepared by Advanced Tax Solutions; is that right?

25    *A.*  Yes.

Michael Jeka - Cross

1    *Q.* Now directing your attention to Government 6 --

2           *THE COURT:* Where are we headed with this examination

3    with this specific witness?

4           *MS. BECK:* Your Honor, Mr. Jeka was the person who was

5    resolving the discrepancy between the returns that were

6    submitted by Mr. Birk that were filed by Advanced Tax

7    Solutions --

8           *THE COURT:* I understand. But what's the significance

9    of him having -- reading this page where Advanced Tax Solutions

10   is the putative preparer of the tax return?

11          *MS. BECK:* Because he testified that he did not recall

12   who submitted the returns on behalf of Mr. Birk.

13          *THE COURT:* Well, you're not indicating that this

14   refreshes his recollection; you're just simply showing that to

15   him. For what purpose?

16          *MS. BECK:* Because I'm going to ask a follow-up

17   question, Your Honor, regarding whether or not this does in

18   fact refresh his recollection about who filed the returns from

19   1998 to 2005.

20          *THE COURT:* Well, let's get there.

21          *MS. BECK:* I am, Your Honor. Unfortunately, there are

22   just three more exhibits to go.

23          *THE COURT:* Well, I'll allow you to represent to the

24   witness he's going to read the same thing.

25

Michael Jeka - Cross

1    *BY MS. BECK:*

2    *Q.*  Mr. Jeka, would you accept my representation that

3    Exhibits 2 through 10 are tax returns that were submitted by

4    Advanced Tax Solutions on behalf of Mr. Birk from 1998 through

5    2005?

6    *A.*  Yes.  As I look at these, that's what I would say.  Yes.

7    *Q.*  Okay.  So with regard to your involvement going forward,

8    you were then to consider those substitute for returns and the

9    returns submitted by Mr. Birk; right?

10   *A.*  I'm sorry.  Repeat that again, that --

11   *Q.*  Sure.  So one of the things that you do in your collection

12   due process hearing is discuss with Mr. Birk his tax liability;

13   right?

14   *A.*  Yes.

15   *Q.*  And when you're doing that, you are looking at the

16   substitutes for returns prepared by the IRS and the returns

17   that he filed in response to those substitutes for returns;

18   right?

19   *A.*  Yes.  I'm looking at both of them.

20   *Q.*  Okay.  On January 3, Mr. Birk appeared for his in-person

21   collection due process hearing; right?

22   *A.*  Yes.

23   *Q.*  Now, that sounds formal, because it's a hearing.  But it

24   was a meeting in your office; right?

25   *A.*  Yes.

Michael Jeka – Cross

1  *Q.*  And at that meeting, Mr. Birk told you that the substitutes

2  for returns that were prepared by the IRS were extremely high;

3  right?

4  *A.*  Yes.

5  *Q.*  And you said that that was because they included IRA

6  rollovers.

7  *A.*  Yes.

8  *Q.*  Okay.  And in your experience, it's not unusual for

9  substitute returns to be higher than actual returns, is it?

10  *A.*  That is correct.

11  *Q.*  Because the IRS doesn't have the cost of goods sold or

12  deduction information when they're preparing substitutes for

13  returns?

14  *A.*  Correct.

15  *Q.*  One of the other things that you discussed with Mr. Birk

16  was his beliefs about the tax code; right?

17  *A.*  Not exactly.  If he would have brought that up, I would

18  have given him a short opportunity to say what he was about to

19  say, but with a limited amount of time, and explain to him that

20  his what we would term frivolous arguments were not a part of

21  the hearing process, and we would not be discussing anything

22  like that in any detail.  But at least to afford him a very

23  short opportunity to say what he had to say; but to make it

24  perfectly clear to him, we were not going to get into a

25  discussion of any detail of his arguments.

Michael Jeka – Redirect

1   Q.   Okay.

2           No further questions.  Thank you.

3           THE COURT:  Redirect examination for the Government,

4   Ms. Hadden?

5           MS. HADDEN:  Yes, Your Honor.

6                       **REDIRECT EXAMINATION**

7   BY MS. HADDEN:

8   Q.  Mr. Jeka, are you a tax lawyer?

9   A.  No.

10  Q.  And is it your job in these hearings to discuss and dispute

11  tax law with a taxpayer?

12  A.  Absolutely not.

13          MS. HADDEN:  Thank you, Your Honor.  No further

14  questions.

15          THE COURT:  Very well.  May Mr. Jeka be excused and

16  released from subpoena?

17          Any objection by the Government?

18          MS. HADDEN:  No, Your Honor.

19          THE COURT:  Or by Mr. Birk?

20          MS. BECK:  No.  Thank you, Your Honor.

21          THE COURT:  Mr. Jeka, you are both excused and

22  released from subpoena with our thanks.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  You're welcome.

25          Very well.  The Government may call its next witness.

Roseanne Miller – Direct

1        Ms. Hadden.

2        *MS. HADDEN:*  Thank you, Your Honor.

3        *THE COURT:*  You're welcome.

4        *MS. HADDEN:*  The United States calls Ms. Roseanne

5   Miller.

6        *THE COURT:*  Thank you.

7        Ms. Roseanne Miller?

8        *THE WITNESS:*  Yes.

9        *THE COURT:*  Good afternoon.  If you would please come

10  forward and stand right here in front of my bench to be sworn.

11        *THE WITNESS:*  Okay.

12        *THE COURT:*  There is fine, ma'am.  Thank you.

13        Please face me and raise your right hand to be sworn.

14  And thank you.

15        May I have your attention in the courtroom.

16        (**ROSEANNE MILLER, GOVERNMENT'S WITNESS, SWORN**)

17        *THE COURT:*  Thank you.

18        Please be seated in that witness stand.

19        And, Ms. Hadden, you may inquire.

20        *MS. HADDEN:*  Thank you, Your Honor.

21        *THE COURT:*  You're welcome.

22                    **DIRECT EXAMINATION**

23  *BY MS. HADDEN:*

24  *Q.*  Good afternoon, Ms. Miller.  Could you please tell the jury

25  what city and state you live in.

Roseanne Miller – Direct

1    A.   I live in Grand Junction, Colorado.

2    Q.   What is your educational background?

3    A.   I graduated high school in 1985 and attended community

4    college after that in San Diego, California, and then went back

5    to college in 1999, early 2000.  Did not obtain a degree.

6    Q.   What is your employment history?

7    A.   I have been with the IRS since 1989.  I started August 1989

8    as a tax examiner with the automated collections system and

9    became a revenue officer in 1991, I became a technical advisor

10   in 2011, and currently am a technical advisor.

11   Q.   What is a technical advisor?

12   A.   I provide technical advice and guidance to field revenue

13   officers.  If they have questions about procedures or how to do

14   things or case development, then they call me, and I help them

15   out.  I also provide litigation support to Department of

16   Justice attorneys and local area counsel attorneys.

17   Q.   Did you work on a case regarding Mr. Lawrence Birk?

18   A.   Yes.

19   Q.   What was your role when you were on his case -- when you

20   were dealing with his case?

21   A.   I was a revenue officer in the field.

22   Q.   When did you start working on his case?

23   A.   In 2007.

24   Q.   What was -- what was the first thing you did when you got

25   his case?

Roseanne Miller – Direct

1    *A.*  I would have done an initial analysis, just a review of

2    what our computer database showed, what the previous case

3    history showed, case documents that were already in the case

4    file, that type of thing.

