1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 18-cr-00359-REB
3
UNITED STATES OF AMERICA,
4
      Plaintiff,
5
vs.
6
LAWRENCE MARTIN BIRK,
7
      Defendant.
8
_____
9
                    **REPORTER'S TRANSCRIPT**
10                       TRIAL TO JURY
                          DAY THREE
11 _____

12         Proceedings before the HONORABLE ROBERT E. BLACKBURN,

13  Senior Judge, United States District Court for the District of

14  Colorado, continuing at 8:36 a.m., on the 24th day of July,

15  2019, in Courtroom A1001, United States Courthouse, Denver,

16  Colorado.

17                   **A P P E A R A N C E S**

18         CHRISTOPHER MICHAEL MAGNANI and ELIZABETH CARYL
    HADDEN, Trial Attorneys, U.S. Department of Justice, Tax
19  Division, 601 D Street, N.W., Washington, DC, 20004, appearing
    for the Government.
20

21         EDWARD HARRIS and JENNIFER LYNN BECK, Assistant
    Federal Public Defenders, 633 17th Street, 10th Floor, Denver,
22  Colorado, 80202, appearing for the Defendant.

23

24              THERESE LINDBLOM, Official Reporter
             901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

1              **P R O C E E D I N G S**

2                 (In open court at 8:36 a.m.)

3                 *THE COURT:*  Good morning, and thank you.

4                 Again, as is your custom, either be seated or remain

5      standing for our jury.

6                 Madam Clerk.  Thank you.

7                 (Jury in at 8:37 a.m.)

8                 *THE COURT:*  And ladies and gentlemen, please be

9      seated.

10                Ladies and gentlemen of the jury, good morning.

11                *JURY:*  Good morning.

12                *THE COURT:*  We are prepared to resume trial together.

13     Let us do precisely that.  Thus, the Government may call its

14     next witness.

15                Ms. Hadden.

16                *MS. HADDEN:*  Thank you, Your Honor.  The United States

17     calls Ms. Jennifer Morgan.

18                *THE COURT:*  Ms. Jennifer Morgan, good morning.

19                If you will make your way to stand in this open area

20     in front of the bench, please.

21                Face me and raise your right hand to be sworn, please.

22                May I have your attention in the courtroom.

23                (**JENNIFER MORGAN, GOVERNMENT'S WITNESS, SWORN**)

24                *THE COURT:*  Thank you.  Please be seated in that

25     witness stand.

Jennifer Morgan – Direct

1          Ms. Hadden, you may inquire.

2                    **DIRECT EXAMINATION**

3     *BY MS. HADDEN:*

4     *Q.*   Ms. Morgan, what city and state do you live in?

5     *A.*   I live in Woodland Park, Colorado.

6     *Q.*   What is your educational background?

7     *A.*   High school and some college.

8     *Q.*   What is your employment history?

9     *A.*   I started with the IRS in 2006 in accounts management; I

10    became a revenue officer in 2007; I moved to advisory, to be an

11    advisor in 2014; and then I became an advisory group manager in

12    2015.

13    *Q.*   And what is an advisory group manager?

14    *A.*   Advisory provides technical guidance to revenue officers

15    and other departments within the IRS.  We also deal with the

16    public for things like lien certificates.  We provide technical

17    guidance to ROs for things like seizures and suits and -- we

18    basically give technical guidance to internal departments.

19    *Q.*   Is that the position you're still in now?

20    *A.*   I'm the advisory group manager, so I manage advisors.

21    *Q.*   Okay.  Did you work on this case regarding Mr. Lawrence

22    Birk?

23    *A.*   Yes, I did.

24    *Q.*   What was your role in this case?

25    *A.*   I was a revenue officer -- a field revenue officer.

Jennifer Morgan – Direct

1   *Q.*   When did you start working on this case?

2   *A.*   In June 2011.

3   *Q.*   And what did you do when you first got on the case?

4   *A.*   I reviewed the previous history.  The case has been

5   assigned to an RO prior to being assigned to me, so I reviewed

6   all of the history and determined my next action, whether I

7   needed to do a field call or research or --

8   *Q.*   So of the collection tools that were available to you, what

9   of those tools did you use in this case?

10   *A.*   I used -- I issued a bank levy; I issued summons to banks

11   and mortgage holders; I seized vacant land; I started doing

12   research for -- to establish an alter ego; I --

13   *Q.*   Let me stop you there.

14   *A.*   Okay.

15   *Q.*   You just mentioned the alter ego and levying bank accounts.

16   Can you explain what an alter ego is and what the purpose is.

17   *A.*   An alter ego is when you have an individual and an entity,

18   and they act one and the same.  So money is deposited into a

19   personal account or a business account and commingled, to the

20   point that you can't tell the difference between the two?

21   Money is being used for both entities.

22   *Q.*   So is there a difference between levying a personal bank

23   account versus a business bank account?

24   *A.*   Yes.

25   *Q.*   And what is the different process for a business bank

Jennifer Morgan – Direct

1   account?

2   *A.*   On a business bank account, if –– for a revenue officer, if

3   the individual account is assigned in our inventory, we can't

4   just go levy a business bank account.  We have to have either

5   that case assigned to us as well, or we have to establish that

6   there is an alter ego situation, where funds are being

7   commingled.  So we have to do a lot of research, summons,

8   information to establish the alter ego; and then we have to get

9   counsel's approval before we can issue a levy to a business

10   bank account in that situation.

11   *Q.*   Did you do that in this case?

12   *A.*   I started to do that.  I did not complete that.

13   *Q.*   So did you ever levy the business bank account?

14   *A.*   No.

15   *Q.*   What about his personal bank account, were you able to do a

16   levy on his personal bank account?

17   *A.*   Yes.

18   *Q.*   Do you remember approximately how much you got from that

19   levy?

20   *A.*   It was approximately $32.

21   *Q.*   So what's the different process for the personal bank

22   account?  What do you have to do for that?

23   *A.*   You have to send a notice to the taxpayer to let them know

24   that that is your intent, your intent to levy personal assets,

25   to get them the opportunity to come forward and, you know,

Jennifer Morgan – Direct

1    clear up the account or even appeal that process.

2    Q.  Does it need any additional approvals from counsel or --

3    A.  No.

4    Q.  How about retirement accounts, are you able to levy

5    personal retirement accounts, like 401Ks or IRAs?

6    A.  We can; but that, again, is a more in-depth process.  We

7    have to secure -- at the time I think it was director approval

8    in order to levy a retirement account.  And, again, you have to

9    show that there is no other means of collection.  They don't

10   want you to do that unless it's a last resort.

11   Q.  So did you send the defendant any notices or letters

12   throughout your time as RO on this case?

13   A.  Yes.

14        MS. HADDEN:  Ms. Burgess, if you could please bring up

15   Government Exhibit 53.

16        Ms. Roberson, if you could please give the screen.

17        THE COURT:  Time out.  Technology is wonderful until

18   it isn't.

19        Counsel, you may resume your examination.

20        MS. HADDEN:  Thank you, Your Honor.

21        THE COURT:  You're welcome.

22   BY MS. HADDEN:

23   Q.  Ms. Morgan, do you recognize this document?

24   A.  Yes, I do.

25   Q.  And what is it?

Jennifer Morgan – Direct

1    *A.*  This is a correspondence that I issued when I received a

2    letter from the taxpayer.  This is my response to that letter.

3    *Q.*  And what is the date of this letter?

4    *A.*  8/30 -- is that 8/30/2011?  There we go.  8/30/2011.

5    *Q.*  And what tax periods was this for?

6    *A.*  This was for 1998 through 2005.

7    *Q.*  What was the purpose of this letter?

8    *A.*  The purpose was to respond to Mr. Birk for a letter that he

9    had issued to me.  It's basically explaining that we're going

10   to go forward with our collection process.

11        *MS. HADDEN:*  And, Ms. Burgess, if you could please

12   bring up Government Exhibit 54.

13   *BY MS. HADDEN:*

14   *Q.*  What is this letter?

15   *A.*  This is a notice that we send when -- when you receive a

16   case in your inventory, if prior notices have been issued --

17   for instance, intent to levy notices -- and more than 180 days

18   have passed, we're required to send another notice to say, hey,

19   we're getting ready to enforce collection again.  It's just

20   kind of like a warning letter.

21   *Q.*  What is the date of this letter?

22   *A.*  This letter is January 24, 2012.

23        *MS. HADDEN:*  If you go to page 2, please, Ms. Burgess.

24   *BY MS. HADDEN:*

25   *Q.*  What tax period is this for?

Jennifer Morgan – Direct

1    *A.*  This is for 1998 through 2005.

2    *Q.*  So in addition to the collections tools that you already

3    said you used, summons and levies and liens, did you do

4    anything else in this case?

5    *A.*  I made several field calls to do research.  I met with

6    other departments as needed to accomplish what I was trying to

7    do.

8    *Q.*  So let's talk about the field calls.  Where did you go for

9    your field call?

10   *A.*  I made a field call to Park County Clerk and Recorder and

11   to Park County Assessor's office to get information on the real

12   property located in that county.  I also made a field call to

13   the personal residence; I made a field call to the Teller

14   County Courthouse, Clerk and Recorder and County Assessor, to

15   verify records for real property located in that county; I also

16   viewed the vacant land in Cripple Creek, which is Teller

17   County.  I think that's all.

18   *Q.*  When you say the "personal residence," of who?

19   *A.*  Of the taxpayer, Mr. Birk.

20   *Q.*  And the vacant land, who did that belong to?

21   *A.*  Mr. Birk.

22   *Q.*  Okay.  Could you please describe the personal residence

23   that you witnessed when you went on your field call.

24   *A.*  It was a log cabin.  It was –– appeared to be pretty large.

25   I was only there for a short period of time.  But it was

Jennifer Morgan - Direct

1  located in Lake George in a gated community; and it was back

2  towards the back of that gated community, if I remember right.

3  And there was a detached garage next to the home and then a

4  vacant lot next door that Mr. Birk also owned.

5  *Q.*  Did you ever attempt to do any seizures in this case?

6  *A.*  I did.

7  *Q.*  Can you please describe the process of actually getting a

8  seizure.

9  *A.*  To get a seizure, you have to do courthouse research to

10  verify what type of encumbrances are listed against the

11  property, if there is any other owners involved, if there is

12  mortgage lenders, if there is balance owed on the property

13  through a loan, if there is other liens involved.  And then you

14  have to write a memo to show that you've tried other means of

15  collection prior to seizure, like bank levies; and then you

16  have to weigh the risk, you know, to determine if there is

17  enough equity available to pay the outstanding tax liability

18  before you pursue seizure of anything.  And then you have to

19  secure manager approval, territory manager approval, and

20  advisory and counsel approval before you can seize the land or

21  any other item.

22  *Q.*  In this case there were a number of properties.  How did

23  you decide which property to try to seize?

24  *A.*  The -- well, we try to, again, avoid seizing a personal

25  residence until last resort.  The vacant land next door to the

307

Jennifer Morgan – Direct

1    personal residence was owned by Mr. Birk and a third party, you

2    know, 50 percent interest for each person; so that's, you know,

3    a little difficult to seize something like that, because then

4    you've got an innocent third party involved.  So we try to

5    avoid that if at all possible.  The vacant land in Cripple

6    Creek, however, was unencumbered and belonged to Mr. Birk; so

7    that was the reason I chose that property.

8    Q.  Did you get approval to seize that property?

9    A.  I did.

10   Q.  So once you get approval, what is the process for actually

11   going about seizing the property?

12   A.  You have to contact our PALS, which is Property Appraisal

13   Liquidation Specialist department.  You have to contact them,

14   they look at the property, they determine the fair market

15   value, and they are the ones that actually auction and sell the

16   property.  So you contact them.  You -- you know, they

17   determine if there is going to be any additional administrative

18   expenses to seizing the property, whether it be advertising,

19   things like that, that are associated with the auction.  And

20   then once they -- you know, once they determine that there --

21   the value is enough to seize it, we're going to get some equity

22   to be able to pay the tax debt, then they take over and

23   actually complete the advertising, the auction, the sale.  They

24   receive the funds from the sale and then post them to the

25   account; and then they turn, you know, the account back over to

Jennifer Morgan - Direct

1   the revenue officer once they've completed that process.

2   Q.  What is the notification process to the defendant during

3   this period?

4   A.  So you have to notify the taxpayer in person if you plan to

5   seize something.  You have to give them a prior notice so that

6   they have the opportunity again to full pay the account or make

7   arrangements to full pay the account; and then you also have to

8   hand deliver the notice of seizure and give them the

9   opportunity to appeal that process.

10  Q.  So what are the taxpayer's rights in a seizure?

11  A.  He has the right to appeal the process --

12  Q.  And to -- I'm sorry.  Go ahead.

13  A.  Go ahead.

14  Q.  I was just going to say, who do they appeal to?

15  A.  Appeals has their own department.  So you appeal -- you can

16  appeal to -- you fill out a form and send it in to the person

17  assigned to the case, and then they forward it to the appeals

18  division.

19        MS. HADDEN:  Ms. Burgess, if you could please bring up

20  Government Exhibit 55.

21  BY MS. HADDEN:

22  Q.  Did you in fact serve the defendant with the seizure

23  paperwork in person?

24  A.  I did.

25  Q.  What is this document?

Jennifer Morgan – Direct

1  A.  This is the form 668B.

2  Q.  What is its purpose?

3  A.  This is the notice of levy to seize the vacant land.  This

4  shows all of the tax periods involved and the total dollar

5  amount and the location where it was served.

6  Q.  What is the date of the notice?

7  A.  April 27, 2012.

8  Q.  Is this one of the documents that you provided the --

9  Mr. Birk at the time of the seizure?

10  A.  It is.

11  Q.  What other documents did you provide him during the

12  seizure?

13  A.  The form 911, which is for him to be able to request

14  assistance from the taxpayer advocate if he chose to do that.

15  That's another option to help resolve the account.  Also the

16  form 2433, which is the notice of seizure.  And -- I believe --

17  I'd have to look at my notes to see if that was all that was

18  handed to him that day.

19  Q.  Did you speak with Mr. Birk when you provided him these

20  documents?

21  A.  I did.

22  Q.  What did he say?

23  A.  I don't recall him saying anything.

24  Q.  You didn't have a conversation with him?

25  A.  I just explained to him that these were the documents I was

Jennifer Morgan – Direct

1   providing and his appeal rights -- actually, I do recall, I

2   think he did say that he would appeal.

3   *Q.*  So in addition to providing him the documents, you talked

4   to him about his rights?

5   *A.*  Correct.

6   *Q.*  Can you describe to him the property that was actually

7   seized?

8   *A.*  It was vacant land.  It was 9 acres -- a little over

9   9 acres of vacant land in Cripple Creek, Colorado.  It was on

10  kind of a hilly area with trees and -- that was -- it was just

11  vacant land.

12  *Q.*  So, ultimately, was that property seized?

13  *A.*  It was.

14  *Q.*  And was it sold?

15  *A.*  It was.

16  *Q.*  How much was it sold for?

17  *A.*  I believe it was around 12,000.

18  *Q.*  Do you remember what date it was sold?

19  *A.*  I don't remember the date right off the top of my head.

20  *Q.*  If I provided you the ICS history to refresh your

21  recollection, would that help?

22  *A.*  Yes.

23        *MS. HADDEN:*  Ms. Roberson, if you could please give

24  her Exhibit -- I believe it is --

25        Sorry, Your Honor.

Jennifer Morgan – Direct

1          It's Government Exhibit 133 for identification.

2     *BY MS. HADDEN:*

3     *Q.*  Ms. Morgan, if you can just look through that and see if

4     you can determine the date of the sale.  And then look up at me

5     after you find it.

6     *A.*  Okay.  So there was two different dates.  Are you looking

7     for the first one or the second one?

8     *Q.*  How about the date of auction?  What was the date of

9     auction, where the bidder actually won the auction?

10    *A.*  Okay.

11    *Q.*  Maybe I can help you out.  I'm going to direct your

12    attention to page 137.

13    *A.*  Okay.  1/29/2013.

14    *Q.*  Let me hold you up for one minute.  Does that refresh your

15    recollection?

16    *A.*  Yes.

17    *Q.*  And so what date was the property sold in the auction?

18    *A.*  Okay.  Just a second.  12/27/2012.

19    *Q.*  Thank you.

20    *A.*  Sorry about that.

21    *Q.*  No problem.

22          When did you stop working on this case?

23    *A.*  In 2013, I believe.

24          *MS. HADDEN:*  Thank you, Your Honor.  I have no further

25    questions.

Jennifer Morgan – Direct

1        THE COURT:  Very well.  Thus, cross-examination, if

2   any, for Mr. Birk.

3        Ms. Beck.

4        MS. BECK:  We have nothing at this time, Your Honor.

5   Thank you.

6        THE COURT:  May Ms. Morgan therefore be excused and

7   released from subpoena?

8        Any objection by the Government?

9        MS. HADDEN:  No, Your Honor.

10        THE COURT:  Or Mr. Birk.

11        MS. BECK:  No, Your Honor.  Thank you.

12        THE COURT:  Ms. Morgan, you are both excused and

13   released from subpoena with our thanks.

14        THE WITNESS:  Thank you.

15        THE COURT:  You're welcome.

16        Very well.  The Government may call its next witness.

17        MR. MAGNANI:  United States calls Mary Trabold.

18        THE COURT:  Thank you.

19        MR. MAGNANI:  If we could have the monitors turned off

20   for a second while Ms. Burgess finds --

21        THE COURT:  Good morning.

22        THE WITNESS:  Good morning.

23        THE COURT:  You'll stop right there and thank you.

24        May I have your attention in the courtroom.

25

Mary Trabold – Direct

1          (**MARY TRABOLD, GOVERNMENT'S WITNESS, SWORN**)

2          Thank you.  Please be seated in that witness stand.

3          Mr. Magnani, you may inquire.

4          *MR. MAGNANI:*  Thank you, Your Honor.

5          *THE COURT:*  You're welcome.

6                          **DIRECT EXAMINATION**

7   *BY MR. MAGNANI:*

8   *Q.*  Good morning, Ms. Trabold.

9   *A.*  Good morning.

10  *Q.*  Could you just please introduce yourself to the jury and

11  let them know where you're from.

12  *A.*  I'm originally from upstate New York.

13  *Q.*  Where did you go to school?

14  *A.*  I got a bachelor's from industrial and labor relations from

15  Cornell University and a master of science and accounting and a

16  master of business administration from Northeastern University

17  in Boston.

18  *Q.*  And what did you do with those degrees after graduating

19  school?

20  *A.*  With my undergraduate degree, I actually worked in the

21  title business for a period of time; and then I returned to

22  school to become an accountant.  And after graduation, I was

23  self-employed for a period of time; and then I started working

24  for the IRS in 2002.

25  *Q.*  If you could just tell the jury, what did you do for the

314

Mary Trabold - Direct

1    IRS when you started working for them?

2    A.  I was a general program revenue agent.  So as you heard

3    Mrs. Applegate describe yesterday, I conducted examinations of

4    individuals, and corporations, businesses, flow-through

5    entities, and so on.

6    Q.  Where did you work for the IRS as a general program revenue

7    agent?

8    A.  In Baltimore, Maryland.

9    Q.  How long did you work as a revenue officer before moving on

10   to something else at the IRS?

11   A.  I was there for about two years and nine months.  Then I

12   decided to try my hand at becoming a criminal investigator, so

13   I joined the IRS's criminal investigation division.

14   Q.  What position did you hold in the criminal investigation

15   division?

16   A.  I was a special agent.

17   Q.  Like Special Agent Warnock?

18   A.  Yes.

19   Q.  And how long were you a special agent?

20   A.  It was -- I was a special agent from 2005 -- July 2005

21   through January of 2008, and then I left and returned to

22   examination.

23   Q.  Why did you leave the criminal investigation division to go

24   back to becoming a revenue agent?

25   A.  There were a couple of reasons.  First, to be perfectly

Mary Trabold – Direct

1    honest, it turns out I'm not a very good shot.  And the second

2    reason was that I missed doing more technical tax work.

3    Q.  And when you went back to being a revenue agent, which

4    group of the examination function were you in?

5    A.  Well, I was briefly back in general program for a couple of

6    months; and then shortly after that, I joined the special

7    enforcement program in the IRS Small Business/Self-Employed

8    division.

9    Q.  And can you just describe to the jury, what is the

10   difference between the general program and the special

11   enforcement program?

12   A.  The general program sort of audits your mom and pop

13   businesses, you know, your regular taxpayers who don't have any

14   particular indicators of fraud on their tax returns.  So

15   special enforcement program, we look at taxpayers who may be

16   underreporting income; and we also serve as cooperating agents

17   in administrative and grand jury cases with the criminal

18   investigation division.

19   Q.  What is cooperating agent, as you've used the term?

20   A.  The cooperating agent basically is kind of a technical

21   advisor to criminal investigation.  The IRS doesn't expect its

22   special agents to know all the ins and outs of tax law; and so

23   a revenue officer is frequently brought in to determine what

24   the tax amount might be on a particular case and analyze the

25   financial records, bank statements, and so on.

Mary Trabold – Direct

1    *Q.*  Are you a cooperating agent in this case?

2    *A.*  Yes, I am.

3    *Q.*  Is that because you know more about tax than Special Agent

4    Warnock?

5    *A.*  I think that's probably safe to say.

6    *Q.*  What -- in your experience, both in the general program and

7    the special enforcement program, what -- about how many audits

8    would you say you've done?  If you could just sort of give a

9    flavor of the extent of your experience.

10   *A.*  I would estimate that I've audited on the order of 500

11   different taxpayers.

12   *Q.*  And in addition to just having experience conducting

13   audits, can you tell the jury about any sort of professional

14   training you've received as a revenue agent?

15   *A.*  Sure.  Every revenue agent starts out with basic revenue

16   agent training, so that would be individuals.  And then we move

17   on to C corporations and then flow-through entities, which are

18   partnerships and S corporations.  I've also had basic

19   employment tax training as well as specialized fraud training

20   in my role as a staff agent.

21   *Q.*  Now, I'd like to focus a bit on the general program work.

22   Did you say that's what Revenue Agent Applegate was working in

23   when she audited Mr. Birk?

24   *A.*  Yes.

25   *Q.*  Okay.  So if you could just sort of describe the process.

317

Mary Trabold - Direct

1   How does your work take place in the general program in a

2   normal audit?

3   A.  Well, most general program audits begin with a filed tax

4   return.  So the tax returns are selected for examination based

5   on -- in part on a computer score; and then they're looked at

6   by an individual revenue agent who decides if that return

7   should be audited and if so, then what issues the examiner

8   should take a look at.  Then the case eventually makes its way

9   to the revenue agent, who will then send out a letter to the

10  taxpayer, requesting a call to say -- you know, to set up the

11  appointment to begin the examination process.

12  Q.  And when you say the revenue agent decides what items to

13  look at, I mean, what do you mean by that?

14  A.  Well, when I look at a tax return and I'm deciding whether

15  to audit, I'm going to look at -- we're trained to look for

16  what are called large, unusual, or questionable items.  So

17  those are things that seem out of place or are really what we

18  call material, which is to say, really large, where they have a

19  big impact on what the bottom-line tax amount is.

20  Q.  Could you just give an example just so the jury understands

21  kind of what you're talking about.

22  A.  Sometimes it's like -- if you think you know what the type

23  of business is, then you would expect to see certain expense

24  items.  So if somebody is saying, I'm selling Mary Kay, and

25  they don't show any inventory or cost of goods sold on their

318

Mary Trabold – Direct

1   tax returns, I might be saying, well, that doesn't really make

2   sense to me.  Why is that?

3   Q.  Now, after you sort of decide what items you want to focus

4   on, what does a general program revenue agent do to conduct the

5   audit?

6   A.  Well, assuming the taxpayer gets in contact with the

7   revenue agent, you find out what kind of books and records they

8   have.  And then you send an appointment letter with what we

9   call an information document request.  And that IDR, as we call

10  it, lists out the types of records we'd like to obtain.  So if

11  it's a Schedule C business, we would ask for bank statements,

12  all business and personal checking and savings accounts and

13  investment accounts, and so on.

14  Q.  And in addition to getting information from the audited

15  taxpayer, is there also information that you get from IRS

16  records to help you conduct the audit?

17  A.  Yes.  As you've heard a number of witnesses talk about, the

18  IRS has information returns that are provided to us by third

19  parties.  So those would be like your W-2s and 1099s or 1098s,

20  mortgage interest statements, and documents like that.

21          What we do is look to see what is on the IRS system

22  and then compare that to what is shown on the tax return.  And

23  if there are discrepancies we'll probably add that issue, if

24  it's material enough, to the document request to find out what

25  is going on there with that.

Mary Trabold - Direct

1    Q.  As an auditor in the general program, are you ever tasked

2    with trying to determine the amount -- let me ask a different

3    question.

4         You testified about looking for sort of unusual or

5    questionable items.  Do you ever just try to find out what the

6    proper income is?

7    A.  Yes.

8    Q.  How do you do that?

9    A.  Well, we start with what are called minimum income probes.

10   And that's where, if you have a Schedule C -- I don't know how

11   many of the jurors are self-employed, so I'm going to just

12   explain for a moment what a Schedule C is.

13        When you're self-employed, and you don't have a

14   corporation or you're not part of a partnership, you would

15   report your business activity on what we call a Schedule C.

16   And that gets attached directly to your 1040.  So when you're

17   auditing a Schedule C business, you do certain minimum income

18   probes, and that includes looking at the bank statements, like

19   I described.  And we would also consider whether the taxpayer

20   seems to have enough money to live on.  So we'd look at their

21   sources of cash and things that they could use to support them.

22   So that could be -- you know, maybe they took a really big

23   loan, so their income might look low, but they have money to

24   live on, because they borrowed it.

25   Q.  Now, you -- and in talking about Schedule Cs, this might be

320

Mary Trabold - Direct

1    a good time to ask you:  How was Mr. Birk's business

2    categorized on his tax return?

3    *A.*  It was a Schedule C.

4    *Q.*  Why is it a Schedule C?

5    *A.*  Because while there is an LLC -- which is a limited

6    liability company -- Mr. Birk is the only member of that, so

7    that entity is disregarded for tax purposes, and it's reported

8    directly on Mr. Birk's 1040.

9    *Q.*  Now, just jumping to the -- at the conclusion of an audit,

10   when you do your work, what are the possible outcomes at the

11   end of an audit?

12   *A.*  Well, as you heard Revenue Agent Applegate describe, three

13   possible outcomes.  This is actually something I discuss right

14   up front -- right at the beginning of meeting with the

15   taxpayer.  It was explained that, of course, you could end up

16   owing additional funds, which is pretty much what everybody

17   expects -- well, fears.  There could also be no change to the

18   exam.  Sometimes it's just because the return is perfectly

19   fine, and sometimes there are just minor adjustments that

20   really aren't worth making.  And the third possibility is that

21   we might issue a refund.  And I have actually issued refunds

22   over the course of my career.

23   *Q.*  Now, let's move on -- you said you've been in the special

24   enforcement program since 2008?

25   *A.*  Yes.

Mary Trabold – Direct

1    *Q.*   Okay.  Did you receive any additional training before

2    joining that program?

3    *A.*   Yes.  I went to Oakland, California, for two weeks and

4    received special enforcement program training.  And there is an

5    emphasis on fraud and indirect methods in that class.

6    *Q.*   Can you just talk about just generally -- you mentioned

7    being a cooperating agent in this case.  How many cases will

8    you generally be a cooperating agent on at a time?

9    *A.*   Well, it can vary tremendously.  Right now I'm a

10   cooperating agent on three all grand jury cases.  And in

11   addition to that, I maintain an inventory of civil cases; and

12   right now I think that's in the order of 20 to 30 separate

13   taxpayers.

14   *Q.*   And those civil cases, those are -- is that kind of like

15   what you described before, the audit?

16   *A.*   To some extent.  But because they're SEP cases, there is

17   probably more going on than in a general program case.

18   *Q.*   And when you say "SEP," do you mean special enforcement

19   programs?

20   *A.*   Yes, I do.  Sorry.  We speak in acronyms.

21   *Q.*   In case you haven't noticed.

22         Your Honor, at this point, based on the qualifications

23   of this witness, the United States moves to offer Ms. Trabold

24   as a summary expert in accordance with our filing at ECF 59.

25   And we offer her as an expert in IRS practices and procedures,

Mary Trabold - Direct

1    federal tax of individuals and small businesses, and

2    accounting.

3         THE COURT:  Response to the proffer.

4         MS. BECK:  No objection, Your Honor.

5         THE COURT:  The proffer is accepted.  The Government

6    may proceed.

7    BY MR. MAGNANI:

8    Q.  Ms. Trabold, who has to file tax returns?

9    A.  U.S. persons who have income over certain threshold amounts

10   based on their filing status.

11   Q.  And if -- who has to pay tax?

12   A.  Again, those U.S. persons.  If you have a filing

13   requirement and the -- the return that you prepare shows that

14   you owe money, then that's what you have to pay.

15   Q.  And when you say "a filing requirement," can you just sort

16   of explain what that means.

17   A.  Well, so you're entitled -- at least up until this past

18   year, you're entitled to a standard deduction, personal

19   exemption.  So if your income doesn't exceed those base

20   numbers, then there is no point in you filing for most

21   purposes, unless you want to get a refund from withheld money.

22   So in those circumstances, you wouldn't necessarily have to

23   file a tax return.

24        COURT REPORTER:  Could you please speak into the

25   microphone?

Mary Trabold - Direct

1          MR. MAGNANI:  Should I ask the question again?

2    BY MR. MAGNANI:

3    Q.  And so could you just describe who has to pay tax.  Could

4    you just sort of restate your answer, Ms. Trabold.

5    A.  Sure.  When an individual has income in excess of their

6    standard deduction, personal exemptions, then they would have

7    to file a tax return.  If that -- if their income is below

8    that, there would not be necessarily a requirement.  Although,

9    we generally -- if you've been a W-2 wage earner, you've

10   probably had taxes withheld.  And those would be -- and it

11   would be desirable for you to get the refund, so then you would

12   want to file regardless of whether you exceeded that threshold.

13   Q.  If you know, could you sort of ballpark what that threshold

14   was between '98 and 2005.

15   A.  It would depend on the filing status.  So if you were

16   married filing separately, those numbers would probably be in

17   the 3,000 to $5,000 range.  For somebody married filing

18   jointly, it's going to be more than twice that, 10 to 12,000,

19   as a guess.  I did not refresh my memory on the numbers.

20   Q.  But it's not terribly high?

21   A.  No, not particularly.

22   Q.  Okay.  Now, when did you join this case as a cooperating

23   agent?

24   A.  I was assigned to this in April of this year.

25   Q.  Have you looked at a bank record or two in your time as a

Mary Trabold - Direct

1  cooperating agent?

2  *A.*  Yes.  I have looked at a lot of bank records, almost 20

3  years' worth.

4  *Q.*  Now, what, if anything, stood out to you about the bank

5  records you reviewed in this case?

6  *A.*  There were two things.  First was the extensive use of

7  official checks for business; and the second was the degree to

8  which personal expenses were being paid out of a business

9  account.

10       *MR. MAGNANI:*  If I could have one moment, Your Honor.

11       *THE COURT:*  You may.  Thank you.

12       *MR. MAGNANI:*  Madam Clerk, if I could have the

13  monitors pulled back up for the jury.  Thank you.

14  *BY MR. MAGNANI:*

15  *Q.*  I'd like to direct your attention to Exhibit 100, please.

16  Whenever you have the changes -- what are we looking at here?

17  *A.*  This is the account signature card for Park State Bank &

18  Trust for Tarryall River Log Homes LLC.

19       *MR. MAGNANI:*  If you could go to the next page,

20  please.

21  *BY MR. MAGNANI:*

22  *Q.*  Do you know why there are driver licenses on this page?

23  *A.*  Well, I believe it was Marcy Zurek who explained yesterday

24  that the bank has to have identification to know who they're

25  banking with.

Mary Trabold - Direct

1    Q.  From the driver licenses here, are you able to tell the

2    birth years of Mr. and Mrs. Birk?

3    A.  Yes.

4    Q.  What are those years?

5    A.  Mr. Birk was born in 1953 and Mrs. Birk in 1955.

6    Q.  Now, you mentioned the official check activity.  And can

7    you just describe to the jury, what is -- without having to

8    look at every single one -- what are Exhibits 101 through 115?

9    A.  They are examples of official check activity.  So there --

10   those exhibits include the statement that shows the deposits of

11   a large item; then the check that was written to Park State

12   Bank & Trust to purchase the official checks; and in some

13   instances, the actual official checks themselves are there.

14   And some of the official checks were redeposited, so there is

15   supporting bank statement information for those activities, as

16   well.

17   Q.  So can you just very briefly just describe the change in

18   the bank records from the early years that you had them to -- I

19   mean, you said 20 years of bank records.  Were the records the

20   same throughout that whole period?

21   A.  No.  In some periods we had more information than in

22   others.  So this exhibit I believe starts in 2006; and in that

23   period of time, Park State Bank & Trust was not able to provide

24   all of the official check copies to the IRS.

25            MR. MAGNANI:  Let's pull up Exhibit 103, please, just

Mary Trabold – Direct

1   to look at some of these examples that you're talking about.

2   BY MR. MAGNANI:

3   Q.  What are we looking at here?

4   A.  This is a statement from Park State Bank & Trust for the

5   Tarryall River Log Homes LLC account.

6   Q.  And what, if anything, can you tell from looking at this

7   particular statement?

8   A.  Well, there is a particularly large deposit on June 23 in

9   the amount of $23,072.98.

10  Q.  And what else can you tell from looking at this statement?

11  A.  That there was a deposit for $25,000 received by wire on

12  June 23, 2008.

13       MR. MAGNANI:  And if we could please go to the next

14  page of the exhibit.

15  BY MR. MAGNANI:

16  Q.  And if you could --

17  A.  The --

18  Q.  I'm sorry.  Are you able to take that stylus next to the

19  monitor -- can you just see if that works?

20  A.  Doesn't seem to work.

21  Q.  Okay.

22       COURTROOM DEPUTY:  Counsel, I will have the IT

23  department take a look at this.

24       MR. MAGNANI:  This one is also not registering.

25

327

Mary Trabold - Direct

1    *BY MR. MAGNANI:*

2    Q.  What of significance is on this for the purposes of your

3    work in this case?

4    A.  Well, this check is made payable to Park State Bank & Trust

5    in the amount of $23,072.98.  It's signed by Mr. Birk; and the

6    memo line on the check says "OCs," which means official checks.

7    Q.  Is the date -- what, if anything, is significant about the

8    date of this purchase of official checks?

