1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 18-cr-00359-REB

3

UNITED STATES OF AMERICA,

4

    Plaintiff,

5

vs.

6

LAWRENCE MARTIN BIRK,

7

    Defendant.

8

_____

9

**REPORTER'S TRANSCRIPT**

10                TRIAL TO JURY
                 DAY FOUR

11

_____

12        Proceedings before the HONORABLE ROBERT E. BLACKBURN,

13  Senior Judge, United States District Court for the District of

14  Colorado, continuing at 8:42 a.m., on the 25th day of July,

15  2019, in Courtroom A1001, United States Courthouse, Denver,

16  Colorado.

17              **A P P E A R A N C E S**

18        CHRISTOPHER MICHAEL MAGNANI and ELIZABETH CARYL
  HADDEN, Trial Attorneys, U.S. Department of Justice, Tax

19  Division, 601 D Street, N.W., Washington, DC, 20004, appearing
  for the Government.

20

21        EDWARD HARRIS and JENNIFER LYNN BECK, Assistant
  Federal Public Defenders, 633 17th Street, 10th Floor, Denver,

22  Colorado, 80202, appearing for the Defendant.

23

24          THERESE LINDBLOM, Official Reporter
        901 19th Street, Denver, Colorado 80294

25      Proceedings Reported by Mechanical Stenography
       Transcription Produced via Computer

**P R O C E E D I N G S**

(In open court at 8:42 a.m.)

*THE COURT:*  Good morning and thank you.  Please be seated.

Thank you.  Resume on the record in open court continuing these trial proceedings, operating now and briefly deliberately outside the presence and hearing of the jury, which is in momentary recess vis-a-vis these trial proceedings.

We convene as constituted for the Court to continue its ongoing colloquy with the Government concerning a request for leave to present rebuttal evidence.  What is the state and status of that request, counsel?

*MR. MAGNANI:*  Good morning, Your Honor.  The Government rests its case, will not be calling any rebuttal witnesses.

*THE COURT:*  Very well.  What I intend to do is summons the jury into the courtroom and jury box, declare that the evidence in the trial of this case is in fact complete; ask counsel for the Government and Mr. Birk to confirm that stated fact; then dismiss the jury until approximately 9:30, during which hiatus we will conduct post-evidentiary proceedings, which I believe will be relatively short -- hopefully that's not Panglossian -- followed by a formal charging conference, preceded by your receipt and review of the instructions and verdict form proposed by the clerk.

1          Very well.  Madam Clerk, without further delay, please

2   show the jury into the courtroom, with my thanks.

3          (Jury in at 8:45 a.m.)

4          THE COURT:  Thank you.  Madam Clerk.

5          Ladies and gentlemen, please be seated.

6          Ladies and gentlemen of the jury, good morning.

7          JURY:  Good morning.

8          THE COURT:  While you have been waiting patiently, we

9   have been working diligently.  I now state and announce that

10  the evidence to be presented during this trial has been

11  presented and is now complete, but I inquire of the parties to

12  confirm that representation.

13         Is that correct from the perspective of the

14  Government?

15         MR. MAGNANI:  Yes, Your Honor.

16         THE COURT:  And from the perspective of Mr. Birk?

17         MR. HARRIS:  Yes, Your Honor.

18         THE COURT:  Thank you.

19         Ladies and gentlemen of the jury, once again, it is

20  the duty of the Court, counsel, and Mr. Birk to engage in

21  post-evidentiary proceedings, somewhat analogous to mid-trial

22  proceedings; that those post-evidentiary proceedings will be

23  followed by a formal charging or jury instruction conference,

24  during which the Court will approve the instructions on the law

25  and verdict form to be given to you by the Court.

1          Now, again, I'm guessing --but it's based on a little

2     bit of experience in this regard -- we're going -- I'm going to

3     place you in temporary recess concerning this trial until

4     9:30 a.m., again, measured and gauged by the courtroom clock.

5          During that time, you will not necessarily be

6     sequestered.  If you need breakfast or coffee or whatever, this

7     will be your opportunity.  It's important that you be back, of

8     course, punctually so that we may resume on the record if we're

9     prepared to proceed, then, at 9:30 a.m.  Plan accordingly.

10          In preparation for your recess, two things:  Leave

11     behind on your seats face down your notetaking materials and,

12     again, take the reasonable time necessary to read and heed

13     those critically important rules that continue to govern you as

14     jurors in the trial of this case.

15          As concerns you, ladies and gentlemen of the jury, you

16     are in recess until 9:30 a.m.

17          All rise pending the exit of this jury.

18          (Jury out at 8:47 a.m.)

19          THE COURT:  Thank you.  And, again, please be seated.

20     However, we shall be at ease pending the return of

21     Ms. Roberson.

22          Very well.  We resume on the record operating

23     deliberately for now outside the presence and hearing of the

24     jury, which is in temporary recess until approximately

25     9:30 a.m.  We convene as constituted to conduct

1    post-evidentiary proceedings, during which the Court shall

2    receive, entertain, and resolve to the extent required or

3    practicable any post-evidentiary motions, petitions, or

4    requests.

5           Are there any such post-evidentiary matters by the

6    Government?

7           MR. MAGNANI:  No, Your Honor.

8           THE COURT:  Thank you.

9           By Mr. Birk.

10                        **RULE 29 MOTION**

11          MR. HARRIS:  Only one -- and I suspect largely as a

12   formality for preservation -- and that would be a renewal of

13   the Rule 29 motion, which I now renew.

14          THE COURT:  Very well.

15          Standing on the record, I presume?

16          MR. HARRIS:  That's correct, Your Honor.

17          THE COURT:  Very well.  Response, if any, by the

18   Government.

19          MR. MAGNANI:  The Government also stands on the

20   record, Your Honor.

21          THE COURT:  Very well.  Thus, having reviewed and

22   considered all relevant evidence adduced during the trial of

23   this case, both direct and circumstantial, I find and conclude

24   that the evidence remains adequate, substantial, and sufficient

25   to sustain a conviction on the crime charged in Count 1 of the

1    Indictment.   Therefore, it is ordered that the defendant's oral

2    post-evidentiary motion for judgment of acquittal under

3    Rule 29(a) is respectfully denied.

4              Done in open court, effective forthwith.

5              Any further post-evidentiary matters by the defense?

6              *MR. HARRIS:*  No, Your Honor.

7              *THE COURT:*  Very well.

8              As soon as practicable, the Court will provide you

9    with its proposed instructions and verdict form.  I'll permit

10   you roughly 15 minutes to peruse those instructions.  None of

11   them should come as a surprise; most of them are stipulated in

12   whole or major part.

13             The Court when it convenes its charging conference

14   will first consider its proposed instructions and verdict form,

15   considering each instruction in numerical order.  Following

16   consideration of the Court's proposed instructions and verdict

17   form, the parties will be given an opportunity to identify and

18   tender any additional proposed instructions and verdict form

19   that may be timely and appropriately, considering the totality

20   of relevant circumstances, so please plan accordingly.

21             Very well.  I ask that you remain in or near the

22   courtroom.  We are producing copies of the Court's proposed

23   instructions as we speak.  They'll be presented to you at your

24   respective tables, and the clock will begin to run.

25             Very well.  We are in recess pending commencement of a

1   formal charging conference.

2           Madam Clerk.

3           (Recess at 8:52 a.m.)

4           (In open court at 9:25 a.m.)

5                   **JURY INSTRUCTION CONFERENCE**

6           *THE COURT:*  Thank you, and please be seated.

7           Very well, we again proceed on the record in open

8   court, continuing to do business outside the presence and

9   hearing of the jury, which remains in temporary recess

10  vis-a-vis this trial.  We convene as constituted to conduct as

11  advertised by the Court a formal charging or jury instruction

12  conference.

13          During the conference, as indicated, we will first

14  consider the instructions proposed by the Court and a

15  concomitant verdict form, following which the parties will

16  receive a reasonable opportunity to be heard on additional

17  instructions and verdict forms.

18          Directing your attention to the Court's proposed

19  instructions, we will proceed in numerical order.

20          The initial question is a leading one, "Any

21  objection?"  That's either yes or no.  And you need not stand,

22  lest you wear your knees out.  When we have an objection, then

23  the argument should be from the standing position behind the

24  podium at the microphone, please.

25          The Court has proposed twelve instructions and a

1    concomitant verdict form.

2           Directing your attention to Instruction No. 1, any

3    objection by the Government?

4           *MR. MAGNANI:*  No, Your Honor.

5           *THE COURT:*  By the defense?

6           *MR. HARRIS:*  No, Your Honor.

7           *THE COURT:*  Instruction No. 1, approved.

8           Instruction No. 2, any objection by the Government?

9           *MR. MAGNANI:*  No, Your Honor.

10          *THE COURT:*  By the defense?

11          *MR. HARRIS:*  No, Your Honor.

12          *THE COURT:*  Instruction No. 2, approved.

13          Instruction No. 3, any objection by the Government?

14          *MR. MAGNANI:*  No, Your Honor.

15          *THE COURT:*  For the defense?

16          *MR. HARRIS:*  No, Your Honor.

17          *THE COURT:*  Instruction No. 3, approved.

18          Instruction No. 4, any objection by the Government?

19          *MR. MAGNANI:*  No, Your Honor.

20          *THE COURT:*  For the defense?

21          *MR. HARRIS:*  No, Your Honor.

22          *THE COURT:*  Instruction No. 4, approved.

23          Instruction No. 5, any objection by the Government?

24          *MR. MAGNANI:*  Yes, Your Honor.

25          *THE COURT:*  Any objection by the defense?

1              MR. HARRIS:  Yes, Your Honor.

2              THE COURT:  All right.  The objections of the parties.

3       Hopefully, they have not been inspired or coerced by the

4       comments of the Court.  I can tell you before I receive your

5       arguments that I'm prepared to receive your stipulated

6       Instruction No. 5.  Even though I would technically

7       differentiate between substantive exhibits and demonstrative

8       exhibits, I don't know that we need to be that detailed as we

9       instruct a lay jury.

10             Now, with those additional comments, does the

11      Government persist in its objection?

12             MR. MAGNANI:  Yes, Your Honor.

13             THE COURT:  All right.  What's your objection?

14             MR. MAGNANI:  And I believe the defense is in

15      agreement with this, is that we propose just not giving

16      Instruction No. 5, because it may be confusing to the jury,

17      that they think the summaries that they do have are subject to

18      the restriction.

19             THE COURT:  I don't want to tip my hand, but good

20      plan.

21             Response by the defense and concomitant objection, if

22      any.

23             MR. HARRIS:  I agree with Magnani and the Court.  I'm

24      fine with not giving No. 5.  It's probably less confusing, at

25      the end of the day.

1          *THE COURT:*  Thank you.  Then Instruction No. 5 is

2     rejected.

3          I may or may not renumber the instructions.  I'm

4     simply more likely to under Instruction No. 5, simply indicate

5     there is no Instruction 5.  That may be helpful to you as you

6     formalize and finalize your final argument with numerical

7     references to the jury instructions.

8          Instruction No. 6, any objection by the Government?

9          *MR. MAGNANI:*  No, Your Honor.

10         *THE COURT:*  By the defense?

11         *MR. HARRIS:*  Yes.

12         *THE COURT:*  Your objection, Mr. Harris.

13         *MR. HARRIS:*  It's simply the same objection previously

14     lodged as stated in ECF No. 86, filed last night, at page 2

15     through middle of page 3.  I won't reiterate it on the record,

16     but would refer the Court to it and incorporate it by

17     reference.

18         *THE COURT:*  And I will credit you with all reasoned

19     stated arguments advanced and authorities cited in your

20     response.  Thank you.

21         Response by the Government.

22         *MR. MAGNANI:*  No, Your Honor.

23         *THE COURT:*  The Court's turn.

24         First of all, the instruction proposed by the

25     Government is, indeed, untimely.  And on that basis alone, I

1    respectfully reject the proposed instruction by the Government.

2    The Government could and should have anticipated the

3    promulgation and tender of such an instruction.  That ruling,

4    however, does not preclude or prohibit the Court from

5    instructing the jury completely and accurately on the law

6    applicable in the trial of this case.  We have, with a limiting

7    instruction and other statements, created a reasonable

8    expectation by this jury that the Court will state the law to

9    them and state the law including but not limited to the

10   circumstances under which an individual is responsible to file

11   and pay federal income taxes.  Thus, the Court's Proposed

12   Instruction No. 6.

13          There is nothing controversial about this instruction;

14   there is no incorrect or incomplete statement of the law in

15   this instruction; this instruction will not confuse or mislead

16   the jury.  To the contrary, it will fill the gap -- the hiatus

17   and lacuna -- that we have created in the trial of this case;

18   and it will properly instruct the jury on the law applicable to

19   this case without vitiating any defense of good faith that may

20   be permitted by the Court.

21          Therefore, the defendant's objection is overruled.

22   Instruction No. 6 is approved and shall be included in its

23   charge to the jury.

24          Instruction No. 7, any objection by the Government?

25          MR. MAGNANI:  No, Your Honor.

1          THE COURT:  Or the defense?

2          MR. HARRIS:  No, Your Honor.

3          THE COURT:  Instruction No. 7, approved.

4          Instruction No. 8, any objection by the Government?

5          MR. MAGNANI:  No, Your Honor.

6          THE COURT:  Or the defense?

7          MR. HARRIS:  No, Your Honor.

8          THE COURT:  Instruction No. 8 is approved.

9          Instruction No. 9, any objection by the Government?

10         MR. MAGNANI:  Yes, Your Honor.

11         THE COURT:  By the defense?

12         MR. HARRIS:  Yes, Your Honor.

13         THE COURT:  I'm being double teamed here.  Let me hear

14   first from the Government.