5    *Q.*  Now, we've all heard all the collection tools that are

6    available to revenue officers.  What of those collection tools

7    did you use in this case?

8    *A.*  I used notice of levy, notice of federal tax lien, summons.

9    *Q.*  Did you send out any notices or letters to the -- to

10   Mr. Birk?

11   *A.*  I did.

12       *MS. HADDEN:*  Ms. Burgess, if you could please bring up

13   Exhibit 40.

14   *BY MS. HADDEN:*

15   *Q.*  Ms. Miller, what is Exhibit 40?

16   *A.*  That is a final notice, notice of intent to levy.

17   *Q.*  What is the purpose of this letter?

18   *A.*  The purpose is to provide notice to, in this case, Lawrence

19   Birk that I had planned on issuing notices of levy and/or

20   filing a notice of federal tax lien.  And he had the

21   opportunity to file a collection due process appeal if he so

22   desired or, of course, to pay it prior to that 30-day period.

23   *Q.*  What is the date of this letter?

24   *A.*  It is dated October 29, 2007.

25       *MS. HADDEN:*  If you could please go to page 2,

1    Ms. Burgess.

2    *BY MS. HADDEN:*

3    Q.  For what tax period was this for?

4    A.  It was for civil penalties for 1998 and 1999.

5    Q.  To be clear, you said civil penalties.  Does this include

6    the tax he owed?

7    A.  No.

8    Q.  So this is just the penalty?

9    A.  It was, I believe, for frivolous filing penalties.  And

10   civil penalties is what we list on the notices, as well as the

11   notice of federal tax lien and levy, as the form number.

12   Q.  Thank you.

13           Ms. Burgess, can you please bring up Exhibit 41.

14           What is Exhibit 41?

15   A.  That is another final notice, notice of intent to levy,

16   that is -- was issued to Lawrence and Jean Birk.

17   Q.  And what is the date of this letter?

18   A.  October 29, 2007.

19           *MS. HADDEN:*  And, Ms. Burgess, if you go to page 2.

20   *BY MS. HADDEN:*

21   Q.  What time tax period is this for?

22   A.  That is for 1998, 1999, 2000, 2001, '2, '3, '4, and '5.

23   Q.  And as the other notice only showed penalties, what does

24   this notice show?

25   A.  This is for income tax for form 1040, as well as penalties

Roseanne Miller - Direct

1   and interest on that tax.

2   Q.   Okay.  Did you ever have any conversations with Mr. Birk

3   through your collection process?

4   A.   I had two phone conversations with Mr. Birk.

5   Q.   Do you remember about when those occurred?

6   A.   One was in 2007, and the other was in 2009.  I don't

7   remember the specific dates.

8   Q.   Do you remember generally what Mr. Birk told you in those

9   conversations?

10  A.   The one in 2007, he was calling in response to the final

11  notice, notice of intent to levy.  And I would have to refer to

12  my notes to know exactly -- I recall that we discussed the

13  notices, he had planned on filing a collection due process,

14  that he was a We the People follower, and that's all I recall

15  without looking at the history.

16  Q.   Do you remember what you would have advised him if he told

17  you the things that you just said?

18  A.   I would have advised him he had the 30 days in order to

19  submit the collection due process hearing request or full-pay

20  the liability before I took enforcement action.

21  Q.   So you said he discussed wanting a collection due process

22  hearing.  So what happens if he requests that over the phone to

23  you?

24  A.   That needs to be in writing.  So I --

25  Q.   So what would you have told him?

1    *A.*  It needs to be in writing.  Yeah.  And the forms and the

2    procedures for requesting that collection due process hearing

3    was sent with the final notice, notice of intent to levy.

4         *MS. HADDEN:*  Ms. Burgess, can you please bring up

5    Exhibit No. 45.

6    *BY MS. HADDEN:*

7    *Q.*  Ms. Miller, what is Exhibit 45?

8    *A.*  That is what we call a reminder notice, and it's just

9    reminding Mr. Birk that he still owes the liability.  And it

10   provides a current balance and it tells him that if he doesn't

11   pay it or get in contact with me to resolve the balance, then I

12   will proceed with collection action.

13   *Q.*  And what is the date of this letter?

14   *A.*  It is dated September 11, 2008.

15        *MS. HADDEN:*  If you go to page 2, please, Ms. Burgess.

16   *BY MS. HADDEN:*

17   *Q.*  What tax period is this for?

18   *A.*  It's for the civil penalties for 1998 and 1999.

19        *MS. HADDEN:*  And, Ms. Burgess, if you could please

20   bring up Exhibit 47.

21   *BY MS. HADDEN:*

22   *Q.*  Is this similar to the first letter for --

23   *A.*  It is.  It's a reminder letter.

24   *Q.*  What is the date of this letter?

25   *A.*  It is dated September 11, 2008.

Roseanne Miller – Direct

1  *Q.*  If we go to the second page, what tax period is this for?

2  *A.*  It's for liabilities -- income tax liabilities for '98

3  through 2005.

4     *MS. HADDEN:*  And if we could please bring up

5  Government Exhibit No. 46.

6  *BY MS. HADDEN:*

7  *Q.*  And what is this letter?

8  *A.*  That is the final notice, I believe, with the -- we send it

9  return receipt, and so that's the card that the post office

10  returns to us to identify who signed for the letter.

11  *Q.*  What was the date of this letter?

12  *A.*  That's September 11, 2008.

13     *MS. HADDEN:*  And if we go to page 3 of that exhibit,

14  please.

15  *BY MS. HADDEN:*

16  *Q.*  What tax periods is this for?

17  *A.*  That is for 2004 and 2005.  And the liability form

18  number -- I don't recall specifically what that is for.

19  *Q.*  Okay.

20  *A.*  I'd have to look at my notes.

21  *Q.*  So one of your collection tools is a seizure.  Can you

22  explain what a seizure is.

23  *A.*  A seizure is an action where we would take an asset and

24  sell it, such as a piece of real property or a vehicle, coins.

25  *Q.*  And what is the process for conducting a seizure?

1   *A.*  Well, we provide notice -- I did not conduct a seizure in

2   this particular case.  I issued levies, which also attach to

3   assets; but it's a different type of --

4   *Q.*  Uh-huh.

5   *A.*    -- action.  So the procedure for a seizure would be to

6   notify the taxpayer prior to the seizure that we were going to

7   take the action against a specific asset and provide them with

8   the opportunity to resolve the balance prior to taking that

9   action.

10        *MS. HADDEN:*  Ms. Burgess, if you can please bring up

11   Exhibit 48.

12   *BY MS. HADDEN:*

13   *Q.*  Ms. Miller, what is this document?

14   *A.*  That is a letter where I am advising Mr. and Mrs. Birk that

15   my next intended action was to file a civil suit -- or

16   recommend a civil suit be filed to foreclose the tax liens

17   against three parcels of property.

18   *Q.*  And what is the date of that letter?

19   *A.*  March 25, 2009.

20        *MS. HADDEN:*  And, Ms. Burgess, would you please bring

21   up Exhibit 49.

22   *BY MS. HADDEN:*

23   *Q.*  Ms. Miller, what is this document?

24   *A.*  That is another reminder letter that I sent along with the

25   previous letter to provide the amount of the balance due that

261

Roseanne Miller – Direct

1    they would need to pay or make arrangements to resolve prior to

2    me taking the proposed action as a civil suit.