9    A.  Well, this check was purchased on the same day that the

10   $25,000 had been wired into the Park State account.

11        MR. MAGNANI:  Okay.  If we could please go to

12   Exhibit 106, please.  Start on the first page.

13   *BY MR. MAGNANI:*

14   Q.  And, Ms. Trabold, what -- what do we see here?

15   A.  This is a deposit ticket and a deposited item in the amount

16   of $58,000.

17   Q.  And just briefly, what is a deposit ticket?

18   A.  It's a form that you fill out when you are going to deposit

19   money at the bank.  It identifies -- so if you were going to

20   deposit cash and checks, you would have numbers on different

21   line items.

22        MR. MAGNANI:  If we could please go to page 4.

23   *BY MR. MAGNANI:*

24   Q.  And I'd like to ask you, Ms. Trabold, can you also see that

25   deposit reflected on the bank statement?

Mary Trabold - Direct

1    A.   Yes.  It's July 27, towards the top.

2    Q.   Is that that second line?

3    A.   Yes.

4    Q.   Again how much is it, just to help --

5    A.   $58,000.

6         MR. MAGNANI:  If we could please go to page 2 of this

7    exhibit.

8    BY MR. MAGNANI:

9    Q.   And does this -- what do you see on this exhibit?

10   A.   Well, there is a large check on July 28 in the amount of

11   $44,003.

12   Q.   Do you -- is that figure significant to you for any reason?

13   A.   Well, it's remarkably round.  I know that Park State Bank &

14   Trust at this period in time charged $1.50 for official checks.

15   So this was for two official checks totaling $44,000.

16        MR. MAGNANI:  If we could go to page 6.

17   BY MR. MAGNANI:

18   Q.   What are we looking at here?

19   A.   So we have a check here payable to Park State Bank & Trust

20   from Tarryall River Log Homes in the amount of the $44,003.

21   That would be to purchase the official check.  And as you can

22   see on the memo line, it says "OCs."

23        MR. MAGNANI:  If we could go to the next page, please,

24   page 7.

25        THE WITNESS:  This is an official check from Park

Mary Trabold - Direct

1    State Bank & Trust payable to Jean Birk in the amount of

2    $24,000.

3    *BY MR. MAGNANI:*

4    Q.  What date was this check purchased?

5    A.  It was purchased on July 28 of 2011.  And the other

6    noticeable thing on this is, you can see in the lower left-hand

7    corner right beneath the check, there is a date of August 22,

8    2011.  And that amount -- that date indicates when -- there we

9    go.

10   Q.  Okay.  The system is catching up with us.

11   A.  That indicates that the check was redeposited a little less

12   than a month later.

13           MR. MAGNANI:  Okay.  And can we go to page 15, please.

14   *BY MR. MAGNANI:*

15   Q.  Now, you mentioned there were two official checks purchased

16   on that first date?

17   A.  Yes.

18   Q.  Now, what are we looking at here?

19   A.  This is a deposit ticket from September 1 of 2011, as well

20   as a copy of the deposited official check.

21   Q.  Okay.  And who is this official check made out to, if you

22   can see it?

23   A.  It's payable to Marty Birk.

24   Q.  And was this purchased on the same day?

25   A.  Yes, it was.  It's hard to see at this scale, but it

330

Mary Trabold - Direct

1    does -- it is the July 28 date of check.

2           MR. MAGNANI:   Okay.   Now -- if we could go to page 16,

3    please.

4    *BY MR. MAGNANI:*

5    *Q.*   And what can you see from this bank statement?

6    *A.*   There is a $20,000 deposit on September 1.

7    *Q.*   Is that the redeposit of the official check?

8    *A.*   Yes.

9    *Q.*   So what -- you know, this buying official checks, holding

10   onto them, and later redepositing them, what effect did that

11   have?

12   *A.*   Well, it deprives the taxpayer of interest that he could be

13   earning and having the money sitting in his bank account.   It's

14   essentially like taking out cash and hoarding it, just keeping

15   it stuffed under your mattress, because it's not doing anything

16   for you other than existing.   Because the moment you buy that

17   official check, the money is no longer in your account.   The

18   bank has it, because they secure the money to hold onto it for

19   when the check is actually redeposited, the bank then has the

20   money to pay the draw on that account.

21   *Q.*   So when the money is out of the account, what effect does

22   that have, if any, on the IRS?

23   *A.*   Well, it means the money is not available for seizure.

24   *Q.*   Okay.

25   *A.*   Or any kind of levy.

Mary Trabold - Direct

1   Q.   Okay.  We just went through this example, probably took too

2   much time doing it.  Can I just ask you, in this example, the

3   checks were made out to Mr. Birk and his wife.  Were they

4   always made out to Mr. Birk and his wife?

5   A.   No.

6   Q.   Can you tell the jury, who else were the official checks

7   made out to?

8   A.   They were sometimes made out to Honest Abe Log Homes, which

9   is where Mr. Birk purchased his log home kits.  I also saw them

10  to other vendors, you know, subcontractors and so on, like

11  foundation work, septic work, and so on.

12  Q.   And so in paying -- what's the difference from paying a

13  vendor with just a normal check from your checking account and

14  an official check?

15  A.   Well, an official check is guaranteed.  But I've -- what

16  I've seen in most -- in most audits that I've done, most

17  businesses don't try to do a lot of business in official

18  checks.  It's inefficient because you're -- the money comes out

19  of your account a lot sooner than it would otherwise.

20  Q.   Now, without going through all the bank records or the 15

21  examples, is there a summary that the jurors can see?

22  A.   Yes, there is.

23          MR. MAGNANI:  Okay.  Can we please pull up

24  Exhibit 116.

25          And if you could just, if it's easier for folks to

332

Mary Trabold - Direct

1   see, maybe zoom in on one section.

2   *BY MR. MAGNANI:*

3   *Q.*  Ms. Trabold, if you could kind of explain to the jurors

4   what exactly they're looking at here.

5   *A.*  So this is a summary of a sample of official check

6   transactions.  There is one for every year, and I believe there

7   is one year that has two examples.  It summarizes the

8   information that we have available from the bank records.

9          So you can see right up front in 2006, there was a

10  deposit from the Hallenbeck Coin Gallery.  And then there were

11  two official checks coming out that we don't know where they

12  went because those records weren't available.

13  *Q.*  And is that because those are the early years?

14  *A.*  Yes.

15         *MR. MAGNANI:*  Okay.  If you could go to the next page,

16  please.  Great.

17  *BY MR. MAGNANI:*

18  *Q.*  Same thing, just more examples?

19  *A.*  Yes.  And these are good, because we do have the official

20  check; and so we're able to see who was being paid.  So if you

21  look at, say, Exhibit 107 right there, you know, one of the

22  official checks was for Bavarian Electric, another was for AC

23  Concrete.  These would be business-related expenses.

24  *Q.*  Now, do you -- why is the date column included in this

25  exhibit?

Mary Trabold - Direct

1   *A.*  Because it ties -- whenever there was -- I can't say

2   "whenever," but certain large deposits often resulted in

3   same-day withdrawals by official check.

4   *Q.*  And what effect did that have of drawing the money by an

5   official check on the same day of deposit?

6   *A.*  What it meant is there really wasn't any opportunity for

7   the IRS to get any funds from this account.

8   *Q.*  Now, were these 15 official checks the only 15 official

9   checks that Mr. Birk drew?

10  *A.*  No, they weren't.  There were quite a number more.

11          MR. MAGNANI:  Could we please pull up Exhibit 117.

12  And if we could zoom in on the table, please.

13  *BY MR. MAGNANI:*

14  *Q.*  So how much -- well, how many official checks did Mr. Birk

15  draw on his business -- his Tarryall River Log Homes account in

16  the period that you reviewed from 2006 to 2018?

17  *A.*  There were at least 229.

18  *Q.*  Why do you say "at least"?

19  *A.*  Well, as I said, for some of those early years, we didn't

20  have the official checks.  I made my best examination of the

21  records to determine -- there were certain instances where I

22  could tell that Mr. Birk had purchased two official checks,

23  say, with one check to Park State Bank, because it would say

24  "OCx2," meaning official check times two.  And there were a

25  couple of other instances where someone I think at the bank,

Mary Trabold - Direct

1    judging by the handwriting, wrote the official check numbers on

2    the back of the checks to Park State Bank.  And so I was able

3    to infer there were, you know, two, three, or four official

4    checks from that one check to Park State Bank.  So those

5    additions are included in a number of OCs; but I wasn't able to

6    do that with all of the checks at Park State Bank, where we did

7    not have the actual official check.

8    Q.   So in short, could have been more than that?

9    A.   Yes.

10   Q.   Okay.  And what about the amount of money that was taken

11   out of the account with official checks?

12   A.   As you can see, it is $1.6 million.

13   Q.   Can you just describe your confidence in that figure.

14   A.   I'm quite confident in that.  It's based on the checks

15   payable to Park State Bank for the official checks themselves.

16   Q.   Apart from the official checks, what else were you able to

17   glean from your extensive analysis of the bank records in this

18   case?

19   A.   As I said earlier, Mr. Birk made extensive use of the

20   business account for his personal expenditures.

21   Q.   Did he always do that?

22   A.   No.  He -- there was a period of time where he would use

23   his personal account for personal activities.  There were

24   transactions that took place there, and I would see transfers

25   from the business account to the personal account to pay -- you

Mary Trabold - Direct

1    know, to cover expenses and so on.  But over time, the activity

2    in the personal account dropped off noticeably, beginning,

3    really, in 2006.  But by the middle of 2007, the activity in

4    that personal account was minimal.  There were a few things

5    here and there, but there was nothing significant.

6    Q.  Can you just describe to the jury, when you're talking

7    about personal -- let me ask a different question.

8            What are the types of things you would expect to see

9    coming out of a personal account?

10   A.  Well, groceries, utilities, you know, buying gas for your

11   car, things along -- you know, your mortgage payment, all of

12   those sorts of things are, you know, what most people would pay

13   from their personal accounts.

14   Q.  Did you see those -- just now focusing on the later years,

15   say 2008 and beyond, did you see those things coming out of

16   Mr. Birk's personal account?

17   A.  No.

18   Q.  What about the business account?

19   A.  Yes.  That's where the personal expenditures were coming.

20   I would see groceries, liquor store purchases, air travel.

21   There was all kinds of things along those lines.

22   Q.  Okay.  Now, did you conduct -- did you perform an analysis

23   of the average bank account balances for these accounts over

24   time?

25   A.  Yes.

336

Mary Trabold - Direct

1          MR. MAGNANI:  Okay.  If you could pull up, please,

2    Exhibit 118.

3    BY MR. MAGNANI:

4    Q.  And if you could just -- and I know this is several pages.

5    If you could just sort of -- feel free to tell Ms. Burgess --

6    I'll let you direct the exhibit.  But if you could just

7    describe to the jury what this is.

8    A.  Okay.  This is fairly simply.  So on the left-hand side, it

9    tells you the month that this is for; and the middle column is

10   the average balance on -- in the personal account; and the

11   right-hand column shows the average balance in the business

12   account.  And these numbers come directly from the statements

13   provided by Park State Bank & Trust.

14          So as you can see in 2000 and 2001, the numbers are

15   kind of normal, you know, what you might typically expect.  A

16   business account tends to have more money in it than a personal

17   account, in my experience.  And so as you scroll through a

18   couple of pages, you can see that the numbers start to decline

19   in 2004 --

20   Q.  I'm sorry, Ms. Trabold.  Just for the benefit of the court

21   reporter, when you're talking about a page, if you can just

22   indicate a year or something on there so that it's clear for

23   the record.

24   A.  Okay.  So this page is 2002 through 2004, partially.  And

25   the balance in the business account, instead of being 3,000 or

Mary Trabold – Direct

1   so, is now down to an average in the 1,000 to 2,000 range.

2           If you could advance a couple of pages.

3           So here is 2006.  And in the middle of 2006, we're

4   looking at balances now typically under $1,000 per month.  And

5   as I said earlier, in 2007 -- the middle of 2007 -- those

6   balances dropped even more in that personal account, which is

7   the middle column.  You begin to see there is barely $100,

8   sometimes 100 or $200 in the account.  At this time also the

9   balance in the business account was declining, but it was still

10  not to the extent it was in the personal account.

11          *MR. MAGNANI:*  If we could go to the next page, please.

12  And the next page.

13          *THE WITNESS:*  So here -- you know, this is 2011, '12,

14  and '13.  We can actually see the balance go as low as $3 or

15  $6.  And during this period of time, one of the things that I

16  noticed consistently was, there was a $7 account low balance

17  fee charged by Park State Bank every month.  And so there would

18  then be a periodic redeposit, usually in cash, of, say, 50 or

19  $100 to pull the balance back up again.  And then month after

20  month, it would again drop by $7 or so.

21          *MR. MAGNANI:*  And if we could just advance a couple of

22  more, just to get through the --

23  *BY MR. MAGNANI:*

24  *Q.*  So now looking at 2017.

25  *A.*  So you can see in, you know, July and August -- the average

Mary Trabold - Direct

1    balance in July was $13, and in August, it was $6.  And that

2    difference is the $7 fee I was talking about.

3    Q.  So is that to say that toward the end there was only one --

4    well, not only one -- but in many months only one expense?

5    A.  Yes.  There would occasionally be a payment of a penny or

6    so in interest.  But, essentially, sometimes the only

7    transaction was that $7 fee.

8    Q.  And from your analysis of the bank records, what was

9    keeping the average balance in the business account lower?

10   A.  Well, that would be the use of the official checks.

11          MR. MAGNANI:  Okay.  Could you please go to the next

12   page, Ms. Burgess.  And the next one --

13          Actually, no.  I'm sorry.  Let's go back.

14   BY MR. MAGNANI:

15   Q.  What -- what is happening --

16          Just for the record, this is the -- we're looking at

17   the 2018 -- '17 through '19.  Can you tell us what is going on

18   here, Ms. Trabold?

19   A.  Yes.  What is immediately noticeable is that the average

20   balance in the personal account goes up in December of 2018;

21   and that was because there was a deposit of a $10,000 check

22   from Mr. Birk's father-in-law.

23   Q.  You said 10,000?

24   A.  Yes.

25   Q.  So why are the account balances so low for -- so much less

Mary Trabold - Direct

1   than 10,000?

2   A.  Well, because shortly after the money was deposited, a good

3   portion of it was taken out.  There was a check to cash in the

4   amount of $3,400, as I recall; and then there was a check

5   written to Park State Bank & Trust for a couple of official

6   checks.  And then subsequently, into 2019, there were also some

7   transfers from the personal account into the business account.

8        MR. MAGNANI:  If we could please go to the next page.

9   BY MR. MAGNANI:

10  Q.  What's this?

11  A.  This is a graphical representation of the account balances

12  in the personal account at Park State.

13  Q.  And what conclusion does this help convey about your

14  testimony?

15  A.  Well, this shows that the -- the pattern.  So you can see

16  that in the earlier periods of time, there was, shall we say, a

17  healthier balance in the personal account.  And then once you

18  get into the middle of 2017 -- 2007 -- excuse me -- the balance

19  then drops and stays at a bare minimum for an extended period

20  of time.

21  Q.  And which account is this for?

22  A.  This is the personal account.

23       MR. MAGNANI:  Could we go to the next page, please.

24  BY MR. MAGNANI:

25  Q.  What's the difference with this one?

Mary Trabold - Direct

1   A.  Well, in the business account, it generally has a higher

2   average balance all over time.

3   Q.  And sorry.  Just to -- are you saying that this is the

4   business account?

5   A.  Yes.  This is the business account, but it's -- it has a

6   higher balance than you would see in the personal account.

7   Q.  And what -- even after the balance got lower, what is

8   different between this one and the personal account?

9   A.  Well, there was always a little higher balance here.  But

10  it does show the same sort of pattern, that beginning in, you

11  know, 2006, 2007, the balance is considerably lower than it had

12  been in the earlier years.

13       MR. MAGNANI:  If we could go to the next slide,

14  please.

15  BY MR. MAGNANI:

16  Q.  Now, apart from the balances being lower, how would you

17  describe the difference in activity in the two accounts,

18  starting in mid 2007?

19  A.  Well, the activity level is a little hard to measure from

20  an average monthly balance.  But you can see that there is very

21  little money left in the accounts after -- after all is said

22  and done with the transactions that occurred every month.

23  Q.  Well, let me ask you, which account had greater fluctuation

24  in value from the period, you know, 2006 or '7 onward?

25  A.  Oh, the business account.  Definitely.

341

Mary Trabold - Direct

1    Q.  Apart from what we can just see from this graph, what does

2    your analysis of the two bank accounts glean about the

3    different activity levels in the accounts?

4    A.  Well, almost all of the activity was really taking place in

5    the business account; and that includes personal expenditures

6    as well as business expenses.

7    Q.  Okay.  So let's talk about personal expenditures.  You

8    testified earlier that you did not see what you said you'd

9    expect to see in a personal account.

10   A.  Yes.

11   Q.  Now, I'd like to ask you, did you see those type of

12   personal expenditures anywhere?

13   A.  Yes.  They were coming out of the business account.

14   Q.  Okay.  Did I -- well, let me ask you this:  What is a bank

15   spread?

16   A.  A bank spread is a spreadsheet.  As an accountant, that's

17   what I like to do.  In this case, we made a spreadsheet for

18   2013 through 2017 that summarizes and details all of the

19   withdrawal activity in the Park State business account for

20   Tarryall River Log Homes.

21        MR. MAGNANI:  Could you please pull up page 2 of

22   Exhibit 132.

23   BY MR. MAGNANI:

24   Q.  Ms. Trabold, what is this that we're looking at here?

25   A.  This is the spreadsheet.

342

Mary Trabold - Direct

1   Q.   Okay.  Can you please just describe the categories to the

2   jury.

3   A.   Sure.  The date is the date of transaction; the amount,

4   self-explanatory; the type basically indicates how it's

5   indicated on the statement.  So if there is an electronic

6   withdrawal, it would be like a debit card or an ECH, and then

7   there were certain expenses that were paid by check.  And then

8   there is a payee.  And then there is a category that I have

9   assigned to either a business expense, a personal expense.  I

10  was trying to get a sense for the character, the nature of the

11  activity in this account.

12  Q.   Okay.  Do you know about how many -- well, is this a full

13  bank spread?

14  A.   Well, it doesn't spread the deposits.  As I said, this is

15  only limited to the 2013 through 2017, because to create a

16  spreadsheet with this degree of detail takes a very, very long

17  time; and I didn't have enough time to do more.  But this does

18  give you a sense of what was going on in the bank account.

19  Q.   Do you know about how many items -- how big is this

20  spreadsheet?

21  A.   I don't know exactly.  It's pretty extensive.

22  Q.   Is it thousands of items?

23  A.   Yes.

24       MR. MAGNANI:   Now, please go to the first page of the

25  spreadsheet -- of the exhibit.

Mary Trabold - Direct

1    *BY MR. MAGNANI:*

2    *Q.*   Okay.  What is -- what's that?

3    *A.*   This is a summary of the deposits that were reported on the

4    bank statements, as well as a collation of the expense

5    categories as I determined them in the spreadsheet.

6           So you can see that the business expenses total for

7    this period, $752,817.81.  And then there is also a category

8    for cash.  Because I don't know how that cash was used, so I

9    broke it out separately.  And then you can see the official

10   check fees, that are items that I determined to be personal.

11   And there are certain things that were unknown.  Those were

12   just items that I didn't know what they were.

13   *Q.*   Now, so -- does this mean between 2013 and '17, about

14   three-quarters of the deposits were spent on business expenses?

15   *A.*   Not necessarily, no.  I was trying to be very conservative

16   in how I determined whether an expense was business or not.  If

17   it had the appearance of being a business expense, then I put

18   it in the business expense category.

19          So one of the big item questionable things was fuel.

20   Mr. Birk seemed to buy a lot of gas.  And so if something could

21   have been construed as being fuel, then I put it as a business

22   expense, unless I had a way to determine that it was -- that

23   some portion of these expenses were personal.

24   *Q.*   So when you say you were being conservative -- can you just

25   explain what that means.

Mary Trabold - Direct

1    *A.*  Sure.  So I recall there was an item for Laval Gas and

2    Liquor.  And that could have been for gas, or it could have

3    been for liquor, or anything else you might get in a

4    convenience-type store; but because it could have been for gas,

5    I put it in the gas category.  The same thing with King

6    Soopers, which is -- you know, you would typically think it's a

7    grocery store, of course.  But it could have also -- some King

8    Soopers stores have gas stations, and so I put that in the

9    business category.

10        One of the other fairly noticeable things was a lot of

11   purchases at Safeway.  And in the early years, say 2013, I

12   could see a sort of pattern in the expenditures at Safeway.  So

13   the statement would read -- on the bank statement it would say

14   Safeway ST, which I took to mean Safeway store; and then some

15   would say Safeway FU, which I took to refer to fuel for a gas

16   station.  So if I knew it was a fuel expense, I put it as a

17   business expense.  If it was a Safeway store, I considered it

18   to be personal.

19        And one other thing that I noticed was, Mr. Birk has a

20   tendency to top off his gas expenditures, and so it would land

21   on a dollar a lot.  So very frequently, it would be an even

22   number.  So in later years, I was able to use that pattern to

23   distinguish to some extent between the business and personal at

24   Safeway.

25   *Q.*  So you mentioned -- and correct me if this is not what

345

Mary Trabold - Direct

1    you're saying.  You mentioned, basically, the business expense

2    is anything that could have possibly been a business expense?

3    A.   Yes.

4    Q.   What about the personal expenses?  How confident can you be

5    that those expenses are, in fact, personal and not business

6    related?

7    A.   I'm fairly confident.  This was -- like I said earlier, you

8    know, I was talking about airfare, things for liquor stores and

9    so on.  One of the other things that I also included in

10   personal were out-of-state expenses.  I know from my review of

11   Mr. Birk's records, that his dealer agreement with Honest Abe

12   log homes has his activities in that business limited to

13   certain counties in Colorado.  So if I saw an expense in Texas

14   or Virginia or Illinois, I excluded them and classified them as

15   personal.

16   Q.   What about restaurants, did you include that as business or

17   personal?

18   A.   That was personal.

19   Q.   And after doing all of this work, what's your conclusion

20   about Mr. Birk's use of his Tarryall River Log Homes account at

21   Park State Bank & Trust?

22   A.   It served all of his needs, both business and personal.

23   Q.   Now, what is the significance of using that account for

24   personal reasons?

25   A.   Well, as you've heard from Revenue Officer Morgan, if -- it

Mary Trabold - Direct

1   can be difficult to get approval to seize funds from a business

2   account without going through a lot of hoops for the alter ego.

3   So by having all of this activity and funds in the business

4   account, it was much harder for the IRS to obtain the money via

5   levy.

6   Q.   If the IRS is trying to collect money on an individual's

7   tax debt, can they take assets from a company?

8   A.   Not without getting a lot of approval.

9   Q.   And so, you know, why is that?

10   A.   Well, it's -- you have to be able to show that the business

11   and the person are intermingled to such an extent that there

12   really isn't a distinguishment -- there is no way to

13   distinguish between the two of them.

14   Q.   Do you know if the IRS ever levied the business account?

15   A.   I did not see that in any of the bank records.

16   Q.   Now, did you hear any testimony about levies of personal

17   accounts?

18   A.   Yes.

19   Q.   Did you also review any records that showed that?

20   A.   Yes, I did.

21   Q.   Well, if you could just tell the jury, what did the IRS

22   levy from Mr. Birk's personal account?

23   A.   I saw one levy in 2008 for about $30.  And then there was

24   another levy in 2011, as Revenue Officer Morgan described; and

25   that was for $32.

347

Mary Trabold - Direct

1  *Q.*  Why were those amounts so low?

2  *A.*  Because the balance in the personal account was being kept

3  so low.

4  *Q.*  Any other levies in the accounts?

5  *A.*  I did see some Colorado levies in the personal account.

6  *Q.*  Now, in addition to analyzing these bank records, did you

7  also use your experience and training as a revenue agent to

8  review the audit files in this case?

9  *A.*  Yes, I did.

10  *Q.*  Okay.  And if you could just give the jury a very brief

11  summary of what type of audit work was done for the years in

12  question here.

13  *A.*  Sure.  In 1998 and '99, that was conducted from the IRS

14  campus.  And all that basically did was match information

15  return data to what was not filed.  And so the adjustments in

16  the audit for that only reflect information return data -- or

17  as we call it, IRD.

18  *Q.*  Even more simple than information return data or IRD, in

19  case --

20  *A.*  So W-2s, interest, things along those lines.

21  *Q.*  Did the 1998 and '99 audit examine summonsed bank records?

22  *A.*  No.

23  *Q.*  Okay.  Can you please describe the audit that was done in

24  2000 -- for 2000 through 2003?  Excuse me.

25  *A.*  Sure.  That was conducted by Revenue Agent Applegate.  That

Mary Trabold – Direct

1   was what we call a field examination, where the revenue agent

2   could go out and meet with the taxpayer face to face and

3   conduct an interview and so on.  That, of course, didn't happen

4   in this case.  And as Mrs. Applegate described, she did issue

5   summons for bank records for that period of time, as well as

6   make a third-party contact to Honest Abe Log Homes.

7   *Q.*  Did Mr. Birk cooperate with the audits?

8   *A.*  No, he didn't.

9   *Q.*  What are the implications of that?

10  *A.*  Well, it ended up -- because he wasn't cooperating, his

11  assessments were a lot higher than they would have been.  It's

12  hard for an examiner to determine what expenses, if any, should

13  be given to the taxpayer.  The burden is on the taxpayer to

14  support their deductions, and so we as the IRS aren't in a

15  position to make a determination on our own that certain

16  expenses are for business or not.

17          And so the other part of it was, I did -- I found a

18  couple of mistakes in the audit.  And if Mr. Birk had been

19  engaged in the audit process, those mistakes would have been

20  caught; and his tax liability would have been lower as a

21  result.

22  *Q.*  In your experience just being an auditor and working across

23  the table from a taxpayer, can you just describe, what are

24  the -- I mean, what are the roles of the taxpayer and the

25  auditor; and how do those roles work together to make sure

Mary Trabold - Direct

1    mistakes are caught?

2    A.  Sure.  It's actually -- an audit is actually far more

3    collaborative than people think.  The IRS doesn't come in and

4    say, okay, on day one, this is what you owe us.  And, in fact,

5    as I described, we send out an information document request so

6    the taxpayer knows what records we want to look at.  And as I

7    said earlier, we look at the bank statements.  And so what I do

8    is -- after doing a spreadsheet for all of the deposits for all

9    of these accounts, I look at the totals; and then I compare

10   that to what is reported on the tax return so we know what the

11   sources are.  And more often than not, there is a difference

12   between what is in the bank accounts and what is on the

13   returns.

14         And so that means that there may be non-taxable items

15   that should be excluded from the analysis, and sometimes it

16   means that there is unreported income.  But there is a process

17   that -- there is a back-and-forth that goes on, where, you

18   know, if I'm looking at a case where I have a $50,000

19   discrepancy, I'm going to say to the taxpayer, hey, can you

20   explain this to me?  What am I missing?  You know, tell me what

21   I should be excluding from income.  And so as a result, we very

22   often chip that number down to the point where we can explain

23   it all or we are in fact at the end left with an income

24   adjustment.

25   Q.  In addition to your review, sort of looking at, like, the

Mary Trabold - Direct

1   guts of the audit and sort of the specific work that was done

2   to compute tax, did you also review the audit file to determine

3   if proper IRS procedures were followed?

4   A.  Yes.

5   Q.  And can you just describe just briefly, just what

6   procedures were done and that had to be done and that were in

7   fact done.

8   A.  Sure.  The most important thing in this was that the case

9   was reviewed after it was closed, and a statutory notice of

10  deficiency was issued.  In fact, for '99 through 2003, there

11  were statutory notices of deficiency.  And once those expire,

12  you know, after -- we call them 90-day letters, but we also do

13  allow for mailing time.  After that point, then, the case is

14  closed and the tax would be assessed.

15  Q.  Within those 90 days plus mailing time, what are the

16  options that a taxpayer have if they wish to dispute the

17  statutory notice of deficiency?

18  A.  The 90-day letter itself lays out what the options are.  So

19  it says that you can petition the tax court and get a hearing

20  in front of a judge, and you can do that without having to pay

21  the tax.  It also says that you are entitled to -- you can pay

22  the tax if you want.  I don't know if it also explains, but you

23  could pay the tax and then file in district court instead of

24  going to tax court.

25          But the other most important takeaway from the 90-day

Mary Trabold - Direct

1    letter is it notifies the taxpayer that they can go to the

2    Taxpayer Advocate Service and ask for assistance.

3    *Q.*   What is the Taxpayer Advocate Service?

4    *A.*   It's an independent function within the IRS that helps

5    taxpayers navigate what can be a Byzantine tax system.   In

6    Mr. Birk's case, he could have gone to the taxpayer advocate

7    and asked for help in getting a reconsideration of his audit to

8    perhaps lower that amount.

9    *Q.*   And besides -- you mentioned tax court and district court,

10   does the letter also mention another form of appeal?

11   *A.*   Well, indirectly.   So when you file a petition to tax

12   court, the case gets sent to IRS counsel.   And the attorneys

13   don't want to take the case to tax court if it can be settled.

14   So they then refer it to the IRS appeals office, and appeals

15   will see if there is a way to settle the case.

16   *Q.*   Did we hear from some appeals officer in this trial?

17   *A.*   Yes.   But they were appeals settlement officers.   So on the

18   exam side, there are appeals officers; and on the collection

19   side are settlement officers.

20   *Q.*   And, actually, can you just explain to the jury, when you

21   say "exam side," "collection side," "appeals side," can you

22   very briefly give an explanation of the sort of structures of

23   the IRS?

24   *A.*   Sure.   Both revenue agents and revenue officers are in the

25   small business/self-employed division.   But my job as an

Mary Trabold - Direct

1   examiner -- or auditor, as most people would think of me -- is

2   to assess the tax.  So I make a determination about, you know,

3   what is the reasonably correct amount of tax from my audit?

4   And the job for collection is to try to collect on the things

5   that I assess, as well as to collect on tax that people have

6   notified the IRS about but haven't necessarily paid.

7   Q.  And you mentioned exam and collection being under the same

8   roof.  What about appeals?

9   A.  Appeals is separate.

10  Q.  Why is it separate?

11  A.  So that they can give independent hearings.  It's not --

12  the appeals officers aren't beholden to the same management

13  chain that I am so that they can act independently.

14  Q.  Now, if someone gets a 90-day letter, and after 90 days

15  plus mailing they don't assert one of the rights in the letter,

16  what happens?

17  A.  Then the tax is assessed and posted to the taxpayer's

18  account.

19  Q.  So what does that mean?

20  A.  It means that it shows up on the records -- as you heard on

21  day one of the trial, it shows up on the electronic -- the

22  IRS's electronic record of your account.

23  Q.  Once the tax is assessed, there is no more appeals, or what

24  happens after that?

25  A.  No.  You can still get an audit reconsideration, as well as

Mary Trabold - Direct

1   do a collection due process hearing, as we've heard in the

2   court.

3   Q.   So how long have all of these taxpayer rights been

4   available?

5   A.   To some extent, they've been around for quite some time.

6   They've really got strengthened in -- beginning in 1998.  After

7   certain congressional hearings, there was the IRS Restructuring

8   and Reform Act, and that formalized a lot of the appeals rights

9   and so on that taxpayers do enjoy.

10  Q.   And you've spoken mostly about the appeals right on the

11  examination side.  I just want to ask, have you ever worked as

12  a revenue agent or an appeals officer?

13  A.   No.

14  Q.   Are you -- before this trial, have you been sort of -- do

15  you have any independent training or familiarity with the

16  appeals rights on the collection side?

17  A.   No.

18  Q.   Have you heard from any collections and appeals witnesses

19  testify in this trial?

20  A.   Yes.  We've had three settlement officers and three revenue

21  officers testify.

22  Q.   And can you just basically summarize, as you understand

23  them, what are the appeal rights on the collection side?

24  A.   Well, I was always -- so you could hear that every time a

25  notice of intent to levy or a notice of federal tax lien was

Mary Trabold - Direct

1    filed or going to be filed, Mr. Birk was advised of his right

2    to a collection due process hearing.

3    Q.   Now, speaking of those witnesses, did you hear when

4    Ms. Beck asked several of the witnesses if Mr. Birk still owes

5    tax --

6    A.   Yes.

7    Q.   -- for the years in question?

8    A.   Yes.  I did hear that.

9    Q.   Do you remember what the answers of those witnesses were?

10   A.   Most of the witnesses, as I recall, seemed to say, yes, the

11   IRS could still pursue the collection actions against Mr. Birk

12   after this trial.

13   Q.   And do you have an opinion on that?

14   A.   I do.

15   Q.   What's your opinion?

16   A.   That's not entirely true.

17   Q.   Please explain.

18   A.   The assessments for 1998 through 2005 have all expired.

19   There is a ten-year collection statute of limitations; and so

20   after ten years, the IRS has to write off those assessments and

21   can't pursue them further.

22   Q.   And so as you understand it today, how much money can the

23   IRS collect from Mr. Birk for 1998 through 2005?

24   A.   Nothing.

25   Q.   What about for 2006 through 2011?

Mary Trabold - Direct

1    A.   Yes.  Examination was conducted for those years.  I don't

2    know what the balance is on those accounts at this point.

3    Q.   But is it still collectible?

4    A.   As far as I know, yes, it is.

5    Q.   What about for 2012 through 2018?

6    A.   No assessments were made.

7    Q.   Do you have an opinion as to why no assessments had been

8    made for 2012 through 18?

9    A.   I -- I would be speculating, but I think --

10        MS. BECK:  Objection.  Speculation.

11        THE COURT:  By definition, out of bounds; and the

12   objection is sustained.

13   BY MR. MAGNANI:

14   Q.   I'll ask a different question.  Can you talk about the

15   circumstances when the examination function -- the auditors of

16   the IRS would not conduct an audit of a taxpayer who hadn't

17   filed returns?

18   A.   We would look at whether there is a likelihood of

19   collectibility.  It's not necessarily worth it for me as an

20   examiner to go and assess an additional tax if the IRS isn't

21   going to be able to collect on that.

22   Q.   So in some sense, a resource management issue?

23   A.   So --

24        MS. BECK:  Objection.  Leading.

25        MR. MAGNANI:  I'll withdraw the question.

356

Mary Trabold – Direct

1          *THE COURT:*  Sustained.

2     *BY MR. MAGNANI:*

3     *Q.*  What is a Z freeze?