15         MR. MAGNANI:  Your Honor, the Government's only

16   objection to Instruction No. 9 is -- comes in the last

17   paragraph, where it says "The Government must prove beyond a

18   reasonable doubt that defendant failed to act in good faith."

19   And I'm putting emphasis on "act in good faith."  And the

20   following sentence, "Good faith is a complete defense."  And I

21   just think this is at odds with the previous instruction,

22   No. 8, which says the defendant -- that "The Government must

23   prove that the defendant did not have a good faith belief that

24   he was complying with the law."

25              So, Your Honor, in *Cheek v. United States*, it's very

 1   clear from the Supreme Court that "good faith" is a modifier of

 2   the word "misunderstanding"; and that's borne out in

 3   Instruction No. 8.  It's not about, did a person engage with

 4   collections officers in good faith?  It's about a good faith

 5   misunderstanding.  The Supreme Court interpreted the willful

 6   requirement to mean -- to shield honest taxpayers from having a

 7   good faith misunderstanding about the law, not to shield people

 8   who just maybe act in good faith, which I think is a confusing

 9   term and is contradictory with Instruction No. 8, if only

10   slightly.

11             THE COURT:  Do you have any substitute language to

12   propose?

13             MR. MAGNANI:  Your Honor, if the Court is inclined to

14   keep the current instruction, I would -- I would propose just

15   repeating the section from No. 8.  So, in other words -- and

16   I'm directing the Court's attention to the second to last line

17   of Instruction No. 9.  The Government would propose saying,

18   "The defendant" -- sorry.  I'll read the whole sentence -- the

19   whole section.  "The Government must prove beyond a reasonable

20   doubt that defendant did not have a good faith belief that he

21   was complying with the law," which is what it says in No. 8.

22             As for the last sentence, the Government would propose

23   that it says, "A good faith misunderstanding of the law is a

24   complete defense," not just "good faith" alone, which I think

25   might be confusing.

1          THE COURT:  Thank you.

2          Response by the defense to the objection of the

3    Government and the defendant's independent objection, as well.

4          MR. HARRIS:  I -- I don't share the same concern that

5    the Government has about that formulation.  I think it says the

6    same thing.  But to the extent that the Government objects, I

7    also don't object or wouldn't object were the Court to change

8    the language as the Government has proposed.

9          THE COURT:  All right.  And that objection for now is

10   sustained, contingent on any subsequent ruling on the objection

11   of the defense.

12         MR. HARRIS:  The only objection we have to Instruction

13   No. 9 would be the inclusion of the third paragraph, which is

14   either a reformulation of -- or essentially a reformulation of

15   Government proposed instruction G-2.  And standing on our

16   previously filed opposition to that instruction, we would

17   oppose it for the same reasons.

18         THE COURT:  All right.

19         I have resolved the objection by the Government; I

20   sustain it, warranting and requiring an amendment of the final

21   paragraph of Instruction No. 9 to include the language proposed

22   by the Government, which is unopposed and now approved by the

23   Court.

24         Now, the Government's response, if any, to the

25   different, discrete objection of the defense to Paragraph 3.

1          MR. MAGNANI:  Just very briefly, Your Honor.

2          Also citing to the *Cheek* case, if there is any

3    confusion from the majority's opinion in this case, I think

4    that it's all made very clear.  The Court is aware of Justice

5    Scalia's concurrence, in which he was very disappointed that a

6    good faith belief that the law is unconstitutional is no longer

7    a valid defense.  So I think that it's abundantly clear from

8    *Cheet* that that is an accurate statement of law; and the

9    Government doesn't object to the other modifications that the

10   Court took with its proposed instruction.

11         THE COURT:  I presume no reply necessary, but I

12   inquire to confirm.

13         Mr. Harris.

14         MR. HARRIS:  Correct.  I have no reply.

15         THE COURT:  Having considered the objection of the

16   defense to paragraph No. 3 of Instruction No. 9, I find that

17   the Government has the better of it.  Again, this is a correct

18   statement of the law; it is not incomplete or incorrectly

19   propounded; it will not confuse or mislead the jury; instead,

20   it is necessary to fully advise the jury on the law applicable

21   on this issue of good faith misunderstanding.  Thus, the

22   objection of the defendant to Paragraph 3 of Instruction No. 9

23   is overruled; and Instruction No. 9 as to be revised is

24   approved.

25         I want to make a brief record with respect to the

 1    defense of good faith.  I continue to debate internally whether

 2    or not the defendant is entitled to a good faith

 3    misunderstanding defense, because as a matter of law, a claim

 4    of unconstitutionality may not form the basis of a good faith

 5    misunderstanding defense.  I have captured throughout the trial

 6    excerpts of the statements of the defendant -- including his

 7    own testimony yesterday -- where he started and where he ended.

 8    And, frankly, all roads trace back to fundamentally a claim of

 9    unconstitutionality.

10         Now, you can use whatever euphemistic misnomers you

11    like; it's misapplied, to me.  Well, that's quintessentially a

12    claim of unconstitutionality as applied to the defendant.

13    Quintessentially, his claim is, I don't have to file or pay

14    federal income taxes because this tax as applied to me and my

15    sources of income is unauthorized under Article 1 and a couple

16    of its sections of the Constitution.  That's just another way

17    of saying that I believe the tax is unconstitutional.  And as I

18    say, that may not form the basis of a good faith

19    misunderstanding.

20         Well, I'm unwilling to finalize that ruling, but I

21    make that record nonetheless, and perhaps I achieve some form

22    of legal or psychological catharsis from it.

23         On to Instruction No. 10.  Any objection by the

24    Government?

25         *MR. MAGNANI:*  No, Your Honor.

1          THE COURT:  Or the defense?

2          MR. HARRIS:  No, Your Honor.

3          THE COURT:  Instruction No. 10, approved.

4     Instruction No. 11, any objection by the Government?

5          MR. MAGNANI:  No, Your Honor.

6          THE COURT:  Or the defense?

7          MR. HARRIS:  No, Your Honor.

8          THE COURT:  Instruction No. 11, approved.

9     Instruction No. 12, any objection by the Government?

10         MR. MAGNANI:  No, Your Honor.

11         THE COURT:  Or the defense?

12         MR. HARRIS:  No, Your Honor.

13         THE COURT:  Instruction No. 12, approved.

14         Finally, directing your attention to the verdict form

15    proposed by the Court.  Any objection by the Government?

16         MR. MAGNANI:  No, Your Honor.

17         THE COURT:  By the defense?

18         MR. HARRIS:  No, Your Honor.

19         THE COURT:  The verdict form is approved.

20         Does the Government tender any other jury instructions

21    or verdict form for consideration by the Court?

22         MR. MAGNANI:  May I address the Court from the table,

23    Your Honor?

24         THE COURT:  You may.

25         MR. MAGNANI:  Just, there was Stipulated Instruction

1    No. 11, was something that the parties agreed to and filed

2    prior to the commencement of trial.  This was the knowingly

3    deliberate ignorance instruction.  It's a pattern instruction

4    from the Tenth Circuit.

5         THE COURT:  Well, if you can find in the other jury

6    instructions where the term "knowingly" exists, then I'll

7    consider your stipulation.  But we looked, couldn't find it,

8    making by definition an instruction on the definition of

9    "knowingly" needless and superfluous.

10        MR. MAGNANI:  Your Honor, the reference in this case

11   is not in the adverbial form; but is the definition of

12   "willfulness" in element 4 at the Court's Instruction No. 7,

13   defining it as "the voluntary intent to violate a known legal

14   duty."  And the Government's -- in proposing -- that's what I

15   think the parties were thinking of.  I'll stand on that.

16        THE COURT:  Well, you know, the Court couldn't get

17   there because "known" and "knowingly," although certainly

18   grammatically related, are different terms.  And I can tell you

19   that most perspicacious apperceptive jurors will not make the

20   connection either.

21        If you're asking me to give the term "knowingly" in

22   any of its various grammatical forms, including "known," then

23   I'll consider your request.  Otherwise, it's inherently

24   confusing.

25        MR. MAGNANI:  And, Your Honor, if the -- and directing

1    the Court's attention to Stipulated Instruction No. 11.  Would

2    the omission of the first sentence that references the word

3    "knowingly" satisfy the Court's concern?  And I can read what

4    the instruction would sound like without it, if that would be

5    beneficial.

6         *THE COURT:*  You need not to do that.

7         Let me hear from the defense.  Under consideration is

8    Stipulated Instruction 11, a proposed definition of the term

9    "knowingly."  Each of you should know how reticent the Tenth

10   Circuit is for a court to instruct on the definition of

11   "knowingly," perhaps for some of the reasons that are exposed

12   during this colloquy.  But who knows the mind of a superior

13   court.

14        *MR. HARRIS:*  So when -- when I initially looked at

15   this, I was cognizant of the Circuit's reluctance.  What I

16   didn't look at or consider as fully is whether the word

17   "knowingly" was actually used in the instructions.  The Court

18   is correct, and it is not used.  I don't think under those

19   circumstances that the instruction is appropriate as it stands.

20        Having said that, I don't think we can then just kind

21   of make it up as we go along and say, well, they use another

22   form of a word that has the letters K-N-O-W at the beginning of

23   it.  I don't think it is the same grammatically or conceptually

24   to say that something is a known legal duty, where "known" is

25   used as an adjective to describe a legal duty, and to say that

1   someone took some action knowingly, when "knowingly" is an

2   adverb describing the manner in which the action is performed.

3          Under those circumstances, I've reconsidered my

4   position as to the stipulated instruction, and withdraw the

5   stipulation, and would stand opposed or object to the giving of

6   that instruction or any similar variant.

7          THE COURT:  Thank you.

8          Reply, if any, by the Government.

9          MR. MAGNANI:  Briefly, Your Honor, the Government

10  would just point to defense counsel's question of his own

11  client, Are you an ostrich?  No.

12         Your Honor, this is known as an ostrich instruction.

13  But I will say given the withdrawal of the stipulation and

14  given what Your Honor advised of the Tenth Circuit's uncomfort

15  with this, the Government will withdraw its request, as the

16  instruction is no longer stipulated.

17         THE COURT:  In the words of the Bard, much to do about

18  nothing.  And, therefore, putative Stipulated Instruction

19  No. 11 is respectfully rejected now formally.

20         Other instructions or verdict form by the Government?

21         MR. MAGNANI:  No, Your Honor.

22         THE COURT:  Or by Mr. Birk?

23         MR. HARRIS:  No, Your Honor.

24         THE COURT:  Then these are the instructions of the

25  Court.

1          We'll make the necessary amendments or corrections as

2    soon as practicable.  We'll provide you with correcting copies,

3    maintaining the original numerical order, so as not to sabotage

4    your closing arguments that may in part rely on the initial

5    enumeration.

6          Now, I have reserved by trial preparation conference

7    order 45 minutes total for closing argument.  I now inquire

8    after the evidentiary landscape is known, is that sufficient?

9          From the perspective of the Government?

10         MR. MAGNANI:  The Government would make do, Your

11   Honor.

12         THE COURT:  All right.  That includes, of course --

13   not trying to sandbag you -- your opening closing argument and

14   your rebuttal closing argument.

15         MR. MAGNANI:  Yes, Your Honor.

16         THE COURT:  I leave it to you to reserve that which

17   you will for rebuttal argument, but I caution and admonish you,

18   rebuttal closing argument must be rebuttal.  It is not an

19   opportunity to argue you in stuff at a time when the defense is

20   effectively precluded from responding.

21         MR. MAGNANI:  The Government shares the Court's view,

22   and -- does the Court inquire now how much time?

23         THE COURT:  No, I do not.  You're trying this case;

24   I'm not.

25         Will that be sufficient for the defense?

1          MR. HARRIS:  Yes, Your Honor.

2          THE COURT:  I typically provide each juror with a

3     complete packet of copies of the jury instructions and the

4     verdict form.  Of course, they will be required to use in their

5     solemn deliberations the original instructions and verdict

6     form.

7          Any objection by the Government?

8          MR. MAGNANI:  No, Your Honor.

9          THE COURT:  Or the defense?

10          MR. HARRIS:  No, Your Honor.

11          THE COURT:  Okay.  Now, unless you request or require

12     it, I do not require the court reporter to make a verbatim

13     record as I read the jury instructions and verdict form to the

14     jury.  Instead, if I encounter any kind of error, I immediately

15     call that to the attention of all parties in interest,

16     promising to correct it as soon as practicable and providing

17     all parties in interest with a corrected or amended copy of the

18     instruction or verdict form that might be affected.

19          Any objection by the Government?

20          MR. MAGNANI:  No, Your Honor.

21          THE COURT:  Or the defense?

22          MR. HARRIS:  No, Your Honor.

23          THE COURT:  And I have to focus on the defendant.

24     Does the defendant waive his right to have a verbatim record as

25     the Court reads the jury instructions and verdict form to the

1    jury?

2          *MR. HARRIS:*  Yes, he waives it.

3          *THE COURT:*  We'll proceed on that basis, and you will

4    remain on Ms. Lindblom's Christmas card or other holiday card

5    list.

6          Now, as soon as we conclude this jury instruction

7    conference, I will retire to make the necessary changes.  You

8    must caucus and confer with Ms. Roberson to identify those

9    trial exhibits admitted in evidence or otherwise that will be

10   made available to this jury during its solemn deliberations.

11   So please stand by for that important purpose.

12         Any other business now by the Government?

13         *MR. MAGNANI:*  No, Your Honor.

14         *THE COURT:*  Or the defense?