3           MS. HADDEN:  Ms. Burgess, if you could please go to

4    page 2.

5    BY MS. HADDEN:

6    Q.  What tax periods is this relating to?

7    A.  That's for form 1040 individual income tax for 1998 through

8    2005.

9    Q.  Did you ever receive any responses from Mr. Birk in letter

10   form?

11   A.  Yes.

12          MS. HADDEN:  Your Honor, the next exhibit, the defense

13   and the Government agreed on a limiting instruction, which was

14   filed in Document 64.

15          Would you like me to provide you a copy of that?

16          THE COURT:  That would probably be the best and

17   fastest way.

18          MS. HADDEN:  Your Honor, this is for Exhibit 51.

19          This is a letter from Mr. Birk to the IRS.

20          THE COURT:  What's your request?

21          MS. HADDEN:  I request that a limiting instruction be

22   given as regard to this exhibit.

23          THE COURT:  Now?  Afterwards?  Both?

24          MS. HADDEN:  After would be fine, Your Honor.

25          THE COURT:  Very well.

1        Is that acceptable to the defense, inasmuch as this is

2   represented as a stipulation?

3        MS. BECK:  Yes, Your Honor.  Just alerting the Court

4   to Paragraph 2 of the Document 64, which the Government is

5   asking you to read.  There are a couple of bracketed portions

6   there.  Obviously --

7        THE COURT:  I'm sorry.  I can't hear you.

8        MS. BECK:  You can't hear me?

9        THE COURT:  I can't hear you.

10        MS. BECK:  Okay.  So Document 64, page 8 is what the

11   Government is asking you to read.  We don't object, so long as

12   the Court includes the appropriate bracketed portion of

13   Paragraph 2.

14        THE COURT:  There are three items in brackets.

15        MS. BECK:  Right.  My position would be that the first

16   one should be read.

17        THE COURT:  Counsel, you either have a stipulation or

18   you do not.  Is it the information in the first of these three

19   optional brackets?

20        MS. HADDEN:  Yes, Your Honor.

21        THE COURT:  All right.

22        And, counsel, you'll alert me as to the propitious

23   timing of the giving of this stipulated limiting instruction?

24        MS. HADDEN:  Yes, Your Honor.

25        THE COURT:  Thank you.

Roseanne Miller – Direct

1       *MS. HADDEN:*  Ms. Burgess, can you please bring up

2   Government Exhibit 51.

3   *BY MS. HADDEN:*

4   *Q.*  So, Ms. Miller, what is this document?

5   *A.*  That is a letter from the Birks, addressed to me, and

6   providing copies of other correspondence that were sent to, I

7   believe, Tom Bentley in appeals and some congressman.

8   *Q.*  Do you remember the general gist of the letter, what the

9   point was?

10  *A.*  It explains that the We the People movement was still the

11  Birks' intent to follow and -- can I see the second page?

12  *Q.*  Sure.

13      Page 2 of Exhibit 51, please.

14  *A.*  And he asked for releases of the notice of federal tax

15  liens -- actually, kind of demanded -- and provided some

16  information about We the People.

17      *MS. HADDEN:*  If you could please go back to page 1,

18  and to the bottom of the first paragraph, starting with "this

19  letter provides."  If you could just highlight that, please.

20  *BY MS. HADDEN:*

21  *Q.*  Ms. Miller, if you can just look at the bottom of that

22  paragraph right there, starting with the reference --

23  *A.*  With the reference "we urge"?

24  *Q.*  Yes.

25  *A.*  "We urge the IRS to cease and desist any and all collection

Roseanne Miller – Direct

1    actions against us at this time, as further action may

2    incriminate you personally or anyone at the IRS who may be

3    willing to sign a verified assessment necessary to proceed in a

4    civil suit.  Also, we hereby demand that the IRS release all

5    notices of federal tax liens currently filed into the public

6    record."

7    Q.  Okay.  All right.

8          Can we go back to page 1, please.

9          I really meant for you to look at -- I'm sorry, it was

10   confusing -- the bottom of Paragraph 1, starting with the

11   reference, 3 and 4.

12   A.  I see.  I'm sorry.

13   Q.  That's okay.

14   A.  So you want me to read that?

15   Q.  Yes, please.

16   A.  Okay.

17   Q.  Starting with "the reference" to the end of the paragraph.

18   A.  "The reference 3 and 4 letters clearly show the intent of

19   the IRS to deprive us of property under color of law.  Our

20   position in this matter remains unchanged, and we will defend

21   ourselves and our property by whatever means are necessary.  It

22   is the right of a sovereign people."

23          MS. HADDEN:  Okay.  Can you zoom out, please.

24   BY MS. HADDEN:

25   Q.  What was the date of this letter?

Roseanne Miller – Direct

1    *A.*  April 14, 2009.

2    *Q.*  And if you look at page 3 of this document, who is that

3    addressed to?

4    *A.*  Congressman Doug Lamborn.

5    *Q.*  Do you have any idea who that is?

6    *A.*  I don't recall.

7         *MS. HADDEN:*  If you can zoom out, please.

8    *BY MS. HADDEN:*

9    *Q.*  He identifies in paragraph 2 a tax amount.  What is the

10   amount that is identified there?

11   *A.*  $2,140,806.82.

12        *MS. HADDEN:*  And if we can go to page 5.

13   *BY MS. HADDEN:*

14   *Q.*  Who is this letter addressed to?

15   *A.*  Thomas Bentley.

16   *Q.*  Do you know Mr. Bentley?

17   *A.*  Yes.

18   *Q.*  And who is he?

19   *A.*  He's an appeals officer -- he was before he retired.

20   *Q.*  What would you normally do as a revenue officer if you

21   receive a letter like this?

22   *A.*  As far as?

23   *Q.*  What would your response to this letter be?

24   *A.*  I don't believe I responded to this letter.  I proceeded

25   with the actions that I had intended to take, as far as trying

Roseanne Miller – Direct

1   to resolve the case and collect the taxes.

2   *Q.* And were you able to resolve the case and collect the

3   taxes?

4   *A.* No.

5   *Q.* When did you stop working on this case?

6   *A.* 2011.

7            *MS. HADDEN:* Your Honor, at this time we would ask for

8   the limiting instruction regarding this exhibit.

9            *THE COURT:* Any objection by Mr. Birk?

10           *MS. BECK:* No, Your Honor.  Thank you.

11           *THE COURT:* Thank you.

12           Ladies and gentlemen of the jury, please be instructed

13  as follows:

14           Concerning Government's Exhibit 51, made the subject

15  of the testimony of the witness, the exhibit may only be

16  considered for the limited purpose of determining what the

17  defendant believed or understood about his legal duty to pay

18  federal income taxes.  The exhibit contains statements about

19  the law in the form of defendant's position on what the law is.

20  It is my duty to explain to you the law applicable to this

21  case.  You may not rely upon any statements of law contained in

22  this exhibit.  You may rely only upon the law as I give it to

23  you in the jury instructions at the end of this case.  It is

24  your sworn duty to follow all of the rules as I explained them

25  to you.

Roseanne Miller – Direct

1          And you are so instructed.  Thank you.

2          Counsel.

3              MS. HADDEN:  Thank you, Your Honor.  No further

4    questions.