4     *A.*  It's a freeze that is put on a taxpayer's module by the

5     criminal investigation division.

6     *Q.*  Can you please explain just sort of in -- besides saying

7     module -- could you explain in English what that means and why

8     it's done.

9     *A.*  Sure.  So when a taxpayer is placed under criminal

10    investigation, the CI agent will have this freeze code put on

11    the taxpayer's account.  And what that does is indicate to

12    examination and collection that they should not be taking

13    actions on this particular case.

14    *Q.*  Now, did Mr. Birk ultimately file tax returns for the years

15    in question in this case, 1998 to 2005?

16    *A.*  Yes.

17    *Q.*  Were those tax returns -- well, actually, let me ask you

18    this question first:  Before engaging Advanced Tax Solutions,

19    did he file tax returns for any of those years?

20    *A.*  Yes.

21    *Q.*  What years?

22    *A.*  1998 and 1999.

23    *Q.*  Were those returns accepted?

24    *A.*  No.

25    *Q.*  Have you reviewed those originally filed returns?

Mary Trabold – Direct

1    *A.*   Yes.

2    *Q.*   Have you reviewed both of them or just one?

3    *A.*   I believe I've only seen the 1998 frivolous return.

4         MR. MAGNANI:  Now, if we could please pull up

5    Exhibit 1.

6    *BY MR. MAGNANI:*

7    *Q.*   And, you know, again, I will let you -- if you want to

8    direct Ms. Burgess through this return and just sort of

9    explain, what is Mr. Birk claiming in this return?

10   *A.*   Well, he's reporting -- I'm not going to read off every

11   item -- but most -- the biggest income item on here is for a

12   capital gain, and that's the $40,683.16.  And there are a few

13   other smaller items like interest and dividends.

14   *Q.*   And how much is he reporting in wages on this return?

15   *A.*   Nothing.

16         MR. MAGNANI:  Could we please go to the next return --

17   next page, excuse me.

18   *BY MR. MAGNANI:*

19   *Q.*   What was the profession of Mr. Birk at the time for 1998,

20   according to this return?

21   *A.*   An engineer.

22   *Q.*   When was this return filed?

23   *A.*   I would have to see the date, but I can see that -- it was

24   signed on July 26, 2005.

25   *Q.*   And what is this return requesting from the IRS?

Mary Trabold - Direct

1   *A.*   A $52,644.38 refund.

2   *Q.*   And without going through the entire return, do you know

3   what the basis of that request for refund was?

4   *A.*   Yes.

5   *Q.*   And before you answer that, could we please advance to the

6   next page.

7           And can you zoom in -- yeah, Section 7 -- yeah, that's

8   good.

9           So what is this form?

10  *A.*   This form -- I'm not sure -- particularly familiar with it,

11  but --

12  *Q.*   Well, what is the -- what is a W-2?  Let's start --

13  *A.*   A W-2 is an information return; and it shows your wages

14  received and then taxes withheld, your social security taxes

15  withheld, and Medicare taxes withheld.

16  *Q.*   So if I lost my W-2, would I be out of luck, or would I

17  still be able to file a tax return?

18  *A.*   You would still be able to file.

19  *Q.*   Okay.  What is this form?

20  *A.*   This is called a substitute for W-2 or form 1099-R,

21  regarding distributions from pensions, annuities, retirements,

22  et cetera.

23  *Q.*   And so what company is this a substitute -- who made this

24  substitute return?

25  *A.*   Mr. Birk.

Mary Trabold - Direct

1   Q.   And what is it purporting to be a substitute for?  For the

2   W-2 from what company?

3   A.   From PRC, Inc.

4   Q.   And does it give an explanation for why a substitute for

5   W-2 is being used instead of a W-2?

6   A.   Yes.

7   Q.   What's the explanation?

8   A.   May I read it?

9   Q.   You may.

10   A.   "Request, but company refused to issue corrected form

11   listing payments of wages as defined in IRC Sections 3401(a)

12   and 3121(a).  The amounts listed as withheld are correct on

13   form W-2 submitted to IRS."

14   Q.   Have you seen the actual W-2 issued by PRC, Inc., for this

15   year?

16   A.   I don't recall seeing that.  I do recall seeing a summary

17   that was in the Advanced Tax Solutions file of what the W-2

18   information was.

19   Q.   And so are you talking about the tax return that Advanced

20   Tax filed for 1998?

21   A.   Yes.

22   Q.   So what do you mean when you say "a summary"?

23   A.   So when using those -- typically, tax accounting programs,

24   you're going to input the data for each line item on the W-2.

25   And that information was included in the files that -- from

360

Mary Trabold - Direct

1  Advanced Tax.

2  Q.  And maybe I'll ask you, do you know -- did the form W-2

3  that was actually issued by PRC, Inc., did that report wages?

4  A.  Yes.

5  Q.  Do you know about how much?

6  A.  I don't recall off the top of my head.

7        MR. MAGNANI:  If we could please go to Exhibit 3.

8        I'm sorry.  Exhibit 2, please.  Go to page 18 -- I'm

9  sorry.  If we could please go to the last page, very last page

10  of the exhibit.  I apologize, I don't know the page number.

11  BY MR. MAGNANI:

12  Q.  So what's this?

13  A.  This is a W-2.

14  Q.  And who issued this W-2?

15  A.  PRC, Inc.

16  Q.  Who was it issued to?

17  A.  Mr. Birk.

18  Q.  For what year?

19  A.  1998.

20  Q.  And how much did PRC, Inc., report to the IRS that it paid

21  Mr. Birk in wages in 1998?

22  A.  $55,947.05.

23  Q.  Just back to that --

24        You know, we don't have to pull it up.  We can take

25  down all the tax returns for a minute.

Mary Trabold – Direct

1      -- first 1998 return that you looked at, what was the

2  basis of the refund request?  What was Mr. Birk claiming

3  entitled him to a $52,000 refund?

4  A.   If you add up the taxes withheld, the social security taxes

5  withheld, the Medicare taxes withheld for both Mr. Birk and

6  Mrs. Birk, it adds up to the $52,000 number.

7  Q.   Is it fair to say that, essentially, just asking for back

8  all the income taxes, social security taxes, and Medicare

9  taxes?

10  A.   Yes.

11  Q.   Okay.  Do you -- and just -- we've talked a lot about

12  income taxes.  Just briefly, what is social security tax?

13  A.   That is what you pay in in order to get social security

14  benefits when you are old and infirm.

15  Q.   And so they asked for it back on that return?

16      THE COURT:  Oh --

17  BY MR. MAGNANI:

18  Q.   When you're above -- is there --

19      THE COURT:  When you're mature and eligible?

20      THE WITNESS:  My apologies, Your Honor.

21      MR. MAGNANI:  The Court's indulgence.  Apologies, Your

22  Honor.  I didn't see any older people in the courtroom.

23  BY MR. MAGNANI:

24  Q.   So do you know if either of the Birks receive social

25  security today?

362

Mary Trabold - Direct

1   *A.*   Yes.

2   *Q.*   Who?

3   *A.*   Mrs. Birk.

4          THE COURT:  Counsel, excuse the interruption.  But

5   it's time for our mid-morning recess, ladies and gentlemen.

6   During which you may stand down, and after which, you must

7   return to continue and complete your testimony.

8          And will you do that?

9          THE WITNESS:  Yes.

10          THE COURT:  You're excused until then.  Thank you.

11          THE WITNESS:  Thank you.

12          THE COURT:  Counsel, you may be seated at your

13   convenience.

14          Ladies and gentlemen, in preparation for this

15   mid-morning recess -- ah, you're clairvoyant.  Two things:

16   First, leave on your chairs face down your notetaking

17   materials; and, of course, continue to be mindful of and

18   sensitive to those critically important rules that govern you

19   as jurors in the trial of this case.

20          We are in recess for 15 minutes.

21          Madam Clerk.

22          (Recess at 10:06 a.m.)

23          (In open court at 10:27 a.m.)

24          THE COURT:  Thank you, and please be seated.

25          Very well.  For now, we proceed on the record in open

Mary Trabold - Direct

1   court, deliberately outside the presence and the hearing of the

2   jury to address at least preliminarily an issue raised by

3   counsel, brought to the attention of the clerk in hopes that

4   counsel could gain my attention.

5           All right.  You've got it.  As succinctly as possible,

6   what's the issue?

7           MR. MAGNANI:  Thank you, Your Honor.

8           Just based on defense counsel's representations in

9   opening statements that Mr. Birk may have developed some of his

10  ideas by talking to an attorney -- he mentioned a professor in

11  a business law class who was an attorney gave him these

12  ideas -- the Government wanted to bring to your attention that

13  we may -- to this point, the name of this person has not been

14  disclosed.  Defense counsel has represented to me that he does

15  not believe Mr. Birk will identify a particular person or a

16  name.  But the Government wanted to raise this and bring to the

17  Court's attention that if Mr. Birk does testify that he spoke

18  to a specific person, the Government will likely ask the Court

19  for adjournment if it's surprised by that information only

20  during the testimony, as the Government would need to have the

21  time to find the person, subpoena the person, and potentially

22  call them as a rebuttal witness.

23          THE COURT:  So you need to give me an FYI --

24          MR. MAGNANI:  Your Honor --

25          THE COURT:   -- for an issue that is not ripe?

Mary Trabold - Direct

1          MR. MAGNANI:  The reason I'm bringing it up now, Your

2    Honor, is because if, for example, Mr. Birk testified that he

3    did rely from a person, I would like to be able to say, you

4    heard in open court on the record your counsel say that you

5    would not name a certain person, and you heard that it would

6    take the Government time to try to find that person and call

7    that person.  And I think that would be proper impeachment in

8    light of this, and that I've made my record.

9          THE COURT:  Well, again, the matter is not ripe.

10   Tacitly and inherently, apparently, you're seeking some kind of

11   advisory ruling; but you're not seeking any formal relief from

12   the Court.  So why am I involved yet?  And why would this be

13   difficult for me to resolve?

14         MR. MAGNANI:  I don't expect that it would, Your

15   Honor.  The Court is correct, the Government is not asking for

16   a ruling.  The Government is making a record that this

17   happened, so that if this is ever reviewed on appeal, Your

18   Honor's decision whether to grant an adjournment or not can be

19   properly reviewed by the Court of Appeals.

20         THE COURT:  The standard of review is abuse of

21   discretion.  Can you see me smiling both outwardly and

22   inwardly?  I'm never going to be reversed on an abuse of

23   discretion standard about whether to temporarily place a trial

24   in recess.  There are many more points on this record that have

25   needed more sedulous treatment.  This is certainly not one of

365

Mary Trabold - Direct

1   them.

2          *MR. MAGNANI:*  Very well, Your Honor.  Thank you.

3          *THE COURT:*  All right.  Madam Clerk.  I heard it.

4   Please escort the jury into the courtroom.

5          I also make the record that needed to be made.  Could

6   have been made during mid-trial proceedings just as easily,

7   again, without delaying and inconveniencing the jury.  That's

8   my record.

9          (Jury in at 10:32 a.m.)

10          *THE COURT:*  Ladies and gentlemen, please be seated.

11          Mr. Magnani, you may resume your direct examination.

12          *MR. MAGNANI:*  Thank you, Your Honor.

13          *THE COURT:*  You're welcome.

14   *BY MR. MAGNANI:*

15   *Q.*  Good morning again, Ms. Trabold.

16   *A.*  Good morning.

17   *Q.*  Now, before we took our break, we were talking a little bit

18   about those 1998 and '99 tax returns.

19   *A.*  Yes.

20   *Q.*  Were other '98 and '99 tax returns ultimately filed by

21   Mr. Birk?

22   *A.*  Yes.

23   *Q.*  Okay.  Now, did you -- who filed Mr. Birk's subsequent '98

24   and '99 tax returns -- who prepared them, rather?

25   *A.*  Advanced Tax Solutions.

Mary Trabold - Direct

1    *Q.*   Who prepared his 2000 through 2005 tax returns?

2    *A.*   Advanced Tax Solutions.

3    *Q.*   Were those returns filed with the IRS?

4    *A.*   Yes.

5    *Q.*   Were they accepted?

6    *A.*   Not as filed.

7    *Q.*   Were some accepted and some not?

8    *A.*   Yes.

9    *Q.*   Okay.  Can you just please sort of explain to the jury

10   which were accepted and which were not, if you know?

11   *A.*   Well, in 1998 there were two returns submitted by Advanced.

12   And the first return was accepted by the IRS, but the second

13   return, which was amended and had an NOL carryback -- the net

14   operating loss carryback -- that one was not.  The 1999 return

15   was accepted.  And the 2000 through 2003 returns were accepted

16   in part because of the audit adjustments that had already been

17   made and the determinations that Revenue Agent Applegate had

18   made.  The tax examiner who was sorting through the returns

19   used some of Mrs. Applegate's numbers and some of the numbers

20   from the returns that were prepared by Advanced Tax Services.

21   Now, for 2004 and 2005, the IRS accepted those returns as

22   filed.

23   *Q.*   Why were the 2004 and 2005 returns accepted as filed?

24   *A.*   Because no return had been filed previously, and no

25   substitute for return had been done for those years.

Mary Trabold - Direct

1  Q.  And why were the -- let's focus on the 2000 to 2003, the

2  ones that Ms. Applegate testified about.  Why were the Advanced

3  Tax returns for those years not accepted in full?

4  A.  Well, the determination was made that because Revenue Agent

5  Applegate had looked at third-party records, the bank

6  statements and Honest Abe Log Homes information, that that was

7  more reliable than the information that was submitted with the

8  protest returns.

9  Q.  And, again, just so there is no confusion, when you say

10  "protest returns," does that mean -- what does that mean?

11  A.  It just means they were protesting the SFR, the substitute

12  for return.  It doesn't characterize Mr. Birk's beliefs in any

13  way.

14  Q.  Now, how much of the income that Revenue Agent Applegate

15  found or determined was reported on those 2000 to 2003 returns?

16  And I'm not asking for a number, but some of it, all of it,

17  none of it?

18  A.  It appears that some of it was.

19  Q.  So do you know what income Revenue Agent Applegate had in

20  her exam that was not on the 2000 through 2003 tax returns?

21  A.  There were retirement distributions; they were either from

22  pensions, 401Ks, or individual retirement accounts; and those

23  funds were not reflected as taxable on the returns, for

24  2000 and 2001, specifically.

25  Q.  Do you know why that retirement income was not reflected on

Mary Trabold - Direct

1    the returns prepared by Dale Erikson of Advanced Tax Solutions?

2    A.  Well, Mr. Erikson testified that he was not told about some

3    of the retirement income that the Government had determined.

4    But he did talk about on the 2000 return, there was a

5    $45,805 -- I believe it was characterized as a pension

6    distribution that was marked as rollover on the face of the

7    return, which meant that it was not taxable.  But the

8    examination that Revenue Agent Applegate did found those funds

9    to be taxable.  And when I looked at the records, I found those

10   to be taxable, as well.

11   Q.  Well, let me just ask you, more broadly, when Mr. Erikson

12   prepared his returns, what sources of information was he

13   relying on?

14   A.  Well, he was relying on what he was able to obtain from the

15   Internal Revenue Service, as well as what Mr. Birk provided to

16   him.

17   Q.  And what did you and Ms. Applegate have at your disposal

18   that Mr. Erikson did not have at his disposal?

19   A.  We had the bank deposit details.

20   Q.  When you say "the bank deposit details," can you just be

21   specific in identifying a particular bank account?

22   A.  Well, there were two involved.  One was the Park State

23   Bank -- well, actually, three.  There was the Park State Bank &

24   Trust, the Tarryall River Log Homes account; there was also

25   small activity in the personal account; and then the third

Mary Trabold - Direct

1   account that was at issue was an account at Vectra Bank in the

2   name of Tarryall Asset Management, Inc.

3   Q.  To avoid confusion about the difference between Tarryall

4   River Log Homes and Tarryall Asset Management, Inc., do you

5   have an acronym?

6   A.  I refer to it as TAMI, T-A-M-I.  And I'll continue to do

7   that when discussing that entity.

8   Q.  Okay.  Now, just generally, from your review of the audit

9   that was done by the IRS, what are your general conclusions

10  about the accuracy of the audit that was done?

11  A.  Well, it was accurate within its own limitations; but it's

12  not a complete reflection of Mr. Birk's business activity.

13  Q.  Okay.  Did you develop your own independent conclusions

14  about the amount of tax Mr. Birk would have owed for the years

15  1998 through 2005?

16  A.  Yes, I did.

17  Q.  Can you just basically explain the principles that you used

18  to come up with your conclusions.

19  A.  Certainly.  So I tried to be conservative in determining

20  what Mr. Birk's taxes should be.  When I looked at the tax

21  returns that Advance Tax prepared, I saw that the income that

22  is reported on the Schedule C -- again, that's the business

23  portion of the 1040 -- was accurate based on the information

24  that was provided to Mr. Erikson.  So because I did not have

25  the underlying data -- the receipts and so on to actually do an

Mary Trabold - Direct

1    audit of that, I made the determination to accept the

2    Schedule C as reported on the returns for 2000 through 2005 --

3    or -- yes, through 2005.

4          But when I was looking at the audit files, I could see

5    that there was retirement income that should have been included

6    in income and was not.  And so I made adjustments for that,

7    plus certain follow-on adjustments that are impacted by income

8    levels and so on.

9    Q.  Now, what tool -- what information did you have at your

10   disposal when you did your review and computations that Revenue

11   Agent Applegate did not have available to her when she did her

12   initial audit?

13   A.  Well, she didn't have Mr. Birk's books and records; so she

14   couldn't see the business ledger or profit and loss statement

15   that had been provided to Mr. Erikson.  So she was operating

16   with one eye closed, in a way.  You know, she could only see

17   what she could get from the bank and what she could obtain from

18   Honest Abe Log Homes; and so she was really hampered in terms

19   of making a determination as to the deductibility of other

20   expenses and so on.

21   Q.  And since you had those books and records, did you sort of

22   accept them as is, or did you try to verify whether the books

23   and records were truly accurate?

24   A.  I decided to accept them as is.  I didn't want to

25   substitute suppositions and my judgment with regard to those

371

Mary Trabold - Direct

1    expenses.  It seemed -- it would be unfair to Mr. Birk to do it

2    that way, so I just let the Schedule C be as filed.

3    Q.  So what's the primary difference between your analysis and

4    the tax returns that Advanced Tax Solutions filed?

5    A.  It's all about the retirement income.  There was retirement

6    funds that were distributed in those years to the Birks, and

7    they were not reflected as being taxable on the return.

8    Q.  And you mentioned -- you used, again, this term

9    "conservative," you tried to be conservative.  Can you just

10   explain, what do you mean when you say you're trying to be

11   conservative?

12   A.  I was trying to give Mr. Birk the benefit of every doubt.

13   Q.  And has your analysis in creating the computations for this

14   case, is that the same as the analysis you would bring to a

15   normal civil audit?

16   A.  No.

17   Q.  Can you please explain the difference.

18   A.  There is a different standard of proof in a criminal case

19   versus a civil case, and there is also a different burden that

20   is placed on the taxpayer.  So if I'm going to adjust income in

21   a civil audit, the burden of proof is on me as representing the

22   government.  But to -- for expenses in civil examination, the

23   burden of proof is on the taxpayer to support the deductions

24   that they're claiming.

25              So in this case, I just accepted every expense,

372
Mary Trabold - Direct

1  including the cost of goods sold, which included inventory, and

2  I just accepted that all at face value.

3      MR. MAGNANI:  Okay.  Could we please pull up

4  Exhibit 130.

5  BY MR. MAGNANI:

6  Q.  And what is this, Ms. Trabold?

7  A.  This is a summary of my tax computations.  Behind this is a

8  tax computation spreadsheet and report for each of these years,

9  and it shows my total tax due and owing as I computed it as

10  $283,172.19.

11  Q.  And when you say -- well, what did you say follows --

12  excuse me.  Let me ask a different question.

13      After this summary, what else is in this exhibit?

14  A.  I did a tax computation spreadsheet for each year 1998

15  through 2005.  And then I also entered adjustments into the

16  program that we use civilly to determine tax liability, and

17  that also supports the computations in my spreadsheets.

18  Q.  Okay.  And if we could -- well, let me just ask you for the

19  record:  Based on your exam, how much did he owe for 1998

20  through 2005?

21  A.  $283,172.19.

22  Q.  Slow down for the court reporter's benefit.

23  A.  Right.

24  Q.  And does this -- is this tax only, or does this include

25  interest and penalties?

Mary Trabold - Direct

1    *A.* This is tax only.

2            *MR. MAGNANI:* Okay. Now, could we please pull up on

3    the other side -- could we leave this open and pull up on the

4    other side of the screen Exhibit 92. And I don't know if you

5    can --

6    *BY MR. MAGNANI:*

7    *Q.* Well, what is Exhibit 92, just to remind the jury?

8    *A.* This was a summary of taxes as computed by Advanced Tax

9    Solutions.

10   *Q.* Okay. Are you able to read through that dark shading what

11   the tax only due was, according to the Advanced Tax Solutions

12   tax returns?

13   *A.* $94,121.

14   *Q.* And so what would you say accounts for the difference

15   between the 283,000 that you found due and the 94,000 that they

16   found due?

17   *A.* It's the taxable retirement income.

18   *Q.* Okay. And just, you know -- just one more question

19   about -- when you talked about being conservative, how would

20   you have approached -- let me ask you this: How did your --

21   your analysis for 2004 and '5, how does that compare to the

22   Advanced Tax Solutions analysis?

23   *A.* That is the Advanced Tax Solutions amount.

24   *Q.* So why did you not use your own independent judgment to

25   determine the tax due and owing for 2004 and '5?

374

Mary Trabold - Direct

1   A.  Because I did not have sufficient information to substitute

2   my judgment for what was on the tax returns.

3   Q.  And so just what are the years where there is the biggest

4   differences between your analysis and the Advanced Tax

5   analysis?

6   A.  2000 and 2001.

7   Q.  Okay.  Ms. Trabold, I'd like to now talk to you about

8   Tarryall Asset Management, Inc., which you described as TAMI.

9           And if we could just pull up -- and I will -- before

10  we pull it up, I would just note and ask counsel if there is

11  any objection.  Exhibit 139 is a demonstrative exhibit that is

12  not in evidence and will not be submitted to the jury.  And I

13  sent it to counsel.  And I don't believe there is an objection,

14  but --

15          MS. BECK:  No objection.

16          MR. MAGNANI:  Okay.

17          THE COURT:  Government Exhibit 139 may be used and

18  discussed as a demonstrative exhibit only.

19          MR. MAGNANI:  Okay.

20  BY MR. MAGNANI:

21  Q.  And, Ms. Trabold, I don't know if your pen works or if --

22  let me just ask you this:  Can you just explain to the jury

23  what we're looking at here?

24  A.  This is an example of how IRA funds or 401K funds can be

25  moved around between trustees without incurring any tax

Mary Trabold - Direct

1   liability.

2   Q.  Okay.  So --

3   A.  So -- so the top line shows, say, you have an IRA or a

4   401K, and it's at Fidelity Investments --

5   Q.  Let me interrupt you.  Can you start by giving a very brief

6   description of what is a 401K or an IRA?

7   A.  Sure.  A 401K is deferred retirement arrangement.  So your

8   employer takes money out of your check before it comes to you

9   and before it's taxed, and it's placed into an account to be

10  held on your behalf until such time as you withdraw it.  And an

11  IRA, or an individual retirement account, is basically a

12  personal retirement savings account.  So you get to set aside

13  in these years up to $2,000 each, and you get a deduction for

14  that on your taxes, and the money that you put into that

15  account and anything that you earn from it isn't taxed until it

16  is withdrawn.

17  Q.  And -- okay.  And can you -- and what tax rate do you pay

18  when you take out -- when you finally withdraw the money?

19  A.  It depends.  If you take the money out after you reach the

20  age of 59 1/2, it is simply taxed at what we call your marginal

21  tax rate; so, you know, that would be the highest tax rate at

22  which you are paying your taxes.  So -- and that could range,

23  you know, 27 percent or 15 percent or -- the idea behind these

24  types of retirement accounts is that when you withdraw the

25  funds when you're older, you're in a lower tax bracket so you

Mary Trabold – Direct

1    aren't paying as much tax as if you were being taxed on the

2    money when you earned it when you were younger.

3    Q.   What happens if you take the money out before you reach the

4    age of 59 1/2?

5    A.   Well, the funds are taxable; and they're also subject to a

6    10 percent tax because you have withdrawn the money early.

7    Unless there are certain exceptions for, say, a medical issue

8    or something; and then you would not be assessed that

9    10 percent tax.

10   Q.   What is an IRA or 401K custodian?

11   A.   That's the trustee who holds the funds on your behalf.

12   Q.   Can a person just hold their own 401K or IRA funds?

13   A.   No.

14   Q.   So if someone transfers their IRA or 401K from one

15   custodian to another, is that a taxable event?

16   A.   Not if it's transferred directly from trustee to trustee.

17   Q.   Can you give an example?

18   A.   So this is what is on the slide here.  So you have your

19   funds at Fidelity, and you decide that you can get a better

20   rate at Wells Fargo.  So you move the funds from Fidelity to

21   Wells Fargo, but the money doesn't pass through your hands.  It

22   goes directly from Fidelity to Wells Fargo, and it's either a

23   transfer or a direct rollover of the funds.

24   Q.   And if you instead just take the funds out, does that have

25   a name that is sometimes used?

Mary Trabold - Direct

1   *A.*  It's called a distribution.

2   *Q.*  And what year do you have to pay the tax for a

3   distribution?

4   *A.*  In the year that it is distributed.

5        MR. MAGNANI:  Okay.  If we could please go to the next

6   line -- the next page.

7   *BY MR. MAGNANI:*

8   *Q.*  So can you just describe what we're looking at here?

9   *A.*  This is -- I'm not sure I see -- the top line, I believe,

10  is the same as the previous slide.  The bottom shows that where

11  the IRA or 401K being held by the custodian -- in this

12  particular case, in Mr. Birk's case, the funds were distributed

13  to Tarryall Asset Management, Inc. -- as I said, I'll call it

14  TAMI -- and then those funds were distributed to either

15  Mr. Birk's business account at Park State Bank & Trust, or they

16  were actually sent directly to Honest Abe Log Homes via wire

17  transfer.

18  *Q.*  In your analysis of this transfer, when the money was

19  transferred from the IRA or 401K custodian to TAMI, did you

20  treat that as a direct rollover or as a distribution?

21  *A.*  I treated it as a distribution.

22  *Q.*  Why didn't you treat it as a direct rollover since it was

23  going to another company?

24  *A.*  Because TAMI is a sham.

25  *Q.*  What do you mean by that?

Mary Trabold - Direct

1    *A.*  It was created solely as a vehicle to distribute those

2    retirement funds without having any tax withheld or any -- or

3    any reporting requirements to the IRS.

4    *Q.*  So if I had my retirement at Fidelity and I asked them to

5    pay it all to me, would Fidelity have to report that

6    distribution to the IRS?

7    *A.*  Yes.

8    *Q.*  But what if I had my money at Fidelity and I told them all

9    to transfer it to a different custodian, would that have to be

10   reported to the IRS?

11   *A.*  No.  Not if it was a transfer.

12   *Q.*  Well, let me ask you about TAMI.  What --

13            If we could pull up Exhibit 121, please.

14            And what -- actually, if we could go to the --

15            Well, what's the first page of this?

16   *A.*  Oh, this is a certificate from the Colorado Secretary of

17   State.

18   *Q.*  And what does the Colorado -- well, what is one of the

19   things that the Colorado Secretary of State is responsible for

20   doing?

21   *A.*  They maintain corporate filings for corporations and LLCs

22   and the like.

23            *MR. MAGNANI:*  Okay.  If we could go to the next page,

24   please.

25

Mary Trabold – Direct

1   *BY MR. MAGNANI:*

2   *Q.*  And what is this?

3   *A.*  This is the articles of incorporation for TAMI.

4   *Q.*  And can you just sort of describe what we're looking at

5   here.

6   *A.*  Sure.  It gives the name of the entity, its address, and

7   who its registered agent is, as well as the name of the

8   incorporator.  And the name of the incorporator is Mr. Birk.

9   *Q.*  Okay.  And is he also the registered agent?

10  *A.*  Yes, he is.

11  *Q.*  Anyone else affiliated with TAMI?

12  *A.*  No.

13  *Q.*  When was TAMI incorporated with the Colorado Secretary of

14  State?

15  *A.*  You can see the stamp on the top says May 4, 2000.

16  *Q.*  After TAMI was incorporated, did it ever obtain an EIN

17  number?

18  *A.*  Yes.  That's an employer identification number.  That's the

19  equivalent of a social security number but for a business

20  entity.

21      MR. MAGNANI:  And if we could please go to Exhibit 14,

22  page 2.

23  *BY MR. MAGNANI:*

24  *Q.*  Are you able to tell from this document when TAMI applied

25  for and received its federal tax ID number?

Mary Trabold - Direct

1   *A.* I don't believe it's on this page.

2   *Q.* Well, can we go to the next page, just in case.  Is it on

3   this page?

4   *A.* Yes.  You can see on May 9 it applied for an EIN.

5   *Q.* So how many days after it was incorporated did it apply for

6   an EIN?

7   *A.* Five.

8   *Q.* Now, did TAMI ever file a tax return?

9   *A.* No.

10  *Q.* So why would TAMI need an EIN number?

11  *A.* In order to open a bank account.

12  *Q.* Did TAMI, in fact, open a bank account?

13  *A.* Yes.

14  *Q.* Where did it open that account?

15  *A.* At Vectra Bank.

16  *Q.* Do you know about when it opened that account?

17  *A.* In May of 2000.

18  *Q.* Shortly after getting the EIN?

19  *A.* Yes.

20  *Q.* Were you here in the courtroom when Dale Erikson testified?

21  *A.* Yes.

22  *Q.* What did -- what did Mr. Birk tell Dale Erikson TAMI was?

23  *A.* That it was an entity for -- for moving money.  I can't

24  remember his exact phrase.

25          *MR. MAGNANI:*  If we could pull up Exhibit 93, please.

Mary Trabold – Direct

1    *BY MR. MAGNANI:*

2    *Q.*  Did Mr. Erikson testify about notes he took during a

3    meeting with the defendant?

4    *A.*  Yes.

5    *Q.*  And are these those notes?

6    *A.*  Yes.

7    *Q.*  And so -- well, what do these notes say TAMI is?

8    *A.*  It says it's a personal service corp. and has a federal

9    employer ID number.  That's what FEIN stands for.  And it's a

10   corporation to move money around.  It also says that it was

11   funded with personal funds and paid money to the LLC for a spec

12   home, which means a house built on spec, for sale, eventually.

13   *Q.*  Now, did you review those TAMI bank records?

14   *A.*  Yes.

15   *Q.*  Did you -- did you spread the account?

16   *A.*  Yes, I did.

17          *MR. MAGNANI:*  Okay.  Could we please pull up

18   Exhibit 131.

19   *BY MR. MAGNANI:*

20   *Q.*  Now, what is this, exactly?

21   *A.*  This is a record of all of the activity in the Vectra Bank

22   account, deposits and withdrawals.  I've set it up this way so

23   that you can see the flow of money and the impact that it has

24   on the balance in the account.

25   *Q.*  Now, looking at this exhibit, do you remember the exact

Mary Trabold - Direct

1  date -- what's the exact date that the Vectra account was

2  opened for TAMI?

3  *A.*  Well, I believe it would be with the opening deposit on

4  May 10 of 2000.

5  *Q.*  Do you recall how many days that was after Mr. Birk

6  obtained the federal tax ID number?

7  *A.*  It's the next day.

8  *Q.*  Does this spread include every deposit and every withdrawal

9  from the TAMI account?

10  *A.*  Yes.

11  *Q.*  And where -- after the money -- well, about how much money

12  came into the TAMI account?

13  *A.*  It was over $400,000 over the course of 2000 and 2001.

14  *Q.*  And where did that money go eventually?

15  *A.*  From what we could identify -- and it's not all -- we don't

16  know -- I don't know where all of the money went -- but over

17  $300,000 of that went either to Tarryall River Log Homes at the

18  Park State Bank & Trust or to Honest Abe Log Homes.

19  *Q.*  And so just to walk through an example, can we just zoom I

20  guess between May 10 and August -- August 14, first couple of

21  lines.  That's great.

22        So these first two -- well, let me just -- the first

23  two deposits that came in on May 10, right when the account was

24  opened, how much were those deposits for about?

25  *A.*  Well, they totaled $104,716.

Mary Trabold - Direct

1    *Q.*  How long did that money sit in the account?

2    *A.*  It was almost all distributed by August 11 of 2000.  You

3    can see that the balance in the account dropped to $372.

4            *MR. MAGNANI:*  And just if we can scroll down a little

5    bit.

6    *BY MR. MAGNANI:*

7    *Q.*  How much money came in on August 14, 2000?

8    *A.*  The balance went up to $199,000, so it went up by almost

9    200,000.

10   *Q.*  Now, to create this spread -- and this is only two pages;

11   right?

12   *A.*  Yes.

13   *Q.*  To create this, did you -- which bank records did you rely

14   on to get the information that you put in these columns?

15   *A.*  Well, I started with the Vectra Bank account records; and

16   then I looked for corresponding transactions at Park State,

17   particularly in the Tarryall River account.

18   *Q.*  And so what did you conclude -- where did you conclude the

19   money coming into the Vectra TAMI account was going,

20   ultimately?

21   *A.*  If it wasn't going to Honest Abe Log Homes, what I could

22   identify went to Park State Bank, to Tarryall River Log Homes.

23           *MR. MAGNANI:*  Could we pull up Exhibit 120.

24   *BY MR. MAGNANI:*

25   *Q.*  Do you recognize what Exhibit 120 is?

Mary Trabold - Direct

1   *A.*  Yes.

2   *Q.*  What is it?

3   *A.*  This is a bank statement for the Vectra Bank account for

4   TAMI.

5   *Q.*  Okay.  Now -- is this one of the primary sources of your

6   summary that we just looked at?

7   *A.*  Yes.

8        *MR. MAGNANI:*  Can we go to page 2, please.

9   *BY MR. MAGNANI:*

10  *Q.*  So before when we were looking at that initial deposit on

11  May 10, 2000, is that what this is reflected here?

12  *A.*  Yes.  This is the deposit ticket for the two checks.

13       *MR. MAGNANI:*  And if we can go to the next page,

14  please.

15  *BY MR. MAGNANI:*

16  *Q.*  And what's this?

17  *A.*  This is one of the deposited items.

18  *Q.*  And can you describe what this item is?