15         *MR. HARRIS:*  No, Your Honor.

16         *THE COURT:*  Thank you.

17         Please close the record.  The Court is in recess.

18         Madam Clerk.

19         (Recess at 9:50 a.m.)

20         (In open court at 10:13 a.m.)

21         *THE COURT:*  Thank you again.  Please be seated,

22   albeit briefly.

23         Very well.  You have been provided with a corrected

24   Instruction 5 and 9.  Any additional objections not now of

25   record to preserve your record?

1           By the Government?

2           *MR. MAGNANI:*  No, Your Honor.

3           *THE COURT:*  By the defense?

4           *MR. HARRIS:*  No, Your Honor.

5           *THE COURT:*  These are the jury instructions.  I

6    presume that we are prepared to instruct, argue, and submit, in

7    that order.

8           Madam Clerk, please retrieve our jury.  Thank you.

9           (Jury in at 10:15 a.m.)

10          *THE COURT:*  Thank you, Madam Clerk.

11          Ladies and gentlemen, again, please be seated.

12          Ladies and gentlemen of the jury, again, good morning.

13          *JURY:*  Good morning.

14          *THE COURT:*  As you heard me say and continues to be

15   true, while you have been waiting patiently, we have been

16   working diligently.  We are prepared to resume trial together.

17          Now, Madam Clerk, I'm going to ask that you tender to

18   each juror a complete packet of copies of the jury instructions

19   and verdict form approved by the Court for use in the trial in

20   this case.

21          As for your notes, as you receive your packet of

22   copies, please put your name on it, to distinguish your packet

23   of copies from your colleagues and fellow jurors.

24          Momentarily, I will read the instructions on the law

25   and the verdict form approved by the Court for use in this

1   specific trial.

2          Now, though each of you now have a copy of those

3   instructions and verdict form, and you will have, of course,

4   the originals with you for your consideration and completion in

5   your jury deliberation suite, I encourage you to follow along

6   as I read the instructions and the verdict form.

7          Now, if I find mistakes in the instructions or the

8   verdict form as I read them to you, I will call that to your

9   attention for tentative correction, following which, as soon as

10  practicable, I will provide you and other parties in interest

11  with any corrected or amended copy of an instruction or the

12  verdict form.

13         Importantly, if you discern discrepancies or

14  inconsistencies between the original final instructions and

15  your copies or any previous instructions that I have given you

16  during the trial, you must now be governed and guided by the

17  Court's final original instructions.

18         Now, please do not return your copy of the

19  instructions and the verdict form with the originals.  Although

20  you may not deface or mark on the originals, you may do as you

21  choose with respect to your copies.  I encourage you to be

22  guided by the aphorism of Samuel Clements -- the late, great

23  Mark Twain -- do not do that which is illegal, immoral or

24  fattening with your copies.

25         Now, some of the instructions are very short, while

1    others are much longer.  For your part, you must not be

2    concerned with or affected by the appearance, order, or format

3    of the instructions or verdict forms.  Those are decisions that

4    I have made.

5         Very well.  These are the instructions on the law.

6         (Instructions read but not reported.)

7         *THE COURT:*  Ladies and gentlemen of the jury, those

8    are the instructions and verdict form approved by the Court for

9    use during the trial of this case.

10        The attorneys will now present closing argument,

11   commencing with the Government's opening portion of the closing

12   argument, followed by the closing argument of Mr. Birk, and

13   concluding with the Government's rebuttal closing argument.

14        I remind you that like opening statements, closing

15   arguments are not evidence and should not be considered as such

16   by you.  Thus, what the attorneys said to you or showed you

17   during their closing arguments is not evidence.  In this trial

18   the evidence came not from this podium, but, instead, from that

19   witness stand.

20        Very well, if the Government is prepared to make its

21   opening closing argument, it may.

22        Mr. Magnani.

23        *MR. MAGNANI:*  Your Honor, if I could just wait until

24   the podium and monitors are turned on.

25        *THE COURT:*  You may have.  The clock is tolled.

1          MR. MAGNANI:  Thank you.

2          THE COURT:  Thank you, Madam Clerk.

3                         **CLOSING ARGUMENT**

4          MR. MAGNANI:  Why are we here?  Throughout this

5    country, citizens assemble to serve on juries, to resolve

6    disputes of fact in important controversies.

7          You're here because of one dispute of fact.  It became

8    apparent when Mr. Harris stood up and gave his opening

9    statement, there is really one issue in this case:  Did the

10   defendant know he was required by law to pay taxes?  You're the

11   judges of the fact; it's your job to decide the answer to that

12   question.

13         And to prove that he knew he was obligated to pay tax,

14   the Government called witnesses.  You heard from 14 witnesses.

15   You will have at your disposal in the jury room binders of

16   evidence that you've seen throughout the trial.  It's the

17   Government's burden to prove it, and that's the case we put on.

18         And after that, the defendant took the stand.  If you

19   slept through the Government's entire case, you would know

20   everything you need to know just from the defendant's

21   testimony, because he said two important things.  The first, he

22   knows how the American system works.

23         This is a man who, according to Mr. Harris, was living

24   the American dream.  He's not someone who grew up without an

25   education; he has two master's degrees.  And he testified,

1   yeah, he knows how the system works.  He knows, in America,

2   it's up to the courts to interpret the law and say what the law

3   is.  He's not someone screaming on the street who doesn't

4   understand the law.  He understands that that's how justice is

5   done in America.  It's the courts that decide.  It's not every

6   man for himself can decide what he believes the law is.

7        And, two, he says he knows every judge in this great

8   country disagrees with his view on the law.  So he knows it's

9   the judges who say what the law is, and he knows that the

10  judges don't believe what he says he thinks the law is.

11       So why are we here?  This man knows what the law is;

12  he's just refusing to admit it, which is very convenient in

13  this case.

14       Now, even though there is only perhaps one fact in

15  dispute, the Government has the burden, as it should in a

16  criminal case, to prove every element beyond a reasonable doubt

17  he.  And we've put on evidence, and I'd like to just go through

18  some of that evidence and discuss it and address each element

19  one at a time.

20       So you've heard from the judge, this is a one-count

21  Indictment.  I think both counsel stood up in the beginning and

22  said it's a simple case.  There is not a ton of charges.  And

23  the Indictment, as you heard from Judge Blackburn, has four

24  elements.

25       First, the defendant owed substantial income tax from

560

1    1998 through 2005.  Now, you heard in the Indictment, the

2    Government alleged it was at least 90 something thousand.  And

3    you'll see from the exhibits, that's the amount that Advanced

4    Tax Solutions said he owed based on his own filed returns.  It

5    was at least that much.  You don't have to decide that.  You

6    don't have to decide if it's the amount that Ms. Trabold

7    calculated or if it was the amount that was properly assessed,

8    his transcript.  It doesn't matter what the amount is.  You're

9    not here to calculate tax; you're here just to decide if the

10   amount he owed was substantial.  This is not in dispute.

11         Two, the defendant intended to evade and defeat the

12   payment of tax.

13         Three, the defendant committed an affirmative act of

14   evasion.  And there is two alleged in the Indictment.  We

15   talked about them earlier.  One is that he used the business

16   account to do all of his personal expenses.  And he did that

17   because he knew, as you heard from the witnesses, it's much

18   harder for the IRS to levy a business account to satisfy an

19   individual tax debt.  So he shifted everything to the business

20   account.  And, two, he would try to keep that account balance

21   low by when he would make a deposit, he would quickly pull out

22   the money in the form of an official check.  So those actions

23   are not disputed.  And his intent, the fact that he did that to

24   evade taxes, he said himself -- he said, yeah, that's why I was

25   doing it.  I didn't want the IRS or the Colorado Department of

1    Revenue to get my money.

2          So, you know, in this case, we've given some samples

3    that are in evidence.  This slide is not in evidence, but this

4    is just a summary of those official checks that we put in

5    evidence.  So, you know, you can see that, basically, the same

6    day, big deposit would go in, official checks would come out.

7    And we've submitted as evidence samples, you know, that ranged

8    the years, different amounts.  Sometimes they were made out to

9    himself or his wife, sometimes to a vendor, but it was all done

10   for the same purpose.  And there is also a summary of all of

11   those official checks.  This is in evidence, this summary, and

12   so you can look at that.  And then, of course, the actual bank

13   records, the guts that sort of underlie each of these is also

14   there if you want to look at that as well.  And remember, it's

15   not just these 15.  This is a million 6, $1.6 million of

16   official checks coming out of the bank account for the one

17   purpose of evading the payment of tax.

18         And as for the use of the personal accounts, I mean,

19   the defendant missed it, but, you know, you also have the

20   average balance exhibits.  So this is just the graphical

21   representation.  The first was the personal, the business, and

22   then the two of them together.  So those are the elements 2 and

23   3.

24         So the act is element 3, and element 2 is the intent

25   of that act.  So those we're sort of putting together, he

1       committed those acts for the purpose of evading tax.

2               Now -- and then fourth is that the defendant acted

3       willfully.  We -- the judge has defined willfulness.  I think

4       it makes an appearance in Instructions 7, 8, and 9.  It's the

5       important part of this case.  And so for that, as you heard

6       from the beginning, you're not going to have any direct

7       evidence.  Right?  We didn't put any mind readers on the stand

8       to say that they looked into the defendant's mind and could say

9       that, you know, he knew what the law was.  We don't have brain

10      scan, scientific reports saying this.  For this, you're going

11      to rely on circumstantial evidence and your common sense.

12              And actually just to go through -- so with

13      willfulness, I want to talk about what willfulness is and what

14      it is not.  So it's been defined for you.  It's a voluntary

15      intent to violate a known legal duty.  The question here is

16      whether the legal duty was known.  That's the portion of

17      willfulness that is disputed in this case.

18              Taxes are complicated.  We've been talking about this

19      since the beginning.  The law does not criminalize people who

20      have a good faith misunderstanding.  This is not about that.

21      This is not about a defendant who was confused about the gift

22      limits or the taxability of international profits or the

23      deductibility of a long-lived tool.  If you remember, he talked

24      with Dale Erikson over email about, is something a long-lived

25      tool?  This is not about those complicated things in tax law

1    for which a person might reasonably have a good faith

2    misunderstanding.  This is about a simple thing -- do you have

3    to pay tax or not?

4         It's important also to say what willfulness is not.

5    You heard it from the Court.  Disagreeing with the law does not

6    constitute a good faith basis, because everybody has to abide

7    by the law whether they agree with it or not.  We couldn't have

8    it any other way.

9         It's also not believing the law is unconstitutional.

10   We have judges for that.  If a person believes the law is

11   unconstitutional, that shows that they understand what the law

12   is.  They have a strong opinion about it; they've looked at it;

13   they've read it; they understand it; but they go, wait, I know

14   another legal document that says this.  That's not a good faith

15   misunderstanding of the law.  Neither is protesting the

16   government, ignoring the courts, saying you're going to

17   withhold all support from this servant government.  That's not

18   a good faith misunderstanding of the law.

19        So why are we here?  The defendant did not have a good

20   faith misunderstanding of the law; he was just greedy.

21        So what really happened?  We tried to present the

22   evidence in a chronological order as best we could.  And so you

23   know that the last time Mr. Birk filed a timely tax return and

24   paid was in April of 1998.  That was his '97 tax return.  You

25   know that -- his W-2 is attached -- there is three '98 returns.

564

1    But the first '98 return that was done by Advanced Tax

2    Solutions, by Dale Erikson -- the nervous guy who was the

3    accountant, who talked about doing the taxes -- you know that

4    in that job -- his W-2 was there -- he made wages at PRC, Inc.,

5    which he said was a defense contractor.  Big client was the

6    DOD.  And the defendant testified, he knows the government

7    needs money to build whatever secret stuff he was working on as

8    an engineer.

9         So he left that job, and what did he do?  And moved

10   out here and started his own business.  So what does that mean?

11   No more withholding.  All right.  My whole career the

12   government has just been taking taxes straight out of my

13   paycheck, but now I'm my own businessman.  Now it's up to me to

14   tell the government what I owe.  It's a good time to drop out

15   of the system.  Right?

16        And what does he do when he starts that?  This is what

17   I'm going to refer to as the TAMI fraud.  And whether it's a

18   sham or a conduit, it doesn't matter.  Even the defendant

19   admitted -- he goes, yeah, I did that to avoid the IRS

20   withholding.  Because he knows his view of the law is not the

21   correct view of the law.

22        Now, the TAMI fraud is -- and as much as this case is

23   simple, I think this is a little bit confusing, so I just do

24   want to go through it in a little more depth.

25             *THE COURT:*  And a little more slowly, if you would,

1    counsel.

2         *MR. MAGNANI:*  Sorry.  I'm worried about the time, Your

3    Honor.

4         You heard from Ms. Trabold, if you have a retirement

5    account, be it a 401K or an IRA, you make a deal with the

6    government.  And you say, government, please don't tax my

7    income in this year.  I promise I'll give that money to

8    someone, a custodian, and they'll make sure it's there for me

9    when I retire.  Right?  If you transfer that money from one

10   custodian to another, that's not a taxable event.  It's just

11   held by a different person watching your money.  No tax.  If

12   you're not happy with Fidelity and you move to Wells Fargo, no

13   tax.  You still don't have that money.  But if you take that

14   money, you take it for yourself, you have to pay tax on it in

15   the year that you take it.  It's called a distribution.  Now,

16   if you're under 59 1/2 at the time, there is also an additional

17   tax.  And you asked your custodian -- if you say, Hey,

18   Fidelity, send me some of my money -- it's my money -- they

19   would do so; but they would withhold some tax and pay it to the

20   government.  So that's what Mr. Birk was trying to avoid.