5              THE COURT:  Madam Clerk, would you kindly return this

6    to Ms. Hadden, with my thanks.

7              MS. HADDEN:  Thank you, Your Honor.

8              THE COURT:  You're welcome.

9          Cross-examination for Mr. Birk.

10             MS. BECK:  No, thank you, Your Honor.

11             THE COURT:  Very well.

12         May Ms. Miller be excused and released from subpoena?

13         Any objection by the Government?

14             MS. HADDEN:  Thank you, Your Honor.

15             THE COURT:  Or Mr. Birk.

16             MS. BECK:  No, thank you.

17             THE COURT:  Ms. Miller, you are excused and released

18   from subpoena with our thanks.

19             THE WITNESS:  Thank you.

20             THE COURT:  You're welcome.

21         Very well.  The Government may call its next witness.

22         Ms. Hadden.

23             MS. HADDEN:  Thank you, Your Honor.  The United States

24   calls Mr. Thomas Bentley.

25             THE COURT:  Thank you.

Thomas Bentley – Direct

1          Mr. Thomas Bentley, good afternoon.

2          THE WITNESS:  Good afternoon.

3          THE COURT:  If you would please make your way to come

4    stand in this open area in front of my bench, please.  Right

5    there is fine, sir.

6          If you'll face me and raise your right hand to be

7    sworn.  Thank you.

8          May I have your attention in the courtroom.

9          (**THOMAS BENTLEY, GOVERNMENT'S WITNESS, SWORN**)

10          THE COURT:  Thank you.  Please be seated in that

11   witness stand.

12          And, Ms. Hadden, you may inquire.

13          MS. HADDEN:  Thank you, Your Honor.

14                    **DIRECT EXAMINATION**

15   BY MS. HADDEN:

16   Q.  Good afternoon, Mr. Bentley.

17   A.  Good afternoon.

18   Q.  If you could tell us the city and state that you live in.

19   A.  Grand Junction, Colorado.

20   Q.  And what is your educational background?

21   A.  Bachelor of science degree, business administration, with a

22   triple minor.

23   Q.  Where did you get that degree?

24   A.  Cameron University, Lawton, Oklahoma.

25   Q.  What is your educational background?

269

Thomas Bentley - Direct

1    *A.*  Other than that, just the professional training that I

2    received while serving as a government employee.

3    *Q.*  What's your employment history?

4    *A.*  It's quite lengthy.  Where do you want me to begin?

5    *Q.*  How about after college.

6    *A.*  After college, went to work for Department of Defense as a

7    mail and file clerk, file clerk.  Worked up to GS-5 rating.

8    Got a management assistant position with Department of the

9    Army.  And took the PACE exam, had a composite score of 93, and

10   received, like, 80 invitations to join the alphabet soup of the

11   government.

12   *Q.*  Wonderful.

13   *A.*  I chose the Internal Revenue Service.  Was hired as a grade

14   5 for one pay period, then they promoted me to grade 7 under

15   the superior academic performance program.  I was a 7 for one

16   year, was promoted journeyman level revenue officer as a 9.

17   Eighteen months later, competed and received my GS-11 position.

18   Eighteen months after that, competed, received GS-12 position.

19   Then I was selected for national office program manager for

20   Commissioner Gibbs, where I worked collection programs in the

21   analytical services section.

22        After that, you know, you go to national office.  You

23   want to get in and get out in two years, otherwise you're stuck

24   in the ivory castle.  And since I only managed programs and not

25   people, I would have been stuck had I got my grade 14 position.

Thomas Bentley - Direct

1   I was a 13 program manager.  So I came out to Grand Junction,

2   Colorado, as the manager of the collection division.  After

3   three years of management -- I never felt like I was being

4   productive as a manager, you know, facilitator, cheerleader,

5   coach, holding meetings, writing reports, same reports at the

6   beginning of every month, and doing evaluations but not

7   actually doing the work.  I requested that the director place

8   me as an offer in compromise specialist, which I did for about

9   six years.  And then the office of appeals opened up a position

10  as a settlement officer, grade 13, and I was selected.  I

11  finished my career as a settlement officer in the appeals

12  division.

13  Q.  Okay.  What year did you start at the IRS?

14  A.  What year did I --

15  Q.  Did you start working at the IRS?

16  A.  1981.

17  Q.  And you said you -- until the end of your career, so are

18  you retired now?

19  A.  Yes.

20  Q.  What year did you retire?

21  A.  July 3 -- on my birthday -- 2008.

22  Q.  So you said you -- the last position you held was a

23  settlement officer.  What are your duties as a settlement

24  officer?

25  A.  Well, it's best described as what the mission statement of

Thomas Bentley - Direct

1    a settlement officer in the field states, and that is that --

2    to resolve issues between taxpayers and the government to

3    both's best interests in the least intrusive manner possible.

4    Q.  And what does that mean to you?

5    A.  That means that you give the taxpayer a right to offer up a

6    solution and verify that that solution will suffice, will work.

7    Q.  Did you work on a case involving Mr. Lawrence Birk?

8    A.  Apparently I did.

9    Q.  Do you remember it specifically?

10   A.  I don't.

11   Q.  Okay.  Do you remember what year -- what did you review

12   before you came to testify today in order to refresh your

13   recollection?

14   A.  I reviewed the ACDS history.

15   Q.  What is that?

16   A.  ACDS stands for the Appeals Case Management Delivery

17   System.

18   Q.  And what -- how does the information get into that system?

19   A.  The individual settlement officer inputs it.  It's a

20   portion of the history, when the case is received, what actions

21   are taken on it, from start to finish.  And that was in -- the

22   ACDS history, indicated that I worked the case in January of

23   2008 into June of 2008.

24   Q.  And what was your role on this case?

25   A.  Settlement officer to handle the collection due process

272

Thomas Bentley – Direct

1    hearing requests.

2           *MS. HADDEN:*  Ms. Burgess, if you could please bring up

3    Government Exhibit 42.

4    *BY MS. HADDEN:*

5    *Q.*  Do you recognize this document?

6    *A.*  Yes.

7    *Q.*  And what is it?

8    *A.*  This is the letter acknowledging receipt of the taxpayer's

9    request for a hearing that is sent out by -- in this case, Joan

10   Littleton, who does a preliminary work for settlement officers.

11   *Q.*  What is the date of this letter?

12   *A.*  February 4, 2008.

13   *Q.*  What tax period does this letter refer to?

14   *A.*  '98, '99, 2001, 2000, 2002, 2003, 2004, and 2005.

15   *Q.*  Now, did you actually set a collection due process hearing

16   in this case?

17   *A.*  Excuse me?

18   *Q.*  Did you have a collection due process hearing in this case?

19   *A.*  I did not.

20   *Q.*  And why was that?

21   *A.*  Because the taxpayer withdrew his request for the hearings.

22   *Q.*  All right.  Before we get to that, I'm going to bring up

23   Government Exhibit 43.

24           And what is Government Exhibit 43?

25   *A.*  This is the letter that I sent scheduling the collection

Thomas Bentley - Direct

1   due process hearing.

2   *Q.*   What was the date set for the hearing?

3   *A.*   The date set for the hearing was May 29 at 3:30 p.m.

4   *Q.*   What was the date of this letter?

5   *A.*   May 5, 2008.

6   *Q.*   If I can direct you to the third page of this letter.

7   *A.*   All right.