19  *A.*  Sure.  This is a check from Janus to -- paid to the order

20  of Tarryall Asset Management FBO Jean A. Birk.  FBO means for

21  benefit of.

22  *Q.*  So if I or anyone wanted to do what you described as a

23  direct rollover, and they wanted to move their retirement

24  assets from one custodian to another custodian, whose name

25  would be on the check for that distribution?

Mary Trabold - Direct

1    *A.*  It would be the name of the receiving institution, but it

2    would be identified for the particular account of the

3    individual who -- whose retirement funds it is.

4    *Q.*  So when Janus cut this check, who was this check made out

5    to?

6    *A.*  To TAMI.

7         *MR. MAGNANI:*  If we could go to the next page, please.

8    *BY MR. MAGNANI:*

9    *Q.*  What's this one?

10   *A.*  This is the second check that was deposited in May.

11        *MR. MAGNANI:*  And then if we could just jump to

12   page 8.

13   *BY MR. MAGNANI:*

14   *Q.*  What are we looking at here?

15   *A.*  This is another deposit to the Vectra Bank account.

16   Deposit, ticket specifically.

17   *Q.*  And how many checks is this for?

18   *A.*  Two.

19   *Q.*  And what's the total?

20   *A.*  $198,946.29.

21        *MR. MAGNANI:*  Next page, please.

22   *BY MR. MAGNANI:*

23   *Q.*  And this?

24   *A.*  And, again, this is a check from Janus to TAMI for benefit

25   of Jean Birk.

Mary Trabold - Direct

1          MR. MAGNANI:  Next page, please.

2     BY MR. MAGNANI:

3     Q.   And what's this?

4     A.   This is another check from Janus payable to TAMI for

5     benefit of Jean Birk.

6     Q.   Now, are there a lot more bank records like this from

7     Vectra for the TAMI account?

8     A.   Yes.

9     Q.   Are these just examples of some of the items on your

10    spreadsheet?

11    A.   Yes.

12          MR. MAGNANI:  If we could just go back to Exhibit 131,

13    please.  Now -- and if we could scroll to the second page,

14    please.  If you could zoom on the bottom.

15    BY MR. MAGNANI:

16    Q.   And just -- what's your conclusion on what TAMI was?

17    A.   TAMI was created to take funds from Mr. and Mrs. Birk's

18    retirement funds and run them through so that they could be

19    distributed without any withholding and without any reporting

20    to the IRS.

21    Q.   How long was the TAMI account open?

22    A.   It was open from May of 2000 until August of 2001, where

23    you can see the last item on the spreadsheet says "forced debit

24    to close."  That means that the account was closed.

25          MR. MAGNANI:  No further questions.

Mary Trabold – Direct

1          *THE COURT:*  Cross-examination for Ms. Beck.

2          *MS. BECK:*  Nothing, Your Honor.

3          *THE COURT:*  Very well.  May Ms. Trabold be excused and

4    released from subpoena?

5          Any objection by the Government?

6          *MR. MAGNANI:*  We would still keep her under subpoena

7    in case she may be required for rebuttal.

8          *THE COURT:*  All right.  Mis Trabold, you may be

9    excused.  You remain under subpoena and subject to recall by

10   the Government.  The arrangements for when and if that were to

11   occur, I leave that to counsel and yourself.

12         *THE WITNESS:*  Thank you, Your Honor.

13         *THE COURT:*  You're welcome.

14         Very well.  The Government may proceed.

15         *MS. HADDEN:*  Thank you, Your Honor.  The United States

16   calls Special Agent Ben Hopping.

17         *THE COURT:*  Very well.

18         Special Agent Hopping, good morning.  Would you please

19   come forward and be sworn by the Court.  Please come to this

20   open area in front of my bench.  There is fine.

21         Please face me and raise your right hand to be sworn.

22   Thank you.

23         May I have your attention in the courtroom.

24         (**BENJAMIN HOPPING, GOVERNMENT'S WITNESS, SWORN**)

25         *THE COURT:*  Thank you.  Please be seated in that

Benjamin Hopping – Direct

1    witness stand.

2              Ms. Hadden, you may inquire.

3              *MS. HADDEN:*  Thank you, Your Honor.

4              *THE COURT:*  You're welcome.

5                         **DIRECT EXAMINATION**

6    *BY MS. HADDEN:*

7    *Q.*  Good morning, Mr. Hopping.

8    *A.*  Good morning.

9    *Q.*  What city and state do you live in?

10   *A.*  Littleton, Colorado.

11   *Q.*  Where do you work?

12   *A.*  In Denver, Colorado.

13   *Q.*  What is your employment?

14   *A.*  I'm a special agent with the IRS criminal investigation

15   division.

16   *Q.*  What is your educational background?

17   *A.*  I have a bachelor's degree in accounting and a bachelor's

18   degree in economics.

19   *Q.*  What is your employment history?

20   *A.*  I've been a special agent since May of 2001.  Prior to

21   that, I was an auditor in a public accounting firm.

22   *Q.*  What are your duties as a special agent?

23   *A.*  I investigate tax crimes and tax-related crimes and money

24   laundering.

25   *Q.*  And what training do you get to become an IRS CI agent?

Benjamin Hopping - Direct

1   *A.*  So we spend six months at the Federal Law Enforcement

2   Training Center.  Three of those months are for criminal

3   investigator training program, and then the second three months

4   are for special agent basic training.

5   *Q.*  Do you know the defendant in this case?

6   *A.*  Yes.

7   *Q.*  How do you know him?

8   *A.*  I interviewed him with Special Agent Godson (ph).

9   *Q.*  When did you do that interview?

10  *A.*  In June of 2014.

11  *Q.*  Where did you speak to the defendant?

12  *A.*  On the side of the road in front of his gated community.

13  *Q.*  And why did you speak to him there?

14  *A.*  It's gated, so we couldn't approach him at his house.  We

15  had to wait for him to leave so we'd had an opportunity to

16  speak with him.

17  *Q.*  And when you first approached him, what did you say to him?

18  *A.*  We identified ourselves, and we told him that we were there

19  related to a tax assessment on him.

20  *Q.*  Did you tell him he was under criminal investigation?

21  *A.*  Yes, we did.

22  *Q.*  Did you read him any rights?

23  *A.*  Yes.  We read him noncustodial statement of rights.  It's

24  an IRS form that we read from.

25  *Q.*  And, generally, what kind of rights do you inform the

Benjamin Hopping – Direct

1  defendant when you interview them?

2  A.  We tell him that he's under investigation, that he doesn't

3  have to speak with us, and that he can have an attorney if he

4  would like one.  Also that he's not in custody.

5  Q.  Did the defendant agree to speak with you?

6  A.  Yes, he did.

7  Q.  What, if anything, did the defendant tell you about his

8  dealings with the IRS?

9  A.  He said that they had assessed him a tax liability of about

10  $2 million and that they had been trying to collect that tax

11  from him.

12  Q.  Did he discuss whether or not he filed any tax returns?

13  A.  Yes, he did.

14  Q.  And what did he tell you about that?

15  A.  He said that he had his 1998 through 2005 tax returns

16  prepared and that the resulting tax liability from those

17  returns was $98,000.

18  Q.  What, if anything, did he tell you about whether he planned

19  to pay his taxes owed to the IRS?

20  A.  He said he would consider making payments.

21  Q.  What, if anything, did he tell you about the We the People

22  movement?

23  A.  He said he was party to a lawsuit the We the People

24  movement filed against the U.S. government, along with 14 other

25  individuals.  And they were arguing that the tax laws were not

Benjamin Hopping - Direct

1    being properly implemented.

2    *Q.* What did he tell you about the business he ran?

3    *A.* He told me that he ran Tarryall -- the first name is

4    Tarryall.  I don't remember the rest of the name of the

5    business, but it was his own company that built log homes.

6    *Q.* Did he tell you anything about the profits of that company?

7    *A.* Yes.  He deposited them into Park State Bank, where he had

8    a bank account in the same name as his company.

9    *Q.* Did he mention any other businesses or entities that he

10   owned?

11   *A.* Yeah.  He also owned Tarryall Asset Management, but he said

12   at the time of the interview it was defunct.

13   *Q.* Did he discuss any bank accounts that he owned?

14   *A.* Yes.  He had a bank account at Park State Bank in the name

15   of Tarryall Log Homes.

16   *Q.* Did he have any other bank accounts?

17   *A.* No.

18   *Q.* Would it help to refresh your recollection of any other

19   bank accounts to see your memorandum of interview?

20   *A.* Yes.

21        *MS. HADDEN:* Your Honor, may I give Ms. Roberson

22   Government Exhibit 137 for identification?

23        *THE COURT:* You may.

24        Madam Clerk, thank you.

25

Benjamin Hopping – Direct

1    *BY MS. HADDEN:*

2    *Q.*  Agent Hopping, if you could review that.  And look up after

3    you find it.

4    *A.*  Okay.  Yes.

5    *Q.*  Does that refresh your recollection?

6    *A.*  It does.

7    *Q.*  What other bank accounts did he mention owning?

8    *A.*  So prior to the Park State Bank, he said that he also had

9    accounts at Vectra Bank and Mountain National Bank.

10   *Q.*  What, if anything, did he discuss about his use of cash?

11   *A.*  He said that he would withdraw cash out of his account and

12   keep it at his house and use it to pay bills.

13   *Q.*  Did he discuss what amounts he would withdraw?

14   *A.*  Between 3 to $5,000.

15   *Q.*  And what, if anything, did he tell you about his use of

16   official checks?

17   *A.*  He said that he would use the official checks to draw down

18   on his account, hold them for a period -- time period, and then

19   use -- and then redeposit those checks when it was time to pay

20   bills, and then write additional checks out of his account.

21   *Q.*  What, if anything -- did he tell you why he did this?

22   *A.*  Yes.  He said he didn't want to keep a large balance in the

23   account because he didn't want the IRS to sweep any money out

24   of it.

25           *MS. HADDEN:*  Thank you, Your Honor.  No further

Benjamin Hopping – Cross

1    questions.

2              THE COURT:  Very well.

3              Cross-examination of this witness for Mr. Birk,

4    Ms. Beck.

5              MS. BECK:  Thank you.

6              THE COURT:  You're welcome.

7                        **CROSS-EXAMINATION**

8    BY MS. BECK:

9    Q.  Good morning, Special Agent Hopping.  How are you?

10   A.  Good morning.  Good.  Thank you.

11   Q.  So you became involved in this case once it was a criminal

12   investigation; right?

13   A.  Yes.

14   Q.  And you went out to Mr. Birk's gated community and waited

15   for him to come out so that you could speak with him?

16   A.  Yes.

17   Q.  You informed him of his rights and his right to a lawyer?

18   A.  Yes.

19   Q.  And he agreed to speak with you?

20   A.  Yes.

21   Q.  He was cooperative with your interview of him?

22   A.  Yes.

23   Q.  And he told you about how the IRS had assessed a tax

24   liability against him?

25   A.  Yes.

1    *Q.* He specifically said, yes, the fraudulent assessment of

2    $2.2 million; right?

3    *A.* Yes.

4    *Q.* And he told you that he felt the U.S. tax code was being

5    misapplied and therefore being enforced unlawfully; right?

6    *A.* Yes.

7    *Q.* He told you that gains and losses only applied to certain

8    activity which does not include a direct tax on individual

9    income, only an indirect tax; right?

10   *A.* Yes.

11           *MS. BECK:* May I have a moment?

12           *THE COURT:* You may, thank you.

13           *MS. BECK:* Nothing further.

14           *THE COURT:* Very well.

15           Ms. Hadden, redirect examination for the Government?

16           *MS. HADDEN:* No, Your Honor.

17           *THE COURT:* Thus, may Special Agent Hopping be excused

18   and released from subpoena?

19           Any objection by the Government?

20           *MS. HADDEN:* No, Your Honor.

21           *THE COURT:* Or by Mr. Birk?

22           *MS. BECK:* No thank you.

23           *THE COURT:* Special Agent, you are both excused and

24   released from subpoena with our thanks.

25           *THE WITNESS:* Thank you.

1            THE COURT:  You're welcome.

2            Madam Clerk, would you please return to Ms. Hadden the

3      exhibit marked and used to refresh your recollection.  Thank

4      you.

5            Very well, the Government may proceed.

6            MR. MAGNANI:  Your Honor, the United States rests.

7            THE COURT:  Very well.

8            Ladies and gentlemen of the jury, the Government has

9      completed the presentation of its case in chief and has rested.

10     It now becomes necessary for the Government and the defense and

11     the Court to conduct mid-trial -- or in our business,

12     halftime -- proceedings.  The amount of time necessary to

13     conduct and conclude those halftime proceedings, as you might

14     imagine, varies widely from case to case and trial to trial.

15     Rather than me to guess wrongly to your detriment and

16     inconvenience, I'm simply going to place you and give you an

17     extended noon hour.

18            So I'm going to place you in recess as concerns these

19     trial proceedings until 1 o'clock p.m., again, as gauged and

20     measured by the courtroom clock.  During this extended noon

21     hour, you are not sequestered; instead, you may separate, leave

22     the federal courthouse, go your separate ways, subject to the

23     following two conditions:

24            Alas, you know them well.  First, leave your

25     notetaking materials face down on your seats or chairs.  And,

1    second, again, take the reasonable time necessary to read and

2    heed those critically important rules that especially now that

3    you're out of my sight govern your conduct as jurors in the

4    trial of this case.

5            Thus, as concerns you, ladies and gentlemen of the

6    jury, you are in recess until 1 o'clock p.m.  Good morning.

7            All rise pending the exit of this jury.

8            (Jury out at 11:14 a.m.)

9            THE COURT:  Thank you.  And please be seated.

10           Very well.  We resume on the record in open court,

11   operating for now deliberately, intentionally, outside the

12   presence and hearing of the jurors, which are in recess

13   vis-a-vis this trial until 1 o'clock p.m.

14           We convene as constituted to conduct mid-trial or

15   halftime proceedings, during which the Court will receive,

16   entertain and resolve to the extent necessary or practicable

17   mid-trial motions, petitions, requests, and other relevant

18   matters.

19           I begin with the Government, are there any such

20   mid-trial matters by the Government?

21           MR. MAGNANI:  No, Your Honor.

22           THE COURT:  Very well.

23           By Mr. Birk?

24           MR. HARRIS:  Yes, Your Honor.

25                       **RULE 29 ARGUMENT**

1          *MR. HARRIS:*  At this time, on behalf of Mr. Birk, I

2    would move pursuant to Rule 29(a) of the Federal Rules of

3    Criminal Procedure for a judgment of acquittal.  The Court is

4    clearly well aware of the standards.  And I won't have much

5    argument, other than to note that it would be our position that

6    the evidence presented so far is insufficient to sustain a

7    conviction, particularly as it regards willfulness.

8          *THE COURT:*  Counsel.  Thank you.

9          Response by the Government, Mr. Magnani.

10         *MR. MAGNANI:*  Thank you, Your Honor.

11         Your Honor, we oppose the motion, because a reasonable

12   fact finder could conclude beyond a reasonable doubt that

13   Mr. Birk was willful in this case, along with the other

14   evidence.  We stand on the record.

15         *THE COURT:*  Thank you.

16         After the Government had completed the presentation of

17   its case in chief and had rested, the Court conducted mid-trial

18   proceedings, during which it received *inter alia* the oral

19   mid-trial motion of Mr. Birk for judgment of acquittal under

20   Federal Rule of Criminal Procedure 29(a).

21         Having reviewed and considered all relevant evidence

22   adduced during the trial *pro tanto*, both direct and

23   circumstantial, as a whole and for now in the light most

24   favorable to the Government, I find and conclude that the

25   evidence is adequate, substantial, and sufficient to sustain a

398

1       conviction as to the offense charged in one count of the

2       Indictment.   Therefore, it is ordered that the defendant's oral

3       mid-trial motion under Rule 29(a) for judgment of acquittal is

4       respectfully denied.

5                   Done in open court effective forthwith.

6                   Further mid-trial motions or matters by Mr. Birk?

7                   *MR. HARRIS:*   No, Your Honor.

8                   *THE COURT:*   Counsel, let me begin my initial

9       discussion concerning jury instructions.   Thank you for

10      preparing and submitting as many stipulated instructions as you

11      have.   I would direct your attention, however, to your proposed

12      stipulated instruction concerning summaries and charts.

13                  I won't spend much time on it, but it's ambiguous and

14      confusing and, thus, in need of disambiguation.   It essentially

15      indicates that the summaries and charts are not evidence.

16      However, the summaries and charts, with the exception of the

17      last demonstrative exhibit used by the Government in its

18      examination of Ms. Trabold, are exhibits admitted in evidence,

19      sending the wrong or a confusing signal to the jury.

20                  I would encourage you to meet and confer to perhaps

21      more accurately state your position with respect to those

22      summaries and charts which have been admitted in evidence.

23      Don't worry.   I'm working on my own version, but encourage you

24      to react to the Court's observation and, perhaps, constructive

25      criticism, as well.

1          Very well.  There being no other business to come

2    before the Court during these mid-trial proceedings, we are in

3    recess in our own right until 1 o'clock p.m.

4          Madam Clerk.

5          (Recess at 11:19 a.m.)

6          (In open court at 1:05 p.m.)

7          THE COURT:  Good afternoon, and thank you.  As you

8    choose, either be seated or remain standing for our jury.

9          Madam Clerk, once again, and thank you.

10         (Jury in at 1:06 p.m.)

11         THE COURT:  Ladies and gentlemen, please be seated.

12         Ladies and gentlemen of the jury, good afternoon.

13         JURY:  Good afternoon.

14         THE COURT:  We have completed our mid-trial

15   proceedings and are prepared to resume trial together.  Let us

16   do precisely that.  And, thus, when prepared, Mr. Birk may call

17   his first witness.

18         Mr. Harris.

19         MR. HARRIS:  Thank you, Your Honor.

20         The defense would call Mr. Birk.

21         THE COURT:  Very well.

22         Mr. Birk, good afternoon.

23         THE DEFENDANT:  Good afternoon, sir.

24         THE COURT:  If you'll approach my bench, please.

25   That's fine.

Lawrence Martin Birk – Direct

1    And if you'll raise your right hand to be sworn.

2  Thank you.

3    May I have your attention in the courtroom.

4    (**LAWRENCE MARTIN BIRK, DEFENDANT'S WITNESS, SWORN**)

5    *THE COURT:*  Thank you.  Please be seated in that

6  witness stand.

7    Mr. Harris, you may inquire.

8    *MR. HARRIS:*  Thank you, Your Honor.

9    *THE COURT:*  You're welcome.

10                    **DIRECT EXAMINATION**

11  *BY MR. HARRIS:*

12  *Q.*  Please state your name and spell your last name.

13  *A.*  Lawrence Martin Birk, B-I-R-K.

14  *Q.*  Mr. Birk, tell the jury a little bit about yourself, just a

15  little bit about your background, by way of introduction.

16  *A.*  Very well.  I'm 65 years old.  I'm married.  My wife's name

17  is Jean.  We've been married for 27 years.  I have two adult

18  children, Jason and Erica, from a previous marriage.  They live

19  in Charlottesville, Virginia.  My daughter works for the

20  University of Virginia campus police, so this has been an

21  interesting experience for her.  My son is a chef.

22    My educational background, I have an undergraduate

23  degree from Oregon Tech in industrial management.  I have two

24  graduate degrees, both from Colorado Tech, one in management

25  science and one in business administration.

Lawrence Martin Birk - Direct

1          I served in the military.  I spent three years in the

2     Army in the early '70s, including a short tour in Vietnam, at

3     the tail end of that.  I then joined the Marine Corps Reserve

4     with intent to become a pilot.  Unfortunately, that did not

5     work out; so I left the military and began a career in the

6     defense industry.  I spent 22 years traveling around the

7     country, working for many brand-name defense contractors.  A

8     lot of interesting programs.

9          I am an ordained minister and an elder in the

10    Evangelical Protestant Church.  And I like to hike the

11    mountains and camp and fish.  And that's pretty much it.

12    Q.  Okay.  You mentioned your educational background.  What

13    about currently, are you employed or self-employed?  What's

14    your work status?

15    A.  Currently, I am retired.  I retired last December and

16    closed my log home business.

17    Q.  And was that Tarryall?

18    A.  Tarryall River Log Homes; correct.

19    Q.  When did you start Tarryall?

20    A.  I initially began in summer of '98.  I became an

21    independent dealer for Honest Abe Log Homes, and I -- when I

22    retired from the defense business in 2000, I became a general

23    contractor and a custom log home builder.

24    Q.  And what was, like, the average sales price of a log home

25    that you would be selling?

Lawrence Martin Birk - Direct

1   A.  Well, the kit price that I would purchase from Honest Abe

2   Log Homes usually ran around $40,000 delivered; and then the

3   finished product on the owner's land would typically be a

4   $200,000 project.

5   Q.  And so what was your net?

6   A.  I usually ran about 8 to 10 percent, typically, between the

7   sale of the package and the construction project.

8   Q.  And you mentioned you're retired.  Does that mean that you

9   are no longer running Tarryall?

10  A.  I am no longer running Tarryall.

11  Q.  Why?

12  A.  Well, I have a full dance card right now.  My wife and I

13  like to travel.  We -- my mother lives in Virginia, and she's

14  quite elderly and got some medical issues, so I try to spend as

15  much time as I can back there.  I have a sister in Texas.  I

16  already mentioned that my kids were in Charlottesville,

17  Virginia.

18  Q.  Okay.

19  A.  That's pretty much what we're doing with our time now.

20  Q.  Now, in your list of educational accomplishments, I don't

21  think you mentioned a law degree.  Are you a lawyer?

22  A.  No, sir.  I am not.

23  Q.  Are you an accountant?

24  A.  I am not.

25  Q.  Do you have any formal training in tax law?

Lawrence Martin Birk - Direct

1    A.  No, sir.  I do not.

2    Q.  Have you ever paid income taxes to the federal government?

3    A.  I have.

4    Q.  When?

5    A.  That would have started with my military service in 1973

6    through the first quarter of 2000.

7    Q.  In that long period of time, why were you paying taxes?

8    A.  Well, I, like a lot of Americans, believed that we were

9    required to do so.  I had never even looked at the tax code.

10   Q.  And at some point did you stop paying taxes?

11   A.  Yes, I did.

12   Q.  Why?

13   A.  The journey began when I was in graduate school in 1998 --

14   '97, actually, is when I started my MBA program.  And I was in

15   a business law class, and there was a discussion one night

16   between the professor and one of the students about the tax

17   code, which got my interest.  And there was some follow-on

18   discussions before that class ended, and I started doing my own

19   research.

20   Q.  And we'll talk a little bit more about that in a moment.

21   But just to sort of close the loop on that chronology, you paid

22   taxes, you stopped paying taxes.  Do you intend at any point to

23   pay any taxes again?

24   A.  I believe that may become necessary.

25   Q.  And are you against paying the federal income taxes under

404

Lawrence Martin Birk – Direct

1   any and all circumstances?

2   *A.*   No, I am not.

3   *Q.*   Do you believe that taxes serve any valid purpose?

4   *A.*   Oh, yes.  Absolutely.

5   *Q.*   Elaborate.

6   *A.*   Well, the government is very large.  And it has large

7   revenue requirements, our military, our social programs, the

8   day-to-day operation of the government, this courthouse, for

9   example, and everybody who is in it.

10  *Q.*   And anything else as to that?

11  *A.*   We obviously have a lot of expenses.  We have foreign

12  programs that we support; we have a lot of issues on our border

13  right now that require attention.  There is a lot of revenue

14  requirements, and I fully appreciate that.

15          *MR. HARRIS:*  Ms. Roberson, could you activate us if we

16  aren't?

17          *COURTROOM DEPUTY:*  You are.  I just have the jury

18  blanked.

19          *MR. HARRIS:*  Great.

20          Mr. Cohen, could you pull up Government Exhibit 20.

21  *BY MR. HARRIS:*

22  *Q.*   Mr. Birk, taking a look at what's already admitted,

23  Government Exhibit 20, just reacquaint us with what that

24  appears to be.

25          And, by the way, if it's easier for you to look on the

405
Lawrence Martin Birk – Direct

1   screen or in the notebook, either one is fine.

2   A.   I can see the screen just fine.

3        That's much better.  I don't need my glasses for that.

4   Okay.  Okay.

5   Q.   So walk us through, what is that?

6   A.   It's a letter in response to correspondence that I sent to

7   the IRS telling me that the federal tax laws are passed by

8   Congress, signed by the President, the role of the Internal

9   Revenue Service for administering those tax laws.

10  Q.   Okay.  I'm going to ask you some specific questions about

11  it.

12       Mr. Cohen, if you could zoom in on the second full

13  paragraph -- I'm sorry.  The other -- that.  Yeah.

14       So federal tax laws are passed by Congress and signed

15  by the President.  Do you agree?

16  A.   I agree.

17       MR. HARRIS:  And -- we can take that -- zoom it down.

18       There is a sentence there, "while tax collection is

19  not a popular function," if you could find and zoom in on that.

20  It's the second paragraph, the last sentence.  Right around

21  there.

22  BY MR. HARRIS:

23  Q.   So they tell you that tax collection is not a popular

24  function.  Let's just stop there.  Fair statement?

25  A.   Fair statement.

Lawrence Martin Birk - Direct

1    Q.  It isn't -- it is clearly a necessary one.  Do you agree?

2    A.  I agree.

3    Q.  Okay.  The government had --

4            You can take that down.

5            The government alleges that you did not pay taxes from

6    roughly 1998 to 2018, or 2000 to 2018; is that, generally

7    speaking, true?

8    A.  That is correct.

9    Q.  Now, what exactly is your understanding of the law with

10   respect to your duty to pay the taxes that the government says

11   you have not paid?

12   A.  My research and my beliefs involve what I call

13   constitutional boundaries that exist that describe the two

14   basic categories of tax, direct taxes and indirect taxes.  And

15   the Supreme Court ruled often and consistently that any tax

16   levied by the Congress must fall into one of those two

17   categories.  There is not a third.

18   Q.  And to be clear, when you say something like "the Supreme

19   Court ruled" or when you state these things that you believe to

20   be propositions of law, you're stating what you understand the

21   law to be; correct?

22   A.  Absolutely.

23   Q.  Continue, if I interrupted.

24   A.  Okay.  If you look at some of those early Supreme Court

25   decisions, like the *Brushaber* decision, you will see that the

407

Lawrence Martin Birk - Direct

1    Court said that the income tax must be an indirect tax,

2    otherwise it would be an apportioned and direct tax to the

3    states based on their census or population.  And I believe that

4    the current tax that is imposed upon our incomes is, in fact,

5    an unapportioned direct tax.

6         MR. MAGNANI:  Excuse me.  I would just rise, not to

7    object, but to ask the Court for a 105 instruction as to

8    specific cases and propositions of law as explained by the

9    defendant.

10         THE COURT:  At this time?

11         MR. MAGNANI:  Whenever the Court thinks it's

12    appropriate.  I'll defer.

13         THE COURT:  Well, counsel, I look to you to guide the

14    Court either by individual or joint request.

15         MR. MAGNANI:  It would be the --

16         THE COURT:  I will grant that request eventually.

17         MR. MAGNANI:  All right.

18         MR. HARRIS:  With respect to that very brief -- I will

19    not be making that request, but I will not oppose it when made.

20    BY MR. HARRIS:

21    Q.  Continuing, then.  So what's the -- what's the upshot of

22    all of this?  What's the impact in terms of your payment of

23    taxes?

24    A.  I was obviously engaged by the IRS shortly after I ceased

25    filing.  And I was still -- through the first quarter of 2000,

408

Lawrence Martin Birk – Direct

1   still had some corporate income with a W-2 that was being

2   filed.  So what I did was I quit filing, and I quit paying, and

3   the IRS engaged me, and I engaged them back.  We began to

4   correspond.

5   Q.  Did you view it as -- give me one moment.

6           Did you view it, as Ms. Trabold characterized it, as a

7   collaborative process?

8   A.  I believe it has to be.  Yes.

9   Q.  And do you believe there are any categories of income that

10  are subject to federal taxation?

11  A.  Absolutely.  I believe that if you have income from the

12  exercise of a federal privilege of any kind -- and a good

13  example of that would be social security income.  It's not

14  disability.  Certainly federal salaries, including our

15  military, would fall into that category.  It's a privilege to

16  have a government job.  If they pay it, they can tax it.

17  Q.  So to summarize some of what you're saying -- I just want

18  to know -- correct me if I'm wrong -- are you saying that this

19  is a constitutional problem -- it's of a constitutional

20  dimension?  Or are you saying that some taxes apply to some

21  kinds of income and some don't?

22  A.  I don't believe it's a constitutional problem.  I think

23  it's a misapplication of our tax laws problem within the

24  boundaries that I discussed earlier, that the Constitution as

25  amended and a handful of early-on Supreme Court decisions set

409

Lawrence Martin Birk - Direct

1   those boundaries.  I think that most -- as a result of those

2   boundaries, including this unapportioned direct tax issue, most

3   public sector -- or private sector receipts are not taxable

4   income.

5   Q.  Do you believe -- or put somewhat differently, is it your

6   understanding of the law that you have a duty to pay taxes on

7   income from Tarryall Log?

8   A.  No.  Those would be private sector receipts.

9   Q.  Do you believe, or is it your understanding of the law,

10  that there was an obligation to pay tax on moneys flowing

11  through Tarryall Asset Management, Inc.?

12  A.  No.  Those were private funds that were being transferred

13  from one entity to another and eventually used for business

14  purposes.

15  Q.  And we'll talk a little more about that later.  But while

16  we're on it.  You heard Ms. Trabold characterize TAMI -- as she

17  puts it -- as a sham.  Did you view it as a sham?

18  A.  No, sir.  I view it as a conduit.

19  Q.  What's that distinction you draw between conduit and sham?

20  A.  Well, a sham certainly feels like something inappropriate,

21  something bad.

22  Q.  Okay.  So let's return, then, to the beginning.  How did it

23  come to pass that you stopped paying taxes?  In other words,

24  what first drew attention?

25  A.  Well, I talked about the business law class.  That got me

410
Lawrence Martin Birk - Direct

1   started in doing some research on my own.  And by that time,

2   the internet was still somewhat in its early phases, but it was

3   up and running.  I had access through the college.  And the

4   other thing that was going on during that time were the IRS

5   abuse Congressional hearings at the tail end of the Clinton

6   administration.  And I believe that was discussed earlier by

7   the government witness, including the restructure and reform

8   act.

9         So I went from there -- I became aware that there was

10  a tax honesty movement, I'll call it, that existed across this

11  country in different forms, some good and some bad.  And I

12  eventually found my way to the We the People Foundation for

13  Constitutional Education.

14  Q.  And with respect to what your professor told you, did you

15  simply rely on what he said, or did you look further --

16  A.  Oh, I absolutely looked further.

17  Q.  And you have no attorney-client relation with that

18  individual; correct?

19  A.  No.  No.  He was just a professor at the school.

20  Q.  You've mentioned We the People.  Were your views influenced

21  to any degree by the teaching of any particular folk?

22  A.  Oh, absolutely.

23  Q.  For example?

24  A.  Just a brief background on that organization.  It was

25  originally set up before I was associated with it as a

411

Lawrence Martin Birk – Direct

1    nonprofit corporation.  Mr. Bob Schulz was the chairman, a

2    rather accomplished *pro se* litigant in his own right.  But the

3    centerpiece of that organization were ex-IRS agents.  Joe

4    Banister, who was a former Special Agent, CID, forensic CPA;

5    John Turner, a former revenue officer; Sherry Jackson, a former

6    revenue agent.  Those folks traveled far and wide addressing

7    groups in seminars and also at meetings in Washington, D.C.

8    Q.  And you, at least -- well, how did you come into contact

9    either with them or their work?

10   A.  Well, they had a website up; and I began to follow some of

11   their information.  And in 1998, they had a meeting in

12   Washington, D.C. at the National Press Club that I attended.

13   Q.  And based on all of that, did you form any impressions

14   about whether they seemed to know what they were talking about,

15   at least to you?

16   A.  Well, I believed that the testimony that was being given by

17   Joe Banister, in particular, at that meeting was compelling and

18   credible.  But I did look into some of the things he said.  He

19   did publish an investigative report that he -- before he went

20   public with it, he ran it up the chain of command at the IRS,

21   which resulted in his resignation -- they were not going to

22   respond to it -- that is now available.  That was probably --

23   if I was going to form a belief, that was probably a pretty

24   good start right there.

25   Q.  And, again, as to Mr. Banister specifically, did you simply

412

Lawrence Martin Birk - Direct

1    take his word as gospel --

2    *A.*  Oh, no.

3    *Q.*  -- so to speak?

4    *A.*  No, I don't do that.  I've got two graduate degrees.  I

5    learned how to do research and to form a hypothesis and to

6    collect my data and score it.

7    *Q.*  How much time would you estimate, looking back, that you

8    spent researching these things?

9    *A.*  I think early on, it was maybe an hour, five days a week or

10   so, I would spend -- take time to get on the internet and see

11   what was going on and do a little research.

12   *Q.*  And later?

13   *A.*  As I got more involved with the We the People Foundation,

14   probably going to maybe a couple of hours a day, seven days a

15   week.

16   *Q.*  Speaking of We the People, do you -- are you still

17   affiliated in any way with them?

18   *A.*  I am not currently.  I would categorize that organization

19   as currently dormant.  They still have a website up, but it has

20   not been touched since I think 2012 or something.  But it's an

21   archive.  It's a good research tool.

22   *Q.*  At various times over the course of your interaction with

23   or relationship with We the People, did you find yourself

24   always in agreement with everything they espoused?

25   *A.*  Oh, no.  Definitely not.  There were things like zero

413

Lawrence Martin Birk - Direct

1    returns and things that I knew were wrong.  I --

2    Q.  And how much money would you say you've spent over time in

3    all of these endeavors?

4    A.  Well, initially, I became a $50-a-month contributor to the

5    organization.  But surrounding the preparation for given

6    meetings, the need to publish materials and travel and set

7    things up, that started to add up.  Maybe 4 or $500 a month on

8    the average.

9    Q.  And in the course of the research that you did, how common

10   was it for you to come across views contrary to your own?

11   A.  Oh, using the internet as a search tool, you can find lots

12   of contrary opinions on almost anything, including tax matters.

13   Q.  Typically, if you saw a link debunking or claiming that an

14   argument that you believed to be accurate was wrong or

15   frivolous, what would be your reaction?

16   A.  There -- as I gained experience in the tax honesty

17   movement, we'll call it, I began to generate a short list of

18   people and sites that I felt were not credible.  They were

19   usually trying to sell you something, some kind of silver

20   bullet to try to quit paying taxes.  And that's kind of a

21   glaring example of things that I would avoid.