21        So what does he do?  He goes to the Colorado Secretary

22   of State and he creates a company, a corporation.  He's the

23   only member.  He's the registered agent.  You have the

24   Secretary of State documents.  He creates Tarryall Asset

25   Management.  What a great name.  It sounds like an asset

1    management company.  Perhaps it sounds like a custodian of

2    retirement funds.  Is Mr. Birk in the business of being a

3    retirement custodian?  No.  But you could see, kind of looks

4    the same.  So when he transfers that money from the original

5    custodian to TAMI, it looks like a direct rollover -- to use

6    the taxable term that Ms. Trabold told us -- but it's not.

7    Because that money goes from TAMI right into his pocket.  He

8    takes the money, puts it into his business.  Or to be more

9    accurate, sometimes it went to Honest Abe, which was his big

10   vendor.

11        So what was this, sham, conduit?  Whatever you want to

12   call it, it was a $400,000 taxable retirement distribution in

13   disguise.  That's what the TAMI fraud is.

14        So he starts his own business, funds it with the

15   proceeds of the TAMI fraud, goes off the grid, stopped filing.

16   Again, it's a good time.  No more withholding.

17        After a while, you know, the IRS, they tend to notice

18   if you stop filing tax returns.  They start to come after him.

19   First they contact him, hey, you know, did you file a return?

20   And what does he do?  He hunkers down.  He'll find some

21   like-minded We the People friends, and he jumps on a bandwagon.

22   And, you know, maybe it was understandable at that time for him

23   to jump on, be easily tricked by these people.  Maybe at the

24   beginning, maybe it was.  It's a tempting story.  If you are a

25   business owner and you don't have to pay withholding, it's a

1   pretty -- you know, I think he said, I watch out for

2   silver-bullet schemes that say you don't have to pay tax.

3   Well, whatever scheme he was following, certainly didn't

4   require him to pay any tax.  So he jumped on that bandwagon,

5   filed a lawsuit, filed frivolous tax returns.  And those

6   frivolous returns -- you have one of them, you have Exhibit 1.

7   That's that 1998 return where he requested the $52,000 refund,

8   asking for all of his social security tax back, even.  He fully

9   intends to take social security.  His wife takes it.

10          So the lawsuit fails, and the IRS pressure starts to

11   mount.  You know, those notices to levy, they're scary letters.

12   You don't want to get those notices.  Although, as you guys

13   know -- and I hope we keep this secret -- just because it's a

14   final notice of intent to levy, doesn't mean your money is in

15   risk right away, as you probably learned throughout this trial.

16   But let's keep that in the vault.

17          So, you know, pressure starts to mount.  And so, as

18   Mr. Harris said, he goes to Advanced Tax Solutions with his

19   spirit broken.  His spirit has been broken.  The American dream

20   is over.  He goes there.  And why does he go there?  He goes

21   there because he knows the game is up.  I can't -- you know,

22   he's not a kid.  He's a grown man.  He's an educated man, and

23   he knows the jig is up.  He goes there to file his proper tax

24   returns.  But this is where the greed comes in.  What's he not

25   willing to do when he goes there?  He is not willing to tell

 1    Dale Erikson about his conduit; he is not ready to pay

 2    additional tax on $400,000 of income.

 3         Now, Mr. Erikson said he had two sources of

 4    information.  He said, I got some information from the IRS --

 5    which the IRS didn't see this as a distribution.  They didn't

 6    have any reporting of that -- and I got information from the

 7    defendant.  Nothing.  Nothing there about TAMI.  Nothing about

 8    the conduit.  And that is Ms. Applegate, the second witness you

 9    heard, the revenue agent who audited him, she's the one who

10    found it.  She said, yeah, he left me a message, he sent me a

11    bunch of garbage, but he wouldn't give me records.  So she

12    summonsed records, and she found that.  But for that, that TAMI

13    fraud might not have been uncovered.  So he files the returns;

14    he refuses to pay anything, not a dollar; he doesn't hire a

15    lawyer to fight this; he doesn't go into court.  You know, as

16    he says in his letters, he knows he doesn't have a chance in

17    court.  He knows what a lawyer will tell him.

18         You know, this is a guy -- do you think he would

19    let -- as good of lawyers as they may be, do you think the

20    defendant would let Mr. Harris and Ms. Beck build a log home

21    for him?  No.  People have certain expertise.  And it's

22    interesting, a lot of the CPAs he talked about, disbarred.  One

23    of the lawyers I asked him about, Larry Becraft, sanctioned in

24    court.  Bob Schulz, the We the People guy -- you know, if you

25    look at that exhibit, the truth about frivolous tax filers,

1    you'll find a lot of the names of the people, the disbarred

2    professionals that the defendant said he relied on.

3           What does he do?  Nothing is working.  He throws a

4    tantrum.  This is about the defendant's defiance.  It's about

5    his greed and his defiance.

6           So that's what happened.  You don't need to decide all

7    of that.  You're here, really, as counsel said in opening, for

8    something much simpler.  Did the man know he had to pay taxes?

9    That's it.  And, so for that, you're going to rely again on

10   circumstantial evidence.  And luckily, as the judge just told

11   you, the law makes no distinction between direct and

12   circumstantial evidence.

13          Now, he talked about eyewitness, ear witness.

14   Sometimes that can be unreliable.  That's direct evidence, but

15   it can be unreliable.  Here you have documents.  So it's

16   circumstantial, but it's reliable evidence.  You're permitted

17   to draw reasonable inferences as you feel are justified in

18   light of your experience.  You can make deductions and reach

19   conclusions that reason and common sense lead you to draw.  In

20   other words, in a world without mind readers and brain

21   scanners, what could be better than 12 citizens with their

22   collective life experience and common sense to decide a dispute

23   of fact like the one we have today?

24          Now, mentioned about the defendant's testimony, talked

25   about some principles of law, I would -- because we did make

1   you sit through 14 witnesses and a lot of exhibits, I would

2   like to spin through some of the evidence.  And this evidence

3   also you can use as circumstantial evidence as to what was

4   really in the defendant's mind.

5         Okay.  First witness, Ms. Morgan.  She was the lady

6   who came here from Utah.  She had been working at the IRS for a

7   very long time.  And she actually said she helped draft the

8   letter 3175 -- and I will not use any more letter numbers in

9   the rest of this closing.  But these are the letters that the

10  IRS sent to the defendant to explain to him, your positions are

11  frivolous.  Here is the one he got in 2001.  Federal courts

12  don't agree.  2004, he gets another one.  Courts don't agree;

13  people who violate the tax law can be prosecuted; claims

14  presented don't relieve you from your responsibility to pay

15  tax; if you keep sending us this stuff, we are not going to

16  keep responding to you.

17        Defense's whole case is, I didn't get the attention I

18  wanted from the IRS.  That is not relevant in this case.

19  Whether he got an appropriate amount of attention from the

20  government is not an element of the crime.  That's not what's

21  at stake here.  That's not the issue here.  And the IRS also

22  says, by the way, if we don't respond to you, that doesn't mean

23  we agree with you.  We're just not going to respond to this

24  nonsense.

25        2006 another letter.  Here they mention even the

1    Supreme Court has rejected this.  They also say -- this is

2    important.  The defendant, you know, he acknowledged this too.

3    The IRS says, look, it's not -- we can't -- if you have a, you

4    know, constitutional issue -- and they say that on the third

5    line of the document -- if you have a constitutional issue,

6    guess what?  The appeals officers, they're not Supreme Court

7    justices.  They can't say, wow, maybe you're right.  The taxing

8    clause -- that's not their job.  Their job is to enforce the

9    law as it comes down.  As the defendant said, I know I can't

10   convince these people.  There is a chain of command.

11           You know, more notice, frivolous arguments, and then

12   another 3175.  You know, this is ten years later.  He gets one

13   in 2001, another in 2011.  It's a decade of him being told by

14   the IRS that, you know, his arguments are frivolous.

15           Also, I mean, if he didn't get a lot of notices from

16   the IRS, he also got a lot of notices demanding payment.

17   Right?  These notices also, throughout the years, you know,

18   they notified him at least that the government's position was

19   that he owed tax.  Tell him how much to pay, requests to pay.

20   Actually, this one, Exhibit 37, it lays out -- you heard it

21   from some of the appeals officers.  They go, look, we try to

22   work with folks to get this settled.  Right?  There are tons of

23   options that we have.  If you submit your financial

24   information; we can do an installment agreement; a short-term

25   payment plan; an offer in compromise, where you basically say

1   look, I'll offer this much to settle this, and we can

2   compromise and put it to bed.  They like to put it to bed.

3   They don't like chasing people for ten years.  They can even

4   decide it's currently not collectible; this person just doesn't

5   have the financial resources to pay the debt; currently not

6   collectible; the person can also declare bankruptcy.  Tons of

7   options.  Didn't explore any of them.

8           More notices.

9           Oh, this was interesting.  So if you remember

10  Mr. Jeka?  He was the second appeals officer you heard from.

11  He had the tan suit and the loud tie.  He was the one who -- he

12  wrote this memo -- and this is in evidence.  He says, yeah, I

13  asked him how much he owed; and he said about $168,000.  Now,

14  where does that money come from?  Dale Erikson.  Remember at

15  the end, after preparing all the returns, he gave him a summary

16  that said, you owe $168,000.  So the defendant went -- I mean,

17  Mr. Whalen and Mr. Erikson, the two Advanced Tax Solutions

18  employees, these are -- you know, tons of master's degrees,

19  CPAs.  Dale was so embarrassed to tell you all he got a bronze

20  medal on the exam.  These are smart, reputable people who don't

21  engage in this type of stuff.  The defendant hired them to

22  prepare serious tax returns based on the information that he

23  gave them.  That's what they did.  And when he went into the

24  appeals meeting, he said, yeah, this is what I owe.

25          He also went on to say -- well, we'll get to that,

1    actually, in a minute.

2           Another notice.  Notices.  Again, it's not a surprise

3    to this man.  Oh, let's talk about this, too.  The intent to

4    foreclose.  You heard about all the procedures the IRS has to

5    go through to do a levy.  Then you heard Revenue Officers

6    Morgan and Miller, I believe, the last two women that you heard

7    from that were revenue officers, talking about, well, I

8    identified his property -- this is the woman who went to his

9    house with the guys wearing the armor.  She's the one who got

10   the threatening correspondence.  She said, I identified his

11   property; and he had three pieces of property.  One was the

12   home he lived in, and the IRS doesn't really let us take homes

13   that people live in.  The second he owned with a third party.

14   And she said, well, the IRS doesn't want to seize property that

15   will affect an innocent third party.  So what does she get?

16   She got 9 acres.  You can see it was sold at auction, and the

17   IRS got about 12,000 bucks.  When these revenue officers are

18   coming to his home, he knows that he has the requirement to pay

19   taxes.  It's not a surprise to this man.  You know, the letters

20   come; the amounts mount; and that's it.

21          Okay.  So the IRS told him.  Right?  Who else told

22   him?  The federal courts.  That's why when he testifies, he has

23   to say of course he knows the courts don't agree with him.

24   Filed a lawsuit, a constitutional lawsuit, making

25   constitutional claims about the tax system.  He was one of I

1    think he said 1,000 plaintiffs.  That lawsuit was denied.  They

2    appealed.  They went to the courts of appeal.  Denied by a

3    three-judge panel.  They appealed it again.  They wanted all of

4    the judges in the Court of Appeals to consider the argument.

5    It was denied again.  Finally, last chance, Supreme Court of

6    the United States, you know what happened.  That was denied

7    too.  By the way, we didn't show this exhibit, but Exhibit 122

8    is a one-page piece of paper that explains the procedural

9    history of that case.  It's not all the legal documents;

10   hopefully, it's written in plain English.

11            How else can we know that Mr. Birk knew he had to pay

12   taxes?  What he said in his letters.  I mean, even before he

13   testified -- you know, when he faxed Mr. Stork -- this was the

14   first collections officer you heard from.  He was talking

15   about, I want -- this is in 2005, by the way -- I want to come

16   back in the system.  I'm going to file back returns.  He says,

17   "I also told you, I no longer deem it appropriate to argue the

18   application of tax laws or other legal matters with the IRS but

19   to allow the courts to resolve it."  He says, "Based on our

20   conversation of yesterday, I probably owe some good people at

21   the IRS an apology for my past actions in this matter."

22            What happened to that Mr. Birk?  That Mr. Birk didn't

23   want to pay taxes, so -- and he says, you know, he'll file

24   taxes and pay what is due.  He filed them; didn't pay.

25            He goes to Advanced Tax Solutions.  This is when his

1    spirit was broken.  And he does what you would understand, what

2    your common sense tells you a man in his position would want to

3    do.  The court is not going your way, you see the writing on

4    the wall, so you go to a reputable place.  I think they said

5    they had ten employees then, at least four CPAs.  He wants to

6    know his options, and he wants help in returning to the system.

7    Here is $10,000; please help me.  And that's what those men

8    did.  You heard them testify.  They helped him; they provided

9    him the best returns they could with the information -- you

10   see, if you look through the correspondence, he's thanking Dale

11   for his attention to detail and his hard work on this matter.

12   That's the work they did.

13        He filed the returns.  And the first batch of returns

14   he filed in November of 2006, and the second -- oh, this was,

15   by the way, after the Court had denied his lawsuit.  Which,

16   it's interesting, because he's saying, I'm giving you these

17   returns under duress.  I've got this court case, and maybe that

18   will give me some tax relief.  So it's under duress.  But this

19   was after the court denied his case.  So, I mean, maybe he was

20   holding out on appeal.  I guess, it hadn't been denied on

21   appeal at this point.  That's true.