8   *Q.*   Yes.  And do you see the enclosures that were attached to

9   this letter?  What are those enclosures?

10  *A.*   The F433A/B in the F656 stands for the form, 433A, which is

11  an individual financial statement for self-employed and wage

12  earners, and the B is for business taxpayer entities.  And then

13  in the form 656, the 656 is an offer in compromise.  That is a

14  pamphlet that includes both the financial statements and the

15  form 656, which is the offer form.

16  *Q.*   And then what about the second line there of the enclosure,

17  what is that?

18  *A.*   As the taxpayer was presenting what is considered frivolous

19  tax arguments, they have a document -- I believe it's 26 pages

20  in length -- that describes all arguments that are defined as

21  frivolous.  It's not something that we appeals settlement

22  officers have any requirement to discuss, because that's not

23  the purpose of the hearing.  The purpose is to find resolution.

24          *MS. HADDEN:*  If we can go to page 4 of Exhibit 43.

25

Thomas Bentley - Direct

1    *BY MS. HADDEN:*

2    Q.  So is that the document you were just discussing?

3    A.  Yes.

4    Q.  And you sent that out as part of this letter about the

5    hearing?

6    A.  Yes.  As part of the letter.

7    Q.  Now, I asked you earlier, did the hearing occur?  And you

8    said it did not, and you said because the defendant withdrew.

9         If I can direct you to Exhibit 44.  What is this

10   document?

11   A.  This is a facsimile transmittal to the taxpayer and his

12   wife.

13   Q.  And who is it from?

14   A.  It's from me.

15   Q.  And what was the purpose of this fax?

16   A.  I had received the fax correspondence from the taxpayers,

17   and they indicated that they wished to withdraw the offer in

18   compromise -- excuse me -- the collection due process hearing,

19   so I sent them forms for the 1256 to do so.

20        *MS. HADDEN:*  Could we go to page 2, please, Ms.

21   Burgess.

22   *BY MS. HADDEN:*

23   Q.  Is this the form you were just talking about?

24   A.  Yes.  That's one of six, I believe.

25   Q.  And why were there six?

Thomas Bentley - Direct

1  *A.*  Because there are different tax years.

2  *Q.*  So they --

3  *A.*  There may have been a different status on each of the

4  requests, that being either the collection due process or the

5  equivalency hearing.  Meaning, you know, if it was filed

6  timely -- the request was filed timely, it would be a

7  collection due process hearing.  If it wasn't filed timely,

8  then we also granted an equivalency hearing.  The only

9  difference between the two is, when the hearing request is made

10 timely, the taxpayer has a right to petition the tax court;

11 whereas, the equivalency hearing does not, because it's not

12 timely.

13 *Q.*  Okay.  So did you ever receive a formal form withdrawing

14 from the hearing?

15 *A.*  Yes.  I received the same forms back, along with his

16 correspondence.

17        *MS. HADDEN:*  And, Ms. Burgess, if you could please

18 bring up Exhibit 51.  And go to page -- page 5, please.

19 *BY MS. HADDEN:*

20 *Q.*  Do you recognize this letter, page 5 of Exhibit 51?  It's

21 also on the screen in front of you.

22 *A.*  I do recognize this letter, but the letter that I received

23 in return was marked "copy."

24 *Q.*  Oh, you did.  Okay.  You got a copy?

25 *A.*  Yes.

Thomas Bentley - Direct

1   Q.   Well, do you remember getting this letter, though?

2   A.   Yes.

3   Q.   Okay.  What's the date of this letter?

4   A.   Excuse me?

5   Q.   What's the date of this letter?

6   A.   Basically, that they were withdrawing the request.

7   Q.   Right.  What date was this letter?

8   A.   Oh, date.

9   Q.   Yeah.

10  A.   April 14, 2009.

11  Q.   Are we on the right one?

12       Are you on Exhibit 51, sir?

13  A.   Yes.

14  Q.   Page 5 -- page 5, the one that was actually addressed to

15  you?

16  A.   Oh.

17  Q.   It's also on the screen in front of you, too.

18  A.   Sorry.  Yes.

19  Q.   What is that letter dated?

20  A.   That's the letter that I was referring to, because it was

21  marked "file copy."

22  Q.   What is the date of that letter?

23  A.   May 29, 2008.

24  Q.   And do you remember, what was the purpose of this letter,

25  why he sent it to you?

Thomas Bentley - Direct

1   A.  Basically, what he states in the opening statement --

2   sentence, "Regarding the collection due process hearing

3   scheduled for today via telecom, we, the undersigned, formally

4   withdraw our request for said hearing."

5   Q.  Okay.  And so did you take that as a withdrawal from the

6   hearing?

7   A.  Yes.

8   Q.  And when did you stop working on this case?

9   A.  Shortly thereafter.

10  Q.  Do you remember the date?

11  A.  I would have to see my final disposition report.  It's a

12  form 5402.  Or my history from the ACDS.

13       MS. HADDEN:  One moment, Your Honor.

14       THE COURT:  Certainly.

15       Ladies and gentlemen of the jury, if you're quick, an

16  opportunity to stand and stretch.

17       MS. HADDEN:  Your Honor, may I provide Ms. Roberson

18  Government Exhibit 136 for identification only?

19       THE COURT:  You may.

20  BY MS. HADDEN:

21  Q.  Mr. Bentley, if you could look at it yourself, and look up

22  when you're done.

23       Does that document refresh your recollection?

24  A.  Yes.

25  Q.  And when did you stop working on this case?

Thomas Bentley – Cross

1    *A.*  June 3, 2008.

2          *MS. HADDEN:*  Thank you, Your Honor.  No further

3    questions.

4          *THE COURT:*  Very well.

5          Cross-examination for Mr. Birk.

6          Ms. Beck.

7          *MS. BECK:*  Thank you, Your Honor.

8          *THE COURT:*  You're welcome.

9                      **CROSS-EXAMINATION**

10   *BY MS. BECK:*

11   *Q.*  Good afternoon, Mr. Bentley.  How are you?

12   *A.*  Good afternoon.  Good.

13   *Q.*  Mr. Bentley, you got involved in this case when Mr. Birk

14   requested a collection due process hearing; right?

15   *A.*  Yes.

16   *Q.*  And you sent him a notice setting that collection due

17   process hearing; right?

18   *A.*  That's correct.

19   *Q.*  And when you sent him that notice, it included the

20   frivolous argument package; right?

21   *A.*  Yes.

22   *Q.*  And you wrote in your letter to him, in that notice, that,

23   "All of the correspondence you have sent to the IRS has been

24   identified as espousing frivolous tax arguments.  Please

25   provide a written statement as to what relevant issues you wish

279

Thomas Bentley - Cross

1   to raise." Right?

2   *A.* That's correct.

3   *Q.* And on -- very shortly after receiving that letter,

4   Mr. Birk withdrew his request for the collection due process

5   hearing; right?

6   *A.* Yes.

7   *Q.* And you testified that in appeals, you don't discuss

8   frivolous tax arguments because the purpose of that hearing

9   isn't to discuss those issues; right?

10  *A.* That's correct.

11  *Q.* And in Mr. Birk's withdrawal of his request for the

12  collection due process hearing, he said, "We have put forth

13  many questions regarding the correct application of the tax

14  laws, determination of taxable income, and the due process of

15  law." Right? That's what he wrote to you?

16  *A.* Okay. Yes.