22        Other sites, particularly academic or law sites, very

23   intriguing reading.  Especially case law.  I hate to admit it,

24   but I enjoy reading case law.

25   Q.  So if you come across a -- well, in the course of your

Lawrence Martin Birk - Direct

1   research, did you come across links to government sites or

2   publications such as those that were sent to you claiming that

3   different anti-tax arguments were frivolous?

4   *A.*   Oh, absolutely.   I spent quite a bit of time on the IRS

5   website.   I still do.

6   *Q.*   And is it fair to say that some of the interpretations of

7   law on that website differ significantly from your own?

8   *A.*   Absolutely.

9   *Q.*   So when that happens, what, if anything, do you do?

10  *A.*   Well, it's back to trying to form a hypothesis of what the

11  issue is.   And then you go research it, and you try to find

12  out, what are they -- what are the courts saying about it, what

13  is academia saying about it?   There is a plethora of published

14  researchers out there -- once again, some are better than

15  others, but it's worthwhile reading.

16  *Q.*   Let me ask you this -- and I don't mean it in any way to be

17  insulting, but there is not a lot of ways to ask this.   You do

18  realize, don't you, that probably the vast majority of people

19  don't subscribe to your understanding of the law.   Right?

20  *A.*   Yes, sir.   That's correct.   Including my own family.

21  *Q.*   I mean, you do realize that -- I mean, this is a little

22  like Don Quixote tilting at a windmill; right?

23  *A.*   Yes, sir.

24  *Q.*   And yet you persist; right?

25  *A.*   Yes, sir.

415

Lawrence Martin Birk – Direct

1   *Q.*   Why?

2   *A.*   There is a part of me that once I think I've found the

3   truth in a matter, I cannot ignore it any longer.  I persist in

4   researching it, and it just becomes a basis for my belief

5   system.  I can't discard it.  I can't turn a blind eye to it.

6   *Q.*   Is it simply a question of you being a stubborn guy?

7   *A.*   No, not at all.  I don't think anybody that knows me would

8   say I'm a stubborn guy.

9   *Q.*   Do you simply turn a blind eye to any contrary argument?

10  *A.*   No.  That's not my nature.

11  *Q.*   Are you an ostrich?

12  *A.*   I am not.

13  *Q.*   At some point, as we know, the IRS contacted you about

14  nonpayment issues.  Do you remember roughly when that first

15  occurred?

16  *A.*   I'm thinking about spring of 2000, maybe, I got my first

17  CP515 letter, which is basically a letter from the IRS that

18  says, I did not get your return.

19  *Q.*   And at some point, did you try to let the IRS know what you

20  thought the law was concerning tax liabilities?

21  *A.*   Yes, I did.

22  *Q.*   How did you do that?

23  *A.*   Via correspondence, initially.

24  *Q.*   And, generally speaking, what do you feel the IRS response

25  was to that correspondence?

Lawrence Martin Birk - Direct

1    A.  Almost always it was that I was taking a frivolous position

2    and they were not going to address it.

3    Q.  Do you believe that the IRS answered your questions?

4    A.  No.

5    Q.  Let me back up a bit.  So the correspondence -- and we'll

6    talk and look at some of it -- but the correspondence was --

7    that you sent to them, was it in the form of, you know, a

8    manifesto or a series of questions or a little bit of each?

9    A.  Well, certainly, I had questions that I would ask.  A

10   manifesto, I don't think so.  I don't think I would call my

11   beliefs a manifesto.

12   Q.  Okay.  Did they, as far as you could tell, try to rebut

13   your position in any meaningful way?

14   A.  I don't believe so.  Usually what I heard was, my position

15   was frivolous, that the courts had consistently ruled against

16   these positions, and they weren't answering my specific

17   questions.

18   Q.  Did they ever provide you evidence that your view of the

19   law was unfounded?

20   A.  Well, they certainly provided me with some information.

21   They would point me to pamphlets or provide them as

22   attachments, and I did read those.

23   Q.  And we'll talk about those in some detail.

24        So when they present with you information -- and by

25   "they," I mean the IRS specifically -- when they present that

Lawrence Martin Birk - Direct

1   information to you that was contrary to your position, what did

2   you do with that?

3   A.  Well, once again, if it was in the form of case law -- I

4   like to read case law -- I would go to look at those decisions.

5   One of the things that I always kind of used as a screening

6   device, it wasn't a Supreme Court case and it was very case

7   specific.  And I would kind of set those aside in a separate

8   category.  Meaningful information.

9   Q.  Were you, in fact, willing to discuss your tax liability

10  with the IRS?

11  A.  Absolutely.

12  Q.  With respect to answers to questions, are you familiar with

13  something called a petition for redress?

14  A.  Yes, I am.

15  Q.  As it applies here, what are we talking about?

16  A.  The -- once again, through my association with the We the

17  People Foundation, we decided after a couple of years as

18  individuals and as an association attempting to get the IRS and

19  the Department of Justice to attend a meeting with us to

20  discuss these issues, that they were not going to do that.  So

21  we resorted to our First Amendment right -- the last ten words

22  of the First Amendment -- to petition the government for a

23  redress of grievances.  These petitions were drafted -- the

24  first one was regarding correct application of our federal tax

25  laws, and it was served upon the government.

418
Lawrence Martin Birk – Direct

1  *Q.* Fast forwarding.  That didn't end well; correct?

2  *A.* It did not.

3  *Q.* What happened?

4  *A.* Well, after years of serving petitions for redress –– and

5  it got to be a much bigger matter constitutionally than just

6  federal tax issues, but that's not for this discussion –– but

7  we decided as an association –– and a group of individuals,

8  something over 1400 plaintiffs joined the lawsuit, the right to

9  petition lawsuit, we called it, against the United States

10  government.

11  *Q.* And what happened to that lawsuit eventually?

12  *A.* It was filed in the District Court for the District of

13  Columbia.  And I believe it was Judge Emmet Sullivan had the

14  case.  After about a year, he dismissed the case, stating in

15  his comments that, sure, we have a right to petition, but the

16  government has no obligation to listen or provide redress.

17  *Q.* Did it end there?

18  *A.* It did not.  We appealed that case to the Circuit Court of

19  Appeals for the District of Columbia.

20  *Q.* And what happened?

21  *A.* After about nine months, they issued a decision, affirming

22  the lower court decision to dismiss.  The opinion for the Court

23  was written by Judge Kavanaugh, who is now on the Supreme

24  Court, and Judith Rogers.

25  *Q.* And then what?

419
Lawrence Martin Birk - Direct

1   *A.*   We petitioned the Supreme Court to pick up the case.

2   *Q.*   Did they?

3   *A.*   They did not.

4   *Q.*   So is that the end of it?

5   *A.*   Well, it was the end of that lawsuit, for sure.  I don't

6   believe it's the end of it.  I think the American people need

7   to pick it up through their elected representatives, is the

8   next step.

9   *Q.*   So this petition for redress -- and we'll look at some of

10  that -- but does it contain a bunch of claims about the

11  applicability of tax?

12  *A.*   Not really claims.  It's formatted as a remonstrance, as

13  a --

14  *Q.*   Questions, then?

15  *A.*   Questions.  I believe there are 60 plus, 62, maybe, in that

16  particular petition on the federal income tax.

17  *Q.*   Do the claims in the petition go beyond the specific

18  understandings of law that you have as to the applicability of

19  income to your business income?

20  *A.*   Oh --

21  *Q.*   In other words, is the petition broader?

22  *A.*   Yeah, it's broader.  There are a number of different issues

23  addressed in there.

24  *Q.*   Do you subscribe to each issue, every single one of them in

25  there?

420

Lawrence Martin Birk - Direct

1   *A.*   No, I don't.

2   *Q.*   Summarize for us what issues in the petition you did

3   subscribe to.

4   *A.*   The first one had to do with the constitutional matter of

5   two types of taxes.

6   *Q.*   Okay.

7   *A.*   That you find in Article I, which is our legislative branch

8   of government.   We have direct taxes -- that's covered in

9   Section 2 and Section 9 of Article I -- and we have indirect

10  taxes in Section 8.

11  *Q.*   Who drafted those portions?

12  *A.*   I helped quite a bit on that particular question.   There

13  were a few other related ones to that same issue that invoked

14  some Supreme Court cases that addressed the issue.

15  *Q.*   Okay.   Back to you and the IRS.   How many letters would you

16  guess -- let me put it differently, because I don't want you to

17  guess.

18          Do you have a rough idea of how many letters you sent

19  the IRS over time explaining your position or seeking answers

20  to questions?

21  *A.*   I would say well over two dozen.

22  *Q.*   Now, the government's introduced some of them.   Fair to say

23  that's not all two dozen?

24  *A.*   No.

25  *Q.*   Let's take another look at Exhibit 20 -- Government Exhibit

Lawrence Martin Birk – Direct

1    20.

2            Fourth paragraph, first sentence, if you could zoom

3    that, Mr. Cohen.  The one that begins "there are."

4            "There are people who encourage others to deliberately

5    violate our nation's tax laws."  The IRS is telling you this,

6    huh?

7    A.  Right.

8    Q.  Did that come as news to you?

9    A.  No, sir.

10   Q.  Are you one of those people?

11   A.  I am not.

12   Q.  Do you believe you were deliberately violating tax laws?

13   A.  No, I don't.

14   Q.  Do you consider yourself a tax protester?

15   A.  I do not.

16   Q.  In fact, you even told the IRS as much, that you weren't a

17   tax protester; right?

18   A.  I did.

19        MR. HARRIS:  No. 38, please.

20   BY MR. HARRIS:

21   Q.  This is, of course, already introduced.  But let's

22   familiarize ourselves with it.  What is this?

23   A.  That's a letter from Agent Michael Jeka that was on the

24   witness stand I believe yesterday.  It's a letter of

25   determination.  I think it's below that certified mail receipt.

1   *Q.*   Okay.

2   *A.*   That he had received -- "we have reviewed the collection

3   actions," and so on.

4          *MR. HARRIS:*   Okay.   And let's scroll forward in

5   that -- to the next page, if you would, and the next.   Let's

6   keep going down a little.   Okay.

7   *BY MR. HARRIS:*

8   *Q.*   There is a sentence in here -- and I won't bog us down

9   finding it unless Mr. Cohen finds it before I'm done -- that

10  says, "I asked him if he's against the tax system."   Do you

11  remember seeing that at some point?

12  *A.*   I do.

13  *Q.*   And then it continues, "Basically, he said that he believes

14  that taxes are needed and that he is willing to pay what is

15  fair."   And we see that on the screen now.

16         Thank you, Mr. Cohen.

17         Is that true?

18  *A.*   I --

19  *Q.*   Well, let me ask that better.   It's a terrible question.

20         Number one, is it true that he asked you if you're

21  against the tax system, to the best of your recall?

22  *A.*   Yes.

23  *Q.*   And did you, in fact, say something to the effect of, no, I

24  believe taxes are necessary.   I'm willing to pay what is fair?

25  *A.*   Yes.   I remember that conversation.

Lawrence Martin Birk – Direct

1          *MR. HARRIS:*  Okay.  You can take that down.

2     *BY MR. HARRIS:*

3     *Q.*  The IRS has also said at some point -- well, do you recall

4     at some point getting a letter from the IRS associating with

5     you a group called American Rights Litigator?

6     *A.*  I do.

7     *Q.*  Were you ever associated with that group?

8     *A.*  I had hired them -- they had an attorney on staff and a

9     CPA.  I had hired them to do some consulting and to write some

10    letters for me.

11    *Q.*  And that's it?

12    *A.*  That's it.

13    *Q.*  Let's look again at some correspondence.  And let's again

14    go back to No. 20, which we've looked at already.  But I want

15    to focus in on the line talking about -- the very first, right

16    after the salutation.  "Dear Mr. Birk," the very next sentence.

17             "This is in reply to your recent correspondence."  So

18    looking at that letter --

19             We can take that down, just zoomed in --

20             Do you believe that letter to be in any meaningful

21    respect responsive to anything you ever sent the IRS?

22    *A.*  No, sir.  I do not.

23    *Q.*  Do you believe -- well, let's look at another thing.

24             Last paragraph before the "sincerely."

25             They're telling you that federal courts have

424

Lawrence Martin Birk - Direct

1   consistently ruled against the arguments you have made.  Do you

2   agree with that?

3   A.   I do not.

4   Q.   When you read that, what kind of understanding did you come

5   away with of what the IRS meant by that, if any?

6   A.   Well, it doesn't use the word "frivolous"; but they end it

7   by saying they're not going to respond to any of my future

8   correspondence.

9   Q.   Did you view that as responsive?

10  A.   I did not.

11       MR. HARRIS:   Okay.  We can take that down.

12  BY MR. HARRIS:

13  Q.   On February 3 or potentially, February 2 of 2004, did you

14  write to the IRS?

15  A.   I --

16  Q.   If you recall?

17  A.   I don't recall that specific date.  It's very possible.

18  Q.   Okay.  If you could -- and we would like not to publish

19  this one yet -- take a look at Defense Exhibit 1, that

20  Mr. Cohen will put on the screen.

21       Do you see that?

22  A.   I do.

23  Q.   And does that refresh your recollection as to whether you

24  wrote to them --

25  A.   Yes --

425

Lawrence Martin Birk – Direct

1    Q.   -- on --

2    A.   Yes, it does.

3              MR. HARRIS:  Let's go ahead and show that to everyone.

4    BY MR. HARRIS:

5    A.   What is that?

6              MR. HARRIS:  I believe it's a stipulated exhibit.  If

7    not --

8              COURTROOM DEPUTY:  Yes, it is.

9              THE COURT:  It's in by stipulation.

10             MR. HARRIS:  Yes.

11   BY MR. HARRIS:

12   Q.   So let's go back to that.  What is that?

13   A.   That's a letter from me to Agent Burgman.

14   Q.   By the way, did we hear from Agent Burgmann this week?

15   A.   No, we did not.

16   Q.   So does that letter contain some of your questions to the

17   IRS?

18   A.   Let me take a moment, here.

19             Well, using tax avoidance transactions -- let's see,

20   things that I've been accused of.  I stand by my statement

21   there, I've done nothing with American Rights Litigators that

22   I'm aware of that is abusive or unlawful.  And to set the

23   record straight, it talks about, there is no such thing as an

24   abusive tax avoidance scheme, as tax avoidance is perfectly

25   legal.  And I give a cite there.

426

Lawrence Martin Birk - Direct

1        Once again, that refers to the nature of the income

2  tax, which I believe the Supreme Court says very clearly is an

3  indirect tax.  An indirect tax can be avoided.

4  Q.  Let me direct your attention to a couple of passages.  Last

5  full paragraph on that page.

6        So in there you say that -- with respect to the 2003

7  return, you say, "I am a firm believer in the rule of law" and

8  that you haven't found a requirement for you or your wife to

9  file; right?

10  A.  Right.

11  Q.  Then you ask them to be so kind as to send the statute and

12  implementing reg requiring the filing of a specific return;

13  correct?

14  A.  Correct.

15  Q.  So what did you mean by that?  What was your intention in

16  asking them to do that?

17  A.  Well, I believe -- back to my primary belief I have.  I

18  believe that the income tax is an indirect tax.  It's a form

19  and -- with proper subjects of an indirect tax -- what the

20  Supreme Court called it -- and as such, I should be able to

21  find in the tax code, as we do with many other kinds of

22  indirect taxes, the specific taxable source activity I'm

23  involved in, what the tax applies to, and how much it is.

24  Q.  Did they ever send you what you asked them to send you?

25  A.  They did not.

Lawrence Martin Birk - Direct

1          MR. HARRIS:  If we could zoom out and go to the next

2     page.  Zoom in on the 1 through 4 bullet points.

3     BY MR. HARRIS:

4     Q.  What are those?

5     A.  These are specific questions that I asked the IRS.

6     Q.  Did you ever get answers?

7     A.  I did not.

8     Q.  The first question, what -- to the extent that it may

9     require any explanation, what does it mean?  What did you mean?

10    A.  When you search the tax code for a specific definition of

11    taxable source activities that you may be involved in, thereby

12    incurring a tax liability, that's the section that comes up.

13    Q.  And so why did you ask them about that?

14    A.  I wanted them to verify for me that that's what I'm

15    supposed to use to determine my taxable domestic income.

16    Q.  Why did you think they -- well, let me back up.  Did you

17    think they'd answer?

18    A.  I -- I believed they would.

19    Q.  Did you hope they would answer?

20    A.  It was my expectation.  Yes.

21    Q.  Why did you think they'd answer you?

22    A.  Well, you asked earlier about a collaborative effort.  I

23    believe that our government should answer our questions in good

24    faith and public and in a timely manner and allow us to work

25    together on these things, not accuse me of being frivolous.

Lawrence Martin Birk - Direct

1    Q.  Looking at No. 2 on that list, what did you mean?

2    A.  Once again, this talks about domestic income.  If a U.S.

3    citizen lives and works exclusively in the 50 states and

4    receives all of their income -- I don't have any foreign

5    income -- does that section show that income to be taxable?

6    And there is a list there.

7    Q.  Question 3, what did you mean?

8    A.  That specific one -- and I put it in parenthesis -- items

9    of income they receive.  I give examples, compensation,

10   interest, rents, et cetera, are they excluded for federal

11   income tax purposes?  If they're not on that list, are they

12   then excluded, was the point of the question.

13   Q.  Let me ask you this because, you know, some people might

14   think -- they have different take-aways.  To ask them all of

15   this stuff -- but you know there are laws; right?

16   A.  Yes.

17   Q.  I mean, are you just kind of jerking them around?

18   A.  No, I don't think so.  I think they're legitimate

19   questions.  They're very detailed questions.

20   Q.  And questions as to which you had hoped and expected

21   legitimate responses?

22   A.  Absolutely.

23   Q.  Quality responses?

24   A.  Yes.

25   Q.  Question No. 4, what did you mean by that?

Lawrence Martin Birk - Direct

1   *A.*   The purpose of the list of non-exempt income found at that

2   particular cite and why is the domestic income of most

3   Americans not on that list?  I think that's a valid question,

4   such as the income I have with my log home business.  That's

5   not on that list.

6   *Q.*   Okay.  Let's take a look at Government 23.

7          What is that?

8   *A.*   Okay.  There we go.  Much better, thank you.

9          All right.  It's a reply to correspondence of

10  February 3.  "We have determined the arguments you have raised

11  are frivolous and have no basis in law.  Federal courts have

12  consistently ruled" -- we've seen that before.  And I can

13  obtain IRS publications, "Why Do I Have to Pay Taxes?" and so

14  on.

15  *Q.*   Okay.  So that's what we've now come to lovingly know as a

16  3175 letter; right?

17  *A.*   Correct.

18  *Q.*   All right.  Now, they say that in reply to your

19  correspondence of February 3; right?

20  *A.*   Correct.

21  *Q.*   As best you can recall, did you ever send them a February 3

22  correspondence?

23  *A.*   Once again, I can't off the top of my head verify that.

24  *Q.*   Is it possible?  To the extent that that is a reply to a

25  February 3 correspondence, if you sent one, would you have

430

Lawrence Martin Birk - Direct

1    written anything to them that you would consider this to be

2    responsive to?

3    *A.*   No.   Once again, it starts out saying that I've raised

4    frivolous arguments, I can obtain publications, the paragraph

5    we've seen before about people who encourage others to violate

6    tax laws.   It's the same.

7    *Q.*   Okay.   And this is not, certainly, responsive, in your

8    view, to your February 2 correspondence, which we just

9    discussed; correct?

10   *A.*   Absolutely not.

11   *Q.*   You know, kind of to put it in the vernacular, it's like a

12   big F-U; right?

13   *A.*   Correct.

14   *Q.*   What would you have done if they had actually provided

15   answers to your questions?

16   *A.*   Well, I think if they had given specific answers, either in

17   correspondence or agreed to meet and provide those answers, I

18   would have taken the effort to research those.   And if they

19   answered my questions, I guess I would have accepted that.

20   *Q.*   Let's take a look at Government Exhibit 43.   What's this?

21   *A.*   Okay.   It's from Agent Bentley -- who I believe we heard

22   from yesterday -- dated 5th of May.   "Received your request for

23   a collection due process hearing," is what it is.

24   *Q.*   Okay.   Now in there, there is an advisement that says

25   they're required to advise you -- let's find that.   That might

1    be on the next page.  Yeah.  Four lines down.

2    A.  Okay.  I got it.

3    Q.  Here it is a little bigger.

4        So such issues -- refer to such issues.  Let's back up

5    and go up one line.  Let's highlight the first line of that.

6        Did you ever assert to the IRS any argument about tax

7    liability based solely on moral, religious, constitutional,

8    conscientious, or similar grounds?

9    A.  Perhaps in the constitutional arena, but not solely.

10   Q.  Okay.  And in the constitutional arena, only insofar as it

11   relates to the applicability questions that you've already

12   discussed?

13   A.  Right.  Based on the Supreme Court decisions.

14   Q.  Okay.  So they're advising you that such issues and any

15   other frivolous arguments raised -- let's stop there.

16       Frivolous arguments raised, did they ever tell you in

17   any letter which argument you're raising was frivolous or why?

18   A.  No.  I think that's been used consistently as a blanket

19   statement.

20   Q.  In any event, does that admonition in any way describe or

21   address your claims?

22   A.  I believe it does not.

23   Q.  They also write -- let's look at the next paragraph.  "All

24   of the correspondence you have sent to the IRS has been

25   identified as espousing frivolous tax arguments."  Again, your

432

Lawrence Martin Birk - Direct

1   response to that?

2   *A.*   I believe my questions were absolutely relevant.  And I did

3   try to address some at a due process hearing, and I was told

4   face to face that they weren't going to do that.

5   *Q.*   Okay.  Let's turn to that question of the due process

6   hearing.

7          Government Exhibit 27, please.  First paragraph after

8   the "Dear Mr. Birk."

9          More of the same?

10  *A.*   More of the same.

11  *Q.*   Disagree?

12  *A.*   I disagree 100 percent.

13  *Q.*   This time they add some descriptive adjectival language

14  referring to your argument not only as frivolous but

15  groundless.  Disagree with that?

16  *A.*   I disagree.

17  *Q.*   Does that statement or the letter as a whole appear to

18  address any specific question you raised ever?

19  *A.*   Not that I can see.

20         *MR. HARRIS:*  Okay.  We can take it down.

21         Actually, let's put -- let's put 43 up again.  I just

22  want to make sure we covered it.  Go to the second page.

23         We did.  Let's take it down.

24  *BY MR. HARRIS:*

25  *Q.*   Okay.  Let's take a look at Defendant's Exhibit 2.  What's

Lawrence Martin Birk – Direct

1   that?

2   *A.*   This is a letter from me dated February 14, 2005, with a

3   request that this letter and its attachments to be added to the

4   individual master file maintained by the Internal Revenue

5   Service.

6          MR. HARRIS:   Okay.  Let's take that down and look at

7   Defense Exhibit 3.

8          And before we -- I just want to make sure with the

9   government, you're fine with this subject to a 105?

10         MR. MAGNANI:   3, you say?

11         MR. HARRIS:   Yeah.

12         MR. MAGNANI:   Yes.

13         MR. HARRIS:   Okay.  So that is published.

14  *BY MR. HARRIS:*

15  *Q.*   What is this?

16  *A.*   It's a request from me for a collection due process

17  hearing.

18         MR. HARRIS:   Just to be sure that I check off a small

19  or not so small legal box.  I'm moving if it's not already

20  admitted to admit Defendant's Exhibit 2 and 3.

21         THE COURT:   They're in by stipulation.  You only get

22  it in once.

23         MR. HARRIS:   Okay.  That's fine.

24  *BY MR. HARRIS:*

25  *Q.*   Does this appear to be the letter referred to in

434

Lawrence Martin Birk - Direct

1  Exhibit 27?

2        If we can scroll through, see if we can get a better

3  sense.  Or better yet, let's do this --

4        Can you put up Government Exhibit 27 side by side?

5        And let's -- on Exhibit 3, go to the next page.  Next

6  page after that.  Actually, let's put up Exhibit 2 in place of

7  Exhibit 3.

8        Okay.  So does it appear that Exhibit 2 is the letter

9  referred to in Exhibit 27.  In other words, Exhibit 27 being

10 their acknowledgment of request for a collection due process

11 hearing, and your letter in February being the request.

12 A.  I think that's possible.  Although, February to June seems

13 like a long time.  The IRS is usually pretty responsive as far

14 as replying to requests for CDP hearings.

15 Q.  Okay.  At least as far as timeliness?

16 A.  Timeliness.  Sure.

17 Q.  Okay.  In any event --

18       Let's take down Government Exhibit 26.

19       Does Exhibit 2 lay out your concerns that you were

20 holding at that point about tax payments?

21 A.  The first page does.

22 Q.  And then the second page?

23 A.  Petitions for redress -- let's see where I'm -- to my

24 understanding, there is a larger list of folks --

25 Q.  Yeah.  In fact, maybe it will be easier -- let me break

435

Lawrence Martin Birk - Direct

1   that down a little.

2   A.   Okay.

3          MR. HARRIS:   Let's see.   Go back to the first page,

4   please.   The first paragraph, four lines down, "I have put

5   forth," up to "schemes" or -- maybe a little further is fine.

6   BY MR. HARRIS:

7   Q.   Okay.   You say, "I have put forth many questions regarding

8   the correct application of tax laws."   True?

9   A.   True.

10  Q.   Determination of your taxable income, in other words,

11  questions about it; true?

12  A.   True.

13  Q.   Questions about due process of law; true?

14  A.   True.

15  Q.   "IRS has steadfastly refused to answer those questions."

16  True?

17  A.   True.

18  Q.   IRS has accused you of participating in abusive tax

19  avoidance schemes; true?

20  A.   Also true.

21         MR. HARRIS:   Okay.   Let's take that down and zoom in

22  on this, at some point -- "also of record are four petitions."

23  BY MR. HARRIS:

24  Q.   When you say "also of record," what did you mean?

25  A.   That means they were formally served upon the government,

Lawrence Martin Birk - Direct

1    to the Legislative and Executive branches of government in

2    Washington, D.C., and --

3    Q.  And the --

4    A.  And it went on to talk about the lawsuit that I had joined.

5    Q.  And it says there, "In the interest of seeking answers from

6    my servant government," what does that mean?

7    A.  Well, I think that's a -- some language that I used -- the

8    government of this country serves by the consent of the people.

9    It says so right in the Constitution, in the Preamble, and

10   that's just a reference to that.  Obviously, I don't consider

11   them servants *per se*, other than I expect the government as a

12   whole to be a servant to the people.

13   Q.  Okay.  Let's look at another passage.

14        Last sentence on that page, "in 1998."

15        "In 1998 I became aware of a substantial incredible

16   body of legal evidence in support of the proposition that the

17   income tax system was fraudulent in its origin."  Let's stop

18   there.

19        Well, fraudulent in its origin.  What's that?

20   A.  Well, a little bit of history here.  In 1894, the Congress

21   passed an income tax act.  It was promptly struck down by the

22   *Pollock* decision in 1895 as being an unapportioned direct tax

23   on property -- on income.  The Supreme Court, I think -- that's

24   a lengthy case.  It covers a lot of different aspects, but

25   that's probably the gist of it right there.  The unapportioned

437

Lawrence Martin Birk - Direct

1    direct tax aspect of the income tax --

2    *Q.* Let me ask you, then, if it's fraudulent in its origin,

3    does that mean you felt you could never owe taxes again under

4    any circumstances?

5    *A.* Oh, absolutely not. I was going to carry that thought

6    forward just a little bit.

7    *Q.* Okay. Go right ahead.

8    *A.* It's a history lesson. The 16th Amendment, which started

9    its ratification process in 1910 and ended in February of 1913,

10   when it was declared to be ratified by Philander Knox, then

11   Secretary of State. There is a body of evidence published

12   by -- entitled "The Law that Never Was" by a man named Bill

13   Benson. And what he did in the late '70s, early '80s, was

14   visit the state capitals of all 48 states that were in the

15   union at the time and got certified copies of what had actually

16   occurred during the ratification process. And if you look at

17   that body of evidence, you find out that the process left a lot

18   to be desired. It did not even come close. That was -- when I

19   used the term "fraudulent in its origin," that's exactly what

20   I'm referring to.

21   *Q.* You say it was limited in its application to most

22   Americans, what does that mean?

23   *A.* Yes. That, again, refers to the two types of taxes that

24   the Constitution authorizes. The Supreme Court has said it

25   must be an indirect tax; therefore, it must have the form and

Lawrence Martin Birk – Direct

1   proper subjects of an indirect tax.  It does not apply to the

2   private sector funds that most Americans earn.  If they work

3   for themselves or a U.S. company, they have no foreign income,

4   no income from a commerce act of Congress of any kind, or a

5   federal privilege is another way to look at that --

6   *Q.*  Let me interrupt you, if I might.  Where do you believe the

7   legal authority for that statement derives?

8   *A.*  I think it derives from the Constitution itself, as

9   amended, and that handful of Supreme Court cases that define

10  what the income tax is and what it is not.

11  *Q.*  Okay.  Well, take a look at the next page of this exhibit.

12        And turning -- actually, further down in that exhibit,

13  another page in.  Highlighting the numbered section.

14        What is this?

15  *A.*  That is a group of statements that I'm making regarding my

16  understanding at the time of many different issues surrounding

17  the federal income tax.

18        *MR. HARRIS:*  Let's zoom back out on that.  And go to

19  the paragraph that begins at "beyond."

20  *BY MR. HARRIS:*

21  *Q.*  You respectfully request that someone be prepared to

22  discuss something at the due process hearing.  What were they

23  supposed to be prepared to discuss?  Those statements?

24  *A.*  That list of statements.

25  *Q.*  And who was supposed to be prepared to discuss it?

439

Lawrence Martin Birk - Direct

1   *A.*  Whoever the government was going to provide -- holding that

2   meeting, representing the IRS.

3   *Q.*  So these are basically, in one form or another, eleven

4   questions that you have for them; correct?

5   *A.*  Yeah.

6   *Q.*  And did they ever address those eleven issues with you?

7   *A.*  No, they -- they will not do that.

8   *Q.*  When you got to the hearing, did you try to raise those

9   issues?

10  *A.*  I tried to.  But I was informed right away that those were

11  considered frivolous, and they were not going to discuss it.

12  *Q.*  By Mr. -- as you knew him, Mr. Bass?  Now we know his real

13  name.

14  *A.*  Correct.

15  *Q.*  And Mr. Jeka?

16  *A.*  Correct.

17  *Q.*  What happened any time you tried to raise those issues at a

18  hearing?

19  *A.*  Basically brought the meeting to a close.

20       *MR. HARRIS:*  Okay.  We can take that down.

21  *BY MR. HARRIS:*

22  *Q.*  At some point did the IRS send you a publication, "The

23  Truth About Frivolous Tax Arguments"?

24  *A.*  Yes.

25       *MR. HARRIS:*  Let's go to Government Exhibit 43 at page

440

Lawrence Martin Birk - Direct

1    92.  Actually -- Government 43.

2    *BY MR. HARRIS:*

3    *Q.*  Is that the document we're talking about?

4    *A.*  That is it.

5           MR. HARRIS:  Okay.  Just flip through to the next

6    page, and the page after, then the page after that.  Okay.  And

7    one more page.

8           So you can take that down.

9    *BY MR. HARRIS:*

10   *Q.*  You actually read that?

11   *A.*  I did.  Still have a copy of it.

12   *Q.*  Okay.  Considered it?

13   *A.*  I did.

14   *Q.*  Reflected on the possibility that to the extent that it

15   might at some level address some issues, that you might be

16   wrong about stuff?

17   *A.*  I was certainly hopeful of that.  Yes.

18   *Q.*  Why were you hopeful of that?

19   *A.*  Well, at this stage --

20          I forgot the date of the letter we were looking at.

21   2008; is that right?

22   *Q.*  We can pull it up again.

23   *A.*  Yes.  May 5.

24   *Q.*  Okay.

25   *A.*  By this time it had become sort of an arduous journey for

441

Lawrence Martin Birk - Direct

1   me and my wife.  And I was hopeful that we were going to either

2   at a collection due process hearing or perhaps a document like

3   this start to make some progress on this collaborative effort

4   we've been talking about.  And it just didn't answer the mail.

5        MR. HARRIS:  Let's go back to that document in

6   Government Exhibit 43, publication.  Let's actually go one page

7   in.  Keep going.  Yeah.  This.  How many -- let's go one more

8   page and one more after that.

9   BY MR. HARRIS:

10  Q.  So how many pages was that, if you can tell, more or less?

11  A.  Fifty-nine, this says.

12  Q.  So at least 59?

13  A.  Right.

14  Q.  Right.  And looking at this, letters A through J; right?

15  A.  Right.

16  Q.  Each of those letter designations referring to some

17  argument that the Government or the IRS puts forth as

18  frivolous; correct?

19  A.  Well, looking at this short list right here, I don't see

20  any position there -- issue that I ever took a position on.

21  Q.  Okay.

22  A.  Challenging authority of the IRS authorities, no, that's

23  not me.  Unauthorized representatives, no.  And no authority to

24  bring an action, I don't --

25  Q.  Okay.

442

Lawrence Martin Birk - Direct

1   A.   I've never espoused those beliefs.

2   Q.   So there is, like, a dozen subheadings under there?

3   A.   Yes.

4   Q.   Dozens of potential tax arguments that some people are

5   making, that they're swatting down; right?

6   A.   That's what I believe the purpose of this is.

7   Q.   Have you ever taken any courses in law?

8   A.   No.

9   Q.   Are you familiar with the concept called a straw man

10  argument.

11  A.   Yes.

12  Q.   What is that?

13  A.   A straw man, a canned response, a boilerplate, where you

14  come up with a response to a particular situation -- typically

15  a general response -- and you build that straw man as you go.

16  And then that becomes your response in general to these

17  frivolous arguments.

18  Q.   Even if what you're responding to isn't what was put forth

19  to you?

20  A.   Correct.

21  Q.   And that paradigm, how does this fit in, if at all?

22  A.   That was sent to me, not as an answer or a specific

23  response to my questions, but, once again, a straw man

24  approach.  Take a look at these frivolous arguments and see if

25  you find something in there that matches what you're -- the

443

Lawrence Martin Birk – Direct

1  position that you've taken, I think is what they're trying to

2  do here.

3  Q.  Well, let's do that.  Let's match some stuff up.

4       Defense Demonstrative Exhibit No. 10.

5       Now, looking at this, on the left side, what do we

6  see?