22        And, then, yeah, I mean, he gives the final returns to

23   Mr. Jeka in person.  This was in January of 2007.  And that's

24   the meeting where he said, Here are the returns, I owe about

25   168 grand, according to those returns.  Again, TAMI fraud,

1    still concealed on those returns.

2           Okay.  So is this a good faith misunderstanding?  A

3    good faith misunderstanding is a complete defense.  That's a

4    good thing, because people make good faith misunderstandings

5    all the time.  And it shouldn't be a crime if you're genuinely

6    confused about a complex area of the law.  I think even in

7    opening, Mr. Harris said he did a lot of studying to try to

8    understand this complex area of the law.  Some areas of tax law

9    are pretty complicated; the fact that you have to pay tax on

10   income is not complicated.

11          Okay.  Let's look at what he said to Appeals Officer

12   Bentley.  This is the guy in all black with the cool hair who

13   looked like he should be on TV.  He's an IRS employee, which is

14   amazing.  And he testified about all the different grades he

15   worked at.  I mean, he knew his resumé like the back of his

16   hand.  And Mr. Birk sent him a letter.  And this is where, you

17   know, it just starts.  I mean, blatant judicial conspiracy.

18   He's saying -- he's complaining about actions taken against the

19   leaders of The Tax Honesty Movement and We the People.  Again,

20   look at that document.  You'll see some of those names he

21   mentioned.  You'll see We the People in that document on

22   frivolous arguments.  So it's conspiracy that the courts are

23   ruling against them.  It's judicial tyranny.

24          He even says -- and, now, this is after the Supreme

25   Court denied his case -- the refusal -- this is the middle of

1    the page -- "the refusal of the high court" -- that's the

2    Supreme Court -- "to affirm a fundamental right in law, much

3    less provide a clear definition of the meaning of this right,

4    does not change our position one bit."  Is that a good faith

5    misunderstanding?  It doesn't change his position.  The Supreme

6    Court interprets the law and the Constitution; Mr. Birk's

7    opinion is not changed.  That's just defiance.  He's not

8    confused; he's defiant.

9         The courts have rendered themselves closed, meaning

10   the courts won't help me.  And so, you know, what do we have to

11   do?  We have to send petitions -- just look at this last

12   sentence.  He says, "The courts are closed": and then every

13   sentence that follows it starts, "but we believe this," "but we

14   believe that," "we believe this."  It doesn't matter what he

15   believes.  It matters what he knows the law is.  Again, he's

16   not crazy.  He knows it's the court's job.

17        This letter -- this is also when -- you know, "Even if

18   the IRS had a legitimate claim, our constitutional rights to

19   petition prevail legally."  Folks, this is after the Supreme

20   Court said, no, it doesn't.  And Mr. Birk, he said, yeah, I

21   read all of those cases.  I read all the cases that the IRS

22   sent me.  I was really trying to study it.  So don't you think

23   he would have read his own case?  Don't you think he would have

24   known the Supreme Court said, no, you're wrong?

25        So this is where -- you know, look at the last

1   sentence of the first one.  Basically, he's saying, unless you

2   pay more attention to me and give me the answers that I want --

3   you've tried to answer me before, but I didn't like those

4   answers.  Until you give me the answers I want, the federal

5   government is not entitled to any more income taxes.  "The

6   undersigned withdraw any financial support from the government

7   to the fullest extent possible."

8          All right.  The servant government doesn't get any

9   more money until you tell me what I want to hear.  He just

10  doesn't want to pay.  This isn't -- it's a very human thing to

11  understand.  You've got a lot of money, you owe a lot of money,

12  you've been trying to hide the taxability of it, and now you

13  just don't want to pay.  It's easy to understand that, but it's

14  not a good faith misunderstanding of the law.

15         So he throws a tantrum.  The letters to Revenue

16  Officer Miller -- she was the second to last revenue officer

17  that you heard from -- and went to Congressman Lamborn.  I

18  mean, can you forgive the congressman for not responding to his

19  letters when they look like this, talking about the collusion

20  of the courts?

21         And this is the one I was talking about before.

22  "Given the collusion of the courts, we have little chance of

23  success, if any, in challenging the powers that be in a court

24  of law."  What's he saying?  Look at his own words.  He's

25  saying, I can't go into court.  The guys who interpret the law,

1    they know it's not what I say it is.  He knows that.

2            And he goes on to say, you know, if we don't hear from

3    you, the die will be cast, and we'll defend ourselves no matter

4    what.  I mean, you know, he had some reason why this wasn't

5    threatening, something about the Second Amendment.  I don't

6    know.  You guys can decide.  It doesn't matter if it's

7    threatening or not.  It's about his defiance; his no answers,

8    no taxes.

9            When he says "no answers," he doesn't mean no answers

10   at all.  He means, I want the answer that I want.  Right?  He's

11   getting answers; he's getting them from the IRS; he's getting

12   them from the courts.  He's getting all the answer he needs, he

13   just doesn't like them, so he starts harassing people.  This is

14   when he's saying, you know, "further action may incriminate you

15   personally."  This is the one he sent to Ms. Miller, who you

16   heard here.  You know, "we demand that you release all liens,"

17   and "You have 30 days to comply.  If you don't do it, it can

18   result in civil action against you personally or other

19   employees at the IRS."  You know, his -- "our position is

20   unchanged.  We will defend ourselves by whatever means are

21   necessary."  It goes on about the only nonviolent this, the

22   only nonviolent that.  No answers; no taxes.  He got answers;

23   he didn't like them.

24           So when you want to look at circumstantial evidence,

25   there is an abundance of circumstantial evidence in this case

1   that this man knew that he had to pay taxes.

2          So just to quickly close up.  The bottom line is, when

3   you go into that jury room, you don't leave your common sense

4   at the door, you bring it in there, because that's what you're

5   going to use to assess everything in this case.  All that

6   evidence -- and to assess his credibility.  Right?  Think about

7   this, that's your job, the credibility.  Which witness has a

8   personal interest in this case?  Okay.  Who are the people that

9   share Birk's view?  Not law professors, he said; not judges; a

10  bunch of discredited, disbarred CPAs.  The man knows this is a

11  crime.  He says he's followed other cases; he's studied the

12  jury instructions.  Do you think it was a surprise to him this

13  judge told you, folks, you have to pay taxes on income.

14         What he did say was, he believes the laws are 100

15  percent constitutional.  Now, isn't that interesting?  Isn't

16  that convenient?  You know, Mr. Harris stood up and asked him

17  questions on redirect, were you prepared to talk about other

18  people you know?  Well, one, since when do you have to be

19  prepared to tell the truth?  But, two, here is what he was

20  prepared to do:  He was prepared to be firm in 100 percent

21  constitutional.  Why?  Because he knew the judge was going to

22  tell you, believing something is not constitutional is not a

23  good faith misunderstanding.  Mr. Birk was prepared for that.

24  And despite he referenced the First Amendment, Second

25  Amendment, Fifth Amendment, Ninth, Sixteenth, Article 1, the

1  taxing clauses, apportion tax.  You heard what he says, it's

2  constitutional; but he made sure to tell you it wasn't.  How

3  convenient.

4          Again, he's a smart guy.  He has the ingenuity to do

5  the TAMI fraud.  He has two master's degrees.  He's a smart

6  guy; he knows he has to pay tax.  Really, this is a simple

7  case, as everybody said.  It's a simple case, a simple choice.

8  And the choice -- you're not hear to decide if Mr. Birk is a

9  nice guy or a good person.  Very well may be.  The teller at

10  the bank, yeah, he's perfectly nice, polite guy.  That's not

11  your choice.  You're not here to decide how much he owes in

12  tax, whether it's the big number, the middle number, the small

13  number.  Doesn't matter, as long as it was substantial.  You're

14  here to answer one question:  Did he willfully attempt to evade

15  or defeat tax?

16          Ladies and gentlemen, he attempted; and he succeeded.

17  And that's why the only verdict that is consistent with the

18  evidence in this case is the verdict of guilty.

19          Thank you.

20          *THE COURT:*  Counsel, thank you.

21          Very well.  Closing argument for Mr. Birk.

22          Mr. Harris.

23          *MR. HARRIS:*  Thank you, Your Honor.

24          *THE COURT:*  You're welcome.

25

1          **CLOSING ARGUMENT**

2              *MR. HARRIS:*  Good morning.

3              Last I checked, it's not a crime to ask our government

4      questions.  Last I checked, it's not a crime to seek answers to

5      those questions.  Last I checked, in this country we don't send

6      people to jail for asking questions.  Like most of us, Marty

7      Birk spent years unquestioningly paying his taxes every April.

8      Like most of us, for years, he didn't question his tax

9      liability; he just worked hard, served his country in the

10     military, raised a family, paid his taxes, until he didn't.

11             That wasn't just a snap judgment.  He didn't just wake

12     up one day and say, I'm greedy.  I'm going to throw a tantrum.

13     I don't believe in taxes.  I'm just not paying.  No.  He came

14     to question the duty to pay honestly.  He had heard from a law

15     professor that it was important to see if taxes -- tax laws

16     applied to particular income.  That struck him as a novel

17     concept; it raised all kinds of questions in his mind.  We're

18     not here to determine whether those questions, in which he

19     persists, are reasonable, whether he's right or whether he's

20     wrong.  I suspect if we took an instant poll right now,

21     everyone except Marty Birk might say, yeah, he's wrong about

22     that.

23             We're here for a very different purpose, and it's a

24     very different and not terribly nuanced question.  The fact of

25     the matter is that he did spend time studying the tax laws; and

1    he did learn that as he understood it, citizens have a right to

2    seek answers from their government.  And it's sort of

3    intertwined into -- it's enmeshed into his belief system.  It's

4    all intertwined.  This notion of asking the questions, and the

5    right of redress, and the payment, and no answers, no payment,

6    that thing, it's all of a piece with his internal belief

7    system, which affects directly his understanding of the law.

8         You can't divorce the two.  You can't just say, this

9    guy has this whole construct around him of beliefs that he goes

10   to We the People and Tax Honesty People, and he's surrounded by

11   learned people or crazy people or good people or bad people,

12   but now he somehow has to break out of that cocoon and get out

13   of it.

14        I analogize it, if you will, to a cult.  Analogize it

15   to whatever you'll analogize it to.  But at the end of the day,

16   understand this:  This is what he earnestly believes.  And the

17   evidence abundantly shows that.

18        Simply put, we're here today because the IRS never

19   directly answered his questions.  And yet the questions matter.

20   Because, frankly, had they approached this differently, maybe

21   they wouldn't have fueled the suspicion, maybe they wouldn't

22   have poured gasoline on the fire of a paranoia.  But they

23   didn't, and that's a different universe.  Because despite the

24   kumbaya-like notion that, yeah, an audit is just -- everyone

25   gets together and just works it out -- to which at some level

1      naively Mr. Birk subscribed -- to some level cynically, I would

2      posit, the IRS puts to you, that's not what happened.  That's

3      not what happened here.  That's not reality.  What happened is

4      they were dismissive, they were arrogant, they called it

5      frivolous, and yet he still wanted answers.  He believed he had

6      a right to demand answers; and instead of that, he got this,

7      this prosecution.

8           So after three days of testimony from all of those

9      witnesses, it comes down to this:  Did Marty Birk believe in

10     good faith that he didn't have to pay those taxes?  If so, the

11     law tells you, you must find him not guilty.  In fact, unless

12     you find beyond a reasonable doubt that he lacked good faith,

13     you can't convict him.

14          Now, importantly, Instruction No. 2 in your packet

15     gives you some guidance concerning some of these issues and

16     reasonable doubt.

17          The Court has instructed you on reasonable doubt, so

18     let's take a look at that high burden.  If you're not firmly

19     convinced, you've got to find him not guilty.  And I submit,

20     there is plenty of reason to be not firmly convinced.  You may

21     have your suspicions, you may have your thoughts, you may not

22     like what he believes, you may think he's crazy or delusional

23     or wrong, but that's not it.  That's not what you're deciding.

24          And this is the key right here, "hesitate to act."

25     The law is, and the judge has told you, that reasonable doubt

1    is the kind of doubt that would cause a reasonable person to

2    hesitate to act in a matter of importance to him or herself.

3    From everything we've heard, certainly, at bare minimum -- I

4    think it's more than that -- there is reason to hesitate to act

5    before pulling the trigger on a conviction under these facts.

6          It's not enough to just believe maybe he's not guilty.

7    I mean, yeah, obviously, then you acquit.  It's not enough to

8    believe he's -- yeah, he's likely to be guilty.  You need to be

9    firmly convinced.  It's not enough that he's possibly guilty or

10   you suspect it, because then you have hesitation to act.  If

11   you say, well, perhaps, he's guilty, I think it's quite likely

12   he's guilty, that's not it.  That doesn't get you there.

13   You're not over that threshold.  The evidence is clear, there

14   is abundant reasonable doubt about the only issue in this case,

15   his state of mind.

16         There is reasonable doubt about willfulness.  They

17   need to prove he acted willfully.  That's the instruction.  I

18   believe it's No. 7.  You can double-check on that.  And he

19   doesn't act willfully, let's look at that, if he's acting on a

20   good faith misunderstanding.  Now, you can say, well, how is it

21   a misunderstanding, because -- I mean, everyone is telling him

22   this?  Everyone tells a lot of people a lot of things.  I mean,

23   there are people incredibly enough who believe we never landed

24   on the moon on the anniversary of that occurring.  There are

25   people -- and I don't mean to offend anyone's political

 1   beliefs -- who deny climate change.  There are people who

 2   believe still -- there is a flat earth society.  But if it's a

 3   good faith misunderstanding, well, doesn't get you over the

 4   line.  Even if that understanding is wrong -- dead wrong --

 5   even if you think it is unreasonable, not over the line.