17       MS. BECK: Well, if you'll pull up Government

18  Exhibit 51 for me, Mr. Cohen. And turn to page 5, please.

19       Thank you.

20  *BY MS. BECK:*

21  *Q.* So in this first paragraph, starting with, "We have put

22  forth many questions" --

23       Mr. Cohen, if you would highlight that paragraph for

24  me.

25       Mr. Bentley, Mr. Birk wrote, "We have put forth many

Thomas Bentley - Cross

1    questions regarding the correct application of the tax laws,

2    determination of taxable income, and due process of law."

3    Right?

4    A.   That's what it says.   Yes.

5    Q.   And he also wrote, "The IRS has steadfastly refused to

6    answer these questions or accused us of participating in

7    abusive tax avoidance schemes."   Right?

8    A.   That's correct.   Because the issue is not regarding the

9    arguments being presented; it's a -- collection due process is

10   filed for one of two reasons or both.   That regard is 6320 or

11   6330 of the Internal Revenue code; and it has to do with, what

12   do you propose as a taxpayer to -- as an alternative to us

13   filing a lien or taking levy action.

14   Q.   And so just to clarify, when Mr. Birk wanted to address

15   these issues with you, you said that we don't discuss those in

16   this collection due process hearing; right?

17   A.   I never had to say that, I don't believe.

18   Q.   Okay.

19   A.   Because I never spoke to him.

20   Q.   But you testified -- when Ms. Hadden was asking you about

21   this process, you testified that you don't discuss frivolous

22   tax arguments in the appeals process; right?

23   A.   I stated that, yes.

24   Q.   Okay.

25   A.   Not in any length.   We'll give the taxpayer some courtesy

Thomas Bentley – Cross

1   to begin, but it's not the purpose of the hearing.  We have to

2   remind them of that.  The purpose of the hearing is to find

3   resolution to the proposed action that the Internal Revenue

4   Service is proposing to take or has already taken.

5   *Q.*  So you'll give them some courtesy but won't discuss at

6   length?

7   *A.*  That's correct.

8           *MS. BECK:*  Thank you.  No further questions.

9           *THE COURT:*  Any redirect examination for the

10   Government?

11          *MS. HADDEN:*  No, Your Honor.

12          *THE COURT:*  May Mr. Bentley be excused and released

13   from subpoena?

14          Any objections by the Government?

15          *MS. HADDEN:*  No, Your Honor.

16          *THE COURT:*  Or Mr. Birk?

17          *MS. BECK:*  No, thank you, Your Honor.

18          *THE COURT:*  Mr. Bentley, you are both excused and

19   released from subpoena with our thanks.

20          *THE WITNESS:*  Thank you.

21          *THE COURT:*  And the Government may call its next

22   witness.

23          *MR. MAGNANI:*  Thank you, Your Honor.  The United

24   States calls Carrie Westfall.

25          *THE COURT:*  Very well.

Carrie Westfall – Direct

1       Ms. Carrie Westfall, good afternoon.  If you would

2  make your way forward to this open area in front of my bench,

3  please.  I'm going to swear you in.

4       THE WITNESS:  Okay.

5       THE COURT:  There is fine, ma'am.

6       Please face me and raise your right hand to be sworn.

7  Thank you.

8       May I have your attention in the courtroom.

9       (**CARRIE WESTFALL, GOVERNMENT'S WITNESS, SWORN**)

10      THE COURT:  Very well.  Please be seated in that

11  witness stand.

12      Counsel, you may inquire.

13      MR. MAGNANI:  Thank you, Your Honor.

14      THE COURT:  You're welcome.

15                     **DIRECT EXAMINATION**

16  BY MR. MAGNANI:

17  Q.  Good afternoon, Ms. Westfall.

18  A.  Hi.

19  Q.  Where are you joining us from today?

20  A.  I am an employee of Park State Bank out of Woodland Park.

21  Q.  How long have you been an employee of Park State Bank?

22  A.  I've been there approximately ten years now.

23  Q.  What are some of your duties as an employee of Park State

24  Bank?

25  A.  I'm mostly a bank teller, and I also work in personal

Carrie Westfall - Direct

1  banking.  And that's mostly what I do.  I go back and forth as

2  needed.

3  Q.  Okay.  And do you know a Mr. Lawrence Birk?

4  A.  I do.

5  Q.  How do you know him?

6  A.  Well, he's just a customer at the bank.

7  Q.  And about how long have you known him as a customer --

8  well, let me just ask you, do you recognize him?

9  A.  Yes, I do.

10  Q.  Okay.  And how long has Mr. Birk been a customer that

11  you've known at the bank?

12  A.  Well, I was trying to remember.  I think, you know, at

13  least five, six years, but maybe longer.  But, you know, since

14  I've been there a while, I do recognize him when he comes in

15  and always chat and say hello.  He's very friendly.

16  Q.  In the time that you've known him, how regularly would you

17  say Mr. Birk comes into the bank?

18  A.  Well, not sure more recently, because I've been back and

19  forth in the other department.  But sometimes when I've been

20  over there, it's mostly been weekly, average, probably.

21  Q.  And are you familiar with his accounts at the bank?

22  A.  Vaguely.

23  Q.  Well, do you know if he has a business account at the bank?

24  A.  He does.

25  Q.  Okay.  Do you know, only if you remember, what the name of

Carrie Westfall - Direct

1  the business is?

2  A.  I believe it's Tarryall River Log Homes.

3  Q.  In addition to the business account, does he also have a

4  personal account at the bank?

5  A.  Yes.

6  Q.  What type of banking activity can you remember Mr. Birk

7  engaging in, in the time that you interacted with him at the

8  bank?

9  A.  Well, he would come in and make deposits and -- for himself

10  and the business and the church, and then he would purchase

11  official bank checks.

12  Q.  And what -- if you could just briefly explain, what's your

13  understanding of an official bank check?

14  A.  It's like a cashier's check.  And sometimes people will

15  buy -- purchase a cashier's check so that they can pay a bill.

16  Sometimes people need guaranteed funds.

17  Q.  Okay.

18  A.  Or they're taking money out, but they don't want to carry a

19  lot of cash, so they'll take money out and move it to another

20  bank sometimes --

21  Q.  So --

22  A.  -- with a cashier's check.

23  Q.  Sorry.  Were you finished?  I didn't mean to interrupt you.

24  A.  No, I'm okay.

25  Q.  The years you interacted with Mr. Birk as a bank teller at

Carrie Westfall – Direct

1   his bank, how many would you say -- how many official checks

2   would you say he bought?  And if you can't estimate a certain

3   number, was it a lot, a little?  If you could give us a sense

4   of that.

5   A.  I couldn't remember exactly, I'm sure; but he did come in

6   regular and get them.  But sometimes he would come in for his

7   business.  Sometimes he would come in and -- he worked at a

8   church, and he would do their transactions, as well.  And so

9   I'm not 100 percent sure, but it was quite a few.  I mean, on a

10  regular basis, I guess, he would get official checks.

11  Q.  Do you know Mr. Birk's wife?

12  A.  I don't believe I've ever met her.

13  Q.  So you've never seen his wife come into the bank to buy

14  official checks?

15  A.  No.  I don't think I could recognize her if she did come

16  in.  She might have come in; but I don't remember her, to be

17  honest.

18       MR. MAGNANI:  Thank you, ma'am.  I have no further

19  questions.