7  A.  Those look like the lists -- from my letter, my February 3

8  letter of '04, some of the items off that list.

9  Q.  And the bottom --

10       THE COURT:  Counsel, excuse me.  We appear to be

11  discussing an exhibit that you have characterized as a

12  demonstrative exhibit without response by the Government or

13  approbation by the Court.

14       MR. MAGNANI:  The Government has no objection.

15       THE COURT:  Very well, then.  Neither do I.  And,

16  thus, Defendant's Exhibit 10 may be used, published, and

17  discussed in the presence of the jury as a demonstrative

18  exhibit only.

19       MR. HARRIS:  And I'll be more careful with respect to

20  the next couple.

21       THE COURT:  I'll help you.

22       MR. HARRIS:  Thanks.

23  BY MR. HARRIS:

24  Q.  So on the left side on the bottom, where it says No. 6,

25  what's that?

Lawrence Martin Birk – Direct

1   A.  It says "The Internal Revenue Code as written does not

2   impose a tax on the income of most Americans who have no

3   foreign income or derive income from federal possessions."

4   Q.  Okay.

5   A.  That's a statement that I made in my letter.

6   Q.  Okay.  And so all of these items on the left side from your

7   letters, generally speaking, fall under the category of a

8   question of what is taxable domestic income; correct?

9   A.  Correct.

10  Q.  What's on the right side?

11  A.  That's from the table of contents, I believe, from the

12  document we just had up.

13  Q.  And do you believe that the right side and the content that

14  you've reviewed that goes with that table of contents addresses

15  the questions on the left side?

16  A.  Well, I don't believe that.  I don't think I've made a

17  contention that only foreign source income is taxable.

18  Q.  What about wages, tips, other compensation for personal

19  services?

20  A.  Which one is that?  I'm looking for it.

21  Q.  It's the -- it's on the right side.  Contention 1.

22  A.  Okay.  It's not highlighted.  All right.

23  Q.  Yeah.

24  A.  I believe that, once again, you have to look at the source

25  of wages, compensation for services.  And if it's not as a

1   result of the exercise of some federal privilege -- I think I

2   made a statement earlier that I believe that -- if the

3   government pays it, they can tax it, whether it's Social

4   Security or whether you get a salary from the government or the

5   military.  So I don't know that I would embrace that entirely.

6   I think there could be some exceptions to that statement.

7   Q.  Okay.  Back to the highlighted one, foreign source income.

8   So on the left side, when you talk about 861 and domestic

9   income, and income from the 50 states, domestic income again,

10  No. 6, Americans without foreign source income, why -- what's

11  the disconnect between that and what they're replying to?

12  A.  Well --

13  Q.  Purporting to reply to.

14  A.  Well, I think my statements are asking a specific question.

15         We'll take No. 6, for example.  The Internal Revenue

16  Code as written does not impose a tax on the income of most

17  Americans who have no foreign income or derive income from

18  federal possessions.  It's a partial statement.  I think you

19  can go on to say -- I think I mentioned earlier, income from a

20  commerce act of Congress, for example.  If you mine or drill

21  for oil, if you take commercial pictures in the national forest

22  and derive income from that, that's taxable income, regardless

23  of -- you know, where it is.  If it's a federal privilege,

24  you're going to pay a tax on it.

25         So I think the purpose of No. 6, when I made that

446

Lawrence Martin Birk – Direct

1    statement, I was saying that the way it's written -- once

2    again, I think that the Constitution sets the boundaries for

3    interpreting that -- it's an indirect tax.  And I think if it's

4    not from the exercise of a federal privilege, then it's not

5    taxable income.

6    Q.  Okay.  Now, you reviewed the entirety of Government Exhibit

7    43; correct?

8    A.  I have.  And I still have a copy of it.

9    Q.  And are you prepared if, for example -- I'm not going to do

10   it -- but if the government came up and pointed you to some

11   section of it, to discuss with them why -- or how or whether

12   that answers questions?

13   A.  I would do my best.

14        MR. HARRIS:  Okay.

15        Your Honor, at this time I would ask to show the jury

16   defense Demonstrative Exhibit No. 11.

17        THE COURT:  Response.

18        MR. MAGNANI:  The Government doesn't object to the use

19   of any of defense counsel's demonstrative exhibits, provided

20   they're the ones that the defense has shown us previously.

21        MR. HARRIS:  I promise I've not sneaked in new ones.

22        THE COURT:  Well, as we focus on Defendant's

23   Exhibit 11 for identification, it may be used, published, and

24   discussed in the presence of the jury as a demonstrative

25   exhibit only.

447

Lawrence Martin Birk - Direct

1    *BY MR. HARRIS:*

2    *Q.*  So looking at what's now on the screen -- actually, let's

3    go -- let's go back to the other exhibit for a moment.

4            And before we take a look at I think it was 11, I

5    would also seek the Court's leave with respect to Demonstrative

6    9, to show it to the jury.

7            *THE COURT:*  Same response by the Government?

8            *MR. MAGNANI:*  Yes, Your Honor.

9            *THE COURT:*  Focusing now on Defendant's Exhibit 9 for

10   identification, it, too, may be used, published, and discussed

11   in the presence of the jury as a demonstrative exhibit only.

12           *MR. HARRIS:*  Okay.  Let's look at No. 9.

13   *BY MR. HARRIS:*

14   *Q.*  Okay.  On the left side, what do we have?

15   *A.*  That's from my February 3 letter of 2004.  And it's a

16   statement I made, "As I've been unable to find a requirement in

17   law for me and my wife to file, if you would be so kind as to

18   send me the statute and implementing regulation that requires

19   said filing of a specific tax return, I will promptly send it

20   in."

21   *Q.*  And below that?

22   *A.*  It says, "In fact, I have looked for such a statute and

23   regulation for the past six years.  What I did find was really

24   interesting."

25   *Q.*  And then the next entry, the one with the 11.

448

Lawrence Martin Birk - Direct

1    A.   "The IRS steadfastly refuses to cite its legal authority to

2    require filing of returns and payment of taxes."

3    Q.   Okay.  And on the right side, an excerpt from Government

4    43, concerning the voluntary nature of the federal income tax

5    system and whether or not filing is voluntary.  Isn't that

6    synonymous with saying that, you know, you don't have a legal

7    requirement to file if you're saying something is -- you're not

8    required to file it, aren't you, in effect, saying it's

9    voluntary?

10   A.   I think the -- under the frivolous tax arguments, there are

11   in fact some people out there that would try to get you to

12   believe it is a voluntary act, and they try to reference things

13   in instructions for tax forms that says, voluntary compliance,

14   et cetera, et cetera.  I do not adhere to that belief.  I

15   believe that the income tax is absolutely mandatory for all of

16   those to whom it applies.

17   Q.   Why do you say you can't find a requirement that you need

18   to file?

19   A.   Once again, within the boundaries that I believe are set by

20   the Constitution as amended and the applicable Supreme Court

21   decisions early on, it's an indirect tax and must take the form

22   and proper subjects of an indirect tax.  And that would mean I

23   need to go look for specific taxable source activity that I am

24   involved in, that I have received income from, then I would be

25   told what kind of forms I've got to file and what kind of tax

449

Lawrence Martin Birk - Direct

1    I've got to pay.

2    Q.  Okay.  We've looked at Demonstrative Exhibit 10.  Let's now

3    look at 11, which we've previously been granted leave to

4    publish.

5        Okay.  On the left-hand side, that shows a question

6    you've asked concerning, where do you look to find out if

7    income is taxable; correct?

8    A.  Correct.

9    Q.  On the right-hand side, there is the contention that

10   certain types of income are not income that are taxable;

11   correct?

12   A.  Yeah.  The wages, tips, and other compensation received for

13   personal services are not income.

14   Q.  All right.

15   A.  And I think we addressed that.  I said, certainly some who

16   receive those types of income are involved in a taxable source

17   activity, the exercise of a federal privilege, and they do have

18   to pay a tax --

19   Q.  Okay.

20   A.  -- and file.

21   Q.  And that's not responsive; correct?

22   A.  The -- well, the -- without reading what they said there,

23   that's out of the table of contents --

24   Q.  Right.

25   A.  -- but --

450

Lawrence Martin Birk - Direct

1    *Q.* As you recall from what you have read of it, you didn't see

2    anything responsive?

3    *A.* No. The IRS would refer you to the Internal Revenue Code,

4    where it said -- where it defines gross income and taxable

5    income, it has these lists of classes, types of income, and --

6    but -- nor does it tell you what is the taxable source

7    activity. If it's an indirect tax, it must take the form and

8    proper subject of an indirect tax. It needs to tell me, what

9    activity is that?

10        *MR. HARRIS:* Okay. I would request leave to publish

11   Demonstrative Exhibits -- Defense Exhibits 12, 13, 14 --

12        *THE COURT:* Any objection?

13        *MR. MAGNANI:* No objection to any of the

14   demonstratives, Your Honor.

15        *THE COURT:* Again focusing on Defendant's Exhibit 12

16   for identification, it, too, may be used, published, and

17   discussed in the presence of the jury as a demonstrative

18   exhibit only.

19   *BY MR. HARRIS:*

20   *Q.* And let's look at that.

21        Okay. You posit that if you file, you've waived your

22   Fifth Amendment rights. They reply that taxpayers -- they

23   reply that it's frivolous to say taxpayers don't have to file

24   returns because of Fifth Amendment protections; right?

25   *A.* That's what they're saying.

451

Lawrence Martin Birk - Direct

1   Q.  Do you believe that that's responsive -- I mean, is that a

2   match in terms of arguments, at least?

3   A.  Well, the issue of what generated my statement was a case

4   right here in the Tenth District, gentleman by the name of Bill

5   Conklin -- it's an unpublished case, but it's still

6   available -- where the court finally came through and says,

7   well, yeah, that could happen.  Now, I have never taken that

8   position that -- that I believe you're waiving your Fifth

9   Amendment rights.  Pay attention to what it says on the

10  signature block, though, under penalty of perjury.  So if you

11  do file, you better tell the truth.

12  Q.  Okay.  No. 13, if we could look at that.  What's that?

13  A.  My statement goes back to my commentary on Mr. Benson's

14  evidence, "The Law that Never Was."  I was seeking the

15  government to respond to that.  And what they said -- I don't

16  exactly remember what was said in Paragraph 5 there, but --

17  Q.  Let's take a look --

18  A.  Let's take a look at that.

19  Q.  -- at 43, I believe it is.

20       Why don't we do this -- it might be easier to pull

21  that up.  Let's put 13 back up, and then side by side to the

22  other, and we can flip to it quicker.

23       Okay.  So page 31 in the document, on the -- on the --

24  we can take down 13.  If we can go backwards to 31 as it's

25  numbered at the top.

452

Lawrence Martin Birk - Direct

1          Okay.  So we're looking at that.  Let's zoom that in a

2   little.

3          So this is what is on the right side.  This is the

4   content that goes with that table of contents.  Do you view

5   this as responsive to your statement, or do you not?  And why

6   or why not?

7   A.  This particular one provides a lot of good information.  It

8   says that -- references the *Brushaber* case.  I've got to see

9   what is below that.  If we could scroll down a little bit,

10  because I see a name I recognize.  That's the chairman of the

11  We the People Foundation.  Yeah, I remember that tax

12  termination package.  I did not support that.

13  Q.  Then scrolling down to the case law.

14  A.  Let's keep going.

15  Q.  Okay.

16  A.  A lot of circuit court cases, which is good information.

17  Once again, I would rest upon the evidence as published.  It

18  was provided to every member of Congress from 1983 and the

19  President.  I believe that was Ronald Reagan at the time.

20  Q.  By the way, did you read every one of these cases?

21  A.  No, I didn't read all of them.  I like to read case law,

22  but I just read the highlights on most of these.  Certainly,

23  this one -- if a case refers to another case, like the

24  *Brushaber* case, certainly I would go -- that would get my

25  interest going.  I would look at that one for sure.

453

Lawrence Martin Birk - Direct

1    Q.  Let me ask you about that one, while we're up there.

2           The first case, if we could highlight on that

3    paragraph, number one.

4           So this is a Seventh Circuit case, where they say --

5    they talk about specifically rejecting the argument advanced in

6    "The Law that Never Was"?

7    A.  I do not personally espouse the belief that the 16th

8    Amendment was not ratified, or maybe it was.  I don't think it

9    matters.  The Supreme Court spoke often and consistently in the

10   1916 through about 1929 time frame about what the income tax

11   was and what it was not.  So does it really matter?  It's one

12   of those things.  We've had it for 106 years.  Does it really

13   matter if it wasn't properly ratified at this stage of the

14   game?  If you look at the Supreme Court decisions and what they

15   said the income tax was and what it wasn't, I think it settles

16   the matter.  It creates very clear boundaries on how the tax

17   code should be interpreted.

18   Q.  Okay.

19   A.  And I believe the tax code is absolutely constitutional.

20   Q.  All right.  Let's take that down.

21          And two more, briefly.  Exhibit 14, demonstrative.

22   This is your unapportioned direct tax --

23   A.  Correct.

24   Q.  -- area.  And on the right -- well, let me back up.

25          You said, based on constitutional limits, that most

454

Lawrence Martin Birk - Direct

1    Americans' income can't be taxed in the form of an

2    unapportioned direct tax, those limits being circumscribed by

3    which amendment?

4    *A.*  It's actually in the body of the Constitution and

5    Article I.  I think I spoke to that earlier.  Talks about the

6    two types of taxes that Congress can levy, direct taxes --

7    which is found in Section 2 and 9 -- which requires the

8    apportionment of a direct tax.  And, basically, that means to

9    the states based on census or population.  And in Section 8 of

10   Article I, the indirect tax.

11   *Q.*  So your argument isn't premised on the 16th Amendment?

12   *A.*  No.  I don't -- I'll say it again.  I don't think the 16th

13   Amendment in and of itself addresses the issue.  The Supreme

14   Court has almost set it aside by saying it did not authorize in

15   Congress any new power to tax.  It did not create a third type

16   of tax.

17   *Q.*  Okay.  One last area on this, and that would be Exhibit 15.

18   This one a little different, a due process argument.

19        You say a tax system that violates due process is

20   unconstitutional.  Not terribly controversial; right?

21   *A.*  I don't think so.

22   *Q.*  And --

23   *A.*  Anybody would agree with that statement.

24   *Q.*  Okay.  And they address due process in their exhibit, and

25   they talk about it in the context of collection due process

455

Lawrence Martin Birk - Direct

1    cases.  Right?

2    A.   Yes.

3    Q.   Is that what you mean?

4    A.   I think the reference to collection due process cases is

5    very specific to collection actions by the IRS.  I think that

6    there is potentially other issues -- Fourth Amendment issues,

7    primarily -- that sometimes come into play.  Now, there are due

8    process solutions.  For example, if the IRS issues a

9    third-party summons, like they did to my bank, I can go to the

10   court and petition them to quash that summons.  I know other

11   people who have done that.  If you give the court a good reason

12   for it, normally they'll grant that.  I did not see any reason

13   to do that.  I didn't have anything to hide.  There had been a

14   very thorough discussion of my banking in this court.

15   Q.   Okay.  And we're going to get to that, as well.

16        We can take this down.  Let's take one more look at

17   Exhibit 2.

18        In Exhibit 2 you say, "The federal government cannot

19   tax income within the 50 states."  Let's just find that.  And

20   it might be on the next page, or the page after.  Sorry.

21        It's No. 5.  Did Exhibit 43 address that argument?

22   A.   Oh, boy.  I don't remember off the top of my head.

23   Q.   Well, let me ask you -- go ahead.

24   A.   I do believe what I was talking about here is what we call

25   jurisdictional limitations.  If you look at the Constitution

456

Lawrence Martin Birk - Direct

1    and where the federal government has legal jurisdiction, it --

2    it's varied and far reaching.  Certainly, the District of

3    Columbia and the federal territories, any kind of property

4    where the federal government holds a deed, Army posts, some

5    post offices -- not always.  Sometimes it's a lease.  You've

6    got to be careful.

7         But the relationship I think constitutionally between

8    the federal government and the state speaks for itself, that in

9    many cases, where the government, due to the Ninth and Tenth

10   Amendment limitations -- where it is not specifically granted

11   an enumerated power, it doesn't have.

12   Q.  Okay.

13   A.  The states or the people retain that.

14   Q.  Okay.  That's what you meant?

15   A.  That's where I was going with this one.

16   Q.  Okay.  All right.

17        Let's look at another exhibit.  Let's take another

18   look at Government 38.  And, specifically, where -- this is

19   just to review and expedite -- a letter from Jeka to you;

20   correct?

21   A.  Correct.

22   Q.  And what -- it says in there on the next page -- sorry, on

23   this page, first page -- something about the 16th Amendment --

24   maybe not.

25   A.  Huh.

1      *MR. HARRIS:*  Apparently not.  Let's pull that -- let

2   me look at one thing.

3           I just want to confirm, is this 38?

4           Let's take that down.  I'll ask that a different way.

5   *BY MR. HARRIS:*

6   *Q.*  At some point you received a notice of determination from

7   the IRS; correct?

8   *A.*  Correct.

9   *Q.*  That notice of determination had some discussion in it

10  summarizing your views of the tax system.  Remember, we looked

11  at that a little earlier; right?

12  *A.*  Correct.

13  *Q.*  And somewhere in there, it was stated by the IRS that you

14  believe the 16th Amendment is fraudulent in origin and that IRS

15  collection actions are actually outside the law.  Do you

16  remember words to that effect?

17  *A.*  I believe I do.

18  *Q.*  Is that an accurate statement of your understanding of the

19  law?  And you can just answer yes or no.

20  *A.*  I would say, yes.

21  *Q.*  Okay.  And does that mean that you're unwilling ever to

22  pay?

23  *A.*  No.

24  *Q.*  Okay.  Let's look at Government 51 now.

25          And this is made up of several pieces.  But this first

458

Lawrence Martin Birk - Direct

1    piece, what is that?

2    A.  You say the first piece?

3    Q.  Yeah, just this first page, because it's actually --

4    A.  Oh.  The whole first page?

5    Q.  Yeah.

6    A.  All right.  Copies of correspondence -- and I've got them

7    listed there in my reference list -- to my Congressman.  Let's

8    see here, Agent Bentley, who we saw on the stand --

9    Q.  Let me direct your attention to the top of the document --

10   A.  Okay.

11   Q.  -- subject line.  So this is a letter.  Basically, what's

12   the letter deal with?

13   A.  I'm requesting -- I've made a demand for release of notice

14   of federal tax liens.

15   Q.  Who is the letter addressed to?

16   A.  It was addressed to Agent Miller.

17       MR. HARRIS:  Let's go to the bottom of the page, and

18   carrying over to the next page -- go up a little.  Okay.

19   "Also, we hereby demand" -- that paragraph, if we could zoom

20   that.

21   BY MR. HARRIS:

22   Q.  So this is you writing.  And you're saying you're demanding

23   the IRS release all notices of tax liens; right?

24   A.  Correct.

25   Q.  Why?

Lawrence Martin Birk - Direct

1   *A.*  Well, it's primarily -- if you look at a federal -- a

2   notice of federal tax lien -- and there may be some folks in

3   here who have seen some -- Paragraph A on the back of that

4   notice is missing.  And I believe that was the paragraph that

5   gives the authority to do what they're doing and who it applies

6   to.  And I address that -- that very topic in my right -- in my

7   petition that I had filed with the government.

8          If you read that missing paragraph, it basically tells

9   you that it only applies to officers and employees of the

10  federal government.  And I said, well, number one, why would

11  they take that out?  And then number two, that's not me.  So

12  I --

13  *Q.*  Okay.

14  *A.*  That was basically the gist of why I wanted that out.  It

15  also had to do with -- if you look above, I had tried to get a

16  signed verified assessment from the IRS; and I never received

17  one.

18          *MR. HARRIS:*  Okay.  Let's zoom back out.  And moving

19  to what is marked at the bottom as page 731.  It's this letter.

20  Zooming to the top quarter or so of it.

21  *BY MR. HARRIS:*

22  *Q.*  What's that letter, and who is it to?

23  *A.*  That's one I wrote to my Congressman, Doug Lamborn.  I

24  referenced some letters I had written to the IRS.  And I was

25  filling him -- I was trying to keep him up to speed on the

460

Lawrence Martin Birk – Direct

1    status on this, because I had solicited his aid in trying to

2    work with the IRS.  And that's basically the gist of the

3    letter.

4    Q.  Okay.

5    A.  Refused to answer questions regarding the correct

6    application of our tax laws.

7    Q.  Let's zoom back out on that.

8          Language in there, withdrew our request.

9    A.  Where are we at on this letter?  Which paragraph?

10   Q.  Mr. Cohen will find it.

11   A.  Let's see --

12   Q.  Maybe the next page -- oh, no, it's up here in the first

13   paragraph.  That entire paragraph.

14   A.  Okay.

15   Q.  Okay.

16   A.  Yeah.  "At the time we withdrew our request for a hearing

17   on the basis that the federal government refused to answer

18   questions regarding the correct application of the tax laws,

19   determination of taxable income, and due process of law."

20   Q.  Okay.  Let's stop there.  Let's go back out, highlighting

21   the date of the letter.

22   A.  April of 2009.

23   Q.  So back in April of 2009, more than ten years ago, you were

24   already concerned about the IRS's refusal to answer your

25   questions; correct?

Lawrence Martin Birk - Direct

1    *A.* Oh, very much so.

2         *MR. HARRIS:* Okay. Let's go back into the letter.

3    Second full paragraph, fourth line to the end, from "lives,"

4    down to the end.

5    *BY MR. HARRIS:*

6    *Q.* You say, "What the IRS has done is create a fiction, at

7    best." What do you mean?

8    *A.* Could we include one more line at the top?

9    *Q.* Yeah, sure.

10   *A.* I want to reference that number.

11   *Q.* Mr. Cohen --

12   *A.* Because we've seen a lot of data during this trial. At the

13   time of -- referencing those notices of federal tax liens, that

14   number there, $2.1 million and some change, I was making the

15   statement -- and I'll stand by it -- an amount that exceeds our

16   total income from all sources for our entire lives -- that's me

17   and my wife -- including the value of our real property.

18        So the next question, obviously, would be, this

19   fiction that was created, at best, and at worst, fraud, by

20   recording it into the public record, those notices of tax liens

21   come through the Secretary of State and into your county Clerk

22   and Recorder's office. They not only encumber your property,

23   but affect your credit and your good name, for that matter. So

24   I was challenging that.

25        We have seen some data since then in this trial that's

Lawrence Martin Birk – Direct

1    a number that is slightly more than 10 percent of that.  So my

2    question is, I could understand it being maybe double because

3    of the issue of me not providing or volunteering the

4    information at this time that I did give to, say, Advanced Tax

5    Solutions, and what drove those returns; but I was challenging

6    this number.  And by recording it into the public record, I'm

7    concerned about that.  I was very concerned about that at this

8    time.

9              MR. HARRIS:  Okay.  Zooming back out.  Next page.

10             Actually, back to the other page.  Last paragraph.

11   BY MR. HARRIS:

12   Q.  You say, "The only nonviolent option remaining is for the

13   government to answer."  Let me stop right there, because that

14   will strike someone reading that as jarring.  Are you

15   threatening?

16   A.  You mean violence?

17   Q.  Yeah.

18   A.  That's a direct reference constitutionally to the Second

19   Amendment.  What follows the First Amendment, and why is it

20   where it is?  The last ten words, we have a series of

21   fundamental rights and law.  And the last ten words of the

22   First Amendment says, "and to petition the government for

23   redress of grievances."  If we cannot get good faith answers

24   through correspondence or meetings about the significant legal

25   issues surrounding the federal income tax, what is going to be

463
Lawrence Martin Birk – Direct

1    left to a free people?

2          Now, am I personally threatening violence?  No, I'm

3    not.  I'm talking about, what did our founding fathers and the

4    framers of our Constitution and those first ten amendments give

5    us as far as the tools to hold our own government accountable

6    to the law?  That was why I put that in there.  The Second

7    Amendment speaks for itself.

8          *MR. HARRIS:*  Okay.  Next, if we can zoom back out and

9    go to the next page.  Last part of that paragraph.  Yeah,

10   there.

11   *BY MR. HARRIS:*

12   *Q.*  "No answers, no taxes," what does that mean?

13   *A.*  That referred directly to our petitions for redress.

14   *Q.*  Okay.  One more letter, and then we'll turn to other

15   topics, most likely after the mid-afternoon break.  But let's

16   see how far we can get.

17          Government Exhibit -- well, same exhibit.  Let's go

18   forward in it a page.  Highlighting the top part.

19          And just to expedite, at the risk of leading, letter,

20   May 29, 2008, from you to Bentley; correct?

21   *A.*  Correct.

22   *Q.*  Bentley was the other bearded gentleman that testified;

23   correct?

24   *A.*  Correct.

25   *Q.*  Okay.  So did you write this letter?

Lawrence Martin Birk - Direct

1    *A.*   I did.

2    *Q.*   Why?

3    *A.*   I was -- what I was trying to do was talk about the due

4    process hearing that was originally scheduled.  We had been

5    informed repeatedly by the IRS that they were not going to

6    address in good faith my questions regarding the correct

7    application of our tax laws.  What's the point of going to

8    another meeting, or even a telecon meeting if I'm going to be

9    told the same thing?

10         *MR. HARRIS:*  Zooming in on four lines down from "it

11    has been our intent."  Down a couple of lines.

12    *BY MR. HARRIS:*

13    *Q.*   "It has been our intent these past nine years to

14    communicate with the IRS in good faith."  You wrote that;

15    right?

16    *A.*   I did.

17    *Q.*   You meant that; right?

18    *A.*   Uh-huh.

19    *Q.*   "To administratively resolve the many issues between us as

20    afforded by the law."  Is this the collaborative aspect that

21    you were talking about and hoped Ms. Trabold was sincere about?

22    *A.*   It is.  And we've heard about that often in this trial.

23    And I certainly appreciate that we have that right to due

24    process in this country; but when they end it abruptly by

25    accusing you of having frivolous positions and they won't even

465

Lawrence Martin Birk – Direct

1   talk to you, that's what it is.

2           *MR. HARRIS:*  Okay.  Let's zoom back out.

3           "We've put forth many questions."  It's –– in that

4   paragraph, letter –– it's –– let's just highlight the bottom

5   third of that paragraph.

6   *BY MR. HARRIS:*

7   *Q.*  We'll get back to the other.  But here you refer to his

8   letter of May 5 and that he says, "All of the correspondence

9   you have sent was identified as espousing frivolous tax

10  arguments.  We strongly disagree."  Right?

11  *A.*  I do.

12  *Q.*  Okay.  And then you say, at this point you see no benefit

13  for anyone in further meetings or correspondence for any

14  purpose.  That's what you were just testifying about?

15  *A.*  That's correct.

16  *Q.*  Okay.  We can pull that down.

17          Last half or so of the first paragraph from the R.

18  Creamer down.  There.

19  *A.*  Yeah.  Okay.

20  *Q.*  You say, "Also of record are several petitions for redress

21  of grievances."  And you say, "Those petitions remain

22  unanswered as of this date."

23  *A.*  Correct.  They still are.

24  *Q.*  That was my next question.

25          Let's pull that down.

Lawrence Martin Birk - Direct

1          Bottom paragraph.  "We have watched with dismay as

2    basically everyone refused to respond to questions."  True?

3    A.  True.

4    Q.  Why was it dismaying?

5    A.  Well, I think by this time -- this is 2008 -- my

6    frustration is beginning to show somewhat in my letters.  I am

7    continually told that I'm espousing frivolous arguments; but

8    I'm not getting any answers, any specific responses that would

9    lead me to believe that I am incorrect.  I'm not getting any

10   answers.

11          MR. HARRIS:  Same paragraph.  If you could highlight,

12   Mr. Cohen, the sentence that says "We have also watched."

13   BY MR. HARRIS:

14   Q.  "We have also watched with dismay the blatant judicial

15   conspiracy evidenced by recent legal actions" -- well, judicial

16   conspiracy --

17   A.  Yeah.  When --

18   Q.  You want to elaborate?

19   A.  There is a legislative act called the Anti-Injunction Act

20   that basically forbids a taxpayer, an American citizen, to

21   bring a tax matter into the court for resolution to -- as the

22   Act calls, to avoid paying a tax.  You are required, I guess,

23   by due process to try to administratively resolve that somehow.

24   And if you don't, then they begin collection and seizure and

25   apportionment actions against you.  That was part of what I was

467

Lawrence Martin Birk - Direct

1   talking about there, judicial conspiracy.

2        But there were all kinds of things that were happening

3   against what I called leaders of the tax honesty movement.

4   Outside of the We the People Foundation, there were other

5   things going on.  I did not necessarily support some of the

6   positions these people were taking.  The government was trying

7   to shut down websites.  I think that's a First Amendment issue.

8   We had -- We the People -- I'll give you an example about an

9   attack on the right of free speech, which is the next one.

10       We had a contract with *USA Today* for twelve full-page

11  ads, that were not inexpensive.  We succeeded in running six of

12  them before we received a letter from *USA Today* and a refund on

13  our balance saying, hey, you know, we've been contacted by the

14  Department of Justice, and our attorneys say we better stop

15  doing this.  Oh, really?

16       We had a similar experience with C-Span regarding our

17  meetings at the National Press Club --

18  *Q.*  Okay.  Let me just bring it back for a moment to the

19  letter.  I'm not going to go through every line of the letter;

20  I don't think that would be fair to the jury or the Court.  But

21  fair to say that the bulk of this letter is expressing your

22  concerns historically with what you perceived as the lack of

23  responsiveness and answers to what you viewed as legitimate

24  questions; correct?

25  *A.*  That's the bulk of it.

468

Lawrence Martin Birk – Direct

1    *Q.*  Okay.

2              *THE COURT:*  Counsel, a propitious time, as I am wont

3    to say, to declare and take our mid-afternoon recess for this

4    afternoon of trial.  During this recess, Mr. Birk, you may

5    stand down and return to your seat.

6              *THE WITNESS:*  Thank you, Your Honor.

7              *THE COURT:*  You're welcome.

8              And, counsel, you may be seated at your convenience.

9              Ladies and gentlemen of the jury, in preparation for

10   this mid-afternoon recess, two things:  First, once again,

11   leave your notetaking materials face down on your seats or your

12   chairs.  And on all such occasions, be mindful of those

13   important rules that continue to govern you as jurors in this

14   trial.

15             We are in recess for 15 minutes.

16             (Recess at 3:03 p.m.)

17             (In open court at 3:25 p.m.)

18             *THE COURT:*  Thank you.  And either be seated or remain

19   standing, as you choose, while waiting for the jury.

20             Madam Clerk, one more time, please.

21             Thank you.

22             (Jury in at 3:27 p.m.)

23             *THE COURT:*  Ladies and gentlemen, again, please be

24   seated, with the exception of you, Mr. Harris.  You may resume

25   your direct examination of Mr. Birk.

469

Lawrence Martin Birk - Direct

1          MR. HARRIS:  Thank you, Your Honor.

2          THE COURT:  You're welcome.

3    BY MR. HARRIS:

4    Q.  Let's move to a different topic area.  At some point,

5    despite your understanding of the law concerning your duty to

6    file returns, you did decide to file returns under duress or

7    under protest; correct?

8    A.  Yes, sir.

9    Q.  When approximately did that decision happen?

10   A.  To the best of my recollection, let's see -- that was

11   probably about August of 2006, July -- maybe a little bit

12   before that.  Because I think that's when I approached Advanced

13   Tax Solutions.  Let's say sometime in the spring of '05.

14   Q.  And the spring of '05.  Okay.

15          And did you decide -- why did you decide to do that?

16   A.  I would say it's a twofold answer.  The first one is my

17   loving wife, she was beginning to get nervous about collection

18   and enforcement actions; so she got me thinking about that.

19   The other aspect that I'd been thinking about for some time was

20   the magnitude of the assessments against me and wanting to take

21   some kind of action that would pave the way for coming back

22   into the system, perhaps, and disarming those assessments.

23   Q.  Had you at that point changed any of your understandings of

24   or beliefs with respect to your duty to pay taxes on that

25   income?

Lawrence Martin Birk - Direct

1    *A.*   No.

2    *Q.*   So when you say or write that these returns were filed

3    under duress, what do you mean?

4    *A.*   At that time I was a plaintiff in a lawsuit -- we spoke

5    briefly about that -- the right to petition lawsuit with We the

6    People Foundation, and approximately just under 1,500

7    plaintiffs total.

8    *Q.*   And so what's -- what's the relation between the lawsuit

9    and the under the duress?

10   *A.*   The -- at the time I had expectations that our right to

11   petition lawsuit would bear fruit and that the government would

12   be required to provide answers in good faith in public to those

13   petitions.

14   *Q.*   And so when you write "under duress," what does it mean to

15   you?

16   *A.*   It meant to me that I was willing to file those returns and

17   sign them under penalty of perjury at the time.  Even though my

18   philosophies may have been different, the data was as accurate

19   as I could make it at the time.

20   *Q.*   Okay.  Now, you sometimes refer to this as getting back

21   into the system; correct?

22   *A.*   Correct.

23   *Q.*   What does that mean?

24   *A.*   It basically means, filing returns and working with the IRS

25   to pay the taxes.

1    Q.   So -- okay.  You're going to get back into the system.

2    What steps did you take to get back in?

3    A.   Well, the first one was approaching Advanced Tax Solutions

4    to prepare returns from '98 through 2005.  And then --

5    certainly, behind the scenes, I do keep good records; and I had

6    to get busy generating data for Mr. Erikson.

7    Q.   And about how much did it cost in total to get back in?

8    A.   As far as what I paid Advanced Tax Solutions, I believe

9    that the total number ended up being around $12,000.

10   Q.   Now, when you met with Advanced Tax Solutions -- let's

11   actually step back a minute.  You did meet with them; correct?

12   A.   I did.

13   Q.   And was that with Mr. Whalen initially?

14   A.   Initially, Mr. Whalen; correct.

15   Q.   Did you have any second meeting with Mr. Whalen?

16   A.   I don't believe I did.

17   Q.   Did you have any meeting with Mr. Erikson?

18   A.   I did.

19   Q.   More than one or just one?

20   A.   I remember two meetings with Mr. Erikson.

21   Q.   In any of those three in total meetings, variously, with

22   Erikson or Whalen, did you have any conversation with them

23   concerning your understanding of tax law applicability to you?

24   A.   I believe in the initial meeting with Mr. Whalen, we had a

25   short discussion.  And he made his position very clear to me,

472

Lawrence Martin Birk – Direct

1    that that was not going to be something they could do.  That

2    they would prepare those returns to the best of their ability

3    in accordance with the rules as they understood them.