 6          Of course, you can't just disagree with the law.

 7   Granted.  But you didn't hear a single thing from him saying, I

 8   just disagree with the law.  And I submit that you've not seen

 9   any circumstantial evidence that this is a matter of just

10   disagreeing, saying, nah, I disagree.

11          So what does the evidence show?  Let's take a look.

12          Well, he had questions about the law.  Is there anyone

13   in this room who doesn't -- well, some in the room, on the

14   prosecution side.  But, really, does anyone doubt for a second

15   that he did study and try to educate himself about income tax

16   law?  Now, the Government wants you to believe that all he is

17   relying on is a bunch of these protesters, disbarred CPAs,

18   whatever.  No, that's not what he said.  That's not what

19   occurred.  He relied on cases.  He said he loves to read cases,

20   cases and statutes.

21          And in Marty's view, the general requirement about his

22   duty to pay on business income is based on his understanding

23   and reading of those cases.  And, you know what?  The law is a

24   tricky thing.  And there is a reason, I suppose -- they tell me

25   there is -- that we go to law school for three years.  There is

1   a reason that there are state Bar licensing requirements, and

2   not everyone gets it.  Some people think they get it, but not

3   everyone gets it.

4          But, you know, the law is a tricky thing.  Even the

5   best and the brightest legal minds can interpret it

6   differently.  That's why we see people who go to Harvard and

7   Yale and then Stanford Law School, people who have served as

8   governors and judges on circuit courts of appeal, people of

9   real legal distinction, the best and brightest legal minds in

10  the country get up to the Supreme Court.  And you can have a

11  Ruth Bader Ginsburg over there on the left, and you can have a

12  Judge Kavanaugh over there on the right.  They're both

13  intelligent people; they both have different interpretations of

14  the law.  Five to four, six to three.  Most of these Supreme

15  Court decisions aren't even unanimous.

16         So, you know, it's easy to get up here and beat up on

17  his understanding of the law or to call him cynical or

18  greedy -- and I'll get to that -- but, you know, it's a tricky

19  thing.  He's not a lawyer, he's a business guy, he's a family

20  man, he has an inquisitive mind, and he tried to learn what the

21  law was.

22         When he made that determination, he reached certain

23  conclusions.  Those conclusions might be wrong, and you might

24  disagree with them.  But it's not -- it's not -- just some

25  convenient recent concoction to avoid taxes.  His view is that

1    in order to be required to file a federal income tax, he's got

2    to be liable for the tax, it's got to be defined as income by

3    the law, and the law must apply to him.  He told you that this

4    law professor told him -- and this is what sparked his

5    interest -- that the law applies to everyone to whom it

6    applies.  That's what got him thinking.  Different things send

7    people in different directions in life.  That's what sent him

8    down this path.

9         He told you, I don't believe it's a constitutional

10   problem.  He told you, I think it's a misapplication of our tax

11   laws.  So respectfully, I think Mr. Magnani mischaracterizes

12   Mr. Birk's argument.  You know, that's fine.  He's an advocate,

13   and he can cast it how he chooses.  You'll figure out how you

14   cast it.  But you heard the testimony.  He told you he didn't

15   think taxes were unconstitutional; he supports taxes in his own

16   way.  He didn't tell you that he simply disagreed with the law.

17   His questions and his understandings revolve around application

18   of the law.

19        Now, make no mistake about it, he asked questions.  He

20   tried consistently to get answers, but they refused to answer

21   his questions.  It's not about attention.  I think I heard that

22   he's seeking attention.  This is not.  You think this is the

23   ideal attention-seeking behavior, getting yourself prosecuted?

24   That's not what this is about.  He has his ingrained belief

25   system.  He's trapped in his entrenched worldview.  It's at

1    this point not even volitional, I would put to you.  He's

2    asking questions; the responses fuel his suspicion.  Think

3    about it, think about how we get locked into our little belief

4    systems.

5          So what do they do?  They don't answer his questions,

6    consistently, dismissively, derisively.  It's easier for them

7    to label it as frivolous.  It's easier to send him a form

8    letter than to provide just a straight-up answer, because it

9    was never -- it was never the right time for the IRS to answer

10   his questions.

11         Kristy Morgan, their first witness, exemplifies this

12   problem.  She claims to have authored the 3175 letter, but she

13   claims not to know the manual's provisions on frivolous.  She

14   claims the IRS doesn't even have to respond once they call you

15   frivolous, but she isn't familiar with the policy that taxpayer

16   inquiries should get quality responses.  She agrees on

17   cross-examination, reluctantly, that the IRS must provide

18   quality response; but then she claims it's not their

19   responsibility to explain the law.  She denies, incredibly,

20   that it's the IRS defining "frivolous"; but then later admits,

21   sort of, that, well, the IRS attorneys are defining it.  Well,

22   that's really slicing the baloney pretty thin.

23         It was never the right time to answer questions.

24   Applegate didn't want to answer questions.  He sent her

25   letters; he sent her a disc; she never even answered the

1   questions in the letters; she didn't even look at the disc.

2   Oh, it's a virus on it maybe.  I'm afraid.  You don't think the

3   IRS has some kind of computer that they can put it on?  You

4   don't think they have world-grade anti-virus?  She's worried

5   about malware suddenly?  But that's not really it, because she

6   later admits, well, I didn't think I really needed to, even

7   though she admitted to Ms. Beck on cross that it is the IRS

8   mission statement to help taxpayers understand their liability;

9   even though she admitted that this is to be done by quality

10  responses to the correspondence; even though she admitted that

11  the IRS manual says you have to be responsive to taxpayer

12  needs.  You know, we all have different needs.  We all come at

13  life differently.  And she admitted that the IRS has an

14  obligation to respond even if the taxpayer is flagged as

15  frivolous, but it was never the right time to answer questions.

16          Mr. Skaluba, or Mr. Bass, or whatever his name really

17  is -- you know, Marty Birk provided him information and

18  arguments, and it was just simply ignored.  He refused even

19  when it was raised to discuss We the People because it was

20  never the right time to answer questions.

21          Jeka didn't answer questions.  There was a hearing, of

22  sorts, if you want to call it that.  But he refused to discuss

23  tax liability arguments at the hearing.  At a hearing, he won't

24  discuss tax liability arguments.  Quote, Birk's frivolous

25  arguments were not part of the hearing process.  No wonder

1    Marty Birk didn't call him back.  What on earth would have been

2    the point?  That's not a tantrum.

3         It was never the right time to answer questions for

4    them.  Roseanne Miller wouldn't answer questions.  Look at

5    Exhibit 51, Marty Birk's letter to her.  Quote, I don't believe

6    I responded to this letter, she says.  It was never the right

7    time to answer questions.  Bentley -- the Kris Kristofferson

8    looking guy -- he didn't answer questions.  Too dated.

9         Look at Exhibit 51 again.  Now, Marty Birk says he put

10   forth many arguments.  But Bentley told us, discussion of those

11   arguments is just not part of the process.  They're all about

12   process.  You know, Mr. Magnani asked at one point one of the

13   agents -- I forget which -- something like, well, yeah, do you

14   guys have the time to provide individualized legal memos to

15   everyone?  That -- maybe they don't.  Maybe they should.  I

16   don't know; but, clearly, we're a long ways off from an

17   individualized legal memo.  We're at the canned response stage.

18   It was never the right time to answer questions.

19        Jennifer Morgan didn't answer.  She just sent him a

20   3175 form.  Okay.  They never treated him seriously.

21        Just take a look at the evidence when you get back

22   there in the jury room.  If his questions are so frivolous, why

23   not just answer him right out; send him a letter answering him;

24   pick up the phone and call him;  email him; send a carrier

25   pigeon.  Don't just refer him to a 60-some-page boilerplate

1    compendium of case citations, a canned response.

2            Now, the Government wants to argue to you that he

3    lacked a good faith basis because he ignored facts.  Look at

4    the evidence.  He reviewed what they sent him, and he kept

5    asking questions.  If that were the case, that he was just

6    ignoring facts, why even bother to ask the question?  Why not

7    say, I'm right; you're wrong; taking my catcher's mitt and bat

8    and ball and going home.  He tried to engage.

9            They want you to believe that he had to know he was

10   wrong.  Why?  Because no law professors espoused his views,

11   because he can't name a judge who does, because everyone says

12   so, because he only knows a couple of non-taxpayers.  And that

13   was bizarre; that was embarrassing; that was cringeworthy.  The

14   sort of mini Army-McCarthy hearing.  You know, how many people

15   do you know who are communists?  Name them.  Give us names.

16   How do you spell the name?  I want to go find them.

17           I think that, when you scratch below the veneer,

18   that's where the IRS is at.  That's why he is crazy suspicious.

19   But guess what?  Majority opinion does not equal proof of

20   right; majority opinion does not decrease strength of belief;

21   majority opinion does not break down psychologically entrenched

22   belief systems; majority opinion doesn't make Don Quixote think

23   that the prostitute isn't Dulcinea; majority opinion doesn't

24   affect Captain Ahab's pursuit of Moby Dick; majority opinion

25   doesn't change climate deniers into tree huggers.  And there is

1    no evidence to suggest that Marty Birk did not actually believe

2    he had a legal duty to pay.  To the contrary, the evidence

3    shows that he absolutely believed what he said; and he still

4    does.

5          So ask yourselves this:  Why wouldn't the government's

6    refusal to directly answer his questions fuel a natural

7    suspicion on his part?  Think about this in the context of your

8    own lives.  Your child, your spouse, your lover goes out, comes

9    back at 2:00 in the morning, drunk.  And you say, Where the

10   hell were you?  You get no response.  You're already

11   suspicious.  You say, Where the hell were you?  And they give

12   you some evasive answer.  I don't know where.  You say, Where

13   the hell were you?  They say, I've been here the whole night.

14   They try to gaslight you.  What does that lead you to think, if

15   you already were of a mind to be suspicious?

16         Marty Birk asked specific questions, and he expected

17   specific answers.  And take note of this, the Government didn't

18   even present all of his letters.  What did they -- why not?  He

19   was writing them as early as 2001; they didn't present that;

20   they're cherrypicking; ask yourselves why.  They've got the

21   burden.

22         Look, this case is not about whether we have a right

23   to petition, *per se*; but it is enmeshed in his beliefs.  And,

24   really, don't we really have a right to ask the government

25   something?  I mean, isn't that really what Marty is saying?  Is

594

1    it -- is the Internal Revenue Service exempt from answering

2    questions?  No.  In the end, we're not here because of what he

3    did; we're here because when we write the government and ask

4    them a question, they ought to reply.  But in his case, with

5    people of his mindset, certainly, they ought to reply.  And it

6    would have been very simple for them to come back and simply

7    say, yeah, we read your letters.  Here specifically is where

8    you're mistaken.  He's saying, just write me back and say yes

9    or no to this, and they didn't.

10           And here you have a man who spent all of this time

11   looking at these issues, struggling with them.  Isn't that good

12   faith?  A man who didn't just accept what others tell him, but

13   examined it himself.  Isn't that good faith?  Someone that

14   acting that way -- someone acting that way, just seems they're

15   acting in good faith.  And how do we know he had good faith?

16   Well, again, circumstantially, it would have been a heck of a

17   lot easier to not fight the IRS.  Again, that's -- this bad

18   attention-seeking behavior, if it is attention-seeking

19   behavior.  He didn't need the money.  His family has, as he put

20   it, deep pockets.  Sure, he wanted the money; he didn't want to

21   give up money he thinks he doesn't owe.  But, I mean, think

22   about it, you come from a family that has money, you owe some

23   amount of money, people are levying liens, you're having to go

24   through all of this trouble to try to avoid this, I mean, why

25   go to that effort if you're not doing it in good faith, if

1  you're not really believing -- if you're not really drinking

2  the Kool-Aid, so to speak.

3         If he didn't believe what he said, why wouldn't he

4  fold up his tent before they actually got to this point, before

5  we walked into this courthouse?  After all, he's going to have

6  to pay either way.  You heard that.  And we heard a little

7  conflict.  Most of the witnesses say he's going to have to pay

8  either way.  But even per Ms. Trabold, the IRS can still assess

9  plenty of years -- I believe it's 2006 to 2011, 2012 through

10  '18.  I mean, yeah, they don't get to capture all of it,

11  perhaps; but there is a lot of money there, especially with the

12  extortionate, usurious interest rates the law provides.

13         Okay.  The protest returns, what about them?  Well, I

14  submit they don't really prove much of anything.  They don't

15  prove willfulness.  Pay -- you know, he filed tax returns.  He

16  was contesting the SFRs.  Just filing it doesn't mean that he

17  admits owing taxes.  Sometimes, as with Mr. Birk, it is just

18  easier to pay than to fight.

19         Now, looking at them specifically, they're really very

20  close to the substitute for return amounts.  The numbers are

21  actually not that far off.  He maintains that they're correct.

22  He's explained the discrepancy in terms of TAMI and the IRA, he

23  explained the rollover issue, and it's 100 percent consistent

24  with his beliefs and understandings why he set TAMI up and why

25  he did it that way.  Further, the IRA is complicated.  It's not

1    that simple, so much so that they need the fancy demonstrative

2    with the circles.  And he never ever hid TAMI from Advanced

3    Tax.  They had what they needed to sort this out.  They're

4    professionals.  Erikson knew what to ask.  He even asked the

5    questions to Mr. Birk; and Mr. Birk answered them, because he

6    wasn't hiding anything.