20       THE WITNESS:  Okay.

21       THE COURT:  Cross-examination for Mr. Birk?

22       MS. BECK:  No, thank you, Your Honor.

23       THE COURT:  Very well.

24       May Ms. Westfall be excused and released from

25  subpoena?

Carrie Westfall – Direct

1          Any objection by the Government?

2          *MR. MAGNANI:*  No, Your Honor.

3          *THE COURT:*  Or the defense?

4          *MS. BECK:*  No, Your Honor.  Thank you.

5          *THE COURT:*  Ms. Westfall, you are both excused and

6     released from subpoena with our thanks.

7          *THE WITNESS:*  Thank you.

8          *THE COURT:*  You're welcome.

9          And when prepared, the Government may call its next

10    witness.

11         *MR. MAGNANI:*  Thank you, Your Honor.  The United

12    States calls Marcie Zurek.

13         *THE COURT:*  Very well.

14         Ms. Marcie Zurek, good afternoon.  If you will make

15    your way to come stand in this open area in front of my bench,

16    please.  There is fine.  Thank you.

17         Please face me and raise your right hand to be sworn.

18    Thank you.

19         May I have your attention in the courtroom.

20          (**MARCIE ZUREK, GOVERNMENT'S WITNESS, SWORN**)

21         *THE COURT:*  Very well.  Please be seated in that

22    witness stand.

23         Counsel, you may inquire.

24         *MR. MAGNANI:*  Thank you, Your Honor.

25         *THE COURT:*  You're welcome.

Marcie Zurek – Direct

1          **DIRECT EXAMINATION**

2     *BY MR. MAGNANI:*

3     *Q.*   Good afternoon, Ms. Zurek.

4     *A.*   Good afternoon.

5     *Q.*   Where do you work, ma'am?

6     *A.*   Park State Bank & Trust.

7     *Q.*   How long have you worked at Park State Bank & Trust?

8     *A.*   Thirty years.

9     *Q.*   What's your current role at that bank?

10    *A.*   My current role is senior vice president and a trust

11    officer.

12    *Q.*   And can you just describe some of the duties that you have

13    in that role.

14    *A.*   For --

15    *Q.*   Actually, I'm sorry.  I'll ask a better question.

16    *A.*   Okay.

17    *Q.*   Can you specifically talk about some of the sort of bank

18    operations duties that you have in that role?

19    *A.*   Sure.  So any like bank subpoena summons, subpoenas, I take

20    care of those.  Any documents we receive that need to be

21    reviewed, I review them.

22    *Q.*   Just -- just to stop you there.  Let's start with, first of

23    all, what do you understand a bank summons to be?

24    *A.*   We're served with a summons to -- typically, it's bank

25    records, signature cards, bank statements, checks, deposits,

288

Marcie Zurek - Direct

1    official checks, wires.

2    *Q.*  And when you get those summonses, what do you do?

3    *A.*  We review them, and then we prepare the documents, and then

4    follow the introductions in the summons.

5    *Q.*  Besides summonses, do you also deal with levies and

6    garnishments?

7    *A.*  Yes.

8    *Q.*  Can you explain to the jury how you deal with -- let's

9    start with levies first.

10   *A.*  So a levy when we get in the mail or served with it, and we

11   basically have to hold the funds in the account.  For an IRS

12   levy, we hold the funds for 20 days.  If there is no

13   discrepancy, then we mail them to the IRS.  Any garnishments is

14   usually court ordered, and we have to wait for the court to

15   release instructions.

16   *Q.*  And can you just explain the difference -- as you

17   understand, the difference between a levy and -- versus a

18   garnishment?

19   *A.*  Yes.  Typically, the levy comes from, like, the IRS or the

20   State of Colorado.  Occasionally, we get stuff from other

21   states.  Garnishment is typically done through the courts, like

22   they have gone to court and they are -- didn't win the -- I

23   guess depends on which way you get.  They're looking to collect

24   the funds.

25   *Q.*  You mentioned that if you get an IRS levy, you sort of sit

Marcie Zurek - Direct

1    on it 20 days.  Am I saying that right?

2    A.  We have to hold -- usually the instructions for an IRS levy

3    requests us to hold the funds for the 20 days.  And if there

4    has been no release of those, then we mail them to the IRS, per

5    the instructions on the levy.

6    Q.  Is a levy for a certain amount?

7    A.  Yes.  It usually describes the customer, their tax ID

8    number, and the amount that they're requesting.

9    Q.  And what happens if the amount of the levy is greater than

10   the funds in the account?

11   A.  Then we only hold the amount that is available.

12   Q.  Have you dealt -- besides IRS levies, have you dealt with

13   other levies -- well, let me ask you a different question.

14           Do you always for any levy have to sit for 20 days

15   before taking action?

16   A.  For the State of Colorado, those, we do immediately, per

17   their instructions.  For the IRS levies, if it says 20 days, we

18   do 20 days.

19   Q.  And do you -- if you get an IRS -- well, let me ask you:

20   If you get a levy from the State of Colorado, do you notify the

21   account holder before disbursement of funds, or it's just

22   immediate?

23   A.  We do.  We do a mailing, typically.  Sometimes we call them

24   as a courtesy.  Kind of just depends.  State of Colorado

25   sometimes will show up at our bank in person.

Marcie Zurek - Direct

1   Q.   To take the money?

2   A.   So we do an official check, and they're gone, so --

3   Q.   Now, what about for an IRS levy, during those 20 days that

4   you're holding, do you notify the customer?

5   A.   Yes.  We send them a copy of it.

6   Q.   What about if you get a summons, do you notify the customer

7   whose accounts are being summonsed?

8   A.   Typically, as a courtesy we do that; but sometimes there is

9   instructions in there to not notify the customer.

10  Q.   And I'd like to just -- there are two binders over there to

11  your right-hand side.  And I'd like to point your attention to

12  Exhibit 100 through 115.

13            We can pull up 100.  There are some pictures with it.

14            And -- yeah.

15            So, Ms. Zurek, can you see on the screen okay?

16  A.   Yes.

17  Q.   Okay.  What is this?

18  A.   Our bank signature card.

19  Q.   And if you could just describe to the jury, what is a bank

20  signature card?

21  A.   If you come to open an account at the bank, then we request

22  that you sign a signature card so we have your signature on

23  file.

24  Q.   And can you flip to the next page, please, of the exhibit.

25  And what is this one?

Marcie Zurek – Direct

1    *A.*   That would be the personal signature card with copies of

2    IDs that -- when they opened the account.

3    *Q.*   Sorry.  I should have asked you, what is the difference

4    between the signature card on the first page of Exhibit 100 and

5    the second page?  And don't feel rushed.  Please take your

6    time.

7    *A.*   The first one I believe was the business account, and the

8    second one was for the personal account.

9    *Q.*   Now, why -- why do you have the driver licenses for the

10   potential account?

11   *A.*   We require the driver's license to open an account.

12   *Q.*   And what about for a business account?

13   *A.*   Well -- looking at the date, we probably had the driver's

14   license on file from when we opened the personal account in

15   February.  So when the business account was opened in April, we

16   would have already had the copies of ID on file, so we wouldn't

17   have necessarily made another copy.

18   *Q.*   And do you know why -- and only if you know.  Do you know

19   why you got to get the driver's licenses when someone opens a

20   bank account?

21   *A.*   Well, we have to be able to identify the person coming in

22   and opening the account.