4    Q.  Who decided what materials they would have to prepare your

5    returns?

6    A.  Mr. Erikson requested specific information from me, and we

7    kind of built on that as we went through the process of

8    preparing those returns.  There was quite a bit of email

9    traffic and some phone calls with Mr. Erikson to provide that

10   information to him.

11   Q.  Did you provide everything that you had been requested to

12   provide?

13   A.  I did.

14   Q.  Were you ever dishonest with them?

15   A.  I was not.

16   Q.  Did you ever hide anything from them?

17   A.  I did not.

18   Q.  Did you either discuss or provide to them information about

19   Tarryall Asset Management?

20   A.  I did.  There were some handwritten notes, I think, that

21   have been part of the record for this trial.  There was a

22   specific phone call I had with Mr. Erikson about that, where he

23   requested some information from me.  And I did my best to come

24   up with that.

25            I think the information was originally flagged by the

1  IRS to Mr. Erikson through Mr. Bass, and I went and retrieved

2  those records, and we corrected that return.

3  Q.  With respect to Tarryall Asset Management, was it your

4  intention that Tarryall Asset Management be used as some sort

5  of device to hide income from the IRS?

6  A.  That was not my intent.  I think I said earlier, I was

7  intending to use it as a conduit to move my funds in the form

8  of -- primarily my wife's retirement funds, and she agreed with

9  that -- from the custodians into that conduit so that those

10 funds could be used in Tarryall River Log Homes.

11 Q.  Did Mr. Erikson ever tell you, write you, or otherwise

12 advise you that you were doing anything wrong in -- with

13 respect to Tarryall Asset Management?

14 A.  No, he did not.

15 Q.  Had he told you that you were doing something wrong, what

16 would you have done?

17 A.  Well, I think at that point, when we were preparing

18 returns, it was probably overcome by events.  The -- the

19 actions that were taken far preceded my involvement with

20 Advanced Tax Solutions, so it was a -- a past data point that

21 really needed to be corrected.  And I think the handwritten

22 notes that Mr. Erikson had as part of this court record show

23 that.

24 Q.  Did you rely on Advanced Tax Solutions to complete returns

25 correctly?

474

Lawrence Martin Birk – Direct

1    A.   Yes.

2    Q.   At some point your relationship with Advanced Tax Solutions

3    ended; right?

4    A.   That's correct.

5    Q.   How did it end and why?

6    A.   Well, I think we reached a point after we had produced all

7    the returns through 2005, to file those returns under duress,

8    as we have just spoken about, and I felt at that time their

9    work for me was completed.  I had not ruled out a future

10   relationship with them, and I don't think they had either, but

11   we were done.

12   Q.   Amicably?

13   A.   Yes.

14   Q.   Now, there was a power of attorney, POA, in effect at

15   times; right?

16   A.   That's correct.

17   Q.   And that granted them the right to advocate for you with

18   the IRS; right?

19   A.   That's correct.

20   Q.   We've heard some testimony about that.  Who terminated it?

21   A.   I did.

22   Q.   For the reasons you've just discussed?

23   A.   That's correct.

24   Q.   Now, you've heard the testimony from Ms. Trabold and other

25   witnesses, and it -- to summarize, it would appear the IRS is

1  claiming, variously, number one, that you deliberately

2  underreported income at times.  Did you?

3  A.  I did not consider that in the overall scheme, that it was

4  taxable income.  It was earned income that my wife had made or

5  myself -- mostly my wife's, again.  Those were my funds.  I

6  made no intent to violate anything.  I was merely using my

7  funds.

8  Q.  Did you at any time deliberately overreport business

9  expenses or list as expenses things that were not expenses?

10  A.  No.  I would not do that.

11  Q.  Did you at times use the Tarryall business bank account,

12  the PSBT bank account ending in 694, to conduct personal

13  business affairs?

14  A.  Yes, I did.

15  Q.  Did you at times use your business account to pay personal

16  expenses?

17  A.  I did.

18  Q.  Why?

19  A.  Once again, it was -- those were considered my funds.  One

20  of the convenience items -- I had a debit card for that

21  account, which I did not have on my personal account, which

22  made it easy on the fly to purchase fuel occasionally.  Most of

23  the fuel was, in fact, business use.  It's a long way to

24  anywhere in Park County.  I think most of the special agents

25  who have been out there, they probably know.  Groceries

Lawrence Martin Birk - Direct

1    occasionally, using that debit card, that's how it was

2    purchased.  It was a matter of convenience for me.

3    Q.  Did anyone ever -- let me ask a different question.  Did

4    you hold any funds in that business account in a fiduciary

5    capacity for anyone?

6    A.  If we're talking about something like deposit money --

7    Q.  Uh-huh --

8    A.  -- yes.  Occasionally I would get large deposits on a log

9    home package, *per se*, that I would deposit to my business

10   account.

11   Q.  Now, this business of official checks, is what you've told

12   Agent Hopping true, that you maintained -- that you

13   deliberately maintained a low balance in the Tarryall business

14   account by purchasing official checks?

15   A.  I did.

16   Q.  And why?

17   A.  To protect my funds, which were also my customers' funds at

18   times, or my subcontractor or suppliers' funds, from being

19   seized.

20   Q.  And the reason for that is you didn't believe that the IRS

21   was legally entitled to those funds; correct?

22   A.  That's correct.

23   Q.  Now, with respect to the IRA rollover issue and the -- you

24   remember the discussion of that; correct?

25   A.  I do.

477

Lawrence Martin Birk – Direct

1  *Q.*  And the demonstrative exhibit with all of those circles;

2  right?

3  *A.*  Correct.

4  *Q.*  Tell us about that.  What -- what -- why did you not simply

5  transfer that distribution from one trust to another?

6  *A.*  I --

7  *Q.*  One --

8  *A.*  My wife decided and I decided we wanted to use those funds

9  to invest in our log business.  We actually used a lot of that

10  money to build what we called a spec house, which we used as a

11  model and a place to store things like doors and windows for

12  other projects.

13  *Q.*  Was it your intention in handling the funds the way you did

14  with TAMI as the intermediary for them, to defraud the IRS?

15  *A.*  No.  Of course, not.  I considered those to be our funds.

16  That was a conduit that I used for that purpose.

17  *Q.*  Did you consider those distributions, those funds, to be

18  taxable income?

19  *A.*  I did not.

20  *Q.*  And is that for the same or similar reasons to the reasons

21  you've expressed as to other income?

22  *A.*  That's correct.  It's private sector funds.

23  *Q.*  Did you hide either the existence of TAMI or the

24  distributions themselves from Advanced Tax Solutions?

25  *A.*  I did not.  I called them personal funds.  They were on the

Lawrence Martin Birk - Direct

1   handwritten notes, and that's what I considered them.

2   Q.  Now, there was discussion in Ms. Trabold's testimony of a

3   company you had worked for, PRC.

4   A.  Correct.  That was the last company I worked for in my

5   defense industry career.

6   Q.  And she explained a discrepancy between the 1998 return you

7   filed and Advanced Tax Solutions' return as it related to some

8   of that income.  Do you recall that testimony?

9   A.  I certainly do.

10  Q.  What comment, if any, do you have with respect to the PRC

11  question?

12  A.  Those funds that were discussed, the lion's share of that

13  was really from my wife's employment at MCI.  She was laid

14  off -- when WorldCom purchased MCI, she was laid off at the end

15  of 1998.  She had a rather substantial benefit, based on her

16  years of service, that was paid at the end of 1998.  Obviously,

17  taxes and withholding was done on that.  When I say "taxes,"

18  I'm talking about payroll taxes, Social Security, and Medicare.

19  And we decided that since we did not believe that was taxable

20  income, that we would correct those W-2s and make a request for

21  a refund.

22  Q.  Just a couple of more questions.  I won't say one last

23  question, because I've never been correct when I said it.

24       But do you expect to be issued SFRs or otherwise be

25  assessed taxes and forced to pay them on at least some of these

479

Lawrence Martin Birk - Direct

1   tax years at some point regardless of the outcome of this case?

2   A.  I would hope to avoid going down that path again and having

3   the IRS prepare returns.  I believe it's fair to say that my

4   wife and I are poised regardless of the outcome of this case to

5   file those returns, to work with the IRS, to get squared away

6   on that.  We're retired now.  We don't need these kind of --

7   these kinds of things in our lives.  So I would intend to avoid

8   going through that whole process again and to approach the IRS

9   and sit down, get the paperwork done, get into an offer in

10  compromise, and call it good.

11  Q.  Trepidatiously, I'll say this, one last question --

12          THE COURT:  Perhaps with subparts.

13          MR. HARRIS:  Perhaps.

14  BY MR. HARRIS:

15  Q.  Why are you pleading not guilty?

16  A.  I believe that the research I've done on the federal tax

17  system, the original intent of those who wrote the tax laws,

18  the 16th Amendment, even back to the Constitution itself, the

19  original intent of those taxing clauses, gave me an

20  understanding of the true nature of the income tax.  And it was

21  my sincere belief that the tax laws were being misapplied.  I

22  think that it's fair to say that the government and, for the

23  most part, the lower courts, believe that the 16th Amendment

24  did authorize some kind of unapportioned direct tax or perhaps

25  a -- some unknown third kind of tax, and I disagree with that.

Lawrence Martin Birk – Direct

1  I believe that that is not what the law says and the Supreme

2  Court cases that surround it, and that is my belief.

3        MR. HARRIS:  No further questions.

4        THE COURT:  Very well.  Cross-examination for the

5  Government?

6        Mr. Magnani.

7        MR. MAGNANI:  Your Honor, at this time can we have

8  that 105 instruction, please?

9        THE COURT:  You may.

10        Ladies and gentlemen of the jury, you are instructed

11  as follows:  At various times during the testimony of the

12  defendant, he expressed his beliefs and understanding or

13  referred to exhibits in which he expressed his beliefs and

14  understanding about his legal duty to pay federal income taxes.

15  This testimony and those exhibits may only be considered by you

16  for the limited purpose of determining what the defendant

17  believed or understood about his legal duty to pay federal

18  income taxes.  This testimony and those exhibits may not be

19  considered or accepted by you as correct statements of the

20  applicable law governing the legal duty to file federal tax

21  returns or to pay federal income taxes.

22        It is the duty of the Court, not a party or an

23  attorney, to explain to you the law that applies in this trial.

24  You may not rely on any statements of law expressed by the

25  defendant in his testimony or in the exhibits to which he

481

Lawrence Martin Birk - Cross

1    referred.  Instead, you may rely only on the law as the Court

2    gives it to you in the final jury instructions at the end of

3    this case.  It is your sworn duty to follow all of the rules of

4    law as the Court explains them to you, and you are so

5    instructed.

6           Now, I reiterate my earlier question,

7    cross-examination for the Government?

8           *MR. MAGNANI:*  Thank you, Your Honor.

9           *THE COURT:*  You're welcome.

10                         **CROSS-EXAMINATION**

11   *BY MR. MAGNANI:*

12   *Q.*  Good afternoon, Mr. Birk.

13   *A.*  Good afternoon, sir.

14   *Q.*  Did you understand the instruction that the judge just gave

15   to everyone in this room?

16   *A.*  I believe I did.

17   *Q.*  And so do you understand that, basically, it's the Court's

18   duty to interpret the law?

19   *A.*  I understand that.

20   *Q.*  And that it's the Court's job to say what the law is --

21          *MR. HARRIS:*  Objection.  401, 402, 403.  Relevance.

22          *THE COURT:*  Response.

23          *MR. MAGNANI:*  The defendant's understanding of what

24   the law is, is at the heart of this case, Your Honor.  It's

25   imminently relevant.

Lawrence Martin Birk - Cross

1       THE COURT:  It's relevant under Rule 401, thus

2   ostensibly admissible under Rule 402.  Its probativity is not

3   substantially outweighed by any one or more of the six dangers

4   made the focus of Rule 403.  So those bases of objection are

5   respectfully overruled, and the examination may continue.

6   *BY MR. MAGNANI:*

7   *Q.*  Do you need me to repeat the question --

8   *A.*  No, I understand.

9   *Q.*  And so do you understand, although you may have opinions

10  about the law, it's ultimately the courts that get to say what

11  the law is?

12  *A.*  I understand that.

13  *Q.*  You mentioned a lot of cases.  Are you familiar with

14  *Marbury v. Madison*?

15  *A.*  I am.

16  *Q.*  Ever since 1803, that's what the law has been in this

17  country?

18  *A.*  I understand that.

19  *Q.*  Now, you don't think that means that because the courts

20  have that power, that's not a judicial conspiracy, is it?

21  *A.*  No, it's not.

22  *Q.*  Well, let me switch gears.  You mentioned that you're

23  recently retired?

24  *A.*  That's correct.

25  *Q.*  Okay.  And -- I'm sorry, can you remind us again, when did

Lawrence Martin Birk - Cross

1    you say you retired?

2    A.   Last December.

3    Q.   You say you're 65?

4    A.   I'm 65.

5    Q.   And how much money do you have saved for retirement?

6    A.   I never really thought about -- probably $50,000, I guess,

7    in liquid assets, and my home, which is paid for and probably

8    worth 3 or 400K.  Depends on the market.

9    Q.   Sure.  And just to sort of get through the jargon, when you

10   say liquid assets, do you mean cash?

11   A.   I would say cash, other liquid kinds of assets that you

12   could sell.  I've got some machinery that I kept from the

13   business that has some value, motor vehicles, just liquid

14   assets.  If I needed money, I could go sell something.

15   Q.   And apart from the liquid assets that you're referring to,

16   do you have any other bank accounts?

17   A.   No, I do not.

18   Q.   Stock accounts?

19   A.   I do not.

20   Q.   I should clarify, when I'm asking the questions, did the

21   answers that you gave, does that apply to your wife, as well?

22   A.   That's correct.

23   Q.   So you're an MBA --

24   A.   (Nodded head.)

25   Q.   I'm sorry.  You have to answer yes.

484

Lawrence Martin Birk - Cross

1    A.   Yes, I am.

2    Q.   Okay.  You run a business?

3    A.   I did.

4    Q.   You created profit and loss statements?

5    A.   I did.

6    Q.   So do you think that you can live the rest of your life on

7    $50,000?

8    A.   That is not my plan.  The short answer is, I am truly

9    blessed to have some very deep pockets in the family, on both

10   my wife's side and mine.  There will be some inheritance kinds

11   of transactions at some day in the future, should I live long

12   enough to enjoy that.

13   Q.   And is -- you heard Ms. Trabold testify earlier?

14   A.   I did.

15   Q.   Okay.  And so is it fair to say that your folks or Jean's

16   folks are giving you guys some money now?

17   A.   We've been getting a gift once a year from my mother and

18   from her father.  It's not a big number.  Whatever the gift

19   threshold is.  I think it's $14,000 now.

20   Q.   Okay.

21   A.   That certainly factors into, you know, the cash we have to

22   live.  It's not cash in my pocket until I get ETA check, but

23   those -- those deposits would certainly be reflected in my bank

24   records.

25   Q.   And are gifts taxable, as you understand it?

485

Lawrence Martin Birk - Cross

1   A.   No, they're not.  Up to that threshold.

2   Q.   What about inheritance, is that taxable?

3   A.   I think it is, both at the federal and state level.  I

4   think there will be some tax liability when that happens.

5   Q.   You -- and please correct me if I misquote you.  But I

6   think you said on direct that if the government pays it, they

7   can tax it, or something to that effect?

8   A.   It's a general rule.  I think unless it's, like, disability

9   payments and things that are, you know, of law.  Generally

10  speaking, yes.  Like a Social Security check, you bet.

11  Q.   So if the government pays wages to me, for example, that

12  can be taxed?

13  A.   Yes.

14  Q.   Okay.  Now, also, just drawing on your experience as an

15  MBA, do you think that the government could fund itself only

16  from taxing government employees?

17  A.   No, no.  There is indirect taxes, duties, tariffs, excises.

18  And then there is, of course, the Federal Reserve system, and

19  we all know what is going on there.

20  Q.   Now, do you remember when Mr. Harris gave his opening

21  statement, and he said that it wasn't because you thought you

22  were someone special.  That's not why you stopped paying;

23  right?

24  A.   That's correct.

25  Q.   And you agree with that?

486

Lawrence Martin Birk - Cross

1   A.   I do.

2   Q.   Would you agree you've gotten an extra special amount of

3   attention from the federal government over the years?

4   A.   I have.  And believe me, I know a lot of other folks that

5   have been in the tax honesty movement that have also received a

6   lot of attention.

7   Q.   And is some of that attention what your lawsuit was about,

8   the retaliation that you mentioned in the lawsuit?

9   A.   Not the lawsuit, *per se*.  The lawsuit was specifically to

10  the right to petition.

11  Q.   But in the lawsuit, there were two claims; right?

12  A.   The first claim -- we're talking about the right to

13  petition lawsuit?

14  Q.   I'm sorry.  I'll just be clear.  In the lawsuit that We the

15  People filed with 1,000 something plaintiffs --

16  A.   Yes.

17  Q.   -- there were two claims in that lawsuit; correct?

18  A.   I believe there was.

19  Q.   And one of the claims was basically, we are

20  constitutionally entitled to a response from the government?

21  A.   That is correct.

22  Q.   The other one is that the government should be enjoined,

23  prevented from retaliating against us for holding these views?

24  A.   That's correct.

25  Q.   So the retaliation was about the government attention that

487

Lawrence Martin Birk - Cross

1    was focused on those folks in the movement?

2    A.   That was my intent of that statement; correct.

3    Q.   Just speaking -- Mr. Harris asked you a little bit about

4    the intent of your statements.  Would you agree as you sit here

5    today and you read some of those statements, would you forgive

6    someone for someone perceiving them as threatening?

7    A.   I would forgive them.  I got asked that point-blank by a

8    special agent on my property one day.  He put that letter in my

9    face -- it wasn't George; I don't believe, it was.  It was an

10   older gentleman, very large.  He put that letter in my face and

11   said, What do you mean by that?

12   Q.   Was that the gentleman who came with Ms. Morgan, who

13   testified earlier?

14   A.   Correct.

15   Q.   Okay.  So you sent the letter to Ms. Morgan first; and then

16   she came to your property with an older gentleman, as you

17   described it?

18   A.   With six agents.  Yes.

19   Q.   Okay.  Those agents were armed?

20   A.   They had body armor on, so I don't know for sure.  There

21   were also still some sitting in vehicles.

22   Q.   My question is, would you forgive Ms. Morgan for after

23   receiving your letter, talking about the only nonviolent means,

24   for not coming alone to your house?

25   A.   Absolutely.  I fully appreciate.  The frustration was

488

Lawrence Martin Birk - Cross

1    probably showing in any correspondence by then.

2    Q.  Okay.  So I just want to run through a few things that I

3    hope are not too controversial.  So you understand that in this

4    case, you know, the Government has a burden to prove certain

5    elements?

6    A.  I do.

7    Q.  Okay.  And my understanding is that you don't contest any

8    of those elements except for one; is that right?

9    A.  If you could --

10   Q.  Sure --

11   A.  -- remind me of the elements.  Be specific.

12   Q.  Okay.  Sure.

13        MR. HARRIS:  He's here to testify about facts, not to

14   interpose his views of the law.  It's burden shifting.

15        THE COURT:  Response.

16        MR. MAGNANI:  There is only one fact in dispute in his

17   question, Your Honor, and it's about what is in the defendant's

18   brain.  And so these questions are probative of that.  And it's

19   only circumstantial evidence that the Government can rely on in

20   this case.

21        THE COURT:  Well, you know, you can ask specific

22   questions without framing them in the essential elements on the

23   law, which I will instruct the jury concerning.  And you simply

24   can proceed on that basis.

25        MR. MAGNANI:  Very well.

489

Lawrence Martin Birk - Cross

1    *BY MR. MAGNANI:*

2    *Q.*  So just -- we'll keep it simple.  You agree that between

3    1998 and 2005, you worked every year?

4    *A.*  I did.

5    *Q.*  You made money?

6    *A.*  I did.

7    *Q.*  And you lived on that money?

8    *A.*  I did.

9    *Q.*  Okay.  And would you agree that the amounts of income that

10   were reported on the returns that you worked with Advanced Tax

11   on, those accurately reflected the amount of income you earned?

12   *A.*  In accordance with the rules that Advanced Tax Solutions

13   supplied, yes.

14   *Q.*  Now, before you -- you testified that in those early years,

15   you were still at PRC?

16   *A.*  Correct.

17   *Q.*  Can you just tell us, what exactly is it?  You said defense

18   contracting, but what did you do?

19   *A.*  PRC at that time was a subsidiary of Litton Industries, a

20   defense contractor.  We did a variety of design and support

21   activities for U.S. Space Command, Cheyenne Mountain, other

22   kinds of sensor systems, we'll call them.  I can't say any more

23   than that, because I'm still bound by my agreement.

24   *Q.*  Okay.  What was your job there?

25   *A.*  I started out as what they call a logistics support

490

1    analyst.  What that entails is defining operation and support

2    requirements, spare parts, operation and maintenance manuals,

3    training, teaching the government end user how to operate and

4    maintain the system.  That basically encompasses that.

5    *Q.*  And so when you're talking about this -- was your client

6    the Department of Defense?

7    *A.*  Yes, it was -- Department of Defense, Air Force, Space

8    Command, other entities.

9    *Q.*  Okay.  Now, for your 1998 return --

10   *A.*  Uh-huh.

11   *Q.*  -- the one you filed before Advanced Tax Solutions.

12   *A.*  Okay.

13   *Q.*  Do you recall that?

14   *A.*  Yes, I do.  The corrected W-2 one.

15   *Q.*  Exactly.  So you -- PRC Inc., your company, gave you a W-2

16   at the end of the year?

17   *A.*  Correct.

18   *Q.*  That W-2 said that they paid you a lot of wages?

19   *A.*  Correct.

20   *Q.*  You asked them if they would issue you a W-2 that said they

21   paid you no wages?

22   *A.*  I'm not sure if that's correct.  What I did was I asked

23   them to correct the W-2 -- there is a line -- there is a

24   number -- as you well know, there is different blocks on that

25   W-2 that define what kinds of income you've received.  And what

Lawrence Martin Birk - Cross

1   I was asking them to do is correct the taxable income line and

2   zero that out, because I did not believe it was taxable income.

3   They, obviously, refused to do that.

4   Q.  Well, there is not a taxable income on a W-2.  Isn't the

5   first line on a W-2 wages?

6   A.  Wages, okay.  I agree with that.

7   Q.  On your tax return you put zero for wages?

8   A.  Correct.

9   Q.  And you had asked them if they would put zero for wages on

10  the W-2?

11  A.  I did.

12  Q.  Okay.  So they disagreed with your reading of the law, and

13  they refused to do it?

14  A.  I expected that.  Yes.

15  Q.  Now, you said if the government pays, it can tax it.  Does

16  that not apply if they pay a contractor?

17  A.  It would apply to the contractor, certainly, as a

18  corporation, but not their private sector employees.  It's a

19  different thing than, say, working for a civilian Department of

20  Defense.

21  Q.  Now, switching over from being a W-2 wage earner -- is that

22  term something you're comfortable with?

23  A.  Yes.

24  Q.  Okay.  Switching over to being your own businessman, did

25  that mean that you were no longer required to have taxes

492

Lawrence Martin Birk - Cross

1    withheld from your income?

2    A.   I believe that.  Yes.

3    Q.   And you switched over in about 2000?

4    A.   The first quarter of 2000; that is correct.

5    Q.   And you agree that even though taxes are no longer

6    withheld, it is the IRS's position that you still owed tax?

7    A.   I understand that.  Yes.

8    Q.   And just so we're clear, is it also true that between 2006

9    and up until your retirement, you continued to build log homes

10   for your company?

11   A.   That's correct.

12   Q.   You continued to make profit?

13   A.   I continued to earn income, yes.

14   Q.   Okay.  Is -- well, let me ask you this:  Was the income you

15   earned greater than the money that you spent to earn that

16   income?

17          I'll ask a different question, were you in the black

18   or in the red?

19   A.   Sometimes I was in the red.

20   Q.   Okay.

21   A.   But depended on the project.  I obviously endeavored not to

22   do that.  But we had to operate on a pretty slim margin up

23   there in central Colorado, so --

24   Q.   Now, after not -- when you first dropped out of the system,

25   the IRS audited you; right?

Lawrence Martin Birk - Cross

1    A.   I never went to a face-to-face audit; so from that

2    perspective, no.   They were conducting audits for the purpose

3    of creating SFRs.

4    Q.   So did the IRS audit you?

5    A.   I did not participate in that.   No.

6    Q.   Sorry.   My question is, did they audit you?

7    A.   I -- yes.   They audited me without my presence or my

8    participation.

9    Q.   You didn't -- did they invite you to participate?

10   A.   I don't recall getting invited to an audit.   I got some

11   letters requesting some documentation.   But I didn't -- I've

12   been to an audit.   I went to one in my life.   I spent 27 years

13   as a W-2, including my military service; and I did my own taxes

14   for 27 years.   I got audited one time, and I paid the amount at

15   the audit, $1.26.

16   Q.   I'm sorry.   My only question was, did you participate in

17   the audit?

18   A.   No.

19   Q.   You saw Ms. Applegate testify?

20   A.   I did.

21   Q.   Okay.   And would you agree that she sent you a letter and

22   that you called in response and left her a voicemail?

23   A.   Yes, I remember that.

24   Q.   And would you agree that you would not give her any bank

25   records?

Lawrence Martin Birk - Cross

1   A.   I -- I wouldn't give her any records.

2   Q.   And when your bank, Park State Bank & Trust, got a summons,

3   you reached out to them and told them not to give up any

4   records?

5   A.   No, I did not --

6   Q.   You --

7   A.   I did not instruct them to do that.  The only notification

8   that I got was a letter from the president of the bank, wanting

9   to close my accounts.

10  Q.   And when --

11  A.   And then I found out when I went in to talk to him that it

12  had to do with the summons.  So we worked out an agreement.  I

13  said, I'll take care of my issues.  Don't worry about me suing

14  the bank.  He said, fine.  You can have your accounts.

15  Q.   So is it your testimony that you never threatened to sue

16  the bank at first?

17  A.   I never threatened to sue the bank.

18  Q.   But the resolution was, I'll promise not to sue you, and

19  you can --

20  A.   They were good with that.  Absolutely.

21  Q.   Okay.

22  A.   I never tried to quash the summons.  I didn't have anything

23  to hide.

24  Q.   Now -- and do you agree with the witnesses and exhibits

25  that show that you have not voluntarily paid a dollar in tax

Lawrence Martin Birk - Cross

1   since 1998?

2   *A.*  I agree with that.

3   *Q.*  And is that also true for the state of Colorado?

4   Voluntarily, I'm talking about.

5   *A.*  Aside from withholding, that's correct.

6   *Q.*  And does -- now, shortly after you got those notices of

7   intent to levy, is that about the time frame when you stopped

8   using your personal account?

9   *A.*  I'd say that's correct.

10  *Q.*  And that's when you started using your business account for

11  personal expenses?

12  *A.*  Certainly started using it a lot more.  That's correct.

13  *Q.*  It's your only bank account at that point?

14  *A.*  My only bank account with a debit card.  I still had

15  another account, but we didn't use it much.

16  *Q.*  You agree that about a million six of official checks

17  coming out of that account?

18  *A.*  That's the record.  I don't have that number handy, but I

19  assume that Park State Bank & Trust keeps good records and that

20  the IRS does too.

21  *Q.*  Well, I don't want you to assume.  Sir, I mean, if the

22  question is you don't know, that's fine.  You can say you don't

23  know.

24  *A.*  I don't know.

25  *Q.*  Okay.  You don't have any reason to dispute that figure?

496

Lawrence Martin Birk - Cross

1    *A.*  No.

2    *Q.*  And also you don't dispute that you did all of this to

3    protect against the IRS or the Department --

4    *A.*  No, that --

5    *Q.*  I'm sorry.  If I could --

6    *A.*  That is not correct.

7    *Q.*  Oh, I want to make sure so it's clear for the court

8    reporter and the record.  My question is, did you engage in the

9    official check buying to prevent the IRS and Colorado

10   Department of Revenue from sweeping your account?

11   *A.*  Not entirely.  No.

12   *Q.*  In part?

13   *A.*  In part, I did.  Yes.

14   *Q.*  Okay.  Now I'd like to ask you about -- that's what you

15   told Agent Hopping?

16   *A.*  Absolutely.  Had nothing to hide.

17   *Q.*  Now, I want you to focus on TAMI.  And since you said you

18   have nothing to hide, why did you incorporate TAMI and open a

19   bank account as a conduit?

20   *A.*  I needed to have a conduit to do those transfers from the

21   custodians who -- various custodians to an account that I had

22   access to so that I could use those funds.

23   *Q.*  So you had an IRA at Park State Trust, didn't you?

24   *A.*  I had an MSA.

25   *Q.*  Talking about an IRA?

497

Lawrence Martin Birk - Cross

1  *A.*  I don't know that I had an IRA at Park State.  I don't

2  remember having one.

3  *Q.*  So some of the money came from Janus, for example?

4  *A.*  That was my wife's funds.

5  *Q.*  So there was nothing preventing you from saying, hey,

6  Janus, that's my money.  Just send it to my personal account.

7  *A.*  That's correct.

8  *Q.*  If you did that, they would have withheld tax?

9  *A.*  That's correct.  A tax that I did not believe I owed.

10  *Q.*  And so -- you had had tax withheld from earlier

11  distributions that you had taken from retirement accounts.

12  If -- I'll ask a clearer question.

13       Before you created TAMI, you had taken other

14  retirement distributions, and tax was withheld?

15  *A.*  I'm thinking about that.  There might have been one that I

16  did, and I'm trying to remember when that would have been.  I'm

17  thinking it was, I don't know, $30,000 or something.  But there

18  was one.  Yes.

19  *Q.*  And not to get into specifics, but -- and you got a

20  record -- a tax record about that distribution at the end of

21  the year called a 1099; right?

22  *A.*  I did.

23  *Q.*  And when you got that 1099, you brought it to Advanced Tax

24  Solutions and gave it to Mr. Erikson.

25  *A.*  Are we talking -- we're talking about the --

498

Lawrence Martin Birk - Cross

1   *Q.*   So --

2   *A.*   -- '98 and subsequent distributions, not prior to that.

3   Because mine would have been prior to that.

4   *Q.*   And when I'm asking about yours, I'll just say yours or

5   your wife's, if that's easier.

6   *A.*   That's fine.

7   *Q.*   So you brought Mr. Erikson 1099s showing that you had

8   retirement distributions; right?

9   *A.*   I did.

10   *Q.*   And that factored into his tax preparation; right?

11   *A.*   That's correct.

12   *Q.*   And you agree, though, that you didn't tell him about TAMI

13   as this conduit?

14   *A.*   Only from the standpoint that I was using that to -- as a

15   conduit for personal funds.

16   *Q.*   So I guess my question is, you did not tell Mr. Erikson

17   that you took over $400,000 in retirement assets, put it into

18   TAMI, and then into your business?

19   *A.*   Not specifically, I didn't.  No.

20   *Q.*   Did you tell him that in any way?

21   *A.*   I don't recall doing that.  I think when the information

22   from the IRS came back, he had some questions, and I explained

23   what that was.  I was not intending to mislead him.  I honestly

24   believed that was not taxable income.  It was personal funds.

25   *Q.*   So why did you give him the 1099s for other distributions

Lawrence Martin Birk - Cross

 1   for him to use in his tax analysis?

 2   *A.*   What were the other 1099s --

 3   *Q.*   The 1099 --

 4   *A.*   Other than the rollover ones, there was other 1099s?   I

 5   don't recall hearing about those.

 6   *Q.*   I'll move on.

 7   *A.*   Or what they would be.

 8   *Q.*   So -- now, you said that you terminated Advanced Tax after

 9   you filed the tax returns?

10   *A.*   Correct.

11   *Q.*   Just briefly, why did you terminate them?

12   *A.*   I -- I believed that we were done with that phase, which

13   was to get those returns produced and filed.

14   *Q.*   And so -- I'm sorry.   One more question on TAMI.   I want to

15   make sure I just understand this.

16         When you talk about the conduit, is it your testimony

17   that you used TAMI as a way to avoid paying withholding on a

18   tax you didn't believe in?

19   *A.*   Yes.

20   *Q.*   Okay.   So you started your testimony -- and forgive me if

21   I'm misquoting you -- but you basically said you might file tax

22   returns going forward or you might not, or it may become

23   necessary?   What was it that you said?

24   *A.*   I think sitting here today, that there is a -- some

25   certainty that's going to happen, that I will be going back and

Lawrence Martin Birk - Cross

1    filing those returns, working with the IRS to resolve this

2    matter.  I'm retired now.  I don't -- I don't need any more of

3    this, and I know my wife doesn't.

4    Q.  Just today, as you sit here, do you believe that you are

5    required to file a tax return?

6    A.  I do not.

7    Q.  So what about on your wife's social security income that

8    she's drawing?

9    A.  Yes.

10   Q.  And --

11   A.  There will be a 2019 return filed.  I can assure you of

12   that.

13   Q.  And what about you, are you going to take social security?

14   A.  Maybe some day.  I'm not in a hurry to do that until age

15   70.

16   Q.  Now, you mentioned that you don't -- that you haven't paid

17   federal tax in about 20 years; right?

18   A.  About 20 years.  That's correct.

19   Q.  Or Colorado state tax?

20   A.  Or Colorado state tax.

21   Q.  What about real estate tax?

22   A.  That's a direct tax that's levied on property by the

23   state -- by the county, actually, is who collects it.  I'm good

24   with that.

25   Q.  So, sorry, is the answer yes?

501

Lawrence Martin Birk - Cross

1    *A.*   Yes.

2    *Q.*   Yes, that you do pay real estate tax?

3    *A.*   I do.

4    *Q.*   Do you pay vehicle tax?

5    *A.*   I do.

6    *Q.*   And how many vehicles would you say you've owned since

7    1998?

8    *A.*   Oh, my gosh.  Including trailers and special mobile

9    equipment and machinery, maybe a dozen.

10   *Q.*   And you've always paid your taxes on those things?

11   *A.*   I did.

12   *Q.*   Okay.  Now, why don't you pay the state tax?

13   *A.*   Thirty-four states in the union have what we call a

14   piggyback tax.  That means if you look at the implementing

15   statute and regulation at the state level, you always start out

16   with your federal tax liability.  Typically, you take your

17   federal adjusted gross income and add your state deduction to

18   it, and that's where you start.  It's Article 39, I think

19   Section 24 -- 22, Paragraph 104.

20   *Q.*   Of --

21   *A.*   Colorado Revised Statute.