7         And what about the PRC?  Well, yeah, he wanted taxable

8    income fixed on the W-2, as he saw the term.  Same for the use

9    of the business account for personal expenses -- which, by the

10   way, certainly it isn't illegal to use a business account for

11   personal expenses, unless you're a fiduciary or something, you

12   know, managing someone else's funds.  They're his funds one way

13   or another.  Which pocket I take my wallet out of really

14   doesn't determine anything.  He didn't believe he owed taxes.

15   And, sure, he wanted to protect himself.

16        Now, the protest returns, Advanced Tax Solutions

17   prepared them.  They're the pros, and he cooperated fully with

18   them.  Remember, he answered their emails; he responded to

19   their questions; he provided them 1099s and account statements

20   and IRA info; and I think they said 69-page -- but I may have

21   got that wrong in my notes -- but a substantial business ledger

22   and QuickBooks profit-and-loss statement; and he never asked

23   them to file a frivolous return -- and I put that word in

24   quotes -- a return that would be deemed frivolous by IRS

25   attorneys -- or make so-called frivolous arguments.

1          And as to those returns, they didn't just rely on what

2    Mr. Birk told them.  Erikson and Whalen got info from the IRS

3    as well, so they knew about TAMI.  They asked the questions;

4    they made their determinations; they had everything else.  But

5    in the end, protest returns aren't really the issue here;

6    doesn't really matter that the numbers are a bit different;

7    what matters is, he believed he didn't owe anything.  So even

8    if you think that he misrepresented his income or expenses or

9    the TAMI thing is a problem or this looks shady or that's a

10   little shifty, if you suspect or think that it's probably or

11   perhaps or maybe leaning a little the way towards that he's

12   somehow guilty of something, or where there's smoke there is

13   fire, none of that is proof beyond a reasonable doubt, number

14   one.  And number two, none of that really goes to his good

15   faith in the fundamental core belief system of what the law is.

16   And that means he wasn't evading a tax liability that he knew

17   he had a duty to pay.

18          Likewise, his use of bank checks doesn't negate good

19   faith.  He was 100 percent candid with the IRS.  He told them

20   he's trying to avoid levies.  If he's acting in bad faith, why

21   on earth is he going to be -- why is he going to out himself?

22   Why is he going to confess?  Why?  Because he believed he

23   didn't actually owe the money that they were seeking, because

24   he believed he didn't owe anything.

25          And he didn't give up that belief when he sought

1    Advance Tax's help.  You heard what happened.  It's

2    understandable to any of us who have ever been in a long-term

3    relationship -- certainly understandable to me -- he was

4    appeasing his wife.  She was getting frustrated; she was

5    getting sick of the whole thing.  And, yeah, he was kind of

6    beaten down.  Yeah, I'll own it, his spirit was broken.  He was

7    taking the path of least resistance with the IRS.  He viewed it

8    as a compromising of his principles, but he was going to do it.

9         And it means nothing -- remember, there was some

10   cross -- some redirect, I think, of Whalen, where he was asked

11   about some statement about Marty Birk seeing the futility of

12   arguing the illegality of the taxes.  Yeah.  Yeah, I guess

13   that's the case.  He thought it was futile.  He was banging his

14   head against the wall, despite what he believed; but futility

15   is not an abandonment of belief.

16        When you go back to deliberate, remember this:  To

17   acquit Marty Birk, you don't have to believe he's right, as

18   long as he is acting in good faith, as the law has been given

19   to you.  History and literature are filled with figures who

20   become obsessed with things and follow them blindly, right or

21   wrong, rational or irrational.  As I've mentioned, Don Quixote,

22   Captain Ahab, flat earthers, moon landing deniers, just to name

23   a few.

24        At the end of the day, no willfulness is no guilt.  I

25   said right up front, Marty Birk doesn't dispute that he has

1   made money.  And I don't know why they brought all of these

2   witnesses on, all of these people to show what he made and all

3   of that, because there never was any contest about that.  We've

4   acknowledged freely from the beginning, said so right at the

5   jump, we don't dispute that Marty made money; we don't dispute

6   that he didn't file; what we do dispute is whether or not this

7   was done with a criminal state of mind.  That's the top- and

8   bottom-line issue.  Good faith means no guilt, and he had good

9   faith in abundance.

10          Ladies and gentlemen, you all swore an oath to follow

11   the law.  If Marty Birk had a good faith belief that the tax

12   law didn't apply to him, doesn't matter whether it's reasonable

13   or unreasonable, right or wrong, it's your duty to acquit.

14   It's your duty to follow the law.  Let the IRS collect civilly.

15          What you can't do is go back there and say to

16   yourselves or each other, what if everyone was a Marty Birk?

17   We'd have no military; we'd have no social safety net.  You're

18   not here to decide that.  That's for legislators; that's for

19   others.  You have one duty:  To follow the law where it takes

20   you.  Where it takes you is acquittal.

21          And at the end of the day, your work is about to

22   begin.  Our work is just about done, other than some nervous

23   waiting.  You've been entrusted with, really, the most awesome

24   responsibility that our Constitution gives us, deciding the

25   legal fate of another person.  That's never easy, but it's a

1    really important task for both the justice system and for

2    Mr. Birk especially.  And it's especially important here,

3    because there is really only one verdict which the law and the

4    facts demand, and you have the power and the responsibility to

5    render that verdict.  I trust you'll also have the wisdom and

6    the courage to render that verdict, because it's the verdict

7    compelled by justice.  Not guilty.

8            Thank you for your attention.

9            THE COURT:  Counsel, thank you.

10           Rebuttal closing argument for the Government.

11           MS. HADDEN:  Yes, Your Honor.

12           THE COURT:  Ms. Hadden.

13                      **REBUTTAL ARGUMENT**

14           MS. HADDEN:  Let's be clear here:  The defendant

15   didn't just ask questions; he also didn't just have a belief;

16   he committed a crime.  He took affirmative acts to conceal his

17   income from the IRS, evasive acts.  That's different than these

18   other belief systems where people believe weird things.

19   They're not all committing crimes.  The defendant committed

20   affirmative acts of evasion.  And it wasn't just because he

21   believed it; it's because he decided to ignore the law for his

22   own benefit.

23           The defendant wants you to believe that he had a good

24   faith belief, but that's not even what you need to find.  What

25   you need to find is that he had a good faith misunderstanding

1     of the law.  And in the face of over ten years of collection

2     activity by the IRS, sending him notices and letters and

3     publications and holding hearings; in the face of his own CPAs

4     saying that his arguments are not correct; in the face of the

5     case that he brought in court with numerous other litigants;

6     the Supreme Court denying his case; that is not a good faith

7     misunderstanding of the law.  That is ignoring the law and

8     deciding you're not going to follow it.

9          The defendant also wants you to believe that it's not

10    a constitutional argument.  The evidence does not support that.

11    He got on the stand and constantly cited the Constitution.  His

12    argument is all about the Constitution.  And as the

13    instructions told you, arguing that the tax laws are

14    unconstitutional is not a defense, and it is not a good faith

15    misunderstanding of the law.

16         Now, Mr. Harris during trial spent a lot of time

17    talking about how this is basically all the IRS's fault because

18    they simply didn't answer his questions.  The IRS did answer

19    his questions.  If you look at Exhibit 43, which is a big, fat

20    exhibit, what the IRS sent him about the truth about taxes.  On

21    page 2 there is even a case discussing the We the People

22    movement and one of his mentors, Mr. Schulz.  Almost all of his

23    arguments are addressed in that document.

24         The IRS did answer his questions.  Maybe they didn't

25    engage an entire hearing about it, but they answered his

1    questions.  And even if they didn't answer his questions, it's

2    irrelevant.  The defendant didn't have a good faith

3    misunderstanding of the law.  He knew what the law was; he just

4    didn't want it to apply to him.

5         Now, did the defendant go to a tax lawyer to discuss

6    this with a tax lawyer?  Did he bring his own case in court and

7    fight it in court?  No.  He could have kept asking these

8    questions of the government; he could have gone to tax lawyers;

9    he could have kept filing and paying his taxes while still

10   answering those questions.  Nobody is telling him he can't

11   answer questions, but you have to file and pay.  He could have

12   fought all of that and still not committed a crime.  He could

13   have still held his beliefs and not committed a crime.  The

14   defendant is not, again, under a good faith misunderstanding of

15   the law.  He knows what the law is; he just doesn't want to

16   follow it.

17        Ms. Beck in *voir dire* brought up a hypothetical with

18   one of the jurors, Mr. Martin, and talked about a no parking

19   sign and then a parking attendant coming and saying, don't park

20   here.  And Mr. Martin obviously said he would not park there.

21   If everybody of authority is telling you not to park someplace,

22   and there is a sign saying not to park, you're not going to

23   park.  If you do, you're still ignoring the law.  You're not

24   having a misunderstanding of the law.  The law is clear.  That

25   is the defendant in this case.  Everyone with authority, all

603

1    the signs are there that the law is you have to pay taxes, the

2    law is, you have to file a tax return, and he just decided to

3    ignore that law.  And he did not file, did not pay.  He

4    eventually filed through his CPAs and reported that he did in

5    fact owe taxes.

6         The bottom line is, the defendant was told over and

7    over from every authority that he is violating the law and that

8    he has to pay taxes.  And he chose to ignore it and do whatever

9    he wanted so that he could keep all the money for himself, and

10   that is not a good faith misunderstanding of the law.  And that

11   is why there is only one verdict in this case, and that is

12   guilty.

13        *THE COURT:*  Counsel, thank you.

14        Again, ladies and gentlemen, I rehearse my earlier

15   instructions:  What counsel said to you and showed to you

16   during their respective closing arguments ain't evidence and

17   may not be considered by you as such.

18        Well, folks, the evidence is in; you've been

19   instructed on the law; you've had the benefit of closing

20   arguments; that means momentarily, you will retire to discharge

21   your solemn duties as jurors in the trial of this case.

22        I remind and instruct you that you may deliberate only

23   while all jurors are present together in the jury room.  Thus,

24   you must suspend your deliberations until and unless you are

25   all present in the jury room.

604

1          Now, in this case, we're at the noon hour.  I can

2   either discharge the alternate duties without lunch or not.

3   I'm not that mean spirited.  So that the alternative alternate

4   jurors may have the benefit of having lunch with all of you,

5   courtesy of the court, you may and must not commence your

6   deliberations until after you have finished your lunch and

7   until after the alternate jurors have left the jury room.

8          I ask Ms. Roberson and the two court security officers

9   seated at the rear of the courtroom to come forward and be

10  sworn as the initial bailiffs of this jury.

11         Please raise your right hands to be sworn by the

12  court, and thank you.

13         May I have your attention in the courtroom.

14         (Court swears court security officers and courtroom

15  deputy.)

16         Thank you, and please stand by.

17         Madam Clerk, you are authorized and directed to

18  administer this same solemn oath to any other person who may be

19  approved by the Court to serve as a bailiff in this trial.

20         I now make the original jury instructions available to

21  our bailiffs and provide that all evidence admitted during the

22  trial should be delivered to the jury as soon as possible.

23         Very well.  At this time, with the exception of our

24  two alternate jurors -- and you need to understand, you were

25  never selected individually.  I simply selected the seats of

1   the alternate jurors during the trial preparation conference on

2   July 11, 2019, before we knew who you were and where you would

3   be seated.  Our alternate jurors are, Alternate No. 1, Juror

4   No. 1, Ms. Theresa Lopez.  Our Alternate Juror No. 2 is Juror

5   No. 8, David Trujillo.

6            Very well.  To the other twelve regular jurors, this

7   case is now formally submitted to you.  Good luck, and

8   Godspeed.

9            Would the two alternates please remain behind.

10            All rise pending the exit of the twelve regular

11   jurors.

12            (Jury out at 12:05 p.m.)

13            Thank you, Madam Clerk.

14            Ladies and gentlemen, again, please be seated.

15            We continue on the record in open court operating for

16   now deliberately outside the presence and hearing of the twelve

17   regular jurors, who have left the courtroom and entered their

18   jury deliberation suite.

19            I direct my remarks to our alternates, Ms. Lopez,

20   Mr. Trujillo.  First, I need to thank you for your service in

21   the trial of this case.  And I know without you telling me that

22   you may be suffering from ambivalence.  Part of you may be

23   relieved, and part of you may wish that you could soldier on

24   and discharge fully your duties in the trial of this case.  You

25   don't need to disclose that to anyone.

1          Now, I've considered all the options that I have; and

2     I am going to require that you remain as alternate jurors in

3     the trial of this case.  But I'm not going to sequester you in

4     some private area within the courthouse; instead, momentarily,

5     I'm going to allow you, of course, to enter the jury

6     deliberation suite, with which you are now familiar, enjoy

7     lunch with your fellow colleagues, then retrieve and remove

8     your belongings from the jury room.  And then you may separate,

9     leave the federal courthouse, and go your separate ways until

10    further order of the Court.

11         What does that look like?  It means that you will

12    continue in your role and service as an alternate juror; it

13    means that you will remain on call and available to replace one

14    of the regular jurors, if necessary; it means that you must

15    provide us -- Ms. Roberson -- with the most reliable means by

16    which you may be contacted if necessary.  Because, again that's

17    the tradeoff for not being sequestered here in the courthouse.

18         Please understand and know, you remain subject to the

19    rules, admonitions, and prohibitions that have governed you

20    throughout the case and this trial.  They remain in full force

21    and effect.

22         Do you have any questions for me as you continue in

23    your important role as alternate jurors?

24         *JUROR:*  No, Your Honor.