23   *Q.*   Is it required that you do that?

24   *A.*   Pardon?

25   *Q.*   Is it a requirement?

Marcie Zurek - Direct

1    *A.* Yes, it is.

2    *Q.* Now, if you could just -- you don't have to flip through

3    all of these, but if you could sort of yourself look through

4    Exhibits 100 through 115. And after you've had a chance -- you

5    don't need to look -- but just to flip through them.

6    *A.* Okay.

7    *Q.* So are you -- you're generally pretty familiar with Park

8    State Bank records?

9    *A.* Yes.

10   *Q.* Do those appear to be Park State Bank records?

11   *A.* Pardon?

12   *Q.* Do those appear to be Park State Bank records?

13   *A.* Yes.

14   *Q.* Did you produce any Park State Bank records?

15   *A.* Yes.

16   *Q.* For Mr. Birk's account?

17   *A.* Yes.

18   *Q.* Okay. What about for his business account?

19   *A.* Yes, I did.

20   *Q.* Can you -- can you just sort of describe for the jury --

21   are you familiar with an official check?

22   *A.* Yes.

23   *Q.* And are there some other names that maybe other banks use

24   for official checks?

25   *A.* Yes. Cashier's checks is common.

Marcie Zurek - Direct

1  *Q.*  Is it also sometimes called a bank check?

2  *A.*  Right.

3  *Q.*  And what is the definition -- just as best as you can

4  explain it -- of what an official or cashier's check is?

5  *A.*  It's an instrument that a customer comes in and purchases

6  with funds from their account, and then it creates an official

7  check or a cashier's check that they use to make payment on

8  something.

9  *Q.*  And so how would you describe the difference between an

10  official check and just a regular check that you might get from

11  opening a checking account?

12  *A.*  Well, official check would be guaranteed funds, where a

13  personal check may or may not.  I mean, by the time it goes

14  through the system.  But we have to pay those official checks.

15  *Q.*  So if a person wants to get an official check for an amount

16  of money that is more than they have in their account, can they

17  do that?

18  *A.*  No.  No.

19  *Q.*  So when a person who receives an official check cashes it,

20  where does that money come from?

21  *A.*  It comes from our bank account or --

22  *Q.*  Now, about the records that you talked about -- did you

23  work on the production of the records in this case?

24  *A.*  Yes.

25  *Q.*  Did you notify Mr. Birk when you produced the records?

Marcie Zurek - Direct

1    *A.* Not on those last one. No.

2    *Q.* Why --

3    *A.* I mean, we've had several over time. But --

4    *Q.* Well, let me ask you: You said -- I believe you said that

5    you do it as a courtesy?

6    *A.* Yes.

7    *Q.* So do you know why -- only if you know -- Mr. Birk wasn't

8    given notice when records were produced pursuant to summons on

9    his accounts?

10   *A.* Well, we had -- at one time had contacted Mr. Birk for --

11   that was early 2005, 2006; and then we had gotten a letter back

12   saying he didn't want us to produce the records. So we had to

13   reach out to our attorney, and we were advised to produce out

14   the records.

15   *Q.* So -- I'm sorry, I should have asked before. Does it --

16   have records from Mr. Birk's bank accounts been produced

17   multiple times over the years?

18   *A.* Yes, they have.

19   *Q.* Do you know about when that was to the best of your

20   knowledge, about when it was that Mr. Birk sort of, I guess,

21   challenged the summons?

22   *A.* The one --

23        *MS. BECK:* Objection, Your Honor. Leading.

24        *MR. MAGNANI:* I asked her when.

25        *THE COURT:* It's not leading. It doesn't offend

1   Rule 611(c).  It's a fair question.  The objection is

2   overruled.

3           Ma'am, you may answer counsel's last question if after

4   all of this you recall it.  If you do, you can answer it of

5   your personal knowledge.

6           *THE WITNESS:*  I believe it was 2005 or 2006.  I can't

7   be exact, but --

8           *MR. MAGNANI:*  Okay.  Thank you.

9           I have no further questions.

10          *THE COURT:*  Very well.

11          Cross-examination for Mr. Birk.

12          Ms. Beck.

13          *MS. BECK:*  No, thank you.

14          *THE COURT:*  Very well.

15          May Ms. Zurek be excused and released from subpoena?

16          Any objection by the Government?

17          *MR. MAGNANI:*  No objection, Your Honor.

18          *THE COURT:*  Or by Mr. Birk?

19          *MS. BECK:*  No, Your Honor.  Thank you.

20          *THE COURT:*  Ms. Zurek, you are both excused and

21   released from subpoena with our thanks.

22          *THE WITNESS:*  Okay.

23          *THE COURT:*  Unless there is a specific request to

24   proceed to the next witness, it's time to call it a day.

25          Discerning no special request, ladies and gentlemen of

1    the jury, this brings us to a close and conclusion of day two

2    of trial.  Again, momentarily, as is now your custom, you will

3    not be sequestered.  You'll be free to separate, leave the

4    federal courthouse, go your separate ways overnight.

5             Two things:  Leave your notetaking materials face down

6    in your chairs or your seats.  And before you leave, please

7    take the reasonable time necessary once again to read and heed

8    those critically important rules that especially now govern

9    your conduct as jurors in this trial.

10            I again respectfully request that you report for

11   further duty and service tomorrow at 8:30 a.m.

12            But I quickly inquire, will that be unreasonable or

13   terribly inconvenient for any one or more of you?

14            (No response.)

15            Presumably not.

16            Very well.  As concerns this case in trial, we are in

17   recess until tomorrow at 8:30 a.m.  Good afternoon.

18            (Recess at 4:45 p.m.)

19                         **I N D E X**

20   **Witness**                                             **Page**

21      KRISTY MORGAN

            Direct Examination By Mr. Magnani           52
22          Cross-examination By Ms. Beck                61
            Redirect Examination By Mr. Magnani          79
23      PAULETTE APPLEGATE
            Direct Examination By Mr. Magnani            81
24          Cross-examination By Ms. Beck               101

25

1        BRUCE STORK
                Direct Examination By Ms. Hadden              107
2               Cross-examination By Ms. Beck                 117
                Redirect Examination By Ms. Hadden            128
3        FRED SKALUBA
                Direct Examination By Ms. Hadden              131
4               Cross-examination By Ms. Beck                 139
         TODD WHALEN
5               Direct Examination By Mr. Magnani             145
                Cross-examination By Ms. Beck                 169
6               Redirect Examination By Mr. Magnani           176
         DALE ERIKSON
7               Direct Examination By Mr. Magnani             178
                Cross-examination By Ms. Beck                 218
8        MICHAEL JEKA
                Direct Examination By Ms. Hadden              228
9               Cross-examination By Ms. Beck                 243
                Redirect Examination By Ms. Hadden            252
10       ROSEANNE MILLER
                Direct Examination By Ms. Hadden              254
11       THOMAS BENTLEY
                Direct Examination By Ms. Hadden              269
12              Cross-examination By Ms. Beck                 278
         CARRIE WESTFALL
13              Direct Examination By Mr. Magnani             283
         MARCIE ZUREK
14              Direct Examination By Mr. Magnani             287

15                      REPORTER'S CERTIFICATE

16           I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
17
             Dated at Denver, Colorado, this 18th day of December,
18   2019.

19

20

21                         Therese Lindblom,CSR,RMR,CRR

22

23

24

25