22   *Q.*   Just so -- I just want to make sure I clearly understand

23   your position.  So are you saying that because the state tax

24   relies on the federal tax computations, therefore, it's not

25   lawful?

502

Lawrence Martin Birk - Cross

1    *A.*  Well, it's -- if I -- I would say that if I don't have a

2    federal tax -- if I don't believe I have a federal tax

3    liability, I don't have a state tax liability.  The state wrote

4    the law.

5    *Q.*  Okay.  And now the -- is it also true if you don't pay your

6    real estate tax, the state will take your house?

7    *A.*  I believe that will happen.

8    *Q.*  But, I mean, the IRS, you heard from agents, that they

9    can't really take a house that you live in with much ease.

10   *A.*  Oh, no.  I --

11   *Q.*  So if you don't pay your vehicle tax, can they suspend your

12   registration on your cars?

13   *A.*  Well, it will expire; and then you get to talk to the

14   sheriff's deputy or the trooper or whoever notices that.  And

15   there is a penalty applied.

16   *Q.*  So -- now -- and just -- if I'm not phrasing this

17   accurately, please correct me.  But is, basically, your basic

18   position that you would file taxes if you got a sort of

19   tailored explanation to your particular issues from the IRS?

20   *A.*  Well, from the government, the IRS, somebody in Congress.

21   I want the issue of the unapportioned direct tax on our incomes

22   to be addressed.

23   *Q.*  And you tried to raise this with several appeals officers,

24   for example?

25   *A.*  I did.

503

Lawrence Martin Birk - Cross

1   *Q.* Three of whom testified in this trial?

2   *A.* Correct.

3   *Q.* And, basically, they said, I'll listen to your argument but

4   not really engage, but just sort of be polite and ignore it?

5   *A.* I don't think we got that far.

6   *Q.* Okay. So do you think that an appeals officer at the IRS

7   has the power to interpret statutes and the Constitution?

8   *A.* No, I don't. But they have a chain of command also. And

9   all I was really asking was for them to accept many materials I

10  had provided and to take -- take that up the chain of command,

11  and maybe I would get a response.

12  *Q.* So the answer is no, you don't --

13  *A.* No.

14  *Q.* -- don't think they have it?

15  *A.* No. They don't have.

16  *Q.* And so you know that at the top of that chain of command,

17  their position is, you have to pay tax on income you earn in

18  this country?

19  *A.* Well, so far that's been true. Yes.

20  *Q.* That's always been true, the last 100 years?

21  *A.* Well, I guess you could make that statement. Sure.

22  *Q.* Now -- and you're aware that no court in this country has

23  ever said anything other than that folks have to pay tax on the

24  income earned in this country?

25  *A.* I'll accept that for face value.

Lawrence Martin Birk – Cross

1    Q.  Well, I'm just asking if you're aware of it.  I don't want

2    you to accept what I'm saying.

3    A.  Well, I don't know that that's true.  No.

4    Q.  Now, you mentioned that you were skeptical of folks who

5    sold silver bullet "here's the way to get out of taxes"

6    packages?

7    A.  True.

8    Q.  Okay.  So you never fell for any of those silver bullet

9    schemes?

10   A.  No.  I don't ever remember signing up or buying something

11   like that.  No.

12   Q.  But you just did your own research?

13   A.  I did.

14   Q.  And you mentioned spending -- was it 50 bucks a month, was

15   it?

16   A.  Well, yeah, that was kind of almost like association dues.

17   I was just supporting the home team.

18   Q.  And so -- and the home team, this is We the People?

19   A.  We the Peopled Foundation; correct.

20   Q.  And We the People -- you mentioned John Turner.  You

21   described him I think as a *pro se* litigant?

22   A.  That was the chairman, Mr. Schultz.

23   Q.  Bob Schulz?

24   A.  Right.  Mr. Turner was a former revenue officer out of

25   Washington state, I think.

Lawrence Martin Birk - Cross

1   *Q.*  Mr. Schulz -- so when you say *a pro se* litigant, that means

2   he wasn't a lawyer; right?

3   *A.*  No, he was not a lawyer.

4   *Q.*  And you mentioned that meeting you went to in D.C.  Were

5   there a lot of the big members of the movement there?

6   *A.*  Yes.

7   *Q.*  Larry Becraft, was he there?

8   *A.*  Yes.

9   *Q.*  You know who he is?

10  *A.*  Yes.

11  *Q.*  An attorney from Alabama?

12  *A.*  Yes.

13  *Q.*  Okay.

14  *A.*  I know him.

15  *Q.*  You're aware he's been sanctioned by the courts for making

16  frivolous tax arguments?

17  *A.*  At least once.

18  *Q.*  For arguing that the 16th Amendment was not properly

19  ratified?

20  *A.*  I am aware of that.

21  *Q.*  Okay.  And that case is cited in that big packet that the

22  IRS sent you; isn't it?

23  *A.*  It is.

24  *Q.*  And you also mentioned Mr. Banister.  I think you said he

25  was the IRS agent and CPA?

Lawrence Martin Birk - Cross

1    *A.* He was a -- yeah. He called himself a forensic CPA. He

2    was a special agent, CID agent.

3    *Q.* He's not a special agent anymore, is he?

4    *A.* No, he's not.

5    *Q.* He's not a CPA anymore; right?

6    *A.* Not that I know of.

7    *Q.* He was disbarred from being a CPA?

8    *A.* Yes.

9    *Q.* He was indicted criminally?

10   *A.* He was.

11   *Q.* Okay. Now, the folks that testified here, the CPAs,

12   Mr. Erikson and Mr. Whalen, haven't been indicted; right?

13   *A.* Not that I'm aware of.

14   *Q.* Still have their CPA licenses?

15   *A.* Yes.

16   *Q.* Okay. But you didn't agree with them and their

17   understanding of how the system works?

18   *A.* I'm -- I really didn't discuss that aspect of it. I knew

19   they were going to apply the rules as they understood them, and

20   I was okay with that.

21   *Q.* And so you -- you mentioned the American Rights Litigators

22   earlier.

23   *A.* Yes.

24   *Q.* And I think you said -- and correct me if I'm wrong -- you

25   hired them to do some consulting and write letters?

Lawrence Martin Birk - Cross

1   *A.*   Correct.

2   *Q.*   And when you say "write letters," do you mean send

3   correspondence to the IRS on your behalf?

4   *A.*   Yes.

5   *Q.*   So it's true that one of those folks was your power of

6   attorney --

7   *A.*   That's correct.

8   *Q.*   -- before the IRS?

9   *A.*   You bet.

10  *Q.*   And that person's name was Brian Malatesta?

11  *A.*   That sounds right.

12  *Q.*   And he was a CPA?

13  *A.*   That sounds right.

14  *Q.*   Not anymore?

15  *A.*   That's my understanding.

16  *Q.*   And he was enjoined by a federal court -- prevented from

17  representing folks before the IRS?

18  *A.*   I don't know about that, but -- could be.

19  *Q.*   He wasn't your CPA for long.

20  *A.*   No, he wasn't.  I ceased activity with that group.

21  *Q.*   Now -- so why -- well, let me just ask you:  You never

22  hired a lawyer to serve as your counsel and give you advice on

23  taxes?

24  *A.*   I did not.

25  *Q.*   You never pressed your case in a court?

Lawrence Martin Birk - Cross

1    *A.*   I did not.

2    *Q.*   Not tax court?

3    *A.*   Not a tax court.

4    *Q.*   Not in Article III court?

5    *A.*   No.

6    *Q.*   Okay.  And is -- but you understand that legal

7    controversies are decided in courts; right?

8    *A.*   Unless there is -- like the anti-injunction act that I

9    referred to previously, where you're not allowed to go to the

10   court --

11   *Q.*   And that --

12   *A.*   -- with a tax matter.

13   *Q.*   But that holding was decided in a court; right?  Judge

14   Kavanaugh, he's the one that said that; right?

15   *A.*   I believe so.

16   *Q.*   Okay.  Do you understand in this country, courts are where

17   we settle legal disputes?

18   *A.*   I agree with that.

19   *Q.*   Okay.  Not in appeals conferences or places like that?

20   *A.*   True.

21   *Q.*   Not on the phone with your auditor?

22   *A.*   True.

23   *Q.*   And isn't it true that in one of your letters you wrote --

24   that you basically said, you had no chance winning in the

25   courts.

Lawrence Martin Birk - Cross

1   *A.*   I don't recall what letter that was, but -- it's possible

2   that I would have said something like that out of frustration.

3   *Q.*   So does that mean that you didn't really mean it?

4   *A.*   I'm sure when I wrote it, I did.

5   *Q.*   So you knew when you wrote that letter that you had no

6   chance of prevailing in court?

7   *A.*   I don't believe I had any intent to use the court at that

8   time.  I was going to use the right to petition and the

9   Congress, who makes the laws, to try to resolve the matter.  I

10  thought our chances were far better with the Congress.

11  *Q.*   So you didn't -- you did not intend to use the courts?

12  *A.*   I did not intend to use the court.

13  *Q.*   And when you say "petition," do you mean like that letter

14  you sent to Congressman Lamborn?

15  *A.*   No.  The petition for redress itself.

16  *Q.*   So --

17  *A.*   All I was doing is informing him that we had done so and

18  that he had not responded.

19  *Q.*   So why would you have said that you had no chance in court

20  and that you were going to rely on the petition process even

21  after the Supreme Court denied the We the People lawsuit?

22  *A.*   We, first of all, I guess I was not surprised that that

23  happened.  I had high hopes that we would get into the Supreme

24  Court with that issue.  In fact, the appeals court, Judge

25  Rogers, wrote in her opinion that it would be interesting to

510

Lawrence Martin Birk - Cross

1  see how the Supreme Court would handle it, since it was a first

2  impression constitutional issue.  It never had been

3  adjudicated.  So that did not happen.

4  Q.  Now, you just mentioned the Constitution.  And correct me

5  if I'm wrong, but you testified on direct -- you said, I

6  believe the tax system is 100 percent constitutional.  Was that

7  your testimony?

8  A.  I believe it is, if it's properly applied.  Absolutely.

9  Q.  Okay.  But in your testimony, you referenced Article I of

10  the Constitution?

11  A.  Correct.

12  Q.  First Amendment?

13  A.  Correct.

14  Q.  Second Amendment?

15  A.  I did.

16  Q.  Fifth, Ninth, and Tenth?

17  A.  Sure.

18  Q.  16th?

19  A.  You bet.

20  Q.  So -- and in your letters you reference several Amendments

21  to the IRS?

22  A.  Yes.

23  Q.  Now, when you say that you believe the tax system is

24  100 percent constitutional -- well, let me withdraw that

25  question.

511

Lawrence Martin Birk - Cross

1          You know that no court has ever held the tax system

2    unconstitutional; right?

3    *A.*   Correct.

4    *Q.*   Would you agree that in your correspondence, however, you

5    claimed that the tax system was not constitutional?

6    *A.*   If I said that, it was probably related to the 16th

7    Amendment issue.

8    *Q.*   Okay.  And so -- but is the answer yes --

9    *A.*   Yes.

10   *Q.*   -- that you said that.

11          Okay.  Are you saying that your view has changed from

12   when you wrote those letters to today?

13   *A.*   No.  I think it's a matter of interpretation.  I believe if

14   the tax laws are applied properly in accordance with the way

15   the tax code is written, within the boundaries of the

16   Constitution, that it is absolutely constitutional.  The

17   problem is the misapplication, not the least of which is a

18   direct unapportioned tax on our income.

19   *Q.*   When you use the words "direct" and "unapportioned," those

20   are constitutional terms, are they not?

21   *A.*   They are.

22   *Q.*   But you're saying your argument is not constitutional.

23   *A.*   My argument is not constitutional?  I'm not making an issue

24   out of the ratification of the 16th Amendment.  I talked to

25   that earlier.  I don't think it matters.  I think that Supreme

Lawrence Martin Birk - Cross

1  Court cases early on address those issues and certainly I

2  believe clearly stated that it did not create some kind of a

3  new tax and that it was an indirect tax --

4  Q.  Okay --

5  A.  -- with proper form and subjects.

6  Q.  You have said that the government violates the taxing

7  clauses of the Constitution; correct?

8  A.  I believe that is what we're facing today.  Yes.

9  Q.  So today as you sit here, you believe the government's

10 interpretation of the tax laws is violating the taxing clause

11 of the Constitution?

12 A.  Yes, I do.

13 Q.  Now, this -- the views that you have, do you espouse them

14 to other folks?

15 A.  Well, when I was associated with We the People, I certainly

16 did.  I went to meetings.  I even held meetings.  I was the

17 Park County coordinator for We the People Congress.

18 Q.  But today, do you try to get other people to not pay their

19 taxes?

20 A.  No.  I don't discuss it with anybody anymore.

21 Q.  Your kids, do they pay their taxes?

22 A.  They do.

23 Q.  Okay.  What about your clients, do you ever discuss it with

24 them?

25 A.  No.  I wouldn't say my clients.  I may have had some

Lawrence Martin Birk - Cross

1  discussions with subcontractors, but certainly not initiated by

2  me.

3  Q.  Let me ask you, you would agree that your view is an

4  outlier view?

5  A.  Yes.  I would say that it's not mainstream.

6  Q.  It's a view on the far fringes; would you agree with me?

7  A.  Perhaps you could categorize it as that.

8  Q.  Let me ask you this:  Besides you and your wife, do you

9  know anyone else that doesn't pay taxes?

10  A.  Yes.  I know quite a few people who don't.

11  Q.  Even though they earn income?

12  A.  Yes.

13  Q.  Who?

14  A.  Well, I can't divulge that.  I won't do that.  Why would I

15  do that?  Let's just say that up where I was running my

16  business, we had a lot of subcontractors, carpenters and

17  drywall guys and roofers, they don't even have bank accounts.

18  Q.  So --

19  A.  They want to be paid in cash.

20  Q.  So I'm asking you if you could tell us who the people that

21  you know are that don't pay taxes, even though they earn

22  income?

23      MR. HARRIS:  Objection.  Relevance as to the names of

24  individual people.

25      THE COURT:  Response.

514

Lawrence Martin Birk - Cross

1          MR. MAGNANI:  Your Honor, it goes to this witness's

2     credibility.  He's just testified he knows many people who

3     don't pay taxes.  And if he actually does, he should name them.

4     He has no privilege.

5          THE COURT:  Credibility is always relevant.  We start

6     in the Federal Rules of Evidence at 104(e), go quickly to Rules

7     401, 402, 403, and wind up at 611(b), just showing off.  The

8     objection is overruled.

9          Sir, you shall answer the question, as long as you

10    recall it and can answer it.

11         THE WITNESS:  Very well, Your Honor.

12         I know several -- I'll call them concrete flatwork

13    contractors that are outside the system.

14    BY MR. MAGNANI:

15    Q.  I'm sorry.  The question is, would you tell me the names of

16    the people you know who make income and don't pay taxes?

17         MR. HARRIS:  I think he's trying to answer the

18    question.  Maybe if Mr. Magnani gave him a chance.

19         THE WITNESS:  Greg -- you want full names?

20    BY MR. MAGNANI:

21    Q.  First and last names.

22    A.  Greg Langendorfer is one.  Oh, boy, I'm trying to remember

23    the other guy's last name.

24    Q.  How do you spell the last name?

25    A.  I think it's Langendorfer.  L --

Lawrence Martin Birk - Cross

1   Q.   Try your best.

2   A.   L-A-N-G-E-N-D-O-R-F-E-R.   I'm trying to remember the guys

3   that work on that crew.

4   Q.   What's the name of the crew?

5   A.   Oh, they're just a group of subcontractors that work for

6   many people.   Bona Fide Concrete Companies.   And when they need

7   help, they bring these guys in.

8   Q.   So the question is, what's the name of the crew?

9   A.   Of the crew?

10  Q.   So, Mr. Birk, if I wanted to find these people and bring

11  them into court to ask them the same questions, how would I

12  find them?

13  A.   Well, quite honestly, I have a hard time finding them

14  sometimes, up in Park County.   But I'm trying to remember some

15  more names for you.   I'm trying to multiplex here.

16  Q.   Sir, you were on a lawsuit with over 1,000 plaintiffs

17  claiming that the tax laws were unconstitutional.   Are you

18  saying that the only person that you can tell me --

19  A.   That was a long time ago.   And I didn't know a lot of these

20  people personally.

21  Q.   So is the answer -- so here is my question:   Are you

22  telling us the only person you can name is one guy who works on

23  a crew?

24  A.   No.   There is lots of contractors up there.   In many cases,

25  I don't even know their last names.

Lawrence Martin Birk - Cross

1   Q.   Okay.  So it's your testimony that you can't give the name

2   of a single person, except for this one person that you've

3   named and you don't know where he works?

4   A.   I don't -- well, he works at various places.  I don't know

5   where he lives.

6   Q.   Sir, you testified that you paid membership dues in an

7   organization; correct?

8   A.   I did.

9   Q.   That organization protested the tax system; correct?

10  A.   I don't know if I would the use the word "protest."  We

11  don't consider ourselves tax protesters.

12  Q.   Sure.  That organization filed a lawsuit in federal court

13  saying they don't have to pay federal taxes because of their

14  First Amendment rights to a response to their petition of

15  grievances?

16  A.   That is correct.

17  Q.   You worked with these people.  And in working with them,

18  you placed ads in newspapers; correct?

19  A.   Correct.

20  Q.   You said you spent hundreds of dollars on travel; correct?

21  A.   I did.

22  Q.   Okay.  And what you're saying now is that you don't know if

23  any of these people by their names, whether or not they pay

24  taxes on income earned in this country?

25  A.   That particular group of people, no, I don't.

517

Lawrence Martin Birk - Cross

1   *Q.*  So you're still sticking with, you know one person, a guy

2   on a crew?

3   *A.*  No, I --

4          *MR. HARRIS:*  Mischaracterizes his testimony.  That is

5   absolutely not what he's saying.

6          *THE COURT:*  Guess what?  We're in luck.  The jury gets

7   to determine who said what to whom and when, and we'll leave it

8   up to the jury to determine that.  Whether or not counsel

9   believes it or not is irrelevant.  The objection is overruled.

10         Let's move on, counsel.

11         *MR. MAGNANI:*  I just -- to answer the question -- may

12  the witness answer the question?

13         *THE COURT:*  Well, let's do it this way:  To the extent

14  that you persist in your question, please reiterate it.

15         *MR. MAGNANI:*  Sure.

16  *BY MR. MAGNANI:*

17  *Q.*  Is it your testimony that you only know the first and last

18  name of one person who makes income in this country and doesn't

19  file tax returns?

20  *A.*  No.  That's not correct.

21  *Q.*  So please tell us the name of the other folks.

22  *A.*  And I don't know what their current status is, but I know

23  they've had issues with the IRS.  John Dillon.

24  *Q.*  Sort of a celebrity?

25  *A.*  Well, he had a company named Gunsmoke Excavating.

518

Lawrence Martin Birk - Cross

1   *Q.* Are you saying that you were personal friends with him?

2   *A.* I wouldn't say friends.  Business associates.

3   *Q.* Okay.

4   *A.* You know -- I guess I didn't come prepared to give you a

5   list of names today.  But if I sat down, I could probably come

6   up with some.  But -- never really thought about that.  But

7   there is -- you know, the rural areas are a lot different.

8   There are a lot of people that live up there on purpose, and

9   they don't even have bank accounts.

10  *Q.* So you're saying, you just know some unbanked people who

11  get paid in cash, those are the only ones --

12  *A.* No.  Like I said, I don't initiate the conversations, but

13  sometimes these people do.

14  *Q.* So in your travels in the We the People movement, haven't

15  you met a lot of like-minded people?

16  *A.* Years ago I did, yes.

17  *Q.* None of those people, you can't think of any of them?

18  *A.* Not off the top of my head.

19  *Q.* So --

20  *A.* The senior people.  We talked about Joe Banister and John

21  Turner and Sherry Jackson.

22  *Q.* So you're talking about the senior people, some of whom we

23  talked about before?

24  *A.* Yes.

25  *Q.* And --

519

Lawrence Martin Birk - Cross

1    *A.*  But I don't know what their status -- I don't know if they

2    were paying taxes or filing them.  We never really discussed

3    that.

4    *Q.*  Now, you've done a lot of legal research over the course of

5    your study in taxes; right?

6    *A.*  I think that's a fair statement.

7    *Q.*  I think -- you say that you do research, you get data, test

8    hypothesis --

9    *A.*  Sure.

10   *Q.*  Sort of pretty scientific?

11   *A.*  Yeah.

12   *Q.*  Okay.  But you would agree that you have a bit of a

13   conflict of interest.  This isn't an impartial academic study;

14   right?

15   *A.*  I think that would probably be fair.  I think most people

16   would be that way if they've come to a position where they

17   think they have an understanding of something.  That doesn't

18   mean they won't consider alternatives, they won't look at that

19   information.  I think I've already testified to that.

20   *Q.*  Sure.  And you have.  But my question is, you would agree

21   with me that you have a bit of a conflict in this regard.

22   *A.*  A conflict?  I'm not --

23   *Q.*  Right --

24   *A.*  I might have a bias of some sort because of the information

25   I've seen year after year after year.

520

Lawrence Martin Birk - Cross

1   Q.  You're not like an unbiased, impartial law professor

2   studying this as an academic issue?

3   A.  Probably not.  No.

4   Q.  You're not aware of any law professors that have agreed

5   with your conclusions?

6   A.  I don't know that I've talked to any about my conclusion.

7   Quite frankly, I was a student sitting in a class listening to

8   other people talk.

9   Q.  So my question was, you're not aware of any law professors

10  that agreed with your position?

11  A.  No, I'm not.

12  Q.  You're not aware of any federal judges who agree with your

13  position?

14  A.  The only one that comes to mind -- and I don't know if

15  Judge Fox is still in the Eastern District of North Carolina.

16  But in 2003, he had a case where during a hearing, he made a

17  comment on the record about the ratification of the 16th

18  Amendment that I thought was interesting.  That if you looked

19  at the evidence, you would find that not the prerequisite

20  number of states ratified that amendment.  Okay?  I just

21  thought it was curious that a senior judge in a District Court

22  would make a comment like that on the record.  But --

23  Q.  I'll ask a different question.  When I say "agree with your

24  views," I'm not talking about the 16th Amendment --

25  A.  Okay.

521

Lawrence Martin Birk - Cross

1  *Q.*  -- I'm talking about your views --

2  *A.*  No.  I do not know anybody.

3  *Q.*  Just so we're clear, I need to make sure the court reporter

4  gets this --

5  *A.*  Okay.

6  *Q.*  Your view that folks like you in business in America don't

7  have to pay income tax, that specific view is not shared by

8  anyone on the federal bench in this country?

9  *A.*  Not that I know of.

10  *Q.*  Now, you also know that a lot of the folks who have been

11  affiliated with this movement have ended up in pretty bad

12  shape; right?

13  *A.*  I'm aware of some of that, yes.

14  *Q.*  Some folks have been indicted?

15  *A.*  Yes.

16  *Q.*  Some folks been convicted?

17  *A.*  Yes.

18  *Q.*  Some folks gone to prison?

19  *A.*  Yes.

20  *Q.*  In your study, did you ever study those cases of those

21  people?

22  *A.*  The ones that I spent the most time on were the acquittals.

23  *Q.*  So let me ask you this:  Looking at those acquittals, did

24  you ever look at the jury instructions in those cases?

25  *A.*  I did.

522

Lawrence Martin Birk - Cross

1    Q.  So did you look at the way the judge instructed the juries

2    on the law in those cases?

3    A.  I did.

4    Q.  Did any judge in any of those cases ever tell the jury that

5    your view of the law was a correct one?

6    A.  No.  It -- in the instructions, it had more to do with what

7    I believed the law is.

8    Q.  And so the -- so you do understand that the instruction is

9    about what you believe the law is?

10   A.  Correct.

11   Q.  Okay.  And you also read instructions in those cases that a

12   belief that the law is unconstitutional is not a good faith

13   defense?

14   A.  I'm not sure I'm making that claim, that it's

15   unconstitutional.

16   Q.  I'm sorry.  I'll repeat the question.  Did you read

17   instructions in criminal cases -- judges instructing juries --

18   that a belief that the law is unconstitutional does not

19   constitute a good faith defense?

20   A.  I believe that's correct.

21   Q.  And that's why you are 100 percent not making a

22   constitutional argument; isn't that right?

23   A.  No, not from that perspective.  I think that it's my

24   understanding of the law of the Constitution and the Supreme

25   Court cases, that's why I'm making that statement.

Lawrence Martin Birk - Redirect

1      MR. MAGNANI:  Very well, Mr. Birk.  Thank you.

2      THE WITNESS:  You bet.

3      THE COURT:  Mr. Harris, redirect examination?

4      MR. HARRIS:  Yes.  If I could have a moment?

5      THE COURT:  And you may, of course.  Thank you.

6      Stand and stretch if you're quick, ladies and

7  gentlemen of the jury.

8                   **REDIRECT EXAMINATION**

9  BY MR. HARRIS:

10  Q.  Couple of questions, following up on what Mr. Magnani was

11  asking you in different areas.

12      So I want to make sure that you're clear on what he

13  was asking you, because I wasn't at times, with respect to

14  people who don't pay taxes that you may know.  So let me, with

15  that introduction, introduce this topic.

16      It's fair to say, isn't it, that over periods of time,

17  you knew plenty of people who didn't pay taxes; right?

18  A.  Over periods of time; correct.

19  Q.  People in the tax honesty movement; correct?

20  A.  Correct.

21  Q.  People at We the People; right?

22  A.  Correct.

23  Q.  Other people here and there that you would come into

24  contact with through your study and associations; correct?

25  A.  Correct.

                                                                      524
                        Lawrence Martin Birk - Redirect

1   Q.  He asked you, however, two distinct questions that at times

2   I believe were conflated.  I want to know, do you think that

3   those questions sometimes merged together?  Do you think that

4   sometimes he was asking --

5            MR. MAGNANI:  Objection, Your Honor.

6            MR. HARRIS:  I'll ask it differently.

7            MR. MAGNANI:  Counsel is testifying.

8            THE COURT:  Well, we've got a part of the question;

9   we've got an objection; we've got an offer to rephrase.  I'm

10  going to make it easy on myself and allow counsel to rephrase.

11  That moots the objection; obviates the necessity for my ruling;

12  I'm off the hook.

13           You may ask your next question, counsel.

14           MR. HARRIS:  Thank you, Your Honor.

15  BY MR. HARRIS:

16  Q.  Did you fully understand his question as referring to one

17  or another of the two groups, people you've known generally and

18  people you know now in Park County?

19  A.  I -- I think he was just testing me to know if I could list

20  a group -- bunch of people by name, which made me very

21  uncomfortable, quite frankly.

22  Q.  Why?

23  A.  Well, I don't think that it's proper to name other people

24  by name that -- you know, I'm not sure what their current

25  situation is.  Maybe they're already engaged with the IRS too.

Lawrence Martin Birk – Redirect

1   I don't know.  Maybe they've left the area.  Maybe they've

2   died, for that matter, because this goes back 20 years.

3   Q.  Okay.  Have you spent a whole lot of time other than in the

4   last few minutes wracking your brain to figure out who you know

5   who pays taxes and who you know who doesn't?

6   A.  Not really, no.

7   Q.  That hasn't been a big focus of your attention; right?

8   A.  Not at all, really.

9   Q.  You've got your own tax problems?

10  A.  That's correct.

11  Q.  Law professors, judges, other people, you're aware of

12  plenty of people besides law professors and judges that don't

13  endorse your view of the law; right?

14  A.  Yes.  My own family.

15  Q.  Does it mean you're wrong?

16  A.  I don't think so.

17  Q.  Has it given you pause to think, though, over time as to

18  whether you might be wrong?

19  A.  No, not really.

20  Q.  Why?

21  A.  Well, I think people have a variety of opinions about

22  things; and how they form those opinions is also varied.  I

23  don't think it's my role to try to correct them.  I learned a

24  lesson in graduate school about, you know, phases of truth.

25  You know, you start out with disbelief.  Somebody will look at

526

Lawrence Martin Birk - Redirect

1   you and say, that can't be true because -- I would know about

2   it.  And then they would ridicule you, you don't believe that,

3   really.  Then they get angry about it, say, if you don't stop

4   that, you're going to get in trouble.  And the last one is

5   acceptance, because now the truth has manifested itself.  You

6   know, are there lessons there in dealing with people?  Yes.

7   Q.  Are you familiar with a guy named Galileo?

8   A.  I am.

9   Q.  Did he hold an unconventional belief?

10  A.  Very much so.

11  Q.  Mr. Magnani talked about some statement, no chance in

12  court.  Do you know what document he was referring to that he's

13  quoting from?

14  A.  Not off the top of my head.

15  Q.  Do you believe that whether or not you had a chance in

16  court, that -- well, let me put it differently.

17         Would your view concerning whether or not you had a

18  chance in court affect your understanding of the law?

19  A.  No.  I don't think so.

20  Q.  Just a few loose ends.

21         Vehicle taxes, you were okay paying those; right?

22  A.  Yes.  I think those are valid constitutional taxes at the

23  federal and the state levels, depending on what kind of tax

24  you're paying.  I've never been involved in things like

25  commercial trucking or things that have DOT requirements, but I

1    do know a lot of people that do.

2    Q.  If we had a national sales tax, would you be okay paying

3    that?

4    A.  Well, I think from the standpoint of a valid indirect tax

5    and a proper form and subject, yes, I would.

6    Q.  Colorado taxes.  I just want to make sure we all understand

7    your position.  Colorado state income taxes, what's your

8    concern with respect to those.

9    A.  I don't have a concern.  I have an understanding of what

10   the revised statute says --

11   Q.  That's --

12   A.  -- and how it works.

13   Q.  That's a better way to put it.  What's that understanding?

14   A.  It's basically a piggyback tax.  It starts right in the

15   statute in the first line, it talks about your federal adjusted

16   gross income.  So you start with the federal tax liability.

17   Q.  So if you start -- so garbage in, garbage out?

18   A.  Basically.

19          MR. HARRIS:  If I could have a moment.

20          THE COURT:  You may, counsel.  Thank you.

21          MR. HARRIS:  I have no further questions.

22          THE COURT:  Very well.

23          Mr. Birk, once again, you may stand down and return to

24   your seat.

25          THE WITNESS:  Thank you, Your Honor.

1              THE COURT:  You're welcome.

2              Very well.  The defense may proceed.

3              MR. HARRIS:  Your Honor, at this time the defense

4    rests.

5              THE COURT:  Thank you.

6              Does the Government seek leave of the Court to present

7    rebuttal evidence?

8              MR. MAGNANI:  Your Honor, if we could answer that

9    question first thing tomorrow morning?

10             THE COURT:  No, sir.  I reasonably expect the

11   Government to be able to respond to that question.

12             MR. MAGNANI:  We do not have a witness prepared right

13   now.

14             THE COURT:  Very well.

15             I presume, therefore, that the evidence is complete,

16   but I now inquire of the parties to confirm.

17             Is it from the perspective of the Government?

18             MR. MAGNANI:  As far as I know right now, yes.  But I

19   don't -- I have not had the opportunity to see if we can call

20   any rebuttal witnesses regarding the matters we just --

21             THE COURT:  Are you requesting leave of the Court to

22   present rebuttal evidence?

23             MR. MAGNANI:  I'm requesting leave of the Court to be

24   able to find out if we can get a witness here tomorrow morning,

25   and I can answer that question then.

1       *THE COURT:*  Well, that sounds like you're requesting

2   leave of the Court to present rebuttal evidence if the

3   unidentified witness that you have in mind is available to the

4   Government.

5       *MR. MAGNANI:*  Yes.  Yes, Your Honor.

6       *THE COURT:*  All right.  So that's your -- your answer

7   is yes?

8       *MR. MAGNANI:*  Yes, requesting leave.

9       *THE COURT:*  That's important in how I deal with the

10  jury and the timing of their return and post-evidentiary

11  matters.  So thank you.

12      Ladies and gentlemen of the jury, that brings us to a

13  conclusion of this day of trial.  As is your custom,

14  momentarily, you'll not be sequestered, you'll be free to

15  separate, leave the federal courthouse, and go your separate

16  ways over night.

17      Two things:  First, leave your notetaking materials

18  face down on your chairs, please.  And, second, take the

19  reasonable time necessary, once again, to read and heed those

20  critically important rules that govern your conduct as jurors

21  in this trial.  We're so close; don't blow it.

22      Now, I'm going to respectfully request that you report

23  for further service tomorrow at 8:30 a.m.  But I quickly

24  inquire, will that be unreasonable or terribly inconvenient for

25  any one or more of you?

1          (No response.)

2          Then we'll proceed on that basis.

3          Now, we'll either have rebuttal evidence by the

4    Government or not.  Following the presentation of rebuttal

5    evidence, if any, by the Government, the evidence in the trial

6    will be complete.  That will require the parties -- the Court,

7    and counsel -- to engage in post-evidentiary proceedings, which

8    I don't believe will take very long.  That will be followed by

9    a formal jury instruction conversation, at which the Court will

10   approve the jury instructions and verdict form to be given to

11   you later in the trial.  That will be followed by me

12   instructing you on the law applicable to the trial of this case

13   to be followed by closing arguments by the respective parties.

14   At that point, the case will be submitted to you formally to

15   commence your solemn deliberations.

16          Now, starting tomorrow, courtesy of the Court, lunch

17   will be provided.  Now, if you're expecting me to provide you

18   with a home-cooked meal, that probably won't happen.

19          Very well.  With those things firmly in mind, as

20   concerned this case in trial, we are in recess until tomorrow

21   at 8:30 a.m.

22          Good evening.

23          Madam Clerk.

24          (Recess at 4:52 p.m.)

25

1                          **I N D E X**

2    **Witness**                                         **Page**

3    Rule 29 Argument                                      398

4        JENNIFER MORGAN
             Direct Examination By Ms. Hadden             301
5        MARY TRABOLD
             Direct Examination By Mr. Magnani            314
6        BENJAMIN HOPPING
             Direct Examination By Ms. Hadden             389
7            Cross-examination By Ms. Beck                394
         LAWRENCE MARTIN BIRK
8            Direct Examination By Mr. Harris             401
             Cross-examination By Mr. Magnani             482
9            Redirect Examination By Mr. Harris           524

10

11

12                    REPORTER'S CERTIFICATE

13           I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
14
             Dated at Denver, Colorado, this 20th day of December,
15   2019.

16

17                        _____

18                        Therese Lindblom,CSR,RMR,CRR

19

20

21

22

23

24

25