25         *THE COURT:*  I discern none.

1          Again, for you, I conclude where I commenced, with

2    thanking you for your selfless service in the trial of this

3    case.  Good luck and Godspeed to both of you.

4          All rise, pending the exit of our two alternate

5    jurors.

6          Ms. Roberson, turn right around and collect the

7    notetaking materials from Ms. Lopez, please.

8          Otherwise, please be seated.

9          We'll be at ease pending the return of Ms. Roberson.

10   She'll feel responsible to complete her minutes of these trial

11   proceedings.

12         Right on cue.

13         Very well, counsel, unless a verdict is sooner

14   received, we shall convene on the record in open court this

15   afternoon at 4:45 p.m. to conduct further proceedings

16   consistent with the circumstances then existing.  Please plan

17   accordingly.

18         Please remain within 10 minutes of the courtroom, not

19   the courthouse.  That's a very different assignment.  And,

20   counsel, while out of the courtroom -- and I'm sure you will

21   be -- please inform Ms. Roberson of your whereabouts and

22   provide her with the very best reliable means by which you may

23   be contacted.

24         Very well.  Pending further proceedings, the court is

25   in recess.  Madam Clerk.

1          (Recess at 12:10 p.m.)

2          (In open court at 2:02 p.m.)

3          *THE COURT:*  Good afternoon.  And thank you.  Please be

4   seated.

5          We convene once again on the record in open court,

6   operating for now and temporarily outside the presence of the

7   hearing of the twelve regular jurors, who are ensconced in

8   their jury deliberation suite.

9          We convene as constituted because at 1:45 this date,

10  the clerk through the duly sworn bailiff received a note from

11  the Court that reads succinctly:  "We, the jury, have a

12  verdict."

13         Unless there is good cause shown, then the Clerk of

14  Court should again return the jury to the jury box to receive

15  and publish the verdict.

16         I discern no objection.

17         Madam Clerk, please retrieve our jury perhaps one last

18  time.

19         (Jury in at 2:05 p.m.)

20         *THE COURT:*  Madam Clerk, if you'll approach the side

21  of the bench.

22         Ladies and gentlemen, again, please be seated.

23         Ladies and gentlemen of the jury, good afternoon.

24         *JURY:*  Good afternoon.

25         *THE COURT:*  Pursuant to your note, your bailiff --

1   strike that, your foreperson has informed the bailiff, who in

2   return has informed the Court, that you have achieved and

3   reached a unanimous verdict in the trial of this case.

4            I would ask that your foreperson stand and be

5   identified.

6            Mr. Martin, are you the foreperson of this jury?

7            *JUROR MARTIN:*  Yes.

8            *THE COURT:*  To your knowledge, has this jury indeed

9   achieved and reached a unanimous verdict?

10           *JUROR MARTIN:*  Yes.

11           *THE COURT:*  Have you completed the verdict form

12  pursuant to that verdict, and have you and all other jurors

13  signed it?

14           *JUROR MARTIN:*  Yes.

15           *THE COURT:*  Very well.  I respectfully request that

16  you tender the original jury instructions and verdict form to

17  one of our bailiffs, please.

18           Thank you.  Again, you may be seated.

19           Thank you, Mr. Bailiff.

20           I respectfully request that the defendant, Mr. Birk,

21  and his counsel stand as the Court publishes the verdict of

22  this jury.

23           Under the caption of this case, verdict form.  "We,

24  the jury, on our oaths, unanimously find the defendant,

25  Lawrence Martin Birk, on the crime of attempt to evade or

1    defeat tax, in violation of 26 U.S.C. Section 7201, as charged

2    in Count 1 of the Indictment, the essential elements of which

3    are set forth in Instruction No. 7, guilty."

4             Dated this 25th day of July, 2019, ostensibly signed

5    by the foreperson and all other members of the jury.

6             Mr. Birk and your counsel, you may be seated.  Thank

7    you.

8             I will now poll the jurors individually to verify and

9    confirm the validity and unanimity of their verdict.

10            Is this your verdict, Ms. Archunde?  Am I pronouncing

11   your surname correctly?

12            *JUROR ARCHUNDE:*  Yes.

13            *THE COURT:*  Is this your verdict, Mr. Martin?

14            *JUROR MARTIN:*  Yes.

15            *THE COURT:*  Your verdict, Ms. Gibson?

16            *JUROR GIBSON:*  Yes.

17            *THE COURT:*  Your verdict, Ms. Hulse?

18            *JUROR HULSE:*  Yes.

19            *THE COURT:*  Your verdict, Mr. McCrea?

20            *JUROR McCREA:*  Yes.

21            *THE COURT:*  Your verdict, Mr. Pollock?

22            *JUROR POLLOCK:*  Yes.

23            *THE COURT:*  Your verdict, Mr. Egger?

24            *JUROR EGGER:*  Yes.

25            *THE COURT:*  Your verdict, Mr. Velasco?

1          *JUROR VELASCO:*  Yes.

2          *THE COURT:*  Your verdict, Ms. Lorenz?

3          *JUROR LORENZ:*  Yes.

4          *THE COURT:*  Your verdict, Mr. Floyd?

5          *JUROR FLOYD:*  Yes.

6          *THE COURT:*  And your verdict, Mr. Kolby?

7          *JUROR KOLBY:*  Yes, Your Honor.

8          *THE COURT:*  And your verdict -- with the most

9    difficult surname to pronounce of all -- Mr. Wojnar?

10          *JUROR WOJNAR:*  Yes.

11          *THE COURT:*  Very well.

12          Ladies and gentlemen, you have now completed your

13    duties in the trial of this case and momentarily will be

14    discharged with my thanks.

15          The question may arise, can you and may you discuss

16    this case, the trial, the evidence, the process, your service,

17    your deliberations, and any other related matter?  For your

18    guidance, I instruct you as follows:

19          Under the local criminal rules of this United States

20    District Court, neither the parties, their representatives, nor

21    their attorneys may approach you to engage in a discussion or

22    conversation about any of those matters.  However,

23    metaphorically, this is a two-sided coin.  On the other side,

24    for your part, you may say as much or as little about any

25    aspect of this trial or your service as you choose and with

1    whomever you choose.  However, if any person persists in

2    discussing this case over your objection or if anyone becomes

3    critical of your service as a juror in this trial, please

4    report that directly to me, and I will follow up appropriately.

5          Now, once you've surrendered those all-important jury

6    badges and lanyards in your jury deliberation suite, you are

7    now formally discharged with the thanks of this court.

8          Good luck and Godspeed to each and all of you.

9          All rise pending the exit of these jurors.

10         (Jury out at 2:11 p.m.)

11         *THE COURT:*  Thank you.  And, again, please be seated.

12         We'll be at ease at least for a reasonable time,

13    pending the return of Ms. Roberson to the courtroom.

14         Right on cue, Ms. Roberson.  Thank you.

15         Concerning our two alternate jurors, it is ordered as

16    follows:  That our alternate jurors, Theresa Lopez and David

17    Trujillo, are now formally discharged from further duty and

18    service as alternate jurors in the trial of this case and that

19    the courtroom deputy clerk is authorized and directed to

20    communicate their discharge as soon as practicable.  Hopefully,

21    conveying the heartfelt thanks of the Court for their service.

22         Very well.  Because the verdict is guilty, then the

23    probation department, as required by 18 U.S.C. Section 3552 and

24    Federal Rules of Criminal Procedure 32(c)and (d), shall conduct

25    a presentence investigation and shall file a presentence

1    report.  That normally takes not less than twelve weeks to

2    accomplish.  We're looking at a sentencing hearing, then, in

3    late October.

4            If you'll access your calendars in whatever form you

5    have them, I propose to set this matter now for a sentencing

6    hearing.  I propose Wednesday, October 30, 2019, at 1:30 p.m.

7            October 30, 1:30 p.m.

8            The Government?

9            *MR. MAGNANI:*  That's fine with the Government, Your

10   Honor.

11           *THE COURT:*  The defense, including Mr. Birk?

12           *MR. HARRIS:*  Yes.  That's fine.

13           *THE DEFENDANT:*  Yes, Your Honor.

14           *THE COURT:*  Thank you.

15           Very well.  As agreed by all, this case is continued

16   for sentencing until October 30, 2019, commencing at 1:30 p.m.,

17   at which time Mr. Birk shall again appear before this court in

18   this case without further notice or order from the court.

19           Mr. Birk, do you understand that?

20           *THE DEFENDANT:*  Yes, Your Honor.  I do.

21           *THE COURT:*  Counsel, would you confer to address the

22   issue of remand or bond.

23           *MR. MAGNANI:*  Yes, Your Honor.

24           Of course, as the Court knows under the rules and

25   under statutes at this point, the burden shifts to the defense

1    to prove that Mr. Birk is not a flight risk nor a danger by

2    clear and convincing evidence.  The United States' record on

3    this case is that Mr. Birk was ordered to appear by summons; he

4    didn't appear; it was over a month of him not appearing before

5    he was arrested to show up in this case.  And just in addition

6    to that -- of course, the Government concedes, he's always been

7    here -- the landscape changes after a verdict, and that's why

8    the standard changes, as well.

9         Of particular note, I would ask that the Court -- and

10   I believe I have the law right on this -- should make

11   particularized findings regarding conditions should he be

12   released.  And particularly of concern to the Government is

13   just that it's the Government's belief, based on looking at the

14   bank records, that Mr. Birk belongs to gun organizations and

15   that he owns some guns, including some very expensive ones.

16   Which during the course of our investigation, we did speak --

17   Special Agent Warnock spoke to one person who Mr. Birk gave a

18   $10,000 deposit to borrow some of his expensive weapons.  And

19   so at the very least, Your Honor, although the judgment and

20   conviction is not final, although there is no statute

21   proscribing the possession of those guns, at the very least we

22   think it would be prudent for the Court to order, if he's

23   released, as a condition that those firearms be surrendered and

24   that proper arrangements be made before Mr. Birk returns.

25        *THE COURT:*  Surrendered, then, to whom?

615

1          MR. MAGNANI:  Your Honor, my technical knowledge of

2     the logistics of how that works, to be quite frank, is -- I'm

3     at a loss here.  I defer to the Court or pretrial services or

4     whomever.

5          THE COURT:  Okay.  Thank you.

6          Response, Mr. Harris.

7          MR. HARRIS:  Putting aside any initial questions as to

8     his not being here initially on summons, he's always been here

9     since the case has commenced at the district court level.  He's

10     always been readily accessible to counsel.  Clearly, he's not

11     going anywhere.  He has a wife who has dementia; he's the sole

12     caretaker of her; he poses neither a serious risk of flight nor

13     a danger to anyone in the community.

14          I'm a little surprised that the Government in a fairly

15     routine tax evasion case has taken the position they have;

16     nonetheless, that's their position.  I see no reason whatsoever

17     to remand him; no reason whatsoever to not permit him to remain

18     at liberty.  As to the guns, it's clearly up to the Court.  I

19     don't take a position on that.

20          THE COURT:  Thank you.

21          Well, naive little me was anticipating a stipulation

22     that it continue bond as now supervised.  Having presided over

23     this case since virtually its inception, I find that the

24     defendant has established by a preponderance of the evidence

25     that he is not a flight risk and by clear and convincing

1    evidence that he's not a danger to any person or the community.

2    Thus, warranting his continued release on bond, subject to the

3    existing conditions of supervision and including the following

4    special condition:

5         That by close of business, Mr. Birk shall inventory

6    and identify with specificity make, model, caliber, or gauge of

7    any firearm which he owns and which is in his possession; that

8    this list shall be filed in this case; and that within 24 hours

9    he shall surrender those firearms to the United States Marshal

10   for the District of Colorado or his designee, which in turn may

11   be a federal or state law enforcement official, for

12   safekeeping, providing Mr. Birk with a receipt describing any

13   firearm seized as a special condition of supervision.

14        Mr. Birk, do you understand that special condition?

15        *THE DEFENDANT:*  I do, Your Honor.

16        *THE COURT:*  Very well.

17        Now, let me take this opportunity to publicly commend

18   those of my staff who, once again, have so ably assisted me in

19   the trial of this case.  I don't have to look far.  I look

20   across the room at Ms. Roberson.  Two trials in two weeks, good

21   work.  A special thanks to you.

22        *COURTROOM DEPUTY:*  You're welcome, Your Honor.

23        *THE COURT:*  I have a borrowed court reporter, but I

24   really got a good one, Ms. Terri Lindblom.  Thank you.

25        My judicial assistant, Kathleen Finney, thank you.

1   And to my law clerk, career clerk, assigned to the trial of

2   this case, Mrs. Hazel Porter, a special thanks to you.

3            Thus, I inquire, is there further business to come

4   before the court at this time?

5            By the Government?

6            *MR. MAGNANI:*  No, Your Honor.

7            *THE COURT:*  Or by the defense?

8            *MR. HARRIS:*  No, Your Honor.

9            *THE COURT:*  Very well.  Then please close the record.

10  The court is adjourned and in recess.

11           Madam Clerk.

12           (Recess at 2:23 p.m.)

13                        **I N D E X**

14  ITEM                                              PAGE

15  Rule 29 Motion                                     537
    Jury Instruction Conference                        539
16  Closing Argument By Mr. Magnani                    559
    Closing Argument By Mr. Harris                     583
17  Rebuttal Argument By Ms. Hadden                    601

18                  REPORTER'S CERTIFICATE

19           I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.

20

21           Dated at Denver, Colorado, this 24th day of December,
    2019.

22

23                        *Therese Lindblom*

24  _____
                    Therese Lindblom,CSR,RMR,CRR

25